```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU          :      PART 33
 2   --------------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK,
                                        Indictment No.
 4              -against-                167N-2005

 5

 6   MARK ORLANDO and HERVE JEANNOT,

 7                             Defendants.
     --------------------------------------------X
                               Mineola, New York
 8                             April 18, 2005

 9

10   B E F O R E:     HONORABLE ALAN L. HONOROF
                      Acting Supreme Court Justice
11

12   A P P E A R A N C E S:

13
                HON. DENIS DILLON
14              District Attorney of Nassau County
                BY:  ROBERT T. HAYDEN, ESQ.
15              Assistant District Attorney for the People

16
                DENNIS LEMKE, ESQ.
17                   Attorney for Defendant Orlando
                     114 Old Country Road
18                   Mineola, NY  11501

19
                DANIEL HOCHHEISER, ESQ.
20                   Attorney for Defendant Jeannot
                     270 Madison Avenue
21                   New York, NY  10016

22

23              M I N U T E S   O F   H E A R I N G

24
                                   Edward Dong
25                                 Official Court Reporter
```

Proceedings

2

1    THE CLERK:  Indictment 167N-05, the People

2    against Mark Orlando and Herve Jeannot.  Appearances

3    for the record, please.

4        MR. HAYDEN:  Robert T. Hayden for the People,

5    your Honor.

6        MR. LEMKE:  For Mr. Orlando, Dennis Lemke,

7    appearing for Barry Philips, 114 Old Country Road,

8    Mineola.  Good afternoon, your Honor.

9        MR. HOCHHEISER:  For Mr. Jeannot, Hochheiser

10   & Hochheiser by Daniel Hochheiser.  Good afternoon,

11   your Honor.

12       THE COURT:  Good afternoon.

13       THE CLERK:  This case is on for hearing.

14   People ready?

15       MR. HAYDEN:  Ready, your Honor.

16       THE CLERK:  Defendants ready?

17       MR. LEMKE:  Defendant ready, your Honor.

18       MR. HOCHHEISER:  Defendant's ready.

19       THE CLERK:  Both sides ready.

20       THE COURT:  In that case, Mr. Hayden, would

21   you spell out what we're doing and talk about the

22   Rosario?

23       MR. HAYDEN:  Yes, your Honor.  This is a

24   probable cause hearing for both Mr. Jeannot and Mr.

25   Orlando.  It's a Huntley hearing for both Mr. Jeannot

1   and Orlando because of numerous statements made by

2   each, and there's also a Mapp issue with relation to

3   Mr. Orlando, a consent search, allegedly a consent made

4   by Mr. Orlando.  That's basically it, Judge.

5           THE COURT:  I understood there was something

6   with the search warrant.

7           MR. HAYDEN:  Yes.  Judge Donnino has had

8   search warrants for several months.  He was supposed to

9   rule on the sufficiency of those search warrants but

10  we've heard nothing yet.

11          THE COURT:  Are we going to take that part of

12  it also?  We may take that part also.  We may take a

13  look at the search warrant here.

14          MR. HAYDEN:  Yes, your Honor.

15          THE COURT:  Rosario is exchanged.  Gentlemen,

16  you acknowledge receipt?

17          MR. LEMKE:  Yes, your Honor, acknowledge

18  receipt of the Rosario list as well, items one through

19  75, your Honor, dated today.  Acknowledge receipt.

20          MR. HOCHHEISER:  Yes, Judge.

21          THE COURT:  You have a copy for me?

22          MR. HAYDEN:  I do, Judge.  I would ask that

23  the record reflect that I've given to both counsel a

24  tape from frequency seven involving Bureau of Special

25  Operations officers.  That's not marked as a Rosario

1   item but it was given to both counsel.  Also, there's

2   an item 76 in both packets which is not listed on the

3   Rosario list.  It's five pages of paperwork generated

4   by Detective Manny Nash of the Robbery Squad.  It

5   involves a videotape recovered at the scene from a

6   storage facility and information about a Suzuki Verona

7   automobile registered to Mr. Orlando's wife.

8              MR. LEMKE:  Acknowledge receipt of that, your

9   Honor.

10             MR. HOCHHEISER:  Acknowledge receipt, your

11  Honor.  With respect to the tape, Mr. Hayden said that,

12  since we haven't had a chance to listen to it and

13  review it, that if there are any issues that arise

14  after we listen to it, that we can make our application

15  to recall a witness if necessary.

16             THE COURT:  That will apply to literally

17  every facet of the hearing.  You'll never have a

18  problem with me on that.

19             MR. HOCHHEISER:  Thank you, Judge.

20             THE COURT:  Okay, call your first witness,

21  please.

22             MR. HAYDEN:  Police Officer Phil Brady.

23  P. O.   P H I L I P   B R A D Y, a witness called on behalf of

24  the People, after having been first duly sworn by the Clerk of

25  the Court and stating his command as the Nassau County Police

P.O. Brady/People/Direct

1   Department Bureau of Special Operations and his shield as

2   1567, was examined and testified upon his oath as follows:

3                  MR. HAYDEN:  May I proceed, your Honor?

4                  THE COURT:  Please.

5   DIRECT EXAMINATION

6   BY MR. HAYDEN:

7        Q.   Good afternoon, Officer.

8        A.   Good afternoon.

9        Q.   How long have you been a member of the Nassau County

10  Police Department?

11       A.   Approximately 11 years.

12       Q.   How long have you been a member of the Bureau of

13  Special Operations?

14       A.   Approximately seven years.

15       Q.   Briefly describe your duties with the Bureau of

16  Special Operations.

17       A.   We're the tactical team for Nassau County and we

18  also do plainclothes, perform plainclothes duties.

19       Q.   Do you know a man named Herve Jeannot?

20       A.   Yes.

21       Q.   Briefly describe Herve Jeannot.

22       A.   Male black, approximately five-foot-ten, 165 pounds.

23       Q.   Do you see Herve Jeannot in this courtroom today?

24       A.   Yes.

25       Q.   Would you please point him out and describe for the

1   record what he's wearing today?

2       A.   Wearing a brown shirt, looks like maybe pink

3   stripes.

4       Q.   Where is he located?

5       A.   He's located behind one of the defense attorneys

6   next to the wall.

7              MR. HAYDEN:  Let the record reflect, your

8       Honor, that the witness has indicated the defendant,

9       Herve Jeannot?

10             THE COURT:  The record will so reflect.

11      Q.   I'm directing your attention to around 9:15 on the

12  night of Thursday, December 9 of 2004.  Were you working then?

13      A.   Yes.

14      Q.   How were you dressed then?

15      A.   I was dressed in plainclothes.

16      Q.   Were you working with other Bureau of Special

17  Operations officers?

18      A.   Yes, Officer Tim Marinace and Officer Joseph Hughes.

19      Q.   How were they dressed?

20      A.   Plainclothes.

21      Q.   Were you and the other officers using a motor

22  vehicle?

23      A.   Yes.

24      Q.   Describe it for the Court.

25      A.   It's a turquoise colored Ford Winstar.

1     Q.   Did you and the other officers arrest Herve Jeannot

2   at around 9:15 that Thursday night?

3     A.   Yes.

4     Q.   Describe the circumstances under which you and the

5   other officers arrested Herve Jeannot.

6     A.   Before going out, we were -- had a briefing with

7   homicide detectives and my lieutenant, Mulrain.  We were

8   informed that the subject was involved in a homicide.  We were

9   also informed that a gun was used in this homicide and that he

10  also had a warrant.

11    Q.   Were you given a photograph of Herve Jeannot?

12    A.   Yes.

13    Q.   Had you made observations of that photograph before

14  you arrested Herve Jeannot?

