```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU        :        PART 33
 2   ------------------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK,

 4                                          Indictment No.
                    -against-              167N-2005
 5

 6   MARK ORLANDO and HERVE JEANNOT,

 7                                Defendants.
     ------------------------------------------------X
 8                                Mineola, New York
                                  April 19, 2005
 9

10   B E F O R E:     HONORABLE ALAN L. HONOROF
                      Acting Supreme Court Justice
11

12   A P P E A R A N C E S:   (SAME AS PREVIOUSLY NOTED)

13                         *          *          *

14               THE CLERK:  Indictment 167N-05, the People

15       against Mark Orlando and Herve Jeannot, case on hearing

16       continued.  People ready?

17               MR. HAYDEN:  Ready, your Honor.

18               THE CLERK:  Defendants ready?

19               MR. LEMKE:  Defendant ready, your Honor.

20               MR. HOCHHEISER:  Ready.

21               THE CLERK:  All sides are ready, your Honor.

22               THE COURT:  Good morning.

23               THE CLERK:  Detective McHugh.

24           (Whereupon, the witness resumed the stand.)

25               THE CLERK:  Detective, I remind you you're
```

Det. McHugh/People/Direct                    57

1    still under oath.

2                THE WITNESS:  Yes.

3                MR. HAYDEN:  May I proceed, your Honor?

4                THE COURT:  Yes, please.

5    DIRECT EXAMINATION CONTINUED

6    BY MR. HAYDEN:

7        Q.   Detective, I want to take you back to Mr.

8    Orlando's arrest.  Did you see Mr. Orlando being arrested?

9        A.   Yes, I did.

10       Q.   Describe the motor vehicle Mr. Orlando was driving

11   when he was arrested then.

12       A.   He was driving a 1991 Mercury Cougar, color black.

13       Q.   Was the New York license plate number CLG 3917?

14       A.   Yes, it was.

15       Q.   When did you become aware that Mr. Orlando was

16   driving that vehicle on Thursday, December 9, 2004?

17       A.   I observed him driving it just prior to his arrest.

18   I had observed the auto earlier in the evening about 8 o'clock

19   at his place of employment parked in the lot.

20       Q.   Had you spoken with Tommy Flores?

21       A.   Yes, I had.

22       Q.   What had he told you about that vehicle?

23       A.   He had told me that Mark had driven his black Cougar

24   to work, and he told me the area of the lot in which it was

25   parked in.

1      Q.   You saw that that was the vehicle stopped at the

2   stop sign before your Bureau of Special Operations officers

3   approached it?

4      A.   Yes.

5      Q.   Did you eventually begin speaking with Mark Orlando?

6      A.   Yes, I did.

7      Q.   Who was present when you began speaking with Mark

8   Orlando?

9      A.   Detective James McGinn from the Homicide Squad.

10     Q.   Was Mark Orlando handcuffed when you began speaking

11   with him?

12     A.   No, he was not.

13     Q.   Describe any initial conversation with Mark Orlando.

14     A.   I introduced myself and Detective McGinn again.  I

15   told him I wanted to speak to him about the death of Bobby

16   Calabrese, and I told him before I did that I was going to

17   advise him of his Miranda warnings.

18     Q.   Did you do that?

19     A.   Yes, I did.

20     Q.   How?

21     A.   I read him his rights off of a police department

22   form 233, notification of rights form.

23     Q.   Describe any markings that were eventually placed on

24   that card.

25     A.   Mr. Orlando wrote the word yes next to "Do you

1    understand?" and he signed the card in two spots.  I placed

2    the date and Homicide Squad number on the card.  I signed it

3    as well as Detective McGinn.

4                      MR. HAYDEN:  May I please have this card

5        marked?

6                      THE COURT:  That's the original?

7                      MR. HAYDEN:  Yes, it is.

8                      THE COURT:  Deem it.

9        (Whereupon, People's Exhibit 3 was deemed marked for

10                          identification.)

11   Q.    Do you recognize that card?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    It's the rights' card that I read to Mark Orlando.

15   Q.    How do you know that's the card?

16   A.    The Homicide Squad number, the date, Mr. Orlando's

17   signature.in two spots, my signature as well as Detective

18   McGinn's signature.

19                      MR. HAYDEN:  We would ask, your Honor, that

20       that card be deemed People's 3 in evidence.

21                      THE COURT:  Please show it to both counsel.

22                      MR. LEMKE:  Again, your Honor, for purposes

23       of this hearing, no objection.

24                      THE COURT:  All right, it's received deemed

25       People's 3.

Det. McHugh/People/Direct                    60

1    (Whereupon, People's Exhibit 3 was deemed marked in evidence.)

2        Q.   Using that card in evidence, please read the

3    Constitutional rights for the Court the same way you read them

4    for Mark Orlando and please include any responses he may have

5    made.

6        A.   Before asking you any questions, you should

7    understand you have the right to remain silent and that any

8    statements you make may be used against you in court.  Also

9    you have the right to talk to a lawyer before answering any

10   questions or to have a lawyer present at any time.  If you

11   cannot afford to hire a lawyer, one will be furnished you if

12   you wish, and you have the right to keep silent until you have

13   had a chance to talk with a lawyer.

14       I asked the question that's also on the card:  "Do

15   you understand?"  He said yes.

16       I then read:  Now that I have advised you of your

17   rights, are you willing to answer questions?  He again said

18   yes.

19       Q.   Did you and Detective McGinn speak with Mark Orlando

20   after he was informed of his Constitutional rights?

21       A.   Yes, we did.

22       Q.   Describe your involvement in that conversation.

23       A.   I asked Mr. Orlando his home address, which he

24   provided, 1119 Joselson Avenue in Bay Shore.  I asked him his

25   date of birth, which he told me was September 26, 1970.  I

1   asked him how he knew Bobby Calabrese.  He told me he had been

2   introduced to Bobby Calabrese by a friend, a coworker by the

3   name of Tom Flores; that he had been introduced for the

4   purposes of making bets; that he had gambled with Bobby

5   Calabrese for about six weeks up until the time of his death;

6   that during the course of that six-week period he had won

7   approximately $10,000.  He would place the bets through an 888

8   offshore account number.  His account number was Pop 1271,

9   with a password of Tom.

10           While he was betting with Bobby Calabrese, they

11   would usually square up at the end of the week, sometimes

12   Thursday, sometimes Friday.  Up until the week of December 3

13   those payments would have taken place out in Farmingdale.  On

14   the week of December 3 Mark Orlando had lost $8700 which he

15   was due to pay Bobby Calabrese on Thursday or Friday.  He was

16   also -- he also owed him $9100 for bets that had been made

17   earlier in that same week.  However, he explained to me that

18   that money would not be due until the following week.  He

19   owed, between the two weeks of betting that I had described,

20   he owed a total of $17,800.  However, Bobby Calabrese owed him

21   $800 from a prior payoff, which would drop the amount that he

22   actually owed to $17,000.

