```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU          :        PART 33
 2   ------------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK,
                                          Indictment No.
 4            -against-                    167N-2005

 5

 6   MARK ORLANDO and HERVE JEANNOT,

 7                              Defendants.
     ------------------------------------------X
                              Mineola, New York
 8                            April 18, 2005
                                   19
 9

10   B E F O R E:   HONORABLE ALAN L. HONOROF
                    Acting Supreme Court Justice
11

12   A P P E A R A N C E S:

13
             HON. DENIS DILLON
14               District Attorney of Nassau County
                 BY:  ROBERT T. HAYDEN, ESQ.
15               Assistant District Attorney for the People

16           DENNIS LEMKE, ESQ.
17               Attorney for Defendant Orlando
                 114 Old Country Road
18               Mineola, NY  11501

19           DANIEL HOCHHEISER, ESQ.
20               Attorney for Defendant Jeannot
                 270 Madison Avenue
21               New York, NY  10016

22

             M I N U T E S   O F   H E A R I N G
23

24

25                              Edward Dong
                                Official Court Reporter
```

1        A.    Correct.

2        Q.    And can you tell me why you didn't believe him at

3    that point?

4        A.    The time frame, including the 911 calls, the witness

5    interviews of the people that made those calls that discovered

6    the body, the videotape off of the Central Storage Facility

7    including those times, the movements of the cars also on that

8    videotape, the cell site information, all of those things.

9        Q.    All of those things led you to believe that Mr.

10   Jeannot was more than just present, right?

11       A.    No.  At that point they would have led me to believe

12   that he was certainly present at the time of the homicide.

13       Q.    But that's it?

14       A.    That's correct.

15       Q.    So when Mr. Jeannot tells Detective Partee that he

16   was present and that he didn't shoot the guy, why didn't you

17   believe that?

18            MR. HAYDEN:  Objection.  That's not the

19        testimony.

20            THE COURT:  Sustained.

21       Q.    You weren't present when Mr. Jeannot was allegedly

22   advised of his Miranda rights, correct?

23       A.    I was not present, no.

24       Q.    Are you aware that a detective told Mr. Jeannot

25   while he was in the second interview room that his story was

1    inconsistent with Orlando's and that Orlando was telling the

2    truth?

3         A.   Yes.

4         Q.   And who told Mr. Jeannot that?

5         A.   I believe that occurred during the interview by

6    Detective Partee and Detective Trillo.  Which one of those two

7    actually made that statement I don't know.

8         Q.   And it's after that statement by either Detective

9    Partee or Detective Trillo that Mr. Jeannot's version of

10   events changed, causing Detective Trillo to come to you,

11   correct?

12        A.   I don't know whether it had changed or started to

13   change before that.  I wasn't in that interview.

14        Q.   Now, are you aware that police told Mr. Jeannot on

15   the evening of December 9 and in the morning of December 10

16   that if he didn't cooperate with them that he could be

17   released from the precinct?

18             MR. HAYDEN:  Objection.  That assumes that it

19        happened.

20        Q.   Well, did it happen?

21        A.   Not that I'm aware of.

22        Q.   Was the subject of Bobby Calabrese's employer's

23   interest in the matter brought up during the interviews of Mr.

24   Jeannot?

25             MR. HAYDEN:  Objection.  Once again, that

1      assumes that there's such an interest.

2              THE COURT:  Let's find out.

3      A.   During my interview that was not brought up, no.

4      Q.   Well, as a result of your knowledge and

5   investigation of this case, do you know if that subject was

6   brought up with Mr. Jeannot during this interview process

7   we're talking about?

8      A.   No, I do not.

9      Q.   And I'm correct that you don't know prior to 4

10  o'clock in the morning, 4:30 in the morning, before you got

11  into the room with Jeannot, you don't know whether he asked

12  Partee, Trillo, Nigro for an attorney, correct?

13     A.   I wouldn't know that, no.  I wasn't there.

14     Q.   How many separate statements in total did Mr.

15  Jeannot make to police that were reduced to writing?

16     A.   Two.

17     Q.   And it's fair to say that he didn't write either

18  statement, correct?

19     A.   Correct.

20     Q.   Were you present -- who was the detective who asked

21  Mr. Jeannot whether he wished to be interviewed by an

22  assistant district attorney on videotape?

23     A.   I prepared that request.

24     Q.   And I take it that you explained the contents of

25  that request before asking him to sign it?

1     A.    Yes.

2     Q.    Can you describe that discussion that you had with

3     Mr. Jeannot before it was executed?

4     A.    I explained to Mr. Jeannot that now that he had made

5     a written statement, that he would be afforded the opportunity

6     to go over, speak to the district attorney and have his

7     statement videotaped.  I filled -- we have a preprinted form.

8     I filled in the blanks.  I gave it to him to read over.  He

9     declined the opportunity to have a video.  He said he didn't

10    want to subject his family to that.  He signed it --

11    Q.    I'm sorry.  Go ahead.

12    A.    He signed it and I signed it.

13    Q.    Did you ask him what his family concerns were?

14    A.    No.

15    Q.    I believe you testified yesterday that this, the

16    death of Mr. Calabrese or the incident involving Mr.

17    Calabrese, came to the attention of the police department

18    pursuant to 911 calls; is that right?

19    A.    Yes.

20    Q.    And have you had an opportunity to listen to tapes

21    of those calls?

22    A.    Yes.

23    Q.    And who was it that made those calls?

24    A.    I'm aware of a call from the clerk at the 7-11 which

25    is right down the street from the scene.

1    Q.   And did you have an opportunity during your

2    investigation to interview that person?

3    A.   Yes.

4    Q.   And what did that person tell you?

5    A.   A customer came in the store telling him that there

6    was someone lying in the roadway down the street and they

7    asked him to dial 911, which he did.

8    Q.   And was there anybody else -- withdrawn.

9         Did anybody else besides that clerk call 911 that

10   you're aware of?

11   A.   I don't recall if there's other 911 calls.  There

12   may have been another call relative to hearing shots fired.

13   Q.   Did you interview the customer who notified this

14   clerk who called 911?

15   A.   Yes, I did.

16   Q.   And what did that customer tell you?

17   A.   He and his girlfriend were riding northbound on

18   Broadway when they saw a body in the street, saw somebody

19   laying in the street.  They pulled around it and went to 7-11

20   and asked the man to call 911.

21   Q.   It's fair to say that neither the clerk nor the

22   customer provided any information concerning suspects; is that

23   right?

24   A.   That's right.

25   Q.   I believe during the course of your investigation

1   you also spoke to a witness by the name of Robert Ianfolla; is

2   that right?

3        A.   Yes.

4        Q.   Did that conversation occur on December 4?

5        A.   Yes.

6        Q.   And the gist of what he told you was that he was

7   with Mr. Calabrese at the Calabrese residence on December 3 at

8   8:00 p.m.; is that right?

9        A.   Somewhere around that time, yes.

10       Q.   And that Mr. Calabrese told him he was going to

11  Island Park to meet a guy named Mark to collect a gambling

12  debt, right?

13       A.   Yes.

14       Q.   And Mr. Ianfolla made no mention of Herve Jeannot,

15  correct?

16       A.   No, no mention.

17       Q.   Am I correct?

18       A.   No mention, you're correct.

19       Q.   And you also interviewed, I believe, that same day

20  Sean Monaghan?

21       A.   Sean Monaghan may have been interviewed that day.

22  I'm not certain of whether it was that day or the next day.

23       Q.   Prior to Mr. Jeannot's arrest, Sean Monaghan was

24  interviewed, correct?

25       A.   Yes.

1    Q.    He did not mention Mr. Jeannot; is that correct?

2    A.    That's correct.

3    Q.    And prior to the arrest of Mr. Jeannot, I believe

4    it's December 4 or around that day, you interviewed Mr.

5    Calabrese's father; is that right?

6    A.    Yes.

7    Q.    Did he make any mention of Mr. Jeannot?

8    A.    No.

9    Q.    You testified that one of the pieces of evidence

10   that you reviewed prior to the arrest of Mr. Jeannot and

11   Orlando was this videotape from Central Self Storage.  Do you

12   remember?

13   A.    Yes.

14   Q.    And it's your testimony that you could see on that

15   videotape a light-colored auto coming down Broadway; is that

16   right?

17   A.    Yes.

18   Q.    Could you make out the color of the car?

19   A.    Light color.

20   Q.    That's a black and white videotape?

21   A.    Yes.

22   Q.    So everything is either black or white?

23   A.    Light or dark.

24   Q.    And your testimony is that you could see on that

25   videotape something besides the automobile's lights?  You

1  could distinguish the color?

2      A.   I could distinguish that it was only a light color.

3  I didn't say a color, just light.

4      Q.   You're not -- you're not testifying that you viewed

5  this videotape and that you could see that one of the autos on

6  the videotape was a Suzuki, are you?

7      A.   It's my belief that one of the autos on that

8  videotape was a Suzuki Verona, yes.

9      Q.   Do you know that from watching the videotape or is

10 that watching the videotape plus your knowledge of other

11 pieces of evidence?

12     A.   At the time that I first reviewed the tape, it was

13 from reviewing the tape solely.

14     Q.   You could see that it was a Suzuki just from viewing

15 the tape?

16     A.   No.   I had a photograph of

17 holding it up next to each other, I

18 determination.

19              MR. HOCHHEISER:   Excu

20      one moment?

21              THE COURT:   Sure.

22                 (Pause in the pro

23              MR. HOCHHEISER:   I h

24      Honor.   Thank you.

25              THE COURT:   Mr. Lemke.

1          MR. LEMKE:  Thank you, your Honor.

2   CROSS-EXAMINATION

3   BY MR. LEMKE:

4       Q.   Detective, I too will be asking some questions.

5   I'll try not to be redundant in some areas however.  You're

6   the carrying detective regarding the investigation of the

7   death of Bobby Calabrese, correct?

8       A.   Yes.

9       Q.   And on December 3, 2004, was it at that time that

10  you first became aware of a homicide down in Island Park?

11      A.   Yes.  It's actually North Long Beach.

12      Q.   North Long Beach.  Do you recall about when you

13  received that phone call?

14      A.   9:00 p.m.

15      Q.   And do you recall who that was from?

16      A.   Detective Nash from the Fourth Squad.

17      Q.   And would it be correct to say that you then

18  responded to that location?

19      A.   Yes.

20      Q.   And in doing so, I take it, when you had arrived

21  that either the Crime Scene Search Unit was probably there at

22  that point?

23      A.   They had not arrived yet.

24      Q.   Other officers may have been there?

25      A.   Officers were there and the scene was secured, yes.

1    Q.    And at that point in time do you know whether there

2    was a canvas of the area for any possible witnesses to the

3    incident?

4        A.    Yes.

5        Q.    And in doing so, were there either lead sheets

6    prepared or other notations made regarding any conversations

7    that either yourself, any of the other officers or detectives

8    may have made regarding conversations with possible witnesses?

9        A.    Yes.

10       Q.    And in doing so, had there been in your discussions

11   or as you're aware of, whether on December 3, 2004, there were

12   any eyewitnesses to the death of Bobby Calabrese?

13       A.    When you mean eyewitness, someone that says they

14   actually saw someone standing there with a gun?

15       Q.    Yes.

16       A.    No.

17       Q.    As you sit here today, has there been anyone that

18   has been brought to your attention that has become an

19   eyewitness, that has seen the shooting of Bobby Calabrese?

20       A.    No.

21       Q.    Has there been anyone through your canvassing that

22   has come forward to say they saw a light-colored Suzuki Verona

23   leaving that location at about 8:30, 8:40 on December 3, 2004?

24       A.    No.

25       Q.    Has there been anyone that has been able to

1    identify -- you know who Mark Orlando is, correct?  I think

2    you pointed him out.

3         A.   Yes.

4         Q.   Has there been anyone through your investigation

5    that has identified that Mark Orlando was present or there on

6    December 3, 2004?

7         A.   No.

8         Q.   So as you begin your investigation on February 3

9    [sic], you then begin, I would say, regarding the

10   relationships and friends of Bobby Calabrese and trying to put

11   together an investigation, correct?

12        A.   Yes.

13        Q.   And in doing so, one of the people -- and I may be

14   out of order -- was, I think you had testified, a Tommy Flores

15   you had spoken to?

16        A.   Yes.

17        Q.   And I believe that was on December 5 of 2004?

18        A.   Yes.

19        Q.   And there was a statement made by Mr. Flores, I

20   believe, on December 7 of 2004?

21        A.   Yes.

22        Q.   I believe there also had been conversations with Mr.

23   Flores's girlfriend, Barbara Diamont, I believe, correct?

24        A.   Yes.

25        Q.   And you testified a little earlier regarding those

1    conversations that either they had with their observations of

2    the relationship between Mark Orlando and Mr. Jeannot as well

3    as conversations they may have had from Mr. Orlando, correct?

4         A.   Yes.

5         Q.   You also had, I believe, a conversation with -- is

6    it pronounced Mr. Ianfolla?

7         A.   Ianfolla.

8         Q.   Ianfolla, regarding his being with Mr. Calabrese on

9    December 3 at around 8:00 p.m.; is that correct?

10        A.   Yes.

11        Q.   And that he had received a phone call and then left,

12   correct?

13        A.   Yes.

14        Q.   And do you recall whether he had indicated -- and

15   this is Bobby Calabrese -- that he was going to meet somebody

16   by the name of Mark?

17        A.   That's what Ianfolla told me, yes.

18        Q.   You also heard the name Mark mentioned a few times

19   between Barbara and Tommy Flores, correct?

20        A.   Mark Orlando, yes.

21        Q.   And you had also, prior to December 9 in this

22   debriefing, had viewed the video from Central Self Storage,

23   correct?

24        A.   Yes.

25        Q.   And in looking at that video, you've testified that

1    it's your opinion that the vehicle in that video would be

2    either very similar or could be a Suzuki Verona, correct?

3         A.   My belief at that time was it a 2004 Suzuki Verona,

4    yes.

5         Q.   Do you know when the Veronas were first made?

6         A.   No, I do not.

7         Q.   In looking at that video, were you able to determine

8    how many people were in that car?

9         A.   No, just a driver.  I mean, obviously there was a

10   driver, so at least one person.

11        Q.   So you were able to see the car being operated, but

12   you can't see through the glass who was driving or how many

13   people in the car, correct?

14        A.   That's correct.

15        Q.   You can't also see a license plate, correct?

16        A.   No.

17        Q.   And in fact, you had viewed that prior to December 9

18   of '04, correct?

19        A.   Yes.

20        Q.   And as a result of this investigation, there was a

21   debriefing called at either the Homicide Squad on December 9,

22   correct?

23        A.   Yes.

24        Q.   And was that called at your request?

25        A.   Yes.

Det. McHugh/People/Cross-Lemke                    117

1      Q.   And you make a determination that you now wish to

2   have Mark Orlando arrested, correct?

3      A.   Yes.

4      Q.   And during this debriefing, there's a number of

5   members that you testified from the Homicide Squad and from

6   BSO, and they were divided into teams as to who's going to

7   arrest either Mark Orlando or the codefendant, correct?

8      A.   That was done, yes.

9      Q.   And the decision at that time to place Mark

10  Orlando -- and I'm referring to Mark Orlando now -- under

11  arrest, was based on -- well, withdrawn.

