```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU        :       PART 33
-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,
                                              Indictment No.
                                              167N-2005
            -against-


MARK ORLANDO and HERVE JEANNOT,

                            Defendants.
-----------------------------------------X
                                    Mineola, New York
                                    April 18, 2005


B E F O R E:    HONORABLE ALAN L. HONOROF
                Acting Supreme Court Justice


A P P E A R A N C E S:


        HON. DENIS DILLON
            District Attorney of Nassau County
            BY:  ROBERT T. HAYDEN, ESQ.
            Assistant District Attorney for the People


        DENNIS LEMKE, ESQ.
            Attorney for Defendant Orlando
            114 Old Country Road
            Mineola, NY  11501


        DANIEL HOCHHEISER, ESQ.
            Attorney for Defendant Jeannot
            270 Madison Avenue
            New York, NY  10016


            M I N U T E S   O F   H E A R I N G


                                    Edward Dong
                                    Official Court Reporter
```

1   Q.   And that was at 9 o'clock?

2   A.   That's correct.

3   Q.   Still didn't give him his rights, correct?

4   A.   He was given his rights at 20 to 10:00 -- 10:10

5   p.m., yes, he was.

6   Q.   The night before?

7   A.   That's correct.

8   Q.   Now we're talking 12 hours later, correct?

9   A.   I had not read him his rights in that time period,

10  no.

11  Q.   His statement had already been taken and he had

12  signed that statement, correct?

13  A.   That's correct.

14  Q.   And it ended and three hours had gone by without

15  anyone going in there saying they wanted to talk to him,

16  right?

17  A.   Correct.

18  Q.   In fact, some point later that morning Cereghino

19  goes in to get a second signed statement, correct?

20  A.   I believe so, yes.

21  Q.   You weren't present for that, correct?

22  A.   No, I was not.

23  Q.   So when you go back in at 10 to 8:00, what do you

24  now tell my client at that time, Mr. Orlando?

25  A.   I tell Mr. Orlando that Herve Jeannot had admitted

1  to the shooting, that he said that Mark Orlando had paid him
2  to do the shooting. He told us where he had disposed of the
3  bullets and the gun and that if Mark Orlando wanted to give
4  his side of the story, now would be the time to do it.
5     Q.  So now you go in. Now for the first time my client
6  is told by you or anyone else that you're aware of the
7  specifics that the codefendant had now given; isn't that
8  correct?
9     A.  Correct.
10    Q.  And you go in and not only do you give the
11 specifics, but you tell my client that the codefendant had
12 indicated where the gun was thrown, where the bullets were
13 thrown, correct?
14    A.  Um-hmm.
15    Q.  Where the shooting took place?
16    A.  Um-hmm.
17    Q.  That the codefendant had done the shooting, correct?
18    A.  Correct.
19    Q.  So all that is now told to my client. My client is
20 told for the first time that the codefendant has now
21 inculpated himself and now my client says, "Whew, now I can
22 tell you what happened," right?
23    A.  Yes.
24         MR. HAYDEN: Objection to the "Whew, now I can
25    tell you what happened." Where did that come from?

1    MR. LEMKE: I'm sorry.

2    Q. He says, "Now I can tell you what happened"?

3    A. Words to that effect, yes.

4    Q. He begins to tell you now he was so afraid of the
5    codefendant, correct?

6    A. Yes.

7    Q. Tells that he was afraid to say anything because he
8    was threatened by the codefendant, correct?

9    A. Correct.

10   Q. That his wife was about eight months pregnant,
11   correct?

12   A. That she was pregnant? I don't recall how far along
13   she was, but yes, that she was pregnant.

14   Q. And Mark tells you and you asked him, "Why would you
15   be afraid of him?" And he tells you how he saw him kill this
16   guy in cold blood and that he threatened he'd do the same
17   thing to him, correct?

18   A. That's correct.

19   Q. He said that when you started asking him about,
20   "Well, what did you do right afterwards?" And my client
21   started telling you, "I went anywhere I could go to be seen,
22   so that when I'm ever contacted I could say, 'See, I was here
23   with this guy. I was here with this guy.'" And he tells you
24   everywhere that he went and why he did that, correct?

