```
1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU         :      PART 33
2    ------------------------------------------------X

3    THE PEOPLE OF THE STATE OF NEW YORK,

4                                           Indictment No.
                      -against-            167N-2005
5

6    MARK ORLANDO and HERVE JEANNOT,

7                                Defendants.
     ------------------------------------------------X
8                                Mineola, New York
                                 April 20, 2005
9

10   B E F O R E:    HONORABLE ALAN L. HONOROF
                     Acting Supreme Court Justice
11

12   A P P E A R A N C E S:  (SAME AS PREVIOUSLY NOTED)

13                      *        *        *

14                THE CLERK:  This is Indictment 167N-05, the

15   People against Mark Orlando and Herve Jeannot.  This

16   hearing is continued.  People ready?

17                MR. HAYDEN:  Ready, your Honor.

18                THE CLERK:  Defendant ready?

19                MR. LEMKE:  Defendant ready, your Honor.

20                MR. HOCHHEISER:  Defendant ready, your Honor.

21                THE CLERK:  Both sides ready, your Honor.

22                THE COURT:  Mr. Hayden?

23                MR. HAYDEN:  Detective Joe Lore.

24   D E T.   J O S E P H   A.   L O R E, a witness called on

25   behalf of the People, after having been first duly sworn by
```

1    the Clerk of the Court and stating his command as the Nassau

2    County Police Department Electronics Squad and his shield as

3    541, was examined and testified upon his oath as follows:

4                    MR. HAYDEN:  May I proceed, your Honor?

5                    THE COURT:  Please.

6    DIRECT EXAMINATION

7    BY MR. HAYDEN:

8         Q.   Good morning, Detective.

9         A.   Good morning.

10        Q.   How long have you been a member of the Nassau County

11   Police Department?

12        A.   31 and a half years.

13        Q.   How long have you been a detective?

14        A.   18.

15        Q.   How long with the Electronics Squad?

16        A.   Three years.

17        Q.   Do you know a man named Mark Orlando?

18        A.   Yes, sir.

19        Q.   Briefly describe him.

20        A.   Mark Orlando's a male white, approximately 400

21   pounds, mid 30s.

22        Q.   Do you see Mark Orlando in this courtroom today?

23        A.   Yes, I do.

24        Q.   Please point him out and describe for the record

25   what he's wearing today.

1   A.   He's sitting in the aisle, black sweatshirt, blue

2   collared shirt, black pants.

3           MR. LEMKE:   So stipulated, your Honor.

4           THE COURT:   The record will so reflect.

5   Q.   Do you know a man named Herve Jeannot?

6   A.   Yes, sir.

7   Q.   Briefly describe Herve Jeannot.

8   A.   He's a male black, approximately 160 pounds, medium

9   skin.

10  Q.   Do you see Herve Jeannot in this courtroom today?

11  A.   Yes, I do.

12  Q.   Please point him out and describe what he's wearing.

13  A.   He's wearing a pink, black and gray striped shirt.

14  I can't see his pants.

15          MR. HAYDEN:   Let the record reflect, your

16      Honor, the witness has indicated defendant Herve

17      Jeannot.

18          THE COURT:   The record will so reflect.

19  Q.   I'm directing your attention to the night of

20  Thursday, December 9 of 2004.  Were you involved then with

21  investigating the shooting death of a young man named Bobby

22  Calabrese?

23  A.   Yes, I was.

24  Q.   Did you respond that night to the parking lot of a

25  business called Professional Credit Services in Farmingdale?



1   A.   Yes, I did.

2   Q.   When did you get there?

3   A.   Approximately a little after 8:00 p.m.

4   Q.   Describe the vehicle you were using.

5   A.   The vehicle I was using was a 1998 dark blue Ford

6   surveillance van.

7   Q.   What was your assignment?

8   A.   My assignment was to observe the defendants, locate

9   the vehicle in question and report back to the other members

10  that were on the detail.

11  Q.   Did you locate a vehicle?

12  A.   Yes, I did.

13  Q.   Was that a black 1991 Mercury Cougar?

14  A.   Yes, it was.

15  Q.   New York license plate CLG 3917?

16  A.   That's correct.

17  Q.   What had you been told about that black Mercury

18  Cougar?

19  A.   That it was wanted -- that it belonged to a Mr.

20  Orlando, that it was wanted for an investigation.

21  Q.   Where was the vehicle in the parking lot?

22  A.   In the parking lot it was parked approximately in

23  the middle of the lot west of the front door.

24  Q.   About how far from the front door?

25  A.   About 150 feet.

1    Q.   I'm directing your attention to shortly past 9:00

2  that Thursday night.  Did you see Mark Orlando that night?

3    A.   Yes, I did.

4    Q.   Where was he?

5    A.   He was coming out the front door of his employer.

6    Q.   Describe any observations you made of him then.

7    A.   I observed him walk out of the front door, then

8  proceed west towards the vehicle.

9    Q.   What happened then?

10    A.   He entered the vehicle, started the engine, warmed

11  up a few minutes and then he proceeded out of the parking lot.

12    Q.   What did you do with that information?

13    A.   I then relayed that information to the members of

14  the detail.

15    Q.   Did you notice Herve Jeannot step out of the

16  Professional Credit Services building just a short time after

17  Mark Orlando?

18    A.   Yes, I did.

19    Q.   Just a few minutes later?

20    A.   Approximately.

21    Q.   What did you do with that information?

22    A.   I informed the detail that he was standing on the

23  front steps of the place of employment, and he was talking to

24  a number of different employees at that time.

25              MR. HAYDEN:  Nothing further at this time, your

1      Honor.

2                      THE COURT:  Gentlemen?

3                      MR. LEMKE:  May I, your Honor?

4                      THE COURT:  Please.

5                      MR. LEMKE:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. LEMKE:

8        Q.   Detective Lore, you don't know my client, Mark

9    Orlando, do you?

10       A.   Personally, not at all.

11       Q.   And on December 9 of 2004, there was a debriefing at

12   headquarters.  Would that be correct?

13       A.   That's correct.

14       Q.   And at this debriefing there was a number of

15   homicide detectives as well as members of the BSO, Bureau of

16   Special Operations, correct?

17       A.   Yes.

18       Q.   And I guess also members of the Nassau County Police

19   Department Electronics Squad.  Would that be also correct?

20       A.   Myself, sir.

21       Q.   So the squad is just you?

22       A.   No, no, there are --

23       Q.   There are others?

24       A.   There are 10 other members in our department.

25       Q.   At the debriefing it was just you?

1    A.   That's correct.

2         Q.   And as part of the surveillance you were told to

3    arrive at a location in Farmingdale.  Would that be correct?

4    A.   That's correct.

5         Q.   And you were given certain details such as the

6    business that was to be placed under surveillance, that being

7    the Professional Credit Services?

8    A.   That's correct.

9         Q.   Were you provided information regarding a vehicle or

10   vehicles you were to look for within that parking lot?

11   A.   That's correct.

12        Q.   And are you in a van, I take it?

13   A.   That's correct.

14        Q.   And when you went to that location, what vehicles

15   were you asked to try to observe or to find?

16   A.   A Cougar, a dark colored Cougar, and I believe that

17   was it.

18        Q.   You weren't asked about either a Suzuki or any other

19   light or white colored car in any way?

20   A.   Not to my recollection, sir, no.

21        Q.   In fact, the only vehicle was a black 1991 Cougar

22   that you were told to place under surveillance, if you see it

23   there, correct?

24   A.   That's correct.

25        Q.   And you had a license plate of that vehicle?

1      A.    That's correct.

2      Q.    And no other cars were you asked to look for,

3   correct?

4      A.    Not at that time.

5      Q.    And you arrived at that location about 8 o'clock

6   that night?

7      A.    Approximately 8 o'clock, yes.

8      Q.    And there was a time at about 9 o'clock or 10 after

9   9:00 that you observed a Mark Orlando leaving the Professional

10  Credit Services; is that correct?

11     A.    That's correct.

12     Q.    Now, you were given a photograph of Mr. Orlando?

13     A.    Yes.

14     Q.    And based on that photograph -- again, you had not

15  known Mr. Orlando, but Mr. Orlando left or the person you

16  believed to be Mr. Orlando leave?

17     A.    That's correct.

18     Q.    That's when you notified the others that he had

19  gotten into this car, correct?

20     A.    Absolutely.

21     Q.    Do you recall what he was wearing when he walked out

22  of the building that night?

23     A.    No, I don't.

24     Q.    Did you make any notation as to what he was wearing?

25     A.    No, I didn't.

1        Q.   Did you make any notes -- did he leave out of that

2   building alone?

3        A.   He left alone, yes.

4        Q.   And you made no notations as to what he was wearing

5   or what time he left and so forth, correct?

6        A.   That's correct.

7             MR. LEMKE:  I have nothing further --  sorry.

8        Q.   You had nothing else to do with Mr. Orlando,

9   correct?

10        A.   That is correct.

11        Q.   You didn't go to any other location --

12        A.   No.

13        Q.   -- to observe whether that was the person you saw

14   get in that car?

15        A.   Absolutely not.

16             MR. LEMKE:  Thank you.

17   CROSS-EXAMINATION

18   BY MR. HOCHHEISER:

19        Q.   Good morning, Detective.  My name is Daniel

20   Hochheiser.  I represent Mr. Jeannot.  Was the debriefing from

21   approximately 6:00 to 8:00 p.m. on December 9, 2004, your

22   first contact with this matter?

23        A.   As far as being involved personally, yes.

24        Q.   So you were not involved in the investigation prior

25   to approximately 6:00 p.m. on that day?

Det. Lore/People/Cross-Hochheiser                    233

1      A.   That's correct.

2      Q.   Did you ever have an opportunity on December 9,

3  2004, or prior, to view a videotape which Detective McHugh

4  obtained from Central Self Storage?

5      A.   Did I observe it?

6      Q.   Did you have a chance to view that videotape?

7      A.   Not to my recollection, no.

8      Q.   At the debriefing did you hear mention of the name

9  Herve Jeannot?

10     A.   At the briefing?

11     Q.   Yes.

12     A.   Yes.

13     Q.   And do you remember who mentioned his name?

14     A.   I don't remember.  It was probably one of the

15  detectives involved in the case.

16     Q.   Do you remember what was said about him?

17     A.   No, that we were just looking for two individuals.

18  They had multiple warrants and they were -- it was involved in

19  an investigation of a homicide.

20     Q.   And besides that they were wanted for multiple

21  warrants and that they perhaps were involved in a homicide, is

22  it fair to say that you had no other information about the

23  suspects' connection to this case?

24     A.   That's correct.

25     Q.   And I believe you testified on direct that you

1    arrived in the parking lot of Professional Credit Services at

2    8:00 p.m.?

3        A.   Around 8 o'clock, yes.

4        Q.   And so you waited in your van for approximately one

5    hour before -- withdrawn.

6             Let me step back.  You arrived in the parking lot

7    approximately 8:00 p.m.  When did you first observe the

8    Cougar?

9        A.   When I first arrived at the location I drove into

10   the parking lot, drove around until I did locate the vehicle.

11   Then I took a position a little higher in the parking lot, and

12   I could observe the front door and the vehicle from my

13   location.

14       Q.   Were you just using your eyes to do the surveillance

15   or did you have equipment that you were using?

16       A.   I was using my eyes mainly.  I did have equipment in

17   the van, but I didn't need to use it.

18       Q.   So no mechanical or electronic equipment was used in

19   this surveillance?

20       A.   That's correct.

21       Q.   You first observed my client, Mr. Jeannot, exit the

22   front door at what time?

23       A.   It was sometime after 9:00 o'clock.

24       Q.   Did you make any notes --

25       A.   No, I didn't.

Det. Lore/People/Cross-Hochheiser                    235

1    Q.   -- about your observations --

2    A.   No.

3    Q.   -- of Mr. Jeannot?

4    A.   No, I notified the other members of the detail.

5    Q.   Have you made any notes in connection with this

6    matter whatsoever?

7    A.   I have nothing, no.

8    Q.   When you observed my client exit the front door of

9    Professional Credit Services shortly after 9 o'clock, you said

10   he was talking to a number of people, correct?

11   A.   That's correct.

12   Q.   Do you know who those people were?

13   A.   Not a clue, sir.

14   Q.   How many were there?

15   A.   It depended on the time.  He seemed to stay there

16   for a little bit of a time.  People came, people left; more

17   people came out.  To give you an exact number how many people

18   were out there, I have not a clue.

19   Q.   Did you see him handcuffed?

20   A.   Excuse me, sir?

21   Q.   Did you see Mr. Jeannot handcuffed by members of the

22   Bureau of Special Operations?

23   A.   Yes, I did.

24   Q.   What did you observe?

25   A.   I observed a van type vehicle pull up, three

1  officers come out, identified themselves, seems like, and they

2  arrested -- and arrested him.

