1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NASSAU          :          PART 33
2  ----------------------------------------------X

3  THE PEOPLE OF THE STATE OF NEW YORK,

                                        Indictment No.
4                -against-              167N-2005

5

6  MARK ORLANDO and HERVE JEANNOT,

                              Defendants.
7  ----------------------------------------------X
                              Mineola, New York
8                              April 18, 2005
                                  20
9

10  B E F O R E :     HONORABLE ALAN L. HONOROF
                      Acting Supreme Court Justice

11

12  A P P E A R A N C E S :

13       HON. DENIS DILLON
            District Attorney of Nassau County
14          BY:  ROBERT T. HAYDEN, ESQ.
            Assistant District Attorney for the People
15

16       DENNIS LEMKE, ESQ.
            Attorney for Defendant Orlando
17          114 Old Country Road
            Mineola, NY  11501
18

19       DANIEL HOCHHEISER, ESQ.
            Attorney for Defendant Jeannot
20          270 Madison Avenue
            New York, NY  10016
21

22

          M I N U T E S   O F   H E A R I N G
23

24

                              Edward Dong
25                            Official Court Reporter

1    A.    That's correct.

2    Q.    That encompassed all of about a half hour to 40

3  minutes?

4    A.    Correct.

5    Q.    During that time that you spoke to my client, was he

6  cooperative with you?

7    A.    Yes.

8    Q.    He signed the consent forms for both, correct?

9    A.    Yes, he did.

10   Q.    Buccal swab, clearly he indicated he would not mind

11 having either swabs placed inside his mouth to take whatever

12 was needed for DNA analysis; isn't that correct?

13   A.    That's correct.

14   Q.    Fully cooperated?

15   A.    Yeah.

16   Q.    You had no further conversation with my client?

17   A.    No.

18           MR. LEMKE:   I have nothing further.   Thank you.

19 CROSS-EXAMINATION

20 BY MR. HOCHHEISER:

21   Q.    Good afternoon, Detective.  My client, Herve

22 Jeannot, you said you met him at about 12:30 a.m., correct?

23   A.    12:30 in the afternoon.

24   Q.    In the afternoon, excuse me.  And how long did you

25 spend with my client?

```
 1          A.   Total of less than 10 minutes.

 2          Q.   And did you have any -- withdrawn.

 3               During that 10-minute period, did my client make any

 4     statements to you?

 5          A.   No.

 6          Q.   Did you have any dealings with Mr. Jeannot or

 7     meeting with Mr. Jeannot besides that approximately 10-minute

 8     meeting at approximately 12:30 p.m.?

 9          A.   Not that I remember.

10          Q.   And he was cooperative with you at all times in

11     connection with your request to take the buccal swab; is that

12     right?

13          A.   Yes.

14          Q.   He was polite?

15          A.   Yeah.

16               MR. HOCHHEISER:   Thank you.

17               THE COURT:   Mr. Hayden?

18               MR. HAYDEN:   Nothing, your Honor.

19               THE COURT:   Thank you, Detective.   You're

20          excused.

21               (Whereupon, the witness was excused.)

22               THE COURT:   Mr. Hayden.

23               MR. HAYDEN:   May we approach just a moment,

24          Judge?

25     (Whereupon, an off-the-record discussion occurred at the bench.)
```

```
 1                    THE COURT:  All right, gentlemen, at this time

 2      we'll break until 2 o'clock.  Have a nice lunch.

 3                    (Luncheon recess.)

 4                    AFTERNOON SESSION

 5                    THE CLERK:  Hearing continued.  All sides

 6      ready?

 7                    MR. HAYDEN:  Ready.

 8                    MR. LEMKE:  Yes, your Honor.

 9                    MR. HOCHHEISER:  Ready.

10                    THE COURT:  There might be some application

11      about the defendant testifying in limine.

12                    MR. LEMKE:  I think I'll wait until Officer

13      Nash testifies.

14                    THE COURT:  That's fine.  Mr. Hayden.

15                    MR. HAYDEN:  Judge, I just ask that, for the

16      record, I've given to both counsel a copy of what I've

17      marked Rosario 77, three typewritten pages from Manny

18      Nash.  These are -- this is a typewritten version of

19      the handwritten notes that were already given to

20      defense counsel with the rest of the Rosario material.

21      I have a copy for the Court as well which I'm handing

22      up.

23                    MR. LEMKE:  Acknowledge receipt, your Honor.

24                    MR. HOCHHEISER:  Same.

25                    THE COURT:  Very good.
```

Proceedings                                                    517

```
 1                    MR. HAYDEN:  Also I would ask that the record

 2        reflect I've given to the court reporter all of the

 3        exhibits.  I've made copies of all of the exhibits, and

 4        I've indicated for the court reporter the numbers in

 5        evidence of each of those exhibits along with those

 6        exhibits that went into evidence during the course of

 7        testimony.

 8                    THE COURT:  That will make things far easier.

 9                    MR. HOCHHEISER:  Judge, so we're clear,

10        Rosario 77 is based on Rosario 16 and 17, Mr. Hayden?

11        I don't want to delay things, Judge.  We can ask him

12        questions at the right time if you want.

13                    THE COURT:  Okay.  Before the end of the day

14        you'll have that answer.  Mr. Hayden.

15                    MR. HAYDEN:  The answer is yes.

16                    THE COURT:  See, I told you.

17                    MR. HAYDEN:  May I proceed, your Honor?

18                    THE COURT:  Please.

19                    MR. HAYDEN:  People call Detective Manny

20        Nash.

21        D E T.   M A N U E L   N A S H, a witness called on behalf of

22        the People, after having been first duly sworn by the Clerk of

23        the Court and stating his command as the Nassau County Police

24        Department Robbery Squad and his shield as 875, was examined

25        and testified upon his oath as follows:
```

```
 1   DIRECT EXAMINATION

 2   BY MR. HAYDEN:

 3        Q.   Good afternoon, Detective.

 4        A.   Good afternoon.

 5        Q.   How long have you been a member of the Nassau County

 6   Police Department?

 7        A.   Over 19 years.

 8        Q.   How long have you been a detective?

 9        A.   Eight years.

10        Q.   How long have you been with the Robbery Squad?

11        A.   About two months.

12        Q.   What was your assignment in December of 2004?

13        A.   I worked at the Fourth Squad.

14        Q.   Do you know a man named Mark Orlando?

15        A.   Yes.

16        Q.   Describe him.

17        A.   Male white, about five-foot-eight, heavy build.

18        Q.   Do you see him in this courtroom today?

19        A.   Yes.

20        Q.   Please point him out for the Court and describe what

21   he's wearing today.

22        A.   Man sitting there with the black sweater, black

23   pants.

24             MR. LEMKE:   So stipulated, your Honor.

25             THE COURT:   On stipulation, the record will
```

```
 1         reflect identification.

 2         Q.    Do you know a man named Herve Jeannot?

 3         A.    Yes.

 4         Q.    Briefly describe him.

 5         A.    Male black, approximately five-foot-nine, medium

 6    build.

 7         Q.    Do you see him in this courtroom today?

 8         A.    Yes.

 9         Q.    Point him out and describe what he's wearing today.

10         A.    The male sitting there with the pink and black

11    striped shirt.

12               MR. HOCHHEISER:  We stipulate to that

13         identification for this hearing, Judge.

14               THE COURT:  The record will so reflect.

15         Q.    I'm directing your attention to around 2:35 on the

16    afternoon of Friday, December 10 of 2004.  Were you involved

17    then with investigating the death of a young man named Bobby

18    Calabrese?

19         A.    Yes, I was.

20         Q.    Were you at the Homicide Squad in police

21    headquarters then?

22         A.    Yes.

23         Q.    How did you become involved in the investigation of

24    Bobby Calabrese's death?

25         A.    I was working the night of the murder.
```

