```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NASSAU        :       PART 33
 2  ------------------------------------------X
 3  THE PEOPLE OF THE STATE OF NEW YORK,
 4                                      Indictment No.
              -against-                 167N-2005
 5
 6  MARK ORLANDO and HERVE JEANNOT,
 7                              Defendants.
    ------------------------------------------X
 8                              Mineola, New York
                                April 21, 2005
 9
10  B E F O R E:    HONORABLE ALAN L. HONOROF
                    Acting Supreme Court Justice
11
12  A P P E A R A N C E S:  (SAME AS PREVIOUSLY NOTED)
13                  *       *       *
14          THE CLERK:  Indictment 167N-04, the People
15  against Mark Orlando and Herve Jeannot.  This hearing
16  is continued.  People ready?
17          MR. HAYDEN:  Ready, your Honor.
18          MR. LEMKE:  Defendant for Mr. Orlando ready,
19  your Honor.
20          MR. HOCHHEISER:  For Mr. Jeannot, ready,
21  Judge.
22          THE CLERK:  Both sides are ready, Judge.
23          THE COURT:  I've reviewed the cases that all
24  sides have submitted.  Is there anything anybody else
25  wants to tell me or discuss with me before I make my
```

1 decision?

2 MR. HAYDEN: No, your Honor.

3 MR. LEMKE: Nothing further on behalf of Mr.
4 Orlando, your Honor.

5 MR. HOCHHEISER: I would like to continue
6 with a couple of points if I may, Judge.

7 THE COURT: Please.

8 MR. HOCHHEISER: As to the issue of whether
9 my client's statements to the police, particularly the
10 statements witnessed by Detective Partee and Detective
11 McHugh and reduced to writing by Detective McHugh, were
12 voluntary. As your Honor is aware, there is case law
13 which is very clear that you view evidence based on the
14 totality of the circumstances to determine whether the
15 People have met their burden of proving beyond a
16 reasonable doubt that the statement was voluntarily
17 made.

18 People versus Sunset Bay, a First Department
19 1980 case at 76 AD2d 592 is a case where the court did
20 suppress statements and reversed a murder conviction
21 because of psychological pressures by the police. In
22 this case, if my memory of the case serves me
23 correctly, involved similar tactics to those in our
24 case, that is, the Sunset Bay case involved a high
25 level of emotional intensity. The interrogating

1  detectives stated to the defendant in that case, "Are
2  you crazy, man? Why don't you tell them to get it over
3  with? These people got you uptight. They got you
4  uptight, man. At least you can say -- oh, well, say
5  anything, any foolish thing. I must have done that
6  without even thinking."
7            I bring this to the Court's attention because
8  it's like the testimony in our case where Detective
9  Partee says, "Listen, you can't let this fat white
10 motherfucking piece of shit put this all on you. You
11 got to take some of the weight. Come on, man." It's
12 the same kind of situation and I'd ask you to follow
13 the well-reasoned decision of the First Department in
14 the Sunset Bay case.
15           And also I would along the same lines direct
16 the Court's attention to People versus Zimmer, which is
17 at 68 Misc2d 1067, a Wayne County 1972 case, and that
18 case I think is particularly poignant because in that
19 case they used a lie detector which the police
20 persuaded the suspect that they knew that she was lying
21 because of the lie detector machine, which is analogous
22 here because here we have the so-called central storage
23 videotape, another machine, which the detectives,
24 including Detective Partee who really didn't see
25 anything on the tape, convinces my client the

```
 1    exculpatory statements that he had made up until 4
 2    o'clock in the morning were not going to get the job
 3    done because they had proof on videotape that things
 4    were otherwise. And in that case also the court found
 5    that the defendant's will had been overborne by
 6    improper psychological pressure in contravention of his
 7    Fifth Amendment rights against self-incrimination. The
 8    statement was not voluntarily given.
 9              Also, similar to our case, in the Zimmer case
10    the Zimmer defendant was told two or three times that
11    she was lying. In our case I think it is very clear
12    from the record that the defendant was told in words or
13    substance many times over several hours, "We don't
14    believe you. You got to come clean. You got to take
15    some of the weight," et cetera. And I would ask the
16    Court to consider that case in reaching its decision as
17    to the voluntariness issue.
18              Additionally, on the issue of
19    voluntariness -- and this is an issue I didn't raise
20    specifically, but overnight it occurred to me -- I
21    believe that another basis that the Court should use to
22    suppress the statements in this case, especially the
23    statements taken by Detective McHugh and Detective
24    Partee after 4:00 in the morning, is the fact that my
25    client was Mirandized -- I don't have the time right in
```

front of me, but I believe it's around 10 o'clock in the evening on December 9. He then proceeds to give exculpatory statement after exculpatory statement until approximately 4 o'clock in the morning when Detective Partee enters the picture and gives this rant about having to take some of the weight and appealing to his ethnic and racial connection that my client finally, his will being overborne, "Okay, here it goes. I did it," according to Detective Partee.

