```
 1      STATE OF NEW YORK :  NASSAU COUNTY

 2          SUPREME COURT PART 11

 3      - - - - - - - - - - - - - - - - - - -X

 4      THE PEOPLE OF THE STATE OF NEW YORK,     SCI/IND. NO.
                                                 167N-05
 5                      -against-
                                                 TRIAL
 6      MARK ORLANDO,
                                Defendant.

 7      - - - - - - - - - - - - - - - - - - -X

 8                              262 Old Country Road
 9                              Mineola, New York
                                June 3, 2005
10

11

12      B e f o r e:

13                      HON. DAVID P. SULLIVAN, Supreme Court Justice

14      A p p e a r a n c e s:

15

16              HON. DENIS DILLON
                    District Attorney, Nassau County
17                  By: ROBERT T. HAYDEN, ESQ.
                    Assistant District Attorney
18

19
                DENNIS LEMKE, ESQ.
20                  Attorney for Defendant
                    114 Old Country Road
21                  Mineola, N.Y.  11501

22

23                              Mary Ocskai
                                Official Court Reporter
24

25                      COPY
```

Proceedings

1       THE CLERK:   Ready for the prospective jurors

2   to enter the courtroom?

3       MR. HAYDEN:   Yes.

4       MR. LEMKE:   Yes.

5       THE CLERK:   Bring them in.

6       THE CLERK:   Continued case on trial,

7   indictment 167N-2005, People of the State of New York

8   versus Mark Orlando.

9       People ready?

10       MR. HAYDEN:   People ready, Your Honor.

11       THE CLERK:   Defendant ready to proceed?

12       MR. LEMKE:   Defendant ready.

13       THE CLERK:   Let the record reflect the

14   presence of Mr. Orlando and the twelve remaining

15   prospective jurors.

16       THE COURT:   Good morning, ladies and

17   gentlemen.  We're going to call out your name and you

18   will come up and sit in the seat.  You saw everything

19   yesterday so you know the procedure.  If there's any

20   problems, let me know.  And what will happen is I will

21   briefly question you, not even as extensively as

22   yesterday.  I will let the attorneys talk to you.  If

23   there's any problem you let us know.  Okay.  Thank you.

24       THE CLERK:   Seat number one, Jennifer Zuzio,

25   Z-U-Z-I-O.

Proceedings

1          Gary Pollack, P-O-L-L-A-C-K, seat number two.

2          Seat number three --

3              A PROSPECTIVE JUROR:  I have a problem sitting

4      for two weeks.

5              THE COURT:  You got something going on?

6              A PROSPECTIVE JUROR:  I am in business by

7      myself.  All these people are --

8              THE COURT:  Okay.

9          Consent?

10             MR. HAYDEN:  Consent.

11             MR. LEMKE:  Consent.

12         Remember you heard me say to a lot, all this is

13     going to do, you will come into the seats, we will ask

14     some questions.  Doesn't mean you will remain on this

15     case.  Even if I excuse you from here, you got to go to

16     the commissioner of jurors, even though it's Friday

17     doesn't mean they'll discharge you.  Send you somewhere

18     else today or have you come back on Monday.  Okay.   At

19     least now you know here we're going to be two weeks at

20     the longest, and you know what this case is about.

21             THE CLERK:  Edward McGrann.

22             A PROSPECTIVE JUROR:  I can't do the two

23     weeks.  It would create a financial hardship.

24             THE COURT:  I am sorry.

25             A PROSPECTIVE JUROR:  I can't do the two

Proceedings

1    weeks.  It would create a financial hardship.

2              THE COURT:  Any objection?

3              MR. HAYDEN:  No.

4              MR. LEMKE:  None.

5              THE COURT:  Okay.

6              THE CLERK:  Joseph Dottino, D-O-T-T-I-N-O,

7    seat number two.

8         Seat number three, Anthony DiSalvo, D-I-S-A-L-V-O.

9    Seat number three.

10        Seat number four, Steven Kaplan, K-A-P-L-A-N.  Seat

11   number four.

12             A PROSPECTIVE JUROR:  I have two problems.    I

13   have a problem in that I am a salesman and we have a

14   major trade show next week.  Also have a problem with

15   one of the questions.

16             THE COURT:  Okay.  Any objection?

17             MR. HAYDEN:  No.

18             MR. LEMKE:  None, Your Honor.

19             THE COURT:  Everybody knows only risk you run,

20   told you yesterday, I try to be cooperative with you and

21   stuff, but you will get sent back to the commissioner of

22   jurors.  They may sent you to one of my colleagues.  Who

23   I don't know.  I don't want to say, may not be as

24   cooperative.  So, I reiterate, you know, it's going to

25   be no longer than two weeks here.  When you go over

Proceedings

1      there they can send you on some tobacco case going on

2      for a couple of months.  Lot of stuff out there.  If

3      don't just make up an excuse to get out of here you

4      could end up in a situation that is, you know.

5          Go ahead.

6              THE CLERK:  Marie Ginobbi, G-I-N-O-B-B-I.

7              THE COURT:  Good morning.

8              THE CLERK:  Eileen Leib, for seat number

9      five.

10         John Birnback, B-I-R-N-B-A-C-K, seat number six.

11         Seat number seven.

12             A PROSPECTIVE JUROR:  Sorry, Your Honor.  I'm

13     self-employed.  I already took a week off.  I can't

14     afford two more weeks.

15             THE COURT:  Any objection?

16             MR. HAYDEN:  No.

17             MR. LEMKE:  No.

18             THE CLERK:  Daniel Ginther for seat number

19     six.

20         Joseph Tiriro, T-I-R-I-R-O, seat number seven.

21         Ora Jenkins, J-E-N-K-I-N-S, seat number eight.

22             THE COURT:  What I am going to do, folks, is

23     basically the fact you're sitting in those chairs tells

24     me everything you heard yesterday you don't have a

25     problem with, what you heard thus far.  So, I am going

Proceedings

1   to give the attorneys a couple of minutes to go over the

2   sheets and then allow them to question you.   Okay.

3        No one will have any problem following the law as I

4   give it to you.   You heard all the stuff about

5   presumption of innocence, reasonable doubt.   You have no

6   problem with any concepts, right?

7        Okay.   Counsel, whenever you're ready.   Take your

8   time.   Look over the sheets, and then we will, you can

9   go when you're ready.

10       Go ahead.

11            (Whereupon, Mr. Hayden questioned the

12   prospective jurors, herein not recorded.)

13            (Whereupon, Mr. Lemke questioned the prospective

14   jurors, herein not recorded.)

15            THE CLERK:   First two on the board for two

16   open seats.   Cause People.

17            MR. HAYDEN:   No.

18            THE CLERK:   Defendant.

19            MR. LEMKE:   No.

20            THE CLERK:   Peremptory People.

21            MR. HAYDEN:   Two, Dottino.

22            THE CLERK:   Peremptory defense.

23            MR. LEMKE:   One, Zuzio.

24            THE CLERK:   Next two up, cause.

25            MR. HAYDEN:   No.

Proceedings

1          MR. LEMKE:  No.

2          THE CLERK:  Peremptory.

3          MR. HAYDEN:  No.

4          MR. LEMKE:  No.

5          THE CLERK:  No peremptory, DiSalvo will be

6     eleven.  Ginobbi number twelve.

7          THE CLERK:  Now, alternate seat number one,

8     two challenges apiece.  Cause People.

9          MR. HAYDEN:  No.

10          THE CLERK:  Defendant, cause.

11          MR. LEMKE:  Yes.  She was the one with the

12    photographs.

13          THE COURT:  Miss Leib.  Want to be heard?

14          MR. HAYDEN:  I know when I spoke with her

15    last, she said, yeah, it would be difficult but she said

16    she'd be able to do it.  Be able to look at them and

17    evaluate them.  Nobody said they will enjoy it.  We

18    understand that.  She said she will be able to do it.

19          I know Mr. Lemke engaged in more conversation with

20    her.  She'd rather be on a different kind of case, but

21    maybe some other ones would rather be on a different

22    kind of case.

23          THE COURT:  Okay.  Court's recollection is she

24    had tremendous difficulty in dealing with the fact there

25    would be graphic photos, and also finishing up the voir

Proceedings

1    dire by Mr. Lemke, saying she would not want to sit on

2    this jury if she was in the defense spot.  Under the

3    circumstances the application is granted for cause.

4                    THE CLERK:  Mr. Ginther, number one, People

5    for cause.

6                    MR. HAYDEN:  This is alternate one.

7                    THE COURT:  Yes.

8                    THE CLERK:  Number one.

9                    MR. HAYDEN:  No.

10                   MR. LEMKE:  No.

11                   THE CLERK:  Peremptory.

12                   MR. HAYDEN:  No.

13                   THE CLERK:  Defendant.

14                   MR. LEMKE:  Yes.

15                   THE CLERK:  Seat number one.

16                   THE CLERK:  Okay.  Again, trying to fill an

17   alternate seat.  Number one, People for cause.

18                   MR. HAYDEN:  No.

19                   MR. LEMKE:  No.

20                   THE CLERK:  Peremptory.

21                   MR. HAYDEN:  Yes.

22                   THE CLERK:  One left, alternate seat number

23   one, People cause.

24                   MR. HAYDEN:  No.

25                   THE CLERK:  Defendant cause.

MO

Proceedings

1          MR. LEMKE:  No.

2          THE CLERK:  People peremptory.

3          MR. HAYDEN:  I don't think I have one.

4          THE CLERK:  Leave two for each seat.

5          MR. HAYDEN:  No, she is alternate number one.

6          THE COURT:  Well --

7          MR. LEMKE:  No.

8          THE COURT:  Let's go back to everybody we got

9      rid of here.

10          Off the record.

11          (Whereupon, there was a discussion held off the

12      record.)

13          THE COURT:  Let's go on the record.

14          Counsel, we now have a jury of twelve plus one

15      alternate.  Looking to get a number two and number

16      three.  We had n off the record conference with respect

17      to that, and it's the Court's understanding that both of

18      you are agreeing to consent with respect to the two

19      people, I will now put their names on the record, both

20      you either knocked them out as a peremptory for the main

21      jury; is that correct?  You're consenting?

