1  STATE OF NEW YORK : NASSAU COUNTY

2   COUNTY COURT PART 8

3  - - - - - - - - - - - - - - - - - - -X

4  THE PEOPLE OF THE STATE OF NEW YORK, SCI/IND. NO.
                167N-2005

5      -against-    MURDER 2
                TRIAL

6  MARK ORLANDO,

            Defendant.

7

8  - - - - - - - - - - - - - - - - - - -X

          262 Old Country Road

9          Mineola, New York
          June 7, 2005

10

11

12  B e f o r e :

13     HON. DAVID P. SULLIVAN, Supreme Court Justice

14  A p p e a r a n c e s :

15

16    HON. DENIS DILLON
      District Attorney, Nassau County

17     By: ROBERT T. HAYDEN, ESQ.
      Assistant District Attorney

18

19

20    DENNIS LEMKE, ESQ.
      Attorney for Defendant

21      114 Old Country Road
      Mineola, New York

22

23

24      Mary Ocskai
      Official Court Reporter

25

COPY

MO

Proceedings

| | |
|---|---|
| 1 | THE CLERK:  Remain seated, come to order. |
| 2 | County Court Part VI now in session, David P Sullivan |
| 3 | presiding. |
| 4 | Good morning, Judge. |
| 5 | THE COURT:  Mr. Lemke, for purposes of what I |
| 6 | am about to put on the record, you're waiving your |
| 7 | client's appearance? |
| 8 | MR. LEMKE:  Yes, I do, Your Honor. |
| 9 | THE CLERK:  Continued case on trial, |
| 10 | indictment 167N-05. |
| 11 | May we have the People's appearance for the record, |
| 12 | please. |
| 13 | MR. HAYDEN:  Robert T. Hayden, Your Honor. |
| 14 | The People are ready. |
| 15 | THE CLERK:  Representing Mr. Orlando. |
| 16 | MR. LEMKE:  Dennis Lemke, Your Honor, 114 Old |
| 17 | Country Road, Mineola, New York. |
| 18 | Also ready, Your Honor. |
| 19 | THE COURT:  As you know this Court has been |
| 20 | ready, has stood ready since nine a.m. this morning to |
| 21 | resume the trial.  One of the jurors has still not |
| 22 | arrived.  I am putting this on the record at this point |
| 23 | because pursuant to Criminal Procedure Law 270.35, if |
| 24 | this juror cannot be found and does not show up, the |
| 25 | Court intends to replace her. |

Proceedings

1    So, what I am going to do is take a fifteen minute

2    recess.  All the people in the gallery, get coffee,

3    whatever.  I want to keep you apprised of what is

4    happening.

5         Thank you.

6         (Whereupon, there was a recess in the proceedings.)

7         (Whereupon, the following takes place in chambers.)

8         THE COURT:  Continued trial.  Mr. Lemke is

9    present and the Assistant District Attorney, as well as

10   juror number five, Raffat Hayat.

11        Mr. Lemke, do you waive your client's

12   appearance for this?

13        MR. LEMKE:  Absolutely, yes.

14        THE COURT:  Ma'am, suppose to be here nine

15   o'clock today held up a trial.

16        THE WITNESS:  Extremely sorry.  I have major

17   construction in the house, and something happened that

18   needed my attention there.  I was already to come and

19   there was no one else in the house who could address

20   that so, I was late thirty minutes leaving home, it took

21   me thirty minutes to come here, then another thirty

22   minutes to park the car.

23        So, I am extremely story sorry for that.

24        THE COURT:  No problem.  This is the problem

25   though.  As you know we have a trial.  We have other

MO

1    jury members.  They all have been here since around nine

2    o'clock.  And as you can see a courtroom full of

3    people.  So, I can't hold up the trial if you're late

4    like that.  And, technically, with the commissioner of

5    jurors you can be held in contempt.  I am not looking to

6    do that.  I don't want to do that to you.  Okay.

7         Now, are you going to have a problem anymore because

8    if do you --

9              THE WITNESS:  I don't foresee otherwise I

10   would have said up front when I was picked up as a

11   juror.  I think I should be able to.

12             THE COURT:  I just have to admonish you

13   because if you fall to come or fail to contact us and we

14   don't know what is going on, I will be forced to

15   discharge you from the jury.  Okay?

16             THE WITNESS:  All right.

17             THE COURT:  We know, we spent a lot of time

18   trying to get a fair and impartial juror.  I know both

19   parties want you on the jury.  So, but you have to

20   understand the ramifications.  It's serious business and

21   I can't keep everybody held up.  Okay.  If we stay on

22   our time schedule I hope to be done early next week, way

23   before I, way before we anticipated.  Okay.

24        You provided your cell number to the court officer.

25             THE WITNESS:  Yes.

Proceedings

1           THE COURT:  Make sure you have our number.

2     All right.  So you have to be on time from now on.

3           THE WITNESS:  Yes.

4           THE COURT:  Any question, counsel?

5           MR. HAYDEN:  No.

6           MR. LEMKE:  No.

7           THE COURT:  You can go with the officer.

8        (Whereupon, the following takes place outside the

9     presence of the juror.)

10          THE COURT:  We're going to resume the trial in

11    a couple of minutes.

12       (Whereupon, there was a brief recess.)

13          THE CLERK:  This is the continued case on

14    trial, indictment 167N-05, People versus Mark Orlando.

15       People ready.

16          MR. HAYDEN:  Ready, Your Honor.

17          THE CLERK:  Defendant ready?

18          MR. LEMKE:  Defendant ready.

19          THE CLERK:  Jury's not present.  The defendant

20    is present at this time.

21          THE COURT:  Mr. Hayden, you had additional

22    Rosario you wanted to put on the record.

23          MR. HAYDEN:  Yes, I do, Your Honor.

24       I turned over to Mr. Lemke earlier this morning

25    copies of Rosario 110, 111 and 112.  I also have a copy

Proceedings

1    for the Court with a revise Rosario list which I would

2    ask be marked as a Court exhibit.

3              THE COURT:  Mr. Lemke.

4              MR. LEMKE:  Acknowledge receipt, Your Honor.

5              THE COURT:  Court exhibit X.

6              Anything further before the jury re-enters the

7    courtroom?

8              MR. HAYDEN:  No.

9              MR. LEMKE:  Nothing, Your Honor.

10             THE COURT:  Ready for the jury.

11             THE COURT OFFICER:  Jury entering.

12         (Whereupon, the following takes place outside the

13    presence of the jury.)

14             THE COURT:  Mr. Lemke, Mr. Hayden, I have a

15    juror note.  I am this marking Court exhibit XI.

16         "How many times can a juror be late for non

17    emergency before choosing an alternate?"

18         I will informed the jury we have addressed the

19    situation, and they're not to concern themselves with

20    that any further.  And as I already made a record and

21    admonished that juror and if there's a further lateness

22    the Court intends to discharge that juror.

23             MR. HAYDEN:  Yes.

24             THE COURT:  I won't tell them all that.  Just

25    telling them we're aware of the problem and we have

Proceedings

1          addressed it.

2                    MR. LEMKE:   Yes, Your Honor.

3                    THE COURT OFFICER:   Jury entering.

4                    THE CLERK:   Continued case on trial,

5          indictment 167N-2005, People of the State of New York

6          versus Mark Orlando.

7               Again, People ready?

8                    MR. HAYDEN:   Ready, Your Honor.

9                    THE CLERK:   Defense ready?

10                   MR. LEMKE:   Defense ready.

11                   THE CLERK:   Let the reflect the presence of

12         Mr. Orlando, the sworn jurors and the alternates

13         jurors.

14              When you hear your name called, answer up.

15              Patricia Bologna.

16                   A JUROR:   Here.

17                   THE CLERK:   Aileen Nathan.

18                   A JUROR:   Here.

19                   THE CLERK:   Louis Quaglia.

20                   A JUROR:   Here.

21                   THE CLERK:   Raffat Hayat.

22                   A JUROR:   Here.

23                   THE CLERK:   Sally Turrillbarnes.

24                   A JUROR:   Here.

25                   THE CLERK:   Michael Kirkby.

Proceedings

1      A JUROR:  Here.

2      THE CLERK:  Thomas Scarfo.

3      A JUROR:  Here.

4      THE CLERK:  Christopher Delaney.

5      A JUROR:  Present.

6      THE CLERK:  Jennifer Eichstaedt.

7      A JUROR:  Here.

8      THE CLERK:  Robert Herrera.

9      A JUROR:  Here.

10     THE CLERK:  Anthony DiSalvo.

11     A JUROR:  Here.

12     THE CLERK:  Marie Ginobbi.

13     A JUROR:  Here.

14     THE CLERK:  Ora Jenkins.

15     A JUROR:  Here.

16     THE CLERK:  Jennifer Zuzio.

17     A JUROR:  Here.

18     THE CLERK:  And Joseph Tiriro.

19     A JUROR:  Here.

20     THE CLERK:  Jurors are present and accounted

21  for.

22          THE COURT:  Ladies and gentlemen of the jury,

23  good morning.  Thank you for your patience.

24      The Court has received a note from the jury marked

25  as Court exhibit XI.