15    A.   Yes.

16    Q.   Where did that briefing take place?

17    A.   It was at police headquarters in the -- one of the

18  auditoriums.

19    Q.   Where was Herve Jeannot when you and the other

20  officers arrested him then?

21    A.   He was standing in front of Professional Credit

22  Services underneath -- in a walkway with an awning above it

23  leading to the front door of the building.

24    Q.   Where is Professional Credit Services?

25    A.   It's in Farmingdale.

P.O. Brady/People/Direct                                    8

1    Q.    Where is it in relation to Route 110?

2    A.    It's approximately one block west of 110.

3    Q.    What was Herve Jeannot doing when you and the other

4  officers approached him?

5    A.    He was leaning against a wall with his back to the

6  wall of the walkway reading a magazine.

7    Q.    Were your police shields displayed as you and the

8  other officers approached Herve Jeannot?

9    A.    Yes.

10   Q.    Describe for the Court how they were displayed.

11   A.    As I have it on now on the same chain on my

12 outermost garment of my clothing.

13   Q.    Where was your police van as you and the other

14 officers approached Herve Jeannot?

15   A.    We were parked right in front of the building.

16   Q.    About how far from Herve Jeannot?

17   A.    Approximately 25 feet.

18   Q.    Describe any conversation when you and the other

19 officers reached Herve Jeannot.

20   A.    We just identified ourselves as police officers and

21 advised him that he was under arrest.

22   Q.    What happened then?

23   A.    One cuff was placed on his hand.  At this time,

24 subject Jeannot went down to the ground, just falling down

25 limply to the ground.  Other hand was grabbed and he was

P.O. Brady/People/Direct

1    handcuffed.  We then had to lift him up off of the ground,

2    Officer Marinace and Hughes grabbing one arm, putting an arm

3    under his arm, basically dragging him with his feet dragging

4    to the vehicle.  He wasn't walking on his own.

5        Q.   What happened when you reached the van?

6        A.   At that time I opened the door.  We had to lift Mr.

7    Jeannot up into the vehicle and sit him down.

8        Q.   Where did you seat him?

9        A.   In the back seat of the van, second seat of the van.

10       Q.   What happened then?

11       A.   We went on our way.  We drove approximately four to

12   five blocks, and we transferred him into another vehicle with

13   Homicide, to Homicide's vehicle.

14       Q.   Describe that vehicle.

15       A.   It was a green Lumina, Chevy Lumina.

16       Q.   Did you turn him over to the custody of homicide

17   detectives?

18       A.   Yes.

19       Q.   Who were they?

20       A.   Detective Brosnan and Detective Nigro.

21            MR. HOCHHEISER:  I'm sorry, the last name?

22            THE WITNESS:  Nigro.

23       Q.   Where was Herve Jeannot placed in the Homicide

24   vehicle?

25       A.   Into the rear seat of that vehicle.

1    Q.    Where were the homicide detectives as Herve Jeannot

2    was being placed in the back of that unmarked car?

3    A.    Detective Brosnan was the driver of the vehicle.

4    Detective Nigro got out and opened the back door so I could

5    place him in.

6    Q.    And you did that?

7    A.    Yes.

8    Q.    Did you have any further contact with Herve Jeannot

9    after you turned him over to the homicide detectives?

10    A.    No.

11    Q.    Did you recognize Herve Jeannot when you arrested

12    him from that photograph you had?

13    A.    Yes.

14    Q.    Did you ever come in contact that night with a man

15    named Mark Orlando?

16    A.    No.

17    Q.    Was there any conversation involving Herve Jeannot

18    from the time he was in handcuffs until the time he was in the

19    custody of the homicide detectives?

20    A.    No.

21                MR. HAYDEN:  Nothing further at this time, your

22    Honor.

23                THE COURT:  Okay, Mr. Hochheiser, before you

24    begin your cross, I need about 30 seconds.

25                MR. HOCHHEISER:  Thank you.

1                    (Pause in the proceedings.)

2                    THE COURT:  Sorry.  Mr. Hochheiser, please

3       continue.

4                    MR. HOCHHEISER:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. HOCHHEISER:

7         Q.   Good afternoon, Officer.

8         A.   Good afternoon.

9         Q.   You testified on direct that on December 9, 2004,

10   that you participated in a briefing with homicide detectives;

11   is that correct?

12        A.   Yes.

13        Q.   And who was in charge of that meeting?

14        A.   Lieutenant Farrell.

15        Q.   And how many police were present at that meeting?

16        A.   I don't recall how many.

17        Q.   Who was there?

18        A.   Approximately, I believe it was 10 police officers.

19        Q.   Who were they, if you remember?

20        A.   I don't remember all their names.

21        Q.   Do you remember any of their names?

22        A.   The people who were assigned to me, Officer Hughes

23   and Officer Marinace.

24        Q.   There was a sergeant there as well or no?

25        A.   My lieutenant was there.

1    Q.   And who spoke at this meeting?

2    A.   Lieutenant Farrell.

3    Q.   And what -- how do you say it, Farrell?

4    A.   Yes.

5    Q.   What did Lieutenant Farrell tell you at that

6  meeting?

7    A.   That there was a homicide and that subjects were

8  involved.

9    Q.   Did he say who they were?

10    A.   I was told Jeannot was involved.

11    Q.   And what did he tell you about the connection

12  between Jeannot and the homicide, if anything?

13    A.   I don't recall.

14    Q.   Well, do you recall anything that was said at that

15  meeting about Mr. Jeannot's connection to the homicide?

16    A.   Just that there was a gun involved with the homicide

17  and that's really about it.  Just be careful.   .

18    Q.   And were you told anything by the lieutenant about

19  the relationship between Mr. Jeannot and Mr. Orlando?

20    A.   They were friends.

21    Q.   And what did the lieutenant tell you that your goal

22  was that evening?

23    A.   To safely apprehend Mr. Jeannot.

24    Q.   And did he tell you exactly how to go about that?

25    A.   I don't understand your question.

1        Q.    Did he tell you where this suspect could be located,

2   Mr. Jeannot?

3        A.    Oh, yes.

4        Q.    And what did he tell you?

5        A.    We got a location where he works.  We had a picture

6   of the individual, and we were setting up and waiting for him.

7        Q.    And where did you get that info?

8        A.    That was given to us at the narcotics meeting -- I'm

9   sorry, at the homicide meeting.

10       Q.    By?

11       A.    I believe it was Lieutenant Farrell.

12       Q.    Was this a mug shot from a previous arrest?

13       A.    I believe so.

14       Q.    And you drove to the location with Officer Hughes

15   and Officer Marinace?

16       A.    Yes.

17       Q.    Was there anybody else in your vehicle with you?

18       A.    No.

19       Q.    When you got to the location, how long did you wait

20   before you -- how long were you at the location before you saw

21   Mr. Jeannot?

22       A.    Approximately an hour and a half.

23       Q.    You were basically waiting for him to come out of

24   work; is that correct?

25       A.    Yes.

1      Q.   And who was the first officer who spotted him, if

2   you know?

3      A.   We were advised over the radio.  I don't remember

4   who the first one was.

5      Q.   So there was another team besides you, Marinace and

6   Hughes, correct?

7      A.   Yes.

8      Q.   And you got a call over the radio that the suspect

9   was in front of the building?

10     A.   Yes.

11     Q.   Were you given a description?

12     A.   Yes.

13     Q.   What was said?

14     A.   I don't recall the total description.

15     Q.   Do you recall any part of it?

16     A.   No.  I had a picture of the subject.

17     Q.   And what did you do after you got that transmission?

18     A.   We then went up to the front of the building, parked

19  the vehicle right in front and walked up and approached Mr.