23           On Thursday he was -- Mark Orlando was unable to

24   meet with Bobby Calabrese because he worked until 9:00 p.m.,

25   he told me, and after that, after getting off work, he had

1  gone out with his wife on Thursday evening.  So after being

2  unable to meet with him on Thursday, on Friday afternoon he

3  had called him and told him that he would meet him in the

4  evening down in Island Park.  And the reason that he was going

5  to go to Island Park instead of the usual place in Farmingdale

6  was that he would be out and about.  He had some business at

7  Wantagh Suzuki, so he explained to Bobby Calabrese that he

8  would be out driving anyway, so he would swing down to Island

9  Park.  I asked him if he knew Island Park.  He said yes.  His

10  wife lived there at one time.  She had some relatives that

11  lived there, and at one time his father owned a business, an

12  auto body or auto repair business, on Industrial Place in

13  Island Park.

14          After work on Friday afternoon he had gone to a gym,

15  LA Fitness, on Route 110 with Herve Jeannot, who also worked

16  with him.  They were at the gym for about an hour, hour and a

17  half, and after that, he was going to drive down to Island

18  Park and pay Bobby Calabrese.  Herve was out with him, so he

19  just asked Herve to take a ride with him.  When they got down

20  to the area of the Long Beach bridge, about 8:25 p.m., Mark

21  Orlando called Bobby Calabrese on his cell phone, told him

22  that he was down in Island Park and told him to meet him over

23  by the former McQuade's restaurant by Industrial Place.

24          Herve Jeannot and Mark Orlando in Mr. Orlando's

25  Suzuki Verona parked in that area that I described, and a

Det. McHugh/People/Direct                    63

1   couple of minutes later Bobby Calabrese pulled up in his auto.

2   They had a brief discussion for a minute or two.  He handed

3   the money out the window to Bobby Calabrese.  And the last

4   time he saw Bobby Calabrese he was heading north towards

5   Oceanside, and Mr. Orlando and Herve Jeannot headed back

6   through Long Beach towards home.

7        Q.   Describe Detective McGinn's involvement in that

8   conversation.

9        A.   Detective McGinn had a minimal involvement in that

10  conversation.  He may have asked a question or two, but I

11  don't remember specifics of it.

12       Q.   Describe any further conversation and Detective

13  McGinn's involvement.

14       A.   After Mr. Orlando described those events, he also

15  told me that he had called Wantagh Suzuki right as he was

16  leaving Island Park to see if he could come by and collect a

17  check that was owed him.  He dealt with the boss there, a guy

18  by the name of Ralph.  He was told that Ralph was gone for the

19  day, that the check was unavailable.  When he got up to the

20  Wantagh area, he did stop at Wantagh Suzuki; however, they

21  were closed.

22            I asked him what else happened after that.  He told

23  me he had stopped at an ATM in Wantagh.  Since he had just

24  paid out $17,000, he didn't have any cash on him, so he had to

25  stop at an ATM.  And then he continued on to a friend's house,

1  another coworker by the name of Vivian Barushik, who lived up

2  in Plainview.  He stopped by her.  He and Herve stopped by her

3  house to look at some brickwork, a fence and a pool she had

4  installed.

5      Q.   Did Mark Orlando speak about his gambling?

6      A.   Yes, he did.

7      Q.   Describe that portion of the conversation.

8      A.   I asked him what he gambled on.  He told me at that

9  point he was gambling on football and basketball, college and

10  pros.  I said to him, "I can't believe that you gamble on

11  basketball.  It's my feeling that's the worst sport to gamble

12  on.  It's the only sport where the final score doesn't matter.

13  If a team is up 10 points with 30 seconds left, they let the

14  other team score four points.  They still win the game but

15  they don't cover the spread."  He explained to me that you

16  never bet on the final score in the basketball game.  You bet

17  on various other items: the half time score, the adjusted

18  line, the total points for quarters.  Detective McGinn

19  conducted that portion of the interview relative to the recent

20  gambling activity with Bobby Orlando -- with Bobby Calabrese

21  by Mark Orlando, dates and specific numbers.

22      Q.   Did Mark Orlando talk about being in debt?

23      A.   Yes, he did.  He also detailed to Detective McGinn

24  his mortgages, his credit card debt.

25      Q.   Did he go into some detail with Detective McGinn?

1      A.    Yes, he did.  He went into a lot of detail relative

2    to those items.

3      Q.    Did Mark Orlando write anything while you and

4    Detective McGinn were speaking with him then?

5      A.    He had taken a pad that we had.  He had asked for a

6    pen or pencil.  We gave him a pencil.  He did write, took some

7    notes.  He made some diagrams.

8      Q.    Was he taking notes throughout the conversation

9    about gambling?

10     A.    Yes, he was.

11     Q.    Did he take further notes?

12     A.    Yes, he did.

13     Q.    Four pages?

14     A.    Four pages.

15            MR. HAYDEN:  May I please have these four

16     sheets, your Honor, marked as People's 4A, B, C and D

17     for identification?  These are originals, your Honor.

18            THE COURT:  Let's deem these also.  What I'd

19     like to do, if it's okay with all counsel, is anything

20     that we're deeming in I'd like to replace with

21     photocopies that you can all agree are accurate and

22     we'll mark the photocopies.  I don't want this to get

23     out of control.

24            MR. HAYDEN:  I would be glad to provide

25     those, Judge.

1          THE COURT:  Any objection?

2          MR. LEMKE:  None, your Honor.

3          MR. HOCHHEISER:  No objection.

4     (Whereupon, People's Exhibits 4A, B, C and D were deemed

5                 marked for identification.)

6     Q.   Do you recognize those notes?

7     A.   Yes, I do.

8     Q.   What are they?

9     A.   These are the four pages of notes that Mark Orlando

10    wrote throughout my interview.

11    Q.   How do you know that?

12    A.   I recognize the notes.  I recognize specific

13    references to the items in the notes and I recognize Mr.

14    Orlando's initials on all four pages.

15         MR. HAYDEN:  I would ask that they be deemed

16    into evidence, your Honor.

17         THE COURT:  Please show them to counsel.

18         MR. LEMKE:  Your Honor, on behalf of Mr.

19    Orlando, no objection for, again, the purposes of this

20    hearing, your Honor.  No objection.

21         MR. HOCHHEISER:  Same as to Mr. Jeannot,

22    Judge.

23         THE COURT:  All right, they are received,

24    deemed.

25         MR. HAYDEN:  Yes, your Honor.

1    (Whereupon, People's Exhibits 4A, B, C, and D were deemed

2                         marked in evidence.)

3        Q.    Were notes taken of the conversation with Mark

4    Orlando?

5        A.    Yes, they were.

6        Q.    Who took those notes?

7        A.    Myself and Detective McGinn.

8        Q.    How many pages did Detective McGinn take?

9        A.    Six.

10       Q.    How about yourself?

11       A.    Two.

12       Q.    Did you eventually reduce what Mark Orlando was

13   saying to writing?

14       A.    Yes, I did.

15       Q.    What time did you begin reducing what Mark Orlando

16   was saying to writing?

17       A.    12:10 a.m.

18       Q.    Describe how you reduced what Mark Orlando was

19   telling you to writing.