12          You are also aware that he had an outstanding

13  warrant, correct?

14     A.   Two warrants.

15     Q.   Misdemeanor warrants, I believe, correct?

16     A.   Yes.

17     Q.   And those were outstanding, correct?

18     A.   Active warrants, yes.

19     Q.   And those certainly would give you the authority to

20  place Mr. Orlando under arrest based upon those warrants,

21  correct?

22     A.   Yes, they would.

23     Q.   However, there was also a determination made by you,

24  based upon your investigation, to question Mr. Orlando

25  regarding any involvement he may have had in the death of

1    Bobby Calabrese, correct?

2        A.   He was spoken to about that, yes.

3        Q.   But Mr. Orlando was not spoken to until after he's

4    placed under arrest on December 9, correct?

5        A.   That's correct.

6        Q.   The order that you have that Mr. Orlando be placed

7    under arrest, was that -- you didn't have an arrest warrant

8    for his arrest for the murder of Bobby Calabrese?

9        A.   No.

10       Q.   You had testified that there were no eyewitnesses

11   that put him there.  You had some witnesses indicating to you

12   that Mr. Orlando had met Bobby Calabrese, correct?

13       A.   Yes.

14       Q.   Maybe even to pay off a debt, correct?

15       A.   Yes.

16       Q.   But there wasn't enough -- and correct me if I'm

17   wrong -- at that time to either have an arrest warrant from

18   any sitting judge to arrest Mr. Orlando, correct?

19                  MR. HAYDEN:  Objection.

20                  THE COURT:  Sustained.

21       Q.   You made a determination to have Mr. Orlando

22   brought in or arrested, correct?

23       A.   I made the decision to have him arrested, yes.

24       Q.   And was that arrest for the murder of Bobby

25   Calabrese or was it to have him arrested or brought into

Det. McHugh/People/Cross-Lemke                    119

1  custody as a result of the bench warrants that were

2  outstanding?

3      A.    Both.

4      Q.    And when he's then arrested, you're, I believe, at a

5  location when my client was placed under arrest, correct?

6      A.    Yes.

7      Q.    And that was in Farmingdale, correct?

8      A.    Yes.

9      Q.    By the Airport Plaza?

10      A.    Inside the Airport Plaza.

11      Q.    And when you had arrived, I think you were with

12  nother detective, I believe?

13      A.    Yes.

14      Q.    And when you had arrived, Mr. Orlando was -- at that

15  point was he still on the ground?

16      A.    I was behind the Bureau of Special Operations car

17  when they stopped him, so I was there before he ever got out

18  of the car.

19      Q.    So you were following the BSO vehicle?

20      A.    Yes.

21      Q.    And then a determination is made to then arrest him.

22  or stop the vehicle, correct?

23      A.    Correct.

24      Q.    Now, had you been advised prior to Mr. Orlando's

25  vehicle being stopped that the codefendant moments earlier had

1   been placed under arrest also?

2        A.   No, he hadn't been arrested yet.

3        Q.   Do you know the order in which they were arrested?

4        A.   Orlando first, Jeannot second.

5        Q.   And what time was Jeannot arrested?

6        A.   I believe about 9:20, but I wasn't there when it

7   happened.

8        Q.   And after Mr. Orlando had been, again, taken out of

9   the vehicle, he wasn't taken out of the vehicle by yourself,

10  correct?

11       A.   Correct.

12       Q.   Another officer went over to where the vehicle had

13  pulled over, correct?

14       A.   Um-hmm.

15       Q.   Do you know whether the lights were put on?  Were

16  the bubble lights for the BSO unit on to pull the vehicle

17  over?

18       A.   I believe they had lights on, yes.

19       Q.   The operator of that vehicle pulled that Cougar

20  over, correct?

21       A.   Yes.

22       Q.   And in fact, the officer then got out, went over and

23  what, opened up the door?

24       A.   The door got opened, yes.

25       Q.   And asked the driver to get out, correct?

1      A.   I don't know if he asked him to get out, but he got

2    out.

3      Q.   Prior to following that vehicle, had you seen Mr.

4    Orlando get into that vehicle?

5      A.   That evening?

6      Q.   Yes.

7      A.   No.

8      Q.   So when you began following that Cougar, you had not

9    seen Mr. Orlando get in that vehicle?

10     A.   No, I had not.

11     Q.   And how do you know he was in that vehicle?

12     A.   Because his place of employment -- we had the

13   license plate of his car.  His place of employment was under

14   observation.  He was observed leaving his job and getting in

15   that car and driving away.

16     Q.   Who saw him get into the car?

17     A.   Bureau of Special Operations and the Electronics

18   Squad.

19     Q.   Do you know who in particular?

20     A.   I don't know who from the Bureau of Special

21   Operations.  I believe Detective Lore from the Electronics

22   Squad was involved.

23     Q.   And it's Detective Lore?

24     A.   L-O-R-E.

25     Q.   Was Detective Lore part of the debriefing earlier

1   that night?

2        A.    He was there.  Whether he was there for the whole

3   debriefing or not I don't know.  I know he was advised

4   certainly of the circumstances.

5        Q.    Do you know if Detective Lore was provided a

6   photograph of Mr. Orlando?

7        A.    Photographs were provided.  Whether he in fact had

8   one or not I don't know.

9        Q.    Now, you then follow this vehicle, this Cougar.  You

10  don't see Mr. Orlando get into that Cougar.  How do you know

11  that the vehicle is now leaving the parking area where he

12  works?

13       A.    There's -- it's announced over the radio.

14       Q.    That that vehicle is leaving?

15       A.    I believe so.

16       Q.    And as you're following it behind the other vehicle,

17  the BSO vehicle, you don't see this Cougar in any way

18  violating any VTL violations, correct?

19       A.    Other than the driver not having a license?

20       Q.    You didn't know the -- you did know the driver

21  didn't have a license, correct?

22       A.    Yes.

23       Q.    But you didn't see him get in that vehicle, correct?

24       A.    I was advised he had gotten into that vehicle.

25       Q.    You yourself didn't see him get into that vehicle?

Det. McHugh/People/Cross-Lemke                    123

1      A.    No.

2      Q.    You don't know if the BSO had seen him get into that

3   vehicle, correct?

4      A.    I don't know if they physically saw it themselves or

5   if they were acting on the information that was provided to

6   them.

7      Q.    So you follow the vehicle.  Then there's a

8   determination to pull the vehicle over, correct?

9      A.    Yes.

10     Q.    And he's then placed under arrest, correct?

11     A.    Correct, yup.

12     Q.    He's then placed into your vehicle to be taken back

13  to headquarters?

14     A.    Yes.

15     Q.    When he's initially placed in your vehicle, there's,

16  I believe, a conversation between you and Mr. Orlando,

17  correct?

18     A.    Yes.

19     Q.    And you tell Mr. Orlando that he's under arrest?

20  What do you tell Mr. Orlando at that time?

21     A.    I introduced myself and Detective McGinn.  I tell

22  him I want to speak to him about the death of Bobby Calabrese,

23  that we would be responding to Mineola to police headquarters,

24  and I would speak to him when we got there.

25     Q.    Now, he was in the back seat, I take it?

 1      A.    Yes.

 2      Q.    Were you in the back seat also?

 3      A.    Yes.

 4      Q.    And one of the other detectives was driving,

 5   correct?

 6      A.    Detective McGinn.

 7      Q.    That's probably at that time maybe an 18-minute ride

 8   from Farmingdale back to headquarters, do you know?

 9      A.    I wouldn't know if it's 18 minutes.

10      Q.    Do you know how long it took?

11      A.    It took me 35 or half an hour by the time we get

12   situated, loaded up, half an hour.

13      Q.    During that half-hour ride back, it's your testimony

14   you had no conversation at all with Mr. Orlando?

15      A.    That was my instruction to him, that I would speak

16   to him when we got back, and that's the way it was, yes.

17      Q.    There was complete silence back to headquarters?

18      A.    Other than discussions between Detective McGinn and

19   myself, yes.

20      Q.    You didn't have any discussions with Mr. Orlando

21   about gambling?

22      A.    No.

23      Q.    Or about his relationship with Mr. Calabrese?

24      A.    No.

25      Q.    While you were there at the scene, do you recall

1    whether or not his cell phone was taken out of the Cougar at

2    that time that you were there?

3          A.    I don't know.

4          Q.    And does the name Barry Philips, is that familiar to

5    you in any way?

6          A.    I believe he's an attorney.

7          Q.    And when Mr. Orlando was then placed into custody

8    and you told him you wanted to talk to him about Bobby

9    Cassidy -- Bobby Calabrese, did you then tell him or ask him

10   whether he wanted a lawyer in any way?

11         A.    No.

12         Q.    And did he tell you, "Well, would you please call or

13   get my cell phone?  I want to call my lawyer, Mr. Philips, if

14   it's okay.  If he says it's okay to talk to you, I'll talk to

15   you"?

16         A.    No, I did not.

17         Q.    You never heard that name that evening at all, Barry

18   Philips?

19         A.    I don't know if he's the attorney that called later

20   on during the day.  An attorney called later during the day,

21   so it could be him.

22         Q.    Do you recall what time that attorney had called

23   you?

24         A.    Sometime in the afternoon.

25         Q.    Did you make a notation as to that?

Det. McHugh/People/Cross-Lemke                    126

1    A.    Yes.

2    Q.    Do you have that documentation with you?

3    A.    No, I do not.

4    Q.    Is that something perhaps over lunch you can just

5    review and perhaps I may have it?

6              MR. HAYDEN:  I believe it's on the blotter.  I

7         believe Mr. Lemke does indeed have it.

8    Q.    As you sit here now, you don't know what time that

9    call came in, correct?

10   A.    2, 3 o'clock in the afternoon.

11   Q.    And did you have a conversation with that attorney?

12   A.    I don't believe I did, no.

13   Q.    Do you know who did?

14   A.    The entry in the blotter may refresh my

15   recollection.

16             MR. HAYDEN:  Just for the record, Judge, I have

17        that blotter entry.

18             MR. LEMKE:  It's Rosario 18 or Rosario 19.

19             MR. HAYDEN:  It's 3:15 in the afternoon,

20        attorney Barry Philips, 516, looks like 457-3901,

21        calling representing Mark Orlando.

22   Q.    Does that statement by Mr. Hayden refresh your

23   recollection as to --

24   A.    Yes, it does.

25   Q.    And would it be correct to say that you received a

1    call from Mr. Philips later in that day, correct?

2         A.    Someone in the office received a call from Mr.

3    Philips, yes.

4         Q.    When you arrived back to headquarters, Mr. Orlando

5    is placed in an interview room, correct?

6         A.    Yes.

7         Q.    Interview, perhaps, number one?

8         A.    That would be fair to say, yes.

9         Q.    And when he's brought in, if you know, is Mr.

10   Jeannot already present there in room two?

11        A.    He's in the -- in the office when I arrive with

12   Orlando.

13        Q.    Mr. Orlando gets brought in and he's brought into

14   that room number one, if we can refer to it as that, correct?

15        A.    Yes.

16        Q.    And would it be correct to say that that was at

17   about maybe 2150?  Would that be about right?

18        A.    9:50 p.m., yes.

19        Q.    And he was there for about another 30 minutes before

20   the rights were read to him, correct?

21        A.    About 20.

22        Q.    When you say 20, was there -- I think there was

23   notations made regarding basically a time line; is that

24   correct?

25        A.    Yes.

Det. McHugh/People/Cross-Lemke                    128

1        Q.   Was that made by yourself?

2        A.   Some of it.

3        Q.   And you're saying that about -- if I said 2150 was

4    when you signed into the blotter as arriving at headquarters,

5    that would be about correct?

6        A.   Yes.

7        Q.   Then 2210 I have the rights.  Would that be for Mr.

8    Orlando?

9        A.   Yes.

10       Q.   And that would be from the rights' card which is in

11   evidence as People's 3, correct?

12       A.   Yes.

13       Q.   During the 20 or the half hour from when he first

14   was brought up into the room until the rights were read to

15   him, were you with Mr. Orlando?

16       A.   No.

17       Q.   Was there anyone else that you were aware of, any

18   other detectives, with Mr. Orlando?

19       A.   No other detectives.  Members of the Bureau of

20   Special Operations would have been keeping an eye on him.

21       Q.   So they would have brought him.  Do you recall if he

22   was handcuffed, if you know, during that half hour?

23       A.   From his arrival at 9:50 p.m. until I see him at

24   10:10?

25       Q.   Yes.



1        A.   He would have been -- he was not handcuffed at

2   10:10.  I couldn't tell you how long in that 20 minutes he was

3   handcuffed.

4        Q.   And at that point I think you began -- you read him

5   his rights at 2210, correct?

6        A.   Yes.

7        Q.   And then you had a conversation with him, correct?

8        A.   Yes.

9        Q.   And you're making notations and notes while you're

10  speaking to Mr. Orlando, correct?

11       A.   Some limited notes at that point in time, yes.

12       Q.   And you're also aware that Mr. Jeannot is in room

13  number two, correct?

14       A.   I'm aware that he has arrived in the Homicide Squad,

15  yes.

16       Q.   Are they on the same floor?

17       A.   Yes, they are.

18       Q.   But can you see -- I think you have drapes on some

19  of the windows.  Can you see from room one to room two?

20       A.   If you want to you can, yes.

21       Q.   So you can see if somebody is in the other room,

22  correct?

23       A.   If you want to, you can, if the door is opened.  If

24  the door is closed, of course you couldn't.

25       Q.   If the door gets opened?



1    A.   You could see someone sitting in there.

2    Q.   Now, you're having a conversation with Mr. Orlando

3  that lasts until at least about 10 minutes after 12:00, would

4  that be correct to say, a good maybe two hours, from 2210 when

5  the rights were given until about 0010 statement started?

6    A.   Yes.

7    Q.   In those two hours there's a conversation that

8  you're having, an oral conversation, with Mr. Orlando,

9  correct?

10    A.   Myself and Detective McGinn, yes.

11    Q.   And it's not videotaped, correct?

12    A.   No, it is not.

13    Q.   And it's not tape-recorded, correct?

14    A.   That's correct.

15    Q.   And as there are notes being taken, you're

16  discussing with him his relationship, among a number of

17  things, his relationship with Bobby Calabrese, correct?

18    A.   Yes.

19    Q.   His family, his wife and so forth, correct?

20    A.   Yes.

21    Q.   And discussion regarding his gambling, correct?

22    A.   Yes.

23    Q.   How he met Mr. Calabrese, correct?

24    A.   Yes.

25    Q.   The games that he bets on, correct?

1    A.    Yes.

2    Q.    There's even a discussion about how college

3   basketball is basically a sucker bet on the final score, and

4   there's a discussion that he says, "You don't bet on the final

5   score.  You bet on quarter, half, over, under as far as

6   betting"?

7    A.    Things of that sort, yes.

8    Q.    And there's also a very thorough discussion

9   regarding the betting habits of my client, Mr. Orlando,

10  correct?

11   A.    Yes.

12   Q.    In fact, he goes through when he first met Mr.

13  Calabrese and how he was introduced through Tommy, correct?

14   A.    Right.

15   Q.    And he starts to talk about week one, how much he

16  had won, correct, and what he bet on?