25   A. Correct.

1  Q. And you wrote that down on pages seven, eight, nine
2  and ten in your notes as to this conversation regarding my
3  client, what he couldn't tell you beforehand, why he was so
4  afraid of the codefendant, correct?
5  A. Yes.
6  Q. He tells you all of that. And you leave after
7  about, I guess, about an hour, is that correct, from 7:00 --
8  from 10 to 8:00 to 10 to 9:00?
9  A. Yes.
10 Q. In fact, I think my client had indicated to you that
11 the codefendant claims that he had three guns, that one he had
12 used in another murder; isn't that correct?
13 A. Yes.
14 Q. And that my client indicated what clothes he was
15 wearing and that he went to pay Mr. Calabrese, correct?
16 A. Correct.
17 Q. That he had no idea that Herve was going to come up
18 and shoot him and rob him of his money, correct?
19 A. That's what he said, yes.
20 Q. He never told you that this was a plan on his part
21 to avoid paying the money that he owed Mr. Calabrese, correct?
22 A. That's correct.
23 Q. Continued on to say how over all of the six weeks or
24 seven weeks that my client was actually up about, I think,
25 27,000 and by paying back Mr. Calabrese he'd still be up over

1   10,000 during the six weeks that he was betting, correct?

2       A.   That's correct.

3       Q.   You wrote that all down. You reduced it in part to
4   notes; isn't that correct?

5       A.   That's correct, between the two interviews, yes.

6       Q.   He indicated how he wanted to go back up to the
7   Suzuki dealership to at least, again, see somebody to say,
8   "Listen, that's who's with me," correct?

9       A.   Correct.

10      Q.   Started talking about how he saw and was yelling at
11  Herve about we should go to the police and so forth, and Herve
12  told him, "Just keep going," and that he said he would kill
13  him or Diana, his wife, correct?

14      A.   Not at that point. It was later on that he told him
15  when he pulled up in front of the house to drop him off that
16  he said that.

17      Q.   And in fact when he dropped him off, that's when he
18  said -- Herve told him, "You keep your mouth shut or I'll kill
19  you or I'll kill your wife," correct?

20      A.   Correct.

21      Q.   And then he was able to discuss with you why he
22  couldn't tell you, why you didn't understand earlier?

23              MR. HAYDEN: Objection to he was able to.

24              MR. LEMKE: I'll withdraw the question.

25              MR. HAYDEN: The detective wouldn't

1    understand that.

2    Q.   You then leave at about 10 to 9:00, correct?

3    A.   That's correct.

4    Q.   And again not once in your presence had my client
5    ever admitted either shooting Mr. Calabrese or taking any part
6    in that, correct?

7    A.   That's correct.

8    Q.   And when you leave the room, you come back in, I
9    guess at about 9 o'clock in the morning of February 10; is
10   that correct?

11   A.   That's correct.

12   Q.   Of December 10?

13   A.   I'm sorry?

14   Q.   I'm sorry, December 10?

15   A.   Yes.

16   Q.   When he signs a video refusal which I believe now is
17   in evidence as number 11, correct?

18   A.   Yes.

19   Q.   And at 10 o'clock, if you know, he's offered
20   something to drink?  I think he has a glass of water, correct?

21   A.   I believe it's around 10:00, 10:30, yes.

22   Q.   Then I believe detective -- maybe 10:30.  Would that
23   refresh your recollection, 10:30 maybe?

24   A.   Yes.

25   Q.   Cereghino goes in, correct?

1  A. Correct, if he's not already in there.

2  Q. Do you go back in with Detective Cereghino?

3  A. No, I do not.

4  Q. After my client from 10 to 8:00 to 10 to 9:00 is now telling you everything that has happened about being there, about Bobby being shot, about him in fear for his life, about him being threatened, do you reduce that to writing for him to sign at that point?

9  A. No, I do not.

10 Q. Do you have him videotaped at that point?

11 A. He's asked if he wanted to be videotaped at 9 o'clock, and at 9 o'clock he refused to be videotaped.

13 Q. So after cooperating earlier and at this time you ask him if he wants to be videotaped, he says no?

15 A. That's correct.

16 Q. You don't tell him that, "Listen, you know we'll probably get you to arraignments later this morning, but if you want to meet with the DA, you may be here another day or two"?

20 A. No, absolutely not.

21 Q. In fact, if he was going to meet with the DA, procedurally you've done that before?

23 A. Yes, I have.

24 Q. Once that is done -- withdrawn.

25    To set that up, it's a matter of contacting now the

1  district attorney that will be assigned the case, correct?

2  A.  Correct, who we had been in touch with earlier in

3  the morning, so that would not have been a problem. It's also

4  9 o'clock in the morning. The District Attorney's Office --

5  Q.  Saturday?

6  A.  I'm sorry, Saturday, into Saturday, you're correct.

7  Q.  It's a matter then -- it's done here at the District

8  Attorney's Office?

9  A.  That's correct.

10 Q.  So clearly by bringing someone over, 9 o'clock may

11 have been too late anyway to get somebody to arraignments

12 perhaps. Certainly having a videotape with the District

13 Attorney's Office would have certainly delayed it until the

14 next day, correct?