3      Q.  Did you see them carry him from the ground into

4  their vehicle?

5      A.  It seemed like he was just limp.  I have no idea of

6  what the circumstances were.

7      Q.  Well, did he walk into the --

8      A.  No, he was limp.  He was like being carried by two

9  officers.

10     Q.  Prior to him being carried by the two officers, when

11  he was standing in front of the building, did you see him

12  reading anything?

13     A.  Prior to them arriving, I saw him leaning up against

14  the west side of the doorway.  And he seemed to be reading

15  something, but I have no idea what it was.

16     Q.  And when was the last time you saw Mr. Jeannot on

17  December 9?

18     A.  When he was being brought into the car.

19     Q.  And that was the last time you saw him?

20     A.  That's the last time I've seen him.

21     Q.  Until today?

22     A.  That's correct.

23          MR. HOCHHEISER:  Thank you, Detective.

24          THE COURT:  Mr. Hayden?

25

1    REDIRECT EXAMINATION

2    BY MR. HAYDEN:

3        Q.   Did you recognize both Mark Orlando and Herve

4    Jeannot from the photographs you had been shown?

5        A.   Absolutely.

6                MR. HAYDEN:  Nothing further, your Honor.

7                THE COURT:  Gentlemen?

8                MR. LEMKE:  Nothing further, your Honor.

9                THE COURT:  Thank you, Detective.  You're

10   excused.

11               MR. LEMKE:  Your Honor, may we approach for

12   just one quick second?

13               THE COURT:  You need the detective?

14               MR. LEMKE:  No, the detective can step down.

15            (Whereupon, the witness was excused.)

16   (Whereupon, an off-the-record discussion occurred at the bench.)

17               THE COURT:  Mr. Hayden.

18           MR. HAYDEN:  Detective Derek Partee.

19   D E T.    D E R E K    P A R T E E, a witness called on behalf

20   of the People, after having been first duly sworn by the Clerk

21   of the Court and stating his command as the Nassau County

22   Police Department Homicide Squad, was examined and testified

23   upon his oath as follows:

24

25

1   DIRECT EXAMINATION

2   BY MR. HAYDEN:

3       Q.   Good morning, Detective.  How long have you been a

4   member of the Nassau County Police Department?

5       A.   21 years.

6       Q.   How long have you been a detective?

7       A.   11 years.

8       Q.   How long with homicide?

9       A.   Approximately two years.

10      Q.   Do you know a man named Herve Jeannot?

11      A.   Yes, I do.

12      Q.   Briefly describe Herve Jeannot.

13      A.   He's a male black, approximately 23 years of age,

14  medium build.

15      Q.   You see Herve Jeannot in this courtroom today?

16      A.   Yes, I do.

17      Q.   Please point him out for the Court and describe for

18  the record what he's wearing today.

19      A.   Mr. Jeannot is wearing a black -- brown shirt with

20  black and pink stripes.

21      Q.   Where is he located?

22      A.   He'd located behind his attorney, sitting next to

23  the other defendant.

24              MR. HOCHHEISER:  We stipulate that Detective

25      Partee has identified the defendant.

Det. Partee/People/Direct                      239

1          THE COURT:  Identification is reflected in

2     the record.

3          Q.  I'm directing your attention to the morning of

4     Friday, December 10 of 2004.  Were you involved that morning

5     with investigating the death of a young man named Bobby

6     Calabrese?

7          A.  Yes, I was.

8          Q.  Did you speak with Herve Jeannot that morning?

9          A.  Yes, I did.

10         Q.  What was the approximate time you began speaking

11    with Herve Jeannot?

12         A.  It was approximately 4 o'clock.

13         Q.  Where did you speak with Herve Jeannot?

14         A.  It was in the interview room located in the Homicide

15    Squad.

16         Q.  Briefly describe that room.

17         A.  The interview room is a room approximately 11 feet

18    by 10 feet.  It has a desk in the room, three chairs and a

19    leather brown chaise lounge.

20         Q.  Who was present when you began speaking with Herve

21    Jeannot?

22         A.  Detective Frederico Trillo.

23         Q.  Was Herve Jeannot handcuffed when you spoke with him

24    then?

25         A.  No, he was not.

1    Q.    Who asked you to speak with Herve Jeannot?

2    A.    Detective McHugh asked me to speak with Mr. Jeannot.

3    Q.    Did you take notes of your conversation with Herve

4    Jeannot?

5    A.    Yes, I did.

6    Q.    How many pages of notes?

7    A.    I took approximately six pages of notes.

8    Q.    Describe for the Court your conversation with Herve

9    Jeannot.

10    A.    I was asked to go in and speak to Herve Jeannot by

11    Detective Jack McHugh.  When I walked into the office, into

12    the room, I introduced myself to Mr. Jeannot and I introduced

13    Detective Frederico Trillo to Mr. Jeannot.  Then I asked Mr.

14    Jeannot did he want something to drink, did he want some food,

15    did you need to use the bathroom, which he replied, no, he did

16    not.  Then I asked Mr. Jeannot if he wanted something to eat.

17    He said, no, he did not.

18         I asked Mr. Jeannot -- then I wanted and asked Mr.

19    Jeannot how old he was.  He said he was approximately 23 years

20    old.  I asked Mr. Jeannot where did he live, and he stated

21    that he lived in Deer Park.  He lived on Sammis Place in Deer

22    Park.  I then asked Mr. Jeannot where or who did he live with.

23    He stated that he lived with his mother, father.  He had a

24    sister, brother and a niece and nephew that live in the

25    location in Deer Park.

Det. Partee/People/Direct                    241

1           And I then asked Mr. Jeannot if he attended school

2   and he said, yes, he did.  I asked him which school did he

3   attend.  He said that he attended Kellenberg High School, and

4   I said, "Kellenberg High School, that's interesting because my

5   son also attended the Latin school there.  He was in seventh

6   and eighth grade in the Latin school at Kellenberg High

7   School."  And I asked Mr. Jeannot if he knew my son.  I told

8   him my son's name is Darian Partee and if he knew Darian

9   Partee.  He plays basketball and football.  He's a very good

10  halfback.  He was also a guard on the basketball team.  And he

11  said he did not recognize the name.

12          I asked him did he play sports.  And he said, I

13  believe he said, he did play sports, but I don't recall what

14  sports he played.  And it was interesting because he was

15  attending Kellenberg High School and he lived in Deer Park, so

16  I asked him, "How did you get back and forth from Deer Park to

17  Uniondale to Kellenberg?"  He said at the time that he was

18  attending Kellenberg High School he lived in Uniondale.  And I

19  said, "Oh, that's good, because I lived in Uniondale also."  I

20  said, "Well, what else?  Did you get a degree?  Where did you

21  go to school at?"  He did not go to college.  He went into the

22  Marines.

23          And I said, "The Marines.  Well, in the Marines,

24  what did you do in the Marines?"  I believe he said, well, he

25  said that he was in the special services in the Marines.  And

1    I asked him, "Well, special services in the Marines, as

2    special services are you familiar with assault weapons and how

3    to use revolvers and pistols?"  And he said yes, he did.  I

4    said, "Well, special services, well, you're here now.  Why

5    didn't you continue on your career in the Marines?"  And he

6    said that he was injured and he was released on a medical

7    discharge from the Marines.

8         I said, "Well, what are you doing now now that

9    you're out?"  And he said right now he's going to school and

10   he's working for professional services credit agency in

11   Farmingdale.  I asked him, "Well, what do you do at the

12   professional services credit?"  And I believe he said that he

13   handles accounts for Sprint and that he calls individuals to

14   come and pay their collections.

15        I said, "Well, what do you know about this guy Mark

16   Orlando?  What is your association with this guy Mark

17   Orlando?"  And he explained that him and Mark were friends,

18   that Mark Orlando picked him up and drove him back and forth,

19   they car-pooled back and forth to work.  So I said, "Well, how

20   did you get involved with this guy?  How did you get

21   involved?"  I asked him about the situation that you're in

22   now, and he states that Mark asked him -- Mark had told him

23   that he owed this guy Bobby $17,000.  And Mark asked him to

24   take a ride with him to Long Beach to pay the $17,000.

25        I said, "Well, how did you guys -- what precipitated

Det. Partee/People/Direct                    243

1   you going to Long Beach?  Tell me what happened that day."  He

2   said approximately it was around December 3, the Friday, they

3   left work and they drove to LA Fitness to work out first

4   before they went to Long Beach, and from LA Fitness they drove

5   to Long Beach.  They took the Loop Parkway, driving down to

6   Long Beach, and they were going to drive or meet Bobby

7   Calabrese in an area of some, I believe it was body shops,

8   junkyards, that they were going to meet to exchange the money.

9   And I said to Herve, "Be very careful, Herve, because we know

10  the exchange did not take place in this area.  We have

11  cameras.  We have tapes that were taken from a storage

12  facility place located near the 7-11 that has you guys parking

13  in that area."  He says "Well, yeah, we drove around near the

14  7-11.  We parked the car near the 7-11."

15          He said Mark Orlando called, made a phone call.  He

16  said Bobby Calabrese drove up.  He was in a silver Infiniti.

17  Mark Orlando got out with a grocery bag full of the $17,000.

18  He walked over to the car.  He paid Bobby Calabrese, got back

19  in the car.  They left and they drove back to -- they went to

20  Wantagh Suzuki, I believe, to pay -- Mark had to pay a bill at

21  Wantagh Suzuki.  And they drove back to Mark's house where

22  Herve said he got some tapes from Mark Orlando.  And Mark

23  Orlando dropped him off at home, and then he called his

24  girlfriend.

25          I said, "Well," I said, "look, Herve -- " and I was

1   sitting directly in front of Herve.  I said, "Herve, let me

2   tell you right now, that's not the truth."  I said, "Right now

3   we have Mark Orlando on the other side in the room and he's

4   telling us a different story."  I said, "Herve, all I need is

5   the truth.  And you have this white motherfucker over there,

6   this white piece of shit that you call your friend."  I said,

7   "Mark Orlando is not your fucking friend."  I said, "He's not

8   your fucking friend.  He's a piece of shit and he's not

9   telling the truth, all right?  He's got you here, sitting

10  right here."

11          I said, "This guy is not your fucking friend, all

12  right?"  I said, "I don't know what he told you or what kind

13  of relationship you have with him, but if you were telling the

14  truth, you would tell me exactly what happened, because he's

15  putting it on you.  He's making you the person who did this to

16  Bobby Calabrese.  He's going to walk out of here.  He's

17  putting this shit on you."  "Let me tell you something," I

18  said, "Herve -- " I'm looking right at Herve; I'm looking

19  right at him.  I said, "Let me tell you something.  We've come

20  a long way.  We've come a long way in this fucking country.

21  Your parents, all right, took you out of -- they came out of

22  Haiti.  They were in a country -- they were in a country

23  that's impoverished.  They brought you out of that country

24  that was impoverished.  They didn't have anything.  They

25  brought you to America to give you a start, to give you a

1   start in this country.  They gave you a good education.  They

2   sent you to Kellenberg High School, which is a good education.

3          "They gave you a chance to think for yourself and

4   not get trapped, not to get suckered by this, this

5   motherfucker over there.  He's a piece of shit.  And we've

6   come a long way to not have people in this country, especially

7   white people, to tell us what to do, white people to tell us

8   to commit a crime.  You can think for yourself.  He's a piece

9   of shit, and he's not your fucking friend.  Now, if you think

10  he's your friend, then I can't say anything to that.  But let

11  me tell you --" I'm looking at Herve; I'm looking at him;

12  we're looking at each other, and he knows we're looking at

13  each other.  I said, "I have a son that's 21 years of age.  I

14  have a son, a black male, that I raised to give him a good

15  start in this country.  He went to the same school as you went

16  to.  I hope to God that he makes the right decision in life,

17  that he don't get sucked in by shit, by garbage, by a fat

18  piece of shit like he is, that white motherfucker over there

19  on the other side, to commit a crime, to commit a fucking

20  crime.

21         "He caused you to commit a crime and you're going to

22  let him walk out.  You're going to let this guy walk out, and

23  I'm not going to allow him to walk out of here and you take

24  the fucking weight of all this shit in here, because it's not

25  going to happen.  It's not going to happen on my watch.  He's

1  over there spelling it out, and he's putting it all on you.

2  He's putting it all on you.  You're the guy that did this.

3  You're the guy that thought it up, that it was all your plan.

4          "You don't have -- let me ask you something, Herve,

5  you have a gambling habit?  You owe debts?"  No, he does not.