 1      Q.   As a member of the Fourth Squad?

 2      A.   As a member of the Fourth Squad and I was assigned

 3  to the case.

 4      Q.   Were you in the vicinity of Mark Orlando at around

 5  2:35 that Friday afternoon?

 6      A.   Yes.

 7      Q.   Where was Mark Orlando then?

 8      A.   He was in the Homicide Squad office.

 9      Q.   Describe that location.

10      A.   In police headquarters, at that time we were in the

11  center squad room at that office.

12      Q.   Not an interview room?

13      A.   No.

14      Q.   Where were you with relation to Mark Orlando then?

15      A.   I was standing behind him.

16      Q.   Describe for the Court what happened then.

17      A.   He had asked to make a phone call.  I escorted him

18  out of the interview room, sat him at a desk close to the

19  interview room.  He asked to call his sister, Gina Falco

20  [phonetic].  He gave me a phone number.  I dialed it for him.

21  When the phone started ringing, I handed him the receiver.

22      Q.   Did he speak over the phone then?

23      A.   Yes.

24      Q.   What did you overhear him say?

25      A.   I heard him say, "It's Mark."  He asked me where he

1   was.  I told him he's in Mineola.  He told the person on the

2   phone, "I'm in Mineola."  He said he got arrested last night.

3   Can I refer to my notes?

4                   MR. LEMKE:  No objection, your Honor.

5                   THE COURT:  Yes.

6                   MR. HAYDEN:  If we can just have those

7        marked, Judge.

8                   THE COURT:  Are those the actual notes?

9                   THE WITNESS:  It's a copy.

10                  THE COURT:  Sure, let's mark it.

11          (Whereupon, People's Exhibit 19 was marked for

12                        identification.)

13                  THE COURT OFFICER:  People's Exhibit 19 marked

14       for identification.

15       Q.  Please proceed.

16       A.  He told her, "I wasn't honest with you.  When I went

17  to pay Robby, Herve killed him."  He said he was cooperating,

18  that the cops are cool.  They're giving him food and water.

19  He says, "They got me after work in the black car."  He asked

20  me where the black car was.  I told him it was impounded.

21  Mark asked me what the phone number was.  I gave him the phone

22  number for the office we were at.  He said, "No roughhousing,

23  nothing like that.  They just wanted the truth.  It's not like

24  that.  They're very cool.  I gave a full statement."  He said,

25  "Take care of that, please."  He said, "I think I'm going to

 1   jail because of my involvement in this.  Whatever they need

 2   make available.  Make the house and car available."  And he

 3   said, "You understand why I've been nervous."

 4        Q.   Is that it?

 5        A.   Yes.

 6        Q.   Did you have any conversation with Mark Orlando

 7   after he finished that telephone conversation?

 8        A.   No.

 9        Q.   What did you do with Mark Orlando after he finished

10   that telephone conversation?

11        A.   Brought him back into the interview room.

12        Q.   I'm directing your attention to around 2:50 that

13   Friday afternoon.  Were you still at the Homicide Squad then?

14        A.   Yes.

15        Q.   Were you in the vicinity of Herve Jeannot then?

16        A.   Yes.

17        Q.   Where was Herve Jeannot?

18        A.   At that time he was in the interview room.  He asked

19   to make a phone call.  I escorted him out of the interview

20   room, sat him at a desk in the center squad room at the

21   Homicide Squad.

22        Q.   What happened then?

23        A.   He said he wanted to call home.  He gave me the

24   phone number for his house.  I dialed that number.  There was

25   no answer.  He then wanted to make another call, he said his

Det. Nash/People/Direct                        323

1    friend Ricardo.  He gave me a phone number.  I dialed that

2    number.  It rang.  I handed him the receiver and he spoke.

3         Q.    Describe what you heard then.

4         A.    He said, "Ricky --

5                    MR. HOCHHEISER:  Your Honor -- withdrawn.

6         A.    He said, "Ricky, it's Herve.  Got arrested last

7    night.  When I was waiting for my brother.  Have you spoken to

8    my brother?"

9                    MR. HOCHHEISER:  Your Honor, I'm going to

10        object to the reading.

11                   THE COURT:  Detective, if you can, do it by

12        memory.  If you need to refer to your notes, do so.

13                   THE WITNESS:  Okay.

14        A.    He asked, "Have you spoken to my brother?"

15        Q.    Are those notes already marked, Detective?

16        A.    Yes.  He said he didn't know his brother's off the

17   top of his head, but please call my brother, tell him to call

18   George.  That's basically it.

19        Q.    Did you have any conversation with Herve Jeannot

20   after he finished with the telephone conversation then?

21        A.    We had left off that we'd try to call his house

22   later on.

23        Q.    What did you do with Herve Jeannot after that

24   telephone conversation was finished?

25        A.    Put him back in the interview room.

1      Q.   I'm directing your attention to around 5:35 that

2  Friday afternoon.  Were you still at the Homicide Squad then?

3      A.   Yes.

4      Q.   What happened then?

5      A.   I asked Herve if he wanted to try home again.  He

6  said yes.  I brought him out of the interview room to the

7  telephone, tried calling his house twice and both times there

8  was no answer.  He then asked to call his friend Ricky again.

9  We dialed that number.  He spoke to his friend Ricky.

10     Q.   Describe anything you overheard then.

11     A.   He asked Ricky if he spoke to his brother yet.  He

12  then said, "Let me speak to him."  He said, "I'm still in

13  Mineola.  Arraignment tomorrow.  Be easy on mom.  She's going

14  to find out eventually."  He spoke about a car, an initial

15  payment, something to that effect.  Then asked him to take the

16  collect call block off at home so he could call home.  He said

17  if he goes to the county jail, you got to take the block off

18  so I can call home.

19     Q.   Anything else?

20     A.   No.

21     Q.   What did you do with Herve Jeannot after he finished

22  that telephone conversation?