Detective Trillo gets Detective McHugh. Detective McHugh comes over and takes over the questioning with Detective Partee still present and fails to read him his Miranda rights again. And I believe under the circumstances in this case, six hours after the first reading of Miranda rights, given the conduct and actions and statements made by Detective Partee, that the Miranda case mandates that Detective McHugh not merely, as he testified, tell the defendant, "You understand that Detective Brosnan had Mirandized you," some six hours later when things were -- the state of events was much different.

The case that I had provided to your Honor, People versus Johnson, Kings County case from 1995, 168 Misc2d 81, is a case I believe is instructive, which stands for the proposition that merely advising a

1  suspect that he had previously waived his rights can,
2  in fact, suggest to the defendant that having once
3  waived his rights he could not decline to do so again,
4  and that's at 90.  So I think that's another basis
5  which your Honor should -- another basis your Honor
6  should consider and find that my client's statements
7  were involuntarily made and should be suppressed.
8              As to the other issue which we discussed
9  yesterday as to what is the scope of the probable cause
10 that runs from the misdemeanor warrants in this case in
11 connection with the homicide detention, arrest,
12 questioning, what have you, I have provided your Honor
13 with People versus Way, a Nassau County case, 65 Misc2d
14 865 which quotes the United States Supreme Court
15 decision in Beyers versus United States which held that
16 the court must be vigilant to scrutinize the attendant
17 facts with an eye to detect and a hand to prevent
18 violations of the Constitution by circuitous and
19 indirect methods.  And, your Honor, I submit to you
20 that's exactly what we have here.  The police did
21 indirectly through the back door by circuitry, however
22 you want to phrase it, what they could not have done
23 without these misdemeanor warrants, which I want the
24 record -- which are in evidence.
25              But I just want your Honor to be aware before

1  you make your decision these two warrants for my
2  client, Mr. Jeannot, one docket 2003NA011102, was
3  issued on June 6, 2003, about a year and four months
4  before this arrest for the homicide; and the other one
5  docket number 2002NA0023894, another misdemeanor
6  warrant which was issued August 16, 2004, some almost
7  four months before the homicide arrest. I submit to
8  your Honor that the police suggestion that they were
9  arresting my client based on these warrants --
10 technically while they had the warrants and they could
11 make the arrest, their conduct both before and after
12 the arrests is not at all consistent with returning a
13 defendant who had an outstanding warrant back to court
14 to be returned on those warrants, but they were used as
15 a tool to obtain statements from my client to further
16 their homicide investigation which they could not have
17 done because here they did not have probable cause to
18 connect my client to the homicide, and the record is
19 crystal clear on that. The only thing in the record
20 that they have to establish anything close to
21 reasonable suspicion, which is all that is arguable, is
22 that my client was present, perhaps, with Mr. Orlando
23 at the scene. That's it.
24          So I'm going to ask your Honor to suppress my
25 client's statements based on the Fourth Amendment

1  violations, the Fifth Amendment violations and based on
2  the CPL 60.45 proscriptions and also to suppress the
3  statements as fruits of the illegal arrest which were
4  made without the requisite probable cause. And as to
5  the other matters, I'll rely on the record. Thank you,
6  your Honor.
7           THE COURT: Thank you, gentlemen.
8           MR. HAYDEN: May I just respond briefly,
9  Judge?
10          THE COURT: Yes.
11          MR. HAYDEN: I'm sorry. First of all, it's
12 the People's position that counsel is grossly
13 misstating these cases. As far as Sunset Bay is
14 concerned, it involved a case where promises were made
15 to the defendant, promises that were likely to induce a
16 false confession. He was told, "You're going to go
17 home. You're not going to be charged with anything.
18 You're going to go to the hospital where it's going to
19 be really nice. Your girlfriend can come and visit
20 you. You won't be there for very long." These were
21 deceptive promises that the court determined were
22 likely to induce a false confession. That's nothing
23 like this case.
24          Counsel cites People versus Johnson and
25 neglects to tell the Court that it involved a defendant