22          MR. HAYDEN:  Yes.

23          MR. LEMKE:  Yes.

24          THE CLERK:  What were the two names.

25          THE CLERK:  Alternates?

Proceedings

```
1              THE COURT:  Yes.

2              THE CLERK:  Number two will be Jennifer

3   Zuzzio.  People consent to that?

4              MR. HAYDEN:  Yes.

5              THE COURT:  Defendant.

6              MR. LEMKE:  Yes.

7              THE CLERK:  Number three Joseph Tiriro.

8              THE COURT:  Both sides consent to making that

9   person number three.

10             MR. HAYDEN:  Yes.

11             MR. LEMKE:  Yes.

12             THE COURT:  We have a jury.  I will swear them

13  in, admonish them and tell them to come back at two.  We

14  will do preliminary stuff now.  Take a break, gets the

15  T.V.  I'd like to resolve those issues.

16        (Whereupon, the following takes place in open

17  court.)

18             THE COURT:  Ladies and gentlemen, Mr. Paoli

19  will address you in a minute, my clerk.  We have a

20  jury.  We have taken three alternates.  And I thank all

21  of you for your time and patience, and particularly the

22  alternates.  You will know in a minute who you are.

23  Because that is a difficult position because you stay

24  there for the whole trial but ultimately when it's time

25  for deliberations, you don't go with the jury.  You stay
```

MO

Proceedings

1    separate.  You can't discuss the case.

2        We need the alternates because if a problem arises

3    during the course of the trial we can have that

4    situation where the alternate or alternates would be

5    substituted for a regular juror.

6        So, that is why it's important for you to come in

7    here like the rest of the jury, listen to everything

8    attentively, apply everything you heard throughout this

9    jury selection process.  Okay.

10        THE CLERK:  Ladies and gentlemen, names I'm

11    about to announce, you have been selected to sit on this

12    jury.  When you hear your name announced please remain

13    in your seats.  If you don't hear your name, you're

14    excused from this case with the thanks of the Court.

15    And the court officer will guide you and explain where

16    to go from here.

17        The following jurors are selected.  Remain in your

18    seat.  Anthony DiSalvo, Marie Ginobbi, Ora Jenkins.  You

19    will be number one, Jennifer Zuzio will be number two,

20    Joseph Tiriro number three.

21        Okay.  Name called remain in your seat.  Others

22    again you have the thanks of the court.  Have a nice

23    day.  Thank you.

24        Will the selected jurors please rise and raise your

25    right hand.

MO

Proceedings

1      Do you and each of you solemnly swear to try this

2  action in a just and impartial manner to the best of

3  your judgment and render a verdict according to the law

4  and evidence so help you?

5      (Whereupon, the newly selected jurors collectively

6  answered in the affirmative.)

7      THE COURT:  Folks, what I am going to do is

8  give you certain instructions right now with respect to

9  your responsibilities and then I am going to ask you to

10  come back here at two o'clock.  The rest of the jury

11  will convene at that time.  I will give you preliminary

12  instructions on the law and then we will go into the

13  case.  Okay.

14      We will not sit Monday.  So, you will not have to

15  come Monday.  And, I will tell you that later this

16  afternoon we will resume on Tuesday morning.  Okay.

17      You must not converse among yourselves or with

18  anyone else upon any subject connected with the trial.

19  You must not read or listen to any accounts or

20  discussion of the case in the event that it is reported

21  by news or other media.  You must not visit or view the

22  premises or place where the offense charged was

23  allegedly committed or any other premises or place

24  involved in the case.

25      Prior to your being discharged, you must not

MO

Proceedings

1    request, accept, agree to accept, or discuss with any

2    person the receiving or accepting of any payment or

3    benefit in consideration for supplying any information

4    concerning the trial.

5        You must promptly report to the Court any incident

6    within your knowledge involving an attempt by any person

7    to improperly influence any member of the jury.

8        You're not to access the Internet or Worldwide Web

9    by any means available to you for the purposes of either

10   learning about this case or to learn about the law and

11   legal issues concerning this case.

12       Please follow the sergeant.  I will see you all at

13   two o'clock.  Okay.  Thank you for your patience.

14       (Whereupon, the following takes place outside the

15   presence of the jury.)

16           THE COURT:  At this time, counsel, we will

17   take a fifteen minute break to enable the prosecutor to

18   get the videotape equipment.  There are two applications

19   before the Court that I want to rule on prior to any

20   openings so that both the defendant and the People are

21   on notice what the Court will allow and not allow in

22   regard to these applications.

23       One application involves the photographs and I

24   believe, I don't know if it's in here, but also it deals

25   with the video of the crime scene, and I'd like to see

Proceedings

1    that video outside the presence of the jury.

2        And the other one is an application with respect to

3    eliciting on direct testimony an alleged statement by

4    codefendant.

5        Those are the two applications.

6            MR. HAYDEN:  Yes.

7            MR. LEMKE:  Yes.

8            THE COURT:  I will mark the affirmation by Mr.

9    Hayden with respect to the photographs and/or video as

10   Court exhibit VI.  The affirmation submitted by -- the

11   way, this is VI.  The affirmation submitted by Mr.

12   Hayden with respect to the codefendant's statement will

13   be marked Court exhibit VII.

14       Okay.  Fifteen minutes.  Get your thoughts together

15   on those issues.

16           MR. LEMKE:  Yes.

17           MR. HAYDEN:  Yes.

18   (Whereupon, there was a brief recess in the

19   proceedings.)

20           THE CLERK:  Continued case on trial,

21   indictment number 167N-2005, People versus Mark

22   Orlando.

23       People ready to proceed?

24           MR. HAYDEN:  Ready, Your Honor.

25           THE CLERK:  Defendant ready.

MO

Proceedings

1    MR. LEMKE:  Yes.

2    THE CLERK:  Let the record reflect the

3    presence of Mr. Orlando.  The sworn jurors are not in

4    the courtroom at this time.

5    THE COURT:  On the record.  The Court right

6    now out of the presence of the jury is going to review a

7    videotape that the People seek to introduce during the

8    course of the trial.

9    MR. HAYDEN:  May I place it, Your Honor?

10   THE COURT:  Yes.

11   MR. HAYDEN:  That is it, Your Honor.

12   THE COURT:  We will mark that as a Court

13   exhibit for purposes of this hearing outside the

14   presence of the jury.

15   THE CLERK:  Number VIII, Judge.

16   (Whereupon, Court's exhibit VIII was played in

17   open court.)

18   THE COURT:  Mark it number VIII for purposes

19   of what we did.

20   MR. LEMKE:  No objection at all, Your Honor.

21   THE COURT:  And, Mr. Hayden.

22   MR. HAYDEN:  Yes, Your Honor.

23   THE COURT:  You made an application. Your

24   application is with respect to this video and also

25   photographs.

Proceedings

1          MR. HAYDEN:  That's correct, Your Honor.

2          THE COURT:  Do you want to be heard, Mr.

3     Lemke?

4          MR. LEMKE:  Yes.  I don't have the specific

5     photographs that Mr. Hayden would be referring to.

6     However, regarding the tape, I believe there are, will

7     be a number of tapes, but regarding the tape that's been

8     marked now as I believe VIII, Court exhibit VIII is it?

9          THE COURT:  Right.

10          MR. LEMKE:  Clearly I think I would agree with

11     Mr. Hayden it may be probative obviously in the manner

12     in which Mr. Calabrese was found by the officers that

13     had arrived.  Clearly he was either worked on by

14     emergency personnel as I don't believe the shirt that's,

15     or the sweat shirt that's been cut, certainly I don't

16     believe Mr. Calabrese arrived there with it cut, but it

17     may have been cut by the emergency personnel when they

18     arrived there.  In that sense there may be some propose,

19     probative value to the tape.  I don't disagree with

20     that.

21          However, I don't believe there's anything that

22     would be lost by merely turning the color and having

23     this video, if it's introduced at trial, shown to the

24     jury for the same probative value in black and white.

25     It will not lose anything as far as the manner in which

Proceedings

1   Mr. Calabrese is found.

2       The car that is at the scene, the car that is

3   running.  Clearly showing closeups of the victim in this

4   case as it is regarding perhaps bullet wounds to the

5   back of the head is clearly displayed with this being in

6   black and white.  The blood that is there, will still be

7   shown in black and white as to the pool.

8       So, I think we can agree there may be probative

9   value to the tape.  There's clearly prejudicial value

10  present effect by having closeups of the bullet wounds

11  as well as the blood, all that color is not a necessity

12  for it clearly inflames the jury.  They are certainly

13  graphic and horrible to look at but that itself doesn't

14  excuse it from being shown to the jury.  But when all

15  probative value is still shown in black and white I

16  think the Court of Appeals in various decisions will say

17  no it should come in, it's probative, however, if it's

18  clearly something which can be shown in black and white,

19  the District Attorney's Office can't show the court

20  where it would lose any probative value being in black

21  and white, then we should take every step to avoid any

22  prejudice to the jury, Your Honor.

23      That is my objection, not for the tape itself and

24  what it shows, but clearly those portions in which

25  they're in color, Your Honor.

Proceedings

1   THE COURT: Mr. Hayden, the photographs you

2   seek to introduce at trial are photographs --

3   MR. HAYDEN: Those are crime scene

4   photographs. They're ten of them. They have been

5   pulled from twenty-five, thirty photographs. And also

6   they're autopsy photographs that Dr. DeMartino used to

7   explain the sometimes complicated nature of his

8   testimony.

9   And, as far as the color is concerned, I mean blood

10  is red. The color helps jurors identify what is blood

11  and what isn't. Color is essential to the jurors'

12  understanding of the tape just as the images itself

13  essentially to the jurors' understanding of the tape.

14  I would just read a simple quote here from People

15  versus Erickson. Photographs of a deceased person will

16  be deemed inadmissible only if the sole purpose of the

17  offer is to arouse the emotions of the jury and to

18  prejudice the defendant.

19  Defense counsel concedes that there's probative

20  value to this video. Therefore, defense counsel himself

21  establishes with that concession that these photographs

22  and this video should be admissible.

23  THE COURT: Application by the People that has

24  been marked as Court exhibit number VI is granted. The

25  Court feels that the video as well as the photos as

Proceedings

1    outlined by Mr. Hayden on the record are being offered

2    for their probative value or to corroborate other

3    evidence in the case, and not to heighten any, inflame

4    any prejudice of the jury.