Proceedings

```
 1          With respect to that question, the Court is aware of
 2     the problem.  The Court has addressed the problem with
 3     the juror in question, and if there's any further
 4     problems in that regard, then the Court will take action
 5     with respect an alternate.  Okay.
 6          Now, there's been some talk that some people want to
 7     take notes during the course of the trial.  Is that
 8     correct?
 9               A JUROR:  Yes.
10               THE COURT:  So, if anyone that wants to have a
11     pad and take notes just raise your hands, we will give
12     them out to you right now.  Then I am going to give you
13     a charge with respect to note taking before we
14     continue.  Okay.
15          Anyone who didn't take a pad and changes their mind
16     during the course of the trial just let us know,
17     please.
18          You must follow these rules with respect to note
19     taking.
20          Any note taking are only an aid to your memory and
21     must not take precedence over your independent
22     recollection.  Those jurors who has chosen to take notes
23     must rely on their own independent recollection and must
24     not be influenced by any notes that another juror may
25     take.  Any notes you take are only for your own personal
```

Proceedings

1  use in refreshing your recollection.  Notes serve merely

2  as an aid to the juror's memory.  They are in no way

3  superior to a juror's recollection.

4      Notes may not be used as an authority to dissuade

5  your fellow jurors of what a particular witness did or

6  did not say.  A juror's notes are not a substitute for

7  the recorded transcript of the testimony or for any

8  exhibit received in evidence.  If there's a discrepancy

9  between a juror's recollection and his or her notes

10  regarding the evidence, you should ask to have the

11  relevant testimony read back, or the exhibit produced in

12  the jury room.

13      In addition, a juror's notes are not a substitute

14  for the detailed explanation I will give you of the

15  principles of law that govern this case.  If there's a

16  discrepancy between a juror's recollection and his or

17  her notes regarding those principles, you should ask me

18  to explain those principles again and I will be happy to

19  do so.

20      Any notes taken are confidential and shall not be

21  available for examination or review by any party or

22  other person.  After the jury has rendered its verdict

23  we will collect the notes and destroy them.  Each day

24  when we break, you will leave them here and they will be

25  collected by the clerk.

Proceedings

227

1      Mr. Hayden, ready to proceed?

2                MR. HAYDEN:  Yes, Your Honor.

3                THE COURT:  Please call your next witness.

4                MR. HAYDEN:  Vincent Buscemi.

5   VINCENT BUSCEMI, detective/lieutenant called as a witness on

6        behalf of the People, after having been first duly

7        sworn, and having stated his shield number as 1011, and

8        his command as the Long Beach Police Department, took

9        the witness stand and testified as follows:

10  DIRECT EXAMINATION

11  BY MR. HAYDEN:

12                THE CLERK:  Have a seat.  State your name,

13        spell your last name, give your shield number and

14        command.

15                THE WITNESS:  Detective Lieutenant Vincent

16        Buscemi, B-U-S-C-E-M-I, Long Beach Police Department.

17        My shield number 1011.

18          Good morning, Your Honor.

19                MR. HAYDEN:  Yes, Your Honor.

20        Q.    Good morning.

21        A.    Good morning, sir.

22        Q.    How long have you been a member of the Long Beach

23  Police Department?

24        A.    Approximately twenty-six years.

25        Q.    Did you know a young man named Bobby Calabrese?

MO

Buscemi - People - Direct

1     A.    Yes, I did.

2     Q.    Is Bobby dead?

3     A.    Yes, he is.

4     Q.    How old was Bobby when he died?

5     A.    He was twenty-four years old.

6     Q.    How long had you known Bobby?

7     A.    I've known Bobby his whole life.  I have been

8  friends with his father and his mother for over thirty-five

9  years.

10    Q.    I am directing your attention to Sunday, December

11  5, 2004.

12    Did you see Bobby that day?

13    A.    Yes, I did.

14    Q.    Where was Bobby when you saw him that day?

15    A.    He was in the Nassau County morgue.

16    Q.    Describe the circumstances under which you saw

17  Bobby that day?

18    A.    I had gone to the morgue to identify him.

19    Q.    Did you do that?

20    A.    Yes, I did.

21    Q.    Describe the circumstances under which you

22  identified Bobby's body?

23    A.    I had been asked by members of his family if I

24  would please go over to the morgue and identify their son.

25    Q.    When did you last see Bobby alive?

Buscemi - People - Direct

1      A.    It was about the summer of 2004.

2      Q.    Had Bobby been a wrestler?

3      A.    Yes, he had.

4      Q.    How good?

5      A.    He was state champion in Kellenberg High School.

6      Q.    Describe any observation you made of Bobby's

7    physical condition when you last saw him alive?

8      A.    He was a vibrant athletic, well muscled, beautiful

9    young man.

10               MR. HAYDEN:   May I please have 25 for

11          identification shown to the witness, Your Honor.

12               THE COURT:   Yes.

13               THE COURT OFFICER:   Witness has 25 for ID.

14     Q.    Do you recognize that?

15     A.    Yes, I do.

16     Q.    Is that a photograph of Bobby Calabrese?

17     A.    Yes, it is.

18     Q.    Is that a fair and accurate representation of the

19   way Bobby appeared when you last saw him in the summer of

20   2004?

21     A.    Yes.

22     Q.    Is that a fair and accurate representation of his

23   build?

24     A.    It is.

25               MR. HAYDEN:   Your Honor, the People offer that



1    photograph in evidence.

2                   THE COURT:  Please show it to Mr. Lemke.

3                   MR. LEMKE:  We have seen it. No objection.

4                   THE COURT:  Mark it in People's 25 in

5    evidence.

6                   THE COURT OFFICER:  People's exhibit 25 marked

7    in evidence.

8                   MR. HAYDEN:  Your Honor, may I please have

9    that passed among the jury.

10                  THE COURT:  Yes.

11                  THE COURT OFFICER:  People's 25 in evidence

12   has been published to the jury.

13                  MR. HAYDEN:  Nothing further, Your Honor.

14                  THE COURT:  Thank you, Mr. Hayden.

15                  MR. LEMKE:  May I, Your Honor?

16                  THE COURT:  Yes, Mr. Lemke

17   CROSS EXAMINATION

18   BY MR. LEMKE:

19       Q.    Good morning.

20   Is it Mr. Buscemi or is it Detective Buscemi?

21       A.    Lieutenant.

22       Q.    Lieutenant.  As you're testifying here today, you

23   didn't have any role in the investigation of the death of

24   Bobby Calabrese, did you?

25       A.    No, I did not.

Buscemi - People - Cross

1   Q.   So, you're here as a civilian testifying here

2   today?

3   A.   I was subpoenaed as a police officer.

4   Q.   Subpoenaed as a police officer.

5   Well, you were not involved with the investigation,

6   correct?

7   A.   That's correct.

8   Q.   And, when you went to make the identification of

9   Bobby Calabrese, you didn't go as a police officer but as a

10  family friend, correct?

11  A.   That's correct.

12  Q.   So, you're here testifying as a civilian.  You had

13  no authority as a police officer or lieutenant in the

14  investigation, correct?

15  A.   That is correct.

16  Q.   But yet you have your shield in your jacket today;

17  is that correct?

18  A.   Yes, it is.

19  Q.   Any reason for that?

20  A.   I am a on-duty police officer.

21          MR. HAYDEN:  Objection.

22          THE COURT:  Sustained.  Strike that and

23      disregard it.

24  Q.   You're here as a civilian testifying, correct, not

25  as a lieutenant, correct?

1     A.   Today I am a an on duty police officer.

2     Q.   But regarding your testimony here today, it wasn't

3 as your official duties regarding the investigation of Bobby

4 Calabrese; isn't that correct, Lieutenant?

5     A.   Yes, that is correct.

6     Q.   And you now testified that you know Bobby Calabrese

7 for many years; isn't that correct?

8     A.   Yes.

9     Q.   And, you remember his height.  Is he about 5'7"?

10    A.  5'7", 5'8".

11    Q.   And, his weight was 160 pounds; isn't that

12 correct?

13    A.   Yes.

14    Q.   And, did you also know he was uninvolved with

15 illegal activity?

16    A.   No, I did not.

17    Q.   You didn't know he was involved with gambling,

18 correct?

19    A.   That is correct.  I did not know.

20    Q.   You didn't know he was a runner regarding gambling,

21 correct?

22    A.   I did not know.

23           MR. LEMKE:  I have nothing further.  Thank

24    you.

25           MR. HAYDEN:  Nothing, Your Honor.



1          THE COURT:  Thank you.

2          (Witness excused.)

3          MR. HAYDEN:  Detective Nystrom.

4    DAVID R. NYSTROM, detective, called as a witness on behalf of

5          the People, after having been first duly sworn, and

6          having stated his shield number as 887, and his command

7          as Crime Scene Unit, Nassau County Police Department,

8          took the witness stand and testified as follows:

9    DIRECT EXAMINATION

10   BY MR. HAYDEN:

11          THE CLERK:  Is it detective?

12          THE WITNESS:  Yes.

13          THE CLERK:  Have a seat.

14      State your name, spelling your last name, give your

15      shield number and command.