20  Jeannot.

21     Q.   At that time you had your guns drawn?

22     A.   I did not.

23     Q.   Did anybody?  Did any police officers have their

24  guns drawn?

25     A.   I don't know.

P.O. Brady/People/Cross-Hochheiser                    15

1      Q.   You didn't see anybody with guns drawn?

2      A.   No.

3      Q.   What did you say as you approached Mr. Jeannot?

4      A.   We advised him that we're police and that he's under

5   arrest.

6      Q.   And what were the lighting conditions like at that

7   time?

8      A.   We were under a walkway which was very well lit.

9      Q.   But it was dark out?  It was nighttime?

10     A.   It was nighttime, yes.

11     Q.   And you say your shield was visible?

12     A.   Yes.

13     Q.   Who was the person who actually first grabbed Mr.

14   Jeannot?

15     A.   I believe it was Officer Marinace.

16     Q.   And he's the one who put him on the ground?

17     A.   He didn't put him on the ground.  He fell to the

18   ground.  The subject fell to the ground.

19     Q.   Before he was handcuffed?

20     A.   One handcuff was on him.

21     Q.   And then who put the other part of the handcuff on?

22     A.   I believe it was Officer Hughes.

23     Q.   And then the three of you lifted up Mr. Jeannot and

24   put him in the van?

25     A.   No, the two of them lifted up Mr. Jeannot and put

1    him in the van.

2         Q.    And did he say anything at that point to you?

3         A.    No.

4         Q.    Did you tell him why he was under arrest?

5         A.    I was walking ahead of him.  I opened the van door.

6         Q.    Did you hear Officer Hughes or Officer Marinace tell

7    Mr. Jeannot why he was under arrest?

8         A.    No.

9         Q.    When was the first time that Mr. Jeannot was told

10   that, why he was under arrest?

11        A.    I don't know.

12        Q.    Were there any other detectives or police with

13   Detectives Brosnan and Nigro when you gave custody of Mr.

14   Jeannot to them?

15        A.    I don't believe so.

16        Q.    And that's the last you know of this case basically?

17        A.    Yes.

18             MR. HOCHHEISER:  Thank you.  I have nothing

19        further, Judge.

20             THE COURT:  Mr. Hayden.

21             MR. HAYDEN:  Just briefly, your Honor.

22             MR. LEMKE:  I'm sorry, your Honor, I just

23        have a couple of questions.

24             THE COURT:  Okay.

25             MR. LEMKE:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. LEMKE:

3         Q.    Good afternoon, Officer Brady.

4         A.    Good afternoon.

5         Q.    As you know, my name is Dennis Lemke and I represent

6    Mr. Orlando.  On December 9, when you met at Homicide, was it

7    at the Homicide Squad or police headquarters?

8         A.    It was Homicide Squad.

9         Q.    And the purpose of that was for a debriefing,

10   correct?

11        A.    Yes.

12        Q.    In the investigation in the death of Mr. Calabrese

13   there's a carrying detective that was assigned that case;

14   isn't that correct?

15        A.    Yes.

16        Q.    And the carrying detective in this case, is it

17   Detective McHugh?

18        A.    Yes.

19        Q.    Do you recall if Detective McHugh was at that

20   debriefing on December 9?

21        A.    I don't recall.

22        Q.    During this meeting that you had, the debriefing, I

23   take it you didn't take any notes?

24        A.    No.

25        Q.    And when you left after that debriefing, the only

1    thing that you left with was a photograph of Mr. Jeannot?

2         A.    Yes.

3         Q.    But during that debriefing the name Mark Orlando was

4    certainly mentioned, correct?

5         A.    Yes.

6         Q.    And during that meeting, if you recall, there were

7    others that were assigned to go out at the same time you were

8    assigned to go out to pick up Mr. Jeannot to pick up Mr.

9    Orlando, correct?

10        A.    Yes.

11        Q.    If you know, there was a photograph that was also

12   shown to you regarding Mr. Orlando?

13        A.    I don't recall a photograph.  I wasn't involved with

14   Mr. Orlando.

15        Q.    But you had everybody that was there.  These perhaps

16   10 officers that you can recall, they were going to be split

17   up, those who are going to go pick up Mr. Orlando and some of

18   you were going to pick up Mr. Jeannot, correct?

19        A.    Yes.

20        Q.    And the plan was that they were going to be picked

21   up simultaneously, meaning at the same time, but when they

22   were separated, correct?

23        A.    Safely, yes.

24        Q.    Apart from each other, correct?

25        A.    Yes.

1      Q.   So when you arrived at the Professional Credit

2  Services, you were aware that Mr. Orlando worked there also,

3  didn't you?

4      A.   Yes.

5      Q.   And while you were observing, you had wire or

6  transmission contact with that other team, correct?

7      A.   Yes.

8      Q.   In fact, you were both parked probably within close

9  proximity of each other watching the front of Professional

10  Credit Services, correct?

11      A.   I was not watching the front.

12      Q.   The back?

13      A.   No, I was parked on the side.

14      Q.   Were you able to see Professional Credit Services?

15      A.   I could see the building.

16      Q.   And there was a point in time where you were aware

17  when Mr. Orlando left the premises?

18      A.   Yes.

19      Q.   And you were advised once Mr. Orlando left?  Did you

20  see how Mr. Orlando left?

21      A.   No, I didn't.

22      Q.   But you were advised he's no longer nearby, that

23  it's okay to arrest Mr. Jeannot once he comes out, correct?

24      A.   As long as it was safe, yes.

25      Q.   As long as it was safe.  When Mr. Orlando had left,

1   I don't believe you had anything further to do with Mr.

2   Orlando at all, correct?

3       A.   Not at all.

4       Q.   Whether that was then or back at the precinct,

5   correct?

6       A.   Correct.

7       Q.   Then during the -- one or two more questions.

8   During the debriefing, what else was said that you can recall

9   other than going out to safely arrest these two individuals

10  when they're separate, that one of them may have a weapon or a

11  gun; is that correct?

12      A.   Yes.

13      Q.   That they're wanted for questioning in the death of

14  Mr. Calabrese, do you recall if that was said?

15      A.   I don't recall the wording, the exact wording.

16      Q.   And prior to December 9, had you been in any way

17  involved with the investigation of the death of Mr. Calabrese?

18      A.   No.

19              MR. LEMKE:   I have nothing further, your Honor.

20              THE COURT:   Mr. Hayden?

21  REDIRECT EXAMINATION

22  BY MR. HAYDEN:

23      Q.   Officer, please describe for the Court what you

24  meant when you said that Mr. Jeannot fell to the ground.

25      A.   He just wasn't fighting us.  He just went limp down

1    to the ground not putting up a fight.  Officer Marinace had

2    one hand and subject Jeannot went down to the ground.  That

3    was it.

4              MR. HAYDEN:  Nothing further, Judge.

5              THE COURT:  Gentlemen?

6              MR. HOCHHEISER:  Nothing further, Judge.

7              MR. LEMKE:  Nothing further, your Honor.

8         Thank you.

9              THE COURT:  Thank you.  You're excused,

10        Officer.

11             (Whereupon, the witness was excused.)

12             THE COURT:  Mr. Hayden.

13             MR. HAYDEN:  Police Officer Steven Loschiavo.

14   P. O.   S T E V E N   L O S C H I A V O, a witness called on

15   behalf of the People, after having been first duly sworn by

16   the Clerk of the Court and stating his command as the Nassau

17   County Police Department Bureau of Special Operations and his

18   shield as 1566, was examined and testified upon his oath as

19   follows:

20             MR. HAYDEN:  May I proceed, Judge?

21   DIRECT EXAMINATION

22   BY MR. HAYDEN:

23        Q.   Good afternoon, Officer.

24        A.   Good afternoon.

25        Q.   How long have you been a member of the Nassau County

1   Police Department?

2        A.   It'll be 20 years next month.

3        Q.   How long have you been a member of the Bureau of

4   Special Operations?

5        A.   Eleven years.

6        Q.   Briefly describe your duties with the Bureau of

7   Special Operations.

8        A.   We're the tactical team for Nassau County.  We

9   respond to any type of hostage situations.  We also are the

10  plainclothes anticrime patrol for Nassau County.