20       A.    Based on the details that he had provided me, I

21   would ask a question, he would give a response.  I would say

22   the response back to him.  If he agreed with it, I would then

23   reduce it to sentence form.

24       Q.    When did you finish reducing what Mark Orlando was

25   telling you to writing?

Det. McHugh/People/Direct                    68

1       A.    Just before 2:00 a.m.

2       Q.    What did you do with Mark Orlando's written

3    statement?

4       A.    I read it back to him out loud.

5       Q.    What else did you do?

6       A.    I initialed some corrections that had been made, and

7    I also gave it to him to read to himself, asked him if he had

8    any questions, if he wanted anything changed, to let me know.

9       Q.    Did he do that?

10      A.    I don't believe he wanted anything changed.  He

11   initialed the corrections.  He did, however, ask that an

12   addendum be placed at the end of the statement.

13      Q.    Did you do that?

14      A.    Yes, I did.

15      Q.    Was the statement signed?

16      A.    He signed all of the pages, yes.

17      Q.    Anyone else sign?

18      A.    Myself and Detective McGinn.

19             MR. HAYDEN:  I would ask that this five-page

20   original statement, your Honor, be deemed as People's 5

21   for identification and shown to the witness.

22   (Whereupon, People's Exhibit 5 was deemed marked for

23                        identification.)

24      Q.    Do you recognize that?

25      A.    Yes, I do.

1    Q.   What is it?

2    A.   It's the five-page written statement that I took

3    from Mark Orlando on December 10, 2004.

4    Q.   How do you know that?

5    A.   The Homicide Squad number, the date, Mark Orlando's

6    signature as well as my signature and Detective McGinn's

7    signature.

8              MR. HAYDEN:  People ask that it be deemed in

9         evidence, your Honor.

10             THE COURT:  Please show it to counsel.

11             MR. LEMKE:  On behalf of Mr. Orlando, your

12        Honor, again, for the purposes of this hearing, no

13        objection.

14             MR. HOCHHEISER:  Same as to Mr. Jeannot.

15             THE COURT:  Documents are received.

16   (Whereupon, People's Exhibit 5 was deemed marked in evidence.)

17   Q.   Was Mark Orlando offered anything to eat or drink

18   that night?

19   A.   Yes.

20   Q.   When was that?

21   A.   He had some water, and at about 2:00 a.m. he was

22   offered an egg sandwich that he refused.  Later on in the day

23   he had a doughnut, and he also had lunch at about noon.  I

24   don't recall what the specifics of lunch were, but it would be

25   a sandwich.

1      Q.    Did Mark Orlando use the men's room whenever he

2   asked?

3      A.    Yes.

4      Q.    Describe Mark Orlando's physical condition while you

5   were with him that night.

6      A.    He was fine.  He appeared healthy.

7      Q.    Did you see any injury to Mark Orlando?

8      A.    No.

9      Q.    Did he complain of any?

10     A.    No, he did not.

11     Q.    Describe his demeanor while he was speaking with

12  you.

13     A.    He was calm, at times overly responsive to

14  questions, but he was responsive.

15     Q.    What do you mean by overly responsive?

16     A.    On some questions, instead of just answering the

17  question, he would continue on at length for a period of time.

18     Q.    I'm directing your attention to around 4:30 in the

19  early morning of Friday, December 10 of 2004.  Did you begin

20  speaking with Herve Jeannot at around that time?

21     A.    Yes, I did.

22     Q.    Where was Herve Jeannot when you began speaking with

23  him?

24     A.    He was in the second interview room in the Homicide

25  Squad office.

1    Q.   Describe that room.

2    A.   It's a room that we use for interview purposes.

3  It's approximately eight feet by twelve feet.  It has a desk,

4  three chairs; it also has a lounge.  It has no window on the

5  door and it has a lock on the door.

6    Q.   Who was present when you began speaking with Herve

7  Jeannot?

8    A.   Detective Partee from the Homicide Squad.

9    Q.   Was Herve Jeannot handcuffed then?

10   A.   No, he was not.

11   Q.   Describe the circumstances under which you began

12  speaking with Herve Jeannot.

13   A.   At about 4:20 a.m. I was in the Homicide Squad

14  office.  Mr. Jeannot was being interviewed by Detective Trillo

15  and Detective Partee from the Homicide Squad.  Detective

16  Trillo came out of the interview room and advised me that

17  Herve Jeannot had told him that he had shot and killed Bobby

18  Calabrese.  I spoke to Detective Trillo about his interview at

19  that time.  I wanted to make sure there was nothing that I was

20  unaware of as to whether there were other people involved,

21  whether there was another automobile involved.  He had told me

22  no, none of those other things came up.  At that point in time

23  I went into the interview room.

24   Q.   Describe any initial conversation you had with Herve

25  Jeannot.

1        A.    When I went into the room, I was introduced to Herve

2    Jeannot by Detective Partee.  He introduced me as the

3    investigating detective.  I advised him that he had been given

4    his rights earlier by Detective Brosnan.  He said yes, he was.

5    I asked him if he understood those rights and if he was

6    willing to speak to me at that time.  He said yes.  I then

7    said to him, "I've been told by these detectives that you shot

8    and killed Bobby Calabrese."  He said yes.  I said, "Why did

9    you do that?"  He said, "I was paid $4,000 to do it by Mark

10   Orlando."

11       Q.    Describe any further conversation.

12       A.    I asked him to describe to me the events that led up

13   to that situation.  He told me that on Wednesday, December 1,

14   he was at work with Mark Orlando when Mark Orlando told him

15   that he owed a $17,000 gambling debt to a guy named Bobby,

16   that he didn't have the money and that he was going to have to

17   kill him.  On Friday -- at that time on Wednesday he also told

18   him that he was going to meet with him either on Friday or

19   Saturday night.  He didn't know which.  He'd probably meet him

20   down by some junkyards in Island Park.

21            On Friday, again at work, Mark Orlando spoke to him

22   about killing Bobby Calabrese.  He told him -- Orlando told

23   him he may meet with him, hit him in the head with a large

24   rock or a boulder, try to render him unconscious and then

25   light his automobile on fire and burn him to death.  He also

1  spoke about using a shotgun to kill him, but he said a shotgun

2  makes too much noise and the shotgun that he did have was

3  registered in his name, so he knew he couldn't use that.

4  Later in the day he told him that he was going to meet --

5  Orlando told him that he was going to meet Calabrese that

6  night, that Friday night in Island Park.

7          After work they had gone together in the Suzuki

8  Verona owned by Mr. Orlando to someone's house in Amityville

9  to buy a coat.  After they left the house in Amityville after

10  the purchase, while they were driving to the gym on 110, Mark

11  Orlando told Herve Jeannot that it would be easier for Jeannot

12  to kill Bobby Calabrese than it would be for him to do it and

13  he would pay him $4,000 to do it.  Jeannot agreed that for

14  $4,000 he would kill Bobby Calabrese when they met in Island

15  Park that night.

16          They went to the LA Fitness gym.  They left the gym

17  at about 7:15 or 7:30 p.m.  While they were at the gym there

18  were some other coworkers there, Barbara Diamont, Tommy Flores

19  and another girl.  They then drove -- after they left the gym,

20  they drove down to Island Park.  Mr. Jeannot told me he wasn't

21  really familiar with that area.  Orlando was driving.  They

22  drove down there.  When they got down there, they parked by an

23  area with junkyards and a restaurant that was empty, out of

24  business.