17   A.    Yes.

18   Q.    In fact, he had recorded that, wrote it down, which

19  was then reduced into the statement which we now have in

20  evidence, correct, the first statement?

21   A.    Where he details his betting amounts for those six

22  weeks?

23   Q.    Yes.

24   A.    Yes.

25   Q.    Now, at some point in time you receive somewhat of a

1  log, maybe even a printout of the bets that Mr. Orlando placed

2  with Mr. Calabrese, correct?

3      A.   Yes.

4      Q.   But I'm not too sure -- was that received at a much

5  later time or before December 9 of 2004?

6      A.   I believe it was received during the week of the

7  9th.

8      Q.   You don't know whether you might have had them in

9  hand in speaking to Mr. Orlando?

10     A.   No, we didn't have them in hand.

11     Q.   So there wasn't anything either corroborating what

12  Mr. Orlando was saying regarding these numbers, regarding what

13  he had won or lost?  Do you follow what I'm saying?

14     A.   Other than what he had told other people.

15     Q.   Okay.  As you're discussing it with him, he's going

16  through each week what he had won, correct?

17     A.   Yes.

18     Q.   And he basically had indicated that up until the

19  previous two weeks he was up about 27-, $22,000, correct,

20  overall?

21     A.   Overall, not counting the 17 or --

22     Q.   Yes.

23     A.   He had told me 10,000.  I don't know what those

24  numbers are actually.

25     Q.   That he was up 10,000 even after owing Bobby back

1    maybe about 17, right?

2        A.    Yes.

3        Q.    He had told you that he had the money in his safe?

4        A.    Yes.

5        Q.    And that he kept it from his wife because he was

6    very concerned that his wife was very -- or would be very

7    upset if he was gambling, especially these types of numbers,

8    correct?

9        A.    He was concerned about that.  I don't know that he

10   kept the money in the safe for that reason.

11       Q.    Well, he told you that he had gotten the money out

12   from the safe to go meet Bobby that night, correct?

13       A.    Yes.

14       Q.    And as you're discussing and having a discussion

15   with Mr. Orlando, he's very cooperative with you, correct?

16       A.    He's cooperative, yes.

17       Q.    Not sarcastic, not in any way evasive, correct?

18       A.    Evasive relative to the gambling?

19       Q.    Yeah, and any questions you may be asking him.

20       A.    He was responsive to my questions.

21       Q.    And he goes further on in your conversation with him

22   during the two hours giving you a couple of dates where he had

23   lost some money, and then he had a Monday and Tuesday of

24   November 29 and 30 he told you he had lost about $9100 which

25   was going to be due on Thursday, December 9.  And he was

1  discussing further the relationship regarding the bets and so

2  forth, correct?

3      A.   Yes.

4      Q.   Never told you that he was, two, three, four weeks

5  behind and that Bobby Calabrese had threatened him about

6  paying back any money at all, correct?

7      A.   No.

8      Q.   Had indicated to you that there's this relationship

9  where usually at the end of each week you square up, correct?

10     A.   He described that, yes.

11     Q.   He also goes on to tell you that on this Friday

12  night of the 3rd that he went to the LA Fitness on Route 110

13  to work out, correct?

14     A.   Yes.

15     Q.   He told you about Wantagh Suzuki, that he had, I

16  think, a check that might have been owed to him from there,

17  correct?

18     A.   Yes.

19     Q.   He's telling you the entire day that he had on that

20  3rd and that at about 7:15, 7:30, he went to the gym with

21  Herve, correct?

22     A.   Yes.  Or they left the gym at about 7:15.

23     Q.   I'm sorry, that he left the gym.  Told you what he

24  was driving, where he was going, correct?

25     A.   Yes.

1      Q.   He told you how he called Bobby Calabrese to meet

2  him, correct?

3      A.   Yes.

4      Q.   Even told you and kind of, I think, laughed a little

5  bit, in the past, since Bobby owed me money, he'd meet me up

6  there.  Since I had lost and I was going to be down in the

7  North Long Beach area, I was going to meet him down there to

8  pay him, correct?

9      A.   I don't know about the laughing part, but I agree

10  with the description of where the payments were made.

11      Q.   He also told you that he met up, called Bobby, that

12  Bobby met him and then he gave Bobby the money, correct?

13      A.   Yes.

14      Q.   And then he said that he then left.  He went on --

15  my client told you where he was going after that night,

16  correct?

17      A.   Quite specifically.

18      Q.   And after speaking to him for about those two hours,

19  you began to reduce it to writing, and you then read this to

20  him, I believe, correct?

21      A.   Yes.

22      Q.   Asked him if he could read it, correct?

23      A.   Yes.

24      Q.   I would say it's probably a procedure to give it to

25  him, maybe read the first paragraph and then say, "Read the

1  rest to yourself"?

2      A.   He didn't read it out loud.

3      Q.   And then you asked him to sign it.  You witnessed it

4  as well as one of the other detectives, correct?

5      A.   Yes.

6      Q.   Now, would it be correct to say that this statement

7  was then concluded by maybe 2 o'clock in the morning on

8  December 10?

9      A.   I'd say a little bit before 2:00 a.m., yes.

10     Q.   And then at that point he was offered an egg

11 sandwich from the diner; he refused.  Correct?

12     A.   Yes.

13     Q.   Refused having anything to drink, correct?

14     A.   Yes.

15     Q.   Never indicated he wanted to talk to a lawyer at all

16 or call his wife or anything like that, correct?

17     A.   No.

18     Q.   He also indicated he didn't want any carbonated

19 drink because of the stomach surgery he had, correct?

20     A.   Yes.

21     Q.   Now, up to this point in time, did you also ask

22 him -- and I'm not too sure if it may be you -- to sign a

23 consent form to search the desk at his office?  Were you

24 involved with that?

25     A.   No, I was not.

1        Q.    And there is also from 2 o'clock to 5 o'clock,

2    according to the notations here, it's left basically blank,

3    and then apparently you might have went back in at 5:10?

4        A.    I did not, no.

5        Q.    Between 2 o'clock and 5 o'clock in the morning did

6    you have any other contact with Mr. Orlando?

7        A.    Not that I recall.

8        Q.    And then as you recall, he was still then alone in

9    the interview room one?

10       A.    Yes.

11       Q.    And, well, when you left him, was he still

12   handcuffed or he wasn't handcuffed?

13       A.    He was never handcuffed when he was with me.

14       Q.    And do you know from time to time during those three

15   hours, did you check in to see if he was either sleeping or

16   what he was doing during those three hours?

17       A.    He would have been monitored.

18       Q.    But not by yourself?

19       A.    I may have taken a peek.

20       Q.    And no recollection as to what he was doing during

21   those three hours?

22       A.    I recall him sitting there, and whether he dozed off

23   or not, perhaps.

24       Q.    There's a point in time where you're told by one of

25   the other detectives that there's either been a change or

1    there's a statement by the codefendant in this case, Herve

2    Jeannot, correct?

3        A.    Yes.

4        Q.    What time did that occur?

5        A.    When I'm notified that Mr. Jeannot's story has

6    changed?

7        Q.    Yes.

8        A.    I'm told about 4:20 a.m.

9             THE COURT:  Mr. Lemke, before you ask your next

10    question, can I see counsel?

11   (Whereupon, an off-the-record discussion occurred at the bench.)

12            THE COURT:  At this time, gentlemen we'll break

13    until the 2 o'clock.  Have a nice lunch.

14            (Luncheon recess.)

15            AFTERNOON SESSION

16            THE CLERK:  This is Indictment 167N-05, the

17    People against Herve Jeannot and Mark Orlando, hearing

18    continued.

19            THE COURT:  Mr. Lemke, would you like to

20    continue your examination?

21            MR. LEMKE:  Yes.  Thank you, your Honor.

22   CROSS-EXAMINATION CONTINUED

23   BY MR. LEMKE:

24        Q.    Again, Detective, again directing your attention

25    back to the early morning hours of December 10 of 2004,

1   between 2 o'clock and 5 o'clock in the morning, it's my

2   understanding that my client was in the interview room number

3   one, correct?

4       A.   Yes.

5       Q.   You had already finished up with him at that point,

6   correct, as far as you had a written statement already signed

7   by Mr. Orlando, correct?

8       A.   Yes.

9       Q.   And other than perhaps you looking in once in a

10  while to see how he's doing in that room, there was no other

11  interaction between yourself and my client, correct?

12      A.   Correct.

13      Q.   And no other interaction at your direction of any

14  other officers or detectives between my client and them,

15  correct?

16      A.   Correct.

17      Q.   And prior to 5 o'clock in the morning, it's at that

18  time that you were made aware, based on conversations with

19  other detectives, that the codefendant in this case, Mr.

20  Jeannot, had indicated that he, Mr. Jeannot, had shot Mr.

21  Calabrese, correct?

22      A.   Conversations with other detectives and certainly my

23  own knowledge of that.

24      Q.   At about 5 o'clock in the morning or 5:10, was it

25  yourself that went back in to talk to Mr. Orlando?

1    A.   No, it was not.

2    Q.   And did you have any further conversation with my

3    client from 5 o'clock or 5:10 in the morning on December 10 of

4    '04 regarding the death of Mr. Calabrese?

5    A.   Throughout the remainder of the day?

6    Q.   Yes.

7    A.   No specific conversations that I recall.

8    Q.   So there is a second recorded statement that my

9    client had made later that morning; isn't that correct?

10   A.   Yes.

11   Q.   That was with Detective Cereghino?

12   A.   Yes.

13   Q.   You were not present or involved with that

14   interview; is that correct?

15   A.   That's correct.

16   Q.   Were you also involved, if at all, with any requests

17   of my client to give his statement on video?  Were you

18   involved with that at all?

19   A.   No, I was not.

20        MR. LEMKE:   I have nothing further then.   Thank

21   you, Detective.

22        MR. HAYDEN:   Nothing else, your Honor.   Thank

23   you.

24        THE COURT:   Detective, you're excused.

25        (Whereupon, the witness was excused.)

1          THE COURT:  Mr. Hayden.

2          MR. HAYDEN:  Detective William Brosnan.

3   D E T.   W I L L I A M   F.   B R O S N A N, a witness called

4   on behalf of the People, after having been first duly sworn by

5   the Clerk of the Court and stating his command as the Nassau

6   County Police Department Homicide Squad and his shield as 309,

7   was examined and testified upon his oath as follows:

8          MR. HAYDEN:  May I proceed, your Honor?

9          THE COURT:  Yes, please.

10  DIRECT EXAMINATION

11  BY MR. HAYDEN:

12      Q.   Good afternoon, Detective.

13      A.   Good afternoon.

14      Q.   How long have you been a member of the Nassau County

15  Police Department?

16      A.   I'm in my 33rd year.

17      Q.   How long have you been a detective?

18      A.   I'm in my 23rd year.

19      Q.   How long with Homicide?

20      A.   I just started my 13th year.

21      Q.   Do you know a young man named Herve Jeannot?

22      A.   Yes, sir, I do.

23      Q.   Briefly describe Herve Jeannot.

24      A.   He is a male black, 23, 24 years old, average height

25  and weight.

```
 1       Q.   Do you see Herve Jeannot in this courtroom today?

 2       A.   Yes, sir, I do.

 3       Q.   Would you point him out for the Court and describe

 4  for the record what he's wearing today?

 5       A.   It's the gentleman behind counsel at the second desk

 6  here.  He's wearing a striped shirt.

 7            MR. HAYDEN:  Let the record reflect, your

 8       Honor, that the detective has indicated the defendant,

 9       Herve Jeannot?

10            THE COURT:  The record will so reflect.

11       Q.   I'm directing your attention to around 9:20 on the

12  night of Thursday, December 9 of 2004.  Did you take custody

13  of Herve Jeannot at around that time?

14       A.   Yes, sir, I did.

15       Q.   Who was present when you took custody of Herve

16  Jeannot?

17       A.   It was members of the Bureau of Special Operations

18  and Detective Michael Nigro was with me.

19       Q.   Where were you when you took custody of Herve

20  Jeannot?

21       A.   We were in Farmingdale on a side street off 109.

22       Q.   Was Herve Jeannot handcuffed when you took custody

23  of him?

24       A.   Yes, sir.

25       Q.   Describe any conversation as you took custody of
```

1   Herve Jeannot.

2          A.   I had no conversation with Mr. Jeannot.

3          Q.   What did you do with Herve Jeannot?

4          A.   He was placed in the rear seat of an unmarked police

5   car and driven back to police headquarters Homicide Squad.

6          Q.   Who was driving?

7          A.   I was.

8          Q.   Who else was in the car?

9          A.   Detective Michael Nigro.

10         Q.   Where was he?

11         A.   In the rear seat with Mr. Jeannot.

12         Q.   Describe any conversation on the way to the Homicide

13  Squad.

14         A.   There was no conversation.

15         Q.   When did you arrive at the Homicide Squad?

16         A.   At 10:12 p.m.

17         Q.   What did you do with Herve Jeannot when you arrived

18  at the Homicide Squad?

19         A.   He was placed in an interview room within the

20  confines of the Homicide Squad.

21         Q.   Describe that room.

22         A.   It's approximately eight by ten.  It has a desk,

23  three chairs and there's a couch.

24         Q.   Was Herve Jeannot handcuffed when you placed him in

25  that interview room?

Det. Brosnan/People/Direct

1    A.   He was uncuffed at that point.

2    Q.   Did he remain uncuffed?

3    A.   Yes, sir.

4    Q.   Did you speak with Herve Jeannot?

5    A.   Yes, sir, I did.

6    Q.   Who was present when you began speaking with Herve

7  Jeannot?

8    A.   Detective Nigro.

9    Q.   Describe any initial conversation with Herve

10  Jeannot.

11    A.   When Detective Nigro and myself entered the room, we

12  introduced ourselves and I secured some pedigree information

13  from Mr. Jeannot.

14    Q.   What happened then?

15    A.   He gave me his name, Herve Jeannot.  He told me his

16  date of birth was July the 21st, 1981.  He said he was 23

17  years old.  He told me that he was presently living at 159

18  Sammis Avenue in Deer Park.  He gave me his home telephone

19  number, his two cell phone numbers.  He also told me that he

20  was working at Professional Credit Service on Bi-County

21  Boulevard in Farmingdale.  He gave me that telephone number.

22  He told me that he was working for that business or that

23  location for approximately two and a half years, that he

24  specifically worked on the Sprint account.

25    Q.   What happened then?

Det. Brosnan/People/Direct

1       A.    I told him that I was going to read him his rights,

2   his Miranda warnings.  I did that.

3       Q.    What did you use?

4       A.    I used a card with those rights printed on it.

5       Q.    Describe any markings that were placed on that card.

6       A.    The homicide number assigned to this case, homicide

7   521 of '04.  Mr. Jeannot indicated that he understood his

8   rights by writing the word yes.  He also indicated that he

9   would speak with me or answer questions by putting the word

10  yes and signing his name.  I signed my name.  Detective Nigro

11  also witnessed it.

12              MR. HAYDEN:  May I please have this card

13       deemed, your Honor, as eight for identification and

14       given to the detective?

15       (Whereupon, People's Exhibit 8 was deemed marked for

16                      identification.)