15 A.  Good possibility, yes.

16 Q.  There's no 24-hour arraignment in Nassau County,

17 correct?

18 A.  That's correct.

19 Q.  Now, do you have anything further to do with my

20 client?

21 A.  At that point, no, I do not.

22 Q.  What about later in the morning, did you have any

23 further conversations with him or anything like that?

24 A.  No.

25 Q.  And you're not present when Detective Cereghino goes

1  in and takes a statement from my client, correct?

2      A.   I'm present in Homicide. I'm not present in the

3  interview room.

4      Q.   So when Detective Cereghino goes in and writes down

5  a statement from my client, which I refer to as the second

6  statement, correct --

7      A.   Correct.

8      Q.   -- that statement is not based upon what he told

9  you, is it?

10     A.   No, it's based on what he told Detective Cereghino.

11     Q.   You weren't present for that?

12     A.   That's correct.

13     Q.   You don't know what was reduced to writing or what

14 was omitted or what was left out in the notes that you had

15 recorded, numbers one through, I think, ten, correct?

16     A.   That's correct.

17     Q.   Did you give your totes to Detective Cereghino

18 before he went in, if you know?

19     A.   No, I did not.

20         MR. LEMKE:  I have nothing further.  Thank you.

21 CROSS-EXAMINATION

22 BY MR. HOCHHEISER:

23     Q.   Good afternoon, Detective.

24     A.   Good afternoon.

25     Q.   On the evening of December 9, 2004, did you have any

1  contact with Herve Jeannot?

2      A.   No, I did not.

3      Q.   Did you speak to him during the evening of December
4  9 at any point?

5      A.   December 9 into December 10 I never spoke to Herve
6  Jeannot.

7      Q.   Have you ever met him?

8      A.   No, I have not.

9      Q.   The only information you had during your interviews
10 with Mr. Orlando which you just testified about on
11 cross-examination in response to Mr. Lemke's questions you
12 obtained from your conversations with Detective McHugh; is
13 that correct?

14     A.   Yes.

15     Q.   And there came a time, you testified just now on
16 cross, that around 6:00 a.m. you had a conversation with
17 Detective McHugh about Mr. Jeannot changing his statement; is
18 that right?

19     A.   No, I didn't have a conversation with Detective
20 McHugh. I'm not exactly sure what time the conversation was.
21 I don't believe I testified that I had a conversation with him
22 at 6 o'clock in the morning.

23     Q.   Well, you testified that from 5:10 to 5:35 a.m.,
24 December 10, you're going through "You don't understand"
25 business with Mr. Orlando, right?

1   A.   Correct.

2   Q.   And then you exit the room because you're not
3 getting anywhere and you have a conversation with Detective
4 McHugh, correct?

5   A.   I don't know if I had a conversation with Detective
6 McHugh at that point.

7   Q.   How did you come to learn that Mr. Jeannot had
8 changed his version of events?

9   A.   During the night I believe Detective Partee and
10 Detective Trillo had been in talking to Herve Jeannot, and at
11 one point Detective McHugh took over that interview. And I
12 believe Detective Trillo had stepped out of the room.

13   Q.   And you spoke to Trillo?

14   A.   Probably, yes.

15   Q.   And what did he say to you?

16   A.   That Herve Jeannot was going for the whole thing.

17   Q.   That he was admitting his guilt and implicating Mr.
18 Orlando?

19   A.   Correct. I believe so at that point. I'm not a
20 hundred percent sure on that.

21   Q.   So it's fair to say that all the information that
22 you received as to Mr. Jeannot's statements made December 9
23 and December 10 were obtained by you from other officers who
24 were present?

25   A.   From other detectives, yes.

1   Q.   Other detectives.  So you had no firsthand knowledge
2   of what he said the prior evening or that morning, correct?
3   A.   That's correct, because I had no contact with him at
4   all.
5           MR. HOCHHEISER:  I have nothing further.  Thank
6   you.
7           MR. HAYDEN:  Nothing, your Honor.
8           THE COURT:  Thank you, Detective.  You're
9   excused.
10          THE WITNESS:  Thank you.
11          (Whereupon, the witness was excused.)
12          MR. HAYDEN:  May we approach a moment, Judge?
13          THE COURT:  Yes.
14  (Whereupon, an off-the-record discussion occurred at the bench.)
15          THE COURT:  9:30 tomorrow morning, gentlemen.
16  (Whereupon, the hearing was adjourned until April 20, 2005.)
17              *         *         *
18
19
20
21
22
23
24
25