6  I said, "Did you make bets through Mark?"  Yes, I did.  He

7  said yes, he did make bets; he made small bets.  I said,

8  "Well, you know, this weight is not yours then.  If he owes

9  $17,000, why are you the motherfucker sitting here?  Why are

10  you sitting here?  He should be sitting here, not you, Herve.

11  You should not be sitting here.  Your parents don't -- your

12  parents didn't raise you to be sitting here.  He sucked you

13  into this shit, and you're going to let him walk out.  I'm not

14  going to allow him to walk out.  It's his fucking debt.  It's

15  his idea; it's his plan.  And you shouldn't be sitting here

16  but, yeah, you're here.  You got to take it because you're

17  here.  Don't let him walk out and you take the blame and you

18  sit up in the fucking jail.  Don't let him do it."

19          Herve is not looking directly at me.  Now he's not

20  looking directly at me.  He's looking down.  He said,

21  "Detective, I'll tell you."  Now he looks up at me, but he's

22  not looking directly at me.  He said, "Here it goes.  I shot

23  him."  I said, "Herve, this is going to be a weight lifted off

24  your shoulders.  You shot him?"  Yeah, I shot him.  Okay.  Do

25  you need something to drink?  Do you need something to eat?  I

1   got to have another detective come in.  Detective Jack McHugh

2   is going to come in and speak.

3         At this point Detective Trillo walks out to get

4   Detective McHugh.  As Detective Trillo is outside, I'm talking

5   to Herve.  And I'm telling Herve, I said, "Listen, when

6   Detective McHugh comes in, all we want is the truth of what

7   happened there."  I said, "How did you get -- how did you get

8   trapped into this shit, man?"  He's just shaking his head.

9   You know, he owed him 17,000 and he offered to pay me 4,000 to

10  kill him, and I said I would kill him.  And during that time

11  Jack comes in and sits down and Jack takes over the interview.

12        Q.   Describe any involvement of yours with Herve Jeannot

13  after Detective McHugh entered the room.

14        A.   There was -- during the interview with Herve

15  Jeannot, he was describing how he was crouched down behind

16  Mark Orlando's car before Bobby Calabrese drove up in his

17  vehicle and how he came from behind Mark's car to walk up to

18  shoot Bobby Calabrese.  And I was trying to have Herve

19  describe where he was standing, where Bobby Calabrese was

20  standing, where Mark was standing and how he was coming up

21  from behind.  And that was my involvement, and aside from

22  taking notes.

23        Q.   Did Detective McHugh reduce what Herve Jeannot was

24  saying to writing?

25        A.   Yes, he did.

Det. Partee/People/Cross/Hochheiser                248

1      Q.   Describe your involvement in the taking of Herve

2    Jeannot's written statement.

3      A.   During the written statement that Detective McHugh

4    was taking, I, after he completed the written statement, I

5    read the statement.  I read each page and I signed the bottom

6    of each page verifying that that was the correct statement

7    that I witnessed him taking.

8      Q.   Describe Herve Jeannot's physical condition while

9    you were with him that morning.

10     A.   During my interview with Herve Jeannot, he was very

11   polite.  He was disciplined: yes, sir; no, sir.  We had eye

12   contact with each other during my interview with him.  When he

13   admitted to the shooting, he put his head down.  He seemed

14   remorseful.  He cried after that.  That's basically it.

15              MR. HAYDEN:  Nothing further at this time, your

16        Honor.

17              THE COURT:  Gentlemen, hold up one second,

18        please.

19              (Pause in the proceedings.)

20              THE COURT:  Go ahead, Mr. Hochheiser.

21              MR. HOCHHEISER:  Thank you, Judge.

22   CROSS-EXAMINATION

23   BY MR. HOCHHEISER:

24     Q.   Good morning, Detective Partee.

25     A.   Good morning.

1      Q.    My name is Daniel Hochheiser.  I represent Herve

2    Jeannot.  Detective, what time was it when my client said,

3    "Here it goes.  I shot him," when he first said it?

4      A.    I did not document that time.

5      Q.    Can you give me an approximate time just so we have

6    a framework?

7      A.    Approximately about 4:25.

8      Q.    A.m.?

9      A.    A.m., yeah.

10     Q.    You said that the first time you met Herve Jeannot

11   was 4:00 a.m., December 10; is that correct?

12     A.    Yes, sir.

13     Q.    This was in what the Homicide Squad refers to as, I

14   believe, the second interview room; is that right?

15     A.    Yes.

16     Q.    And he was not handcuffed during the interview; is

17   that right?

18     A.    Yes.

19     Q.    And in your presence he was never handcuffed; is

20   that right?

21     A.    That's correct.

22     Q.    Now, you testified on direct that you took six pages

23   of notes total; is that right?

24     A.    Yes.

25     Q.    Do you have any other notes besides those six pages

Det. Partee/People/Cross/Hochheiser

250

1    regarding this case?

2         A.   No, I do not.

3         Q.   And I'm correct that -- withdrawn.

4              You did not include in your six pages of notes the

5    statement from Herve Jeannot that he agreed to do the shooting

6    for $4,000; is that correct?

7         A.   That's correct.

8         Q.   And how do you make decisions about which statements

9    that you obtain from a suspect in an interview to include in

10   your notes and which not to?

11        A.   Can you repeat that again, sir?

12        Q.   Maybe I can help.  Am I correct that you include

13   what you deem as important information that you obtain from a

14   suspect during the course of an interview, so if an interview

15   is a couple of hours, you don't write every word like a

16   transcript?  You take notes of what you find are important

17   facts; is that right?

18        A.   Yes.

19        Q.   And you included in your notes, for example, that my

20   client told you, "Okay, I'll tell you.  Here it goes.  I shot

21   him."  Right?

22        A.   Yes.

23        Q.   "I shot him" in a homicide investigation is an

24   important statement.  We agree on that, correct?

25        A.   Yes.

1     Q.   And you also include in your notes that my client

2  told you that Mark asked him to take a ride to make a payment

3  for a $17,000 debt to Bobby, right?

4     A.   Yes.

5     Q.   Again, an important fact you felt concerning the

6  motive for the homicide, right?

7     A.   Yes.

8     Q.   You noted also that Herve told you that Orlando and

9  Herve drove to Long Beach, during which time Orlando gave him

10  a revolver, right?

11     A.   Yes.

12     Q.   And that Herve told you he was going to use it only

13  if there was a problem, right?

14     A.   Yes.

15     Q.   And those facts you felt were important to note,

16  right?

17     A.   Yes, it is.

18     Q.   And Herve said to you that they were looking for a

19  secluded area, right?

20     A.   Yes, he did.

21     Q.   And you note that Herve told you that he was hiding

22  behind Mark's car with the gun, right?

23     A.   Yes.

24     Q.   And that he got a signal from Orlando at the time

25  Orlando was face to face with Mr. Calabrese, correct?

1     A.   Yes, he did.

2     Q.   And that's when he came up around the blind side and

3   fired the gun one time, right?

4     A.   Well --

5     Q.   Initially?

6     A.   It's encrypted.  See, my notes are encrypted to give

7   me an idea exactly what the full conversation is.  You just

8   can't say that, yeah, those are important notes.  Notes are

9   important, notations that I do make, but it's all encrypted.

10  When I read that, I can say this is a full conversation; I can

11  expound on it.

12    Q.   Do you have your notes with you?

13    A.   You're reading from them.

14    Q.   Well, I was going to offer them to you if you wanted

15  to take a look at them.

16    A.   Sure, I can take a look.  Thank you.

17              THE COURT:  You want Defense A?

18              MR. HOCHHEISER:  Defense A is fine.

19         (Whereupon, Defendant's Exhibit A was marked for

20                    identification.)

21              THE COURT OFFICER:  Defendant's A marked for

22      identification.

23    Q.   Detective, before we look at that, Herve Jeannot

24  told you when you were present in the second interview room

25  with Detective Trillo that he agreed to receive a payment of

Det. Partee/People/Cross/Hochheiser

1   $4,000 from Mark Orlando in exchange for shooting Robert

2   Calabrese; is that correct?

3       A.   Yes.

4       Q.   Now, could you look at Defense A for identification

5   and just confirm that there is no notation, encrypted or

6   otherwise, about this $4,000 payment?

7       A.   That's correct, I didn't make any notations.

8       Q.   And there's no piece of paper that you forgot about

9   a minute ago that might contain a notation about that $4,000

10  payment; am I correct?

11      A.   Other than the statement that Detective McHugh took

12  from Herve Jeannot which it's in.  The $4,000 payment that he

13  took from Mark Orlando is in Detective McHugh's statement

14  which I was present for.

15      Q.   Okay.  It's fair to say, Detective -- well,

16  withdrawn.

17           You get to the interview room at 4:00 a.m. and the

18  "I shot him" statement occurs, I think you testified, about

19  4:25?

20      A.   Yes.

21      Q.   So before you got to the interview room, did you

22  review any statements, prior statements in the case?

23      A.   Yes.

24      Q.   What did you review?

25      A.   Detective Brosnan had debriefed me on his statement

1    that he had taken from Herve Jeannot.

2        Q.   What did Detective Brosnan tell you?

3        A.   That the statement that he had taken from Herve

4    Jeannot seemed contrived.  The story was just too perfect and

5    asked that I go in with Trillo and speak to Herve Jeannot.

6        Q.   Is it fair to say that Detective Brosnan told you

7    before 4:00 a.m. that he had interviewed Mr. Jeannot and he

8    didn't believe what Mr. Jeannot told him, in substance?

9        A.   No, I wouldn't say that.

10       Q.   He said he did believe him?

11            MR. HAYDEN:  Objection.

12            THE COURT:  Sustained.

13       Q.   What did he say?

14       A.   He said that the statement was too contrived.  He

15   said that the times that we had put together as far as the

16   time of death, the time that people heard gunshots, were too

17   close to the times that they had met with Bobby Calabrese and

18   them not putting themselves directly at the location and

19   somewhere else was not being told.  The truth was not there

20   and for us to go in and see if we can get the truth from Herve

21   Jeannot.

22       Q.   Did Detective Brosnan explain to you how he knew of

23   facts inconsistent with Mr. Jeannot's initial statement?

24       A.   The inconsistency was in the times related to Mr.

25   Jeannot's statement.

1    Q.   You're telling me the substance.  I'm asking for did

2    Detective Brosnan tell you the source of where he got the

3    information about those times, about the positioning of the

4    meeting, et cetera?

5    A.   Well, yes.  Well, as part of the investigation, I

6    was privy to information as part of the investigation.

7    Q.   What information was that?

8    A.   Detective Brosnan did not have to tell me the total,

9    in totality, the times.  I was the scene person at the

10   location when we were conducting the investigation, the crime

11   scene investigation, so I was privy to most of the times.  I

12   had information.  I knew information about the time of death.

13   I had information about the time the call, 911 call came in.

14   I had information as to when people heard shots, so I did have

15   knowledge of that in itself.

16   Q.   Did you have an understanding of how Mr. Calabrese

17   was killed prior to your entering that room at 4:00 a.m.,

18   December 10?

19   A.   Yes.

20   Q.   And what was your understanding?

21   A.   I have scene notes.  In my scene notes, it was my

22   understanding that he was shot three times in the head.

23   Q.   Did you have a belief at that time prior to the 4:00

24   a.m. interview with my client about who shot him and how?

25            MR. HAYDEN:  Objection.

Det. Partee/People/Cross/Hochheiser                    256

1          THE COURT:  Overruled.

2      A.    At the time I covered the scene, we had no idea

3  who was involved in the murder.

4      Q.    I'm talking about your state of knowledge right

5  before you entered the room at 4:00 a.m. to interview my

6  client.

7      A.    Yes, I did.

8      Q.    What was it?

9      A.    The investigation centered around Mark Orlando's

10  debt to Bobby Calabrese.

11      Q.    And what did that piece of information mean to you

12  in terms of the roles of the suspects?

13      A.    As a suspect in that case in paying that debt, we

14  knew that he had met with the deceased and that the times that

15  were downloaded from his cell phone, the times that he said

16  that he was there, were inconsistent -- I'm sorry, Mr. Herve

17  Jeannot's statements were inconsistent with the cell phone,

18  inconsistent with the, like I said, 911 call that came

19  through.  Witnesses stated they heard shots at approximately

20  8:40, 8:36, and they said they're there at 8:30.  It was just

21  too inconsistent.  There were too many inconsistencies.

22      Q.    So it's fair to say when you entered the room at

23  4:00 a.m. to interview my client you had a clear motive to

24  connect Mr. Orlando to the homicide, correct?