23     A.   I returned him to the interview room.

24          MR. HAYDEN:  Nothing further at this time, your

25  Honor.

1              THE COURT:  Gentlemen?

2    CROSS-EXAMINATION

3    BY MR. LEMKE:

4         Q.   Detective, regarding Mark Orlando, I'd ask, it's

5    my understanding that on December 10 at about 2:35 in the

6    afternoon my client was taken to a phone to use; is that

7    correct?

8         A.   Yes.

9         Q.   And was that at the request of Detective McHugh or

10   anyone else?

11        A.   No, it was at the request of Mark.

12        Q.   So Mark asked you, "Please, Detective, can I now use

13   the phone?"

14        A.   Yes.

15        Q.   You brought him out to another room, correct?

16        A.   Yes.

17        Q.   Sat him down and he wasn't handcuffed, was he?

18        A.   Not at that time, no.

19        Q.   And at that point did you ask him what number he's

20   dialing or did you dial the number for him?

21        A.   I asked him what number he wanted to call.  I wrote

22   it down and I dialed it for him.

23        Q.   And that was in fact recorded by yourself as to the

24   number that he called, correct?

25        A.   Yes.

1    Q.   And the person that he was calling, correct?

2    A.   Well, he told me the person he was calling.  I don't

3    actually know who that number belongs to.

4    Q.   Now, when he's making this phone call, you don't

5    tell him, "Listen, I'm going to be listening to your

6    conversation.  I'm going to be standing right behind you," do

7    you?

8    A.   Did I tell him that?  No.

9    Q.   In fact, when you say you overheard him, when you

10   bring him out, you're going to stand there to listen to his

11   conversation, aren't you?

12   A.   I'm standing there to guard a prisoner also, yes.

13   Q.   Well, to guard the prisoner but you clearly were

14   within two feet of him, correct?

15   A.   Yes.

16   Q.   And you have a piece of paper in your hand, don't

17   you?

18   A.   Yes.

19   Q.   And pen in your hand, don't you?

20   A.   Yes.

21   Q.   You're going to write down everything you hear him

22   say, correct?

23   A.   Correct.

24   Q.   You're not guarding him with the pen and piece of

25   paper, no?

1      A.   With the pen, no, I'm not guarding with him with the

2  pen.

3      Q.   So you are there for the purpose of listening to his

4  conversation and recording down what was said?

5            MR. HAYDEN:   Objection.

6            THE COURT:   Sustained.

7      Q.   So you're writing down everything he says,

8  correct?

9      A.   Yes.

10     Q.   You don't handcuff him to, say, a chair while he's

11 making the phone call and walk away, correct?

12     A.   No.

13     Q.   Now, as he's having this conversation, you are not,

14 of course, listening on another phone, are you?

15     A.   No.

16     Q.   But you said you picked up another phone.   You had

17 another phone call?

18     A.   No, I didn't say that.

19     Q.   So you're writing down his conversation and you

20 wrote down that he says, "It's Mark," correct?

21     A.   Yes.

22     Q.   He says -- and he asks you, "Where am I?"   Correct?

23     A.   Yes.

24     Q.   So you're having still a little bit of a

25 conversation with him while he's having this conversation,

1    right?

2         A.   He's asking me questions.  I'm giving him the

3    information he wants.

4         Q.   So he knows you're right there?

5         A.   Absolutely.

6         Q.   And he certainly sees you, as far as you know, with

7    the piece of paper and the pen in your hand, right?

8         A.   Yes.

9         Q.   And he goes on for maybe three minutes, two and a

10   half minutes with the conversation, correct?

11        A.   Yes.

12        Q.   He says to whom he's talking to that it's Herve that

13   killed him, correct?

14        A.   Say it again.  I'm sorry.

15        Q.   That Herve killed him is what he told the person

16   that he was speaking to, correct?

17        A.   Yes.

18        Q.   He said that, "I'm cooperating," correct?

19        A.   He did.

20        Q.   He says that the cops are cool; could be worse.

21   Correct?

22        A.   Yes.

23        Q.   They gave me food and water, correct?

24        A.   Yes.

25        Q.   And they wanted me to tell the truth, so I told them

Det. Nash/People/Cross-Lemke

1    the truth, correct?

2        A.    Yes.

3        Q.    That they got me after work in the black car?

4        A.    Yes.

5        Q.    And then he turned to you and he asked, "Where's the

6    black car?" And you said it was impounded, right?

7        A.    Correct.

8        Q.    He asked you what the phone number is here and

9    573-7788, I take it, is what you had given him?

10       A.    Yes.

11       Q.    And he goes on to say -- and you're still there.

12   You're not walking away, correct? -- that he went to GNC.

13   They picked me up there?

14       A.    Yes.

15       Q.    He also said, "They wanted the truth.  I told them

16   the truth.  There was no roughhousing, nothing like that,"

17   correct?

18       A.    Yes.

19       Q.    I gave them a full statement, correct?

20       A.    Yes.

21       Q.    He says that I think I'm going to jail because of my

22   involvement in this, correct?

23       A.    Yes.

24       Q.    He goes on to say that I told them where it is and

25   everything about it.  I guess that's the car and the house,

1    correct?

2         A.   I don't know what he meant by that, but that is what

3    he said.

4         Q.   And then he also says, "Now you understand why I've

5    been so worried," correct?

6         A.   Yes.

7         Q.   Then he hung up, right?

8         A.   Yes.

9         Q.   Now, that wasn't the only call he made at that time,

10   correct?

11        A.   That's the only call I was present for that Mark

12   Orlando made.

13        Q.   Did you then take him back to the cell at that time?

14        A.   I brought him back in the interview room.

15        Q.   There were no other calls made in your presence?

16        A.   No.

17        Q.   He didn't speak to Mr. Philips in your presence?

18        A.   No.

19             MR. LEMKE:   I have nothing further.   Thank you,

20   your Honor.

21   CROSS-EXAMINATION

22   BY MR. HOCHHEISER:

23        Q.   Good afternoon, Detective.

24        A.   Good afternoon.

25        Q.   I represent Herve Jeannot.   My name is Daniel

1   Hochheiser.  Do you have a copy of Rosario 77 in front of you,

2   Detective?

3        A.   What is it?

4        Q.   It's the typed out version of the phone calls that I

5   think you recently made.

6        A.   Yes, I have a copy of it.

7        Q.   This document, which is a three-page document, this

8   document you prepared based on your notes of the phone calls

9   of Orlando and Jeannot; is that right?

10       A.   My handwritten notes, yes.

11       Q.   And what was the purpose of your typing out Rosario

12   77?

13                 MR. HAYDEN:  Objection.

14                 THE COURT:  I know what the purpose is.  It's

15       a harmless question.

16       A.   To make it easier to read.

17       Q.   And when did you do that?  When did you do the

18   typing?

19       A.   Yesterday.

20       Q.   And was that your idea or Mr. Hayden's idea?

21       A.   It was my idea.

22       Q.   And in this you recorded the important details that

23   you overheard during Mr. Jeannot's conversation with Ricky,

24   correct?