1 who was undergoing heroin withdrawal and that the
2 interrogation took 23 hours. Counsel cites Zimmer and
3 tells the Court that it's the equivalent, the lie
4 detector is the equivalent to the surveillance tape,
5 which is not at all so, and I would cite a case and
6 present a case to the Court when it comes to the
7 surveillance camera, People versus Dickson, 260 AD2d
8 931, Third Department, 1999, which reads in part:
9 Falsely telling him that his actions were memorialized
10 on a video surveillance camera in the gas station, this
11 deception was not so fundamentally unfair as to deny
12 defendant due process or accompanied by a promise or
13 threat likely to induce a false confession. Misleading
14 a defendant into believing that he or she had been
15 under surveillance during the course of an alleged
16 crime is hardly the type of statement that would induce
17 a false confession. I would just like to submit this
18 to the Court.
19 Counsel said that police had been
20 interrogating and browbeating Mr. Jeannot for several
21 hours before he said what he said. That's not at all
22 true. The conversation with Detective Brosnan as
23 described by Detective Brosnan was a fairly mellow
24 conversation. The defendant was courteous throughout.
25 There was eye contact. Everything was on the up and

1  up, no problem at all.  Defendant made his "I had
2  nothing to do with it.  We weren't even there.  We made
3  the payment and took off."  The statement was
4  memorialized and that was it.  That ended at 3:10.
5             According to Detective Partee, he didn't
6  enter the room until 50 minutes had passed at
7  approximately 4 o'clock.  Of the first part of their
8  conversation, I would say the first 15, 20 minutes,
9  based on the description, was a portion of the
10 conversation during which Detective Partee tried to
11 ingratiate himself with the defendant, tried to get to
12 know the defendant a little bit, tried to win the
13 defendant's confidence and develop a rapport with the
14 defendant.  It was only for the last 35 minutes or so
15 they became intense.
16            And we also disagree with what the defense
17 keeps reading:  "You're going to have to take the
18 weight."  That wasn't at all the thrust of that
19 conversation.  The thrust of the conversation is you're
20 going to have to tell us what happened, because he's in
21 there telling us his story.  He's putting it all on
22 you.  We got to hear from you.  We want to know what
23 you have to say.  What happened?  He is not telling him
24 that he knows him to be the shooter.  He's not telling
25 him anything of the kind.  He's telling us his version.

1  We have to know your version. You're going to let him
2  get away with that, blaming the whole thing on you?
3  Tell us what happened. That was the thrust of the
4  conversation. It was very brief.
5      And all Detective McHugh did when it came to
6  rights was reiterate the rights. He didn't tell him,
7  "Hey, you've already been informed. Let's continue."
8  He went through those rights before proceeding with
9  writing down what the defendant was saying into a
10 written statement. That would have taken place
11 somewhere in the vicinity of 10 to 5:00. Now, that's a
12 second rendition of the rights, the first rendition
13 having taken place at about 10:00. That's it, Judge.
14 Thank you.
15      THE COURT: Thank you, gentlemen. The Court
16 having conducted a hearing on this matter and listening
17 to testimony and taking argument by counsel finds and
18 determines as follows: On the evening of Thursday,
19 December 9, 2004, Police Officer Phil Brady of the BSO
20 and Police Officer Steven Loschiavo also of the BSO
21 had, previous to taking into custody these defendants,
22 attended a briefing, inter alia, with the members of
23 the Homicide Squad, during which the Homicide Squad had
24 probable cause to seek the detention of both of these
25 defendants for the crime of murder.

1   Notwithstanding, Police Officer Brady
2   apprehended Mr. Jeannot based on the fact that a
3   warrant was outstanding for his arrest and the
4   Homicide's probable cause to investigate his
5   participation in the murder. Police Officer Loschiavo
6   with the same probable cause and the same similar
7   warrant took defendant Orlando into custody.
8       Thereafter, at the Homicide Squad both
9   defendants received their Miranda rights in accordance
10  with the requirements of the Supreme Court. They both
11  voluntarily waived and relinquished the rights that
12  they had and agreed in the absence of counsel to
13  discuss their participation in these events with the
14  detectives. They both gave admissible written
15  exculpatory confessions, and, thereafter, both made
16  admissible inculpatory written confessions. All
17  statements will be admitted.
18      The detectives further received consent to
19  search the defendant Orlando's business premises. That
20  consent was valid. The articles seized pursuant to
21  such consent will be admitted on the People's direct
22  case, and the DNA samples requested by the defendants
23  were also voluntarily relinquished and will be,
24  whatever the results were, will be admitted on the
25  People's direct case, assuming that a proper foundation

1   is laid for the admission of those items.