5        Also, in the Court's final charge, there will be a

6    charge to the jury with respect to graphic photos and/or

7    videos and what use the jurors should make of that.

8        MR. HAYDEN:  And, the People would urge the

9    court at the time we offer these photographs to review

10   them again, take a look at them, and renew the decision

11   making at that point.

12       THE COURT:  Court will, of course, will on

13   every individual objection made by defense counsel rule

14   on their admissibility based on those purely evidentiary

15   grounds.  This is merely with respect to the application

16   made by you, and the opposition thereto by Mr. Lemke

17   just so that both sides are aware of the Court's

18   inclination with respect to this video and the photos.

19   The proper foundation not laid at trial, of course, it

20   will not get before the jury.

21       Mr. Lemke, with respect to Court Exhibit VII, which

22   is another affirmation by Mr. Hayden, wherein the

23   application being made to this Court to support the

24   introduction of remarks made to the defendant, what

25   exactly are you asking for the codefendant's statement

Proceedings

1    Mr. Hayden.

2         MR. HAYDEN:  Yes.  Detective McGinn confronts

3    the defendant.  The defendant has been trying to

4    convince detectives of the legitimacy of an alibi

5    defense he had put together.  And it's only when the

6    defendant is confronted by Detective McGinn, with a

7    statement that the codefendant's given it up, he is

8    telling us he did the shooting, you paid him, that the

9    defendant changes his story and comes up with a new

10   story.  The story about Herva did it all by himself,

11   that pivotal moment we want to go into and what

12   Detective McGinn said so the jurors understand in

13   context why the defendant was now changing his story.

14        THE COURT:  In sum and substance what exactly

15   is that you anticipate the detective would testify?

16        MR. HAYDEN:  He will say I confronted him, I

17   told him that the codefendant's giving it up, he's

18   giving it up and he's telling us he did the shooting and

19   he's telling us you made him.  No more extensive than

20   that.

21        THE COURT:  What is the purpose of offering

22   that evidence?

23        MR. HAYDEN:  The purpose of offering that

24   evidence is to establish the context in which the

25   defendant all of a sudden changes his initial story,

Proceedings

1    which was his alibi story, and now tried to blame the

2    whole thing on Herva Jeannot, that the defendant had

3    nothing do with what happened that night.

4              THE COURT:  Mr. Lemke.

5              MR. LEMKE:  Your Honor, clearly this Court

6    needs to make a decision regarding what, if any,

7    statements that were made.  To clearly start off with

8    hearsay, Bruton issue has previously been decided, that

9    is why both cases are not being tried together.  Mr.

10   Orlando's being tried separately and in part under

11   Bruton it's to protect the defendant not being able to

12   cross examine any statements that would be used against

13   him in this case such as the codefendant's Herva Jeannot

14   to paraphrase perhaps even six as a number of statements

15   that Mr. Jeannot had made, as my client allegedly had

16   made, and if we're talking perhaps bout one of the last

17   statements that Mr. Jeannot had made regarding, not to

18   paraphrase, giving it up or giving up the entire thing,

19   opposed to that Mr. Jeannot had shot Mr. Calabrese,

20   obviously I have no opposition to that.

21         However, it's a matter of how much of that

22   statement is going to be permitted, and I would take

23   this is on the People's direct case regarding the

24   detective testifying in the manner in which my client

25   first spoke to one officer then changed again and then

MO

Proceedings

1       changed.

2               Am I correct, Mr. Hayden?

3                   MR. HAYDEN:   That's correct.

4                   MR. LEMKE:   If it's on cross of Mr. Orlando if

5       he takes the stand I am aware of all the concerns

6       regarding opening up any door and the case law which is

7       certainly an issue in addressing the People's direct

8       case as to why my clients would have changed his story,

9       and an officer came in, and in this case Detective

10      McGinn speaks to Mr. Orlando and said, listen, your

11      codefendant has given it up, has said Mr. Jeannot had

12      shot him, and he shot him because you paid him, and then

13      my client says, whatever my client says, obviously I

14      have no opposition because those are statements he made

15      to the detectives.  But, I think in regard to what is

16      being said and being paired down, I have no opposition

17      to the fact Mr. Jeannot had indicated that Mr. Jeannot

18      was present and Mr. Jeannot shot him.

19          But I think anything in addition to that, again, is

20      prejudicial.  It violates my ability and right to

21      cross-examine the individual that is now accusing my

22      client of that, and I would move to preclude anything in

23      addition to that first portion, Your Honor.

24                  THE COURT:   Thank you.

25          The application contained in Court exhibit VII is

Proceedings

1    granted.   The Court views that this information that the

2    People are intending to offer in their direct case is

3    not being offered for the truth of the contents of the

4    statement but rather to give a clear picture to the jury

5    what was going on during the interrogation of your

6    client.   The Court, accordingly, feels that Crawford V

7    Washington, not the analysis that takes place in this

8    case, but rather Tennessee V. Street, 471 US 409.  Also

9    the Court cites the Court of Appeals in People V

10   Reynoso, R-E-Y-N-O-S-O, 2 New York 3rd 820.

11        And, at the time that this evidence is offered to

12   the jury the Court will give a limiting instruction to

13   the jury they're not to consider it for its

14   truthfulness, but rather to help them understand the

15   context in which the interrogation is going on.   That

16   same instruction will again be given in the final charge

17   and emphasized again.

18        The application is granted.   Note your exception on

19   the record, Mr. Lemke.

20             MR. LEMKE:  Thank you, Your Honor.

21             THE COURT:  Anything further at this time?

22             MR. HAYDEN:  No, Your Honor.

23             MR. LEMKE:  Nothing further, Your Honor.

24             THE COURT:  We will resume at two o'clock.

25                  L U N C H E O N   R E C E S S

MO

Proceedings

1              (Afternoon session.)

2          THE CLERK:   Case on trial, indictment 157N-05,

3      People versus Mark Orlando.

4          Appearance for the record, People.

5              MR. HAYDEN:   Robert T. Hayden for the People.

6              THE CLERK:   People ready?

7              MR. HAYDEN:   Ready.

8              THE CLERK:   Defendant.

9              MR. LEMKE:   Dennis Lemke, 114 Old Country

10     Road, Mineola, New York.

11         We're ready, Your Honor.

12             THE CLERK:   Let the record reflect the

13     presence of Mr. Orlando.   The sworn jury is not in the

14     courtroom at this time.

15             THE COURT:   Mr. Lemke, we premarked

16     twenty-five photos as People's 1 through 25 for

17     identification.

18         Did you have an opportunity to review them?

19             MR. LEMKE:   Yes, I have.

20             THE COURT:   Would you like to make any

21     objections?   This is with respect to what I ruled on

22     earlier, but you had indicated we didn't have the photos

23     in front of you and I agreed and we now have them.

24     Court reviewed them and you have reviewed them.

25         Would you like to make an objection with respect to

Proceedings

1      them?

2              MR. LEMKE:  Yes, Your Honor.  Certainly not

3      all of them.  There are a number, again, that I think

4      are clearly prejudicial.  There's some that for

5      probative value purposes I can go through each one that

6      I would necessarily not object to.  I don't know if

7      they're in order, but certainly there's others that the

8      probative value could certainly be achieved again by

9      having black and white photos.

10             I think in looking at some of these they're

11     extremely inflammatory and clearly have no purpose other

12     than to inflame, that the black and white could

13     certainly do the same.

14             And regarding the photograph of Mr. Calabrese, and

15     I am referring now to one photograph in which he is

16     wearing blue shorts, premarked as 25, what's to stop

17     thirty photographs coming in.  He is 5'7", I believe,

18     168 pounds, something to that effect, and the medical

19     examiner's report, I think, again show a photograph of

20     him alive.  Again, has no probative value.  Again merely

21     to insight some type of inflammatory emotions to the

22     jury.  I would oppose this as well.

23             THE COURT:  Your objection is overruled for

24     the same reasons I stated earlier.

25             With respect to the photo marked number 25 for

MO

Proceedings

1      identification, of course, that will be subject to the

2      District Attorney, as will for all photos, laying the

3      proper foundation.  However, what was put in the

4      District Attorney's affirmation with respect to that

5      photograph as part of the theory of the prosecution's

6      case.  So, at this time, your objection on these grounds

7      is overruled.  We will deal with it at the time it's

8      sought to be admitted into evidence.

9              Anything further?

10             MR. HAYDEN:  No, Your Honor.

11             MR. LEMKE:  Nothing, Your Honor.

12             THE COURT:  I guess at this time I will let

13     you let in the public.

14             (Whereupon, there was a pause in the

15     proceedings.)

16             THE COURT:  Ladies and gentlemen, before we proceed

17     with the trial, I just admonish everyone in the

18     courtroom that during the course of the trial, if

19     there's any outbursts or any talking in front of the

20     jury, I will immediately have you removed from the

21     courtroom.

22             THE CLERK:  Ready for the jury, Judge?

23             THE COURT:  Yes.

24             THE COURT OFFICER:  Ready, Judge?

25             THE COURT:  Yes.

MO

Proceedings

1             THE COURT OFFICER:  Jury entering.

2             THE CLERK:  Jurors, please listen to  when

3        your name is called.