16          THE WITNESS:  My name is Detective David R.

17      Nystrom, N-Y-S-T-R-O-M, shield 887.

18          THE COURT:  Good morning.

19      Mr. Hayden.

20   Q.   Good morning, detective.

21   A.   Good morning.

22   Q.   How long have you been a member of the Nassau

23   County Police Department?

24   A.   Nineteen years.

25   Q.   How long have you been a detective?

Nystrom - People - Direct

1    A.    Two years.

2    Q.    How long with crime scene?

3    A.    Three and-a-half years.

4    Q.    Briefly describe your duties with crime scene?

5    A.    Crime scene we respond to crime scenes to document,

6    through photography, video, and sketching.  We locate,

7    collect and package evidence at the scenes to be processed.

8    Q.    Directing your attention to around nine o'clock on

9    the night of Friday, December 3, 2004.

10   Were you working then?

11   A.    Yes, I was.

12   Q.    Describe the weather that night?

13   A.    It was cold and it was windy.

14   Q.    Were you notified at around nine that night to

15   respond to the vicinity of Broadway, south of Georgia Avenue

16   in North Long Beach?

17   A.    Yes, I was.

18   Q.    Is that in Nassau County, state of New York?

19   A.    Correct.

20   Q.    Did you respond to that location?

21   A.    Yes, I did.

22   Q.    When did you arrive?

23   A.    It was approximately 10:20.

24   Q.    Describe the area?

25   A.    It's a commercial area.  Broadway runs south off

Nystrom - People - Direct

1   Georgia Avenue which is adjacent to Austin Boulevard which is

2   a main thoroughfare.  The area is a commercial area, lightly

3   traveled at night, poorly lit.

4        Q.   Was there a 7-Eleven in that area?

5        A.   Yes.

6        Q.   Where was the 7-Eleven?

7        A.   In reference to, it's at the intersection of Austin

8   Boulevard, Georgia Avenue and Broadway.

9        Q.   Describe the lighting?

10       A.   Poor.

11       Q.   Did you see an automobile when  you arrived?

12       A.   Yes, I did.

13       Q.   Describe it?

14       A.   It's a gray Infiniti, four door sedan, lights on

15   and running.

16       Q.   Engine was running?

17       A.   Yes.

18       Q.   Where was the Infiniti?

19       A.   It was parked on the east side of Broadway, facing

20   north, and about sixty feet south of the 7-Eleven store.

21       Q.   Was that Cadillac in the vicinity of the Infiniti?

22       A.   Yes.

23       Q.   Where was the Cadillac?

24       A.   That was about sixty feet south of the Infiniti on

25   the same side of the roadway.

1    Q.   Did you see a young man name Bobby Calabrese when

2    you arrived in that vicinity?

3    A.   Yes, I did.

4    Q.   Where was Bobby Calabrese?

5    A.   He was lying face down in the roadway, just south

6    west of his vehicle.

7    Q.   What was he wearing?

8    A.   Gray sweats.

9    Q.   Describe any observations you made of Bobby

10   Calabrese when you saw him then?

11   A.   Again he was lying face down in the roadway, his

12   arms were up, around his head and there appeared to be

13   multiple gunshots to the back of his head.

14   Q.   Describe any observations you made of the sweat

15   shirt?

16   A.   The sweat shirt was cut, and there were a couple of

17   bullet holes in the back of the sweat shirt.

18   Q.   Where was it cut?

19   A.   Up the center.  The sweat shirt was also pulled up

20   around his head and neck area.

21   Q.   Was any money recovered from Bobby's clothing?

22   A.   Yes, there was a $20 bill from his right front

23   pocket.

24   Q.   Were those sweat pants?

25   A.   Yes.

Nystrom - People - Direct

1     Q.   Was any money recovered from Bobby's vicinity?

2     A.   No.

3     Q.   Was any weapon recovered from Bobby's clothing?

4     A.   No.

5     Q.   Was any weapon recovered from Bobby's vicinity?

6     A.   No.

7     Q.   Was any money recovered from the Infiniti while it

8     was there at the scene?

9     A.   No.

10    Q.   Was any money recovered in the vicinity of the

11    Infiniti?

12    A.   No.

13    Q.   Was any weapon recovered from the Infiniti?

14    A.   No.

15    Q.   Was any weapon recovered from the, in the vicinity

16    of the Infiniti?

17    A.   No.

18    Q.   Did you photograph the vicinity where you saw Bobby

19    Calabrese's body?

20    A.   Yes, I did.

21         MR. HAYDEN:  Your Honor, may I please have

22    these ten photographs which have been marked 1 through

23    10 shown to the witness.

24         THE COURT:  Yes.

25         THE COURT OFFICER:  Witness has People's 1

MO

Nystrom - People - Direct

1          through 10 for identification.

2          Q.    Do you recognize those photographs?

3          A.    Yes, I do.

4          Q.    Are those photographs you took while you were in

5     the vicinity of Broadway and Georgia Avenue that Friday

6     night?

7          A.    Yes.

8          Q.    Are those photographs fair and accurate

9     representations of the way that vicinity appeared while you

10    were there that Friday night?

11         A.    Correct.

12                MR. HAYDEN:  People offer those, Your Honor,

13         as 1 through 10 in evidence.

14                MR. LEMKE:  I don't believe I will have an

15         objection but brief voir dire, please.

16                THE COURT:  Yes.

17    Voir dire EXAMINATION

18    BY MR. LEMKE:

19                MR. LEMKE:  Detective on December 3, 2004, you

20         told this jury you took these photographs.

21                THE WITNESS:  Yes.

22                MR. LEMKE:  When you arrived, you weren't the

23         first detective or officer at the scene; is that

24         correct?

25                THE WITNESS:  That's correct.

1          MR. LEMKE:  In fact, in some of these items

2     which have been marked for identification purposes, 1

3     through 10, there is a sweat shirt that is cut that is

4     depicted in this photograph; is that correct?

5          THE WITNESS:  Yes.

6          MR. LEMKE:  You did not cut that sweat shirt

7     yourself, did you?

8          THE WITNESS:  No, I didn't.

9          MR. LEMKE:  In fact, there is also a T-shirt

10    that is depicted in these photographs; is that correct?

11         THE WITNESS:  Yes.

12         MR. LEMKE:  And, that T-shirt is not cut,

13    correct?

14         THE WITNESS:  That's correct.

15         MR. LEMKE:  And when you arrived there at the

16    scene, there were other police officers there before

17    you, correct?

18         THE WITNESS:  Yes.

19         MR. LEMKE:  How many were there?

20         THE WITNESS:  The exact number I couldn't tell

21    you, ten, twelve people.

22         MR. LEMKE:  So, there's been at least ten or

23    twelve people there and the T-shirt that you took the

24    photograph of was not cut, correct?

25         THE WITNESS:  That's correct.

Nystrom - People - Direct

1    MR. LEMKE:  And it wasn't pulled over his head

2    correct, was it?

3    THE WITNESS:  No.

4    MR. LEMKE:  And the sweat shirt itself has a

5    hood; isn't that correct.

6    THE WITNESS:  Yes.

7    MR. LEMKE:  And the hood itself was not cut,

8    was it.

9    THE WITNESS:  I believe it's partially cut.

10   MR. LEMKE:  Okay.  Well, could I have this --

11   well, first of all, if People's 5 for identification

12   could be shown to the witness for a second.

13   THE COURT:  Yes.

14   THE COURT OFFICER:  The witness has

15   People's 5.

16   MR. LEMKE:  You took that photograph,

17   correct?

18   THE COURT OFFICER:  Yes.

19   MR. LEMKE:  That is a fair depiction as to the

20   manner in which the sweat shirt was cut up to the hood;

21   isn't that correct?

22   THE WITNESS:  Yes.

23   MR. LEMKE:  Okay.  And, in fact, the hood was

24   still over his head, correct?

25   THE WITNESS:  The way you see it in the

1   picture is the way it was when I got there.

2           MR. LEMKE:  Okay.  So, that would be self

3   explanatory, correct?

4           THE WITNESS:  Correct.

5           MR. LEMKE:  I have no objection to these

6   photographs going into evidence.

7           THE COURT:  Please mark them in as People's 1

8   through 10 in evidence.

9           THE COURT OFFICER:  People's exhibit 1 through

10  10 have been marked in evidence.

11          MR. HAYDEN:  Your Honor, with the Court's

12  permission, may I present these to the jurors using the

13  presenter and have Detective Nystrom describe what each

14  depicts.

15          THE COURT:  Yes.

16      Detective, please step down and stand to the right

17  of that presenter.

18  Q.   Now placing one on the presenter.

19  Please describe what that photograph depicts?

20  A.   This photograph shows Broadway looking south.

21  7-Eleven store up on my right hand side here.  The light you

22  see in the picture is from our Nassau County police light

23  truck to illuminate the scene so we can process the scene.

24  This is Bobby Calabrese's Infiniti.  This is him lying in the

25  roadway.  And this is the Cadillac that was mentioned before

Nystrom - People - Direct

1    parked about sixty feet south of the Infiniti.

2         Q.   I am now placing 2 on the present.

3         Please describe what that depicts?

4         A.   That is the same depiction just a little bit closer

5    showing again the Infiniti, Bobby Calabrese in the roadway,

6    the Cadillac.  And this is Broadway looking south.