11       Q.   Do you know a man named Mark Orlando?

12       A.   Yes.

13       Q.   Briefly describe Mark Orlando.

14       A.   He's a male white, brown hair, dark eyes, heavyset,

15  approximately 5-11, 6-1.

16       Q.   Do you see Mark Orlando in this courtroom today?

17       A.   Yes, I do.

18       Q.   Please point him out for the Court and describe for

19  the record what he's wearing today.

20       A.   He's sitting right in front of you.  He has on a

21  black sweatshirt with a blue collared shirt underneath and, I

22  believe, black sweatpants and white sneakers.

23            MR. LEMKE:  So stipulated, your Honor.

24            THE COURT:  On the stipulation, the record

25       will reflect identification.

1       Q.   I'm directing your attention to around 9:10 on the

2   night of Thursday, December 9 of 2004.  Were you working then?

3       A.   Yes.

4       Q.   Were you working with another BSO officer then?

5       A.   Yes, I was.

6       Q.   Who was that?

7       A.   Officer Kevin McCarthy.

8       Q.   How was he dressed?

9       A.   In plainclothes.

10      Q.   Were you and Officer McCarthy using a motor vehicle?

11      A.   Yes, we were.

12      Q.   Describe it.

13      A.   It's a black four-door Grand Prix.

14      Q.   Did you and Officer McCarthy arrest Mark Orlando at

15  around 9:10 that Thursday night?

16      A.   Yes, we did.

17      Q.   What had you been told about Mark Orlando before you

18  and Officer McCarthy arrested him?

19      A.   We had a briefing with Homicide and my lieutenant,

20  and we were told that he was involved in a homicide in the

21  Fourth Precinct and he had a couple of arrest warrants.

22      Q.   Did you receive a photograph of Mark Orlando?

23      A.   Yes.

24      Q.   Where did the briefing take place?

25      A.   At police headquarters in the auditorium.

Case 2:11-cv-03992-ERK  Document 8-1  Filed 01/17/12  Page 24 of 55 PageID #: 147

1      Q.   Had you made observations of the photograph of Mark

2   Orlando before you went out to arrest him?

3      A.   Yes.

4      Q.   Where was Mark Orlando when you and Officer McCarthy

5   arrested him then?

6      A.   We were inside of a shopping center parking lot on

7   Route 110.  I believe it's Airport Plaza shopping center.

8      Q.   What was Mark Orlando doing when you and Officer

9   McCarthy arrested him that night?

10     A.   He was leaving his place of business and driving a

11  black Cougar.  When he pulled into that parking lot and

12  stopped at a stop sign is when we stopped him to arrest him.

13     Q.   Describe how the arrest took place.

14     A.   Mr. Orlando proceeded northbound on 110, turned into

15  the Airport Plaza shopping center parking lot.  We were behind

16  him at that time in the black Grand Prix, me and Officer

17  McCarthy.  As he came to a stop at a stop sign in that parking

18  lot, a marked Nassau County Police car came up from our left

19  side, pulled in front of Mr. Orlando's vehicle.  We had our

20  emergency lights on at the same time.  Me and Officer McCarthy

21  stepped out of our vehicle, walked up to Mr. Orlando's, opened

22  his driver's side door, identified myself and asked him to

23  step out of the vehicle.

24     Q.   Where was Officer McCarthy?

25     A.   He walked around Mr. Orlando's vehicle on the

1  passenger side to the front of Mr. Orlando's vehicle.

2      Q.   What happened when you asked Mr. Orlando to step out

3  of his vehicle?

4      A.   His head snapped around to turn to look at me, and

5  he muttered a couple of times, "Oh, shit.  Oh, shit."  I then

6  asked him to step out of the car.

7      Q.   Did he do that?

8      A.   Yes, with my assistance I got him out of the car,

9  and I put him onto the ground on his stomach.

10      Q.   What happened then?

11      A.   I handcuffed him with two sets of handcuffs because

12  he's a large individual.  Then I assisted him up off the

13  ground onto his feet.

14      Q.   Where your police shields displayed as you and

15  Officer McCarthy approached Mark Orlando?

16      A.   Yes, it was.

17      Q.   How were your police shields displayed?

18      A.   In a similar fashion it is right now, on a chain

19  hanging around my neck.

20              MR. HAYDEN:  Let the record reflect, your

21      Honor, that the witness has referred to his police

22      shield which is hanging approximately three-quarters of

23      a foot below his neck?

24              MR. LEMKE:  So stipulated, your Honor.

25              THE COURT:  All right, on stipulation, the

1    record will reflect that.

2        Q.   What did you do with Mark Orlando once you had

3    handcuffs on him?

4        A.   I assisted in getting him up to his feet, and at

5    that point I immediately turned him over to two detectives

6    from Homicide.

7        Q.   Who were they?

8        A.   Detective McHugh and Detective McGinn.

9        Q.   Where were they then?

10       A.   They were immediately behind me once I got Mr.

11   Orlando up off the ground.

12       Q.   What did the homicide detectives do with Mr.

13   Orlando?

14       A.   They placed him in their vehicle which was now right

15   next to mine and put him in the back seat.

16       Q.   Did you have any further contact with Mark Orlando

17   after you turned him over to the homicide detectives?

18       A.   No, none at all.

19       Q.   Did you ever come in contact with a man named Herve

20   Jeannot that night?

21       A.   No.

22       Q.   Did Mark Orlando say anything in your presence other

23   than, "Oh, shit"?

24       A.   No.

25                MR. HAYDEN:  Nothing further at this time, your

1    Honor.

2              THE COURT:   Mr. Lemke?

3              MR. LEMKE:   Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. LEMKE:

6        Q.    Good afternoon, Officer.

7        A.    Good afternoon.

8        Q.    Officer, on December 9 of last year, before going

9    out to arrest Mr. Orlando, there was a debriefing at, I guess,

10   headquarters?

11       A.    Yes.

12       Q.    Do you recall who was at that debriefing?

13       A.    There were homicide detectives, my squad of BSO was

14   working that night and my lieutenant, Lieutenant Mulrain.

15       Q.    Do you know the names of any of the others, either

16   those from BSO or those from Homicide?

17       A.    I know there was myself, Officer McCarthy, which I

18   mentioned, Officer Phil Brady, Joe Hughes, Timothy Marinace.

19   I would be guessing at the others.  I would have to look at

20   the roll call.

21       Q.    Basically Brady, Marinace, guys from BSO?

22       A.    Yes.

23       Q.    Guys within your unit, correct?

24       A.    Yes.

25       Q.    And did the meeting that you had on December 9, did

1    you take any notes regarding that debriefing at all?

2         A.   No, I didn't.

3         Q.   And when leaving that debriefing, you had a

4    photograph of Mr. Orlando, correct?

5         A.   Yes.

6         Q.   Do you recall what time that debriefing started on

7    December 9?

8         A.   I arrived at work at about 5:00 p.m., so I would say

9    shortly after.

10        Q.   What time did you then leave headquarters to go out

11   and arrest Mr. Orlando?

12        A.   Approximately 8 o'clock, maybe 7:30.

13        Q.   So other than arriving at 5 o'clock, maybe saying

14   hello, would it be safe to say this debriefing lasted maybe

15   two hours, two and a half hours?