25          They sat there for a little while.  While they were

1   sitting there, Mark Orlando took a gun out of a black bag that

2   he had in the back seat and he showed the gun to Mr. Jeannot.

3   Jeannot looked at the gun, saw that it was loaded.  I asked

4   him if he knew what kind of a gun it was.  He said yes, it was

5   a .44 caliber Smith & Wesson and it was loaded with six copper

6   jacketed bullets.

7        In their earlier discussions prior to the murder,

8   Orlando had asked Jeannot to get a gun.  Mark Orlando said

9   that he had his own.  He told Jeannot to try and get a gun in

10  case there was somebody else there with Bobby Calabrese.  Mr.

11  Jeannot told me he had tried to get a gun through some people

12  in Uniondale but he was unsuccessful.  I asked Mr. Jeannot how

13  he knew or remembered that it was a .44 caliber Smith &

14  Wesson.  He told me he had dealt with guns before; he was in

15  the military.

16       He kept the gun.  They sat there a couple of

17  minutes.  Mark Orlando told him -- and they saw that there was

18  a body shop or a garage that was open on Industrial Place.

19  Mark Orlando was also concerned about some video cameras in

20  the junkyards, so they decided to move.  They drove a little

21  distance to an area over by a 7-11 that was dark.  They drove

22  around the block a couple of times.  They parked.  Mark

23  Orlando called Bobby.  Mark Orlando told Jeannot that Bobby

24  would be there in about five minutes.  They stayed in the same

25  spot that they were parked.  Mr. Jeannot got out of the car,

1    hid behind the right rear passenger fender.

2            After a couple of minutes, he saw an automobile pull

3    up, park in front of their automobile.  Mark Orlando got out,

4    went up, was talking face to face with Bobby.  Mr. Jeannot

5    circled around behind Orlando's car, came up behind Orlando.

6    Bobby Calabrese saw him, appeared to have fallen to the

7    ground, was holding on to Mark Orlando's leg.  Herve Jeannot

8    said he went up, fired one shot into his head.  Bobby

9    Calabrese rolled over onto his stomach.  He then went and

10   fired two more shots into his head.  They got back into their

11   Suzuki, made a sharp left-hand turn, cut through a car repair

12   shop and headed through Long Beach.

13           While on the Loop Parkway, Herve told me he threw

14   the bullets and the shell casings that were in the gun off of

15   a bridge, and at a second bridge they threw the gun into the

16   water.  He was the passenger in the car.  Mark Orlando told

17   Herve that they were going to be seen, that they should be

18   seen by as many people as possible.  So they stopped by the

19   Wantagh Suzuki dealership to try and pick up that check but it

20   was closed.  They -- Mark Orlando also stopped at an ATM in

21   Wantagh, made a withdrawal.  They then continued and went

22   north on the Seaford-Oyster Bay.

23           They were going to visit a coworker by the name of

24   Vivian Barushik.  They exited the Seaford-Oyster Bay someplace

25   up in Plainview.  There was a dumpster in a schoolyard.  Mr.

1   Jeannot told me he took his clothing and put it in that

2   dumpster.  They then went up to Plainview, visited with Vivian

3   for a while.  After that was done, they drove to Mark

4   Orlando's house where he paid Herve the $4,000 cash.  After

5   that, Mark Orlando dropped him off at home in Deer Park.

6          I asked him where the money is that he was paid.  He

7   said he had paid off a student loan from Nassau Community

8   College.  He had bought some clothing and he had $500, five

9   one-hundred-dollar bills left of that money in a shoebox in

10  his room at his house.

11         Q.   Did you take notes of your initial conversation with

12  Herve Jeannot?

13         A.   Some notes, yes.

14         Q.   How many pages?

15         A.   It's encompassed in those same two pages.

16         Q.   Did you begin reducing what Herve Jeannot was

17  telling you to writing?

18         A.   Yes, I did.

19         Q.   When did you begin reducing what Herve Jeannot was

20  telling you to writing?

21         A.   About 5:00 a.m.

22         Q.   Describe how you reduced what Herve Jeannot was

23  telling you to writing.

24         A.   Based on the details that he had provided, I would

25  ask him a question; he would provide an answer.  I would read

1  him back the answer that he gave me.  I would then construct

2  it in sentence form and reduce it to writing.

3      Q.   When did you finish reducing what Herve Jeannot was

4  telling you to writing?

5      A.   About 6:00 a.m.

6      Q.   What did you do with Herve Jeannot's written

7  statement?

8      A.   I read it back to him out loud.  I initialed one

9  correction.  I gave him the statement to read.  I told him,

10  "If there's any corrections or anything you don't understand,

11  that you want changed, to let me know."  He said after he was

12  finished reading it that it was fine, it was the truth.  I

13  asked him to initial the correction, and I asked him to sign

14  all five pages, which he did.

15      Q.   Did anyone else sign?

16      A.   I signed it as well as Detective Partee.

17           MR. HAYDEN:  I would ask that this five-page

18      written statement be marked as or deemed as People's 6

19      for identification and shown to the witness, your

20      Honor.

21      (Whereupon, People's Exhibit 6 was deemed marked for

22                   identification.)

23      Q.   Do you recognize that?

24      A.   Yes, I do.

25      Q.   What is it?

1     A.   It's the five-page written statement I took from

2  Herve Jeannot on December 10, 2004.

3     Q.   How do you know that?

4     A.   Herve Jeannot's signature as well as my signature,

5  Detective Partee's signature, the Homicide Squad number and

6  the date.

7           MR. HAYDEN:  People would ask that that be

8      deemed as six in evidence.

9           THE COURT:  Please show it to counsel.

10          MR. HOCHHEISER:  No objection as to Jeannot

11     for purposes of the hearing, Judge.

12          MR. LEMKE:  As well as Mr. Orlando, your

13     Honor.

14          THE COURT:  Document is received.

15  (Whereupon, People's Exhibit 6 was deemed marked in evidence.)

16     Q.   I'm directing your attention to around 8:05 that

17  Friday morning.  Did you speak with Herve Jeannot then about

18  giving a videotaped statement?

19     A.   Yes, I did.

20     Q.   Describe the conversation you had with Herve Jeannot

21  about giving a videotaped statement.

22     A.   I explained to him that since he had given a written

23  statement, we would afford him the opportunity to go over to

24  the District Attorney's Office, speak with a district

25  attorney, sit down and have his statement videotaped.

1    Q.    What did he say?

2    A.    He said he didn't want to do that.  He didn't think

3    it would be fair to his family.