17      Q.    Do you recognize that?

18      A.    Yes, sir.

19      Q.    What is it?

20      A.    It's the card I read to Mr. Jeannot that evening.

21      Q.    How do you know it is?

22      A.    It has my signature.  It's marked with the homicide

23  number assigned.  It has, as indicated, the word yes where he

24  understood, his signature and Detective Nigro's signature.

25              MR. HAYDEN:  We ask that it be deemed eight in

Det. Brosnan/People/Direct                    146

1    evidence, your Honor.

2              THE COURT:  Please show it to counsel.

3              MR. HOCHHEISER:  No objection for purposes of

4    the hearing, Judge.

5              MR. LEMKE:  As well on behalf of Mr. Orlando,

6    your Honor.

7              THE COURT:  It's received.

8    (Whereupon, People's Exhibit 8 was deemed marked in evidence.)

9         Q.   Using the card in evidence, please read the

10   Constitutional rights for the Court the same way you read them

11   for Herve Jeannot and please include any responses he may have

12   made.

13        A.   Before asking you any questions, you should

14   understand you have the right to remain silent and that any

15   statements you make may be used against you in court.  Also

16   you have the right to talk to a lawyer before answering any

17   questions or to have a lawyer present at any time.  If you

18   cannot afford to hire a lawyer, one will be furnished you if

19   you wish.  You have the right to keep silent until you've had

20   a chance to talk with a lawyer.  Do you understand?  He said

21   yes.  Now that I have advised you of your rights, are you

22   willing to answer questions?  He again said yes.

23        Q.   What time did you inform Herve Jeannot of his

24   Constitutional rights?

25        A.   That was approximately 10:30 at night.

1    Q.   Describe for the Court any conversation that took

2  place after you informed Herve Jeannot of his Constitutional

3  rights.

4    A.   I asked Mr. Jeannot if he knew why he was brought to

5  homicide.  He said yes.  He said that it's about that kid

6  getting killed.  He says, "I saw him right before that

7  happened.  I was with Mark."  I asked him, "Well, what did you

8  do that whole day, that Friday?"  He said that he went to

9  work.  He worked until 5 o'clock and then he left work with

10  Mark Orlando.  I asked him who was driving.  He told me Mark

11  was.  I asked him what kind of car that was.  He told me a

12  silver Suzuki Verona, I believe.

13        He said that initially after leaving work they went

14  to a person's house that he worked with.  He said that he

15  didn't remember his name, but he lived on the same street as

16  Tommy Flores in Amityville.  He said he was going there for

17  the purpose of buying a leather coat.  He told me that he

18  bought the coat for $60.  Asked him what else they did that

19  night.  He said that they went to the LA Fitness Center where

20  they both worked out for approximately an hour.  After they

21  were finished there, they went down to Long Beach to meet with

22  Bobby to pay off a debt.

23        He said he was aware that Mr. Orlando owed $17,000

24  on a -- in betting money.  He said that Mr. Orlando was, he

25  described him as a big bettor, that he played a lot of sports

Det. Brosnan/People/Direct

1   betting and that he was down the $17,000 and had to meet with

2   Bobby Calabrese to pay him off.  I asked him how they drove

3   there, what route they took.  He said that he drove down the

4   parkway through Long Beach to a main road.  He told me that he

5   wasn't that familiar with the area, but they eventually came

6   into a parking lot of a closed restaurant.  He said they were

7   the only two cars in the restaurant.  He said that Mark pulled

8   the car in and he believes it was around 8 o'clock at night

9   that Mark made a phone call.

10          And about five to ten minutes later Bobby Calabrese

11  met them.  He said that Mark got out of the car, went over to

12  Bobby Calabrese and exchanged the money.  He got back into the

13  car and they went home.  They went back in the opposite

14  direction that they had come.  They made a right coming out of

15  the parking lot back through Long Beach to the parkway.  He

16  said -- he says on the way home they were stopping at the

17  Suzuki dealer in Wantagh because Mr. Orlando had some business

18  at that location.  He says at the time they arrived at that

19  location, they were -- the place was closed, so they continued

20  on to another coworker's home.  I believe he said that was in

21  Massapequa.  It was Vivian, a woman that they worked with.  He

22  said they wanted to go over there because she had some work

23  done to the house and they wanted to see how it came out.

24          I asked him during the night did he make any phone

25  calls, did he receive any phone calls on his cell phone.  He

1    said that he did.  He had a girlfriend that called him or he

2    called her several times, three or four times back and forth,

3    that he was making arrangements to meet that girl later on at

4    his house.  He told me that that girl's name was Carissa

5    Edelman, I believe.  He says that after they were at Vivian's

6    house for approximately a half hour, they left there.  Mark

7    dropped him off and he met with his girlfriend.  She arrived

8    at his house around 11 o'clock at night and left at 3 or 4

9    o'clock in the morning.

10           He said the following morning he woke up between

11   7:00 and 7:30 in the morning to call into work.  He called in

12   sick.  He said at that point he went back to bed and went to

13   sleep.  He said he received a phone call from Mark somewhere

14   around 11 o'clock in the morning telling him that Bobby was

15   shot.  He said he didn't give him any information on it, what

16   happened, how it happened, just that Bobby was shot and that

17   he said he got the feeling that Mr. Orlando was rushing him

18   off the phone.  He said that Mr. Orlando indicated that he

19   would call him back later.  He said that Mr. Orlando did call

20   him back later, and they talked about Bobby being shot and Mr.

21   Orlando discussing with him that he wanted to reach out to

22   Bobby's family and tell them that he did in fact give Bobby

23   the $17,000 and that he should have it on him or it was stolen

24   from him.

25           Q.   Did you take notes of your conversation with Herve

Det. Brosnan/People/Direct

150

1    Jeannot?

2        A.   Yes, sir, I did.

3        Q.   How many pages?

4        A.   I believe it's approximately four pages.

5        Q.   Did you reduce what Herve Jeannot was telling you to

6    writing?

7        A.   Yes, sir, I did.

8        Q.   What time did you begin reducing what Herve Jeannot

9    was telling you to writing?

10       A.   In the statement form?

11       Q.   Yes.

12       A.   That was approximately 2:00 a.m.

13       Q.   Describe for the Court how you reduced what Herve

14   Jeannot was telling you to writing.

15       A.   I started off with, again, pedigree information, his

16   name, date of birth, where he lived.  I then incorporated his

17   Miranda warnings or his rights in that statement, and then we

18   continued with the body of the statement.  We would go along a

19   few sentences at a time.  I'd ask him, "Then what happened?"

20   He would tell me.  I would reduce it to writing and then go

21   on.  At the completion of the statement I told him that I was

22   going to read him back the entire statement, which I did.  I

23   asked him if that's the truth, is that what he told me?  He

24   said yes.

25           I handed him the statement.  I asked him to read it.

Det. Brosnan/People/Direct

1   He did that.  At completion of reading it, he handed it back

2   to me.  He said okay.  I said, "Would you sign it?"  He said

3   yes.  I gave him a pen.  He signed.  I believe it's five pages

4   long.

5       Q.   What time did he sign it?

6       A.   We finished completing the statement approximately

7   3:10 a.m.

8                 MR. HAYDEN:  May I please have this five-page

9       statement deemed as People's 9 for identification and

10      shown to the witness, your Honor?

11               THE COURT:  Yes.

12      (Whereupon, People's Exhibit 9 was deemed marked for

13                      identification.)

14      Q.   Do you recognize that?

15      A.   Yes, sir, I do.

16      Q.   What is it?

17      A.   It's the statement I took from Mr. Jeannot that

18  evening.

19      Q.   How do you know that?

20      A.   It's in my handwriting.  It's signed by myself and

21  Mr. Jeannot and Detective Nigro.

22               MR. HAYDEN:  We ask that it be deemed nine in

23      evidence, your Honor.

24               THE COURT:  Please show it to counsel.

25               MR. HOCHHEISER:  No objection for purposes of

1      the hearing, Judge.

2                    MR. LEMKE:  No objection, your Honor.

3                    THE COURT:  It's received.

4      (Whereupon, People's Exhibit 9 was deemed marked in evidence.)

5          Q.   Was Herve Jeannot offered anything to eat or drink?

6          A.   He was offered water when he asked for it, yes.

7          Q.   Anything to eat?

8          A.   Not while I was in his presence.

9          Q.   Did Herve Jeannot use the men's room whenever he

10     asked?

11         A.   Yes, sir, he did.

12         Q.   Describe Herve Jeannot's physical condition while

13     you were with him.

14         A.   He appeared to be in good physical condition.  He

15     was alert, responsive to the questions.

16         Q.   Did you notice any injury to him?

17         A.   I did not.

18         Q.   Did he complain of any?

19         A.   He did not.

20         Q.   Describe his demeanor.

21         A.   He was calm, polite and, again, responsive to the

22     questions that were asked.

23                    MR. HAYDEN:  Nothing further at this time, your

24     Honor.

25                    THE COURT:  Gentlemen?

1          MR. HOCHHEISER:  Please, your Honor.

2   CROSS-EXAMINATION

3   BY MR. HOCHHEISER:

4       Q.   Good afternoon, Detective.

5       A.   Good afternoon.

6       Q.   My name is Daniel Hochheiser.  I represent Mr.

7   Jeannot.  When was the first time you heard the name Herve or

8   Jeannot?

9       A.   Sometime during that week.

10      Q.   You were involved in the investigation before

11  December 9?

12      A.   Correct, yes, sir.

13      Q.   And how did you become involved in the

14  investigation?

15      A.   I was asked to assist Detective McHugh.

16      Q.   And what did you do in this investigation before

17  December 9, if anything?

18      A.   I spoke to several people during the investigation.

19      Q.   Who did you speak to?

20      A.   I know I spoke to Tommy Flores.  I spoke to his

21  girlfriend.

22      Q.   Barbara Diamont?

23      A.   Yes.  There were several other people, Sean

24  Monaghan, Brian Tompkins, maybe one or two others.  I don't

25  recall at this time.

Det. Brosnan/People/Cross-Hochheiser                    154

1      Q.   Who was Brian Tompkins?

2      A.   He was just a friend of the deceased.

3      Q.   And what information did he provide you with?

4      A.   I don't think -- I don't recall at this time.  I did

5   not review those notes, but I don't know that he gave us any

6   information.

7      Q.   He didn't refer to Mr. Jeannot in any way, did he?

8      A.   He did not.

9      Q.   Thank you.  Now, on December 9 you attended the

10  debriefing with Lieutenant Mulrain and Lieutenant Farrell,

11  correct?

12     A.   Yes, sir.

13     Q.   And what do you remember was said at that meeting

14  about Herve Jeannot?

15     A.   That he currently had several warrants or at least

16  two warrants on him, where he worked.  Specific people were

17  assigned to each one of the defendants.

18     Q.   Was anything said by anybody present at that meeting

19  as to what role the police believed Mr. Jeannot played in Mr.

20  Calabrese's death?

21     A.   I can't say either way.  I don't remember exactly

22  what was said.  I didn't take notes on that meeting.

23     Q.   Now, detectives -- excuse me, BSO Officers Brady,

24  Hughes and Marinace brought Jeannot to you; is that correct?

25     A.   I actually followed them out of the parking lot to

Det. Brosnan/People/Cross-Hochheiser                    155

1   that location.  That's how it worked.

2        Q.   And who brought Jeannot out of the car, out of the

3   BSO car?

4        A.   Specifically?

5        Q.   If you recall.

6        A.   I don't recall.

7        Q.   He was handcuffed at the time?

8        A.   Yes, sir.

9        Q.   And you and Detective Nigro at that point took

10  custody of Mr. Jeannot, correct?

11       A.   Correct, yes, sir.

12       Q.   What time was that approximately?

13       A.   9:20, between 9:20 and 9:30, I guess, at night.

14       Q.   December 9?

15       A.   Correct.

16       Q.   You testified that there was no conversation between

17  you or Detective Nigro and Mr. Jeannot from that point until

18  you put him in the interview room in the Homicide Squad,

19  correct?

20       A.   I did not have a conversation with him at that time,

21  no.

22       Q.   He didn't say anything about the case?

23       A.   He did not.

24       Q.   During that ride, correct?

25       A.   No, sir.

1    Q.   I am correct?

2    A.   You are correct.

3    Q.   And were you the detective that placed Mr. Jeannot

4  in interview room number two?

5    A.   I believe Detective Nigro and myself walked in with

6  him, right.

7    Q.   And when you walked in with him, he was handcuffed?

8    A.   Yes, sir.

9    Q.   And there came a time when you uncuffed him?

10   A.   Correct.

11   Q.   When was that?

12   A.   When he was placed in the seat or seated.

13   Q.   And it's your testimony he wasn't cuffed to the

14  chair at that time?

15   A.   He was not.

16   Q.   And did you have your weapon on you at that time?

17   A.   Absolutely.

18   Q.   As did Detective Nigro, correct?

19   A.   Correct.

20   Q.   And did you start to interview Mr. Jeannot

21  immediately or did you leave him there and step out of the

22  room?

23   A.   Left him there, stepped out of the room.

24   Q.   How much time passed -- withdrawn.

25        Did there come a time when you then reentered the

Det. Brosnan/People/Cross-Hochheiser          157

1    room?

2         A.   Yes.

3         Q.   How much time passed between your exit and entry?

4         A.   10, 15 minutes.

5         Q.   What did you do in that 10- to 15-minute period?

6         A.   I spoke briefly with Detective McHugh.

7         Q.   What did Detective McHugh tell you?

8         A.   To interview Mr. Jeannot.

9         Q.   Did he give you any background about the case or

10   anything?

11        A.   No.

12        Q.   Did you say anything to Detective McHugh about the

13   events leading up to taking Mr. Jeannot into custody?

14        A.   I did not.

15        Q.   So Detective Nigro -- Nigro is it?

16        A.   Nigro, yes, sir.

17        Q.   Nigro, was he in the room while you were out of the

18   room during that 15-minute period?

19        A.   No, sir.

20        Q.   He was out as well and the two of you exited

21   together, correct?

22        A.   Well, I don't know where he was.  I spoke to

23   Detective McHugh about who was going to conduct the interview.

24   It was determined that I would do that.

25        Q.   And you entered the room at that point?

1      A.    Yes.

2      Q.    And you were by yourself with Mr. Jeannot?

3      A.    No, Detective Nigro came in the room with me.

4      Q.    Immediately?

5      A.    Yes.

6      Q.    And you asked the questions and Detective Nigro was

7   there as an additional witness, correct?

8      A.    Correct.

9      Q.    And you took, in addition to asking the questions,

10  you were also the detective responsible for taking notes at

11  that meeting; is that correct?

12     A.    I took the notes, correct.

13     Q.    Detective Nigro didn't take any notes?

14     A.    He did not.

15     Q.    And you testified that you read my client Miranda

16  warnings from a police department card, correct?

17     A.    Correct, yes, sir.

18     Q.    I believe that was introduced into evidence as

19  Exhibit 8; is that right?

20     A.    I believe you, whatever the number is.  It has been

21  introduced, yes.

22     Q.    Now, can you tell us what time that card was signed

23  by you and by Mr. Jeannot?