25          MR. HAYDEN:  Objection.

1          THE COURT:  Sustained.

2      Q.   Your understanding at the time you entered the

3   room at 4:00 a.m. was that Mr. Calabrese was killed in

4   connection with the debt owed by Orlando to Calabrese,

5   correct?

6      A.   Yes.

7      Q.   And you had no information at that time before

8   interviewing my client at 4:00 a.m. to supply a connection of

9   my client to the homicide; is that correct?

10     A.   No, that's not correct.

11     Q.   Other than having evidence that perhaps he was

12  present at the scene, you had no other information connecting

13  him to being a shooter or any involvement in planning the

14  crime or anything that would make him an aider or abettor?

15     A.   Correct, yes.

16     Q.   So it's fair to say that when you entered the room

17  at 4:00 a.m., one of your goals was to obtain information from

18  Mr. Jeannot to fill in that missing piece to connect him,

19  correct?

20          MR. HAYDEN:  Objection.

21          THE COURT:  Sustained.

22     A.   My goal was to get --

23          THE COURT:  No, don't answer.

24     Q.   Well, what was your objective when you walked in

25  the room at 4:00 a.m. to interview my client?

1      A.   My objective was to get the truth.

2      Q.   And when you say your objective was to get the

3   truth, at the time you entered that room, you had an

4   understanding of what the truth was; is that correct?

5              MR. HAYDEN:  Objection.

6      A.   I had an understanding.

7              THE COURT:  I'm going to allow it.  Go ahead.

8      A.   I had an understanding of what the facts of the

9   case told me, and my objective was to interview Herve Jeannot

10   and obtain the truth.

11      Q.   And based on the facts known to you, you had an

12   understanding of what you believed the truth to be at 4:00

13   a.m., correct?

14              MR. HAYDEN:  Objection.

15              THE COURT:  Sustained.

16      Q.   You're aware that Mr. Jeannot was arrested

17   approximately 9:15 p.m. on December 9, right?

18      A.   Yes.

19      Q.   And that he was brought to the Homicide Squad at

20   approximately 10:00, give or take a few minutes here or there?

21      A.   I don't know the exact time, but I guess, yes.

22      Q.   And is it your understanding that my client was in

23   the second interview room at the Homicide Squad from

24   approximately 10:00 p.m. to 4:25 p.m., approximately six hours

25   and 25 minutes, before saying "I shot him," right?

1    A.    I was in and out of the office, so I can't tell you

2    verbatim that he was in that room for six and a half hours.  I

3    was out conducting other investigations.  I was not in that

4    office the whole time.

5        Q.    You were approached by Detective McHugh to assist in

6    the interview of Mr. Jeannot because he hadn't inculpated

7    himself yet, correct?

8        A.    He hadn't told the truth.

9        Q.    If he had told the truth and he had told Detective

10   Brosnan earlier that he had shot him and that he had done it

11   for the $4,000, you probably wouldn't be here today, right?

12              MR. HAYDEN:  Objection.

13              THE COURT:  Sustained.

14       Q.    You testified that when you were taking some

15   preliminary information from my client about his service in

16   the Marines, that you had a discussion with him about his

17   training in, I guess, firearms; is that right?

18       A.    I asked a question, yes.

19       Q.    And what exactly, to the best of your recollection,

20   did he tell you about his training in firearms in the Marines?

21       A.    Just that he had -- I asked him did he have

22   experience or did he have -- has he used those particular

23   weapons.  He said yes, he did.  That was it.  That was the

24   extent of it.

25       Q.    So it was one question from you and a very short

1   answer from him about that?

2        A.   It was three or four months ago.  I don't recall the

3   total conversation in totality, but the best of my

4   recollection, that's the way I remembered it.

5        Q.   Did you ask him what his duties were in the Marines?

6        A.   I don't recall.

7        Q.   When you told my client that you believed that Mr.

8   Orlando was responsible and that, quote, this white piece of

9   shit had put him in this, did you believe that?

10       A.   No, I did not.

11       Q.   And on December 9 -- excuse me, on December 10,

12  2004, had you reviewed -- withdrawn.

13            On December 10, 2004, at 4:00 a.m. at the time you

14  were interviewing Mr. Jeannot, had you had an opportunity to

15  view the Central Storage Facility videotape?

16       A.   No, I did not.

17       Q.   So when you told him that you had tape which showed

18  the positions of the suspects at the time of the incident,

19  that was not true, correct?

20       A.   I stand corrected.  I did view that tape.

21       Q.   When?

22       A.   I can't recall when I reviewed it, but I did review

23  the tape of the -- from the storage facility, showing a

24  vehicle.

25       Q.   And you were able to see what -- you were able to

Det. Partee/People/Cross/Hochheiser                261

1    make out the car?

2         A.   No.

3         Q.   Could you see it was a Suzuki?

4         A.   No.

5         Q.   Could you see that it was light in color?

6         A.   No.

7         Q.   You can't see anything on that tape because it's all

8    black and white with some lights, correct?

9         A.   Correct.

10        Q.   Now, in your testimony on direct you agree that you

11   were emotional, correct?  You testified with emotion?

12        A.   Yes.

13        Q.   And is it a fair inference for me to make that you

14   were emotionally involved in this investigation because of

15   your ethnic, racial connection to my client?

16             MR. HAYDEN:  Objection.

17             THE COURT:  Sustained.

18        Q.   Well, when you told my client that the white guy

19   Orlando was hurting my client, the black man, did you say that

20   because you really believed my client was innocent or did you

21   say that to try to elicit admissions?

22             MR. HAYDEN:  Objection.

23             THE COURT:  Sustained.

24        Q.   Now, there came a time when you told Mr. Jeannot

25   that Mr. Orlando is telling the truth, right?

Det. Partee/People/Cross/Hochheiser                262

1      A.   Yes.

2      Q.   What time was that approximately?

3      A.   I can't recall.

4      Q.   It's between 4:00 and 4:25?

5      A.   I can't -- it's between 4:00 and 4:25, 4:30, around

6  that time.

7      Q.   Well, it's before my client says, "I shot him,"

8  right?

9      A.   Yes.

10     Q.   And was Mr. Orlando telling the truth at that point

11 to other detectives?

12     A.   I don't know.

13     Q.   And you also told my client that his story that he

14 was giving you was not consistent with Mr. Orlando's; is that

15 right?

16     A.   Yes.

17     Q.   And that you didn't believe him, correct?

18     A.   Yes.

19     Q.   And you testified on direct that you told Mr.

20 Jeannot that he was going to have to take some of the weight

21 here, correct?

22     A.   I don't know.  I believe so.  I don't know.  I said

23 a lot during that time.

24     Q.   I know.  I'm not going to -- I'm not going to allow

25 him to walk out of here.  You have to take some weight.



1   That's what you testified to on direct, correct?

2       A.   No, I believe I said, "I'm not going to allow you to

3   take all the weight."

4       Q.   You didn't say in this courtroom under oath that you

5   told my client, "You have to take some weight"?

6       A.   No.  I said, "You're not going to take all the

7   weight.  I'm not going to allow you to take all of the

8   weight."

9       Q.   But you have to take some of it, correct?

10      A.   He would have to take some of the weight?

11      Q.   That's what you testified to?

12      A.   I testified, I said I'm not going to allow him to

13  take -- I'm not going to allow you to take all the weight.

14  That's what I said.

15      Q.   So what you meant by that was that Orlando would

16  have to take some weight and my client would have to take some

17  weight, correct?

18              MR. HAYDEN:  Objection.

19              THE COURT:  Sustained.

20      Q.   What did you mean by that?

21              MR. HAYDEN:  Objection.

22              THE COURT:  Sustained.

23              THE COURT:  Mr. Hochheiser, before you ask

24      your next question, I think we're going to take about a

25      five- or ten-minute break.

1       (Whereupon, a recess was taken.)

2           THE COURT:  Back on the record, gentlemen.  Mr.

3   Hochheiser.

4           MR. HOCHHEISER:  Thank you, your Honor.

5       Q.  Detective, after Detective Trillo came back, he

6   came back with Detective McHugh and the two of them came into

7   the room together, correct?

8       A.  No.

9       Q.  How did it happen?

10      A.  Just Detective McHugh came back into the room.

11      Q.  Detective Trillo was no longer present?

12      A.  Yes.

13      Q.  And Detective McHugh took over the interview and you

14  acted as the backup detective at that point, correct?

15      A.  Yes.

16      Q.  And Detective McHugh -- this session with Detective

17  McHugh began at about 4:30 a.m.; is that right?

18      A.  Approximately, yes.

19      Q.  And what time was Detective McHugh finished reducing

20  Mr. Jeannot's final statement to writing?

21      A.  I don't recall.

22      Q.  Approximately?

23      A.  I don't recall.

24      Q.  Do you have anything that might refresh your

25  recollection?

1       A.    I do not.

2       Q.    Well, how long, approximately, did this part of the

3   interview take from the time Detective McHugh entered the room

4   until the statement was signed by everybody, about an hour?

5       A.    Approximately an hour, I would say, approximately an

6   hour.

7       Q.    And during that approximate hour of time, Detective

8   McHugh asked my client a series of questions and my client

9   gave a series of answers, correct?

10      A.    Yes.

11      Q.    And after my client gave answers, Detective McHugh

12  would write portions of the statement piece by piece, correct?

13      A.    Yes.

14      Q.    And backing up a little bit, before Detective McHugh

15  started to write the statement, am I correct that it was

16  Detective McHugh who made the decision that he would write the

17  statement instead of my client or you?

18      A.    Yes.

19      Q.    And that was, that decision, your understanding is

20  Detective McHugh decided to write it himself to make sure that

21  certain key facts were reflected, correct?

22              MR. HAYDEN:   Objection.

23              THE COURT:   Sustained.

24      Q.    Well, do you know why Detective McHugh chose to

25  write the statement instead of asking my client to write it?

1        MR. HAYDEN:  Objection.

2        THE COURT:  Sustained.

3    Q.   In your presence on the morning of December 10, at

4    any time did any detective, yourself, McHugh or anybody else,

5    ask my client if he wished to write a statement in his own

6    hand?

7    A.   No, he did not.

8    Q.   Now, Detective McHugh would ask a couple of

9    questions, get a couple of answers and then write a small

10   portion of the statement, correct?  It wasn't the whole

11   interview and then he wrote everything?  It was piece by

12   piece, right?

13   A.   No, that's not correct.  Detective McHugh had Herve

14   Jeannot take us through what happened first, and then once he

15   gave us the story as to exactly what happened from the time

16   that he met, the time they discussed it on the 1st of December

17   until the actual murder, then he reduced it to writing.

18   Q.   And Detective McHugh began this process of reducing

19   the statement to writing when you and he were satisfied with

20   the story, correct?

21       MR. HAYDEN:  Objection.

22       THE COURT:  Sustained.

23   Q.   Detective McHugh was the detective that made the

24   decisions on what parts of my client's statement to include in

25   the statement and which parts to exclude, correct?

Det. Partee/People/Cross/Hochheiser                267

1          MR. HAYDEN:  Objection.

2          THE COURT:  Sustained.

3          MR. HOCHHEISER:  Judge, can I be heard on

4     this?

5          THE COURT:  You can, but there's no jury here

6     and I know what happened.

7          MR. HOCHHEISER:  Fair enough.

8     Q.   Are there statements that my client made in the

9     presence of you and Detective McHugh during that 4:30 a.m.

10    interview that is not contained in the final written statement

11    reduced to writing by Detective McHugh?

12    A.   There is not.

13    Q.   Everything my client said when you and Detective

14    McHugh were interviewing him is contained in one, two, three,

15    four, five pages, correct?

16    A.   Yes.

17         MR. HOCHHEISER:  One moment, please, Judge?

18              (Pause in the proceedings.)

19    Q.   Detective, after the statement, this final

20    statement, was signed by you and Detective McHugh and my

21    client, did your involvement in terms of my client end in

22    terms of the interview process that morning?

23    A.   Yes, it did.  As to the best of my recollection,

24    yes, it did.

25    Q.   Were you present when my client was offered the

1    opportunity to give a videotaped statement to an assistant

2    district attorney?

3         A.   I believe I was, yes.

4         Q.   Who made that offer to my client?

5         A.   It would be Detective McHugh.

6         Q.   You have an independent recollection of that?

7         A.   You know, I was present in the room and I do not,

8    no.

9              MR. HOCHHEISER:   I have nothing further, your

10   Honor.   Thank you, your Honor.   Thank you, Detective.

11             THE COURT:   Mr. Lemke?

12             MR. LEMKE:   Just very briefly.

13   CROSS-EXAMINATION

14   BY MR. LEMKE:

15        Q.   Detective Partee, Mark Orlando you now know,

16   correct?