25       A.   During the conversation I wrote down everything I

1    heard him say, be it important or not.  If I heard him say it,

2    I wrote it down.

3        Q.    But there's nothing that he said that you heard

4    that's not contained in this three-page document, correct?

5        A.    He said some stuff I could not hear or understand.

6    He's soft-spoken, difficult to hear.  There were some things

7    he said on the phone that I could not hear.  Needless to say,

8    I did not write it down.

9        Q.    But as to everything you did hear, they're all

10   contained in this document, correct?

11       A.    Correct.

12       Q.    And you testified that you believed Mr. Orlando

13   certainly knew you were couple a feet behind him, right?

14       A.    Yes.

15       Q.    With a pad and a pen?

16       A.    Yes.

17       Q.    Did you have any other contact with my client on

18   either December 9 or December 10 besides arranging these phone

19   calls?

20       A.    No.

21               MR. HAYDEN:  Objection, to arranging these

22       phone calls.

23               MR. HOCHHEISER:  I'll withdraw it.  I'll

24       rephrase it.

25       Q.    I understand he requested to make phone calls, and

1    you helped him, since he was a prisoner, to make those phones

2    calls.  Did you have any other involvement with him besides

3    this meeting you had between 2:50 until whenever that phone

4    call was finished?

5         A.    I think the only other involvement I had with him, I

6    escorted him to the bathroom.

7         Q.    Did he say anything during that trip to the

8    bathroom?

9         A.    No.

10        Q.    Did you hear him make any other statements besides

11   what he said during those phone calls you overheard?

12        A.    No.

13                   MR. HOCHHEISER:  Thank you.

14                   THE COURT:  Mr. Hayden?

15                   MR. HAYDEN:  Nothing, your Honor.

16                   THE COURT:  Thank you, Detective.  You're

17        excused.

18                   (Whereupon, the witness was excused.)

19                   THE COURT:  Mr. Hayden.

20                   MR. HAYDEN:  People rest, your Honor.

21                   THE COURT:  Defense counsel?

22                   MR. LEMKE:  Defense rests on behalf of Mark

23        Orlando, your Honor.

24                   MR. HOCHHEISER:  Defense rests on behalf of

25        Mr. Jeannot.

1    THE COURT:  Are you gentlemen ready to argue?

2    MR. LEMKE:  Yes, your Honor.

3    MR. HOCHHEISER:  Yes, Judge.

4    THE COURT:  Who wants to go first?

5    MR. LEMKE:  I'll go first, your Honor.  Your

6  Honor, clearly the purposes of the hearing for the last

7  three days is not so much the credibility of statements

8  but rather whether or not this Court will permit the

9  assistant district attorney, should they so choose to

10  at the time of trial, introduce either evidence that

11  was seized on behalf of my client or statements that

12  they have alleged to have been made.  So clearly it's

13  become a Huntley hearing as well as a Mapp hearing.

14    I would certainly, for most of my argument,

15  rely on the record, but clearly, initially, it's a

16  matter for this Court to consider whether or not there

17  was probable cause for the arrest of my client, Mr.

18  Orlando, on December 9 at about 9:10.

19    THE COURT:  Let me ask you a question, Mr.

20  Lemke.

21    MR. LEMKE:  Yes.

22    THE COURT:  Suppose that the police knew

23  absolutely nothing to connect either one of these

24  defendants to the murder, nothing at all, zero, but

25  they were aware that there was a warrant for each of

1   their arrest.  Is there any other issue for me to

2   examine in terms of probable cause?

3          MR. LEMKE:  There is not.  I just want this

4   Court, in determining whether there was probable cause,

5   whether this Court, based upon the evidence testified

6   here, feels within its decision that the probable cause

7   was based upon warrants that were outstanding.  And,

8   therefore, your question to me would be no, they don't

9   need anything else.  They could certainly use that as a

10  pretext, as I would argue, if they so choose to do so

11  to pick up Mr. Orlando based upon a warrant that's

12  outstanding for his failure to appear in court and,

13  therefore, have every right to question him further.

14  And that's where I'm relying on the record.  Not to

15  belabor that argument, but I think this Court should

16  have that in making the decision as to whether or not

17  there was enough or not.

18          THE COURT:  I'm not going to forget about it.

19  I just want to be clear that I wasn't missing part of

20  your argument.

21          Mr. Hochheiser, I'm going to ask you the same

22  question, so please be ready with an answer.

23          Go ahead, Mr. Lemke.

24          MR. LEMKE:  That certainly was my argument

25  regarding that.  It then needs to be considered the

1     statements that were made then by my client whether,

2     one, the Miranda warnings were properly given to my

3     client for not only the first statement, which

4     according to the testimony here was given at 20 to

5     10:00 that evening of December 9, I believe, by

6     Detective McGinn.  From that there was a statement that

7     was given.  I'm not going to argue or belabor the

8     argument as to whether it's credible or not.  Clearly

9     that's an issue for a jury, but whether or not at this

10    stage those warnings were properly given to my client

11    and that he properly and voluntarily waived his right

12    to not give a statement and do so.

13           You then have a period in time in which that

14    statement, according to the testimony, was then reduced

15    to writing at about 10 minutes after 12:00 on December

16    10 and was finished by 2 o'clock that morning, and then

17    there was a three-hour break.  There had been some

18    testimony initially as to whether or not there were

19    Miranda warnings given again.  But apparently -- and

20    again it's for this Court to consider whether in fact

21    they were given again -- so, therefore, the time frame

22    for that attenuates in any way the warnings given the

23    night before as well as given the next day at

24    apparently maybe 10 o'clock in the morning by Detective

25    Cereghino before the second statement is taken.  So

1    clearly my argument to both those statements would be

2    that, especially the second one, that those Miranda

3    warnings were not in fact properly given to my client,

4    and this Court will make its decision whether it was or

5    not based on the evidence here.

6         You also have consent forms which my client

7    allegedly had signed.  I'm going to rely on the record

8    as to whether or not they coerced him in signing those

9    documents as to whether to permit the People, if they

10   so choose to do so, to introduce any evidence that may

11   have been seized from my client's place of employment,

12   your Honor, as well as again the buccal swab, again,

13   whether or not that was consensual and voluntarily.  So

14   I'm going to rely on the record for those arguments.

15   Thank you, your Honor.

16        THE COURT:  Thank you, Mr. Lemke.

17        MR. HOCHHEISER:  Your Honor, I am going to

18   ask you to suppress the statements attributed by the

19   police to my client based on two things:  Number one, a

20   lack of probable cause.  And I will answer your

21   question about the warrants.  I believe that the

22   statements were obtained as fruits of this illegal

23   arrest.  And, number two, I'm going to ask you to

24   suppress because the statements were involuntarily

25   made.