2       That constitutes the findings and decisions

3   of this Court. A written decision will follow.

4       Gentlemen, at this time I have been asked by

5   Judge Donnino to have you report to him for purposes of

6   scheduling the trial date. I don't think it's

7   necessary that your clients be present for that. It's

8   simply a scheduling. Gentlemen, thank you.

9       *   *   *

10  C E R T I F I C A T I O N

12  I hereby certify the within to be a true and accurate

13  transcription of my stenographic notes in the above

14  proceeding.

17  _____
    Edward Dong

INDEX TO WITNESSES

Witness

| | Page |
|---|---|
| P.O. BRADY: | |
| Direct by Mr. Hayden | 5 |
| Cross by Mr. Hochheiser | 11 |
| Cross by Mr. Lemke | 17 |
| Redirect by Mr. Hayden | 20 |
| | |
| P.O. LOSCHIAVO: | |
| Direct by Mr. Hayden | 21 |
| Cross by Mr. Lemke | 27 |
| Cross by Mr. Hochheiser | 36 |
| Redirect by Mr. Hayden | 37 |
| Recross by Mr. Lemke | 38 |
| | |
| DET. McHUGH: | |
| Direct by Mr. Hayden | 38 |
| Cross by Mr. Hochheiser | 81 |
| Cross by Mr. Lemke | 112 |
| | |
| DET. BROSNAN: | |
| Direct by Mr. Hayden | 141 |
| Cross by Mr. Hochheiser | 153 |
| Cross by Mr. Lemke | 169 |
| | |
| DET. McGINN: | |
| Direct by Mr. Hayden | 175 |
| Cross by Mr. Lemke | 200 |
| Cross by Mr. Hochheiser | 220 |
| | |
| DET. LORE: | |
| Direct by Mr. Hayden | 225 |
| Cross by Mr. Lemke | 229 |
| Cross by Mr. Hochheiser | 232 |
| Redirect by Mr. Hayden | 237 |
| | |
| DET. PARTEE: | |
| Direct by Mr. Hayden | 238 |
| Cross by Mr. Hochheiser | 248 |
| Cross by Mr. Lemke | 268 |
| Redirect by Mr. Hayden | 270 |
| Recross by Mr. Hochheiser | 270 |
| | |
| DET. CEREGHINO: | |
| Direct by Mr. Hayden | 271 |
| Cross by Mr. Lemke | 285 |
| Cross by Mr. Hochheiser | 304 |

## INDEX TO WITNESSES

DET. HOCTOR:
| | |
|---|---|
| Direct by Mr. Hayden | 307 |
| Cross by Mr. Lemke | 313 |
| Cross by Mr. Hochheiser | 314 |

DET. NASH:
| | |
|---|---|
| Direct by Mr. Hayden | 318 |
| Cross by Mr. Lemke | 325 |
| Cross by Mr. Hochheiser | 330 |

## EXHIBITS

| People's Exhibits | Description | ID | EV |
|---|---|---|---|
| 1 | Statement of Tommy Flores | 45 | 46 |
| 2A-D | Warrants | 51 | 52 |
| 3 | Rights' card | 59 | 60 |
| 4A-D | Notes of Defendant Orlando | 66 | 67 |
| 5 | Statement of Defendant Orlando | 68 | 69 |
| 6 | Statement of Defendant Jeannot | 77 | 78 |
| 7 | Video refusal form | 79 | 80 |
| 8 | Rights' card | 145 | 146 |
| 9 | Statement of Defendant Jeannot | 151 | 152 |
| 10 | Notes of Det. McGinn | 191 | |
| 11 | Video refusal form | 198 | 198 |
| 12 | Rights' card | 274 | 275 |
| 13 | Statement of Defendant Orlando | 278 | 278 |
| 14 | Diagram | 279 | 280 |
| 15 | Consent search form | 284 | 285 |
| 16 | Consent search form | 309 | 310 |
| 17 | Consent search form | 311 | 311 |
| 18 | Consent search form | 312 | 313 |
| 19 | Notes of Det. Nash | 321 | |

| Defendant's Exhibits | Description | ID | EV |
|---|---|---|---|
| A | Notes of Det. Partee | 252 | |
| B | Notes of Det. Cereghino | 286 | |