4          Patricia Bologna.

5             A JUROR:  Here.

6             THE CLERK:  Aileen Nathan.

7             A JUROR:  Here.

8             THE CLERK:  Louis Quaglia.

9             A JUROR:  Here.

10            THE CLERK:  Raffat Hayat.

11            A JUROR:  Here.

12            THE CLERK:  Sally Barnes.

13            A JUROR:  Here.

14            THE CLERK:  Michael Kirkby.

15            A JUROR:  Here.

16            THE CLERK:  Thomas Scarfo.

17            A JUROR:  Here.

18            THE CLERK:  Christopher Delaney.

19            A JUROR:  Present.

20            THE CLERK:  Jennifer Eichstaedt.

21            A JUROR:  Here.

22            THE CLERK:  Robert Herrera.

23            A JUROR:  Here.

24            THE CLERK:  Anthony DiSalvo.

25            A JUROR:  Here.

Proceedings

```
1              THE CLERK:  Marie Ginobbi.

2              A JUROR:  Here.

3              THE CLERK:  Ora Jenkins.

4              A JUROR:  Here.

5              THE CLERK:  Jennifer Zuzio.

6              A JUROR:  Here.

7              THE CLERK:  And Joseph Tiriro.

8              A JUROR:  Here.

9              THE CLERK:  Case on trial, indictment number

10    167N-05, People of the State of New York versus Mark

11    Orlando.

12         People ready?

13             MR. HAYDEN:  Ready, Your Honor.

14             THE COURT:  Defense ready?

15             MR. LEMKE:  Defendant ready, Your Honor.

16             THE COURT:  Let the record reflect the

17    presence of Mr. Orlando and the sworn jurors.

18         Is this jury acceptable to the People?

19             MR. HAYDEN:  Yes, Your Honor, it is.

20             THE CLERK:  Is this jury acceptable to the

21    defense?

22             MR. LEMKE:  So stipulated, Your Honor.  Yes,

23    Your Honor.

24             THE COURT:  Good afternoon, ladies and

25    gentlemen of the jury.
```

Proceedings

1     Again, I thank you for your patience, particularly

2     those of you who were originally told to return this

3     morning.  I hope you all got our messages in time.  I

4     believe you did.

5          We're at the point in the trial where I will read

6     some preliminary instructions to you, and then we will

7     move onto the testimonial phase of the trial.

8          Ladies and gentlemen, you should take a certain

9     amount of pride and satisfaction from the fact that out

10    of the many prospective jurors brought into the

11    courtroom, you were selected as jurors and alternates.

12    You have probably come to the conclusion that as a

13    result of the jury selection process, we have selected a

14    fair and impartial jury.  It's exactly as the criminal

15    justice system intended it to be.

16         We're about to begin the trial of this case

17    concerning which you have heard some details during the

18    process of jury selection.  As the trial begins, it is

19    appropriate to make a few observations concerning the

20    orderly procedure of the trial.  It is hoped that these

21    observations may be helpful particularly to those of you

22    who are serving as jurors in this court for the first

23    time.  The comments and instructions that follow are

24    designed to acquaint you with the separate functions,

25    duties and responsibilities of the Court, counsel, and

MO

Proceedings

1     injury, and to give you a better understanding of how

2     you as jurors should conduct yourselves during the

3     trial.

4          As you know this is a criminal case which has been

5     brought by the People upon an indictment accusing the

6     defendant of the crime of Murder in the Second Degree.

7     Please keep in mind that this indictment is simply an

8     accusation, a paper writing, and is not in any way

9     evidence of the allegations it contains.  It is merely

10    the device used to bring the charge against the

11    defendant.

12         The defendant has plead not guilty to the

13    indictment.  According to the law, the People have the

14    burden of proving, beyond a reasonable doubt, each and

15    every element of the crime charged in the indictment.

16    The defendant does not have to prove anything.  He is

17    presumed to be innocent of the charge.

18         When I have completed these preliminary

19    instructions, the case will begin with a statement by

20    the Assistant District Attorney as to what the People

21    intend to prove.  This is known as the opening to the

22    jury.   The law requires the People to make an opening

23    statement to enable the Court and you, the jury, to

24    better understand the testimony and the evidence that

25    will follow at trial.  On the other hand, defendant's

Proceedings

1   attorney is not required by law to make an opening

2   statement.  This is because the People have the burden

3   of proving the charge beyond a reasonable doubt.  Thus,

4   defense counsel may choose not to make an opening

5   statement but may instead wait to see if the People

6   prove their case.  If the defense counsel chooses not to

7   make an opening statement, you must not draw any

8   inference from this.  As I have indicated, the defense

9   has the legal right to choose not to open.

10       Bear in mind that the opening statements of the

11  Assistant District Attorney or defense counsel, if any,

12  are not evidence.  The evidence upon which you will base

13  your verdict will come to you only from the witness box,

14  or in the form of photographs, documents, or other

15  exhibits introduced and admitted into evidence during

16  the trial.

17       Bear in mind the defendant has no obligation to

18  offer evidence.  The entire burden of proof always

19  remains upon the People.

20       After all the witnesses have testified and all the

21  evidence has been heard and received, each of the

22  attorneys will have the opportunity to argue orally in

23  support of their case.  These closing arguments are

24  known as summations, and like the opening statements are

25  not to be considered by you to be evidence.

Proceedings

Under our system of law, the defense counsel will sum up first, and the Assistant District Attorney will sum up last.  Following summations, I will instruct you on the law which applies to this criminal charge.  You, the jury, will then retire to the jury room to deliberate for the purpose of reaching your verdict.

This, in brief, is the general outline of the trial.  Before we begin with the opening statement, there are certain legal principles which you should keep in mind throughout the trial.

You, the members of the jury, are the sole judges of the facts.  You and you alone will have the responsibility to find and determine the facts.  On the other hand, when I instruct you on the law, either during or at the close of the trial, you must follow my instructions on the law exactly as I give them to you without any hesitation or reservation and even though you may disagree with them.

After the opening statement, witnesses will be called to the stand, and after being sworn will be examined and cross examined.  The questioning of a witness by the lawyer calling that witness is known as direct examination.  The questioning of that particular witness by the lawyer on the opposite side is known as cross examination.

Proceedings

1        From time to time during the trial you will hear

2    the lawyers object to the asking of a particular

3    question.  That means that the lawyer making the

4    objection claims that the question is not a proper

5    question.  The Court must rule, as a matter of law, as

6    to whether it is or is not a proper question.  You must

7    draw no inference from my ruling.  If I find under the

8    rules of evidence that the question is a proper one, I

9    will say objection overruled and the witness will then

10   answer the question.  However, if I find that the

11   objection is not valid and the question is improper, I

12   will say objection sustained and the witness will not be

13   permitted to answer the question.

14       When I so rule, you cannot draw any inference

15   either from my ruling or the question itself.  It is

16   only a question without an answer.  Questions are never

17   evidence.  Only answers constitute evidence.  Therefore,

18   no inference can be drawn from the mere asking of a

19   question.

20       Now, I suspect there will be times when a witness

21   will answer a question before the Court has ruled on the

22   objection.  In such an event if I sustain the objection,

23   I will direct that the answer be stricken.  It then

24   becomes your duty to strike it from your mind and

25   disregard both the question and the premature answer.

Proceedings

1      Do not resent the fact that the attorneys make

2      objections or motions during the course of the trial.

3      That is their job.  You must not hold it against either

4      party when or if I rule against them.

5           Exhibits such as photographs, documents, or other

6      tangible objects presented by either counsel during the

7      course of the trial will first be marked solely for

8      identification.  Such exhibits are not evidence until

9      and unless they are received into evidence by the

10     Court.  When reference is first made during the

11     testimony of a witness to a document, photograph, or

12     other physical or tangible object, it will be marked

13     with a number or letter of the alphabet so that we can

14     identify it and refer to it throughout the course of the

15     trial.  Subsequently, if I find that such exhibit may be

16     received into evidence, it will be so marked into

17     evidence.  Then and only then does it becomes evidence

18     which you may consider during your deliberations.

19          There are specific rules of law which govern your

20     conduct during the entire trial whenever, during the

21     course of this trial, the court stands in recess, or

22     whenever, during the course of the trial, you are asked

23     to retire to the jury room while the Court and counsel

24     discuss matters of law which do not and must not concern

25     you.  You must observe these specific rules of conduct.

Proceedings

1   In fairness to the People and the defendant, you must

2   keep an open mind throughout the trial.

3          You must reach your conclusions and your ultimate

4   decisions only after having heard all the evidence and

5   my instructions to you on the law, and then only after

6   exchanging views and reasoning together with other

7   members of the jury during your final deliberations.

8          Thus, you must not form or express an opinion as to

9   the guilt or innocence of the defendant until the entire

10  case has been submitted to you by the Court.  You must

11  not, during the course of the trial, converse among

12  yourselves or with anyone else upon any subject

13  connected with this trial.  This simply means that you

14  must not discuss this case with anyone, not even with

15  your fellow jurors, nor permit anyone to speak with you

16  or in your presence about any subject connected with

17  this trial.

18         While it is a normal human tendency to converse

19  with people with whom one is thrown in contact, you must

20  not during the time you serve on this jury converse,

21  whether in and out of the courtroom, with any of the

22  parties, their attorneys, any witnesses, or anyone

23  else.  By this I mean you're not only to refrain from

24  conversing about the case, you are not to converse with

25  any of these people at all even to say hello or pass the

Proceedings

1    time of day.  In no other way can everyone be assured of

2    the absolute impartiality they're entitled to expect

3    from you as jurors.

4        In this same vain you will undoubtedly notice that

5    the attorneys will not converse with you either, not

6    even say hello in the hallways.  Do not take this as

7    rudeness on their part.  They are only avoiding any

8    possible appearance of impropriety.  You can easily see

9    how such an appearance of impropriety might arise, for

10   example, if defense counsel were to see the prosecutor

11   talking to a group of jurors or vice versa without

12   knowing that the conversation did not concern the

13   substance of the case.

14       Therefore, to avoid any such allegations or

15   appearances of wrongdoing, both parties concerned will

16   no doubt take steps to avoid you completely while this

17   trial lasts.

18       You must not read or listen to any accounts or

19   discussions of this case as reported by the newspapers,

20   magazines, radio or television, or by any other news

21   media.  You must not visit or view the premises or the

22   place where the offense charged was allegedly

23   committed.  Nor are you to visit or view any other

24   premises or place involved or connected with any of the

25   events or scenes described in this case.

Proceedings

1    Prior to your being discharged, you may not accept,

2    agree to accept, or discuss with any person the

3    receiving or accepting of any payment or benefit in

4    consideration for supplying any information concerning

5    the trial.

6        During the time you serve on this jury, you shall

7    not access the Internet or Worldwide Web by any means

8    available to you for the purposes of either learning

9    about this particular case, or to learn about the law

10   and legal issues concerning this case.

11       Your verdict must be based solely on the testimony

12   that you hear during the trial, the exhibits that are

13   received in evidence during the trial, and my

14   instructions to you on the law.  You're bound to accept

15   the rules of law that I give you and you a must apply

16   those rules of law to the facts as you find them to be.