7         Q.   I am now placing 3 on the presenter.

8         Describe what that depicts?

9         A.   That's Broadway south again, the Infiniti

10   headlights are on.  Bobby Calabrese in the roadway.  As you

11   can see he is just southwest of his vehicle to the rear of

12   the vehicle.

13        Q.   I am now placing 4 on the presenter.

14        Please describe what that depicts?

15        A.   This is Bobby Calabrese in the roadway face down.

16   His arm up above around his head.  Blood in the roadway.  And

17   this is looking west across Broadway from the east curb

18   line.  And the Infiniti would be over here to the northeast

19   of him.

20        Q.   I am now placing 5 on the presenter.

21        A.   This is a closer photo, same direction, looking

22   west across the roadway, his arms here, the cut in the sweat

23   shirt which was mentioned before.

24        Q.   I am now placing 6 on the presenter.

25        A.   This is looking south in the direction south on

1  Broadway at the back of Bobby's lead.  And you can see two

2  gunshot wounds to the back of his head.  His arms up above

3  his head.

4      Q.   I am now placing 7 on the presenter.

5      A.   This photo is looking across Broadway.  As you can

6  see the Infiniti, Bobby's car again.  Bobby Calabrese in the

7  roadway, Broadway.  And this is the 7-Eleven that was

8  mentioned.  This is Broadway going north in this direction,

9  and Georgia Avenue runs east/west at the top of the block of

10 7-Eleven.

11     Q.   I am now placing 8 on the presenter.

12     A.   Okay.  This is south of the scene, looking

13 northbound on Broadway.  Again, Bobby Calabrese in the

14 roadway.  His vehicle parked on the east side curb line.

15     Q.   I am now placing 9 on the presenter?

16     A.   Same direction photo just a little bit back further

17 to give you a better perspective.  This is Broadway looking

18 north.  Bobby Calabrese in the roadway.  His Infiniti on the

19 east curb line.  And this is Nassau County police light truck

20 illuminating the roadway.

21     Q.   I am now placing 10 on the presenter.

22     Describe what that depicts.

23     A.   This is a photo of Bobby Calabrese sweat shirt

24 depicting blood holes with a scale which I placed for

25 measurement purposes.

1      Q.   Please retake the witness stand.

2      Was a part of the bullet recovered at the scene of the

3   shooting?

4      A.   Yes, there was.

5      Q.   Describe the part of the bullet?

6      A.   There's a lead core of the bullet and a copper

7   jacketing which surrounds the bullet.

8      Q.   When you say bullet, are you talking about the

9   projectile?

10     A.   Correct.

11     Q.   The part of a cartridge that comes out through the

12   nuzzle of a barrel?

13     A.   Yes.

14     Q.   What part of the bullet recovered at the scene of

15   the shooting?

16     A.   A copper jacketing.

17     Q.   Who first noticed that copper jacket?

18     A.   That was Dr. O'Reilly from the medical examiner's

19   office.

20     Q.   Describe what happened when he noticed it?

21     A.   Upon completion of my processing of the scene and

22   his examination of Bobby's body, he turned the body over and

23   was feeling through the blood on the roadway and the front of

24   Bobby's body and recovered the copper jacket on the front of

25   his sweat shirt.

MO

Nystrom - People - Direct

1      Q.    What happened then?

2      A.    He recovered it off the sweat shirt and turned it

3  over to me.

4      Q.    What did you do with it?

5      A.    I packaged it in a plastic box, then into a bag,

6  and handed it over to Detective DiBeneditto of our ballistics

7  section.

8      Q.    Is that Jim DiBeneditto?

9      A.    Yes.

10     Q.    Was any other bullet fragments or bullet or parts

11 of a bullet recovered at the scene of the shooting?

12     A.    No.

13     Q.    Was the area searched for other bullets or bullet

14 fragments?

15     A.    Yes.

16     Q.    How?

17     A.    With a metal detector with a rake along the curb

18 line and surrounding grass area and visually by eye with a

19 flashlight.

20     Q.    What was the result?

21     A.    It was negative.

22          MR. HAYDEN:  May I please have People's 26 for

23      identification shown to the witness.

24          THE COURT:  Yes.

25          THE COURT OFFICER:  The witness has 26 for

1         identification.

2         Q.    Please take a look at the contents of that clear

3    plastic bag?

4         A.    Yes.

5         Q.    Do you recognize anything?

6         A.    Item number 1 in the bag, a copper jacketing.

7         Q.    Does that appear to be the copper jacket that you

8    recovered there at the scene of the shooting?

9         A.    Yes.

10        Q.    Does that appear to be the clear plastic box in

11   which you placed that copper jacket?

12        A.    T he box is not up here.  There is just the bag in

13   here.  It's not in the box I packaged it in.  It's not.

14   Here:

15        Q.    Do you see the bag in which you placed it in?

16        A.    No.

17        Q.    Could I see that for a moment.

18   What you see is basically just what appears to be the

19   copper jacket?

20        A.    Yes.

21        Q.    Was any DNA fingerprint or other forensic evidence

22   recovered at the scene of the murder?

23        A.    No.

24        Q.    Did you eventually examine the Infiniti?

25        A.    Yes, I did.

Nystrom - People - Direct

```
1     Q.   Where did you do that?

2     A.   At our Nassau County Police Highway Patrol building

3   leaked at 1255 Newbridge Road in North Bellmore.

4     Q.   Did you remove material from the outside of the

5   Infiniti rear window?

6     A.   Yes, I did.

7     Q.   Describe that material?

8     A.   It was possible human tissue, reddish color.

9     Q.   Was that material eventually submitted for DNA

10  analysis?

11    A.   Yes.

12    Q.   What was the result?

13    A.   Came back to Bobby Calabrese.

14    Q.   Did you examine the outside of the Infiniti for

15  fingerprints?

16    A.   Yes, I did.

17    Q.   Did that include the door handles?

18    A.   Door handles, windows, body passages.

19    Q.   What was the ultimate results?

20    A.   That was negative also.

21    Q.   No identifiable fingerprint?

22    A.   That's correct.

23    Q.   Did you recover a wallet from inside the Infiniti?

24    A.   Yes.

25    Q.   Where was the wallet?
```

| | |
|---|---|
| 1 | A. The front seat console area. |
| 2 | Q. Describe the contents of the wallet? |
| 3 | A. Personal papers, driver's license and approximately |
| 4 | $39. The papers and license were Bobby Calabrese's. |
| 5 | Q. Did you recover any kind of weapon from inside the |
| 6 | Infiniti? |
| 7 | A. No, I did not. |
| 8 | Q. Did you search the inside of the Infiniti? |
| 9 | A. Yes, I did. |
| 10 | Q. Nothing? |
| 11 | A. No: |
| 12 | Q. Did you help generate a computerized sketch of the |
| 13 | murder scene? |
| 14 | A. Yes. |
| 15 | Q. Is the sketch based on your measurements? |
| 16 | A. That's correct. |
| 17 | Q. Has the sketch been enlarged and mounted? |
| 18 | A. Yes. |
| 19 | MR. HAYDEN:  May I please have 27 for |
| 20 | identification shown to the witness, Your Honor. |
| 21 | Q. Do you recognize that? |
| 22 | A. Yes, I do. |
| 23 | Q. What is it? |
| 24 | A. That is a sketch of the scene that has been |
| 25 | generated and enlarged based on my measurements. |

1    Q.   Is that based on your measurements?

2    A.   That's correct.

3    Q.   Is that a fair and accurate representation of the

4    road and building configuration as it was back on the night

5    of Friday, December 3, 2004?

6    A.   Yes.

7         MR. HAYDEN:   The People offer that into

8    evidence, Your Honor.

9         MR. LEMKE:   No objection.   We have seen it.

10   Thank you.

11        THE COURT:   Mark it in evidence.

12        THE COURT OFFICER:   People's 27 marked in

13   evidence.

14        THE COURT:   While that is being marked,

15   counsel, approach, please.

16        (Whereupon, there was a bench conference held off

17   the record.)

18        THE COURT:   27 has been marked in evidence is.

19        MR. HAYDEN:   May I display this to the jury,

20   please.

21        THE COURT:   Yes.

22   Q.   Detective, please step down and describe for the

23   jury what this depicts?

24   A.   This is a map showing Broadway, place of the

25   murder, and the surrounding blocks and buildings.   This is

1   the 7-Eleven that has been mentioned.  Austin Boulevard, the

2   main thoroughfare, which is running northeast.  Georgia

3   Avenue comes in at the top here, and Broadway coming down.

4   This is south.  That is north.  This is Bobby's Infiniti

5   parked here at the east side curb line.  This figure here is

6   Bobby's body lying in the roadway.  Number one is a lighter

7   which was recovered in the vicinity of Bobby's body.  Number

8   two and number three are cigarettes butts which were also

9   recovered at the scene in the vicinity of the vehicle and

10  Bobby's body.

11      Q.   You say that number one is a cigarette lighter?

12      A.   Yes.

13      Q.   Was that submitted to the latent fingerprint unit

14  for analysis?