16        A.   I don't think it was that long, no, because I report

17   to the Fifth Precinct where I work, where I report out of,

18   then I have to respond to headquarters.

19        Q.   And do you recall then what time you received or you

20   arrived at headquarters?

21        A.   Approximately 6:00.

22        Q.   So then maybe it was two hours from 6:00?

23        A.   It could have been.

24        Q.   During those two hours, there was a discussion

25   regarding the manner in which these two individuals, Mr.

1    Orlando and Mr. Jeannot, would be placed under arrest?

2         A.   I'm sorry, could you repeat that?

3         Q.   Sure.  During this debriefing, it was discussed that

4    two individuals would be placed under arrest, correct?

5         A.   Yes.

6         Q.   And it was also discussed who would be, say, team A

7    and team B as to who's going to arrest whom; is that correct?

8         A.   Yes.

9         Q.   As part of that discussion do you recall what else

10   was told to you regarding these individuals?

11        A.   It's very briefly told to us that they were involved

12   in a homicide in the Fourth Precinct.  We really weren't given

13   the details.

14        Q.   Other than the -- but you were given a photograph of

15   my client?

16        A.   Yes.

17        Q.   You did not know my client previous to December 9 of

18   '04?

19        A.   No, I didn't.

20        Q.   And you did not have any involvement with the

21   investigation of the death of Mr. Calabrese prior to December

22   9?

23        A.   Not at all.

24        Q.   And when you then leave, you don't have an arrest

25   warrant for Mr. Orlando, correct?

P.O. Loschiavo/People/Cross-Lemke                    30

1     A.   In my possession, no, I don't.

2     Q.   In fact, I don't believe there was an arrest

3  warrant, correct?

4     A.   I don't know.

5     Q.   But you certainly didn't have one?

6     A.   No.

7     Q.   You're directed to arrest Mr. Orlando for a

8  homicide?

9     A.   We were told he had two warrants and that he was

10  involved in a homicide.  That's what I was directed.

11     Q.   When you say the two warrants, are you going out to

12  pick up Mr. Orlando because he has outstanding warrants or

13  because he's wanted and he's going to be arrested for the

14  homicide?

15     A.   I'm going out because I was directed by my

16  lieutenant to arrest him and hand him over to Homicide.

17     Q.   And the reason that you arresting Mr. Orlando is

18  because?

19     A.   I was directed to by my lieutenant.

20     Q.   Without any reason?

21     A.   He had --

22           MR. HAYDEN:  Objection.

23           THE COURT:  Sustained.  It's really my

24  decision.

25     Q.   Well, you're saying he had two warrants.  What

1  were those warrants for?

2      A.   They were misdemeanor warrants for, I believe it was

3  aggravated unlicensed.

4      Q.   Do you know from what jurisdiction, what county?

5      A.   I really don't.  I'm assuming Nassau, but I don't

6  know for sure.

7      Q.   I don't want you to assume.  Do you know?

8      A.   No, I don't.

9      Q.   Did you see a physical copy of any warrant from any

10  jurisdiction?

11      A.   No.

12      Q.   So you're basically told to go out to arrest Mr.

13  Orlando because he has a warrant or warrants and also for a

14  homicide?

15      A.   When you say for a homicide, all I was told was he

16  was involved in a homicide.  So I don't know if he's -- that's

17  all I knew, yes, for the warrant and for his involvement in a

18  homicide, yes.

19      Q.   So you have his photograph.  You go out to a

20  location.  I guess it would be correct to say at Professional

21  Credit Services.  You were aware where he worked, correct?

22      A.   Yes.

23      Q.   You were aware the codefendant also worked there,

24  correct?

25      A.   Yes.

1    Q.   You got there maybe about 8 o'clock.  Would that be

2  correct?

3    A.   Yes.

4    Q.   You then waited until you saw either Mr. Orlando or

5  Mr. Jeannot leave that location; is that correct?

6    A.   Well, we weren't in contact with them leaving.  We

7  were advised they were leaving.

8    Q.   And then you -- when is the first time you see Mr.

9  Orlando?

10   A.   Well, I see his vehicle first, obviously, leaving

11 the parking lot of his place of business.  I come in contact

12 with him personally when I stop him in the parking -- shopping

13 center.

14   Q.   When you got there at about 8 o'clock, did you know

15 what type of vehicle Mr. Orlando was driving?

16   A.   Yes.

17   Q.   Who gave you that information?

18   A.   We had a van in the parking lot which had the car

19 under surveillance from Electronics.

20   Q.   When did that van get there, if you know?

21   A.   Prior to my arrival.

22   Q.   And so did you know prior to your arrival the type

23 of vehicle that Mr. Orlando was driving?

24   A.   Not for certain until I got there.

25   Q.   When you say not for certain, had that vehicle been

1    given to you as a possible car that Mr. Orlando drives?

2         A.   Yes.

3         Q.   So at the debriefing you had more than just a

4    photograph of Mr. Orlando.  You had a possible car he was

5    driving, correct?

6         A.   Well, yes.

7         Q.   You had a location where he worked, correct?

8         A.   Yes.

9         Q.   You had apparently at least a warrant or two that

10   was outstanding as the basis to pick him up, correct?

11        A.   Yes.

12        Q.   What else was told to you?

13        A.   Basically that was it.  That he would be leaving

14   around 9:00 p.m., and there was a plan to sort of make the

15   stop a safe one and that was basically it.

16        Q.   When you see the vehicle leaving the parking lot,

17   could you describe where that vehicle drove?

18        A.   Well, he was leaving the parking lot and he made a

19   left.  I believe it's Michael Street but I'm not a hundred

20   percent sure of that, which leads out to Route 110.

21        Q.   And he goes out on 110?

22        A.   He makes a left northbound on 110.

23        Q.   He goes northbound for a short period of time,

24   correct?

25        A.   Yes.  He heads, I believe, east.  He makes a right

```
 1    turn.  He makes a right turn into a shopping center, which is

 2    east actually, yes.

 3         Q.   From the time you first followed him driving out,

 4    you certainly didn't pull him over at that point, correct?

 5         A.   No.

 6         Q.   Was there any Vehicle and Traffic Law that Mr.

 7    Orlando was involved with in operating that vehicle?

 8         A.   No.

 9         Q.   He makes the right turn.  He goes into the parking

10    area.  Has he still violated the law in your presence?

11         A.   No.

12         Q.   Had you seen him get into that vehicle?

13         A.   No.

14         Q.   There was another officer in your car as well,

15    correct?

16         A.   Yes.

17         Q.   Had he seen this person get into that car?

18         A.   No.

19         Q.   You then pull that car over, correct?

20         A.   Yes.

21         Q.   So you pull the car over without knowing who's in

22    that vehicle, correct?

23         A.   No, we were told by Electronics who was in the

24    vehicle.  I didn't see him myself.

25         Q.   You pull the car over.  You go over and you then
```

P.O. Loschiavo/People/Cross-Lemke                    35

1    open up the door yourself?

2         A.   Yes.

3         Q.   And you ask him to get out?

4         A.   Yes.

5         Q.   Is that when you identify yourself as an officer?

6         A.   I opened the door.  I identified myself and asked

7    him to get out.

8         Q.   And he cooperates and gets out, doesn't he?

9         A.   He gets out, yes, slowly, but he gets out.

10        Q.   Then you ask him to lay down on the ground?

11        A.   It was sort of like one continuous motion.  It

12   wasn't like he was up on his feet and then got down on the

13   ground.

14        Q.   Did you tell him why he was being asked to get out

15   of the car?