4    Q.    Did he sign a form?

5    A.    Yes, he did.

6    Q.    Describe that form.

7    A.    It's a preprinted form that we have in the office

8    that encompasses the video refusal.  I filled in the necessary

9    blanks.  I asked him to sign it.  He did and I witnessed it.

10              MR. HAYDEN:  Your Honor, I would ask that this

11        original document be marked as People's 7 for

12        identification, deemed as seven for identification and

13        shown to the witness, please.

14        (Whereupon, People's Exhibit 7 was deemed marked for

15                            identification.)

16    Q.    Do you recognize that?

17    A.    Yes, I do.

18    Q.    What is it?

19    A.    It's the videotape interview refusal form that I

20    just described.

21    Q.    How do you know that?

22    A.    My signature, the date, as well as Herve Jeannot's

23    signature.

24              MR. HAYDEN:  People ask that be deemed as seven

25        in evidence, your Honor.

```
 1                    THE COURT:  Please show it to both counsel.

 2                    MR. HOCHHEISER:  No objection, as to Mr.

 3         Jeannot for purposes of the hearing.

 4                    MR. LEMKE:  As well as Mr. Orlando, your

 5         Honor.

 6                    THE COURT:  Document is received.

 7         (Whereupon, People's Exhibit 7 was marked in evidence.)

 8         Q.   Was Herve Jeannot offered anything to eat or drink?

 9         A.   Yes, he was.

10         Q.   When was that?

11         A.   Throughout the course of the night.  I believe he

12    had an egg sandwich somewhere around 2:00 a.m.  I also know he

13    had lunch somewhere around noon.

14         Q.   Anything to drink?

15         A.   Water, that I recall.

16         Q.   Did Herve Jeannot use the men's room whenever he

17    asked?

18         A.   Yes, he did.

19         Q.   Describe Herve Jeannot's physical condition while

20    you were with him.

21         A.   He was fine.  He appeared healthy.

22         Q.   Did you observe any injury to him?

23         A.   None.

24         Q.   Did he complain of any?

25         A.   No, he did not.
```

1    Q.   Describe Herve Jeannot's demeanor while you were

2   with him.

3    A.   At first throughout the interview he was calm.  He

4   was responsive.  However, after the written statement was

5   finished he did break down and cry for about 15 minutes.

6              MR. HAYDEN:  Nothing further at this time, your

7       Honor.

8              THE COURT:  Gentlemen?

9              MR. HOCHHEISER:  Judge, now would be a good

10      time to take a five-minute break.

11             THE COURT:  If you'd like, sure, we'll take

12      five minutes.

13             (Whereupon, a recess was taken.)

14             THE COURT:  Gentlemen?

15             MR. HOCHHEISER:  Judge, if it's okay with the

16      Court, I was going to go first.

17             THE COURT:  By all means.

18   CROSS-EXAMINATION

19   BY MR. HOCHHEISER:

20      Q.   Detective, good morning.

21      A.   Good morning.

22      Q.   As you know, my name is Daniel Hochheiser.  I

23   represent Herve Jeannot.  Nice to see you again.

24             When was the first time, Detective, that you heard

25   the name Herve Jeannot?

1      A.    The full name, first and last name?

2      Q.    Any reference to Jeannot or Herve.

3      A.    The first time I heard the name Herve would be on

4  Sunday, December 5, 2004.

5      Q.    And who or what was the source of your hearing the

6  name Herve on December 5?

7      A.    Tom Flores.

8      Q.    And it's fair to say, Detective, that Mr. Flores was

9  the first witness that you interviewed in this matter?

10     A.    During the course of this homicide investigation?

11     Q.    Civilian witness.

12     A.    There were other witnesses.  If you want to be more

13  specific as to the type of witness.  There were other

14  witnesses in the case that were interviewed before Flores.

15     Q.    By you?

16     A.    Yes.

17     Q.    But Mr. Flores was the first witness who mentioned

18  either Herve or Jeannot to you in those interviews?

19     A.    I believe that's correct, yes.

20     Q.    Before interviewing Mr. Flores, did you obtain any

21  information from any other witnesses which you believed tended

22  to connect Herve Jeannot to the Calabrese homicide?

23     A.    No.

24     Q.    Now, in your December 5 interview with Mr. Flores,

25  he told you that Orlando and he drove to work together.  I

1    believe this was the Thursday before the homicide.  Correct?

2        A.    Yes.

3        Q.    And that Orlando complained to Flores about wanting

4    to make these two $5,000 bets but was not able to; is that

5    right?

6        A.    Yes.

7        Q.    And Flores also told you in that interview that he

8    had observed earlier in the week before the murder that

9    Orlando -- that he saw Orlando and Herve at work whispering

10   together throughout the week; is that right?

11       A.    Yes.

12       Q.    And you also testified, I believe, that Mr. Flores

13   told you in that conversation that Orlando and Herve, when

14   they were at the gym on the evening of December 3, that they

15   seemed in a hurry, correct?

16       A.    Yes.

17       Q.    Now, they didn't do much exercise?

18       A.    Yes.

19       Q.    Now, you agree with me that as a result of your

20   December 5 conversation with Mr. Flores that he did not

21   provide you with any information that would lead you to

22   believe that Mr. Jeannot shot Calabrese, correct?

23              MR. HAYDEN:   Objection.

24              THE COURT:   Overruled.

25       A.    I wouldn't agree with that, no.

1          Q.    Well, what is accurate?

2          A.    He provided me with information that Herve Jeannot

3     was in the company of Mark Orlando, and I'm talking about at

4     the time now when I'm talking to Flores.

5          Q.    December 5 we're talking about.

6          A.    Right, both of them are present at the homicide

7     scene.  This is based on other factors other than just Flores,

8     or you're just talking about Flores?

9          Q.    We're talking about your conversation with Flores,

10    the information that came from him.  You're not testifying

11    here that Flores told you on December 5 that he knew that

12    Orlando and Herve were at the scene of the homicide, are you?

13         A.    Flores knew that they were in the area of the

14    homicide.

15         Q.    Did you ask him how he knew that?

16         A.    Yes, I did.

17         Q.    And what did he say?

18         A.    He had spoken to Mark Orlando who told him that.

19         Q.    And what did Mr. Flores tell you Mark Orlando told

20    him about that?

21         A.    That Mark Orlando and Herve Jeannot had driven

22    together down to Island Park to the area of Industrial Place

23    by McQuade's restaurant, by Puma's auto body and they had met

24    with the victim.

25         Q.    So it's fair to say as a result of this December 5

1    interview with Mr. Flores that you knew from him that Mr.

2    Jeannot and Mr. Orlando were alleged to have been at the

3    scene, but that was the extent of the information?  You

4    weren't given any information about who actually did the

5    shooting because Mr. Flores didn't know that, correct?

6         A.    That's correct.

7         Q.    For example, as a result of your conversation with

8    Mr. Flores, Mr. Flores didn't provide you with any information

9    as to whether Mr. Orlando was responsible for the killing or

10   Mr. Jeannot or both, correct?

11        A.    That's correct.

12        Q.    So you agree with me at the conclusion of your

13   interview with Mr. Flores you did not have probable cause to

14   arrest Herve Jeannot, correct?