24     A.    At approximately 10:30 at night.

25     Q.    And you testified that early in the interview of Mr.

1    Jeannot you asked him if he knew why he was brought to the

2    squad, and he had said something to the effect of for a

3    homicide about the kid getting killed.  Is that accurate?

4        A.   Yes.

5        Q.   Now, was that back and forth between you and him

6    before the Miranda card was read to him and signed or after?

7        A.   That was after.

8        Q.   So before you asked Mr. Jeannot any questions, you

9    read him the Miranda card, correct?

10       A.   Correct.  The only information that was asked of him

11   was pedigree information prior to the rights.

12       Q.   So name, date of birth, address, where you work and

13   then Miranda?

14       A.   Correct.

15       Q.   Now, you said that -- well, withdrawn.

16            So the Miranda card was finished at about 10:30

17   p.m.?

18       A.   Correct.

19       Q.   But the written statement which Mr. Hayden had

20   introduced as Exhibit 9, you didn't begin the process of

21   creating that statement until 2 o'clock in the morning; is

22   that right?

23       A.   That's also correct, yes, sir.

24       Q.   So between the time that my client was Mirandized

25   and the time you started to reduce his statement to that

Det. Brosnan/People/Cross-Hochheiser                160

1    written form, three and a half hours passed.  That's fair,

2    right?

3         A.   Yes.

4         Q.   Now, in this three-and-a-half-hour period you took,

5    I believe, four pages of notes?

6         A.   Yes.

7         Q.   And all the information that is contained in your

8    four pages of notes you recorded during that period from 10:30

9    p.m. to 2:00 a.m.; is that right?

10        A.   Correct.

11        Q.   Now, did you stay in the interview room with Mr.

12   Jeannot during that entire three-and-a-half-hour period or

13   were there breaks taken?

14        A.   There was breaks.

15        Q.   So in terms of the first period before the first

16   break, how long a period was that?

17        A.   I believe the first break was approximately 12:30 at

18   night or in the morning.

19        Q.   So you interviewed him for approximately two hours

20   to start, correct?

21        A.   Correct.

22        Q.   And you were aware from your investigation, from

23   participating in the debriefing earlier that day, that Mr.

24   Jeannot had worked that day at Professional Credit Services,

25   correct?

1    A.    Yes.

2    Q.    Were you aware of what his hours were?

3    A.    I don't specifically recall that.  I knew it was

4  until later on at night because that's what time he was coming

5  out, and that's what time we got him.

6         Q.    Were you aware that his shift was something in the

7  neighborhood of 9:00 a.m. to 9:00 p.m.?

8         A.    I can't tell you that I knew that.  All I knew is

9  that he was getting off approximately 9 o'clock at night.

10        Q.    Did you understand that he had been working a full

11  day that day?

12        A.    I knew that he was working.  I couldn't tell you if

13  he worked two hours or 12 hours.  I don't remember that.

14        Q.    So as far as you know, he may have worked 12 hours

15  that day, correct?

16                MR. HAYDEN:  Objection.

17                THE COURT:  Sustained.

18        Q.    Who made the decision at 2:00 a.m. that you would

19  be the one who actually handwrote the statement?

20        A.    Detective McHugh.

21        Q.    And when did he give you that instruction?

22        A.    Sometime prior to 2:00 a.m.

23        Q.    There was a discussion between you and Detective

24  McHugh prior to 2:00 a.m. concerning whether you should let my

25  client write the statement or whether you should write the

1    statement?

2        A.   No, there's never a discussion about that.  It was

3    whether or not we were going to take a written statement as he

4    was giving it to us with the facts at that time.

5        Q.   Did you offer my client an opportunity to write the

6    statement in his own hand?

7        A.   No, absolutely not.  That's never done.

8        Q.   In the history of the world?

9              MR. HAYDEN:  Objection.

10             THE COURT:  Sustained.

11       Q.   And why is it never done?

12             MR. HAYDEN:  Objection.

13             THE COURT:  Sustained.

14       Q.   Why did you decide to write the statement instead

15   of permitting my client to write it?

16       A.   We write out the statement because there are certain

17   things that we want in the statement, including information

18   about himself, his rights incorporated into the statement and

19   to make a flow of the statement so that it makes sense.

20   Somebody just writing something down, it's just a piece of

21   paper.  They're given the opportunity to read it.  It's read

22   back to them.  They're given the opportunity to sign it, which

23   he did.

24       Q.   It's fair to say, Detective, that as far as your

25   interview with my client, his writing doesn't appear anywhere

Det. Brosnan/People/Cross-Hochheiser          163

1    in your file; is that correct?

2         A.   As opposed to signing Miranda cards.

3         Q.   He didn't make a written statement in his hand

4    anywhere, correct?

5         A.   He did not write out the statement.  He signed each

6    page, correct.

7         Q.   And why did it take three and a half hours to

8    reduce -- to begin to reduce his statement to writing?

9              MR. HAYDEN:  Objection.

10             THE COURT:  As to the form I'll sustain it.

11        Q.   Is there a reason you waited three and a half

12   hours to begin reducing the statement to writing?

13        A.   No, there's no particular reason.  It's just that's

14   how long it took.  That's when we decided to take that

15   particular statement.

16        Q.   You said that at 12:30 a.m. you stepped out of the

17   room; is that correct?

18        A.   Yes, sir.

19        Q.   And what did you do at that point?

20        A.   Mr. Jeannot wanted to use the bathroom, the men's

21   room.

22        Q.   You took him there?

23        A.   Yes, sir.

24        Q.   And at that point at 12:30 a.m., to your knowledge,

25   he still hadn't had anything to eat, correct?

Det. Brosnan/People/Cross-Hochheiser          164

1      A.   No, he hadn't had anything to eat since he was in

2   custody two hours, no.   I have no idea what he ate during the

3   day.  As far as I know, he could have had seven meals.   I have

4   no idea.

5      Q.   Right.  But as far as 9:20 p.m. when you first took

6   custody of Mr. Jeannot, he hadn't eaten anything, certainly

7   until 12:30; is that correct?

8      A.   He did not eat anything during the time he was with

9   me, no.

10     Q.   And the whole time with you until 3:10 a.m., right?

11     A.   Neither one of us ate.  It wasn't like I went off

12  and had dinner and left him.

13     Q.   You were working, I understand.

14     A.   Right.

15     Q.   He didn't have anything to eat from 9:20 p.m. until

16  3:10 a.m., correct?

17     A.   Not as far as I knew, no.

18     Q.   And you took him to the bathroom at 12:30 and you

19  brought him back to the room at what time?

20     A.   However long it took to walk down the hall.  We put

21  him back in the room, and I went back in approximately 15

22  minutes later.

23     Q.   So the interview starts back at about 12:45 a.m.?

24     A.   Yes.

25     Q.   And at that time you continued the questioning?

Det. Brosnan/People/Cross-Hochheiser                165

1       A.    Yes.

2       Q.    And how long did the second session last with him?

3       A.    We went back over his original statement or

4  interview on the chain of events, how he described them.  He

5  was confronted with the fact at that point that he wasn't

6  where he said he was, that he said he was actually on the

7  other side of the street, because they were on videotape.  He

8  said that it wasn't him; it must have been someone else.  I

9  said, "We have you on videotape.  We have Bobby Calabrese on

10  videotape.  We have you meeting."  He says it wasn't him.  He

11  said Mark must have had something done.  I asked him, "Was

12  somebody else with you, that they got out of the car, that

13  they left you someplace?  He goes no, it was just him and

14  Mark.  That took approximately another hour, hour and 15

15  minutes.

16             There came a period of time, I'm guessing around

17  1:45, quarter to 2:00 in the morning, that I left the room

18  again and had a discussion with Detective McHugh on what was

19  to happen next.

20      Q.    And what videotape are you referring to?

21      A.    I believe there was a videotape from one of the

22  stores over there.  I believe it was a 7-11 or one of the

23  factories over there.  I'm not sure exactly which.

24      Q.    It's your testimony that you had watched the tape

25  and saw him on the tape?

1      A.   I didn't say that.  What I said was it was my

2  testimony that's what I told him, that he was seen on the

3  tape.  I didn't say that I saw the tape.

4      Q.   That wasn't true, correct?  What you told him was

5  not true about the videotape, correct?

6      A.   There's information on the videotape.  There's a

7  videotape that we believe that it's Mr. Orlando's car.  We can

8  see people.  I don't know how clear it is.  I viewed it once

9  and very quickly.  I couldn't tell you if you can clearly see

10  him or not.

11      Q.   So at the time when you told my client that he was

12  captured on videotape, that was not true, correct?

13      A.   I don't know.

14      Q.   You didn't know.  You were telling him that you knew

15  that and you didn't know?

16      A.   Correct, absolutely.

17      Q.   And was the subject discussed by you with Mr.

18  Jeannot about what might happen to him should he be released

19  in connection with Bobby Calabrese's employer?

20      A.   I'm sorry, I don't understand the question.

21      Q.   Well, was the subject of the possible -- withdrawn.

22           Did you discuss what might happen to Mr. Jeannot

23  should he be released and exposed to a confrontation with

24  Bobby Calabrese's employer?

25      A.   I don't know who Bobby Calabrese's employee is.

Det. Brosnan/People/Cross-Hochheiser          167

1      Q.   Employer.

2      A.   Employer.  And I never discussed anything like that

3 with him.

4      Q.   It's fair to say that after completing your

5 interview of Mr. Jeannot at 3:10 a.m. that you didn't believe

6 his statement; is that true?

7      A.   Correct, I did not believe it.

8      Q.   And you told him that you didn't believe him; is

9 that true?

10     A.   I could have possibly.  I don't remember my exact

11 words.  I could have possibly said that to him at the

12 completion.  I don't remember specifically saying that, but,

13 no, I did not believe that that was what happened.

14     Q.   And did Detective Nigro speak during this five-hour

15 period or so?

16     A.   I was doing most -- I would say I did 99 percent of

17 the questioning.  Detective Nigro was new to homicide.  He was

18 more of an observer than a participant.

19     Q.   Did you tell my client that his story was

20 inconsistent with Mr. Orlando's statement?

21     A.   At that time?

22     Q.   During that five-hour or so period.

23     A.   I don't believe so.

24     Q.   After the interview was concluded at 3:10 a.m., you

25 had a conversation with Detective McHugh, correct?

Det. Brosnan/People/Cross-Hochheiser          168

1    A.   Yes.

2    Q.   What did you say to Detective McHugh?

3    A.   I told him that the statement was complete.

4    Q.   And false, correct?

5    A.   We already discussed that prior to me taking the

6    statement, that we knew that that was not the truth.

7    Q.   And how did you know that?

8    A.   Because it was based on Detective McHugh's

9    investigation.

10   Q.   So you didn't know that.  Detective McHugh knew

11   that.  Correct?

12   A.   Well, from what he knew, he told me that it was not

13   true.

14   Q.   Did he say why it wasn't true, why he thought it

15   wasn't true?

16   A.   I knew prior to that during the course of the

17   investigation that they were there at the time of the

18   homicide.  Them telling us that they were not there was not

19   true.  There was some evidence to indicate that that was true

20   about them being there.  He was telling us he was on one side

21   of the street.  We knew them to be on the other side of the

22   street based on Detective McHugh's investigation.

23   Q.   When did your shift end that morning, December 10?

24   A.   I'm not sure.  I believe I was there all night.

25   Q.   So after the interview concluded at 3:10 a.m., you

1   continued working on the case?

2       A.   I don't know what specifically I did at that point,

3   and I'm not sure if I went home or not.  I believe I stayed

4   all night.

5       Q.   You never asked my client if he wanted to speak to

6   an assistant district attorney on videotape, did you?

7       A.   I don't believe I was part of that.

8       Q.   Is there anything my client told you that is not

9   included in Exhibit 9?

10      A.   Exhibit 9 is?

11      Q.   Is the formal written statement that you wrote out

12  for him.  You want to take a look?

13      A.   That's his version of events as he gave them to me.

14      Q.   The one that you started at 2 o'clock and finished

15  at 3:10 in the morning.

16      A.   Yes, sir.

17      Q.   Is there anything else that he told you that's not

18  included in there that you recall?

19      A.   Not that I recall.

20               MR. HOCHHEISER:  Thank you very much.

21               THE COURT:  Mr. Lemke.

22  CROSS-EXAMINATION

23  BY MR. LEMKE:

24      Q.   Detective Brosnan, on December 9 of 2004, I would

25  be correct to state that you spent most of that evening with

1   the codefendant, Mr. Jeannot?

2       A.   Yes, sir.

3       Q.   And you know Mr. Orlando, Mark Orlando?

4       A.   Yes, sir.

5       Q.   Did you have any conversations with Mr. Orlando

6   either the night of December 8, December 9 into the morning of

7   December 10?

8       A.   Yes, sir.

9       Q.   And where were those conversations?

10      A.   In an interview room.

11      Q.   That was with Mr. Orlando?

12      A.   Yes, sir.

13      Q.   And where and at what time were those conversations?

14      A.   That was sometime in the morning, approximately 8

15   o'clock or so.  I briefly went into the room with Detective

16   McGinn.

17      Q.   This is about 8 o'clock in the morning on December

18   10?

19      A.   I believe it was approximately that time, Counselor.

20   I'm not sure of the exact time.

21      Q.   When you went in was Mr. Orlando alone?

22      A.   Besides Detective McGinn and myself, yes.

23      Q.   And you went in to speak to Mr. Orlando?

24      A.   I went in with Detective McGinn who was going to

25   interview him, yes.

1    Q.    Did you remain during that interview with Mr.

2    Orlando?

3    A.    No, I was in and out of the room.

4    Q.    In your presence did you read any Miranda warnings

5    or any rights from any cards to my client at 8 o'clock in the

6    morning?

7    A.    I did not, no.

8    Q.    Did Detective McGinn?

9    A.    Not that I was aware of.

10    Q.    And you said you went in and out from about 8

11    o'clock.  Was Detective McGinn taking any notes regarding that

12    conversation?

13    A.    I believe he was.

14    Q.    And do you recall what was said during that

15    conversation, if at all?

16    A.    I do not.

17    Q.    And do you know whether that conversation at some

18    point was reduced to writing?

19    A.    I believe it was.

20    Q.    And were you present for that?

21    A.    I was not.

22    Q.    And so then you didn't witness any second statement

23    from my client; is that correct?

24    A.    That's correct, sir.

25    Q.    And did you make any notes or did you not regarding

1    the conversation between Mr. Orlando and Detective McGinn?

2         A.   I did not.

3         Q.   And when was the last time then you would have seen

4    Mr. Orlando?

5         A.   Sometime during the day.  I'm not sure of the time.

6         Q.   When you went in with Detective McGinn, it was about

7    8 o'clock in the morning on December 10?

8         A.   Yes, sir.

9         Q.   Had you had any statement or were you aware that the

10   codefendant in this case, Mr. Jeannot, had gave a second

11   statement?

12        A.   Yes.

13        Q.   And when you went in with Detective McGinn to speak

14   to Mr. Orlando, had you confronted Mr. Orlando regarding this

15   change of statement from the codefendant?

16        A.   It was actually Detective McGinn that did that, that

17   said that Mr. Jeannot had given a second or given a statement

18   indicating both of them are responsible.