17        A.   Yes.

18        Q.   Prior to December 9, you didn't know Mr. Orlando,

19   correct?

20        A.   That's correct.

21        Q.   On December 9, when you were speaking and

22   interviewing the codefendant, Herve Jeannot, had you had any

23   conversations with my client at all that night?

24        A.   I did not.

25        Q.   Did you have any conversations with him after any

1   statements from the codefendant, Mr. Jeannot?

2       A.   I did not.

3       Q.   And at about 4:25 after Mr. Jeannot had indicated to

4   you that he shot Mr. Calabrese, you left that room and you had

5   advised the carrying Detective McHugh of that fact, correct?

6       A.   No, that's not correct.

7       Q.   When did you first let Detective McHugh know?

8       A.   It was Detective Trillo who left the room to advise

9   Detective McHugh.

10      Q.   That was at about 4:30?

11      A.   It's about approximately 4:30, yes.

12      Q.   Had you had any direct conversations with Detective

13  McHugh after speaking with the codefendant, Mr. Jeannot?

14      A.   After he made the admission --

15      Q.   Yes.

16      A.   -- that he shot him?  I did not.  Only when he came

17  into the room.

18      Q.   And that was at about what time?

19      A.   Approximately 4:30.

20      Q.   That was Detective McHugh, correct?

21      A.   Yes.

22              MR. LEMKE:  I have nothing further.  Thank you.

23              THE COURT:  Mr. Hayden?

24              MR. HAYDEN:  Just briefly, your Honor.

25

1    REDIRECT EXAMINATION

2    BY MR. HAYDEN:

3        Q.    Detective, you testified during cross-examination

4    that you viewed a videotape; is that right?

5        A.    Yes.

6        Q.    Describe the circumstances under which you viewed

7    the videotape.

8        A.    I just walked into the room when they were looking

9    at the videotape and just briefly looked at it and just walked

10   out.  I didn't sit there.

11       Q.    Did you make any effort to identify any vehicle in

12   that videotape?

13       A.    I did not.

14       Q.    Did you take photographs of motor vehicles to try to

15   identify any vehicle you saw in the videotape?

16       A.    No, I did not.

17            MR. HAYDEN:  Nothing further, Judge.

18            THE COURT:  Gentlemen?

19   RECROSS-EXAMINATION

20   BY MR. HOCHHEISER:

21       Q.    Detective Partee, during our last break, did you

22   discuss the subject of the videotape and your testimony about

23   it here with ADA Hayden?

24       A.    Yes.

25       Q.    And he explained to you that other detectives had

1    testified at this hearing that they had identified a Suzuki

2    off that videotape, correct?

3         A.    No, that's not correct.

4         Q.    What did he say to you?

5         A.    He asked me what my involvement was in looking or

6    viewing the videotape, and I explained to him what my

7    involvement was in viewing that videotape.

8                    MR. HOCHHEISER:  Thank you.

9                    THE COURT:  Mr. Lemke?

10                   MR. LEMKE:  Nothing further.  Thank you.

11                   THE COURT:  Thank you, Detective.

12                   THE WITNESS:  Thank you, sir.

13              (Whereupon, the witness was excused.)

14                   THE COURT:  Mr. Hayden.

15                   MR. HAYDEN:  Detective James Cereghino.

16   D E T.   J A M E S   C E R E G H I N O, a witness called on

17   behalf of the People, after having been first duly sworn by

18   the Clerk of the Court and stating his command as the Nassau

19   County Police Department Homicide Squad and his shield as 561,

20   was examined and testified upon his oath as follows:

21                   MR. HAYDEN:  May I proceed, your Honor?

22   DIRECT EXAMINATION

23   BY MR. HAYDEN:

24        Q.    Good morning, Detective.

25        A.    Good morning, Counselor.

Det. Cereghino/People/Direct                    272

1      Q.   How long have you been a member of the Nassau County

2   Police Department?

3      A.   A little over 28 years.

4      Q.   How long have you been a detective?

5      A.   Just about 18 years.

6      Q.   How long with Homicide?

7      A.   A little over seven years.

8      Q.   You know a man named Mark Orlando?

9      A.   Yes, I do.

10     Q.   Briefly describe him.

11     A.   Male white, about five-ten, heavy build, dark hair,

12   clean-shaven.

13     Q.   Do you see Mark Orlando in this courtroom today?

14     A.   Yes, I do.

15     Q.   Please describe for the Court what he's wearing and

16   where he's sitting.

17     A.   He's the gentleman sitting with the black shirt on

18   with, looks like, a light blue collared shirt underneath.

19              MR. LEMKE:   So stipulated, your Honor.

20              THE COURT:   The record will so reflect.

21     Q.   I'm directing your attention to the morning of

22   Friday, December 10 of 2004.  Were you involved that morning

23   with investigating the death of a young man named Bobby

24   Calabrese?

25     A.   Yes, I was.

Det. Cereghino/People/Direct                    273

1      Q.    Did you speak with Mark Orlando that morning?

2      A.    Yes, I did.

3      Q.    What was the approximate time you began speaking

4    with Mark Orlando?

5      A.    At about 10:00 a.m.

6      Q.    Where did you speak with Mark Orlando?

7      A.    In the main interview room of the Homicide Squad at

8    1490 Franklin Avenue, Mineola, New York.

9      Q.    Briefly describe that room.

10     A.    10 foot by 10 foot, desk, three chairs, a filing

11   cabinet and the entrance, there's a door with a half a window

12   on top, and there's another window filling up the rest of that

13   wall.

14     Q.    Who was present while you were speaking with Mark

15   Orlando?

16     A.    It was just Mr. Orlando and myself.

17     Q.    Was Mark Orlando handcuffed while you were speaking

18   with him then?

19     A.    No, he was not.

20     Q.    Describe any initial conversation with Mark Orlando.

21     A.    I entered the room. I reintroduced myself, because

22   when he had been brought in the night before, I was the one

23   who took the handcuffs off him and searched him. I told him

24   that -- I asked him if he wanted to give a statement

25   pertaining to the events of December 3. He said he did. At

1    that time I read him his rights from a rights' card.

2        Q.    Describe any markings that were eventually placed on

3    that card.

4        A.    I read him his rights, and at that point I said, "Do

5    you understand?"  He said yes.  I handed him the card.  I

6    asked him to read it.  I said, "If you do understand, I ask

7    you to put the word yes and sign your name after the

8    question."  Eventually he started to write on the bottom of

9    the card, which is the improper place.  I corrected him and

10   told him I wanted it after the question, "Do you understand?"

11   He then put the word yes and signed his name.  I took the card

12   back and asked him at that time if he was willing to speak to

13   me without an attorney being present.  He said yes.  I handed

14   him the card again.  I asked him to put the word yes after

15   that question and to sign it and he did.

16               MR. HAYDEN:  Your Honor, may I please have this

17          card deemed as People's 12 for identification and shown

18          to the witness?

19          (Whereupon, People's Exhibit 12 was deemed marked for

20                          identification.)

21       Q.    Do you recognize that card?

22       A.    Yes, I do.

23       Q.    What is it?

24       A.    This is the departmental form 233 notification of

25   rights which I used on December 10 at 10:00 a.m. to advise Mr.

1    Orlando of his rights.

2        Q.    How do you know that?

3        A.    By my signature, Mr. Orlando's signature and my

4    print on the top with the date and the time.

5                    MR. HAYDEN:  People ask that it be deemed 12 in

6            evidence, your Honor.

7                    MR. LEMKE:  May I see it, your Honor?

8                    THE COURT:  Show it to counsel.

9                    MR. LEMKE:  No objection, your Honor.

10                   THE COURT:  It's received.

11                   MR. HOCHHEISER:  No objection, your Honor.

12                   THE COURT:  It's received.

13       (Whereupon, People's Exhibit 12 was deemed marked in

14                            evidence.)

15       Q.    Using that card, please read the Constitutional

16   rights for the Court the same way you read them for Mark

17   Orlando and please include for the Court any responses he may

18   have made.

19       A.    I told him to pay attention.  He was looking at me

20   when I stated, Before asking you any questions, you should

21   understand you have the right to remain silent and that any

22   statements you make may be used against you in court.  Also

23   you have the right to talk to a lawyer before answering

24   questions or to have a lawyer present at any time.  If you

25   cannot afford a lawyer, one will be furnished you if you wish,

1  and you have the right to keep silent until you have had a

2  chance to talk with a lawyer.  I asked him, "Do you

3  understand?"  He said yes, and that's when I handed him the

4  card the first time.  As I said, he initially started to put

5  his answer on the bottom.  I directed him to the question, "Do

6  you understand?"  At that time he put yes and he signed his

7  name.

8          I took the card back and said, Now that I have

9  advised you of your rights, are you willing to answer

10  questions?  He said yes.  I handed him the card and I said,

11  "Put the word yes after the second question," and he signed

12  his name again.

13      Q.    Did you speak with Mark Orlando after informing him

14  of his Constitutional rights?

15      A.    Yes, I did.

16      Q.    Did you reduce what Mark Orlando was telling you

17  then to writing?

18      A.    Yes, I did.

19      Q.    Describe for the Court how you did that.

20      A.    I had had no prior contact with Mr. Orlando, so

21  everything I asked him I had no prior knowledge of, so I just

22  asked him brief background information, where he lived, how

23  old he was, his date of birth, that he was married, that he

24  lived with his wife and mother-in-law, where he worked.  And I

25  then wrote the rights into the statement.  Upon completion of

```
 1   that, I started the statement with how he had started gambling

 2   with the deceased.

 3        Q.   Would you ask questions?

 4        A.   Yes, sir.

 5        Q.   What would you do when he answered your questions?

 6        A.   I would ask him a question.  He would answer it.  I

 7   would tell him how I was going to put it down on the

 8   statement, and he agreed with it and then I would reduce it to

 9   writing.

10        Q.   Did you continue that way?

11        A.   Yes, sir.

12        Q.   All the way through the statement?

13        A.   Yes, sir.

14        Q.   What did you do with the completed statement?

15        A.   I gave him an opportunity to read it.  He had made

16   corrections during the taking of the statement, and when he

17   had an opportunity to read it, he made several additional

18   corrections.  And when all the corrections were made and he

19   had an opportunity to read it, I then asked him to sign it.

20   At that time I believe he wanted one thing added, which it

21   was, and then when he was satisfied with the statement, I

22   asked him to sign the bottom of each page, which he did.

23        Q.   Did you sign it as well?

24        A.   Yes, I did.

25             MR. HAYDEN:  Your Honor, may I please have this
```

1    statement deemed as People's 13 for identification and

2    shown to the witness?

3              THE COURT:  Yes.

4    (Whereupon, People's Exhibit 13 was deemed marked for

5                      identification.)

6    Q.    Do you recognize that?

7    A.    Yes, sir, I do.

8    Q.    What is it?

9    A.    This is the statement that I took on the morning of

10   December 10, 2004.  It was Mr. Orlando's statement.

11   Q.    How do you know it is?

12   A.    By my print, by the date and time on top, my

13   signature, Mr. Orlando's signature and the numerous

14   corrections that he made.

15             MR. HAYDEN:  People ask that it be deemed 13 in

16   evidence, your Honor.

17             THE COURT:  Please show it to counsel.

18             MR. LEMKE:  No objection for the purposes of

19   this hearing, your Honor.

20             THE COURT:  All right.

21             MR. HOCHHEISER:  Same, Judge.

22             THE COURT:  It's received.

23   (Whereupon, People's Exhibit 13 was deemed marked in

24                      evidence.)

25   Q.    What was the approximate time Mark Orlando signed

Det. Cereghino/People/Direct

1   his written statement?

2       A.   I would say a little after noon, right around noon

3   or a little bit after on the morning of the 10th.

4       Q.   Did Mark Orlando draw a diagram while you were

5   reducing what he was saying to writing?

6       A.   Yes, he did.

7       Q.   How did that happen?

8       A.   On page four when he started explaining where the

9   cars were parked and who was standing where, I asked him -- I

10  gave him a piece of paper and a pen, and I asked him to draw

11  where the various -- where the Cadillac was, where his car

12  was, where the car of the deceased pulled up to, where

13  everyone was standing so I had a better idea of how the events

14  went down as described by Mr. Orlando.

15           MR. HAYDEN:   May I please have this one sheet

16      of paper deemed as People's 14 for identification and

17      shown to the witness, your Honor?

18      (Whereupon, People's Exhibit 14 was deemed marked for

19                     identification.)

20      Q.   Do you recognize that?

21      A.   Yes, I do.

22      Q.   What is it?

23      A.   This is the drawing or sketch that Mr. Orlando did

24  for me on December 10, 2004.