1    As to the issue if the police didn't know

2 anything about the case, if they never had that

3 briefing, if they never interviewed anybody and they

4 merely had the misdemeanor warrants, would this Court

5 have enough before it on the record to sustain a

6 finding of probable cause as to the arrest of Herve

7 Jeannot? I believe that the answer is no, and I

8 disagree with co-counsel perhaps slightly. I think

9 there is no question here that they were not arresting

10 Mr. Jeannot for misdemeanor warrants. We had a

11 debriefing in the auditorium of the Homicide Squad.

12 They were going to arrest two individuals who are

13 suspects in a homicide.

14    THE COURT: Would you agree with me that it

15 doesn't make any difference whatsoever what the police

16 thought they had or didn't have in terms of probable

17 cause, that that determination is up to me and that I

18 have no reason to decide that the police did not have

19 warrants when they arrested your client?

20    MR. HOCHHEISER: Well, I think that the Court

21 has an interest in not permitting the police to do an

22 end run around the Fourth Amendment and permit the

23 police to use a ruse of arresting somebody on one thing

24 when we all know, everybody in the courtroom knows, the

25 cops know they didn't arrest them for the warrants.

1        THE COURT:  Like Al Capone.

2        MR. HOCHHEISER:  Well, yes, like Al Capone,

3    exactly, Judge.  Could they have gone and picked him up

4    and then brought them to criminal court and arraign

5    them on the misdemeanor warrants?  Fine, no problem.

6    But to keep them in the Homicide Squad for overnight

7    for almost a dozen hours, questioning them about a

8    homicide, I mean, let's -- we see a duck, let's call it

9    a duck.  This is an arrest for a homicide, not for

10    misdemeanor warrants.

11        THE COURT:  The first threshold I have to get

12    to is whether or not the police had probable cause to

13    take your client into custody.  I find the police to

14    have acted with a warrant.

15        MR. HOCHHEISER:  And I agree they had a

16    warrant.  I don't take issue with that.  I would ask

17    you to find that the scope of their probable cause was

18    limited to those misdemeanor warrants, and they had to

19    act consistent with an arrest for those misdemeanor

20    warrants.

21        THE COURT:  Do you have any cases as to the

22    scope of probable cause?

23        MR. HOCHHEISER:  Not on me, Judge.  I can do

24    research and get back to you.

25        THE COURT:  Well, that would prevent me from

Proceedings                                        340

1     ruling from the bench.  Let me just be content with

2     your answer of no.

3              MR. HOCHHEISER:  Well, my answer is not no.

4     I don't know standing before you.

5              THE COURT:  Do you want to try to take a look

6     at that?

7              MR. HOCHHEISER:  Sure.

8              THE COURT:  Okay.  Because I don't have to

9     rule from the bench.

10             MR. HOCHHEISER:  I think that, just to

11    complete the argument on probable cause, I don't think

12    there's any question the way this record reads the way

13    it is the only information and evidence the police had

14    at 9:15 p.m. or 9:10 p.m. on December 9, 2004, is that

15    they had spoken to Tom Flores and they had spoken to

16    Barbara Diamont who had statements from Mr. Orlando

17    which placed my client at the scene.

18             THE COURT:  Didn't they have cell phone

19    records also?

20             MR. HOCHHEISER:  Exactly, establishing

21    presence as well, presence.  I don't think --

22             THE COURT:  Presence at approximately the

23    scene of the crime and the time of the crime.

24             MR. HOCHHEISER:  Absolutely, right.  But

25    that's not enough just to be present.  It's black

Proceedings                                    341

1       letter law that that is not evidence of criminal

2       activity, and they had no evidence as to what, if any,

3       Mr. Jeannot's role was in that incident.

4               THE COURT:  Preventing them, in your opinion,

5       from reasonably detaining your client to investigate?

6               MR. HOCHHEISER:  They could detain him based

7       on reasonable suspicion at that point.

8               THE COURT:  Which you claim is not present.

9       I just want to understand your argument.

10               MR. HOCHHEISER:  I'm talking about probable

11      cause.

12               THE COURT:  I'm talking about reasonable

13      suspicion, reasonable detention for purposes of

14      investigation, having already taken the defendants into

15      custody pursuant to a valid warrant.

16               MR. HOCHHEISER:  I would agree that having

17      evidence that places an individual at the scene of a

18      homicide with another person being the codefendant

19      would establish reasonable suspicion to detain and

20      question, but that, Judge --

21               THE COURT:  Even without probable cause to

22      take them into custody?

23               MR. HOCHHEISER:  I agree, Judge, but my

24      disagreement -- perhaps I'm not sure if we have a

25      disagreement.  That's not this case.  This case is they

1     made an arrest for the homicide.

2            THE COURT: See, that's where we're splitting

3     this hair.

4            MR. HOCHHEISER: Okay.

5            THE COURT: For sure they made an arrest.

6     For sure they had a warrant when they made the arrest.

7     In my opinion, for sure they had reasonable suspicion

8     to detain and investigate. That's our hair that we're

9     splitting.

10           MR. HOCHHEISER: Okay. And I don't think

11    we're going to come to common ground right now on that,

12    so I don't want to take up the Court's time with

13    further argument. And I will do my research and get

14    back to the Court on those issues.

15          As to the voluntariness issue, I believe that

16    it's clear on the record that my client was detained in

17    the second interview room at the Homicide Squad for

18    approximately 12 hours. I don't think there's -- well,

19    withdrawn.

20          My client maintained that he was not the

21    shooter in this case for hours and hours and hours, and

22    only after Detective Partee explained to him that he

23    had to take some of the weight, then he said, "Okay, I

24    shot him."

25          THE COURT: Fairly candid testimony by the

1       detective, wouldn't you say?

2               MR. HOCHHEISER:  Say again?

3               THE COURT:  Fairly candid testimony by the

4       detective.

5               MR. HOCHHEISER:  Perhaps too candid, Judge.

6       I believe that that detective really was very candid,

7       in that he showed the coercion that we all know goes

8       on, and here's one detective who actually testified in

9       open court about it, about telling a guy, "You have to

10      take some of the weight.  You have to say A, B and C or

11      you got big problems."  He had a version of the truth

12      that he was seeking to corroborate through my client's

13      statements, and he wasn't happy with the prior

14      statements because they exculpated my client.  He

15      needed a shooter.  He didn't have it.  And through

16      almost a dozen hours of questioning, finally he

17      overbore my client's will, and he produced this "I shot

18      him" statement.

19              And mysteriously, this statement, this -- but

20      that wasn't enough.  Now he had the shooter but he had

21      to explain why he would shoot him.  So now we have this

22      deal that my client supposedly makes with Mr. Orlando

23      to receive $4,000 in exchange for the shooting, which

24      mysteriously, is absent from Detective Partee's notes

25      and winds up in Detective McHugh's notes.  So I think

1        the record will speak for itself.