17       You must promptly report to me personally any

18   attempt by any person to converse with you, or who in

19   any way improperly attempts to influence you or other

20   members of the jury concerning this case.  You must not,

21   however, discuss with your fellow jurors either the fact

22   that a third person has sought to discuss the case in

23   your presence, or the fact that you feel it necessary to

24   bring such an attempt to the attention of the Court.

25   You must bring it immediately to the Court's attention.

Proceedings

1    Juror number one, by virtue of the fact that you're

2    sitting in that seat, you will be the forelady of the

3    jury, and that means you will just make sure, at the

4    time of deliberations, that deliberations run in an

5    orderly fashion, and that any questions or requests the

6    jury has be put in a written form and signed by you and

7    submitted to the Court.

8    After the opening statement by the Assistant

9    District Attorney and by defense counsel, if any, the

10   People will call their witnesses and proceed to offer

11   evidence and testimony in direct proof of the People's

12   case.

13   Thus the trial has commenced.  The defendant, the

14   attorneys and myself would all like to thank you in

15   advance for assuming this important responsibility of

16   serving as jurors in this criminal case.  All

17   communication or requests for information are to be

18   addressed to the Court and must be in writing, dated,

19   with the time of day, signed by the forelady, and place

20   in an envelope which will be provided to you and

21   sealed.  You should then deliver the sealed envelope to

22   the court officer outside the jury room who will in turn

23   deliver it unopened to the Court.

24   At this time, Mr. Hayden, please proceed with your

25   opening statement.

MO

Proceedings

1      MR. HAYDEN:  Yes, Your Honor.

2          I will take you back to around 8:36 on night of

3      Friday, December 3, 2004.  The air outside was cold and

4      clear.  Twenty-four year old Bobby Calabrese just pulled

5      up along Broadway, a quite, dim lit street in North Long

6      Beach in an area where there are some abandoned

7      buildings, some business properties, and a boat yard.

8          Bobby was there on business, the gambling

9      business.  He made payments, and he took collections.

10     He was there to meet the defendant who had set up the

11     meeting and he was already there waiting for Bobby who

12     was introduced by a mutual friend, a young man by the

13     name of Bobby Flores.

14         The defendant was placing sports bets through Bobby

15     for several weeks.  At first the defendant did nothing

16     but win but the defendant's luck changed.   He started

17     to lose.  That Friday night the defendant owed $17,000

18     to Bobby, who always made payments while the defendant

19     was winning, and was there now to collect.

20         But the defendant didn't intend to pay Bobby

21     anything.  He didn't have the $17,000.  He couldn't make

22     the payment.  He had another solution.  Unbeknownst to

23     Bobby the defendant had brought along a young man known

24     as Herva Jeannot who was hiding as Bobby stepped outside

25     of his automobile to join the defendant.  Armed with

Proceedings

1    a .44 caliber Magnum revolver Herva Jeannot was crunched

2    down behind the defendant's car and waited.  He waited

3    until the defendant and Bobby were together.  He waited

4    until they were standing together, talking together,

5    face to face.

6         He waited until this defendant was distracting

7    Bobby just as they had planned.  Then he made his move.

8    He moved slowly and as silently as he could.  He

9    approached Bobby from behind the defendant who weighed

10   close to four hundred pounds.  Then he waited for the

11   defendant's signal.  Bobby was relatively small, about

12   5'7", but he was agile enough and athletic enough, being

13   a Kellenberg High School wrestling champion but he

14   didn't have a change.  The defendant gave a signal.  The

15   defendant betrayed Bobby with a hug.  He hugged Bobby

16   and got a hold of Bobby's hood and pulled it over the

17   sweat shirt from behind.  He yanked Bobby's sweat shirt

18   up over his head and to Bobby's left and exposing the

19   right side of the back of Bobby's head and twisted

20   Bobby's right arm back behind his right ear.  The same

21   way a hockey player would yank an opponent's jersey over

22   his head during a fight to immobilize him, so Bobby

23   couldn't see, so Bobby couldn't run.  So he couldn't get

24   away and hide.  So, he couldn't resist.  So he couldn't

25   fight back and defend himself.  So Herva Jeannot could

Proceedings

1    execute Bobby, and that is exactly what Herva Jeannot

2    did.

3        Herva Jeannot stepped up on Bobby and fired.  The

4    bullet tore through Bobby's right forearm and into his

5    skull from behind his right ear.  That bullet did

6    horrific damage to Bobby's brain.  Bobby went down on

7    the cold hard surface of the road and laid dying.

8    Herva Jeannot leaned down over Bobby and fired two more

9    shots.  Those bullets tore into the left side of the

10   back of Bobby's head, those bullets tore holes through

11   the back of the sweat shirt.

12       The neck of the sweat shirt was still up over the

13   top of Bobby's head and it had settled back and folded.

14   One of those bullets tore three holes through folds in

15   the sweat shirt.  It tore into Bobby's skin, through his

16   brain, and out through his right cheek tearing a hole in

17   the upper right chest area of Bobby's sweat shirt.

18   Copper lead bullets were recovered, their core laid in

19   blood right around that hole, right there at the scene.

20   The metal core of that bullet was recovered by Dr.

21   Michael DeMartino during an autopsy.  Dr. DeMartino will

22   tell you how he also recovered the other two bullets

23   from inside Bobby's skull.

24       The defendant's plan was simple.  Kill Bobby, then

25   tell everyone he already paid Bobby that night, right

MO

Proceedings

1    there in that vicinity.  Someone else must have killed

2    him.  Whoever killed him must have taken that $17,000

3    thereby eliminating the $17,000 debt.  Kill Bobby, then

4    provide an alibi.

5        You will learn within two or three minutes of the

6    murder the defendant used a cell phone to call Wantagh

7    Suzuki about a refund check.  Telephone records confirm

8    that he spoke with Frank Walker of Wantagh Suzuki.  He

9    will describe his conversation and how the defendant

10    spoke to him and how he told the defendant the owner

11    wasn't there:  Wantagh Suzuki was closing for the

12    night.  He had to come back the following morning to

13    pick up the check.  He will tell you how the defendant

14    was speaking in a normal tone of voice.  Business as

15    usual.  Absolutely no problem.  This is two and-a-half

16    minutes or so after the defendant watched Bobby die.

17        You will learn that the defendant went to Wantagh

18    Suzuki anyway in spite of the fact he was told it was

19    going to be close, that the owner wasn't there, that he

20    couldn't get the check.  But it had nothing to do with

21    the check.  This was about getting far from the scene of

22    the murder as possible, being seen by people who knew

23    him.  This was all about an alibi.

24        You will learn the defendant didn't actually pick

25    up the refund check until three days later.  You will

Proceedings

1    learn that thirty-five minutes or so after the murder,

2    9:12 that Friday night the defendant stopped at a

3    Wantagh branch Citibank and made a $300 ATM withdrawal,

4    not for the money, but for the receipt, to incorporate

5    the receipt into the alibi.

6         Detective Jim Cereghino of the homicide squad will

7    tell you how he recovered that ATM receipt just where

8    the defendant told the police they would find it, in the

9    defendant's desk, at the collection agency where the

10   defendant worked making telephone calls to people in

11   debt.

12        You will learn that is the only ATM receipt

13   recovered from the defendant, from his home, from his

14   job, from his person.  This ATM receipt was all part of

15   the alibi.

16        You will learn at 9:26 that Friday night the

17   defendant telephoned Mr. Tommy Flores and talk to Tommy

18   Flores about the defendant's efforts to retrieve the

19   refund check, as if Tommy Flores cared.  Telephone

20   records confirm that call.  Tommy Flores will describe

21   his conversation with the defendant then and his

22   complete lack of interest about what the defendant was

23   saying.  All part of the alibi.  By the time the

24   defendant sat down and spoke with homicide detectives a

25   week later, the alibi was all set, already to go.

Proceedings

1          Detectives had a conversation with the defendant

2     then.  They'll tell you how the defendant initially told

3     them he was with Bobby the night of the murder.  He was

4     with Bobby in the vicinity of the murder.  He paid Bobby

5     all of the $17,000.  Debt's clear.  No more debt.  He

6     was with Herva Jeannot.  All he did was accompany him to

7     his meeting with Bobby.  After he paid Bobby, he drove

8     away.  Drove towards Long Beach on his way to Wantagh

9     Suzuki.  The last he saw Bobby, Bobby was driving the

10    opposite way towards Oceanside.  Alive and well.  No

11    problem.

12         Then the defendant went on to talk about the

13    telephone call to Wantagh Suzuki, then the trip to

14    Wantagh Suzuki, and then the stop at the CitiBank

15    branch.  The defendant actually told Detective Jim

16    McGinn of the homicide squad the exact time of that

17    transaction, 9:12.  It was 9:12 at night.  This is a

18    conversation a week later.  All part of the alibi.

19         Detective Jack McHugh of the homicide squad will

20    tell you how he reduced what the defendant was saying

21    then to writing.  You're going to see that signed

22    written statement in evidence.  You're going to hear how

23    the detective kept questioning the defendant because the

24    statement didn't jive with telephone records.  The

25    statement didn't jive with a videotape taken from a

Proceedings

1    nearby storage facility.

2         Now, when the detective didn't accept the

3    defendant's alibi the way he was certain they would, he

4    took a little time, thoughts about it, and changed his

5    story.  Now it's different.  He was there.  He was there

6    at the murder.  He saw it all.  He was an eyewitness,

7    just an innocent bystander.  He happened to be there

8    when Herva Jeannot on his own, out of the blue, with no

9    apparent motive, robbed and murdered Bobby.  He told

10   Detective McGinn that he was standing there with Bobby,

11   standing together, talking together, he paid Bobby,

12   that's why the debt was clear.  The debt's gone.  He

13   hugged Bobby and then the next thing you know there was

14   a gunshot by his right ear and Bobby went down.  After

15   Bobby went down, he saw Herva move over to Bobby's car

16   and shut the driver's door.  Then he saw Herva come back

17   to Bobby and fire the final two shots, and then he got

18   into his Suzuki Verona and Herva got in along side of

19   him and he was driving Herva around Bobby's body, and

20   the defendant told Detective McGinn that the defendant

21   noticed Bobby's feet was still moving, still twisting.