15      A.   Yes.

16      Q.   What was the result?

17      A.   It was negative results.

18      Q.   No identifiable latent fingerprint?

19      A.   That's correct.

20      Q.   Each of those two cigarettes butts which you

21  designated as two and three, were each of those submitted for

22  DNA analysis?

23      A.   Yes, sir, they were.

24      Q.   What was the result?

25      A.   They were also negative.

1    Q.    Please take the witness box.

2    Did you videotape the scene of the murder?

3    A.    Yes, I did.

4    Q.    Have you seen and marked a copy of that videotape?

5    A.    Yes.

6    Q.    How did you mark it?

7    A.    My initials and the date.

8         MR. HAYDEN:   May I please have 28 for

9    identification shown to the witness, Your Honor.

10        THE COURT:   Yes.

11   Q.    Do you recognize that?

12   A.    Yes.

13   Q.    Is that your videotape of the scene of the murder?

14   A.    Yes.

15   Q.    Is that videotape a fair and accurate

16   representation of the way that murder scene appeared while

17   you were there that Friday night?

18   A.    That's correct.

19        MR. HAYDEN:   People offer that in evidence,

20   Your Honor.

21        MR. LEMKE:   We have seen it.   No objection.

22        THE COURT:   Okay.   Mark it in evidence.

23        MR. HAYDEN:   May we take a brief break, Your

24   Honor?

25        THE COURT:   The Court will stand in recess for

MO

Nystrom - People - Direct

1    five minutes, ladies and gentlemen.   Same admonitions

2    apply.   Do not discuss the case among yourselves.

3          Take a brief five minute recess.   Okay.

4                (Whereupon, the following takes place outside

5    the presence of the jury.)

6                THE COURT:   You may step down.

7          Take a five minute recess.

8          (Whereupon, there was a recess in the proceedings.)

9                THE COURT OFFICER:   Ready for the jury, Your

10   Honor.

11               THE COURT:   Yes.

12               THE COURT OFFICER:   Jury entering.

13               THE COURT OFFICER:   Those jurors taking notes

14   make sure you have the right book.   Let's make sure your

15   numbers correspond.

16               A JUROR:   I don't have mine.

17               THE CLERK:   Continued case on trial, 167N-05,

18   People against Mark Orlando.

19         People ready?

20               MR. HAYDEN:   People ready, Your Honor.

21               THE CLERK:   Defendant ready?

22               MR. LEMKE:   Yes.

23               MR. LEMKE:   Defendant ready, Your Honor.

24               THE CLERK:   Let the record reflect the

25   presence of the defendant, the sworn jurors and the

MO

Nystrom - People - Direct

1    alternates.

2                THE COURT:  Okay.  Mr. Hayden, you can

3    continue.  Thank you.

4                MR. HAYDEN:  Yes, Your Honor.

5         With the Court's permission, I'd like to play the

6    videotape for the jury and have the detective step down

7    and narrate for them.

8                THE COURT:  Yes, you may step down.

9         A.    Title sheet to the video stating my name, the date

10   and location.    South on Broadway, surrounding area showing

11   the commercial type of area, Infiniti on the east side.

12   Broadway.  Started out at a distance to show the whole area,

13   then we come in with the video camera and pick up on the key

14   points, any type of crime scene.

15        I am moving in on the vehicle which is running with the

16   lights on, Bobby's body in the roadway.  Another vehicle

17   which had been parked on the other side of the roadway and

18   the Cadillac behind it.  Showing the sides, the front of the

19   vehicle, the plate to identify the car.  Surrounding area,

20   condition of the vehicle, you see the exhaust coming up,

21   Bobby's body in proximity to the vehicle to the southwest of

22   the vehicle.  Bobby's arms up above his head, face down in

23   the roadway.  Cut sweat shirt.  Blood in the roadway.  Injury

24   to the back of his head.

25        Again, his arm up, blood in the roadway coming from his

Nystrom - People - Direct

1    body.  See the sweat shirt blowing around because of the wind

2    that night.  Lighter that is mentioned in the proximity of

3    the body.  All over his body on the left side.  Again the

4    injury to the back of his head.  Showing the proximity of him

5    to the rear of vehicle, rear plate on the vehicle.  See the

6    exhaust, car is left running.

7        Surrounding area, curb line, the grass, and the fence

8    line.  Looking west across Broadway from the east curb line.

9        Again we're illuminating the scene with a hand held light

10   video calm and the light truck down the block due to the fact

11   there is poor lighting on that roadway.

12       Another vehicle that was pulled up on the west side of

13   the roadway.  This is just showing a tire print in the mud on

14   the west curb line of the roadway.  Just looking north

15   Broadway, left side of his vehicle.  Again the Cadillac which

16   was further down the roadway behind his vehicle on an east

17   curb line.  Overall roadway showing what is around.

18       That is it.

19                MR. HAYDEN:  May I proceed?

20                THE COURT:  Yes, Mr. Hayden.

21   Q.   Are you familiar with the term cell site tower?

22   A.   Yes.

23   Q.   What is a cell site tower?

24   A.   It's a tower that's used to receive and relay cell

25   phone signals.

Nystrom - People - Direct

1    Q.    Where was the closest cell site tower to the scene

2    of the murder?

3    A.    It was approximately a quarter mile north of that

4    location, north of Georgia Avenue.

5    Q.    Has a geographic information system map been

6    generated depicting the vicinity of the murder?

7    A.    Yes.

8    Q.    It's location within Nassau County?

9    A.    Yes.   Correct.

10   Q.    What do you mean by a geographic information system

11   map?

12   A.    It's basically a satellite photo showing the

13   geography of a certain area.

14           MR. HAYDEN:   Your Honor, may I please have 29

15       for identification shown to the witness.

16           THE COURT:   Yes.

17   Q.    Do you recognize that?

18   A.    Yes, I do.

19   Q.    What is it?

20   A.    That is a GIS satellite map that was generated and

21   enlarged.

22   Q.    In conjunction with this investigation?

23   A.    Correct.

24   Q.    Is that map a fair and accurate depiction of the

25   layout area, road and building configuration in the vicinity

MO

Nystrom - People - Direct

1    of the murder as it was that Friday night, December 3, 2004?

2        A.    Yes.

3            MR. HAYDEN:    The People offer that in

4    evidence, Your Honor.

5            MR. LEMKE:    No objection, Your Honor.   We have

6    seen it.

7            THE COURT:    People's 29 in evidence.

8            THE COURT OFFICER:    People's 29 marked in

9    evidence.

10           MR. HAYDEN:    With the Court's permission, may

11   I display this to the jury and have Detective Nystrom

12   describe what it depicts.

13           THE COURT:    Would you like the detective to

14   step down.

15           MR. HAYDEN:    Please.

16       A.    This is the satellite photo showing the Island

17   Park;, North Long Beach area, Long Beach, and Meadowbrook

18   Parkway, Wantagh Parkway.   This is the place of, this is the

19   location of the murder where the yellow pointing in, coming

20   down.   This is Austin Boulevard which comes across into Long

21   Beach, Park Avenue, Lido Boulevard, which leads to the Loop

22   Parkway which comes into Meadowbrook Parkway, and goes down

23   into Jones Beach area, and then the Wantagh Parkway, Loop

24   Channel Bridge under construction right now.   Wantagh Parkway

25   coming up to Sunrise Highway in the vicinity of CitiBank and

MO

Nystrom - People - Direct

1    Wantagh Suzuki dealership.  They're both on Sunrise Highway.

2         Q.   Did you determine mileage between points designated

3    on that Geographic Information System Map?

4         A.   Yes, I did.

5         Q.   Tell the jury how you did that?

6         A.   In a crime seen department vehicle, vehicle 1001, I

7    clocked it from the place of occurrence down that route I

8    just described.

9         Q.   When did you drive from one designated point to

10   another?

11        A.   It was a Saturday, around noontime.

12        Q.   Describe the traffic then?

13        A.   Traffic was moderate.

14        Q.   Describe your speed?

15        A.   Speed varied from 30 to 35, depending on the speed

16   limit on the roadway and the traffic as well.

17        Q.   Where did you begin driving?

18        A.   Started on Broadway by the 7-Eleven at the place of

19   the murder.

20        Q.   Where did you finish?

21        A.   Drove up Georgia Avenue and finished up by a

22   Wantagh CitiBank on Sunrise Highway in Wantagh.

23        Q.   Describe the route you took?

24        A.   Went north on Broadway to Georgia Avenue, made a

25   left on Georgia, left, right onto Austin Boulevard, as you

Nystrom - People - Direct

1    saw on the smaller map it's just a, two left turns.  Came

2    down Austin Boulevard over into Long Beach onto Park Avenue.

3    Made a left onto Park Avenue, traveled on Ludy Road, all the

4    way to the Loop Parkway north.  Then east on the Loop Parkway

5    to the Meadowbrook, came down on the Meadowbrook down to

6    Jones Beach, continued to the water tower on Jones Beach, and

7    continued up Wantagh Parkway, over the bridge up to Sunrise

8    Highway.  Got off the exit eastbound on Sunrise Highway.

9         Q.    How many miles between the scene of the murder and

10   the Loop Channel Bridge?