16        A.   No.

17        Q.   Did you tell him he was under arrest?

18        A.   Yes, I believe I did.

19        Q.   What for?

20        A.   I didn't say why.

21        Q.   And it's at that point -- then at some point you put

22   handcuffs on him?

23        A.   Yes.

24        Q.   You have any conversation with him at that point?

25        A.   Not at all.

1          Q.   You help him to his feet.  You put him in your car.

2   Is that correct?

3          A.   No, it's not.  When he is on his feet, the two

4   homicide detectives just take him from me.

5          Q.   That's Detective McHugh?

6          A.   And McGinn.

7          Q.   And McGinn.  I guess he leaves with the other two

8   officers, correct?

9          A.   The other two detectives, yes.

10         Q.   Anything further that you have with him at all?

11         A.   No, sir.

12              MR. LEMKE:  Nothing further.  Thank you.

13              MR. HOCHHEISER:  Judge, may I briefly?

14              THE COURT:  Yes.

15   CROSS-EXAMINATION

16   BY MR. HOCHHEISER:

17         Q.   Good afternoon, Officer.

18         A.   Good afternoon.

19         Q.   At this debriefing from 6:00 to 8:00 p.m., did you

20   hear the name Herve Jeannot mentioned?

21         A.   Yes.

22         Q.   And what was said about Herve Jeannot at that

23   meeting?

24         A.   Basically the same type of information, that he was

25   involved in a homicide in the Fourth Precinct and I believe

1  also he had a couple of arrest warrants, maybe one, maybe two.

2  I'm not certain right now.  And I wasn't given much

3  information because I wasn't involved in his arrest.  I was

4  the other team obviously.

5      Q.   Well, at this debriefing, was this one big group

6  debriefing or were they split up into two groups?

7      A.   No, we were all in the same area.

8      Q.   And was there any discussion about the different

9  roles that the two different suspects may have played in this

10 alleged homicide?

11     A.   Not that I recall.  It was very basic information.

12     Q.   When you were at the Professional Credit Services

13 parking lot, did you make any observations of Herve Jeannot at

14 that time?

15     A.   Not at all.

16     Q.   You didn't see his arrest?

17     A.   No.

18          MR. HOCHHEISER:  I have nothing further.  Thank

19     you, your Honor.

20 REDIRECT EXAMINATION

21 BY MR. HAYDEN:

22     Q.   Did you recognize Mark Orlando that night from the

23 photograph you had?

24     A.   Yes.

25          MR. HAYDEN:  Nothing further, your Honor.

1    RECROSS-EXAMINATION

2    BY MR. LEMKE:

3        Q.    You recognized him after you pulled the car over and

4    opened up the door, correct?

5        A.    Yes.  I hadn't seen him before that.

6                    MR. HAYDEN:  Nothing further, your Honor.

7                    THE COURT:  Thank you, Officer.  You're

8        excused.

9                    THE WITNESS:  Thank you.

10                   (Whereupon, the witness was excused.)

11                   THE COURT:  Mr. Hayden.

12                   MR. HAYDEN:  Detective John McHugh.

13   D E T.   J O H N   M c H U G H, a witness called on behalf of

14   the People, after having been first duly sworn by the Clerk of

15   the Court and stating his command as the Nassau County Police

16   Department Homicide Squad, was examined and testified upon his

17   oath as follows:

18                   MR. HAYDEN:  May I proceed, your Honor?

19                   THE COURT:  Please.

20   DIRECT EXAMINATION

21   BY MR. HAYDEN:

22       Q.    Good afternoon, Detective.

23       A.    Good afternoon.

24       Q.    How long have you been a member of the Nassau County

25   Police Department?

```
 1        A.    30 years.

 2        Q.    How long have you been a detective?

 3        A.    18 years.

 4        Q.    How long have you been with Homicide?

 5        A.    It'll be eight years in June.

 6        Q.    Do you know a man named Mark Orlando?

 7        A.    Yes, I do.

 8        Q.    Please briefly describe him.

 9        A.    He's a male white, about 36 years of age, heavyset,

10   seated at the second row on the left.

11        Q.    What's he wearing?

12        A.    A black sweater with a blue shirt underneath it.

13              MR. LEMKE:  So stipulated, your Honor.

14              THE COURT:  The record will so reflect

15        identification.

16        Q.    Do you know a man named Herve Jeannot?

17        A.    Yes, I do.

18        Q.    Briefly describe Herve Jeannot.

19        A.    He's a male black, about 25 years of age,

20   five-foot-nine, thin build.  He's seated in the second seat on

21   the right wearing a black and purple striped shirt.

22              MR. HAYDEN:  Let the record reflect, your

23        Honor, that the witness has identified the defendant,

24        Herve Jeannot?

25              THE COURT:  The record will so reflect.
```

1     Q.   I'm directing your attention to the night of

2   Friday, December 3 of 2004.   Did you become involved that

3   night with investigating the shooting death of a young man

4   named Bobby Calabrese?

5     A.   Yes, I did.

6     Q.   When was Bobby Calabrese killed?

7     A.   Approximately 7:39 p.m.

8     Q.   Were 911 calls received regarding the death of Bobby

9   Calabrese?

10     A.   Yes, they were.

11     Q.   When was the first call received?

12     A.   Approximately 7:39 p.m.

13     Q.   Was that 7:39?

14     A.   7:39.

15     Q.   Is that 8:39, Detective?

16          MR. LEMKE:   Your Honor, I believe he said 7:39.

17          THE COURT:   He did say 7:39.

18     A.   I'd like to correct myself.   It should be 8:39.

19     Q.   Did you respond to that location?

20     A.   Yes, I did.

21     Q.   Where was Bobby Calabrese killed?

22     A.   In the roadway on Broadway about a hundred feet

23   south of Georgia Avenue in North Long Beach.

24     Q.   When did you get there?

25     A.   9:30 p.m.

Case 2:11-cv-03992-ERK   Document 8-1   Filed 01/17/12   Page 41 of 55 PageID #: 164

1    Q.    Describe that area.

2    A.    It's an industrial, dark commercial area.  There's a

3    public storage facility, a vacant nightclub, a boat yard,

4    several other businesses, including a 7-11 on the corner of

5    Georgia Avenue and Broadway.

6    Q.    Were you familiar with that area?

7    A.    Yes, I was.

8    Q.    Describe your familiarity with that area.

9    A.    I was a police officer and a detective in that area

10    for over 20 years.

11    Q.    Did you see Bobby's body?

12    A.    Yes, I did.

13    Q.    Describe any observations you made of Bobby's body.

14    A.    He was lying facedown in the roadway with his head

15    facing in a southwesterly direction, lying adjacent to his

16    automobile.  He was fully clothed.  He had on a gray hooded

17    sweatshirt.  The sweatshirt had the back pulled up over his

18    head.  The sweat shirt had been cut.  His automobile was still

19    running.

20    Q.    Once again, when was the approximate time of his

21    death?

22    A.    8:39 p.m.

23    Q.    Were you informed of autopsy results involving Bobby

24    Calabrese?

25    A.    Yes, I was.

1     Q.    When was the autopsy performed?

2     A.    December 4, 2004.

3     Q.    When were you informed of the autopsy results?

4     A.    The afternoon of December 4.

5     Q.    What did you learn from the autopsy results?

6     A.    That the victim had suffered three gunshot wounds to

7 the back of his head.

8     Q.    Did you speak with a young man named Robert Ianfolla

9 during the course of the investigation?