15        A.    I would say no.

16        Q.    You did not, correct?

17        A.    Correct.

18        Q.    And that's why you continued your investigation and

19   interviewed other witnesses?

20        A.    Yes.

21        Q.    And who is the next witness that you interviewed --

22   well, withdrawn.

23             Who was the next civilian witness that you

24   interviewed who mentioned the name either Herve or Jeannot

25   after Tommy Flores?

1       A.    Barbara Diamont.

2       Q.    And is that the December 7 conversation?

3       A.    That's the December 5.

4       Q.    How many times did you interview her?

5       A.    Me personally?

6       Q.    Yes.

7       A.    Probably about half a dozen times.

8       Q.    And each of those half a dozen times did you take

9  notes of your meeting with her about the conversation?

10      A.    No.

11      Q.    Did you ever take notes about your conversations

12  with her?

13      A.    Me personally?

14      Q.    Yes.

15      A.    No.

16      Q.    Who did?

17      A.    Detective Nigro and I believe Detective Brosnan

18  interviewed her.

19      Q.    So were you present with Detective Nigro on December

20  5 when he actually interviewed her or you just read his

21  report?

22      A.    I spoke to her after he did that same day.

23      Q.    And is this an accurate summary of the main things

24  that she said about Jeannot during the interviews with

25  Detective Nigro and you, that on Thursday, December 2, Mark

1  said he was -- Mark Orlando said he was mad about not being

2  able to place the bets with the victim because his line was

3  closed; is that right?

4      A.   Yes.

5      Q.   And that she observed Mark and Herve, whose last

6  name she didn't know at the time on December 2, talking in the

7  rear of the cafeteria by themselves, correct?

8      A.   Yes.

9      Q.   And she didn't have any information as to what was

10  discussed in the cafeteria at that time, did she?

11     A.   No.

12     Q.   And on December 3, 2004, this is according to

13  Barbara Diamont's interview conducted by Detective Nigro, I

14  believe, that Herve showed up with another female employee at

15  lunch at a separate table at the same restaurant she was

16  eating; is that correct?

17     A.   I don't know about that.

18     Q.   And that Mark and Herve showed up at the gym on the

19  evening of December 3, right?

20     A.   Yes.

21     Q.   She told you that?  And she also said, like Flores,

22  she said that Mark and Herve left the gym abruptly at about

23  7:15, right?

24     A.   Yes.

25     Q.   Now, is it fair to say that after the December 5

1    interviews of Barbara Diamont by the Nassau Police Department,

2    that you didn't obtain any information about Herve Jeannot's

3    role in the homicide; is that correct?

4        A.   I don't think that's fair to say, no.  There were --

5        Q.   What did Barbara Diamont tell you Herve Jeannot's

6    role in the homicide was?

7        A.   You're talking about relative to Barbara Diamont?

8        Q.   Just Barbara Diamont.

9        A.   I'm sorry.  No, I agree with you.

10       Q.   So it's fair to say that after the interviews with

11   Tom Flores and Barbara Diamont, that what you knew from those

12   two witnesses only was that Herve Jeannot and Mark Orlando had

13   gone to the gym before the homicide and that they had left in

14   a hurry and that Mr. Flores had received information the

15   following morning that Bobby was killed.  Is that fair?

16       A.   You're saying that's all the information that I got

17   from them is this?

18       Q.   That's the basic extent of the information from

19   those two witnesses in terms of linking Herve Jeannot to this

20   incident; is that correct?

21       A.   No, that's not correct.

22       Q.   What is correct?

23       A.   Mark Orlando -- we're talking relative to Jeannot

24   only or Orlando and Jeannot together?

25       Q.   I'm concerned about Mr. Jeannot.

1      A.    I understand that.   That's why I'm asking you,

2  because I'm going to answer about both.

3      Q.    If we could just stick to Mr. Jeannot.

4      A.    The acknowledgment through Mr. Orlando that Jeannot

5  was there at the time of the homicide, and I'm saying as I

6  deemed that through my investigation, to Barbara Diamont and

7  Tom Flores is additional stuff, yes.

8      Q.    You're testifying here today that Barbara Diamont

9  told you that Mark Orlando told her that Herve Jeannot was at

10  the scene of the homicide?

11      A.    I'm saying that Mark Orlando provided details of the

12  homicide to Barbara Diamont, and Mark Orlando provided details

13  to Tom Flores that Herve Jeannot and Mark Orlando were at the

14  homicide scene.

15      Q.    And what did Barbara Diamont tell you that Orlando

16  told her about Herve's involvement in the homicide?

17      A.    Nothing.

18      Q.    And that's the same for Flores, correct?

19      A.    Flores too?

20      Q.    Flores tells you nothing about Jeannot's involvement

21  in the homicide, correct?

22      A.    Other than what I described.

23      Q.    By the way, Tommy Flores, you first, I believe,

24  interviewed him on December 5, but then you obtained a written

25  statement from him on the 7th; is that correct?

1        A.   That's correct.

2        Q.   Can you explain why you didn't reduce his statement

3   on the 5th to writing for two days?

4        A.   Both Tom Flores and Barbara Diamont had come to the

5   Homicide Squad office to be interviewed.  It took quite a

6   while.  Mr. Flores had to make arrangements to attend the

7   wake, so he had to leave.  So we followed up on it two days

8   later.

9        Q.   And the statement, the written statement that was

10  ultimately obtained from Mr. Flores, is it fair to say that

11  that information which was reduced to writing came from the

12  December 5 interview, not a new interview on the 7th, correct?

13       A.   The bulk of the information would have been from the

14  5th, yes.

15       Q.   Just for logistical scheduling reasons it wasn't

16  reduced to writing until two days later?

17       A.   That's correct.

18       Q.   Now, who is the next witness you interviewed after

19  Barbara Diamont in the investigation in terms of Herve Jeannot

20  mentioned, as to a mention of Herve Jeannot, if anybody?

21       A.   No one.

22       Q.   So it's fair to say that before the arrest of Herve

23  Jeannot, Barbara Diamont and Tom Flores are the only civilian

24  fact witnesses that were interviewed mentioning my client's

25  name, correct?

1       A.   Yes.

2       Q.   And you continued your investigation December 8.   I

3  believe you testified that you obtained cell phone records of

4  Mr. Calabrese?

5       A.   Somewhere around the 8th, yes.

6       Q.   And also for Mr. Orlando?

7       A.   Yes.

8       Q.   And Mr. Jeannot?

9       A.   Yes.

10      Q.   And you established, I believe you testified, that

11  those cell phone records revealed that calls from Mark

12  Orlando's cell phone and Herve Jeannot's cell phone on the

13  evening of the homicide, they hit a cell site near the scene,

14  correct?

15      A.   Yes.

16      Q.   And it also helped you establish that at 8:24 p.m.

17  Mr. Orlando called Calabrese, correct?

18      A.   Yes.

19      Q.   And that at 8:38 p.m. Mr. Calabrese received a call

20  from a Sean Monaghan.   In that conversation Calabrese said

21  something to the effect of couldn't speak, doing something,

22  right?