19        Q.   And so you recall that conversation to some extent

20   with Detective McGinn, correct?

21        A.   Correct.

22        Q.   Do you recall what Mr. Orlando's response was?

23        A.   I do not.

24        Q.   Were you present during any time that my client

25   acknowledged at all that the codefendant had shot Mr.

Det. Brosnan/People/Cross-Lemke

173

1    Calabrese?

2        A.    That he said that, no, I wasn't present for that.

3        Q.    So the best of your recollection is that during that

4    conversation between Detective McGinn and my client you can't

5    remember anything about what was said during that hour, two

6    hours?

7        A.    I wasn't with him for a very long period of time.

8    Again, I initially went in with McGinn.  I left almost

9    immediately.  There was a time later I believe I brought your

10   client to use the men's room with someone else.

11       Q.    And you don't recall what time that was?

12       A.    I do not.

13       Q.    Did you make any notations regarding going in to

14   speak with my client?

15       A.    I did not.

16       Q.    And you don't recall what time then that

17   conversation -- withdrawn.

18             I guess Detective McGinn would be the best one to

19   answer these questions then?

20       A.    Absolutely, yes, sir.

21       Q.    Now, Detective Cereghino, he wasn't with you at that

22   time, was he?

23       A.    No, he was not.

24       Q.    He went in, I think, at a later time to speak to my

25   client, Mr. Orlando, if you know?

174

Det. Brosnan/People/Cross-Lemke

1    A.   I believe so, but I couldn't specifically say when.

2    Q.   I think one last question.  As you sit here now, I

3 think I asked you, you have no recollection at all regarding

4 my client acknowledging in any way how Mr. Calabrese was shot

5 or that the codefendant had shot him, correct?

6    A.   No, I was not present for that.

7         MR. LEMKE:  Thank you.  I have nothing else,

8    your Honor.

9         THE COURT:  Mr. Hayden?

10         MR. HAYDEN:  Nothing further, your Honor.

11    Thank you.

12         THE COURT:  Thank you, Detective.

13         THE WITNESS:  Thank you.

14         (Whereupon, the witness was excused.)

15         THE COURT:  Mr. Hayden.

16         MR. HAYDEN:  Detective Jim McGinn.

17 D E T.   J A M E S   M c G I N N, a witness called on behalf

18 of the People, after having been first duly sworn by the Clerk

19 of the Court and stating his command as the Nassau County

20 Police Department Homicide Squad and his shield as 785, was

21 examined and testified upon his oath as follows:

22         MR. HAYDEN:  May I proceed, your Honor?

23         THE COURT:  Please.

24

25

Det. McGinn/People/Direct                        175

1    DIRECT EXAMINATION

2    BY MR. HAYDEN:

3         Q.   Good afternoon, Detective.

4         A.   Good afternoon.

5         Q.   How long have you been a member of the Nassau County

6    Police Department?

7         A.   17 years.

8         Q.   How long have you been a detective?

9         A.   12 years.

10        Q.   How long with Homicide?

11        A.   Four years.

12        Q.   You know a young man named Mark Orlando?

13        A.   Yes, I do.

14        Q.   Please briefly describe him.

15        A.   He's a male white, about five-foot-ten,

16   approximately 350 pounds, about 34 years of age.

17        Q.   You see Mark Orlando in this courtroom today?

18        A.   Yes, I do.

19        Q.   Would you point him out for the Court and describe

20   for the record what he's wearing today?

21        A.   He's the gentleman seated directly in front of me.

22   He's wearing a blue collared shirt on, looks like a black

23   sweatshirt and black sweatpants.

24             MR. LEMKE:  So stipulated, your Honor.

25             THE COURT:  The record will reflect

1        identification.

2        Q.   I'm directing your attention to the night of

3   Thursday, December 9 of 2004.  Were you involved that night in

4   the arrest of Mark Orlando?

5        A.   Yes, I was.

6        Q.   Describe the circumstances under which Mark Orlando

7   was arrested.

8        A.   His car was pulled over in the Airport Shopping

9   Plaza in Farmingdale.  He was taken out of the car, asked to

10  lay down on the ground.  He was then handcuffed while he was

11  down on the ground.

12       Q.   Who placed him in custody?

13       A.   That would be Police Officer Loschiavo and Police

14  Officer McCarthy from the Bureau of Special Operations.

15       Q.   What happened after Mr. Orlando was in handcuffs?

16       A.   He was then picked up off the ground.  He was turned

17  over to Detective McHugh and myself, and he was placed in the

18  rear of a police vehicle.

19       Q.   Was he taken to police headquarters?

20       A.   Yes, he was.

21       Q.   Who drove?

22       A.   I drove.

23       Q.   Where was Detective McHugh?

24       A.   Detective McHugh was directly behind me in the rear

25  seat.

1        Q.   Where was Mark Orlando?

2        A.   Mark Orlando was in the rear seat on the passenger

3    side.

4        Q.   Describe any conversation on the way to police

5    headquarters.

6        A.   Detective McHugh introduced himself and I to the

7    defendant and told him that he was looking into the death of

8    Bobby Calabrese, that we were going to headquarters.  Once we

9    got to headquarters, we would speak to him.

10       Q.   What time did you arrive with Mark Orlando at the

11   Homicide Squad?

12       A.   It would be about 2150, which is 9:50 p.m.

13       Q.   Where was Mark Orlando placed at the Homicide Squad?

14       A.   He was placed in the main interview room off of the

15   Homicide Squad.

16       Q.   Describe that room.

17       A.   It's a room, it's probably about 10 feet by 10 feet.

18   It has a desk, three chairs, filing cabinet, a window with a

19   curtain on it, also has a door, a locked door with a window in

20   the door.

21       Q.   Did you eventually take part in a conversation with

22   Mark Orlando?

23       A.   Yes, I did.

24       Q.   Who was present when the conversation began?

25       A.   Detective McHugh.

Det. McGinn/People/Direct

178

1    Q.   Was Mark Orlando handcuffed when the conversation

2   began?

3    A.   No, he was not.

4    Q.   Describe any initial conversation with Mark Orlando.

5    A.   Again, Detective McHugh introduced himself and I to

6   the defendant.  He told him he was investigating the murder of

7   Bobby Calabrese and before he asked him any questions he

8   wanted to advise him of his rights.

9    Q.   Did he do that?

10    A.   Yes, he did.

11    Q.   How did he do it?

12    A.   He read it to the defendant from what's called a PDC

13   form 233, which is a notification of rights.

14    Q.   Did he ask if the defendant understood?

15    A.   Yes, he did.

16    Q.   What did the defendant say?

17    A.   The defendant said yes, he did.  He was then asked

18   to write the word yes next to "Do you understand?" which he

19   did.

20    Q.   Was he asked if he would speak with you?

21    A.   Yes, he was.  Once he agreed to speak with us, he

22   was asked to sign the word yes, agreeing to speak with us.  He

23   was also asked to sign the bottom of the card stating that he

24   was advised of his rights.

25    Q.   What was the approximate time Mark Orlando was

1    informed of his Constitutional rights?

2         A.    That was about 2210, which is about 10 minutes past

3    10:00 p.m.

4         Q.    Was there a conversation after Mark Orlando was

5    informed of his Constitutional rights?

6         A.    Yes.

7         Q.    Did you take part in that conversation?

8         A.    Yes, I did.

9         Q.    How were you involved?

10        A.    I was backup on the interview with Detective McHugh.

11   Detective McHugh would be the main interviewer, and I was in

12   there to take notes and to ask any pertinent questions that I

13   felt necessary.

14        Q.    How many pages of notes did you take in the

15   conversation with Mark Orlando?

16        A.    Six pages.

17        Q.    Describe any conversation that took place then.

18        A.    Mark Orlando stated that he was expecting us to come

19   and talk to him, that he had seen Bobby Calabrese the night

20   that he was murdered.  He thinks that he might have been the

21   last person to see him alive.  And then Detective McHugh asked

22   him to explain his relationship with Bobby Calabrese.  He then

23   went on to explain that he was introduced to Bobby Calabrese

24   by a coworker and a mutual friend by the name of Tom Flores.

25   Bobby Calabrese was a runner for a bookmaker and that Mark

1   Orlando was a gambler.  They set up a business arrangement.

2   After a couple of days Bobby Calabrese had called Mark

3   Orlando, wasn't sure if it was on his cell phone or on his

4   business phone.  He gave him an account number and password

5   and an 888 phone number to call to make his wagers.

6        He started betting with Bobby Calabrese.  I believe

7   it was in October.  He bet with him for about six weeks.  He

8   got very detailed on his gambling.  He said that in the first

9   week I believe it was $800 and change he had won.  The second

10  week was about a thousand sixty-five dollars he had won.  And

11  the third week he won about $8700 with Bobby Calabrese.  Bobby

12  Calabrese would normally come out to Farmingdale on a Thursday

13  and pay Mark Orlando whatever his winnings were.  I believe in

14  week four he had a very good week.  He won about $17,900.  In

15  week five he had lost, I think, $8700, and in week six he had

16  lost about $9100.

17        Q.   Describe any further conversation.

18        A.   He said during this time Bobby Calabrese would come

19  out and pay him.  During one week Bobby Calabrese was short

20  some money.  He had owed him a few dollars.  And towards the

21  end of the gambling when he had that really bad week, second

22  week where he lost the $9100, I believe it was 11/30, November

23  30, he voluntarily shut down his line.  At that point he owed

24  about $17,000 but said he was still up in the grand total of

25  things.  He was up about $10,000 in the gambling.  But he

1   voluntarily shut down the line because he didn't want to lose

2   any more money.

3          He had made arrangements with Bobby Calabrese to pay

4   the debt that he owed, and he was supposed to meet him on

5   12/2, December 2, to pay the debt from the gambling. Up until

6   11/28 was due on the 2nd of December. He continued to bet

7   after that, and that's when he lost the $9100 on the 29th and

8   the 30th of November. That money would not have been due

9   until 12/9, but being that he said he still had money all

10  together from when he was winning, he wanted to pay Bobby

11  Calabrese all off in one lump sum. And he owed him a total of

12  $17,000.

13         He couldn't meet Bobby Calabrese on the second

14  because he wound up working a 12:00 to 9:00 that day and went

15  out with his wife afterwards. He got a phone call at work on

16  12/3. Bobby Calabrese wanted to meet with him. He said that

17  he had to go down to Wantagh Suzuki to pick up a check.

18  Wantagh Suzuki had owed him money, that he would go down to

19  Island Park and meet Bobby Calabrese. Bobby told him that he

20  was going out to dinner that night and that he would meet him

21  later on sometime that night.

22         He said that he went to the gym on Friday with Herve

23  Jeannot, Tom Flores, Barbara Diamont, who was also a coworker,

24  and, I believe, a Rory Hoffman was the other one that went to

25  the gym. Mark Orlando and Herve Jeannot left the gym about

Det. McGinn/People/Direct                    182

1   7:30 and drove down to Island Park to meet Bobby Calabrese.

2   He said he drove directly down to Industrial Place by a closed

3   restaurant and there's some body shops down there.  When he

4   was asked how he knew the area, he said that his wife was

5   originally from that area, his best -- that area in Long

6   Beach.  He said that his best friend's wife lived on

7   Knickerbocker, which is right in Island Park.  He said that

8   his father had worked in Oceanside at a radiator shop and also

9   had owned Billmar shop, which was a repair shop down in Island

10  Park.

11          He said he drove there and he parked on the side of

12  the road.  He said about five minutes later Bobby Calabrese

13  pulled up and I think it was a Lexus or Infiniti, and they

14  pulled driver's side to driver's side, that they never got out

15  of the car.  They talked for about a minute and that Mark

16  Orlando handed Bobby Calabrese the $17,000.  They said that

17  they had then left there, went down, went back through Long

18  Beach, Loop Parkway to Ocean Parkway to Wantagh Parkway down

19  to Wantagh Suzuki.

20          He had called Wantagh Suzuki.  He was asked if he

21  had called anybody else at that point.  I believe he said he

22  called Tom Flores and he called a friend of his, Vivian

23  Barushik, I think is her last name, and he had also called to

24  his wife between 8:40 and 9:00 p.m. that night.

25          When he got to Wantagh Suzuki, the place was closed.

1   He couldn't pick up his check.  From Wantagh Suzuki, he then

2   went to Citibank on Sunrise Highway where he withdrew $300

3   from the ATM.  He says he doesn't normally save his receipts

4   from the ATM, but he remembers that night that he withdrew the

5   money at 9:12 p.m. and that he had saved that receipt and that

6   receipt was on his desk at work.  He then said he left.

7            He called Vivian again and was on her way.  He went

8   to 135, Route 135, which is Seaford-Oyster Bay, drove over to

9   Vivian's house to look at a pool she had installed.  I believe

10  there was going to be a fence put up.  He wanted to look at

11  the distance between the fence and the pool, and there was

12  also a deck to be taken down.  He said after that, they stayed

13  there about 30 or 40 minutes.  From there he drove Herve home.

14  He called his wife from in front of Herve's house.  Herve

15  called his girlfriend from in front of his house.  He dropped

16  Herve off.  He then went home.

17           At that time, at that point we talked about some of

18  his outstanding debts that he had.  He explained that he had

19  about 10 outstanding debts, and he went into about five of

20  them.  He said that he had a mortgage of $307,500.  The

21  payment on that was approximately 1729 a month with an

22  additional $3200 in taxes annually.  He had a car loan of

23  $19,000.  I believe that was 399 a month or $400 he had to pay

24  on that.  He had a debt with MBNA credit card for $14,000.

25  That was a $400 payment.  He also had a Citibank card that he

1   owed about $4500 on.  That was about a $300 a month payment

2   and that he also had taken out a $25,000 loan over a 20-year

3   period for a built-in pool he had put in his yard, and that

4   was about $259 a month.

5          He was also asked about any bank accounts that he

6   had.  He said that he had a joint account with his wife at

7   Citibank in Farmingdale and that he also had an individual

8   account at Citibank by himself.  He says with some of the

9   winnings that he had, he put a few thousand dollars in the

10  Citibank account, the joint account, and he put some money

11  into his own account to pay some of the credit card bills that

12  he had.

13         Q.   Did he talk about gambling?

14         A.   Yes, he did.  He talked about his gambling

15  extensively.  He said he was playing, betting on college

16  football, pro football and basketball, pro basketball.

17  Detective McHugh had a conversation about he must not be very

18  good at gambling because pro basketball is one of the sports

19  that you don't normally bet on, especially betting on the

20  final score because there's so many things that can change it

21  and there's stuff that you can't prevent from that.  Mr.

22  Orlando told him that he really didn't know what he was

23  talking about because a good gambler never bets on the final

24  score of a basketball game.  He bets on the quarter; he bets

25  on the half time; and he bets on the over and under.