25      Q.   How do you know it is?

1    A.    I recognize it, my signature, Mr. Orlando's

2  signature, and I asked him to date it and he dated it December

3  10 of '04.

4                MR. HAYDEN:  People ask that it be deemed 14 in

5    evidence.

6                THE COURT:  Please show it to counsel.

7                MR. HOCHHEISER:  No objection.

8                MR. LEMKE:  No objection, your Honor.

9                THE COURT:  It's received.

10         (Whereupon, People's Exhibit 14 was deemed marked in

11                         evidence.)

12    Q.    Did Mark Orlando have anything to eat or drink?

13    A.    I believe at about 11 o'clock he was offered a

14  doughnut, which he ate, and towards the end of the statement

15  he was asked if he wanted something to eat because somebody

16  was making a lunch run.  He stated he was on a special diet,

17  so I believe he asked for turkey and cheese on white.  And

18  just as it was delivered, just before it was, the statement

19  was signed.  It was sitting on a desk and he ate it right

20  after that.

21    Q.    Did Mark Orlando use the men's room whenever he

22  asked?

23    A.    Yes, he did.

24    Q.    Describe Mark Orlando's physical condition while you

25  were with him.

Det. Cereghino/People/Direct                                      281

1      A.   I would say he was calm, but also a little bit

2  anxious.

3      Q.   Did you notice any injury to him?

4      A.   No, sir.

5      Q.   Did he complain of any injury?

6      A.   No, sir.

7      Q.   Did you overhear Mark Orlando using the telephone

8  later on that day?

9      A.   Yes, I did.

10      Q.   What was the approximate time you overheard Mark

11  Orlando using the telephone?

12      A.   I believe it was -- I'm not exactly sure, but I

13  believe it was around 2:00 a.m. -- 2:00 p.m., excuse me.

14      Q.   Where was Mark Orlando when he was using the

15  telephone?

16      A.   He had asked to make a telephone call to his wife,

17  so he was brought out of the interview room.  To the immediate

18  right there's a desk.  He was allowed to use the phone on that

19  desk.

20      Q.   Who dialed the phone?

21      A.   I believe I did.

22      Q.   What happened then?

23      A.   When it started ringing, I handed it to him.  He

24  said hello to his wife, and all I heard him say was, "I'm

25  going to jail for life for something I was involved in."

1    Q.  Is that all you heard?

2    A.  I might have heard something about that he's going

3  to be arraigned in court the next day at First District, but

4  after that I don't really recall anything of any particular

5  substance.

6    Q.  Where were you with relation to Mark Orlando while

7  he was talking over the telephone then?

8    A.  I was two to three feet away.

9    Q.  Describe the circumstances under which you were in

10  that vicinity.

11    A.  Well, just for security purposes, while he's on the

12  phone, it was my job to keep an eye on him.

13    Q.  Did you make a note of that remark you overheard?

14    A.  Yes, I did.

15    Q.  Did you have any further conversation with Mark

16  Orlando after he finished that telephone conversation?

17    A.  I might have taken -- I think I took him to the

18  bathroom at 1:30 in the afternoon, but I think my contact with

19  him was very limited after that.

20    Q.  Did you recover evidence involving Mark Orlando

21  during the investigation of Bobby Calabrese's death?

22    A.  Yes, I did.

23    Q.  What did you recover in evidence involving Mark

24  Orlando?

25    A.  Later in the day on December 10 I was directed to

1    respond out to his place of employment -- Mr. Orlando had

2    signed a consent search for his work area -- in an attempt to

3    recover an ATM receipt from Citibank that was dated December

4    3, 2004.

5         Q.   Did you go out to Professional Credit Services?

6         A.   Yes, I did.

7         Q.   What happened when you arrived there?

8         A.   I went out there with Detective Faruch Mehta,

9    M-E-H-T-A, from the Fourth Squad.  We got there, I believe,

10   around 4:30, 20 to 5:00 in the afternoon.  We met with the

11   owner, Mr. Ronald Foster.  He asked that we come back in a

12   half an hour after the place closed so as not to disrupt his

13   business, which we did.  At that time I sat down with Mr.

14   Foster.  I advised him of what we wanted.  We wanted to check

15   the work areas of both Mr. Orlando and Mr. Jeannot.  I then

16   asked him to sign a consent search allowing us to do so, which

17   he did, and he just asked that a restriction be placed on it

18   stating it was just for those work areas.

19        Upon completion of that, there was actually four

20   desks to check, because both Mr. Orlando and Mr. Jeannot had

21   desks that they used to work at and desks that they were

22   currently working at.  All four were checked.  Three of them

23   nothing was recovered, but at Mr. Orlando's new desk I found

24   his wallet with credit cards, personal papers and a Citibank

25   ATM card dated December 3, 2004, at 2112, which would be 9:15

1    p.m.  I also recovered a date book and a spiral notebook with

2    what I believed to possibly contain gambling records.

3               MR. HAYDEN:  Your Honor, may I please have this

4         form deemed as People's 15 for identification and shown

5         to the witness?

6         (Whereupon, People's Exhibit 15 was deemed marked for

7                              identification.)

8         Q.    Do you recognize that?

9         A.    Yes, I do.

10        Q.    Tell the Court what that is.

11        A.    This is the consent search that I filled out for Mr.

12   Foster and asked him to allow us to search the work areas of

13   Mr. Orlando and Mr. Jeannot, which he allowed us to do so,

14   which he signed, I signed and Detective Mehta signed.

15        Q.    How do you know that's what it is?

16        A.    By the signatures, by my print in completing the

17   form and by Mr. Foster's print limited to the work area of

18   Mark Orlando and Herve Jeannot.

19               MR. HAYDEN:  People ask that it be deemed 15 in

20         evidence.

21               THE COURT:  Please show it to counsel.

22               MR. LEMKE:  Again, no objection, your Honor,

23         for purposes of this hearing.

24               MR. HOCHHEISER:  No objection.

25               THE COURT:  It's received.

Det. Cereghino/People/Cross-Lemke                     285

1          (Whereupon, People's Exhibit 15 was deemed marked in

2                              evidence.)

3                    MR. HAYDEN:  Nothing further at this time, your

4          Honor.

5                    THE COURT:  Gentlemen.

6                    MR. LEMKE:  Thank you, your Honor.

7     CROSS-EXAMINATION

8     BY MR. LEMKE:

9          Q.   Good morning, Detective.

10         A.   Good morning, Counselor.

11         Q.   Detective, you became involved with the

12    investigation of the homicide of Mr. Calabrese back on

13    December 3.  Would that be correct to say?

14         A.   No, I don't believe so.  I believe my first

15    involvement was the next day.

16         Q.   The 4th?

17         A.   On the 4th.

18         Q.   And during the investigation from December 4 up

19    until you spoke to Mr. Orlando on December 10, you had made

20    notations, notes; isn't that correct?

21         A.   No, sir, I did not.

22         Q.   You made no notes at all?

23         A.   Oh, yeah, I think I had some written notes just

24    concerning the canvas of the area and of the storage facility.

25                    MR. LEMKE:  And if I could have these just

Det. Cereghino/People/Cross-Lemke                286

1      marked for identification purposes Defendant's B,

2      please.

3            (Whereupon, Defendant's Exhibit B was marked for

4                        identification.)

5            THE COURT OFFICER:  Defendant's B marked for

6      identification.

7            MR. LEMKE:  If that could just be shown to

8      the witness.

9      Q.    Detective, would they be the accumulation of those

10     notes?

11     A.    Yes, sir.

12            MR. LEMKE:  If I could have them back, please.

13     Q.    The carrying detective is Detective McHugh in this

14     case, correct?

15     A.    Yes, sir.

16     Q.    As part of your initial investigation, your own

17     involvement, you began to take notations, make notes, from

18     obviously, looks like December 4 of '04, correct?

19     A.    Yes, sir.

20     Q.    And while you're making these notes, there also

21     appears to be notations made here on December 10 --

22     Professional Credit Services, 500 Bi-County Boulevard,

23     Farmingdale, New York, consent search signed by owner.  Those

24     are your notes, correct?

25     A.    Yes, sir.

Det. Cereghino/People/Cross-Lemke                287

1      Q.   That's regarding the consent search by Ronald

2   Foster, correct?

3      A.   Yes, sir.

4      Q.   And during your initial investigation you made some

5   notations, and on December 10 of 2004 you're now asked to

6   speak with an individual by the name of Mark Orlando, correct?

7      A.   Yes, sir.

8      Q.   And you did not know Mark Orlando prior to speaking

9   with him at about 10 o'clock in the morning of December 10,

10  correct?

11     A.   As I said, the night before when he was brought in I

12  was the one who walked him into the interview room.  I

13  searched him.  I took the handcuffs off him, and that was the

14  limited exposure to him.  That was all.

15     Q.   And when you had searched him at that time, there

16  were no weapons or drugs or any other property on him,

17  correct?

18     A.   No, sir.

19     Q.   And that was, I think, the last involvement from the

20  night before, December 9, correct?

21     A.   Yes, sir.

22     Q.   Might have lasted five minutes maybe, if that?

23     A.   Yes, sir, at tops.

24     Q.   And did you remain at the Homicide Squad that night

25  or did you go home to sleep and then come back?

1    A.   I remained in the Homicide Squad until about 4:00

2  a.m.

3    Q.   And then you went home?

4    A.   Then I went home.

5    Q.   Came back about 10 o'clock?

6    A.   I was back in at 9:00.

7    Q.   When you came back at 9 o'clock in the morning, you

8  had not had any conversation with Mr. Orlando, I would say,

9  correct?

10   A.   Right.

11   Q.   Had you had any conversations with the codefendant,

12  Mr. Jeannot?

13   A.   No.

14   Q.   At 9 o'clock when you come back in, would it be

15  correct to say that you have a conversation with either

16  Detective McHugh regarding what occurred for the four or five

17  hours that you weren't there?

18   A.   Yes, sir.

19   Q.   And in speaking with Detective McHugh, had he

20  advised you that there had been statements made by both Mr.

21  Orlando and by the codefendant, Mr. Jeannot?

22   A.   Yes, sir.

23   Q.   And had he advised you that Mr. Jeannot had given a

24  statement admitting that Mr. Jeannot had shot Mr. Calabrese?

25   A.   Yes, sir.

Det. Cereghino/People/Cross-Lemke

1   Q.  Do you know whether you had read or reviewed those

2   statements?

3   A.  I did not read it.  I was told that by Detective

4   McHugh.

5   Q.  And were you also told then by Detective McHugh that

6   Detective McGinn had been in maybe an hour and a half earlier

7   with Mr. Orlando and that he was changing his story and wanted

8   to give another statement?

9   A.  I wasn't certain as to who had interviewed him, but,

10  yes, that's what I was told, that he initially stated that he

11  had paid the defendant [sic] and went on his way, and he's now

12  stating that he was at the scene of the murder.

13  Q.  And as a result of that, you then went in to speak

14  to my client?

15  A.  I was requested to take a statement from him, so

16  obviously speaking would be part of it, but I was not going in

17  there to interrogate him.  I was going in there to take a

18  statement from him as to his version, his final version of the

19  events.

20  Q.  But do you recall whether or not you had spoken to

21  Detective McGinn as to what Mr. Orlando had said to Detective

22  McGinn?

23  A.  I believe everything I had gotten was from Detective

24  McHugh as to his being at the scene and his actions

25  immediately thereafter.

Det. Cereghino/People/Cross-Lemke                        290

1    Q.    But were you informed that from roughly 10 to 8:00

2    that morning until 9 o'clock, roughly, that morning that

3    Detective Brosnan and Detective McGinn, well, mostly Detective

4    McGinn, had been speaking with my client?

5    A.    I was unaware of that, no.

6    Q.    Were you aware that there were lengthy notes taken

7    regarding that conversation that my client had with both of

8    those officers, those detectives?

9    A.    I believe there were notes, but I didn't review

10   them.

11   Q.    So when you go in to speak to my client, you don't

12   have, in fact, any notes with you at all, correct?

13   A.    Right.

14   Q.    When you go in and begin now to talk to my client,

15   you read from the rights' card once again, I believe, which

16   has now been deemed in evidence as People's 12; is that

17   correct?

18   A.    Yes, sir.

19   Q.    And he had begun, I think, to write down yes,

20   basically on the wrong portion of that card, correct?

21   A.    Yes, sir.

22   Q.    And then you said, "No, you've got to sign up here,"

23   and he had signed there, correct?

24   A.    Yes, sir.

25   Q.    And at this time that you began to talk to him, he

Det. Cereghino/People/Cross-Lemke

1   had been in custody for at least, at that point, 13 hours,

2   correct?

3       A.   Approximately, yes, sir.

4       Q.   And as you begin to talk with him, he's now

5   cooperative with you, correct?