2               And I think that this Court, after reviewing

3        the record, is in a position to suppress based on a

4        lack of voluntariness, and I will rely on the record as

5        to all other matters, Judge.

6               THE COURT:  Thank you.

7               MR. HOCHHEISER:  Thank you, Judge.

8               THE COURT:  Mr. Hayden.

9               MR. HAYDEN:  Yes, your Honor.  First of all,

10       your Honor, there was probable cause to arrest both

11       defendants based solely on the fact that there were two

12       warrants outstanding for both of them.

13               THE COURT:  That's what I think too, but

14       defense counsel disagree with me.

15               MR. HAYDEN:  I just want to cite a couple of

16       cases, Judge:  People versus Retic, 265 AD2d page 855,

17       Fourth Department, 1999, which reads in part:  When the

18       officer learned of the existence of the outstanding

19       warrant, he had probable cause to arrest defendant,

20       period.

21               THE COURT:  Second Department talk about this

22       at all?

23               MR. HAYDEN:  Yes, People versus Boone, your

24       Honor, B-O-O-N-E, 269 AD2d 459, Second Department,

25       2000, which reads in part:  The detective's testimony

Proceedings

```
1   established the existence of a validly issued and
2   outstanding warrant pursuant to which he arrested the
3   defendant.  Thus, the People met their burden of
4   demonstrating the legality of the police conduct.
5            THE COURT:  I'm going to ask you to get those
6   cites up to me, or better yet, the cases if you have
7   them, because as you heard, of course, Mr. Hochheiser
8   has asked for a little bit of time to provide cases
9   contrary to those holdings, and I have given him time
10  to provide those cases.
11           MR. HAYDEN:  I can give them to you right
12  now, Judge.
13           THE COURT:  Thanks.  We haven't heard from
14  the Supreme Court of the United States on this or the
15  Court of Appeals?
16           MR. HAYDEN:  Not that I'm aware of, Judge.
17           THE COURT:  Okay.
18           MR. HAYDEN:  When it comes to Mr. Orlando,
19  your Honor, in addition to the two outstanding
20  warrants, police observed him driving without a valid
21  license.  That alone gave them probable cause to arrest
22  him.  Beyond that, there was probable cause to arrest
23  both defendants for the homicide.  First of all, we
24  know that both defendants were in the vicinity of the
25  homicide at the time of the homicide.  We know that
```

1    because of cell site records.  Those cell site records

2    show that both of them were making calls from the

3    vicinity of the homicide just before it took place and

4    just after it took place.

5            Mr. Orlando told Tommy Flores and Barbara

6    Diamont that he and Herve Jeannot were together when

7    they went to meet Bobby.  They lied about it.  Orlando

8    lied about it when he told both of them that they met

9    on one side of Austin Boulevard by some junkyards by

10   McQuade's, by Puma's when in actuality they met on the

11   opposite side of Austin Boulevard approximately a mile

12   or so from the location where Mark Orlando told Ms.

13   Diamont and Tommy Flores that they met.  It was a lie.

14           The evidence that the defendant told Barbara

15   Diamont -- Mark Orlando told Barbara Diamont that he,

16   while -- that he had learned that it was three shots to

17   the back of the head that killed Bobby, that alone

18   established probable cause for Mark Orlando's arrest,

19   and Mark Orlando, of course, said Jeannot was with him

20   at the time.  That alone established probable cause for

21   his arrest because that was not public knowledge at the

22   time.  The police didn't even have that information at

23   the time.  This call was made Saturday morning, the

24   Saturday morning after the murder.  The autopsy wasn't

25   even completed by that time.  Detective McHugh had no

Proceedings                                             347

1   idea that it was three shots to the back of the head

2   that killed Bobby, but Mark Orlando knew it.  The only

3   way Mark Orlando could have known it is by being there,

4   which, of course, he was, and he told Tommy Flores and

5   he told Barbara Diamont that he was with Herve Jeannot

6   at the time.

7           Both Tommy Flores and Barbara Diamont had

8   told detectives, including Detective McHugh, that they

9   saw Herve Jeannot and Mark Orlando together at LA

10  Fitness out in Farmingdale.  They saw them after 7

11  o'clock that night; that they left about 7:15, 7:30;

12  that they were in a hurry; that they cut off their

13  workouts; that they were both eager to leave, and they

14  both left together approximately 7:15, 7:30.  Given the

15  time it would take to get to the vicinity of the

16  murder, that would put them there together right about

17  the time of the murder.  It was obvious they were going

18  somewhere together because each was trying to hurry the

19  other.

20          The telephone records showed that there was a

21  telephone call made at 8:24.  That call was made by

22  Mark Orlando to Bobby Calabrese, and it would be

23  reasonable to conclude, given everything that Detective

24  McHugh knew, that that was a call where Mark Orlando

25  was telling Bobby where to meet up with him.  And the

1    videotape showed that that location was in the vicinity

2    of the 7-11 on the opposite side of Austin Boulevard

3    from where Mark Orlando had been telling everyone he

4    had met with Bobby.

5         Detective McHugh was aware of a $17,000

6    gambling debt.  This gambling debt was Mark Orlando's

7    debt.  He owed this money to Bobby Calabrese.  He was

8    going to have to pay Bobby Calabrese.  Detective McHugh

9    knew through Tommy Flores and Barbara Diamont that Mark

10   Orlando was a heavy gambler, not likely to have the

11   $17,000 to pay back Bobby Calabrese the money he owed

12   him.

13        Now they come to that scene.  You have the

14   lies about where they were.  You've got another

15   telephone call at 8:38.  That call is made by Sean

16   Monaghan to Bobby Calabrese.  Bobby Calabrese is still

17   alive at that approximate time, and Bobby Calabrese is

18   telling Sean Monaghan, "I'm busy; I'll have to talk to

19   you later.  I will call you later," which of course he

20   never does.  Bobby's body is found within a minute or

21   so of that time.  The 911 call comes in at 8:43, so we

22   can place the time of death somewhere in the 8:39

23   vicinity.

24        The defendant had told -- Mark Orlando had

25   told Tommy Flores that the meeting took place about

1    8:30, and there's very little time for Bobby to have

2    hooked up with someone else between approximately 8:30

3    and the time of the killing, approximately 8:39,

4    because what Mark Orlando is telling everyone is that

5    Bobby drove off in one direction and they drove off in

6    the opposite direction.

7              In addition, you had the videotape, and the

8    videotape showed what Detective McHugh determined to be

9    a Suzuki Verona which he knew was registered to Mark

10   Orlando's wife.  He saw that vehicle circle in front of

11   the storage facility, in front of the storage facility

12   camera three times before finally coming to a stop.

13   The other camera picked it up coming to a stop down the

14   block, and it waited there for a couple of minutes.