22   So, he stopped and Herva got out, walked over, and tried

23   to put a couple more bullets in Bobby's head.  The only

24   problem is that the gun wouldn't fire.  So, Herva went

25   back, climbed in the car, and the defendant drove him

Proceedings

1    away.

2        The detective asked him, the defendant, if he

3    wanted to sit down with an Assistant District Attorney,

4    if he wanted to tell his story to an Assistant District

5    Attorney.  They would do a videotaped statement and the

6    defendant refused, but he did say he would give another

7    written statement, a second written statement.

8        So, an hour later, Detective Cereghino went in to

9    speak with him.  The only problem was he couldn't quite

10   keep that second story straight.  Detective Cereghino

11   will tell you how the defendant told him that, yeah, he

12   met Bobby out on the street.  They were talking

13   together.  He paid Bobby.  Debt's clear.  Don't worry

14   about that.  And he hugged Bobby.  But then he noticed

15   Bobby's facial expression change and Bobby said

16   something, he didn't catch what it was, that the

17   defendant looked over his right shoulder, and it was

18   Herva about five feet behind him, slightly to his right,

19   facing Bobby from behind, beyond five feet, extending

20   his right hand toward Bobby and there was something in

21   Herva's hand.  The next thing you know there's a loud

22   boom.  There is a gunshot and Bobby goes down.

23       The only problem with both versions of the

24   defendant's second story is that neither version could

25   be so.  Herva wasn't facing Bobby when he fired the

Proceedings

1     shot.   Dr. DeMartino will tell you that all three

2     bullets hit Bobby from behind.   All three bullets tore

3     into the back of Bobby's head contradicting what the

4     defendant was saying.

5          See, that second written statement in evidence,

6     you're going to realize, is just another effort on the

7     defendant's part to talk his way out of any

8     responsibility for what he had done.   As if Herva

9     Jeannot did this by himself, out of the blue, for no

10    apparent motive.   As if Herva Jeannot would have

11    executed Bobby in front of an innocent bystander,

12    eyewitness, who knew him, who could identify him to the

13    police, who could have told them everything, then let

14    the innocent bystander live.   As if Herva Jeannot would

15    execute Bobby with no accomplice to get in and out of

16    that unfamiliar area, with no accomplice to lure Bobby

17    to that desolate corner of North Long Beach with a

18    promise of a $17,000 payment.   With no accomplice to

19    distract Bobby, to put him at ease so Bobby wouldn't

20    notice Herva Jeannot approaching him.   Wouldn't be so

21    close up to Bobby to contain him, to hug him, get a hold

22    of him, get his sweat shirt over head.   Hold him

23    relatively steady so Herva could get in there behind him

24    with that .44 magnum revolver and shoot that clean and

25    accurate fatal shot which is exactly what Herva did.

Proceedings

1    With no accomplice to serve as a watchman, getaway

2    driver.  So Herva could get out of there someway and not

3    be standing there with a gun in his hand with Bobby's

4    dead body.

5        No.  The defendant left something out while

6    speaking with the detective.  He didn't say a word about

7    the sweat shirt.  He didn't say anything about yanking

8    that sweat shirt up over Bobby's head to immobilize him

9    for Herva.  Must have slipped his mind.

10       You look at the defendant's second written

11   statement.  Like it never happened.  But you're going to

12   learn over the course of this trial it did happen.

13   Police officer Peter Vozzo is going to come in and tell

14   you he was the first officer on the scene.  He found

15   Bobby's body.  He found that sweat shirt over the top of

16   his head, there were bullet holes in the back of that

17   sweat shirt.  Those bullets hole align with wounds to

18   the left side of the back of Bobby's head.  Dan Brooks

19   will tell you the same thing.  He was the first

20   paramedic on the scene.  He will tell you how he had to

21   cut away the sweat shirt just to get to his head.

22   You're going to see the sweat shirt in evidence.  You

23   will see those bullet holes yourselves.  And you're

24   going to hear testimony about how those bullet holes

25   aligned with the wounds to Bobby's body.  You will see

MO

Proceedings

blood all over the front of the sweat shirt.  You're
going to realize something.  You're going to realize
there were no wounds to Bobby's back or chest, only
wounds to his head and face.  Blood over the front of
his sweat shirt because the front of his sweat shirt was
up over Bobby's face as Bobby laid there dying.

You're going to hear Bobby was a wrestler.  You're
going to realize that he was strong enough and agile
enough to have gotten away given half a chance.  You're
going to realize he was strong enough and agile enough
to have resisted given half a chance.  You're going to
realize he wasn't given half a chance.  You're going to
realize what man could have executed that way.  It had
to be two men.  Had to have Herva Jeannot fire the fatal
shot and you had to have this defendant, it was his
motive, his powerful motive to eliminate $17,000 in
debt.

He was familiar with the area.  He knew his way in
and he new his way out.  He was able to lure Bobby into
that desolate corner of North Long Beach with a promise
of a $17,000 payment.  He knew Bobby well enough to
distract him, to put him at ease, so Bobby wouldn't hear
Herva approaching on that lone, quiet, still corner of
North Long Beach.  He knew Bobby well enough to give him
a hug, betray him, get his sweat shirt over his head and

MO

Proceedings

1    hold him relatively still so Herva could get in there

2    with a .44 Magnum revolver, a heavy bulky gun, and get a

3    clean, accurate fatal shot.

4        Who else was going to be the wheelman?  Who was

5    going to be the getaway driver.  Someone ha to get him

6    out of there.  It was this defendant who told the

7    detective where to find the weapon.  He told the

8    detective that Herva tossed it off a bridge along the

9    Wantagh Parkway into a deep body of water, across from

10   some construction work that was going on.

11       You're going to learn that that body of water was

12   the Sloop Channel, the bridge was the Sloop Channel

13   Bridge, not far from Jones Beach.  Sergeant Greg

14   Magnifico of the marine bureau will tell you how he and

15   other members went to that location.  Divers went down

16   below forty-two feet of water and recovered that 44

17   Magnum revolver just where this defendant said it was.

18       Detective Jim DiBeneditto of the firearms bureau

19   will tell you how he received that .44 Magnum revolver

20   and test fired it.  He test fired the bullets with

21   markings unique to the inside of the barrel of the

22   Magnum revolver.  He took those test fired bullets and

23   their markings and microscopically compared them to the

24   bullets recovered from Bobby and they matched.  All

25   those bullets were fired from the same gun.  That

MO

Proceedings

same .44 Magnum revolver, the murder weapon, which was recovered, of course, just where this defendant said it would be.

In short the People will prove beyond a reasonable doubt that this defendant is guilty as charged of Murder in the Second Degree for planning, setting up, and actively participating in the execution murder of Bobby Calabrese.

Thank you again for your kind attention.

MR. LEMKE:  May I, Your Honor?

THE COURT:  Yes, Mr. Lemke.

MR. LEMKE:  Thank you.

May it please the Court, Mr. Hayden, Mark, ladies and gentlemen.  Good afternoon.

As Judge Sullivan has indicated, I have no burden or obligation to give an opening statement.  However, after listening to Mr. Hayden I think there's a few things I should address at this point.

As you know my client is charged with committing perhaps one of the most vicious and heinous crimes someone could commit against another person.  That is murder.  This is a charge which my client has vehemently denied.  It's because of this denial that each of you sat through our voir dire and are now sitting through the opening statements.  We will now sit and listen to

MO

Proceedings

1    testimony, review any exhibits that are produced in

2    evidence here, view any videotapes that will be

3    introduced here, you'll listen to our summations at the

4    end of this case, listen to and follow Judge Sullivan's

5    law on this case, deliberate and then reach a verdict

6    not only as to Mr. Orlando but to Mr. Calabrese as

7    well.

8         You just heard from Mr. Hayden, very strong,

9    compelling fifteen, twenty minutes of his case.  So, we

10   stop everything now, save ourselves two weeks of

11   testimony, Madam Foreperson, stand up with the rest of

12   the jury, face Mark Orlando and say guilty.  Why don't

13   we do that now?  Why don't we save ourselves two weeks

14   of testimony?

15        I think each of you now know why we wouldn't do

16   that.  Because what you heard from Mr. Hayden, as what

17   you hear from me, is not evidence.  It's what he intends

18   to prove, as I submit to you at the end of this case he

19   will not prove.

20        Mr. Hayden is an attorney, just as I am an

21   attorney.  His responsibility is to bring evidence into

22   this case in a light most favorable to the People, not

23   to Mr. Orlando.  But while I have this chance now to

24   talk to you, I think it's important that I point out

25   those factors in this case which will not be in dispute

1    so you can really focus on what is significant in this

2    case and, that is, what occurred during those 45

3    seconds, because Mr. Orlando spoke to detectives when he

4    was arrested.  He spoke to them and told them what

5    occurred.  And you will see in a surveillance video,

6    that the forty-five seconds of this incident between

7    Mr. Calabrese and Herva Jeannot and Mark Orlando is

8    consistent with what he told the police before

9    Mr. Orlando was told there was such a video.

10             But what is not going to be contested is that

11   Mr. Orlando knows Thomas Flores, that he knew Mr. Flores

12   for a number of months.  My client, in fact, had worked

13   for the last six and-a-half years at Professional

14   Services in Farmingdale, a collection agency.   That

15   Thomas Flores worked there, as well as Thomas Flores'

16   girlfriend.  None of that will be in dispute.

17             It's not going to be in dispute that my client not

18   only is married, but had tried for a number of years to

19   have a baby.  It's not going to be in dispute that Herva

20   Jeannot was a friend, they had met at Professional

21   Services.  It is not in dispute.  It's not going to be

22   in dispute that after many years of trying, that Mark's

23   wife Diane became pregnant.  When I ask you to consider

24   in a second or two how that comes into play in Mark's

25   frame of mind, why he didn't go to the police for a week

MO

Proceedings

after Mr. Calabrese was viciously murdered, because he was murdered in cold blood. That is not in dispute. It's not going to be in dispute that on December 3, 2004, Mark's wife was eight months pregnant.