11        A.    Thirteen miles.

12        Q.    How long did it take you to get there?

13        A.    Twenty-one minutes.

14        Q.    How many miles between the scene of the murder and

15   the Sunrise Highway exit for the Wantagh Parkway?

16        A.    17/4 miles.

17        Q.    How long did it take you to get there?

18        A.    That took just under twenty-six minutes.

19        Q.    How many miles between the scene of the murder and

20   the Wantagh CitiBank branch on Sunrise Highway?

21        A.    That was 17.6 miles.

22        Q.    How long did it take you to get there?

23        A.    Twenty-seven minutes.

24        Q.    How about the Wantagh Suzuki?

25        A.    That is just before the CitiBank.  That was

Nystrom - People - Direct

1    twenty-six minutes, seventeen and-a-half miles.

2        Q.   Please retake the witness stand.

3        Were aerial photographs taken of the scene of the murder

4    and the surrounding area?

5        A.   Yes.

6        Q.   Have you seen those aerial photographs?

7        A.   Yes.

8        Q.   Have they been mounted for courtroom display?

9        A.   Yes.

10       Q.   Are the photographs fair and accurate

11   representations of the roads, buildings, land and see

12   configuration as they were in the vicinity of the murder that

13   Friday night, December 3, 2004?

14       A.   Yes, they are.

15            MR. HAYDEN:   Your Honor, may I please have

16       these five photographs which have been marked 30, 31,

17       32, 33 and 34 shown to the witness, please.

18            THE COURT:   Yes.

19            THE COURT OFFICER:   The witness has People's

20       30 to 34 for identification.

21       Q.   Do you recognize those?

22       A.   Yes, I do.

23       Q.   Are those the five mounted aerial photographs about

24   which you just testified?

25       A.   Correct.

Nystrom - People - Direct

```
 1              MR. HAYDEN:  The People offer those in

 2       evidence.

 3              MR. LEMKE:  No objection, Your Honor.  We have

 4       seen them.

 5              THE COURT:  Mark them into evidence 30, 31,

 6       32, 33 and 34.

 7              THE COURT OFFICER:  People's exhibit 30, 31,

 8       32, 33 and 34 have been marked in evidence.

 9              MR. HAYDEN:  May I have those returned to the

10       witness, Your Honor?

11              THE COURT:  Yes.

12              MR. HAYDEN:  May I please have yellow markers

13       given to the detective?

14              THE COURT:  Yes.

15       Q.    Detective, using those markings that have just been

16       given to you, some of which designate a scene, would you

17       please place a marker on each one of those photographs

18       showing the jury where the scene is with relation to the

19       photograph?

20       A.    Yes.

21       Q.    Does one of those photographs depict the nearest

22       cell site tower to the vicinity of the murder?

23       A.    Yes.

24       Q.    One of those markers has been designated cell site

25       tower.  Do you see that?
```

1      A.    Yes, I do.

2      Q.    Would you please place that in the vicinity of the

3   cell site on that photograph?

4      A.    Okay.

5              THE COURT:  Could you for the record tell us

6         what photograph that is from the back.

7              THE COURT OFFICER:  People's 32 in evidence.

8              THE COURT:  People's 32.  Thank you.

9              MR. HAYDEN:  Your Honor, may I display those

10        photographs to the jury and have Detective Nystrom step

11        down and describe what each depicts.

12             THE COURT:  Yes.

13     Q.    I am now placing 30 on the presenter.

14   Would you describe for the jury that?

15     A.    That is an aerial photo of the scene of the

16   murder.  The yellow dot is marking the scene of the murder on

17   Broadway.  To my right is the northerly direction.  To my

18   left is a south direction.  We're looking west across

19   Broadway and Austin Boulevard.  This is the main roadway.

20   Austin boulevard which runs north/south.  This is Georgia

21   Avenue coming off of Austin Boulevard.  This is Broadway

22   going south/north.  This is 7-Eleven in the vicinity of the

23   murder.  The boat yard which I described in the video.  And

24   the yellow dot again where Bobby's car was parked on the east

25   side which is this side of the roadway facing north.

Nystrom - People - Direct

1      Q.   I am now placing 31 on the presenter.

2      Describe that, please?

3      A.   Another angle of the same location looking

4   eastbound.  Again, Austin Boulevard, this is north, that is

5   east, that is south.  The scene of the murder on Broadway,

6   Georgia Avenue, intersects with Austin Boulevard and

7   Broadway.  Again the boat yard and the 7-Eleven store.

8      Q.   I am now placing 32 on the presenter.

9      Describe what that depicts?

10      A.   This is an aerial photo looking south to the

11   location of the murder which is marked by this yellow dot.

12   That is Broadway which is running here.  Austin Boulevard

13   here.  See the water here, the boat yards are, dot on the

14   left of that yellow dot and right here, what this yellow dot

15   is the marked cell tower that was just mentioned.

16      Q.   I am now placing 33 on the presenter.

17      A.   This aerial photo is looking northbound towards the

18   scene up Austin Boulevard, Broadway is right here, 7-Eleven

19   store you can see in the photo.  And again the yellow dot is

20   the scene of the murder, and the sell tower is located in

21   this green area just north of the murder scene.

22      Q.   I am now placing 34 on the presenter.

23      A.   Again, an aerial photo looking northeast, same,

24   little more northeast.  This is showing the railroad, Austin

25   Boulevard, Broadway again runs here.  This is the location of

Nystrom - People - Direct

1    the murder.  The boat yards are to the yellow dot's right.

2    And the cell tower is north of that yellow dot.

3         Q.    Please retake the witness box.

4              MR. HAYDEN:  May I please have 35 for

5    identification shown to the witness?

6              THE COURT:  Yes.

7              THE COURT OFFICER:  The witness has 35 for

8    identification.

9         Q.  Do you recognize the contents of that clear plastic

10   bag?

11        A.   Yes, I do.

12        Q.   Do those contents include the sweat shirt you saw

13   Bobby Calabrese wearing when you observed him that Friday

14   night?

15        A.   Yes.

16             MR. HAYDEN:  May I please have this clear

17   plastic bag marked 53 for identification shown to the

18   witness.

19             THE COURT OFFICER:  The witness has 53 for

20   identification.

21        Q.   Do you recognize some of the contents of that clear

22   plastic bag?

23        A.   Yes, I do.

24        Q.   Do the contents you recognize include the plastic

25   box you use to contain that copper jacket?

Nystrom - People - Direct

1    A.    Yes.

2        Q.    Do those contents also include the paper bag, the

3    brown paper bag you used to contain the clear plastic box

4    with the copper jacket before you gave it to Detective

5    DeBeneditto?

6        A.    Yes.

7            MR. HAYDEN:  Nothing further at this time,

8        Your Honor.  Thank you.

9            THE COURT:  Thank you.

10           MR. LEMKE:  May I, Your Honor?

11           THE COURT:  Yes, Mr. Lemke.

12           MR. LEMKE:  Thank you.

13   CROSS EXAMINATION

14   BY MR. LEMKE:

15       Q.    Detective, I take it you're fully family with the

16   area of Island Park?

17       A.    Fully familiar meaning all the road ways.

18       Q.    Regarding Austin and Broadway?

19       A.    In that vicinity of the murder, yes.

20       Q.    Okay.  On December 3, 2004, you were involved with

21   an investigation; is that correct?

22       A.    Yes.

23       Q.    And, as part of your investigation I take it you're

24   either contacted or dispatched to respond to a particular

25   scene; isn't that correct?

1     A.   That's correct.

2     Q.   And there came a point in time at about nine

3  o'clock, nine p.m., you arrived on South Broadway?

4     A.   No, that is not correct.

5     Q.   What time did you arrive there?

6     A.   The office was contacted, the arrival time was

7  about 10:22.

8     Q.   Okay.  So, at about 10:22 which would be 10:22 that

9  night?

10     A.   That night.

11     Q.   All right.  Now, when did you first receive the

12  phone call?

13     A.   The office took the phone call around nine

14  o'clock.

15     Q.   You arrived over an hour and-a-half later?

16     A.   Yes.

17     Q.   When you arrive at about hour and-a-half later

18  there already had been at least ten to twelve other officers

19  or emergency personnel, correct?

20     A.   That's correct.

21     Q.   When you had arrived, were you alone in your

22  vehicle?

23     A.   No, I wasn't.

24     Q.   Who was with you?

25     A.   Detective Mike Fannin (phon.).

1    Q.   Detective Fannin was with you?

2    A.   Yes.

3    Q.   When you had arrived, are you part of the Crime

4    Scene Search Unit?

5    A.   Yes.

6    Q.   So, when you arrive you basically have a, I think a

7    van with various equipment in it, correct?

8    A.   That's correct.

9    Q.   Including overhead lights, correct?

10   A.   Yes.

11   Q.   And anything else that may be necessary in

12   collecting any type of evidence which may assist in the

13   investigation to determine what caused the death of, in this

14   case, Mr. Calabrese; isn't that correct?

15   A.   Yes.

16   Q.   When you had arrived, I would probably think that

17   some of the area was cordoned off, correct?

18   A.   A ha, yes.

19   Q.   Probably not with the crime scene tape or had that

20   been cordoned off when you got there?