10    A.    Yes, I did.

11    Q.    Who is he?

12    A.    He's the cousin of the victim, Robert Calabrese.

13    Q.    When did you first speak with Robert Ianfolla?

14    A.    December 4, 2004.

15    Q.    What did Robert Ianfolla tell you then?

16    A.    That on the evening before on Friday night, December

17 3, he had been with the victim at the victim's house at 519

18 East Harrison Street in Long Beach.  They were together, and

19 at about 8:00 p.m. the victim told him he was leaving to go to

20 Island Park to meet a guy named Mark to collect a gambling

21 debt.

22    Q.    Did you speak with a young man named Tommy Flores

23 during the course of the investigation?

24    A.    Yes, I did.

25    Q.    Who is Tommy Flores?

1          A.    Tommy Flores is a lifelong friend of the victim and

2    a coworker of the defendants in this case.

3          Q.    When did you first speak with Tommy Flores?

4          A.    December 5, 2004.

5          Q.    Describe for the Court what Tommy Flores told you

6    then.

7          A.    He told me that on the prior Thursday he had

8    car-pooled to work at Professional Credit Services in

9    Farmingdale with Mark Orlando.  Mark Orlando had driven him to

10   work.  Mark Orlando told him that he had attempted to make two

11   $5,000 bets the night before with the victim, but the victim

12   had shut down the line on him.  Flores told me that he had

13   introduced the victim to Mark Orlando about six weeks prior

14   for the purposes of gambling.  Bobby Calabrese was a bookmaker

15   and Mr. Orlando was a gambler, so he had introduced them to

16   each other.  They had been gambling for about six weeks.

17              On Saturday, Flores was at home when he received a

18   telephone call advising him that Bobby Calabrese had been

19   murdered.  Throughout the week Flores had seen Herve Jeannot

20   and Mark Orlando whispering at work.  On Friday evening,

21   December 3, he had been with them at the gym at the LA Fitness

22   Center on Route 110 in Farmingdale.  The two defendants were

23   there at that time, and according to Mr. Flores, they both

24   seemed like they were in a hurry.  They didn't do very much in

25   the way of exercising.  It seemed like they had someplace to

1   get to.  On Saturday morning, after Mr. Flores was notified of

2   the death, he called Mark Orlando, because he knew that Mark

3   Orlando was supposed to meet with the victim on Friday night

4   to pay a $17,000 gambling debt.

5              When he spoke to Orlando, Orlando acknowledged

6   having met and having paid the debt.  He told him they had met

7   down in Island Park by a restaurant that's now called -- named

8   McQuade's by a place called Puma's, which is an auto body shop

9   somewhere over by Industrial Place.  Orlando told them they

10  met about 8:30.  He had gone there -- Mark Orlando had gone

11  there with Herve Jeannot in his wife's Suzuki Verona.  They

12  had met Bobby Calabrese for a minute or two.  He handed the

13  $17,000 through the window of the car to Calabrese.  Calabrese

14  then made a left heading north towards Oceanside, and Orlando

15  said he and Jeannot then headed through Long Beach back to

16  home.  Mr. Flores asked Orlando where he had gotten the money

17  to pay that debt, and Orlando told him it was the same money

18  that he had been paid by Bobby Calabrese on his gambling

19  winnings.

20       Q.   Did you take a written statement from Tommy Flores?

21       A.   Yes, I did.

22       Q.   When did you take that statement?

23       A.   December 7, 2004.

24       Q.   Did Tommy Flores sign that statement?

25       A.   Yes, he did.

 1              MR. HAYDEN:  Your Honor, may I please have this

 2      two-page statement marked as People's 1 for

 3      identification and shown to the witness?

 4              THE COURT:  Is that an original?

 5              MR. HAYDEN:  No, it's not, Judge.

 6              THE COURT:  Please mark it.

 7  (Whereupon, People's Exhibit 1 was marked for identification.)

 8      Q.   Please take a look at that.  Do you recognize that?

 9      A.   Yes, I do.

10      Q.   Is that a photocopy of Tommy Flores's two-page

11  statement?

12      A.   Yes, it is.

13      Q.   How do you know it is?

14      A.   The homicide number, the date, Mr. Flores's

15  signature as well as my signature.

16              MR. HAYDEN:  People offer that photocopy in

17      evidence, your Honor.

18              THE COURT:  Please show it to counsel.

19              MR. LEMKE:  We have copies.  It's a copy

20      there also?

21              THE WITNESS:  It's a copy.

22              MR. LEMKE:  No objection for purposes of this

23      hearing, your Honor.

24              MR. HOCHHEISER:  Same, Judge.

25              THE COURT:  It's received.

1          (Whereupon, People's Exhibit 1 was marked in evidence.)

2          Q.    Did Tommy Flores tell you what time Mark Orlando had

3     said he met Bobby Calabrese that night?

4          A.    He said about 8:30 p.m.

5          Q.    You referred to Puma's during the course of your

6     testimony.  Were you familiar then where Puma's is located?

7          A.    Yes, I was.

8          Q.    What is Puma's?

9          A.    It's an auto body shop.

10         Q.    Where is it located?

11         A.    It's located on Austin Boulevard in North Long

12    Beach.

13         Q.    Where is it with relation to the scene of the

14    murder?

15         A.    It's about a half a mile southwest of the scene.

16         Q.    You mentioned McQuade's during the course of your

17    testimony.  Were you familiar with McQuade's while you were

18    speaking with Tommy Flores?

19         A.    Yes, I was.

20         Q.    What is McQuade's?

21         A.    It used to be a restaurant.  At the time of this

22    homicide it was, however, closed.

23         Q.    Where is it?

24         A.    It's also on Austin Boulevard in North Long Beach

25    about a half a mile southwest of the scene.

1          Q.    Did you speak with a woman named Barbara Diamont

2     during the course of the investigation?

3          A.    Yes, I did.

4          Q.    Who's she?

5          A.    She's the girlfriend of Tommy Flores, a coworker of

6     Mark Orlando and Herve Jeannot.

7          Q.    When did you first speak with her?

8          A.    December 7, 2004.

9          Q.    What did Barbara Diamont tell you then?

10         A.    On Saturday morning, December 4, she was notified of

11    the death of Bobby Calabrese by her boyfriend, Tommy Flores.

12    She then called Mark Orlando, because she also knew that he

13    was supposed to meet with the victim the night before.  During

14    the course of that telephone conversation, Mark Orlando told

15    her that Bobby Calabrese had been shot in the head three

16    times.

17         Q.    Were the three gunshot wounds to Bobby Calabrese's

18    head public knowledge the Saturday morning Barbara Diamont

19    said she had spoken to Mark Orlando?

20         A.    No, they were not.

21         Q.    Did you watch a videotape during the course of the

22    investigation?

23         A.    Yes, I did.

24         Q.    When did you watch the videotape?

25         A.    December 4, 2004.

1    Q.    Where did you obtain it?

2    A.    From Central Self Storage, which is directly

3  adjacent to the scene on Broadway.

4    Q.    Describe that videotape.

5    A.    It was a videotape of two of the cameras off of the

6  digital surveillance system from that facility, one camera

7  facing -- both cameras are mounted on the rear of the

8  building, one facing directly east out the driveway gate and

9  another camera on the northeast side of the building facing in

10  a northeast direction on to Broadway.

11    Q.    Where were those video cameras with relation to the

12  scene of the murder?

13    A.    The camera facing east out the driveway would be

14  about a hundred feet south of the scene, and the camera facing

15  northeast encompassed the scene.

16    Q.    Describe what you saw as you watched the videotape.

17    A.    I saw a light-colored automobile consistent with a

18  Suzuki Verona come down Broadway on three occasions within

19  about 10 or 15 minutes of the murder, leading right up to the

20  time of the murder.  I saw that automobile come back, park on

21  Broadway facing north at the scene.  I saw the victim's

22  automobile come from the south heading north on Broadway and

23  park in front of that Suzuki Verona at the scene.  I then saw

24  the outline of figures for a couple of seconds and then the

25  Suzuki Verona make a sharp left-hand turn and leave the scene,

Det. McHugh/People/Direct                    49

1   leaving behind the second car that I described with its

2   headlights on.