23      A.   They had a brief conversation, yes.

24      Q.   Now, is it fair to say that in terms of connecting

25  my client, Mr. Jeannot, to the homicide, as of December 8 your

1    sources of information are Barbara Diamont's statement, Tom

2    Flores' statement and the results of the -- of these -- your

3    review of these cell phone records; is that fair?

4        A.   Yes.

5        Q.   And the next day on December 9 you attended this

6    pre-arrest briefing at police headquarters from about 6 to 8

7    o'clock; is that correct?

8        A.   Yes.

9        Q.   And were you, as the case detective who's in charge

10   of the case, were you the one who provided lieutenant, I

11   believe his name was Mulrain, with the information that he

12   used to plan the strategy for the arrest?

13       A.   Myself and my supervisor, Lieutenant Farrell, would

14   have provided him with the details, the particulars of the

15   individuals, where we were going and that part of it.  Mulrain

16   would have coordinated the actual tactical end of it.  That's

17   his responsibility.

18       Q.   Because Mulrain is special operations?

19       A.   That's correct.

20       Q.   And your lieutenant is Homicide?

21       A.   That's correct.

22       Q.   So your supervisor, Lieutenant Farrell, his

23   information about the homicide comes from you, correct?

24       A.   Well, he's been involved in the case with me.  He's

25   assigned to the case with me, and he knows what's going on in

1   the case.

2        Q.   I understand.  But in terms of chain of command,

3   since you're the case detective, you're basically his source

4   of information about the case.  He's not going out and

5   interviewing witnesses, correct?

6        A.   No, he's not.  I'm the source, right, to him.

7        Q.   And who was the source for Lieutenant Mulrain, you

8   or Lieutenant Farrell?

9        A.   Both of us.

10       Q.   Now, Lieutenant Mulrain runs the meeting; is that

11   right?

12       A.   No.

13       Q.   Who runs the meeting?

14       A.   Lieutenant Farrell.

15       Q.   And who was present at this meeting, if you recall?

16       A.   I would believe most, if not all, of the Homicide

17   Squad office members.

18       Q.   You, McGinn, Brosnan, correct?

19       A.   There's about 15 of us.  There's about 15 members.

20       Q.   The entire Homicide Squad office is there?

21       A.   I'm saying most, if not all.  Whether it was

22   somebody could have been on vacation, somebody could have been

23   doing something else.  But I would say the bulk of the office

24   was involved.  Anywhere from 12 to 15 people.

25       Q.   This includes Brosnan, McGinn, Partee?

Det. McHugh/People/Cross-Hochheiser                94

1      A.    Correct.

2      Q.    Nash?

3      A.    Nash, yeah.

4      Q.    And there are special operations officers there who

5  are actually going to make the arrest, correct?

6      A.    Yes.

7      Q.    And what -- when the special operations officers

8  like Brady and Loschiavo, when they arrive at this meeting,

9  what do they know about the homicide investigation before

10  Lieutenant Farrell speaks to them?

11     A.    I don't know that Lieutenant Farrell speaks directly

12  to them.  He may have had their supervisor, Lieutenant

13  Mulrain, speak to them.  This two-hour meeting that we're

14  talking about would have had various aspects of it.  We didn't

15  sit there for two hours and discuss it.  I was involved at

16  some point.  Lieutenant Mulrain would have been involved with

17  his people.  If he had a question or a specific thing, he

18  would have gone back to Lieutenant Farrell.  That's the way

19  those things go.

20     Q.    Who spoke to Officer Brady at the briefing?

21     A.    I would know certainly his supervisor, Lieutenant

22  Mulrain.  You're talking about whether he was directly

23  addressed as to what was going on or was he addressed in the

24  group?

25     Q.    I'm trying to figure out -- Officer Brady, Marinace

1    and Hughes, they're the ones who arrest my client, Jeannot.

2    I'm trying to ascertain the sources of their information

3    before they make the arrest.  Is it correct that Lieutenant

4    Mulrain is the source of their information about the homicide?

5        A.    He would certainly be a part of it.

6        Q.    The main source maybe is fair?

7        A.    The main source, you're talking about relative to

8    the homicide?  The main source -- their main source would be

9    Lieutenant Mulrain, because they're dealing in the tactical

10   part of the case.  They're not dealing in the homicide

11   investigation itself.

12       Q.    You talked to Farrell, Farrell to Mulrain, Mulrain

13   to Brady, Marinace and Hughes, right?

14       A.    Once in a while they let me sneak in there a little

15   bit but that's basically it.

16       Q.    What did you say to those guys?  What did you say to

17   Brady, Marinace and Hughes about the case?

18       A.    About the case?

19       Q.    Yes.

20       A.    I didn't discuss the particulars of the case other

21   than the fact that both have warrants and we're looking to

22   arrest them.

23       Q.    Did you tell Brady, Marinace and Hughes that they

24   were invited to this briefing to plan an arrest of Mr. Jeannot

25   on warrants?

1      A.    Their supervisor, Lieutenant Mulrain, would have

2   been briefed by myself and Lieutenant Farrell about the

3   aspects of the case, including the warrants.  He then would

4   have taken it and explained it to his men.  Whether they

5   physically were there while I was discussing one aspect of

6   this with their lieutenant or I was discussing an aspect of

7   the case with Lieutenant Farrell I wouldn't know.  I don't

8   recall.

9      Q.    But their job was to make an arrest for a homicide.

10  You wouldn't have had a two-hour briefing for the misdemeanor

11  warrants, correct?

12     A.    We're arresting two people relative to a homicide

13  investigation, yes.

14     Q.    Did you make any notes during the debriefing, the

15  two hours?

16     A.    No.

17     Q.    Did you observe anybody taking notes at the

18  debriefing?

19     A.    No, I did not.

20     Q.    Now, there came a time, I believe, when officer --

21  well, withdrawn.

22            How did you hear that Brady, Hughes and Marinace had

23  Jeannot in custody?

24     A.    I believe I got a telephone call.

25     Q.    You were in the office?

1      A.   No, en route to the office.

2      Q.   And where had you been coming from?  I'm not looking

3  to pry into your personal life.

4      A.   I was en route to the Homicide Squad office from the

5  Airport Plaza place of arrest of Mr. Orlando.

6      Q.   And what were you told -- who did you have the

7  telephone conversation with at that time?

8      A.   I believe it was Lieutenant Farrell.

9      Q.   What did he say to you?

10      A.   That Jeannot's arrested.  He would be on his way

11  into the office soon.

12      Q.   And what's -- after you had that telephone

13  conversation with Lieutenant Farrell, shortly thereafter Mr.

14  Jeannot was presented to you and you took custody of him,

15  correct?

16      A.   Mr. Jeannot?

17      Q.   Yes.

18      A.   I was not involved in the arrest of Mr. Jeannot.

19      Q.   He was taken into custody by Detective Brosnan?

20      A.   You're asking me if I knew that at that time right

21  when it happened?