1          He also, when he was asked about the money -- the

2     check that he had to pick up from Wantagh Suzuki, he went into

3     great detail about all the vehicles that he had gotten from

4     Wantagh Suzuki.  I believe the first vehicle he purchased from

5     Wantagh Suzuki was a 2004 Verona.  He had traded in a '98

6     Lincoln Navigator for that 2004 Verona.  I believe he paid

7     20,000 for that, and that was the payment of about $400 a

8     month.  He then said the second vehicle he bought from Wantagh

9     Suzuki was a 2001 Ford Expedition.  He kept the Expedition

10    for, I think, a couple of months, he said, and once the gas

11    prices hit, it was a little too expensive to be driving the

12    Expedition, so he traded in the Expedition for a Suzuki XL 7.

13    He kept the Suzuki XL 7 for approximately two weeks.  And he

14    said, "Look at me.  Look at the size of me.  The Suzuki XL 7

15    was just much too small."  At that point he decided to trade

16    in the Suzuki XL 7 and also trade in the 2004 Verona that he

17    had purchased.  He was going to drive now a '91 Cougar that

18    had been given to him by his father and was on the side of his

19    house.  And he got an upgraded or updated 2004 Verona, and

20    that was the current car that his wife was driving.

21         He was asked why he didn't drive his car down to

22    meet Bobby Calabrese.  He said that he didn't have a driver's

23    license.  Driving that distance and driving through Long Beach

24    and Island Park, he said his car looked like a crack head's

25    car with the tinted out windows, and he was afraid that he was

1   going to get pulled over and that he didn't have a license.

2       Q.   Did Mark Orlando himself write anything during the

3   conversation?

4       A.   Yes, he did.

5       Q.   Describe how that happened.

6       A.   When he started talking about his gambling, he

7   seemed to -- he really wanted to expound on that and he saw

8   that we had a pad on the table.  He asked for a pencil and he

9   sat and he explained how the gambling went.  He was showing

10  the half time, the quarter points, how much he won in week

11  one, week two, showing all, you know, his progression in the

12  gambling.  He also wrote down what he did that night with

13  going to Island Park, then to Wantagh Suzuki, then to

14  Citibank, then to Vivian's, then to home.  There was another

15  diagram and I believe it might have been of Vivian's backyard,

16  but I'm not sure.

17      Q.   Did he write four pages of notes altogether?

18      A.   Yes.

19      Q.   Did Detective McHugh begin reducing what Mark

20  Orlando was saying to writing?

21      A.   Yes, he did.

22      Q.   Describe how Detective McHugh reduced what Mark

23  Orlando was saying to writing.

24      A.   After Mark Orlando -- after we had talked to Mark

25  Orlando and he explained what he had done that Friday night

1   and about meeting with Bobby Calabrese and his relationship

2   with Bobby Calabrese, Detective McHugh asked him if he was

3   willing to give a written statement. He said that he was. At

4   that point Detective McHugh told him he was going to write out

5   the statement, which Detective McHugh proceeded to do.

6       Q.   What was done with that written statement?

7       A.   Once that written statement was completed, Detective

8   McHugh read it out loud to Mark Orlando. He was then given

9   the statement and he was asked to read it, and if there were

10  any corrections or additions that he'd like to it, to make the

11  corrections or additions. Once he made the corrections or

12  additions, he was asked to initial them, and then he was asked

13  to sign the bottom of each page and to sign his name and

14  address on the last page.

15      Q.   Did he do that?

16      A.   Yes, he did.

17      Q.   Was Mark Orlando offered anything to eat or drink?

18      A.   Yes, he was.

19      Q.   When was that?

20      A.   I believe at 2 o'clock in the morning he was offered

21  an egg sandwich and something to drink, which he refused. I

22  believe also sometime in the morning he was offered something

23  to eat and drink, and he refused at that point too.

24      Q.   Did Mark Orlando use the men's room whenever he

25  asked?

1      A.   Yes, he did.

2      Q.   Did you resume speaking with Mark Orlando?

3      A.   Yes, I did.

4      Q.   What was the approximate time you resumed speaking

5  with Mark Orlando?

6      A.   I believe it was about 10 minutes after 5:00 in the

7  morning.

8      Q.   Where was Mark Orlando when you resumed speaking

9  with him?

10      A.   He was still in that main interview room off the

11  Homicide Squad.

12      Q.   Was he handcuffed then?

13      A.   No, he was not.

14      Q.   Who was present when you resumed speaking with Mark

15  Orlando?

16      A.   I talked to him by myself.

17      Q.   Describe the circumstances under which you resumed

18  speaking with Mark Orlando.

19      A.   I told Mr. Orlando that Detective McHugh was now in

20  talking to Herve Jeannot, that it sounded like Herve Jeannot

21  was giving up exactly what happened when they went down to

22  meet Bobby Calabrese and that if he wanted to tell his side of

23  the story, now would be the time to tell his side of the

24  story.  He just kept saying to me, "Detective, you don't

25  understand.  You just don't understand."  I kept asking him to

1   tell me what he was talking about and to try and make me

2   understand, and this just went back and forth for about 25

3   minutes.  I felt that I wasn't getting anywhere, so I left the

4   room after about 25 minutes.

5        Q.   Did you return?

6        A.   Yes, I did.

7        Q.   When was that?

8        A.   I believe that was about 6 o'clock in the morning I

9   returned back.

10       Q.   What happened then?

11       A.   I went back into the room by myself.  I talked to

12   Mr. Orlando again, and I told him that Herve Jeannot was

13   definitely giving up the entire thing.  I told him that Herve

14   was saying where the gun was, that exactly what happened when

15   they went down to meet Bobby Calabrese.  I told him that we

16   had a videotape, that the meeting did not take place where he

17   says that it took place and that we have videotape of where

18   the meeting took place and that he was lying to us at that

19   point.  Herve Jeannot was telling us what we felt was the

20   truth at that point and now would be the time for him to tell

21   us his side of the story.

22            Again he kept saying, "Detective, you don't

23   understand.  You don't understand."  We went back and forth

24   for quite a while on this.  I kept telling him, "Tell me what

25   you're talking about.  Make me understand what I don't

Det. McGinn/People/Direct

1   where the weapon was, what he had done with the bullets, how

2   Bobby Calabrese was killed, and he was saying that Mark

3   Orlando had paid him to do this killing.  After talking about

4   that for several minutes, Mark Orlando said to me, "Okay, I'll

5   tell you the truth.  This is what happened."  He says Herve

6   Jeannot also has an account with Bobby Calabrese.  Mark

7   Orlando had opened up the account for Herve Jeannot.  He was

8   limited to, I think, $500.  He could only bet $250 a game.  He

9   then -- Mark called Bobby and had Herve's line increased.  I

10  believe it was increased up to a thousand to where he could

11  spend $500 a game.  I wasn't sure how that worked.  May I

12  refer to my notes?

13              MR. LEMKE:  No objection, your Honor.

14              MR. HAYDEN:  Certainly.  Your Honor, may we

15      have those notes marked?  Those are not originals so we

16      can have them marked for identification purposes only.

17              THE COURT:  All right.

18          (Whereupon, People's Exhibit 10 was marked for

19              identification.)

20      A.   Again he went into the last phone call he had made

21  to the 888 number was on 11/30.  He said that Herve on 12/1

22  calls me.  Herve Jeannot knew that Mark Orlando was going to

23  pay Bobby Calabrese the $17,000.  He knew that on 12/1 and

24  that Mark Orlando was supposed to go on 12/2 and pay him.  He

25  said he didn't make the payment on 12/2, again, because he

Det. McGinn/People/Direct

1   worked a different shift and went out with his wife

2   afterwards.  He said on Friday, 12/3, that Tom Dia -- I'm

3   sorry, Tom Flores, Barbara Diamont, Herve, Mark Orlando and

4   the other gentleman went to the gym.  He said at about 7:30 --

5   at that point Herve knew that Mark Orlando had to pay the

6   debt.  He says Herve agreed to go down with Mark Orlando to

7   Island Park to pay that $17,000.

8           He said that sometime during the day on Friday,

9   Herve Jeannot had come to work with a brown paper bag.  During

10  the day he asked Mark Orlando if he could put it in his car.

11  Mark Orlando had given him the keys to the car.  I asked him

12  he wasn't concerned about the $17,000 he had in the car?  He

13  said that the $17,000 was in the glove compartment and Herve

14  was going to put the brown bag into the trunk.  He said

15  himself and Tom Flores were standing on the steps in front of

16  the building during a break, and they watched Herve go into

17  the trunk and put the brown paper bag in there.

18          He then went into about being down in Island Park

19  and going up past Peter's Clam Bar and coming back again.  I

20  tried to bring him back on point.  I said that Herve Jeannot

21  is giving up everything that happened.  Tell us what happened

22  to the gun and to the bullets.  He said after they left Island

23  Park on their way back, when they got onto the Loop Parkway,

24  he believes it was the second bridge, Herve Jeannot opened the

25  window and threw the bullets out the window over the bridge

Det. McGinn/People/Direct

1   into the water.  He said then when they hit the Wantagh

2   Parkway, he's not sure if it was the first or second bridge

3   but it's a bridge under construction, that he stopped the car

4   and Herve Jeannot then threw the gun out of -- he got out of

5   the car and threw the gun into the water.

6          He said at this point he said what he was afraid of

7   is he was afraid of Herve Jeannot and his family.  He said

8   that Herve at one point had told him that he had three guns

9   and that he had used one of the other guns in a murder.  We

10  got off the track again and we got back into some of the

11  money.  He was saying that with the $10,000 that he was up he

12  put $6,000 into the checking account.  He paid 4,000 towards

13  the MBNA credit card, 1400 towards the Citibank credit card,

14  250 towards a Capital One credit card and then put $4,000 into

15  the joint bank account.

16         When he was asked about what he was wearing the

17  night that they went down to meet Bobby Calabrese, he said he

18  was wearing white sneakers, white T-shirt, black sweatpants, I

19  believe, with an H on the hip and the black suede jacket that

20  he was wearing that night.

21         He says when they went down to Industrial Place down

22  in Island Park, that some of the shops were open down there

23  and that there was a male black in a gray two-door Grand Am

24  talking on the cell phone.  He felt that that wasn't a good

25  place to meet Bobby Calabrese because the shops were open and

Det. McGinn/People/Direct

194

1  there were people around.  He said that he then called Bobby

2  at about 8:25 across from the 7-11 on Austin Boulevard.  He

3  wasn't sure of the name of the street but it was a street that

4  had a closed club on it.  It was an old nightclub.

5        He said that they drove down the block twice, the

6  second time made a U-turn, pulled over to the side of the road

7  and parked.  He was there about five minutes before Bobby

8  showed up, but he said shortly after they arrived, after a

9  minute or so, Herve Jeannot said that he had to get out and go

10  to the bathroom.  Herve then got out of the car.  He said a

11  couple of minutes later Bobby Calabrese pulls up.  He pulls up

12  to the curb about 20 feet in front of him.  Mark Orlando then

13  gets out of his car.  Bobby Calabrese gets out of his car.

14  The two of them walk up to each other.  They meet almost in

15  the middle of the two cars in the street area.  He gives Bobby

16  Calabrese a hug.  They talk for a couple of minutes.  He then

17  takes the $17,000 out of his breast pocket and he hands it to

18  Bobby Calabrese.

19        He says the next thing he knows, he hears a shot go

20  right past his right ear.  He says he has no idea where it

21  came from, he says, and Bobby Calabrese drops to the ground.

22  He then says that Herve Jeannot now runs up to Bobby

23  Calabrese's car, because the car was running with its lights

24  on and that the door was open.  He said Herve Jeannot closes

25  the door.  He comes back to Bobby.  He bends over Bobby and he

1   shoots him two more times while he's laying in the street.  He

2   says then they both get back into the Suzuki Verona after

3   Herve says let's go.

4          When Mark Orlando was leaving where Bobby was in the

5   street, he said that Bobby's feet were still moving.  He then

6   got into the car and he pulled the car up.  As he pulled the

7   car up, he stopped next to Bobby Calabrese's body in the

8   street.  He says Herve Jeannot then got out of the car and

9   attempted to fire the gun again at Bobby and that the gun

10  would not fire.  He says Herve Jeannot then bent down and he

11  grabbed the $17,000.  Herve got back into the car.  Mark

12  Orlando then pulled out through the tire place, went north on

13  Austin Boulevard past Peter's Clam Bar, made a U-turn and came

14  back.

15         He says he knows in front of 7-11 that there's

16  cameras.  He says at that point he wants to be seen with Herve

17  Jeannot.  He wants everybody possible to know that Herve

18  Jeannot was with him.  He says that he, when he pulled up to

19  the light, he saw people over by Bobby Calabrese.  He said

20  that he was yelling and screaming at Herve that they should

21  call the cops for help and that Herve said they're not calling

22  anybody and to leave.

23         He then drives south on Austin Boulevard.  They see

24  a police car, a marked police car coming up with the lights

25  on.  Herve tells Mark not to speed.  Mark says he stops at

1  every traffic light because he knows that there's cameras in

2  the traffic lights and that he wants pictures to be taken so

3  that he's seen in the car with Herve Jeannot.  He says they

4  drive down on the Ocean Parkway.  The second bridge under

5  construction -- the first bridge on the Loop Parkway he throws

6  out the bullets.  The second bridge or the first bridge under

7  construction on the Wantagh Parkway Herve tells him to stop.

8  He stops and he throws the gun out.

9        At that point, again, he's calling as many people as

10  possible and stopping as many places as possible to be seen

11  with Herve.  He says that's the reason that he calls -- he

12  goes to Wantagh Suzuki.  He knows they're going to be closed,

13  but he's hoping there's people there so he can be seen with

14  Herve.  He then says he goes to the Citibank.  When he goes to

15  the Citibank to withdraw the money, that he actually gets out

16  of the car and goes to the trunk to get his wallet, because he

17  knows there's a camera in the ATM machine.  He says that if

18  he's sitting in the car, the camera would have blocked Herve

19  or he would have blocked Herve Jeannot from the camera, so he

20  got out of the car so that the camera would see Herve Jeannot.

21        He said they then drive over to Vivian's.  On the

22  way to Vivian's house -- she lives in Plainview -- they take

23  the 135.  At exit nine there's a school.  Herve tells him to

24  pull over, and Herve dumps his clothes in the school dumpster.

25  Once they leave Vivian's, he drives Herve home.  In front of

1   the house Herve tells him to keep his mouth shut, otherwise

2   he's going to kill Mark's wife Diana.  He then says that

3   before he drove Herve home, he stopped at his house so that

4   his mother-in-law would see him with Herve, and he gave Herve

5   four porno videos from his house, so his mother-in-law would

6   see him with Herve.

7           He further said that while he was sitting on the

8   block waiting for Bobby, that a black Expedition had gone by

9   and also a guy on a bicycle had gone by.  Again, he was asked

10  what happened with the money that Herve had taken from Bobby.

11  Did he get any of that money back?  At that point he said,

12  "No, that was not my money.  That money belonged to Bobby.  I

13  paid Bobby."

14      Q.   Did you take notes of that conversation?

15      A.   Yes, I did.

16      Q.   How many additional pages of notes did you take?

17      A.   Four pages.

18      Q.   I'm directing your attention to around 9 o'clock

19  that Friday morning.  Did you speak with Mark Orlando then

20  about giving a videotaped statement?

21      A.   Yes, I did.

22      Q.   Describe any conversation you had with Mark Orlando

23  about giving a videotaped statement.

24      A.   I asked him now that he told me this story and if

25  this story was the truth, if he wanted to go over to the

1    District Attorney's Office to be put on videotape, that he

2    would be afforded that opportunity. He said that he did not

3    wish to do that. We have a video refusal form. At that point

4    he was asked to sign the video refusal form, which he did.