6       A.   Yes, sir.

7       Q.   He's telling you what had occurred, correct?

8       A.   Yes, sir.

9       Q.   You're aware that at that point in time that the

10  codefendant had acknowledged that the codefendant had shot Mr.

11  Calabrese, correct?

12      A.   Yes, sir.

13      Q.   You were aware in speaking to my client that he had

14  talked about his relationship with Mr. Calabrese, correct?

15      A.   Yes, sir.

16      Q.   And while you're speaking to my client, you're not

17  making any notes at all, are you?

18      A.   As I'm speaking to him I'm taking the statement.

19      Q.   But you don't make any notes first as to your

20  conversation and then reduce that to a written form which you

21  then ask my client to sign, correct?

22      A.   Yes, sir, I did not take any notes.

23      Q.   As you're writing, you're writing on the original --

24  withdrawn.

25           You are writing what's been now marked in evidence

1    as number 13, People's 13.  That's the paper that you're

2    writing as you're speaking to him?

3        A.   Yes, sir.

4        Q.   As you're writing it down, you start off with some

5    of the information as to where Mark lives, his age, phone

6    number and so forth, correct?

7        A.   Yes, sir.

8        Q.   And you go on to say that he's been advised by you

9    that he has the right to remain silent and so forth, correct?

10       A.   Yes, sir.

11       Q.   And you begin to talk to him regarding the, again,

12   relationship that he has with Mr. Calabrese, that he's betting

13   on various college games, football games, basketball games,

14   correct?

15       A.   Yes, sir.

16       Q.   You're writing in how much he made from Mr.

17   Calabrese the initial first four or five weeks, correct?

18       A.   Yes, sir.

19       Q.   You're writing those numbers down, correct?

20       A.   Yes, sir.

21       Q.   He tells you that over the first few weeks he won

22   approximately $28,000; isn't that correct?

23       A.   Yes, sir.

24       Q.   He also goes on to say that one week he losses about

25   $8700 that he owed Bobby, correct?

1        A.    I believe that's the week seven to nine days prior

2   to the murder.

3        Q.    Now, during your investigation, clearly you were

4   aware that there had been a relationship in which my client

5   placed bets with Mr. Calabrese, correct?

6        A.    Yes, sir.

7        Q.    You knew that going in to talk to my client,

8   correct?

9        A.    Yes, sir.

10       Q.    He voluntarily was discussing that with you,

11  correct?

12       A.    Right.

13       Q.    You didn't have to question my client in any way,

14  correct?

15       A.    No, sir.

16       Q.    Didn't have to make any racial slurs, call him fat

17  bastard or anything, did you?

18       A.    No, sir, I did not.

19       Q.    In fact, he was very cooperative with you, was he

20  not?

21       A.    Yes, sir, he was.

22       Q.    As he was speaking to you, telling you about all

23  these bets that he's making, he comes to a point where he

24  tells you the end of the week where you have to settle the

25  score and pay, correct?

Det. Cereghino/People/Cross-Lemke                              294

1        A.    Yes, sir.

2        Q.    He told you where he would meet Mr. Calabrese,

3   correct?

4        A.    Yes, he said he met him by where he worked in

5   Farmingdale.

6        Q.    And he had indicated this one particular week he had

7   lost towards the end of the week preceding Bobby's death about

8   $8700, correct?

9        A.    Yes, sir.

10        Q.    And he had indicated to you that this isn't a debt

11   that was three months old or four months old, correct?

12        A.    Yes, sir.

13        Q.    He said it was a week?

14        A.    Yes, sir.

15        Q.    And he indicated how in gambling and when you're

16   paying off the runner or the bookie that there's scheduling

17   from, say, Sunday to, say, Friday or Sunday to Saturday and

18   then you pay for that week's bets, correct?

19        A.    Yes, sir.

20        Q.    And he had indicated that the other week where he

21   owed him some money, that wasn't actually due yet for another

22   couple of days because of the scheduling, correct?

23        A.    Right, he didn't owe for a couple of more days but

24   that he wanted to shut down his line and, as I said, that went

25   into the statement.  When he read the statement, he wanted to

1    add the word "permanently."

2        Q.   Because if you have a situation where you now owe

3    the runner, the bookie, money, your credit line is going to be

4    shut down until you pay back what's owed, correct?

5        A.   Your client would know that better than me, but that

6    is what he stated, yes, sir.

7        Q.   He told that to you.  He told you how the

8    operation's run, correct?

9        A.   Yes, sir.

10       Q.   He never told you that Mr. Calabrese had threatened

11   to kill him if he didn't pay this $9,000, correct?

12       A.   Yes, he never stated that the deceased made any

13   threats.

14       Q.   Or that anyone at the deceased's direction made any

15   threats to come after him, correct?

16       A.   He never mentioned anything about any threats.

17       Q.   He told you, "I owe him, at the most, maybe the

18   $8100 all for about five days to a week."  That was it,

19   correct?

20       A.   He sandwiched that in with those two extra days when

21   it came out to about 17,000, an additional $9100, minus, I

22   believe, about $800 in winnings, which brought it right to

23   around a round figure of $17,000 which he owed for the nine

24   days of betting.

25       Q.   He told you he had that money in his safe, in a

Det. Cereghino/People/Cross-Lemke          296

1    couple of safes?

2        A.   He stated he had two bundles in brown paper bags on

3    the night of December 3.

4        Q.   He also discussed with you how that when you asked

5    him, "Where did you get this money from?  How did you just

6    come up with 17,000?  You're working as a bill collector.

7    Where did you get this money from," he said, "I had it because

8    over the course of six, seven weeks I'm up about 28,000.  If I

9    pay him 17,000, I'm still up 10,000."  You had this

10   conversation with him, correct?

11       A.   That's what he stated.

12       Q.   He didn't tell you, "I had to get the money from

13   somebody or had to borrow it."  He said, "I had it in my

14   safe," correct?

15       A.   Yes, sir.

16       Q.   He also tells, when he goes to pay Bobby, he also

17   tells you that Herve said, "Hey, I'll come along with you for

18   a ride," that they went to the gym first, I believe.  Isn't

19   that correct?

20       A.   He told me that the deceased had never met Herve

21   before and that night would be the first time.

22       Q.   And that there was also, I think, a discussion

23   about -- I'm not too sure if it was yourself -- that he also

24   had a very small line of credit with Bobby Calabrese?

25       A.   Yes, that Mr. Orlando had opened for him.

Det. Cereghino/People/Cross-Hemke                                    297

1        Q.   So all this is being discussed this entire time

2   during this conversation, correct?

3        A.   Yes, sir.

4        Q.   He talks about his two cars, correct?

5        A.   I believe so, yes, sir.

6        Q.   Tells you about that they went to the gym and that

7   they are now going so they can pay Bobby, correct?

8        A.   Yes, sir.

9        Q.   During this conversation he also tells you the

10  situation in which Herve shoots Bobby Calabrese, correct?

11       A.   Yes, sir.

12       Q.   And while you're talking to my client, you're

13  questioning him, obviously, about his involvement.  Does my

14  client ever tell you at all that my client went there with the

15  knowledge that Herve was going to shoot that guy, Mr.

16  Calabrese?

17       A.   No, he does not.

18       Q.   Does he ever sit there and tell you that there was

19  an agreement between the two of them to perhaps even rob Mr.

20  Calabrese?

21       A.   No, he did not.

22       Q.   In fact, he didn't even know when you were

23  questioning him whether or not he knew if Herve even had a

24  gun, did he?

25       A.   No, he did not.

Det. Cereghino/People/Cross-Lemke                    298

1    Q.   During this conversation he tells you that after he

2  gives the money to Mr. Calabrese, that it's Herve, the

3  codefendant, that then comes up behind him and shoots Mr.

4  Calabrese, correct?

5    A.   Comes up behind who?

6    Q.   My client, and then shoots Mr. Calabrese?

7    A.   Right, he states that he's behind -- Mr. Jeannot is

8  behind Mr. Orlando while he's talking with him, within a few

9  feet and then he shoots the deceased.

10   Q.   And that in fact is significant to the point where

11 you write or have my client now draw out where the cars are

12 located, correct?

13   A.   Yes, sir.

14   Q.   And what occurs, correct?

15   A.   Yes, sir.

16   Q.   And during this time --

17           THE COURT:   Mr. Lemke, hold on one second,

18     please.

19           (Pause in the proceedings.)

20           THE COURT:   I'm sorry, Mr. Lemke.  Go ahead.

21   Q.   And during this conversation, as you're writing

22 down notes, he also tells you, my client, that after Mr.

23 Calabrese is shot, what he does, where he goes, the number of

24 people that he wants to see him, correct?

25   A.   Yes, sir.  He states that after the deceased is

Det. Cereghino/People/Cross-Lemke

1   shot, while facing the defendant, Mr. Jeannot, that he falls

2   forward and falls down face first in front of him.

3        Q.   And then the codefendant shoots him two more times

4   in the back of the head, right?

5        A.   Yes, sir.

6        Q.   Now, during this conversation that you're now having

7   with my client, there's a point in time that you ask my

8   client, "Listen, you're telling me and you're telling us that

9   you didn't have anything to do with this.  It wasn't

10  pre-planned, that the codefendant then shoots him.  Well, why

11  didn't you tell anybody?"  Correct?  You were asking my client

12  this, correct?

13       A.   I don't believe I ever asked him that.

14       Q.   Well, he tells you and you write it in the statement

15  that he didn't tell what was happening because he was afraid

16  for his life and his wife's life, correct?  And I refer to

17  page seven.

18       A.   Yeah, throughout the total version of his events

19  it's at the very end that he says that.  He never states that

20  after the shooting occurs.  He doesn't state that when they

21  are driving away.  He doesn't state that after the gun is

22  thrown away.  He doesn't state that when he goes to the Suzuki

23  dealer.  He doesn't state that when he goes to Vivian.  It's

24  not until he's driving him home that he states that's when

25  Herve made a threat.

1     Q.    So during the 40 minutes or the hour that you speak

2   to my client, you're not asking him questions.  He's relaying

3   what's happening, correct?

4     A.    Yes, sir.

5     Q.    And he tells you that he knows that Herve has told

6   him that he's killed somebody else before, correct?

7     A.    That's at the end of the statement, sir.

8     Q.    Well, it's in your statement.  Whether it's at the

9   beginning or the end, my client tells you that?

10    A.    It's your client's statement.  It's at the end of

11  the statement that he brings that to light.

12    Q.    Page seven, correct?

13    A.    Second to last page.

14    Q.    He doesn't tell you this three days later, does he?

15    A.    He tells me at the end of the statement, sir.

16    Q.    Which is a conversation you had with my client that

17  morning for about an hour?

18    A.    It took about two hours for the statement, sir.

19    Q.    And in fact, he also tells you about his wife and

20  his wife is pregnant, correct?

21    A.    I believe so, yes, sir.

22    Q.    And he tells you again that Herve told him -- and

23  this is in the statement, page seven.  I'll give you that,

24  Detective -- that my client says that Herve told him, "If you

25  open your mouth and tell them what happened here, I will kill

```
 1   you or your wife or your unborn baby."  Isn't that what he

 2   said?

 3        A.   No, that is not what he said.

 4        Q.   What did he say?

 5        A.   I believe -- if I may quote.

 6        Q.   You may.

 7        A.   "While I was driving home Herve," first he states,

 8   "Herve threatened me and my wife."  When he read it, he

 9   changed it.  He took himself out of it, and just threatened my

10   wife.  He said this wasn't the first person he killed and it

11   won't be the last if you open your mouth and that includes

12   your wife.  After I drove him home, I went home.

13        Q.   My client told you he was afraid of him, didn't he?

14        A.   Yes, sir.

15        Q.   This is all reduced in writing, and then at the end

16   of the statement you ask my client to sign this statement,

17   correct?

18        A.   Yes, sir, I did.

19        Q.   And you also witness him signing that, correct?

20        A.   Yes, sir.

21        Q.   And I don't believe there was any other detectives

22   to witness this; isn't that correct?

23        A.   No, sir.

24        Q.   And there was nobody else in the room at that time,

25   correct?
```

Det. Cereghino/People/Cross-Lemke                    302

1        A.    Yes, sir, it was just Mr. Orlando and myself.

2        Q.    At the end of the statement you didn't ask him if he

3    wanted to have this videotaped, correct?

4        A.    I don't believe I did, no.

5        Q.    And after your conversations concluded with my

6    client, you reduced it to writing.  He signed it and you

7    witnessed it.  There's a later period in time that day, I

8    believe, that you went to a location to retrieve whatever

9    evidence you could find regarding this case; is that correct?