15   And then Bobby's car came around and Bobby's car

16   stopped.  Now this hooks up Mark Orlando, who's already

17   told everyone was with Herve Jeannot.  It was only

18   logical to conclude that, given that they left LA

19   Fitness.  Now, they're here.

20             A couple of minutes later a car stopped.

21   Figures get out of the vehicle.  You can't tell what's

22   going on, but the next thing you know, the Verona is

23   pulling away two minutes or so later in the vicinity of

24   8:38 or so.  Obviously there could be some time

25   differences.  There could be some inaccuracies in the

1    telephone records or in the records of the videotape,

2    but the bottom line is by this time we've got Mark

3    Orlando and Herve Jeannot together at the scene of the

4    murder and then pulling off together after it's

5    reasonable to conclude Bobby was executed.  That is

6    powerful evidence that these two were involved.

7             For probable cause it's required that we

8    establish that it's more likely than not that a crime

9    was committed and it's more likely than not that the

10   defendants are those who committed the crime.  The

11   evidence of the crime is overwhelming.  The discovery

12   of the body at 8:38, the examination of Bobby's dead

13   body by police, the determination that there were some

14   shots to the back of Bobby's head establishes beyond

15   any reasonable doubt -- forget about probable cause --

16   that the murder was committed and it is more likely

17   than not that Mark Orlando and Herve Jeannot are the

18   people who committed it.  And the People submit to you

19   that with all of that evidence taken together, all of

20   the statements that they were together, the cell site

21   records placing them right there, the video placing

22   them right there before and pulling away right after

23   the murder, the statements to Tommy Flores about the

24   death.

25             He also tells Tommy Flores, Mark Orlando

1  does, that his betting line was cut off.  He wanted to

2  make a couple of $5,000 bets but he couldn't do it,

3  meaning he couldn't get back into the game.  That

4  $17,000 debt was outstanding.  It was hanging.  He had

5  no way to get it back.  His line was cut off.  People

6  submit to you it is reasonable to conclude that this

7  gambler, this addictive gambler, is going to be taking

8  drastic measures to alleviate a debt he simply couldn't

9  cover.  That's a reasonable conclusion from everything

10  that the detectives had learned.  Therefore, there is

11  probable cause to arrest both of them for the murder of

12  Bobby Calabrese.

13          As your Honor is aware, they were taken into

14  the Homicide Squad.  Each was almost immediately read

15  Constitutional warnings.  Each said he understood.

16  Each said he was willing to speak with the police and

17  each spoke with the police.  There were breaks between

18  conversations.  Each was offered food numerous times

19  over the course of that night into the following

20  morning.  Each was offered water to drink, anything

21  they wanted to drink.  Each was taken to the men's room

22  whenever he asked.

23          THE COURT:  And each gave a completely

24  exculpatory written statement.

25          MR. HAYDEN:  Each initially gave a completely

1   exculpatory written statement, which the police had

2   reasonable belief both statements were inaccurate, both

3   statements were untrue.

4        THE COURT:  Let's jump beyond that.

5        MR. HAYDEN:  Let's, yes.

6        THE COURT:  Let's jump into Detective

7   Partee's testimony.

8        MR. HAYDEN:  Yes, your Honor.

9        THE COURT:  I want to talk about that.

10       MR. HAYDEN:  Yes, your Honor.  Detective

11  Partee spoke very frankly with Herve Jeannot.  He made

12  no threats to Herve Jeannot.  He made no promises to

13  Herve Jeannot.  He deceived Herve Jeannot.  There's no

14  question about that, and I have cases I want to cite to

15  the Court as far as deception is concerned.

16       THE COURT:  Did he overbear his will by

17  telling him, in effect, without saying these words, but

18  the implication being and the inference to be drawn

19  being, you need to take part of the weight?

20       MR. HAYDEN:  That is not the conclusion I

21  draw at all from Detective Partee's testimony.  My

22  recollection of his testimony, which he stated on the

23  stand during cross-examination, was; "Are you going to

24  let him put all the weight on you?"

25       THE COURT:  Inference being some of the

1    weight.

2          MR. HAYDEN:  He wanted -- what his emphasis

3    was from the start to the finish of that conversation,

4    give me the truth.  I don't believe what you're telling

5    me.  Are you going to let this guy lay it all off on

6    you?  You have got to be kidding.  You let him put it

7    all on you and just walk out of here?  There's no

8    question that Detective Partee said those things to

9    Herve Jeannot.  The conversation was relatively short.

10   Detective McHugh estimated that from the start of the

11   conversation to the time Herve Jeannot said that he'd

12   shot Bobby Calabrese was approximately 20 minutes.

13   Detective Partee estimated approximately 25 minutes or

14   so.

15         But the initial stages of that conversation

16   were very friendly.  The conversation involved Mr.

17   Jeannot's family, his background, his work background,

18   his schooling.  They had something in common.  They had

19   that connection with Kellenberg.  There was some

20   discussion about the Marine Corps.  There was some

21   discussion about his current occupation, and they went

22   briefly through the statement he'd already given to

23   Detective Brosnan, the innocent version -- I was just

24   there; I had nothing to do with it; we weren't

25   involved.  We just paid him off and left is basically

1    what he was saying.  It was a very short time,

2    reasonable estimate would be five to ten minutes before

3    Herve Jeannot came around and admitted that he had shot

4    Bobby Calabrese.  And it was after confrontation that,

5    look, he's laying it all off on you.

6              This wasn't so.  There's no question that

7    Detective Partee was deceiving Bobby Calabrese, but he

8    certainly wasn't overbearing his will.  He was trying

9    to get through to him.  He emphasized again and again,

10   "Are you going to let him get away with it?  Are you

11   going to take all the weight?"  That was more the

12   thrust of it.  It's not "you got to take part of the

13   weight for this."  Are you going to let him walk

14   scot-free?  Are you going to let him put the whole

15   thing on you?

16             THE COURT:  What about the conclusion that we

17   must inescapably look at, if not draw, mostly unsaid,

18   however some questions being asked, objections being

19   sustained, but it's in the record, the detective, in

20   effect, allying himself with the defendant based on a

21   common racial background and gaining his trust, where a

22   detective of another ethnicity might not have been able

23   to draw upon that resource?

24             MR. HAYDEN:  The People submit to the Court

25   that any detective is fully within his rights to use

1    anything he can to try to induce a defendant to tell

2    the truth.  A detective can use his ethnicity to

3    develop a relationship or rapport with the defendant.

4    There's nothing wrong with that.  There's no case law

5    that indicates there's anything wrong with that.

6    Detectives can use a ruse to get through to a

7    defendant, to induce a defendant to tell the truth, to

8    explain what really happened.  A detective can use

9    guile and cunning, and a detective can use flat out

10   deception.  I would like to give you these cases before

11   I proceed any further on that issue.

12              THE COURT:  I'd like to see them.

13              MR. HAYDEN:  This is a quote, your Honor,

14   from People versus Joseph, 309 AD2d 946, Second

15   Department, the year 2003:  It is well established that

16   a police officer's use of guile and deception need not

17   render a defendant's statements involuntary absent a

18   showing that the deception was so fundamentally unfair

19   as to deny due process or that a promise or threat was

20   made that could induce a false confession.