It's not going to be in dispute that Mark Orlando gambles. It's not going to be in dispute that Bobby Calabrese was the runner. You will learn what a runner is. He's collecting or paying off debts for the bets for somebody a little higher up. You will learn that the fact that a runner is murdered, as the prosecution may submit to you, the motive does not in any way relieve the debt that he had to the higher ups.

It's not going to be in dispute that Mr. Orlando was introduced by Thomas Flores to Mr. Calabrese. None of this is in dispute. It's not going to be in dispute that for six to eight weeks prior to December third, that Mr. Orlando's records will show that the detectives had recovered as well through gambling records both, not only from my client, but from Mr. Calabrese as well. That during those preceding weeks Mr. Calabrese had paid out to Mr. Orlando close to $37,000. That he's winning every week, and that the previous week and-a-half of December 3rd of 2004, March Orlando had lost about $8,700 on one week, going into the preceding week, lost about another eight or $9,000.

Proceedings

It's significant to note that when money is to be paid or money is to be collected, you place your bets for Monday through basically Sunday and you pay off your losses perhaps Monday or Tuesday, and that wages of the bets that were being paid Monday, Tuesday, Wednesday in actuality wouldn't have been owed until further into that week.

That is significant in two ways.  One I am asking you to consider is what motive he has.  You'll see there isn't a motive.  He is up over that amount.  He tells the detective at some point he has it in a safe, that then on December third he was going to pay him.  Because you now need to consider, if he is going to murder him, why is he telling everybody he is going to meet him that night.  If he is going there to murder him, because obviously he is there at the scene.  There is going to be no dispute.  And it's not going to be in dispute that Herva Jeannot shot and murdered Mr. Calabrese in cold blood and took his money.

You're going to hear that when they went there on December third at about perhaps 8:36 that evening, that they had both worked together at Professional Services in Farmingdale.  Not in dispute.  It's not going to be in dispute that they left that Friday together.  Why did they leave together?  Because my client lives in Bay

Proceedings

```
 1        Shore.  Herva Jeannot lives in Deer Park.  They work in
 2    Farmingdale.  The previous four or five months my client
 3    would pick up Herva Jeannot and bring him to work, drop
 4    him off and then go home.  You will notice that the week
 5    after Mr. Calabrese was murdered, my client, out of fear
 6    for Mr. Jeannot, I will ask you to consider couple of
 7    things, no longer took him to and from work.  He tried
 8    to avoid him as much as he could because I am going to
 9    ask you to now consider, well, again, if this was a set
10    up as the prosecution will argue at the end of this
11    case, well, why is, and Mr. Hayden will argue here's an
12    alibi, he went here, here, here and there, and there's
13    an alibi.  He never said I was never there.  You will
14    learn when he spoke to the detectives, Mark Orlando in
15    speaking to the detectives, he tells them that when they
16    left that Friday, they went to the gym together, Herva
17    Jeannot and Mark, and they met Thomas Flores and Thomas
18    Flores' girlfriend Barbara at the gym.  You will hear
19    from them.  That Herva Jeannot was anxious.  Herva
20    Jeannot wanted to leave, and Mark was trying to work
21    out.  You will learn he had had a number of surgeries to
22    lose weight.  He lost about three hundred pounds.  He is
23    there.  He said, relax, we'll go, don't worry.  I have
24    to meet Bobby Calabrese.  Going to meet him down in
25    Island Park.  Usually meet him there.  Not a secret to
```

Proceedings

anybody.  They're going down to meet him.  They drive
down.

     You will hear testimony, and this is what you need
to consider, because what occurs during that, where's
the proof that this is aiding and abetting.  There is no
dispute Herva Jeannot killed Bobby Calabrese in cold
blood.  It is for you to consider whether they have
proven, beyond a reasonable doubt, that my client aided
and abetted, that he played some role in this.

     The evidence is going to show they got there.  The
evidence is going to show that they looked for a
discreet place to pay him the money as they always do
and then leave.  It's not going to be disputed, we will
introduce a videotape that shows a car waiting on the
block which happens to be my client's vehicle and at
some point Mr. Calabrese pulls up in his vehicle.  It is
not in dispute, that lasts about forty seconds before
Mark leaves.  It's a video in which we don't see much
other than you see headlights and brake lights.  So,
don't expect to see what occurs.  You will see at least
the timing which is critical, as well as a vehicle.

     I would ask you to also consider during those
forty-five minutes, forty-five seconds, consistent with
what Mark told the detective, not the first time, as you
learn, because when he was arrested they brought him to

MO

Proceedings

```
 1    the precinct to talk to one detective, then one doesn't
 2    write anything down, then a third detective, Cereghino.
 3         What is significant is when he is there, he is
 4    there to pay him.  You will learn that Mark gets out of
 5    the car to pay him, that in the car they had left the
 6    gym in, Herva Jeannot took a bag with some gym clothes
 7    and other things in it, he was in the front seat, they
 8    drove down there, parked, he gets out to pay him as he
 9    tells Detective Cereghino, which is consistent with the
10    video, consistent my client.  He gets out, hands him the
11    money, there is something that Mr. Calabrese sees over
12    Mark's shoulder, consistent as well with the DNA, as
13    well as the forensic testimony, that the gun had to be
14    shot anywhere from perhaps eight inches to the head to
15    perhaps up to forty-eight inches.  Up to four feet.
16    Consistent with what Mark tells Detective Cereghino,
17    that Bobby had fear in his eyes.  That Bobby is facing
18    Mark, as I am now, and over Mark's shoulder, Herva
19    Jeannot comes running over.  That Herva Jeannot has a
20    gun in his hand.  That Mr. Calabrese sees it, and after
21    facing Mark, with his right hand, consistent with what
22    he tells the police, he doesn't know about the
23    ballistics, he doesn't have all these results there when
24    the detective's talking to him, Mark says Bobby, to
25    protect himself, turns at this angle, the bullets comes
```

Proceedings

1    in through the arm, through the back of his head at

2    Bobby and Bobby goes down.   Shot in cold blood.

3        He also tells Detective Cereghino when he is down,

4    he's then shot two more times in cold blood by Herva

5    Jeannot.   It's not going to be in dispute that Herva

6    Jeannot served in the service for two years.   He was

7    trained, he knew how to use and shoot weapons.   Not

8    going to be in dispute.   It's not going to be in dispute

9    that Mark gets into the vehicle, leaves, and now begins

10   to panic.   He tells the detective, I wanted everybody to

11   know that Herva Jeannot was with me.   I called Wantagh

12   Suzuki.   He drove up there.   As soon as I got into the

13   car, Herva Jeannot told me when I said what the F did

14   you do, what did you kill him for, he said I would never

15   rob you, you're my friend, I robbed him.   This isn't the

16   first person I killed, it's not the last person I'll

17   kill.   Your wife is eight months pregnant.   You say a

18   word, you will be next, and before I kill you I will

19   kill your wife and unborn baby.

20       Mark gets in the car and calls everybody he can.

21   He runs here, he runs there, he goes home.   He doesn't

22   tell his wife.   He doesn't sleep.   She knows something

23   is wrong.   He's sitting downstairs in a chair.   He

24   doesn't pick up Herva.   They talk about fifteen times

25   that Saturday trying to figure out what is going to

MO

Proceedings

happen, he doesn't know what to do.  He doesn't say anything Monday, Tuesday, Wednesday, Thursday, Friday. He goes to work and then home.  Fears for his wife. Herva Jeannot works in the same location, same profession.  Herva tells him, don't say a word, say a word you're dead.  Say a word your wife's going to be next.

Friday, they're leaving and they get picked up by the detectives.  The detectives meet with Mark.  They talk to Mark.  He gives his first statement about how he met Bobby, he paid Bobby, but he wasn't there when there was any shooting.  Clearly he lied to the detective. That is not going to be in dispute.  He was in fear. But also at the same time begin to consider Herva Jeannot was also picked up at the same time, also in the precinct speaking to detectives as well.  You will learn that from that evening that he is arrested into the next morning, until about five o'clock in the morning, when Detective Cereghino begins to talk to Mark, there's a detective that is speaking to Mark first, and the detectives, in speaking to Mark, will tell you, when I was talking to Mark I knew Mark wasn't telling me something.  Kept asking him what do you want to tell me.  Mark kept telling me, you don't understand, you don't understand.  I'm afraid.  I can't tell you.  You

Proceedings

1    don't understand.

2         It's not until Herva Jeannot tells the detective

3    that Herva Jeannot himself had shot Mr. Calabrese, that

4    Mark then felt at ease that now they're not going to

5    come after Mark. He didn't say anything. Mark didn't

6    spill any beans. He said I didn't know better. I was

7    there, he shot him. I didn't know what to do. I was

8    afraid, not for my safety, but my wife's and unborn

9    baby.

10        At that point, considering that, considering the

11   timing of what Mark said and what was said before that

12   for him then to say something because the issues for you

13   again is what occurred that night. There is no dispute

14   whatsoever Mr. Calabrese was killed in cold blood and

15   Herva Jeannot had shot him. But the angle, the twisting

16   are all consistent with what Mark told the detective

17   before anything took place, before any videotape came

18   into play. It's going to corroborate, since that time,

19   what he told the detective.

20        I am confident if you keep an open mind, that you

21   listen to the testimony of the witnesses, some of which

22   I may not question at all, at the end of this case, you

23   follow the Judge's instructions on the law, deliberate,

24   and reach the only verdict in this case, and that is

25   Mark Orlando is not guilty.

1          Thank you.

2                   THE COURT:  Yes, call your first witness, Mr.

3      Hayden.

4                   MR. HAYDEN:  Kathleen Cardineau.

5    KATHLEEN CARDINEAU, called as a witness by the People, having

6          been first duly sworn by the Clerk of the Court, was

7          examined and testified as follows:

8    DIRECT EXAMINATION

9    BY MR. HAYDEN:

10                  THE CLERK:  Have a seat.

11          State your name, spell your last name, just give

12      your county of residence, please.

13                  THE WITNESS:  Kathleen Cardineau,

14      C-A-R-D-I-N-E-A-U, Nassau County.

15                  THE COURT:  Good afternoon.

16                  THE COURT:  Good afternoon.

17                  MR. HAYDEN:  May I proceed.

18                  THE COURT:  Yes, Mr. Hayden.

19      Q     Good afternoon, Miss Cardineau.

20      A     Good afternoon.

21      Q     What is your occupation?

22      A     I am a district manager.

23      Q     Where do you live?

24      A     I live in Barnum Island.

25      Q     Is that part of Island Park?



1    A    Yes.

2    Q    Part of North Long Beach?

3    A    Yes.

4    Q    Where do you live in relation to a 7-Eleven store

5    at the intersection of Broadway and Georgia Avenue?