21   A.   It was cordoned off.

22   Q.   When you had gotten there, you also have video

23   equipment, correct?

24   A.   Correct.

25   Q.   And, the location that you saw Mr. Calabrese was on

1    the west side of South Broadway; is that correct?

2         A.   No, his vehicle was on the east side of Broadway.

3         Q.   I am sorry.  The east side, correct?

4         A.   Yes.

5         Q.   Facing?

6         A.   North.

7         Q.   North?

8         A.   Correct.

9         Q.   And, Mr. Calabrese was laying face down, correct?

10        A.   Yes.

11        Q.   South of his vehicle, correct?

12        A.   Correct.

13        Q.   And, this was on South Broadway, correct?

14        A.   Correct.

15        Q.   And, Austin Boulevard is to the west?

16        A.   Yes.

17        Q.   And Austin Boulevard runs what directions?

18        A.   Basically north/south direction.

19        Q.   And, I believe you testified already regarding what

20   is depicted in I believe this is People's 27 in evidence; is

21   that correct, detective?

22        A.   Yes.

23        Q.   And, this was a sketch that was generated by

24   yourself, correct?

25        A.   Yes.

1    Q.    And, in this depiction, can you see it from where

2    you're sitting?

3    A.    Yes, I can.

4    Q.    We have Austin Boulevard, correct?

5    A.    In the orange.

6    Q.    In the orange.  That is a main thoroughfare, isn't

7    that?

8    A.    Yes.

9    Q.    Is it, it runs north and south, correct?

10   A.    Yes.

11   Q.    And where does it -- it runs south.  Where does it

12   go to?

13   A.    Down to Long Beach.

14   Q.    Does it go along any bridge down in Long Beach?

15   A.    Yes, it goes over the Long Beach Bridge into Long

16   Beach.

17   Q.    There are other ways to get into Long Beach from

18   that location other than taking Austin Boulevard?

19   A.    I am not that familiar with all the roadways around

20   there.

21   Q.    Well, there is water, you got to go over some form

22   of some bridge?

23   A.    Yes.

24   Q.    In fact, there's another exhibit in evidence which

25   has also been marked, as People's 29 in evidence.  I think

1   you had indicated you're familiar with this as well, correct?

2       A.   Yes.

3       Q.   And, People's 29 in evidence also depicts Broadway,

4   correct?

5       A.   The arrow is pointing to the approximate location,

6   place of occurrence.

7       Q.   Okay.   That would be POO, place of occurrence,

8   Broadway?

9       A.   Yes.

10      Q.   And, so this, is this map, would be as you say

11  accurate as to how you would get into Long Beach, correct?

12      A.   Yes.

13      Q.   Which would indicate basically one bridge, correct?

14      A.   Yes.

15      Q.   That is Austin Boulevard, that runs down, correct?

16      A.   That's correct.

17      Q.   So clearly a main thoroughfare, correct?

18      A.   Yes.

19      Q.   And, that Austin Boulevard is, as it runs north/

20  south, in relation to south and north Broadway, which also

21  runs north and south; correct?

22      A.   Yes.

23      Q.   And, in the photographs, depicted in evidence,

24  People's 31, this is Austin Boulevard clearly depicted,

25  correct?

Nystrom - People - Cross

1    A.   I can't see from here what you're pointing at.

2    Q.   I am sorry.  If the detective can be shown?

3         THE COURT OFFICER:  The witness has People's

4    exhibit 31.

5    Q.   That is Austin?

6    A.   Wider roadway in the picture.

7    Q.   Two lanes going north and two lanes going south?

8    A.   Yes.

9    Q.   Coming across is the 7-Eleven.  That is there,

10   correct?

11   A.   7-Eleven right by that yellow dot.

12   Q.   And that road just north is Georgia, isn't it?

13   A.   Yes.

14   Q.   On South Broadway, that runs north/south, how far

15   south does that run from that location?

16   A.   How far south does, does South Broadway run from

17   the yellow dot?

18   Q.   Yes.

19   A.   Probably a couple of blocks.  I don't know.  I

20   didn't drive down that way.

21   Q.   You didn't drive down that way; is that what you're

22   saying?

23   A.   I didn't drive the roadway.  I didn't measure the

24   roadway.

25   Q.   Isn't it true that on South Broadway, if you go

1   south, it only goes about two and-a-half more blocks and it's

2   a dead end; isn't that correct?

3        A.   It might be, like I said, I am not familiar with

4   all the roads in that area.  Just the scene of this location,

5   of the murder.

6        Q.   You just testified where the satellite station is

7   located, the cell site, correct?

8        A.   Yes.

9        Q.   You've done your investigation to determine that if

10  somebody used a cell phone you'd be able to determine whether

11  that cell phone was used within a geographical area; isn't

12  that correct?

13       A.   I didn't testify to that.  I just testified to the

14  location of the cell tower.

15       Q.   Okay.  So, you don't know the significance of that

16  yet; is that it?

17       A.   Correct.  That is not my -- like I said, I just

18  testified to the location of the tower in reference to the

19  murder scene.

20       Q.   Yes.  As far you know, perhaps you don't know, that

21  the significance is that somebody was using a cell phone,

22  okay, that can be shown by the location of a cell site tower;

23  isn't that correct?

24       A.   I don't know.  That is not my specialty.  I am not

25  familiar with how you can determine the usage of a cell phone

1   in reference to a tower.

2        Q.   You were just told to go out and find out how to

3   get to the cell tower?

4        A.   I was told to locate the tower.

5        Q.   Right?

6        A.   In reference to the murder scene.

7        Q.   When you had arrived at the murder scene and you're

8   now videotaping it, you weren't present when this sweat shirt

9   was cut, correct?

10       A.   No, I wasn't.

11       Q.   You don't know how it appeared to the first officer

12  or the first person that saw that, correct?

13       A.   No, I don't.

14       Q.   And, in fact, did you talk to the person that night

15  who cut the sweat shirt?

16       A.   No, I didn't.

17       Q.   Did you make any notations regarding that sweat

18  shirt being cut?

19       A.   Did I make any notations in my paperwork that it

20  was cut?

21       Q.   Yes.

22       A.   It was noted just through photography and video.

23       Q.   You didn't talk to anybody who had cut that?

24       A.   Did I talk to anybody that cut that, no.

25       Q.   When you also had arrived, there's a 7-Eleven which

1    has, from the vehicle, from Mr. Calabrese, about fifty feet

2    up, is a seven 7-Eleven; isn't that true?

3         A.   Yes.

4         Q.   That 7-Eleven, so the jury's not confused, that is

5    a 7-Eleven?

6         A.   Yes.

7         Q.   On December 3, 2004, at 8:30 at night, that

8    7-Eleven was open, wasn't it?

9         A.   Yes, it was.

10        Q.   Sells beer in that 7-Eleven, doesn't it?

11        A.   Yes.

12        Q.   Sells a number of things, correct?

13        A.   Yes, that's correct.

14        Q.   And, in fact, that 7-Eleven, when you pull out,

15   which is in People's 30 in evidence, you can come right out

16   onto Broadway, can't you?

17        A.   That's correct.

18        Q.   And if you come right out onto Broadway and, in

19   fact -- withdrawn.

20        If you're even standing in that parking lot of 7-Eleven

21   you can see Mr. Calabrese's car fifty feet away, correct?

22        A.   I would imagine if you're looking in that

23   direction, you would see it.

24        Q.   Okay.  In fact, from where you're sitting now to

25   the back wall, how many feet in your estimation would that

1    be?

2         A.    Probably about fifty.

3         Q.    From the parking lot of 7-Eleven which is open

4    twenty-four hours?

5         A.    From the back end of 7-Eleven is probably fifty

6    feet to the location of the murder.

7         Q.    Which is between this wall and you, correct?

8         A.    Yes.

9         Q.    Clearly, you can see that location, correct?

10        A.    With proper lighting, yes.

11        Q.    Certainly-Eleven was open.  There was lighting in

12   that parking lot, correct?

13        A.    In the parking lot, yes.

14        Q.    On South Broadway, it's your testimony that you

15   didn't go further down -- withdrawn.

16        If you know, further down South Broadway, there's marinas

17   to the east; isn't that correct?

18        A.    Yes.

19        Q.    And, there's one or two industrial buildings there,

20   correct?

21        A.    On the west hand side.

22        Q.    On the west hand side?

23        A.    Yes.

24        Q.    Correct?

25        A.    Yes.

MO

Nystrom - People - Cross

1       Q.   No other residences down there, correct?

2       A.   Further down, a block or so, there is residential

3   housing on the east side of Broadway.

4       Q.   Okay.  In fact, certainly that area is more

5   desolate, more -- well, that is withdrawn.

6       That area is certainly darker, isn't it?

7       A.   Than?

8       Q.   There's nothing open?  There's no establishments

9   open down in that area, correct?

10      A.   That's correct.

11      Q.   Now, you get to the scene.  You videotape what you

12  observe and you, in fact, I don't know, maybe, you testified

13  at some point, you turned over Mr. Calabrese, didn't you?