3          Q.   The victim's car?

4          A.   What I believed to be the victim's car, yes.

5          Q.   What is the significance of the Suzuki Verona?

6          A.   Mark Orlando's wife owned a gray or a silver 2004

7   Suzuki Verona at the time of the occurrence.

8          Q.   When did you learn that the Suzuki Verona belonged

9   to Mark Orlando's wife?

10         A.   I believe it was December 5.

11         Q.   Did you obtain cell phone information during the

12  course of the investigation?

13         A.   Yes, I did.

14         Q.   When was that?

15         A.   About December 8.

16         Q.   Describe the information you obtained.

17         A.   I obtained call detail records for the victim's cell

18  phone, Mark Orlando's cell phone and Herve Jeannot's cell

19  phone.  I also obtained cell site information for Mark

20  Orlando's cell phone and Herve Jeannot's cell phone.

21         Q.   What did you learn from the cell phone information?

22         A.   From the cell site information I learned that

23  telephone calls from Mark Orlando and Herve Jeannot just prior

24  to and just after the homicide were hitting off the cell site

25  located in the Oceanside dump, which is directly north of the

1    scene, indicating that they were in that area when those calls

2    were made.

3         Q.    What else did you learn?

4         A.    From the victim's cell phone I learned that at 8:24

5    p.m. he received a telephone call from the cell phone of Mark

6    Orlando, that conversation lasting one minute and 45 seconds

7    and that at 8:38 p.m. the victim also received a telephone

8    call from a friend, Sean Monaghan.

9         Q.    Did you learn the details of that call?

10        A.    Yes, I did.  It was a very brief conversation.

11   Bobby Calabrese indicated to Sean that he could not speak at

12   that time, that he was doing something.

13        Q.    When did you learn that from Sean?

14        A.    December 4, 2004.

15        Q.    Did you obtain warrant information about Mark

16   Orlando during the course of the investigation?

17        A.    Yes, I did.

18        Q.    When did you obtain that information?

19        A.    December 4, 2004.

20        Q.    Describe any warrant information you obtained about

21   Mark Orlando.

22        A.    He had two active Nassau County warrants for

23   misdemeanor aggravated unlicensed operation in the second

24   degree.

25        Q.    Did you obtain warrant information involving Herve

1   Jeannot during the course of the investigation?

2       A.   Yes, I did.

3       Q.   When did you obtain that information?

4       A.   December 6, 2004.

5       Q.   Describe any warrant information you obtained about

6   Herve Jeannot.

7       A.   He also had two active Nassau County warrants, one

8   for aggravated unlicensed operation in the third degree and

9   one for a violation of a conditional discharge growing out of

10  a prior possession of stolen property case.

11      Q.   How did you obtain the warrant information involving

12  Mark Orlando and Herve Jeannot?

13      A.   I checked their names through the Nassau County

14  Police Department warrant system.

15           MR. HAYDEN:  Your Honor, may I please have

16      these four documents marked as People's 2A, B, C and D

17      for identification?

18           THE COURT:  Sure.

19  (Whereupon, People's Exhibits 2A, 2B, 2C and 2D were marked

20                    for identification.)

21           THE COURT OFFICER:  2A through D.

22      Q.   Detective, please take a look at those documents.

23  Do you recognize those documents?

24      A.   Yes, I do.

25      Q.   What are they?

1      A.    The first two are warrants for Mark Orlando, and the

2  second two are warrants for Herve Jeannot, the warrants that I

3  described.

4      Q.    Are those certified copies?

5      A.    Yes, they are.  They have a raised seal.

6      Q.    Those are the warrants about which you've testified?

7      A.    Yes, they are.

8            MR. HAYDEN:  People offer those as 2A, B, C and

9  D in evidence, your Honor.

10           MR. LEMKE:  May I just see that for one

11  second, please.

12           THE COURT:  Show it to counsel.

13           MR. LEMKE:  For the purposes of this hearing

14  regarding warrants regarding Mr. Orlando, no objection,

15  your Honor.

16           MR. HOCHHEISER:  Same as to Mr. Jeannot for,

17  I believe they're Exhibits 2A and 2B.

18           THE COURT:  All exhibits are received.

19  (Whereupon, People's Exhibits 2A, 2B, 2C AND 2D were marked in

20                          evidence.)

21      Q.    I'm directing your attention to the night of

22  Thursday, December 9 of 2004.  Were you involved that night

23  with the arrest of Mark Orlando?

24      A.    Yes, I was.

25      Q.    Describe the circumstances under which Mark Orlando

Det. McHugh/People/Direct                    53

1    was arrested.

2         A.    Myself, along with other members of the Homicide

3    Squad assisted by the Bureau of Special Operations placed the

4    defendant under arrest in Farmingdale.

5         Q.    Who arrested Mark Orlando?

6         A.    Police Officer Loschiavo and Police Officer McCarthy

7    of the Bureau of Special Operations.

8         Q.    Where were you when they took Mark Orlando in

9    custody?

10        A.    I was at the scene when he was arrested.

11        Q.    Who was with you?

12        A.    Detective James McGinn of the Homicide Squad.

13        Q.    Describe the vehicle you and Detective McGinn were

14   using.

15        A.    1997 Ford Expedition, color beige, department car

16   number 1063.

17        Q.    Did Officers Loschiavo and McCarthy place Mark

18   Orlando in handcuffs?

19        A.    Yes, they did.

20        Q.    What happened after they placed him in handcuffs?

21        A.    The arresting officers turned him over to Detective

22   McGinn and myself.

23        Q.    What did you do with him?

24        A.    Assisted him into the department vehicle that I

25   described.

Det. McHugh/People/Direct                        54

1        Q.    What did you do then?

2        A.    Detective McGinn drove us to police headquarters in

3   Mineola.

4        Q.    Describe any conversation involving Mark Orlando on

5   the way to police headquarters.

6        A.    I introduced myself and Detective McGinn, told him

7   we were from the Homicide Squad, that we wanted to speak to

8   him about the death of Bobby Calabrese and that we would be

9   going to police headquarters in Mineola and I would speak to

10  him when we got there.

11       Q.    Any further conversation involving Mark Orlando?

12       A.    Not at that time.

13       Q.    Any further conversation involving Bobby Calabrese?

14       A.    No.

15       Q.    What time did you arrive with Mark Orlando at the

16  Homicide Squad?

17       A.    9:50 p.m.

18       Q.    Where did you place Mark Orlando at the Homicide

19  Squad?

20       A.    In one of the two interview rooms in the Homicide

21  Squad office.

22       Q.    Describe that room for the Court.

23       A.    It's a room that we use for interviews.  It's

24  approximately 10 feet by 10 feet.  It has a small desk, three

25  chairs, a door with a window and another window and they're

Det. McHugh/People/Direct                    55

1    both covered in curtains.

2                    THE COURT:  Mr. Hayden, before you ask your

3         next question, can I see counsel, please.

4    (Whereupon, an off-the-record discussion occurred at the bench.)

5                    THE COURT:  All right, at this time I think

6         we're going to break until 9:30 tomorrow morning.  Have

7         a nice evening, everybody.  See you tomorrow.

8                    MR. HAYDEN:  Yes, your Honor.

9                    MR. HOCHHEISER:  Thank you, your Honor.

10        (Whereupon the hearing was adjourned until April 19, 2005.)

11                            *        *        *

12

13

14

15

16

17

18

19

20

21

22

23

24

25