22      Q.   Well, when's the next time you see -- withdrawn.

23           You hear that Jeannot has been arrested.  What's the

24  next time you hear the name Jeannot or see Jeannot?

25      A.   I see Jeannot -- I become aware that he's in the

1   Homicide Squad office probably about 10:20, maybe 10:25 p.m.,

2   on the 3rd -- I'm sorry, on the 9th.

3       Q.   And your understanding now and then is that Jeannot

4   was arrested at about 9:15 p.m. December 9 in front of

5   Professional Credit Services, right?

6       A.   Yes.

7       Q.   And do you know where Jeannot was brought initially

8   into the Homicide Squad, what room?

9       A.   Yes, I do.

10       Q.   Where was this?

11       A.   He would have been in what we refer to as the second

12   interview room.

13       Q.   And he was brought there by Detectives Brosnan and

14   Nash; is that right?

15       A.   Yes.  I believe it's Brosnan and Nigro.

16       Q.   Now, what time did Detectives Brosnan and Nigro

17   bring Mr. Jeannot into the second interview room?

18       A.   I don't know.

19       Q.   Do you have an idea?

20       A.   Yes.

21       Q.   What?

22       A.   About 20 to -- or 10:12 p.m., somewhere around

23   there.

24       Q.   And Detective Brosnan and some other detectives,

25   they speak to Jeannot for a number of hours before you even

Det. McHugh/People/Cross-Hochheiser                    99

1   become involved, correct?

2        A.   Yes.

3        Q.   And during those hours, he's in this room which I

4   believe you testified is eight by ten, right?

5        A.   I believe I testified that one's about eight by

6   twelve.

7        Q.   My mistake.  And he was handcuffed to a chair?

8        A.   When?

9        Q.   When he was sitting there in the second interview

10  room.

11       A.   What time?

12       Q.   Was he handcuffed to a chair at any time?

13       A.   That I was with him?  I wouldn't know if he was

14  handcuffed to a chair at any other time other than when I was

15  with him.  When I was with him, he was not handcuffed to a

16  chair.

17       Q.   So your next -- is it fair to say your next contact

18  or information that you received about the interview of

19  Jeannot is when Detective Trillo comes to you and says he said

20  he shot the guy, something like that?

21       A.   You're asking me if that's my first contact with him

22  or is that the first thing that I become aware of relative to

23  what's transpired throughout the evening?

24       Q.   My question, I think, is bad.  Let me rephrase it.

25  You're involved in the interview of Orlando and some other

```
 1    matters in the investigation.  Detectives Brosnan and Nigro or
 2    whoever, they're talking to Jeannot, correct?
 3         A.    Correct.
 4         Q.    And during those several hours until Trillo comes to
 5    talk to you, you don't have contact with Jeannot; am I right?
 6         A.    No, I do not.
 7         Q.    And it's only after Trillo comes to you, that's when
 8    you begin to become involved in the interview process,
 9    correct?
10         A.    Yes.
11         Q.    What does Detective Trillo tell you exactly in that
12    conversation?
13         A.    That Herve Jeannot has told him, he and Detective
14    Partee, that he shot and killed Bobby Calabrese.
15         Q.    Now, what time is that conversation between you and
16    Detective Trillo?
17         A.    Between 4:20 and 4:30 a.m.
18         Q.    December 10?
19         A.    Yes.
20         Q.    Did Detective Trillo say anything else to you during
21    that conversation that you recall?
22         A.    Yes, I asked him if anything had changed, because
23    Detective Trillo had been involved in the case.  There was a
24    written statement that was taken from Herve Jeannot, and I
25    wanted to know if anything changed as far as the details that
```

1    I knew.  Was there anyone else involved?  Was there another

2    automobile involved?  Did I have -- those facts that we had,

3    were they correct?  And he said yes.  There was nothing new or

4    nothing that I didn't know about.

5         Q.    So before the conversation between you and Trillo

6    when he approaches you about Herve saying that he shot the

7    guy, you were aware of and had reviewed a first written

8    statement; is that fair?

9         A.    Yes.

10        Q.    And who took that written statement?

11        A.    Detective Brosnan.

12        Q.    And what was the gist of that written statement as

13   you recall?

14        A.    That Herve Jeannot and Mark Orlando after work on

15   Friday had gone to the LA Fitness Center.  They had gone out

16   to -- prior to that, after work they had gone to buy a coat in

17   Amityville.  Mark Orlando was supposed to go pick up a check

18   at Wantagh Suzuki, so he was out.  Herve was out hanging

19   around with Mark Orlando, and Mark had to drive down to Island

20   Park to pay a gambling debt to Bobby Calabrese.  Then he

21   detailed what happened when they got down there.

22        Q.    Well, in that statement he said that he believes

23   Orlando paid him and then they left, correct?

24        A.    That's correct.

25        Q.    In that version there's no killing, right?

1      A.    That's correct.

2      Q.    So the change in Mr. Jeannot's version of events

3   first developed when you were outside the second interview

4   room; is that correct?

5      A.    Yes.

6      Q.    And you're not aware exactly of what Detective

7   Trillo and Detective Partee -- Detective Brosnan?

8      A.    Partee.

9      Q.    -- said to Mr. Jeannot during that six-hour period,

10  correct?

11     A.    They weren't with him for six hours.

12     Q.    How long were they with him?

13     A.    I'd say about an hour.

14     Q.    From when to when?

15     A.    From about 3:30 to about 4:20, until Trillo comes

16  out and gets me.

17     Q.    What was happening with Mr. Jeannot between 10:12

18  p.m. when he was placed in the second interview room and 3:30

19  when Detective Partee and the rest started to interview him?

20     A.    He was interviewed by Detective Brosnan and

21  Detective Nigro, and he made a written statement in that time

22  period to Detective Brosnan.

23     Q.    And that was also an exculpatory statement, correct?

24  He didn't say that he did it to those detectives?

25     A.    No, he did not.

Det. McHugh/People/Cross-Hochheiser                103

```
 1        Q.   He said he was present but --
 2        A.   Present.  Mr. Orlando paid his gambling debt and
 3   they left.  And the victim drove off and was fine.
 4        Q.   The first -- before the time that Detective Trillo
 5   came to you and told you about this change in the version from
 6   Jeannot, is it fair to say that you didn't believe what
 7   Jeannot was saying to the other detectives?  Is that fair?
 8        A.   Yes.
 9        Q.   What was your belief -- withdrawn.
10             Before Detective Trillo came to speak to you about
11   Mr. Jeannot's alleged confession, what was your understanding
12   about Mr. Jeannot's real role in the homicide?
13                  MR. HAYDEN:  Objection.
14                  THE COURT:  Sustained.
15        Q.   Did you ever tell Mr. Jeannot that you didn't
16   believe him?
17        A.   When I spoke to Mr. Jeannot, I did believe him.
18        Q.   This is before the conversation between you and
19   Trillo?
20        A.   There was no conversation between Jeannot and I
21   before the conversation with Trillo.
22        Q.   But you had seen the prior statements from Jeannot
23   to Partee, correct?
24        A.   Yes.
25        Q.   And that statement you did not believe, correct?
```