5                    MR. HAYDEN: Your Honor, may I please have this

6            one page original form marked as or deemed as People's

7            11 for identification and shown to the witness, please.

8        (Whereupon, People's Exhibit 11 was deemed marked for

9                              identification.)

10    Q.    Do you recognize that?

11    A.    Yes, I do.

12    Q.    What is it?

13    A.    It's the refusal of videotaped interview signed by

14    Mark Orlando, witnessed by myself, dated 12/10 of '04, timed

15    at 9:00 a.m. in the morning.

16                    MR. HAYDEN: People would ask that 11 for

17            identification be deemed as 11 in evidence.

18                    THE COURT: Please show it to counsel.

19                    MR. LEMKE: No objection, your Honor, again

20            for purposes of this hearing.

21                    THE COURT: Both counsel no objection?

22                    MR. HOCHHEISER: No objection. Sorry, Judge.

23                    THE COURT: Received.

24        (Whereupon, People's Exhibit 11 was deemed marked in

25                              evidence.)

Det. McGinn/People/Direct                 199

1      Q.    Was Mark Orlando offered anything to eat or drink?

2      A.    Yes, he was.

3      Q.    When was that?

4      A.    Again, I'll just refer to my notes.  I apologize.

5   About 10:30 in the morning he was offered something.  He had a

6   glass of water, and again about 11 o'clock he ate a doughnut.

7      Q.    Did Mark Orlando use the men's room whenever he

8   asked?

9      A.    Yes, he did.

10     Q.    Describe Mark Orlando's physical condition while you

11  were with him.

12     A.    Healthy.  He seemed fine.

13     Q.    Did you observe any injury to Mark Orlando?

14     A.    No, I did not.

15     Q.    Did he complain of any?

16     A.    No, he did not.

17     Q.    Describe his demeanor while he was speaking with

18  you.

19     A.    He was relaxed.  He was responsive, answered the

20  questions.  Certain questions he was almost overly

21  enthusiastic about answering.  He seemed to love to talk about

22  the gambling.  Again, he liked to talk about when he switched

23  all the cars and the money that he was owed from the cars.

24           MR. HAYDEN:  Nothing further at this time, your

25     Honor.

Det. McGinn/People/Cross-Lemke                    200

1        THE COURT:  Before we begin cross, we'll take

2    about a 10-minute break.

3             (Whereupon, a recess was taken.)

4        THE COURT:  Gentlemen, cross-examination.

5        MR. LEMKE:  Thank you, Judge.

6   CROSS-EXAMINATION

7   BY MR. LEMKE:

8        Q.   Good afternoon, Detective McGinn.

9        A.   Good afternoon.

10       Q.   Detective, regarding Mark Orlando, it appears to me

11   that from the early evening hours of December 9 into the day

12   of December 10, that your responsibilities were in dealing

13   with my client, Mr. Orlando.  Would that be correct to say?

14       A.   That's correct.

15       Q.   In fact, after the debriefing, it was my client that

16   you and another officer had gone to arrest; is that correct?

17       A.   Detective McHugh and I were together, yes.

18       Q.   And in fact, you had placed, that evening of the 9th

19   of December, you had placed my client under arrest, correct?

20       A.   No.

21       Q.   It was BSO that placed him under arrest?

22       A.   That's correct.

23       Q.   I think your vehicle was there; is that correct?

24       A.   That's correct.

25       Q.   And then Mr. Orlando was placed, I believe, into

1    your vehicle?

2         A.   That's correct.

3         Q.   And there was a very brief conversation between

4    either yourself or Detective McHugh and my client?

5         A.   Detective McHugh.

6         Q.   It was Detective McHugh that had advised my client

7    that he was under arrest for -- do you recall what he had told

8    him?

9         A.   He didn't advise him what he was under arrest for.

10        Q.   He just told him that he wanted to speak to him

11   regarding the death of Bobby Calabrese?

12        A.   That's correct.

13        Q.   You arrived back to, I believe, headquarters or the

14   Homicide Squad, correct?

15        A.   Yes.

16        Q.   And my client is then placed at about what, 9:50

17   p.m. into interview room number one?

18        A.   Yes, it's the main interview room.

19        Q.   And over the course of the next few hours he is

20   spoken to either by, I guess, yourself?  You had given him his

21   rights at roughly 2210; is that correct?

22        A.   That would be Detective McHugh that gave him his

23   rights at 2210.

24        Q.   You didn't give them to him?

25        A.   No, I did not.

1        Q.    Were you present for that?

2        A.    Yes, I was.

3        Q.    After they were given to my client, he had indicated

4    that he understood and wished to talk to you and Detective

5    McHugh, correct?

6        A.    That's correct.

7        Q.    In speaking then with both of you, after a period of

8    time, I believe, there's a statement started, and at about 2

9    o'clock in the morning of December -- it would have to be

10   December 10 at this point -- that he had signed a statement;

11   is that correct?

12       A.    Yes.

13       Q.    And you were present for that first statement, if we

14   can refer to it as the first statement?

15       A.    Yes.

16       Q.    And then that statement was finished at about 2

17   o'clock, and at that point you don't have anything or do you

18   have anything to do with my client from that point until 5

19   o'clock in the morning?

20       A.    No, I don't have anything to do with him at that

21   point, no.

22       Q.    At about 5:10 in the morning on December 10, you go

23   back into room one, the interview room, correct?

24       A.    That's correct.

25       Q.    And my client, when you walked in, was he sleeping;

1    by the way?

2        A.   He might have been resting.  I don't recall if he

3    was sleeping or not.

4        Q.   And in fact, from the time that he was first placed

5    under arrest until at least 5:00 in the morning, you didn't

6    provide a blanket or a pillow for him, correct?

7        A.   No, I did not.

8        Q.   In the room he was either in a chair or a bench?

9        A.   A chair.  There's no benches in that room.

10       Q.   He's in that chair.  You go back in around 5 o'clock

11   in the morning -- 5:10, I'm sorry, and you go in and you

12   advise Mr. Orlando that there had been a change, that the

13   codefendant now had changed his statement; isn't that correct?

14       A.   That's correct.

15       Q.   And you go in and you tell Mr. Orlando that the

16   codefendant, Mr. Jeannot, had indicated that Mr. Jeannot had

17   shot Mr. Calabrese; is that correct?

18       A.   No, that wasn't at 5:10.  That was at around 6

19   o'clock in the morning.

20       Q.   You had indicated there was about 10 pages total of

21   notes that you took with conversations you had with Mr.

22   Orlando, correct?

23       A.   That's correct.  In addition, there were the two

24   pages of the time notes.

25       Q.   The first six pages regards the first statement?

1      A.    That's correct.

2      Q.    The next four pages, numbered seven through ten,

3  would correlate to this second statement or conversation you

4  had with my client in the morning of December 10.  Would that

5  be correct?

6      A.    It's actually about the third or the fourth

7  conversation that I'm having with him.

8      Q.    Tell me about the second conversation.

9      A.    The second conversation was about 5:10 in the

10  morning.  That's when he was telling me, "Detective, you don't

11  understand.  Detective, you don't understand.  Detective, you

12  don't understand."  I kept asking him to tell me, to make me

13  understand, and he just, he wouldn't say.  You just don't

14  understand.  We went back and forth with that for about 25

15  minutes and I left the room.

16      Q.    Regarding that conversation, was that within those

17  notes?

18      A.    No, it's not.

19      Q.    So regarding that 25 minutes from 5:10 until 5:35,

20  you're questioning my client, telling him there's a change,

21  that the codefendant has implicated both of them being there

22  and that the codefendant has admitted to other detectives that

23  you were both there and that the codefendant had shot Mr.

24  Calabrese, correct?

25      A.    No, that's not at 5:10, no.

Det. McGinn/People/Cross-Lemke                    205

1        Q.    At 5:10 nothing is discussed, is it --

2        A.    That's correct.

3        Q.    -- about the codefendant changing his testimony,

4   correct?

5        A.    Correct.

6        Q.    And you go in and what do you say to Mr. Orlando at

7   5:10?

8        A.    I told Mr. Orlando that Detective McHugh is now in

9   talking to Herve Jeannot and that I believe that Herve Jeannot

10  is telling him what happened, but I don't know what is

11  happening at that point.

12       Q.    And so, therefore, Mr. Orlando hasn't been told by

13  you or anybody else, as far as you know, that the codefendant

14  has given himself up, correct?

15       A.    That's correct.

16       Q.    And yet Mr. Orlando is saying, "Listen, Detective,

17  you don't understand.  I can't tell you.  You don't

18  understand," correct?

19       A.    That's correct.

20       Q.    And you realize that there's something wrong, that

21  you're trying to talk to Mr. Orlando, correct?

22       A.    Correct.

23       Q.    He was very cooperative three hours or four hours

24  earlier when he gave you this statement that was reduced to

25  writing and he signed, correct?

Det. McGinn/People/Cross-Lemke

1    A.   Correct.

2    Q.   He was very cooperative during that statement,

3 correct?

4    A.   Correct.

5    Q.   But now you come in three hours later; you talk to

6 him and now he's telling you you don't -- he's agitated, isn't

7 he?

8    A.   He doesn't really appear agitated.  He's just

9 telling me, "You don't understand."  His demeanor never really

10 changes.

11    Q.   He's telling you you don't understand.  He certainly

12 didn't tell you that three hours earlier, did he?

13    A.   No, he didn't.

14    Q.   He didn't tell you that four hours earlier, correct?

15    A.   That's correct.

16    Q.   You go in at 5 o'clock.  You tell him something's

17 going on with the codefendant.  He says, "Listen, you don't

18 understand.  You don't understand."  But yet you're asking him

19 what's the matter.  Correct?

20    A.   Correct.

21    Q.   You're asking him, "Are you afraid, what, of the

22 mafia?"  Did that occur during that 25 minutes?

23    A.   No, it didn't.

24    Q.   What else then was said during that 25 minutes?

25    A.   Just I kept asking him, "Make me understand.  Tell

1    me what's wrong.  Make me understand what I don't understand."

2        Q.    You don't understand.

3        A.    Correct.

4        Q.    That took about two minutes.  What happened the

5    other 30 minutes?

6        A.    It was back and forth.  It was about 25 minutes that

7    we were in there, and it was constantly, "Make me understand.

8    Detective, you don't understand.  You don't understand."

9    There was a constant back and forth.

10       Q.    Which was much different than what had occurred

11   hours earlier, correct?

12       A.    That's correct.

13       Q.    You then leave at about 5:35 out of the room,

14   correct?

15       A.    Correct.

16       Q.    You still hadn't told him that the codefendant had

17   given himself up yet, correct?

18       A.    That's correct.

19       Q.    In fact, then five minutes later my client is taken

20   to the bathroom, correct?

21       A.    Um-hmm.

22       Q.    And then brought back in, and at about 6 o'clock now

23   in the morning you go back in by yourself again?

24       A.    That's correct.

25       Q.    Isn't that correct?

1      A.   Yes.

2      Q.   What do you tell my client at that time, 6 o'clock

3  in the morning you're in there by yourself?

4      A.   That Detective McHugh is still in there talking to

5  Herve Jeannot, that he is taking a statement from Herve

6  Jeannot and that I believe that Herve Jeannot is giving up the

7  events of that night.

8      Q.   And what does my client tell you?

9      A.   He is still unresponsive, still telling me that I

10  don't understand.  You don't understand.  You don't

11  understand.

12      Q.   Is that when he tells you that he's afraid that the

13  codefendant would hurt his wife and his family and the unborn

14  child?  Did he discuss that with you at that time or that half

15  hour later?

16      A.   That was later on.  That was about -- that was

17  between 7:50 and 8:50 in the morning.

18      Q.   So still at this time between 6 o'clock and 6:50 --

19  you're in there for this 50 minutes; correct?

20      A.   That's correct.

21      Q.   Again you're trying to get something from my client.

22  You're talking to my client and all he's telling you is you

23  don't understand, correct?

24      A.   That's correct.

25      Q.   And all you're telling my client is, "I believe the

Det. McGinn/People/Cross-Lemke

1    codefendant is giving himself up and telling the truth," but

2    you didn't tell him specifics yet, correct?

3        A.   That's correct.

4        Q.   And yet my client is still there, "You don't

5    understand.  I can't tell you.  You don't understand,"

6    correct?

7        A.   That's correct.

8        Q.   Nothing much more than that at that point, correct?

9        A.   That's correct.

10       Q.   And he's much similar as he was a half hour before

11   that, correct, or at 5:50?

12       A.   Yeah, between 5:10 and 5:35.

13       Q.   Which is much different than he was four hours

14   earlier when he signed that statement?

15       A.   That's correct.

16       Q.   You leave at 6:50 because my client is still telling

17   you, "You don't understand, Detective.  You don't understand."

18   It goes on over and over again for an hour and 50 minutes, an

19   hour and 30 minutes, correct, total from 5:10 until 6:50,

20   minus maybe 10 minutes, 20 minutes, looks like a bathroom

21   break or something in there, right?

22       A.   Yes.

23       Q.   Now, you leave, and at 7:40 my client then goes to

24   the bathroom again, correct?

25       A.   Yes.

Det. McGinn/People/Cross-Lemke                    210

1    Q.   And then at 7:50 you go back in with Detective

2    Brosnan?

3        A.   That's correct.

4        Q.   At this point in time there's already now a second

5    statement from the codefendant admitting his guilt in this,

6    correct?

7        A.   That's correct.

8        Q.   The statement had been signed by the codefendant

9    indicating that the codefendant had shot Mr. Calabrese,

10   correct?

11       A.   Yes.

12       Q.   And gave the specifics of how they drove down and so

13   forth, correct?

14       A.   Correct.

15       Q.   And you were aware now of these specifics when you

16   went in to talk to my client now at 10 to 8:00 in the morning,

17   correct?

18       A.   That's correct.

19       Q.   You go in.  Do you advise my client of any

20   Constitutional rights again at that time?

21       A.   No, I do not.

22       Q.   In fact, they had been, I think you testified, given

23   to him the day before, I believe, at 10 minutes after 10:00;

24   is that correct?

25       A.   It was the night before, yes, at 10 minutes after

1    10:00 p.m.

2        Q.    And he had already been spoken to and had already

3    signed the written statement, correct?

4        A.    That's correct.

5        Q.    Now, there's three hours in between from 2:00 to

6    5:00 where nothing was done with my client, correct?

7        A.    Correct.

8        Q.    And you go back in and at about 10 after 5:00, you

9    don't give him any warnings again at that point, correct?

10       A.    That's correct.

11       Q.    You leave, correct?

12       A.    Correct.

13       Q.    You're back in again at 6 o'clock.  You don't give

14   him any further rights, do you?

15       A.    No, I do not.

16       Q.    And you leave then at 10 to 7:00, correct?

17       A.    That's correct.

18       Q.    In the morning, right?

19       A.    Yes.

20       Q.    And when you go back in at 10 to 8:00, you don't

21   give him his rights then at that time, do you?

22       A.    No, I do not.

23       Q.    Did you also testify that he had signed a video

24   refusal to speak to the ADA at 9 o'clock?

25       A.    Yes.