10       A.    Yes, sir.

11       Q.    And when you went to Professional Credit Services, I

12   believe that's in Farmingdale, correct?

13       A.    Yes, sir.

14       Q.    You met with my client's employer, I think, Mr.

15   Foster?

16       A.    Yes, sir.

17       Q.    And at that time you had searched, I believe, three

18   out of four desks, just asking questions regarding Mr.

19   Orlando's desk?

20       A.    We checked all four desks.

21       Q.    I think two of them were desks that one Mr. Orlando

22   had previously sat at and the other one was where the

23   codefendant had previously sat at, correct?

24       A.    Yes, sir.

25       Q.    That new desk, you searched that desk and I believe

1   you indicated there was a date book that you had recovered, a

2   spiral notebook, correct?

3       A.   Yes, sir.

4       Q.   In that spiral notebook, have you had an opportunity

5   to review and look at that spiral notebook?

6       A.   Not since then.

7       Q.   So as far as any notations that were made in that,

8   whether or not they were as part of collections, that

9   notations are made as to when payments come in, how much

10  somebody owes, certainly those are the type of entries that

11  were in that book that you know?

12      A.   I have no experience in vice.  I have no experience

13  with gambling.  I'm not a gambler.  I considered the

14  possibility that they were gambling records, and that's why I

15  took them to be turned over to Detective McHugh and he could

16  do further research on them.

17      Q.   And the ATM receipt, that was in -- was that in my

18  client's wallet, if you know?

19      A.   Yes, sir, I believe it was.

20      Q.   That is exactly where my client told you it would

21  be?

22      A.   He didn't tell it to me, but I believe that's where

23  he directed us to.

24           MR. LEMKE:  I have nothing further.  Thank you,

25      Detective.

1    CROSS-EXAMINATION

2    BY MR. HOCHHEISER:

3         Q.    Good afternoon, Detective.

4         A.    Counselor.

5         Q.    The statement, that written statement, that you took

6    from Mr. Orlando, you just referred to a number of corrections

7    or changes that were made to the statement, correct?

8         A.    Yes, sir.

9         Q.    And if you'd just briefly look through Exhibit 13,

10   Rosario 15, if you look through that and you look at all the

11   places where there are cross-outs or what look like

12   corrections over this eight-page document, is it fair to say

13   that all those cross-outs were changes requested by Mr.

14   Orlando; is that right?

15        A.    I would say most of them, yes, sir.

16        Q.    There are some changes that you decided without his

17   consent to change?

18        A.    Just in wording, just in wording.

19        Q.    In terms of the cross-outs, were all those

20   cross-outs made after Mr. Orlando requested that changes be

21   made to this statement?

22        A.    Any changes that were made to the statement were

23   done before Mr. Orlando agreed with the statement and signed

24   each page.

25        Q.    So initially, first you took the eight-page

1    statement in writing and the statement didn't have any

2    cross-outs; is that right?

3        A.    No.

4              MR. HAYDEN:  Objection, your Honor, to Mr.

5    Jeannot's attorney questioning Detective Cereghino.

6              THE COURT:  I'm wondering about the standing

7        as far as this.

8              MR. HOCHHEISER:  I'll move it.

9        Q.    You testified that before you began your interview

10   of Mr. Orlando that you had a conversation with Detective

11   McHugh about my client's admission made to Detective McHugh,

12   correct?

13       A.    Yes, sir.

14       Q.    When did that conversation occur approximately?

15       A.    I returned to work at 9:00 a.m.  At about 9:30,

16   quarter to 10:00, that's when Detective McHugh approached me.

17   He had been up all night.  Detective McGinn had been up all

18   night.  I had a couple of hours sleep.  The request was made

19   for me to go and speak to Mr. Orlando.  And at that time I was

20   told that Mr. Jeannot had said that he had been the shooter,

21   and he had done it because he was getting paid $4,000 by Mr.

22   Orlando.

23       Q.    Did Detective McHugh tell you anything else about my

24   client's statements at that time?

25       A.    He might have, but to me that was the sum and

1    substance of it.

2         Q.   Have you ever met Mr. Jeannot?

3         A.   I was present when he was in the Homicide Squad.  I

4    may have taken him to the bathroom, but I had very limited

5    contact with him.

6         Q.   Did you ever hear him make any statement?

7         A.   No, sir.

8         Q.   Were you ever present during any questioning of him?

9         A.   No, sir, I was not.

10              MR. HOCHHEISER:  Thank you very much.

11              THE COURT:  Mr. Hayden?

12              MR. HAYDEN:  Nothing further, your Honor.

13              THE COURT:  Thank you, Detective.  You're

14         excused.

15              THE WITNESS:  Thank you.

16              (Whereupon, the witness was excused.)

17              THE COURT:  Mr. Hayden.

18              MR. HAYDEN:  Detective Ed Hoctor.

19    D E T.   E D W A R D   J.   H O C T O R, a witness called on

20    behalf of the People, after having been first duly sworn by

21    the Clerk of the Court and stating his command as the Nassau

22    County Police Department Homicide Squad and shield as 855, was

23    examined and testified upon his oath as follows:

24

25

1  DIRECT EXAMINATION

2  BY MR. HAYDEN:

3       Q.   Good afternoon, Detective.

4       A.   Good afternoon.

5       Q.   How long have you been a member of the Nassau County

6  Police Department?

7       A.   I'm in my 19th year.

8       Q.   How long a detective?

9       A.   10 years.

10      Q.   How long in Homicide?

11      A.   Three years.

12      Q.   Do you know a man named Mark Orlando?

13      A.   Yes, I do.

14      Q.   Briefly describe him.

15      A.   He's the man sitting behind Mr. Lemke with the --

16  he's Caucasian, black sweater.

17            MR. LEMKE:  So stipulated, your Honor.

18            THE COURT:  The record will so reflect.

19      Q.   Do you know a man named Herve Jeannot?

20      A.   Yes.

21      Q.   Please briefly describe him.

22      A.   He's the male black sitting next to Mr. Orlando with

23  the striped shirt.  He's five-six, five-seven, male black.

24            MR. HAYDEN:  Let the record reflect, your

25        Honor, that the witness has indicated the defendant,

1        Herve Jeannot?

2                 THE COURT:   The record will so reflect.

3        Q.   I'm directing your attention to the afternoon of

4    Friday, December 10 of 2004.  Were you involved that afternoon

5    with investigating the death of a young man named Bobby

6    Calabrese?

7        A.   Yes, sir.

8        Q.   Did you speak with Mark Orlando that afternoon?

9        A.   Yes, I did.

10       Q.   Did Mark Orlando sign a consent form involving a

11   search of his place of employment that afternoon?

12       A.   Yes, he did.

13       Q.   What was the approximate time he signed that form?

14       A.   That was between noon and 12:30.

15       Q.   Where was he when he signed that form?

16       A.   He was in the interview room at the Homicide Squad.

17       Q.   Describe the circumstances under which Mark Orlando

18   signed that form.

19       A.   Detective Cereghino had prepared the form.  He asked

20   me -- I was in the office -- asked me to go in and speak to

21   Mr. Orlando and ask him if he would consent to a search of his

22   place of employment.

23       Q.   What did he say?

24       A.   I went in there with Detective Brosnan.  We spoke to

25   him briefly.  I explained to him that we wanted to search his

1  place of employment, and I read him the form as it had been

2  written or typed by Detective Cereghino.  And I gave it to him

3  to look over.  He didn't have any questions and he signed it

4  and then I signed it and Detective Brosnan signed it.

5              MR. HAYDEN:  May I please have this form deemed

6        as People's 16 deemed for identification and shown to

7        the witness, your Honor?

8        (Whereupon, People's Exhibit 16 was deem marked for

9                        identification.)

10       Q.   Do you recognize that?

11       A.   Yes, sir.

12       Q.   What is it?

13       A.   This is the form that I had Mr. Orlando sign that

14  day.

15       Q.   How do you know it is?

16       A.   Mr. Orlando signed it, I signed it and Detective

17  Brosnan signed it.

18       Q.   Do you recognize the contents as well?

19       A.   Yes, sir.

20             MR. HAYDEN:  People ask that it be deemed 16 in

21        evidence.

22             THE COURT:  Please show it to counsel.

23             MR. LEMKE:  No objection for the purposes of

24        this hearing, your Honor.

25             MR. HOCHHEISER:  No objection.

 1              THE COURT:  It's received.

 2         (Whereupon, People's Exhibit 16 was deemed marked in

 3                          evidence.)

 4         Q.    Did Mark Orlando sign a consent form for a buccal

 5    swab in your presence that afternoon?

 6         A.    Yes, he did.

 7         Q.    What was the approximate time he signed that form?

 8         A.    12:30.

 9         Q.    Where was he when he signed that form?

10         A.    In the same interview room.

11         Q.    Who was present then?

12         A.    Detective Michael Fannon.

13         Q.    Describe the form Mark Orlando signed then.

14         A.    That's a consent for a swabbing for a buccal,

15    consent for buccal swabbing.  It was a preprinted form that

16    had been filled out, was signed by Mr. Orlando, signed by

17    myself and signed by Detective Fannon.

18         Q.    Describe the circumstances under which Mark Orlando

19    signed the form.

20         A.    Detective Fannon and I went into the room where Mr.

21    Orlando was.  We told him we wanted to get a DNA sample from

22    him, and the way we were going to do that was through saliva.

23    He had no objections, and Detective Fannon went on to explain

24    the intricacies of how they were going to do that.

25         Q.    Was a buccal swab taken after Mark Orlando signed

1   that form?

2      A.   Yes.

3              MR. HAYDEN:  May I please have this form deemed

4   as People's 17 for identification shown to the witness,

5   your Honor?

6   (Whereupon, People's Exhibit 17 was deemed marked for

7                     identification.)

8      Q.   Do you recognize that?

9      A.   Yes, sir.

10      Q.   Tell the Court what this is.

11      A.   This is a consent search for the buccal swab that

12  Mr. Orlando signed that day.

13      Q.   How do you know?

14      A.   It's signed by myself, Detective Fannon and Mr.

15  Orlando.

16              MR. HAYDEN:  We ask that it be deemed 17 in

17   evidence, your Honor.

18              THE COURT:  Please show it to counsel.

19              MR. LEMKE:  No objection, your Honor.

20              MR. HOCHHEISER:  No objection.

21              THE COURT:  It's received.

22   (Whereupon, People's Exhibit 17 was deemed marked in

23                  evidence.)

24      Q.   Did Herve Jeannot sign a consent form involving a

25  buccal swab in your presence?

1       A.   Yes, sir.

2       Q.   What was the approximate time that happened?

3       A.   It was just after Mr. Orlando had done his, so it

4   was also around 12:30.

5       Q.   Where was Herve Jeannot when he signed that form?

6       A.   He was in the other interview room in the Homicide

7   Squad.

8       Q.   Describe the form he signed.

9       A.   Similar to the one that Mr. Orlando signed.  It was

10  a consent to take a saliva sample.

11      Q.   Describe the circumstances under which Herve Jeannot

12  signed that form.

13      A.   Myself and Detective Fannon went into the room.  We

14  spoke to Mr. Jeannot.  We asked him if he would give

15  permission to give a saliva sample for DNA purposes, and he

16  had no objection.

17      Q.   Was a buccal swab taken after Herve Jeannot signed

18  that form?

19      A.   Yes, sir.

20      Q.   Who took the buccal swabs that afternoon?

21      A.   Detective Fannon.

22           MR. HAYDEN:  May I please have this form deemed

23  People's 18 for identification and shown to the

24  witness, your Honor?

25  (Whereupon, People's Exhibit 18 was deemed marked for

1                    identification.)

2        Q.   Do you recognize that?

3        A.   Yes, I do.

4        Q.   What's that?

5        A.   This is the form that Mr. Jeannot signed that day.

6        Q.   How do you know?

7        A.   I signed it, Detective Fannon signed it and Mr.

8   Jeannot signed it.

9                    MR. HAYDEN:  We ask that that form be deemed

10      People's 18 in evidence, your Honor.

11                   THE COURT:  Please show that to counsel.

12                   MR. HOCHHEISER:  No objection, Judge.

13                   MR. LEMKE:  No objection, your Honor.

14                   THE COURT:  It's received.

15        (Whereupon, People's Exhibit 18 was deemed marked in

16                          evidence.)

17                   MR. HAYDEN:  Nothing further at this time, your

18      Honor.

19                   THE COURT:  Gentlemen?

20   CROSS-EXAMINATION

21   BY MR. LEMKE:

22        Q.   Detective, is it correct to state that your

23   involvement with my client, Mr. Orlando, on the morning of

24   December 10 was regarding the consent form to search as well

25   as the buccal swab?  Would that be correct to state?