21              There's no promise.  There's no threat.

22   Nothing during the course of that conversation amounts

23   to a promise or a threat.

24              THE COURT:  I'm aware of that case.

25              MR. HAYDEN:  I'd like to cite People versus

1    Louis, 239 AD2d 435, Second Department, 1997.  People

2    versus Ingram, 208 AD2d 561, Second Department 1994.

3    And I quote from that case if I may, your Honor:

4    Although the police falsely informed the defendant

5    before obtaining his confession that the co-perpetrator

6    had implicated the defendant in the subject crime, the

7    ruse was not so fundamentally unfair as to deny due

8    process of law.  That's Ingram.

9           I'd also like to cite People versus Foster,

10   193 AD2d 692, Second Department, 1993, and finally I'm

11   citing People versus Jackson, 140 AD2d 458, Second

12   Department, 1988.  I'd like to quote from that case,

13   your Honor:  The fact that the police falsely informed

14   the defendant before obtaining her confession that her

15   codefendants were in custody and had identified her as

16   the shooter did not mandate suppression of her

17   confession as a matter of law.

18          Once again I would emphasize, your Honor,

19   that there were no threats or promises made by

20   Detective Partee.  Yes, he developed a rapport.  Yes,

21   he developed a relationship, however quick that

22   relationship was developed with Herve Jeannot, and

23   appealed to Herve Jeannot to do nothing more than tell

24   the truth.  And he tried to influence and induce Herve

25   Jeannot to tell the truth by telling him, "Are you

1   going to let him, the other guy, lay it all on you?"

2   without even explaining to Herve Jeannot exactly what

3   Orlando was saying.  He just said, "He's laying it all

4   on you.  The whole thing is you.  Are you going to let

5   him get away with that?"  It's the People's position

6   that that is not so fundamentally unfair as to render

7   this inadmissible or involuntary.  Herve Jeannot

8   voluntarily told Detective Partee which, I submit to

9   the Court -- the People submit, should be obvious from

10  the description of the back and forth of that

11  conversation, all Herve Jeannot did is finally come

12  clean, get it off his chest and explain what had

13  happened that night and that's basically it.

14          Once again, what happened then after a very

15  brief conversation involving Detective Partee and Herve

16  Jeannot is Detective Partee immediately went out -- I

17  should say immediately asked Detective Trillo to get

18  Detective McHugh.  It was Detective McHugh's case.  He

19  knew the details.  He'd understand what it was Herve

20  Jeannot was talking about.  And Detective McHugh came

21  in, began reducing what he was saying to notes and then

22  to writing.

23          And once again, Herve was offered food.  He

24  was offered anything he wanted to drink.  He was

25  offered the men's room any time he chose to use it.  I

Proceedings

1    also have cases to cite, your Honor, as far as the

2    length of interrogation.  May I submit those, your

3    Honor?

4              THE COURT:  Sure.

5              MR. HAYDEN:  Actually, let me give you these

6    cases on deception now.  The cases that deal with

7    length of interrogation, your Honor, first of all,

8    People versus Johnson, 265 AD2d 930, Fourth Department,

9    1999, a quote from that case:  The length of

10   interrogation is not in itself determinative of the

11   voluntariness of the statements.

12             This interrogation lasted for 13 hours, and I

13   would remind the Court again that the conversation

14   between Herve Jeannot and Detective Partee is basically

15   20 minutes to a half an hour.

16             THE COURT:  I'm less concerned with the

17   length of time of the interrogation quite frankly.  The

18   concern I have is the one we've already talked about.

19             MR. HAYDEN:  Yes.  May I just give the rest

20   of these cases, Judge?

21             THE COURT:  Of course.

22             MR. HAYDEN:  People versus Miles, 276 AD2d

23   566, Second Department, the year 2000.  This was an

24   interrogation of approximately 12 hours.  People versus

25   Towndown, T-O-W-N-D-O-W-N, 236 AD2d 821, Fourth

1    Department, 1997, that was 14 hours.  People versus

2    Abreu, 184 AD2d, page 707, this is Second Department,

3    1992, that also was 12 hours, your Honor.

4            Once again, the People's argument is that

5    Detective Partee did not overbear Herve Jeannot's will.

6    He simply spoke to him.  He simply got through to him.

7    He simply communicated with him without use of any

8    threats, without use of any promises whatsoever, just a

9    direct, visceral appeal to his feelings, to his heart,

10   to try to induce him to get it off his chest, which,

11   it's the People's position, Mr. Jeannot voluntarily

12   did.  And I would refer the Court, of course, to those

13   cases that I've cited.

14            Is there any other issue the Court would like

15   me to address?

16            THE COURT:  Well, the Court's attention has

17   been directed to the consent searches as well or the

18   consent forms leading to the swabs and the search of

19   Mr. Orlando's desk.  So if you just want to tell me

20   what you think about those positions, I'll consider it.

21            MR. HAYDEN:  It's the People's position that

22   both defendants had already signed rights' cards.  They

23   already said they understood their rights and were

24   willing to speak with detectives before those

25   conversations took place.  The description on the

1    record is that those forms were read to each defendant

2    and explained to each defendant to whatever extent the

3    defendant wanted the form explained, and then the

4    defendants voluntarily signed those forms and consented

5    to the search.

6                One other thing I would like to submit to the

7    Court, Judge, is I have case law on arrests for

8    warrants or arrests for other matters and then

9    conversations about more serious matters.

10               THE COURT:  Here's how I'd like to handle

11   that:  As Mr. Hochheiser has asked to be able to

12   research a point and provide me with authority and you

13   seek to do the same -- I understand all of your

14   arguments -- I'd like to put this on for tomorrow

15   morning for final argument on these small points now,

16   now small points, and then I'll make my determination.

17               However, I just want you all to know at this

18   point I have been given the authority by the referring

19   court to take a look at the search warrant.  I have

20   looked at the search warrant.  I find it valid and

21   that's the end of that question as far as I'm concerned

22   as far as this level of court is concerned.

23               Gentlemen, I will see you all tomorrow

24   morning.

25               MR. HAYDEN:  Judge, if I just might submit to

1          the Court, I have these cases already.

2                   MR. HOCHHEISER:  Judge, so the record is

3          clear, your decision on the search warrants, in making

4          your decision you reviewed the underlying applications,

5          et cetera?

6                   THE COURT:  Yes, I've taken a look at each of

7          the warrants.  I find them to be validly affirmed and

8          signed off on and returned.  I'm satisfied with the

9          search warrants.

10                  MR. HOCHHEISER:  Thank you very much, Judge.

11      (Whereupon, the hearing was adjourned until April 21, 2005.)

12                              *          *          *

13

14

15

16

17

18

19

20

21

22

23

24

25