6    A    I live on that same block south of the 7-Eleven

7    store.

8    Q    Directing your attention to 8:36 on the night of

9    Friday, December 3, 2004.

10    Where were you then?

11    A    I was in my bedroom.

12    Q    What were you doing?

13    A    I was looking for a book of matches.

14    Q    What did you hear then?

15    A    I heard three sounds that sounded like gunfire,

16    loud bangs, three.

17    Q    How do you know it was 8:36 when you heard the

18    three loud bangs that sounded like gunshots?

19    A    Because I turned around and I looked at the Cable

20    Vision box.

21    Q    Did it read 8:36?

22    A    Yes, it did.

23    Q    How much time passed from the first gunshot you

24    heard until the last gunshot?

25    A    No more than five or six seconds.

Cardineau - People - Direct

1    Q    Do you remember the sequence of the gunshots?

2    A    No.

3    Q    Do you remember how much time passed between the

4    first gunshot and the second two?

5    A    No, I do not.

6    Q    Tell the jury what you did after you heard those

7    three gunshots at 8:36?

8    A    I found my matches and I walked back through my

9    house and picked up some bags that I used to feed stray cats

10   and I went outside of my house, down the stoop, got into the

11   car and drove down the block.  And as I was driving down the

12   block I could see there was something in the street, and I

13   drove fairly slowly, and as I got closer to where I would

14   park my car to feed the cats, two men came from my left side,

15   and as I got up to them I stopped because there was a young

16   man laying in the street.

17   Q    What did you see on the street?

18   A    I saw a young man laying face down on the street.

19   Q    Did you see any sign of life in him?

20   A    No, I did not.

21   Q    What happens then?

22   A    I got out of my car and of the two gentlemen that

23   had crossed the street, one I knew was the fellow from

24   7-Eleven because he had the red thing on.  The other fellow

25   was wearing a baseball cap and the fellow in the baseball cap

Cardineau - People - Direct

1   said to me -- I am sorry.  He said, he said, I think he got

2   hit by a car, and I immediately said, no, he was shot.  I

3   just knew at that point.

4          Q    That was based upon what you heard?

5          A    Yes.

6          Q    Did someone call the police?

7          A    Yes, the fellow from 7-Eleven had a cell phone.  He

8   phoned the police.

9          Q    Did police arrive?

10         A    Yes, they did.

11         Q    Did they cordon off the crime scene?

12         A    Yes.

13         Q    Did your car wind up in that crime scene?

14         A    Yes, it did.

15              MR. HAYDEN:  Your Honor, may I please have

16         these photographs that have been marked 2 and, 1 and 2

17         for identification shown to the witness, please.

18              THE COURT:  Yes.

19              THE COURT OFFICER:  The witness has People's 1

20         and 2 for ID.

21         Q    Do you see your automobile in both of those

22   photographs?

23         A    Yes, I do.

24         Q    Is your automobile a black colored car?

25         A    Yes, it is.

MO

Cardineau - People - Direct

```
 1       Q    Is it to the right of each of those photographs?

 2       A    Yes.

 3       Q    As you're looking at them?

 4       A    Yes.

 5            MR. HAYDEN:  May I please have 7 and 9 shown

 6       to the witness.

 7            THE COURT:  Yes.

 8            THE COURT OFFICER:  People's 7 and 9.  Witness

 9       has them.

10       Q    Do you see your black car in both of those

11       photographs?

12       A    Yes, I do.

13       Q    Is it to the left as you're looking at each of

14       those photographs?

15       A    Yes, it is.

16            MR. HAYDEN:  May I have those back, please.

17       Q    Did your car remain inside the crime scene?

18       A    Yes.

19       Q    Until when?

20       A    Early the next afternoon.

21       Q    Did you hear anything before you heard the three

22       gunshots at 8:36?

23       A    No, I did not.

24       Q    Did you hear anything after you heard the three

25       gunshots at 8:36?
```

Cardineau - People - Direct

1          A     No, I did not.

2                    MR. HAYDEN:  Nothing further at this time,

3          Your Honor:

4                    THE COURT:  Thank you, Mr. Hayden.

5               Any cross examination?

6                    MR. LEMKE:  None at all.  Thank you.

7                    THE COURT:  Thank you, ma'am.  You may step

8          down.

9                    THE WITNESS:  Thank you.

10                    (Witness excused.)

11                    THE COURT:  Mr. Hayden, please call your next

12          witness.

13                    MR. HAYDEN:  Brian Atkinson.

14     Brian Atkinson, called as a witness by the People, having

15          been first duly sworn by the Clerk of the Court, was

16          examined and testified as follows:

17     DIRECT EXAMINATION

18     BY MR. HAYDEN:

19                    THE CLERK:  Have a seat.

20               State your name spelling, your last name, and give

21          your county of residence.

22                    THE WITNESS:  Brian Atkinson, A-T-K-I-N-S-O-N,

23          Nassau County, New York.

24                    THE COURT:  Good afternoon, sir.

25                    MR. HAYDEN:  May I proceed?

Alkinson - People - Direct

1        THE COURT:  Yes, Mr. Hayden.

2    Q    Good afternoon.

3    A    Good afternoon.

4    Q    How old are you?

5    A    Fifty-one.

6    Q    What is your occupation?

7    A    Bonds broker.

8    Q    I direct your attention to around 8:37, on the

9   night of Friday, December 3, 2004.

10        Were you in the vicinity of Broadway and south of

11   Georgia Avenue in Island Park?

12   A    Yes.

13   Q    Is that also called North Long Beach?

14   A    Yes.

15   Q    Is that in Nassau County, state of New York?

16   A    Yes.

17   Q    What were you doing then?

18   A    I was on my way to by Lotto tickets at the

19   7-Eleven.

20   Q    Were you driving northbound on Broadway?

21   A    Yes.

22   Q    Did you notice something then?

23   A    Yes.

24   Q    What did you notice?

25   A    Actually my wife noticed there was a body lying in



MO

Alkinson - People - Direct

1      the street.

2          Q      A young man?

3          A      A young man, yeah.

4          Q      Did you see any sign of life in the young man?

5          A      No.

6          Q      Any motion?

7          A      No.

8          Q      Was the young man laying on the surface of the

9      road?

10         A      Yes.

11         Q      What did you do when you noticed the young man

12     lying on the surface of the road?

13         A      We drove right to the 7-Eleven because I didn't

14     have my cell phone with me to get somebody to called the

15     police.

16         Q      Did someone call the police?

17         A      Yes.

18         Q      Did the police arrive?

19         A      Yes.

20         Q      Did you touch the body before police arrived that

21     night?

22         A      No.

23         Q      Did you see anyone else touch the body before

24     police arrived that night?

25         A      No.

MO

Alkinson - People - Direct

1          MR. HAYDEN:  Nothing further, Your Honor.

2          THE COURT:  Mr. Lemke.

3          MR. LEMKE:  No questions.  Thank you.

4          THE COURT:  Thank you, sir.  You may step

5     down.

6          THE WITNESS:  Thank you very much.

7          (Witness excused.)

8          THE COURT:  Counsel, approach the bench,

9     please.

10          THE COURT:  Ladies and gentlemen, in the

11    gallery, I'd ask you to remain seated while the jury

12    leaves the courtroom.

13          Ladies and gentlemen of the jury, that concludes

14    the proceedings for today.  As I had indicated we're not

15    going to resume until Tuesday.  So, do not come on

16    Monday.  We're going to resume Tuesday.  I am going to

17    direct that you come at nine a.m.  And, again, I

18    reiterate that you might want to come early because of

19    the parking situation.  Hopefully, we do have some

20    delays, I hope to get started somewhere between 9:30 and

21    ten.  I am asking you to get here around nine o'clock.

22    Probably behoove you to get here before nine because of

23    the parking situation.  Okay.

24          If for some reason there is a problem or whatever

25    the officers will provide you with a number to give us a

Alkinson - People - Direct

1    call.  But the quicker we can all assemble, the quicker

2    we can get moving and proceed with the trial.

3         I am going to read the following admonition which I

4    told you all you would here every time we break.  So, by

5    the end of this trial, you will have these admonitions

6    memorized I am sure.

7         You must not converse among yourselves or with

8    anyone else upon any subject connected with the trial.

9    You must not read or listen to any accounts or

10   discussions of the case in the event it is reported by

11   newspapers or other media.  You must not visit or view

12   the premises or place where the offense charged was

13   allegedly committed, or any other premise or place,

14   involved in the case.

15        Prior to your being discharged, you must not

16   request, accept, agree to accept, or discuss with any

17   person the receiving or accepting of any payments or

18   benefits in consideration for supplying any information

19   concerning the trial.

20        You must promptly report to the Court any incident

21   within your knowledge involving an attempt by any person

22   improperly to influence any member of the jury.

23        You're not to access the Internet or Worldwide Web

24   by any means available to you for the purpose of either

25   learning about this case, or to learn about the law and

Alkinson - People - Direct

1   legal issues concerning this case.

2       As I have indicated to you previously, I don't mean

3   you can't go on your computer, you can't go on it to

4   look into this case or anything about this case or the

5   law.

6       Okay.  Hope you have a good weekend.  I will see

7   you Tuesday.

8           THE COURT OFFICER:  Please rise and follow me

9   out.

10      (Whereupon, the following takes place outside the

11  presence of the jury.)

12          THE COURT:   Counsel, anything further?

13          MR. HAYDEN:  Would you like a copy of the

14  Rosario material?

15          THE COURT:  Yes.

16      Anything else?

17          MR. HAYDEN:  That is it.

18          MR. LEMKE:  Nothing, Your Honor.  Thank you.

19          THE COURT:  Trial stands in recess until

20  Tuesday.

21          THE CLERK:  Court exhibit IX.

22          THE COURT:  Have a good weekend.

23      (Whereupon, the trial was adjourned to June 7,

24  2004.)

25

MO