14      A.   The medical examiner did.

15      Q.   You were present, correct?

16      A.   Yes.

17      Q.   And isn't it correct that when Mr. Calabrese was

18  turned over that there was a bullet fragment in the sweat

19  shirt?

20      Isn't that correct?

21      A.   There was a jacketing, copper jacketing that was

22  recovered at the scene when he was turned over.

23      Q.   After he was turned over?

24      A.   Yes.

25      Q.   It was underneath him, correct?

1     A.   Yes.

2     Q.   And, that copper jacket, so the jury is familiar,

3   that, in the operation of a weapon, that copper jacket gets

4   kicked up through the chamber, correct?

5     A.   No.

6     Q.   How does that get kicked out?

7     A.   Pardon me.

8     Q.   That copper jacket, talking about the bullet

9   fragment?

10          MR. HAYDEN:   Objection.   That presumes it gets

11       kicked out which of course it doesn't.

12          THE COURT:   Sustained.

13    Q.   You're familiar with weapons, correct?

14    A.   Yes.

15    Q.   The copper fragment, it's a casing; isn't that

16   correct?

17    A.   No.

18    Q.   What is it?

19    A.   It's a jacketing to the lead bullet.   The lead core

20   bullet casing is a different piece of the overall cartridge.

21    Q.   So, you're describing the, so the jury's, as well,

22   clear, as I am, okay, what you're describing then would it be

23   the bullet?

24    A.   It's part of the bullet.   The bullet is a lead core

25   with a copper jacketing which is the whole projectile which

MO

Nystrom - People - Cross

1     gets ejected from the casing.

2          Q.   All right.  So the projectile, call it a bullet?

3          A.   Yes.

4          Q.   The bullet that's discharged from the gun, right,

5     the bullet was found underneath him, correct?

6          A.   The bullet casing, not the full bullet.

7          Q.   You keep saying the casing.  I don't want there to

8     be any confusion.

9          A.   I am sorry.  You mentioned casing before, the

10    jacketing.

11         Q.   Okay.  When you say jacket, explain to the jury?

12         A.   I did.  It's a lead core with a copper jacketing.

13    That is the whole projectile.

14         Q.   Okay.  Which is shot, and the casing is which holds

15    the gun powder and that is not ejected from the gun?

16         A.   Right.

17         Q.   So, the casing itself would be found in the weapon,

18    depending on what weapon it is, if it's an automatic it could

19    be kicked out, but what was found underneath Mr. Calabrese

20    was clearly what was shot from the barrel of the gun.

21         That is all I am getting at.  Correct?

22         A.   Correct.

23         Q.   And it wasn't found until the medical examiner was

24    there and he was turned over?

25         A.   Yes.

Nystrom - People - Cross

1    Q.   There was only one such bullet; isn't that correct?

2    A.   Found at the scene?

3    Q.   Yes.

4    A.   Yes.

5    Q.   Now, just one or two other questions.

6    I think you also said it was a cold night, cold and

7    windy?

8    A.   Correct.

9    Q.   And, you didn't, I think you indicated, you went

10   into Mr. Calabrese's car; is that correct?

11   A.   After the car was removed from the scene and

12   secured in our highway building in North Bellmore.

13   Q.   Went through it, correct?

14   A.   Yes.

15   Q.   There was no jacket found in that car, correct?    A

16   jacket that you wear?

17   A.   Like a coat jacket.

18   Q.   Yes.

19   A.   Heavy coat jacket.

20   Q.   Nothing, right?

21   A.   No.

22          MR. LEMKE:   Okay.  Thank you, detective.

23          THE COURT:   Thank you, Mr. Lemke.

24       Mr. Hayden.

25          MR. HAYDEN:   Just briefly, Your Honor.

MO

Nystrom - People - Redirect

1            THE COURT:  Yes.

2    REDIRECT EXAMINATION

3    BY MR. HAYDEN:

4        Q.    Detective, counsel asked you during cross

5    examination about lighting in the vicinity of 7-Eleven.  I

6    want to move away from 7-Eleven.  I want to go back to where

7    the scene was.

8        Tell the jury what the lighting was like in the vicinity

9    of the Infiniti?

10       A.    The Infiniti which was fifty feet south of the rear

11   of 7-Eleven the lighting was poor on the roadway.

12       Q.    Was it dark?

13       A.    Dark, yes.

14       Q.    Would you step down for a moment, detective?

15       A.    Yes.

16       Q.    Counsel asked questions about would it be more

17   desolate south of the scene of the shooting; is that right?

18       A.    Yes.

19       Q.    Is there a cut through here between where the

20   Infiniti was and Austin Boulevard?

21       A.    Yes.

22       Q.    Is that cut through one of the quickest ways to get

23   out from Broadway onto Austin Boulevard?

24       A.    From that particular scene, probably, yes.

25       Q.    You cut directly behind 7-Eleven out onto Austin;

MO

1    is that right?

2        A.   Yes.

3            THE COURT:   What exhibit is that you're

4    addressing.

5            MR. HAYDEN:   This is 30.

6            THE COURT:   Thank you.

7        Q.   Please retake the witness box.

8    At this point, Your Honor, I am going to offer 26 for

9    identification into evidence.

10           MR. LEMKE:   No objection, Your Honor.

11           THE COURT:   Mark it People's 26 in evidence.

12           THE COURT OFFICER:   People's 26 marked in

13   evidence.

14           MR. HAYDEN:   Thank you.

15       Q.   Detective, have you ever been a member of the

16   firearms bureau?

17       A.   No, I haven't.

18       Q.   Do you have any expertise in the area of firearms

19   examination?

20       A.   No, I don't.

21       Q.   Cartridge examination?   Anything like that?

22       A.   No.

23       Q.   Would you step down for a moment, please, in front

24   of the jury, with the Court's permission?

25           THE COURT:   Of course.

MO

Nystrom - People - Redirect

1     Q.    Using 26 which is now in evidence, would you show

2  the jury what you mean by copper jackets and metal cores of

3  bullets?

4     A.    Hard to see through the bag but when we talk about

5  copper jacketing, as you can see the difference in color, the

6  copper color of these, certain pieces, that is what encases

7  the lead core which are these deformed pieces.  When the

8  bullet strikes something it deforms.  It breaks it apart

9  depending on what it is.  That is why we have numerous pieces

10  here.  So, the lead core would go inside of these copper

11  jacketings, and that makes up the bullet.

12     Q.    The idea being that the lead core would wear the

13  copper jacket just the way you wear a jacket?

14     A.    Yes.

15     Q.    Please retake the witness stand.

16          MR. HAYDEN:  Nothing further, Your Honor.

17  RECROSS EXAMINATION

18  BY MR. LEMKE:

19     Q.    Detective, somebody travelling on Austin Boulevard

20  and they go to cut through -- may I have People's 30 in

21  evidence.  Great.  Okay.

22     Detective, why don't you step down for a second and stand

23  in front of the jury, with the Court's permission, of

24  course.

25          THE COURT:  Sure.

MO

1       Q.    Referring to People's 30, so the jury can see, this

2    7-Eleven is depicted in here; is that correct?

3       A.    Yes.

4       Q.    In fact, could you just point to that cut through,

5    please, for the jury?

6       A.    Okay.  I will just lay everything out in the photo

7    again so the jury understands what we're talking about.

8       The yellow dot again is the place of the murder,

9    Broadway, Austin Boulevard, Georgia Avenue.  7-Eleven store,

10   the parking lot in front of the 7-Eleven store, behind the

11   7-Eleven store is this cut through that goes from Austin

12   Boulevard to Broadway.

13      Q.    This cut through, if somebody's travelling up

14   Austin and makes a right or comes down and makes a left and

15   through this cut through, you don't know the name of that

16   street, do you?

17      A.    No.

18      Q.    And comes out, they're actually coming out and now

19   what are you, ten, if you come across the street, you're

20   probably ten feet from where Mr. Calabrese is?

21      A.    Very close, sir.

22      Q.    Okay.  Thank you.  I have nothing further.

23            THE COURT:  That is it?

24            MR. HAYDEN:  Yes.  Nothing further.  Thank

25      you.

Proceedings

1      THE COURT:   You may step down.   Thank you.

2   (Witness excused.)

3      THE COURT:   Ladies and gentlemen, please

4   remain seated while we let the jury go.

5    Ladies and gentlemen, I am going to give you the

6   admonitions as I told you when we take a break and I am

7   directing you to return at two p.m.   Going to keep

8   moving and hopefully get a lot in this afternoon.

9    You must not converse among yourselves or with

10   anyone else upon any subject connected with the trial.

11   You must not read or listen to any accounts or

12   discussions of the case in the event it is reported by

13   the newspapers or other media.   You must not visit or

14   view the premises or place where the offense charged was

15   allegedly committed, or any other premises or place

16   involved in the case.   Prior to your being discharged

17   you must not request, accept, agree to accept, or

18   discuss with any person the receiving or accepting of

19   any payment or benefit in consideration for the

20   supplying of any information concerning the trial.   You

21   must promptly report to the Court any incident within

22   your knowledge involving an attempt by any person

23   improperly to influence any member of the jury.   You

24   shall not access the Internet or Worldwide Web by any

25   means available to you for the purposes of either