Proceedings

1    learning about this case or to learn about the law and

2    legal issues concerning this case.

3         Any of you taking notes, just you can leave those on

4    your seat.  And have a good lunch.  See you two

5    o'clock.

6              THE COURT OFFICER:  Please rise and follow me

7    out.

8         (Whereupon, the following takes place outside the

9    presence of the jury.)

10             THE COURT:  Counsel, by the time we get them

11   altogether I expect to resume promptly at 2:15.

12             MR. LEMKE:  Fine, Your Honor.

13             MR. HAYDEN:  Yes.

14             L U N C H E O N   R E C E S S

15             (Afternoon session.)

16             THE CLERK:  Trial continued.  Case on trial,

17   167N-05, People of the State of New York versus Mark

18   Orlando.

19        Are the People ready?

20             MR. HAYDEN:  Ready, Your Honor.

21             THE CLERK:  Defendant ready.

22             MR. LEMKE:  Yes.

23             THE CLERK:  Jurors are not present at this

24   time.

25             THE COURT:  Any applications before the jury



Proceedings

```
 1        comes in?

 2                    MR. LEMKE:  Not from Mr. Orlando.

 3                    MR. HAYDEN:  No, Your Honor.

 4                    THE COURT OFFICER:  Ready for the jury?

 5                    THE COURT:  Yes.

 6                    THE COURT OFFICER:  Jury entering.

 7                    THE CLERK:  Continued case on trial, 167N-05,

 8        People versus Mark Orlando.

 9             Again, are the People ready?

10                    MR. HAYDEN:  Ready, Your Honor.

11                    THE CLERK:  Is the defendant ready?

12                    MR. LEMKE:  Defendant ready.

13                    THE CLERK:  Let the record reflect the

14        presence of Mr. Orlando, the sworn jurors and the

15        alternates.

16                    THE COURT:  Good afternoon, ladies and

17        gentlemen.

18             Mr. Hayden.

19                    MR. HAYDEN:  Christina Rasmussen.

20        CHRISTINA RASMUSSEN, called as a witness by the People,

21             having been first duly sworn by the Clerk of the Court,

22             was examined and testified as follows:

23        DIRECT EXAMINATION

24        BY MR. HAYDEN:

25                    THE CLERK:  Have a seat.
```

Rasmussen - People - Direct

1           State your name, spell your last name for the

2      record, and your county of residence.

3               THE WITNESS:  My name is Christina Rasmussen,

4      R-A-S-M-U-S-S-E-N.  I reside in Bergen County, New

5      Jersey.

6               THE COURT:  Good afternoon.

7               THE WITNESS:  Good afternoon.

8               MR. HAYDEN:  Yes, Your Honor.

9      Q.   Good afternoon.

10     Do you work for Cingular Wireless?

11     A.   Yes, I do.

12     Q.   Did that used to be called AT&T Wireless?

13     A.   Yes.

14     Q.   How long had you worked for Cingular Wireless?

15     A.   Seven years.

16     Q.   Describe your work for Cingular Wireless?

17     A.   I am a manager within the fraud department and also

18     serve as custodian of records.

19     Q.   Have you become familiar with subscriber records

20     over the course of your work?

21     A.   I have.

22     Q.   Have you worked with subscriber records on a

23     regular basis?

24     A.   Yes, I have.

25     Q.   How long have you been working with subscriber

Rasmussen - People - Direct

1    records on a regular basis?

2        A.    Five years.

3        Q.    Have you become familiar with cell phone records

4    over the course of your work?

5        A.    Yes, I have.

6        Q.    Have you worked with cell phone records on a

7    regular basis?

8        A.    Yes.

9        Q.    How long have you been working with cell phone

10   records with on a regular basis?

11       A.    Seven years.

12           MR. HAYDEN:   May I please have 54 for

13       identification shown to the witness, Your Honor.

14           THE COURT:   Yes.

15           THE COURT OFFICER:   Witness has People's 54

16       for identification.

17       Q.    Please take a look at those records.   Do you

18   recognize those records?

19       A.    I do.

20       Q.    Are those AT&T Wireless records for a cell phone

21   with the number 631-882-3428?

22       A.    Yes, they are.

23       Q.    Were those records made in the ordinary course of

24   AT&T Wireless business?

25       A.    Yes.

1      Q.    Was it the ordinary course of AT&T Wireless

2  business to make such records?

3      A.    Yes, it is.

4      Q.    Were those records made at or about the time of the

5  activity recorded?

6      A.    Yes.

7      Q.    Were those records made by persons under a business

8  obligation to make them?

9      A.    Yes.

10           MR. HAYDEN:  The People offer those as 54 in

11      evidence.

12           MR. LEMKE:  I have a copy.  No objection.

13           THE COURT OFFICER:  People's 54 marked in

14      evidence.

15      Q.    Using those records in evidence who was the

16  subscriber for cell phone (631) 882-3428 in early December

17  2004?

18      A.    Mark Orlando.

19      Q.    Using the records in evidence, was (631) 882-3428

20  used to place a call at 8:23 on the night of Friday, December

21  3, 2004?

22      A.    Yes, it was.

23      Q.    Describe that call?

24      A.    That was an outbound call dialed 1-516-790-4461 and

25  was one minute and fifty-two seconds in length.

Rasmussen - People - Direct

1        Q.    Using the records in evidence, was (631) 882-3428

2   used to place a call at 8:39 that Friday night?

3        A.    Yes, it was.

4        Q.    Describe that call?

5        A.    There was also an outbound call to 1-516-785-7000

6   and was one minute and eight seconds in length.

7        Q.    Using the records in evidence, was 631-882-3428

8   used to place a call at 8:41 that Friday night?

9        A.    Yes, it was.

10        Q.    Describe that call?

11        A.    This was an outbound call to 1-516-785-7000 and was

12   forty-nine seconds in length.

13        Q.    Using the records in evidence, was (631) 882-3428

14   used to place a call at 9:14 that Friday night?

15        A.    Yes.

16        Q.    Describe that call?

17        A.    This was an outbound call to 1-516-822-2645 and was

18   two minutes and fourteen seconds in length.

19        Q.    Using the records in evidence, was (631) 882-3428

20   used to place a call at 9:18 that Friday night?

21        A.    Yes, it was.

22        Q.    Describe that call?

23        A.    This was an outbound call to 1-516-822-2645 and was

24   nineteen seconds in length.

25        Q.    Using the records in evidence, was (631) 882-3428

1    used to place a call at 9:19 that Friday night?

2        A.   Yes, it was.

3        Q.   Describe that call?

4        A.   That was an outbound call to 1-516-822-2645 and was

5    25 seconds in length.

6        Q.   Using the records in evidence was (631) 882-3428

7    used to place a call at 9:26 that Friday night?

8        A.   Yes, it was.

9        Q.   Describe that call?

10       A.   This was also an outbound call to 516-902-1019 and

11   was two minutes and forty-four seconds in length.

12             MR. HAYDEN:  Nothing further at this time.

13             THE COURT:  Thank you.

14      Mr. Lemke.

15             MR. LEMKE:  No questions.  Thank you.

16             THE COURT:  Thank you.  You may step down.

17     Thank you.

18           (Witness excused.)

19           MR. HAYDEN:  Peter Vozzo.

20    PETER VOZZO, Police officer, called as a witness on behalf of

21      the People, after having been first duly sworn, and

22      having stated his shield number as 2031, and his command

23      as the Fourth Precinct, Nassau County Police Department,

24      took the witness stand and testified as follows:

25    DIRECT EXAMINATION

COPY

Vozzo - People - Direct

1   BY MR. HAYDEN:

2               THE CLERK:  Have a seat.

3       State your name, spell your last name, give your

4       shield number and command for the record.

5               THE WITNESS:  Police Officer Peter Vozzo,

6       V-O-Z-Z-O.  My shield number is 2031.

7               THE COURT:  Good afternoon.

8               MR. HAYDEN:  May I proceed.

9               THE COURT:  Yes, Mr. Hayden.

10      Q.   Good afternoon.

11      A.   Good afternoon.

12      Q.   How long have you been a member of the Nassau

13      County Police Department?

14      A.   Eight years.

15      Q.   Are you assigned to the Fourth Precinct?

16      A.   Yes, I am.

17      Q.   How long have you been assigned there?

18      A.   Eight years.

19      Q.   Describe your duties with the Fourth Precinct?

20      A.   Answer assignments on the radio and patrol.

21      Q.   What areas do you patrol?

22      A.   I patrol Oceanside, Innwood, Five Towns area, North

23      Long Beach, Island Park.

24      Q.   Where are those in relation to Long Beach?

25      A.   They are just north of Long Beach, adjoining.

Vozzo - People - Direct

1      Q.   All in the same geographical area?

2      A.   Yes.

3      Q.   I am directing your attention to the night of

4    Friday, December 3, 2004.

5         Were you working then?

6      A.   Yes, I was.

7      Q.   Describe the weather that night?

8      A.   It was cold and windy.

9      Q.   How were you dressed?

10     A.   In a Nassau County police uniform.

11     Q.   Using a motor vehicle?

12     A.   Yes, I was.

13     Q.   Describe it?

14     A.   A marked Nassau County police vehicle.

15     Q.   Did you respond that night to the vicinity of

16   Broadway, south of Georgia Avenue in North Long Beach?

17     A.   Yes, I did.

18     Q.   Describe the circumstances under which you

19   responded there?

20     ████████████████████████████████████████████████

21   ████████████████████████████████████

22     Q.   Where did you get the call to respond there?

23   ██████████████████████████████████

24     Q.   When did you arrive?

25   ████████████████

Vozzo - People - Direct

1      Q.    Describe the vicinity of Broadway, south of Georgia

2   Avenue?

3      A.    Broadway is dimly lighted.  It's mostly an

4   industrial area.  There's a boat marina, an abandoned

5   nightclub, used to be called South Beach, and there's a

6   storage facility also that was not open at the time.

7      Q.    Were you the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆arrive in that

8   vicinity?

9      A.    Yes, I was.

10      Q.    Did you see a young man named Bobby Calabrese when

11   you arrived in that vicinity?

12      A.    Yes, I did.

13      Q.    Where was Bobby Calabrese when you first noticed

14   him?

15      A.    The victim was lying face down in the middle of the

16   roadway.

17      Q.    Did you notice anyone in Bobby Calabrese's vicinity

18   when you first arrived and saw him?

19      A.    No, not at that time.

20      Q.    Did you approach Bobby Calabrese?

21      A.    Yes, I did.

22      Q.    Did you see any sign of life as you were

23   approaching Bobby Calabrese?

24      A.    No, I did not.

25      Q.    Describe any observations you made as you were

MO

Vozzo - People - Direct

1    approaching Bobby Calabrese?

2        A.    First observation I made when I approach the victim

3    was there was a substantial amount of blood surrounding the

4    victim.   The victim was also lying face down with his legs,

5    excuse me, his arms above his head.

6        Q.    Was he wearing a sweat shirt?

7        A.    Yes, he was.

8        Q.    Describe that sweat shirt?

9        A.    It was a gray sweat shirt, a hooded gray sweat

10   shirt.   I observed several large holes in the midsection of

11   the back of the sweat shirt with a good, substantial amount

12   of blood also on the rear of the sweat shirt.

13       Q.    Was it a pullover sweat shirt?

14       A.    Yes, it was a pullover.

15       Q.    Where was the neck of that sweat shirt with

16   relation to Bobby Calabrese's head, the top of his head?

17       A.    The neck of the sweat shirt was pulled over the top

18   of the victim's head.

19       Q.    Where were Bobby's arms?

20       A.    Bobby's arms were approximately over his head in

21   this position.   (Indicating).

22       Q.    Did you notice a motor vehicle in Bobby Calabrese's

23   immediate vicinity?

24       A.    Yes, I did.

25       Q.    Describe it.

MO

Vozzo - People - Direct

1    A.    It was a gray 2003 Nissan Infiniti.

2    Q.    Describe any observations you made of the Infiniti

3  as you were arriving that night?

4    A.    When I first arrived at the scene, the engine was

5  running and the headlights were also on in the vehicle.

6    Q.    Did an ambulance arrive a short time after you

7  did?

8    A.    Yes, it did.

9         MR. HAYDEN:  May I please have 35 shown to the

10   witness?

11        THE COURT:  Yes.

12        THE COURT OFFICER:  The witness has 35 for

13   identification.

14   Q.    Do you recognize that?

15   A.    Yes, I do.

16   Q.    What is it?

17   A.    This is the gray sweat shirt, hooded sweat shirt

18  that Bobby Calabrese was wearing that evening.

19        MR. HAYDEN:  Nothing further at this time.

20        THE COURT:  Mr. Lemke.

21  CROSS EXAMINATION

22  BY MR. LEMKE:

23   Q.    Officer, on December 3, 2004 you were asked to

24  respond to a certain location in Island Park; isn't that

25  correct?

Vozzo - People - Cross

1      A.   Yes, it is.

2      Q.   And, you arrived at a certain location in Island

3  Park at what time?

4      A.   8:45 I believe.

5      Q.   And, this isn't the first time you're testifying in

6  court regarding this matter, is it?

7      A.   Yes, it is.

8      Q.   You didn't testify at the Grand Jury?

9      A.   No.

10      Q.   You didn't testify in any of the hearings?

11      A.   No.

12      Q.   Okay did you make any notations regarding your

13  observations back on December 3, 2004?

14      A.   Mental observations.

15      Q.   Mental observations.  Does that mean, you didn't

16  make any notations at all.

17      A.   Sure we do in our memo book.

18      Q.   Did you?

19      A.   No.

20      Q.   So, on December 3, 2004, you respond to a location

21  and you're the first police officer there; is that correct?

22      A.   Yes, I am.

23      Q.   You're in a marked vehicle; isn't that correct?

24      A.   Yes, I am.

25      Q.   Are you by yourself at that time?

MO

Vozzo - People - Cross

1          A.    Yes, I am.

2          Q.    Do you get out of the vehicle?   Correct?

3          A.    A ha.

4          Q.    You, obviously, you observe a body laying on the

5     roadway, correct?

6          A.    Correct.

7          Q.    You're familiar with this area, correct?

8          A.    Correct.

9          Q.    You carry a memo book with you, don't you?

10         A.    Not when you get out of the car.   It stays in the

11    car.

12         Q.    I am sorry.   It's in the car so that you can go

13    back and make notations of anything that is significant;

14    isn't that correct?

15         A.    It's up to your discretion what you can put in and

16    out of your memo book.   You don't have to put entries.   All

17    you have to do is you put an entry to that call in the memo

18    book, if I that is it, any other entries you want to put in

19    there is up to your discretion.

20         Q.    You made no entry whatsoever about the time you

21    arrived, correct?

22         A.    No.

23         Q.    You didn't make any entries of what you observed,

24    correct?

25         A.    Correct.

Vozzo - People - Cross

1    Q.    You didn't make any entry anywhere regarding --

2    A.    I didn't feel it was necessary.

3    Q.    You may not have felt it was necessary, but did you

4  or didn't you make any notation regarding Mr. Calabrese?

5    A.    Not in the memo book.

6    Q.    Not anywhere?

7    A.    Correct.

8    Q.    In fact, this is your area, correct?

9    A.    Correct.

10          MR. LEMKE:   I ask this he shown to the

11  witness, People's 30 in evidence.

12          THE COURT OFFICER:   The witness has 30 in

13  evidence:

14    Q.    Do you recognize that?

15    A.    Yes, I do.

16    Q.    And, that is the location that you responded to.

17  You have Austin Boulevard in that picture, correct?

18    A.    Yes.

19    Q.    7-Eleven.   That is there, correct?

20    A.    Yep.

21    Q.    In fact you indicated December third it was very

22  cold, very windy; isn't that correct?

23    A.    Yes, it was.

24    Q.    And when you get out of your vehicle, you went

25  over, and the sweat shirt, was that cut in your presence?

1    A.   Yes, it was, after the fact.

2    Q.   I am sorry?

3    A.   After the fact.

4    Q.   After what fact?

5    A.   That I was already previously there.

6    Q.   You were there, the sweat shirt was not cut when

7    you arrived, correct?

8    A.   No, it wasn't cut when I arrived.

9    Q.   There was no T-shirt pulled up in any way,

10   correct?

11   A.   No, the T-shirt wasn't, the sweat shirt was.

12   Q.   In fact, when you say pulled up, you didn't take

13   any photographs, did you?

14   A.   That is not my job to take photographs.

15   Q.   Just asking a simple question?

16   A.   No, it wasn't.

17   Q.   You didn't take any photographers, did you?

18   A.   No.

19   Q.   When you had arrived there, you made sure that the

20   area would be protected so when crime scene got there they

21   can gather any evidence and collect any of that evidence,

22   correct?

23   A.   Correct.

24   Q.   And, you observed that Mr. Calabrese was not

25   moving; isn't that correct?

Vozzo -- People - Cross

1      A.   Correct.

2      Q.   And it's at that point in time that either you had

3  called for further assistance, would that be correct?

4      A.   Correct.

5      Q.   And you had asked immediately for an ambulance to

6  respond; isn't that correct also?

7      A.   Correct.  I requested forthwith response.

8      Q.   They also had responded at some point in time,

9  correct?

10     A.   Excuse me?

11     Q.   They had responded as well, correct?

12     A.   Yes, the AMT ambulance arrived shortly after

13  myself.

14     Q.   You didn't make any notation of any of that?

15     A.   No.

16     Q.   Do you remember the names of the EMT that had

17  arrived?

18     A.   Yes, it was AMT Danny Brooks.

19     Q.   In fact, when Mr. Brooks arrived he had arrived

20  with somebody else?

21     A.   There was another officer at the time, several

22  officers, Officer Adam Moore and Officer Richard Verra,

23  V-E-R-R-A.

24     Q.   It would be correct to state that at the time you

25  would assist or try to assist, in this case, Mr. Calabrese

Vozzo - People - Cross

1    isn't that correct?

2        A.   Yes, as best I can.

3        Q.   It was at that point in time you had arrived, did

4    you make a determination whether he had, he was deceased?

5        A.   At that time I did, yes.

6        Q.   Okay.   That he was deceased, correct?

7        A.   Deceased, correct.

8        Q.   And, yet, once the emergency medical people

9    arrived, you then began to move the body of Mr. Calabrese?

10       A.   No, I did not touch the body.

11       Q.   Well, Mr. Brooks did obviously, correct?

12       A.   Mr. Brooks did.

13       Q.   You had already determined Mr. Calabrese was

14   deceased and yet then he began to cut the sweat shirt?

15       A.   Well, I didn't, the AMT did.

16       Q.   I am sorry?

17       A.   He has a better understanding of the victim's life

18   than I do.  I secure the screen.  He arrives, and he has to

19   do what he has to, check the vital signs further.

20       Q.   Right.   That would be up to him to make any

21   determination?

22       A.   Correct.

23       Q.   As to whether or not Mr. Calabrese were deceased,

24   whether any photographs should be taken, whether they should

25   wait for crime scene and so forth, correct?


COPY MO

Vozzo - People - Cross

1       A.   Correct.  He determines if there is still life
2   within the victim.
3       Q.   Okay.  And then after cutting anything else, any
4   movement of the body would be at that point up to Mr. Brooks,
5   the EMT?
6       A.   Correct.
7       Q.   Thank you, officer.
8       A.   You're welcome.
9                THE COURT:  Anything further, Mr. Hayden?
10               MR. HAYDEN:  No, Your Honor.  Thank you.
11               THE COURT:  Thank you, officer.  You may step
12      down.
13               THE WITNESS:  Thank you.
14          (Witness excused.)
15               MR. HAYDEN:  Daniel Brooks.
16   DANIEL BROOKS, called as a witness by the People, having been
17      first duly sworn by the Clerk of the Court, was examined
18      and testified as follows:
19   DIRECT EXAMINATION
20   BY MR. HAYDEN:
21               THE CLERK:  Have a seat.
22          State your name, spell your last name, give your
23      shield number and command for the record.
24               THE WITNESS:  AMT Daniel Brooks, Nassau County
25      Police Department, Emergency ambulance Bureau, shield

Brooks - People - Direct

1      number 18.

2          Q.    Good afternoon.

3          A.    Good afternoon.

4          Q.    How long have you been an ambulance medical

5      technician?

6          A.    I have been with the Nassau County Police

7      Department for eleven years, and I have been in the EMS for

8      almost twenty years.

9          Q.    Describe your work as an ambulance medical

10     technician?

11         A.    To treat sick and injured when they call 911.

12         Q.    On an emergency basis?

13         A.    Yes.

14         Q.    Describe any training you have had in the field of

15     emergency medical care?

16         A.    From 1985 to 1986 I took AMT school.  From 1988 to

17     1989 I took paramedic school.  We had refreshers every three

18     years.

19         Q.    Describe any experience you have had in the field

20     of emergency medical care?

21         A.    Been with several volunteer agencies upstate, two

22     paid accompanies, New York City EMT, three-and-a-half years,

23     and Nassau County Police for eleven years.  Also with the

24     Oceanside Fire Department for fifteen years.

25         Q.    How many emergency calls have you answered?

Brooks - People - Direct

1          A.    Upwards of a hundred thousand.

2          Q.    How many times have you provided emergency medical

3     care to a gunshot victim?

4          A.    At least hundreds, possibly thousands.

5          Q.    I direct your attention to the night of Friday,

6     December 3, 2004.

7          Were you working that night?

8          A.    Yes.

9          Q.    Describe the weather?

10         A.    It was cold.  It was windy.

11         Q.    How were you dressed?

12         A.    Nassau County police uniform.

13         Q.    Were you using a motor vehicle?

14         A.    Yes.

15         Q.    Describe it?

16         A.    A marked Nassau County police ambulance.

17         Q.    Did you respond that night to the vicinity of

18    Broadway, south of Georgia Avenue, in North Long Beach?

19         A.    Yes.

20         Q.    Describe the circumstances under which you

21    responded there?

22         A.    CB which is communications bureau, put over an

23    assignment for an intoxicated person, with subsequent calls

24    for possible person been shot.

25         Q.    When did you get that call?

Brooks - People - Direct

1      A.    2043 hours which is 8:43 p.m.

2      Q.    What time?

3      A.    20 -- 2047 which is 8:47 p.m.

4      Q.    Who was present when you arrived?

5      A.    Police Officer Vozzo was at the scene and another

6   car was down the block blocking the road.

7      Q.    Is that Officer Peter Vozzo?

8      A.    Yes.

9      Q.    Were you the first ambulance medical technician to

10  arrive?

11     A.    Yes.

12     Q.    Did you see a young man named Bobby Calabrese when

13  you arrived in that vicinity?

14     A.    Yes.

15     Q.    Where was Bobby Calabrese when you first noticed

16  him?

17     A.    He was in the middle of the street.

18     Q.    Did you approach him?

19     A.    I did.

20     Q.    Did you detect any sign of life in Bobby Calabrese?

21     A.    No.

22     Q.    Describe any observation you made as you were

23  approaching Bobby Calabrese?

24     A.    There was a large pool of blood, there was a

25  running car, and he had a sweat shirt on that seem to be

MO

Brooks - People - Direct

1    pulled up.

2        Q.   Where was the neck of that sweat shirt with

3    relation to the top of his head?

4        A.   It was over the top of his head.

5        Q.   Could you see his head?

6        A.   No.

7        Q.   Describe for the jury what you did when you reached

8    Bobby Calabrese?

9        A.   In order to determine whether there was any life

10   left in him I reached up to the top of the hood to see if

11   there was anything it.  There wasn't.  So I could cut it

12   without cutting anything on him.  I cut the hood around the

13   top, avoiding the bullet holes for crime scene, and pulled

14   the two pieces apart and peered in his head.

15       Q.   What did you see?

16       A.   Several bullet holes, or at least what appeared to

17   be bullet holes, and no signs of life.

18       Q.   Did you cut into the sweat shirt to get to his

19   head?

20       A.   Yes.

21       Q.   Did you eventually pronounce Bobby Calabrese dead?

22       A.   Yes.

23       Q.   What did you do before pronouncing him dead?

24       A.   Checked his pulse, you know, just looked to see if

25   there was any sign, there was any chance of resuscitating

Brooks - People - Direct

1   him.

2       Q.   Was there?

3       A.   There was not.

4       Q.   Describe the vehicle you observed?

5       A.   I am sorry.

6       Q.   Describe the vehicle you saw?

7       A.   It was a gray newer model Infiniti.

8       Q.   Describe any observations you made of that

9   vehicle?

10      A.   It was running and the headlights were on.

11           MR. HAYDEN:   May I have 35 in evidence shown

12      to the witness.   I take that back, 35 for

13      identification.

14           THE COURT OFFICER:   The witness has 35 for

15      identification.

16      Q.   Please take a look at that?

17      A.   Yes.

18      Q.   Do you recognize that?

19      A.   Yes.

20      Q.   What is that?

21      A.   This is the sweat shirt that the deceased was

22   wearing.

23      Q.   Do you see a cut in that sweat shirt?

24      A.   Yeah.

25      Q.   In the back of the sweat shirt?

1      A.   A ha.

2                THE COURT:   You have to say yes.

3      A.   Yes,.  I am sorry.

4      Q.   Did you make that cut?

5      A.   Yes.

6                MR. HAYDEN:   Nothing further, Your Honor.

7      Thank you.

8                THE COURT:   Mr. Lemke.

9   CROSS EXAMINATION

10  BY MR. LEMKE:

11     Q.   Officer Brooks?

12     A.   AMT.

13     Q.   AMT Brooks.   AMT?

14     A.   Excuse me.

15     Q.   AMT Brooks?

16     A.   Yes, AMT.

17     Q.   On December 3, 2004, you indicated you had arrived

18  at a location on Broadway in Island Park; isn't that

19  correct?

20     A.   Yes.

21     Q.   And when you had arrived, you had indicated that

22  you were in a, basically an ambulance, correct?

23     A.   Correct.

24     Q.   And, you had now testified that there was an

25  individual laying in the roadway, that being Mr. Calabrese;

Brooks - People - Cross

1     isn't that correct?

2          A.    Yes.

3                    MR. LEMKE:  Now, I ask that People's 4 in

4          evidence be shown to the EMT, please.

5                    THE COURT:  Yes.

6                    THE COURT OFFICER:  The witness last 4 in

7          evidence.

8          Q.    That is Mr. Calabrese; isn't that correct?

9          A.    Yes.

10         Q.    That is the person you saw lying on the street on

11    Broadway?

12         A.    Yes.

13         Q.    In fact, he is wearing the sweat shirt at that

14    time, correct?

15         A.    Yes.

16         Q.    He is also wearing a T-shirt; isn't that correct?

17         A.    Yes.

18         Q.    Is that the same T-shirt that is depicted in that

19    photograph?

20         A.    Yes.

21         Q.    That is the same sweat shirt that is depicted in

22    that photograph, correct?

23         A.    Yes.

24         Q.    The sweat shirt that this individual is wearing has

25    a hood on it, correct?

Brooks - People - Cross

1    A.    Yes.

2    Q.    And the hood was on his head, correct?

3    A.    It was above his head.

4    Q.    When you say above his head, when you arrived, the

5    photograph which is in evidence, is showing the sweat shirt

6    as being worn by this individual, correct?

7    A.    Yes.

8    Q.    And his arms are in front of him laying on the

9    ground, correct?

10   A.    Yes.

11   Q.    Now, my question is this.  Did you wind up taking

12   these photographs?

13   A.    No.

14   Q.    And, yet the body is laying face down; isn't that

15   correct?

16   A.    Yes.

17   Q.    And were you present when the body was turned on

18   its back?

19   A.    No.

20   Q.    Okay.  Were you present when they moved the body to

21   look for anything underneath?

22   A.    No.

23   Q.    And then you weren't present when they turned the

24   body back over when they took the photographs; is that

25   correct?

MO

Brooks - People - Cross

1      A.    Right.

2      Q.    Okay.  So, when you arrived, you go over to

3   determine whether or not Mr. Calabrese has any signs of life,

4   correct?

5      A.    Yes.

6      Q.    And were you able to do that?

7      A.    Yes.

8      Q.    There were no signs of life; isn't that correct?

9      A.    Yes.

10     Q.    You were able to determine that right away,

11   correct?

12     A.    It took me a minute.  I had to cut the sweat shirt,

13   but, yes.

14     Q.    You wanted to put your finger on his neck to

15   determine whether there was a purse, correct?

16     A.    Correct.

17     Q.    And, as you were cutting the sweat shirt you have

18   those tools in the ambulance, correct?

19     A.    Yes.  We carry a scissor.

20     Q.    You carry a scissor and certainly I think there's

21   other things as well, correct?

22     A.    Yes, a long list of things.

23     Q.    When you get out of the ambulance you go over at

24   some point in time, perhaps not at this moment, you make

25   notations of what you observe, correct?

```
 1        A.    Yes.

 2        Q.    And did you do that in this case?

 3        A.    Yes:

 4        Q.    Where did you write those observations down?

 5        A.    On a PCR.

 6        Q.    That PCR is I think a form that is provided by the,

 7   I guess, the Nassau County Police Department, correct?

 8        A.    It's a State Department of Health form.

 9        Q.    And, in that form you wrote down what time you had

10   arrived, correct?

11        A.    Yes.

12        Q.    You write down also what you had observed,

13   correct?

14        A.    Yes.

15        Q.    And, you recall also writing down on some other --

16   you don't, do you, carry a memo book?

17        A.    Yes.

18        Q.    You also made some notations on a memo book,

19   correct?

20        A.    Yes.

21        Q.    Notations that you observe what you believe to be

22   three gunshot wounds, correct?

23        A.    Correct.

24        Q.    Also that the sweat shirt was pulled up, correct?

25        A.    Yes.
```

Brooks - People - Cross

1    Q.    You never indicated that the sweat shirt was pulled

2  up over his head, correct?

3    A.    Just noted it was pulled up.

4    Q.    Okay .  And so, pulled up, he's got a hood on,

5  correct?

6    A.    Yes.

7    Q.    Okay.  But you never wrote anywhere it was pulled

8  up over his head, correct?

9    A.    Yes, just that it was pulled up.

10    Q.    Just that it was pulled up, correct?

11    A.    Yes.

12    Q.    Okay:  And, in fact, after you now cut the sweat

13  shirt, you make some observations, correct?

14    A.    A ha.  Yes.

15    Q.    And then -- do you put the sweat shirt back

16  together or just leave it?

17    A.    I leave it.

18    Q.    Okay.  So, in leaving it, in the photograph that is

19  before you, you see the sweat shirt there?

20    A.    Yes.

21    Q.    Okay.  You didn't put it that way, did you?

22    A.    No.

23    Q.    You didn't move it at all, did you?

24    A.    I just cut it.

25    Q.    As the person is laying on his stomach, okay, you

Brooks - People - Cross

1    go over, not to certainly move any of the potential evidence,

2    and you cut up the back of the sweat shirt, correct?

3         A.   The only thing I cut on his sweat shirt was the

4    hood on the side.

5         Q.   Well, if you take a look at the sweat shirt that is

6    there, don't you cut from the bottom of the sweat shirt all

7    the way?

8         A.   I didn't cut from the bottom.

9         Q.   Who cut that?

10        A.   Well, it's hard to tell here whether it's cut from

11   the bottom or where it's cut from.  The only place I cut it

12   was to expose his head.

13        Q.   Let me ask you this.

14             MR. LEMKE:   Can this be shown to this witness,

15        please.

16             THE COURT:   What exhibit is that?

17             MR. LEMKE:   5, I believe.

18             THE COURT OFFICER:   I have 5.

19             THE COURT:   People's 5.

20        Q.   Isn't that a picture depicting that the sweat shirt

21   is cut completely from the bottom up to basically the base of

22   the neck, the hood?

23        A.   Yes.   I don't remember cutting it from the bottom.

24   I remember cutting it from the middle up to the top.

25        Q.   Then that is cut completely, isn't it?

MO

Brooks - People - Cross

1    A.   It's possible I could be mistaken.

2    Q.   Well, that photograph is accurate?

3    A.   Yes, it is.

4    Q.   That is in evidence?

5    A.   I don't remember cutting it from the bottom.

6    Q.   Okay.  So, what you're saying is somebody else may

7  have cut the rest of that sweat shirt?

8              MR. HAYDEN:  Objection.

9              THE COURT:  Sustained.

10   Q.   Did you cut that sweat shirt?

11   Well, you know what, that photograph that you're looking

12 at, that sweat shirt is cut from the bottom?

13   A.   Yes.

14   Q.   In this picture it seems to be cut from the bottom,

15 up to perhaps the base of the hood; isn't that correct?

16   A.   Yes.

17   Q.   And, it's your testimony to this jury that you

18 didn't do that?

19              MR. HAYDEN:  Objection.  That was not the

20       testimony.

21              THE COURT:  Sustained.

22   Q.   Your testimony to this jury is that what -- you cut

23 it as it's depicted in that picture?

24   A.   I don't remember cutting it from the bottom.  I

25 remember cutting it to expose his head.

Brooks - People - Cross

1      Q.   Okay.  My question is, did you cut that as it

2  appears in that photograph?

3      A.   I don't remember cutting it from the bottom.  It's

4  possible that I did though.

5           MR. LEMKE:  Could I have what has been marked

6      35 -- is that in evidence yet?

7           Your Honor, without objection, perhaps I can

8      have it marked in evidence?

9      I ask it be moved into evidence.

10          THE COURT:  People's 35 in evidence on

11     consent?

12          MR. HAYDEN:  Yes.

13          MR. LEMKE:  Yes.

14          THE COURT OFFICER:  People's 35 marked in

15     evidence.

16     The witness has 35 in evidence.

17     Q.   You identified that previously as being the sweat

18  shirt, correct?

19     A.   Yes.

20     Q.   That is the sweat shirt that was cut by you,

21  correct?

22     A.   Yes.

23          MR. LEMKE:  Your Honor, with the Court's

24     permission, I don't know if he needs gloves, I ask that

25     be removed from the bag, please.

Brooks - People - Cross

1          THE COURT:  Do you need gloves?

2          THE WITNESS:  Yeah, that would be appropriate.

3          MR. LEMKE:  Want to take a two minute break,

4     Your Honor:

5          THE COURT:  You can step down then.

6          MR. HAYDEN:  May we purchase for a moment.

7          THE COURT:  Yes.

8          (Whereupon, there was a bench conference held off

9     the record.)

10          THE COURT:  We will take a five minute

11     recess.  Just a couple of minutes.

12          Remember my admonitions.  Don't discuss the case

13     among yourselves or with anyone else.

14          Be back in a couple of minutes.

15          (Whereupon, there was a brief recess in the

16     proceedings.)

17          THE COURT:  Ready, Mr. Hayden?

18          MR. HAYDEN:  Sure.

19          THE COURT:  Bring them in.

20          THE COURT OFFICER:  Jury entering.

21          THE CLERK:  Let the record reflect the

22     presence of the sworn jurors and the alternates.

23          THE COURT:  Mr. Lemke, the witness has removed

24     the sweat shirt.

25          MR. LEMKE:  Thank you.

Brooks - People - Cross

1      Q.    EMT Brooks, do you have before you what has been

2  marked as People's 35 in evidence?

3      I think you testified that you recognize that; is that

4  correct?

5      A.    Yes.

6      Q.    And now you recognize that as the sweat shirt that

7  was worn by Mr. Calabrese on December 3, 2004; is that

8  correct?

9      A.    Yes.

10      Q.    That was the sweat shirt that you cut; is that

11  correct?

12      A.    Yes.

13      Q.    Could you hold up what is in evidence as People's

14  35, please.

15      And, could you open it up, please, to show where the hood

16  is, where the back is, the sleeves, front and back?

17      A.    (Witness complies.)

18      Q.    Now, that is a hood.  Pull the hood forward a

19  second.  Thank you.

20      That is the front, correct?

21      The front is facing the jury, correct?

22      A.    Correct.

23      Q.    Turn that around, please?

24      A.    (Witness complies.)

25      Q.    Facing you, that is the back, correct?

Brooks - People - Cross

1    A.    Yes.

2    Q.    That back, you testified, would you say that that

3    back is cut from the bottom all the way up to the neck,

4    correct?

5    A.    Yes.

6    Q.    It's not cutting into the hood, correct?

7    A.    I am sorry.

8    Q.    It's not cutting from the hood and over?

9    A.    It's cut all the way.

10    Q.    My next question to you, did you cut that entire

11    length?

12    A.    Looking at it, the cut is consistent.  So, I'd say,

13    yeah, I did, but I don't recall specifically cutting it from

14    the bottom.

15    Q.    So, the answer is somebody else may have also cut a

16    part of that?

17              MR. HAYDEN:  Objection.  That is not the

18         testimony.

19              THE COURT:  Sustained.

20    Q.    As you look at that sweat shirt now, does that

21    refresh your recollection whether you cut the whole thing?

22    A.    It appears I cut it from the bottom, yes.

23    Q.    That is all I needed.

24    Thank  you, Your Honor.

25              THE COURT:  Redirect.

Brooks - People - Cross

1              MR. HAYDEN:   Thank you.

2    REDIRECT EXAMINATION

3    BY MR. HAYDEN:

4              MR. HAYDEN:   May I approach, Your Honor?

5              THE COURT:   Yes.

6        Q.   Now, these are the holes you were talking about,

7    AMT Brooks?

8        A.   Yes.

9        Q.   One, two, three, four?

10       A.   Yes.

11       Q.   Is that right?

12   Want you to tell these jurors where these holes were with

13   relation to the wounds to the back of the left side of

14   Bobby's head?

15       A.   The holes were consistent with the holes in Bobby's

16   head.

17       Q.   Aligned with those holes, with those wounds?

18       A.   Yes.

19       Q.   Whether that is the way you found it?

20       A.   Yes.

21       Q.   When we are talking about the neck of the sweat

22   shirt, are we talking about this area here, the neck?

23       A.   Yes.

24       Q.   And this is up over the top of Bobby's head?

25       A.   Yes.

Brooks - People - Redirect

1    Q.   Is that the way you found him?

2    A.   Yes.

3    Q.   No doubt about it?

4    A.   Absolutely.

5    Q.   Now, you can see here this has been significantly

6    ripped in the front; is that right?

7    A.   Yes.

8    Q.   Did you do that?

9    A.   No.

10   Q.   Did you even see this?

11   A.   No.

12   Q.   Did you see Bobby while he was on his back or was

13   it always while he was on his stomach?

14   A.   He was always prone.

15   Q.   You're not responsible for this significant tear in

16   the sweat shirt; is that right?

17   A.   Right.

18   Q.   Did you see anyone else do it?

19   A.   No.

20   Q.   Did you notice this hole here in the sweat shirt?

21   A.   Is that the front?

22   Q.   Yes.

23   A.   Yeah.  No, I did not.

24   Q.   Didn't notice it because you never noticed anything

25   about the front of the sweat shirt because Bobby was on his

Brooks - People - Recross/Redirect

```
 1      symptom; is that right?
 2          A.   That's correct.
 3                   MR. HAYDEN:  Nothing further at this time.
 4      RECROSS EXAMINATION
 5      BY MR. LEMKE:
 6          Q.   It was so significant that you forgot to write it
 7      down anywhere?
 8          A.   Pardon.
 9                   MR. HAYDEN:  Objection.  Objection to the form
10          of the question.
11                   THE COURT:  Rephrase the question.
12          Q.   You never wrote that down anywhere, did you?
13          A.   What down?
14          Q.   Sweat shirt was pulled over his head?
15          A.   No.   My only job is to document he was deceased,
16      not --
17          Q.   So, your answer is no, you never wrote it down?
18          A.   No, I am not crime scene.
19      REDIRECT EXAMINATION
20      BY MR. HAYDEN:
21                   MR. HAYDEN:  What you wrote was it was pulled
22          up?
23          A.   That's correct.
24                   MR. HAYDEN:  Nothing further, Your Honor.
25                   THE COURT:  Can you put that back.
```

Ianfolla - People - Direct

1           THE WITNESS:  Yeah, sure.

2           THE COURT:  Thank you.

3      I am going to have this witness retape it for the

4      time being.  Any objection?

5           MR. HAYDEN:  None, Your Honor.

6           MR. LEMKE:  None, Your Honor.

7           THE COURT:  Thank you.  You may step down.

8           (Witness excused.)

9           MR. HAYDEN:  Robert Ianfolla.

10   ROBERT IANFOLLA, called as a witness by the People, having

11      been first duly sworn by the Clerk of the Court, was

12      examined and testified as follows:

13   DIRECT EXAMINATION

14   BY MR. HAYDEN:

15           THE CLERK:  Have a seat.

16      State your full name.

17           THE WITNESS:  Robert Ianfolla.

18           THE CLERK:  Spell your last name and state

19      your county of residence.

20           THE WITNESS:  I-A-N-F-O-L-L-A, Nassau County.

21           THE COURT:  That is good.  Good afternoon.

22           Go ahead, Mr. Hayden.

23   Q.   Good afternoon.

24   A.   Good afternoon.

25   Q.   How old are you?



COPY   MO

Ianfolla - People - Direct

1     A.    Twenty-four.

2     Q.    What is your occupation?

3     A.    Carpenter.

4     Q.    Did you know a young man named Robert Calabrese,

5  Jr.?

6     A.    Yes, I did.

7     Q.    Was he called Bobby?

8     A.    Yes.

9     Q.    Is Bobby Calabrese dead?

10    A.    Yes, he is.

11    Q.    When did he die?

12    A.    December 3, 2004.

13    Q.    How old was Bobby when he died?

14    A.    Twenty-four.

15    Q.    Describe your relationship with Bobby?

16    A.    We were cousins, more like brothers, best friends,

17 hung out all the time.  Considered him a brother.

18    Q.    Was Bobby a wrestler?

19    A.    Yes, he was.

20    Q.    When did he wrestle?

21    A.    He started wrestling in sixth grade for Long Beach

22 Middle School.  Then he went to Kellenberg and wrestled there

23 and finished his senior year at Long Beach High School.

24    Q.    How good was he?

25    A.    State champion in Kellenberg.  Played fourth in the

Ianfolla - People - Direct

1    county for Long Beach as a senior.

2        Q.    Did Bobby work for a gambling business?

3        A.    Yes, he did.

4        Q.    Describe Bobby's involvement at that gambling

5    business?

6        A.    He was a runner basically.  Gave a number to put in

7    the bets and would pick up the money and drop off the money,

8    whether it was won or lost.

9        Q.    When you say would give a number, you mean a

10   telephone number?

11       A.    Yes.

12       Q.    Bets were called in?

13       A.    Yes.

14       Q.    Did you accompany Bobby when he was introduced to a

15   man named Mark Orlando?

16       A.    Yes, I did.

17       Q.    Were they introduced at a place called Professional

18   Credit Services?

19       A.    Yes.

20       Q.    Where is Professional Credit Services?

21       A.    Route 110 in Farmingdale.

22       Q.    Who introduced Bobby to Mark Orlando?

23       A.    Tommy Flores.

24       Q.    Describe Mark Orlando.

25       A.    Heavy male, white male, about thirty, thirty

Ianfolla - People - Direct

1    something years old, 5'10".

2         Q.    Do you see Mark Orlando in this courtroom today?

3         A.    Yes, I do.

4              MR. LEMKE:  So stipulated, Your Honor.

5              THE COURT:  Let the record so reflect.

6              MR. HAYDEN:  We're referring to the defendant;

7    is that correct, Your Honor.

8              THE COURT:  Yes, sir.

9         Q.    Did you accompany Bobby when he paid gambling

10   winnings to the defendant?

11        A.    Yes, I did.

12        Q.    Where did Bobby pay the defendant?

13        A.    Right in front of the defendant's place of work,.

14        Q.    Professional Credit Services?

15        A.    Yes, it was.

16        Q.    Out on Route 110?

17        A.    Yes.

18        Q.    How many times did you accompany Bobby while he was

19   paying the defendant?

20        A.    Four, maybe.  Maybe five times.

21        Q.    Was the defendant always in the parking lot of

22   Professional Credit Services when you saw Bobby paying him?

23        A.    Yes, he was.

24        Q.    Had you ever seen a man named Herva Jeannot when

25   Bobby was paying the defendant?

Ianfolla - People - Direct

1      A.   No.

2      Q.   Was the defendant always alone when Bobby paid him?

3      A.   Yes, he was.

4      Q.   Where did Bobby park with relation to the

5  Professional Credit Services building?

6      A.   Basically right in front of the front door.  I'd

7  say about a hundred feet, a hundred and fifty feet away at

8  tops.

9      Q.   Would you and Bobby ordinarily wait for the

10 defendant to arrive?

11     A.   Yes.  Yeah.  We would wait for him to come out of

12 his work.

13     Q.   Describe for the jury what was going on in the

14 parking lot those times you saw Bobby pay the defendant?

15     A.   I guess other people were getting out of work,

16 going to their cars and leaving.  There was small group of

17 people sitting around talking.

18     Q.   Did you ever see Bobby pay the defendant when there

19 was still daylight?

20     A.   Yes, I did.

21     Q.   Did you ever see Bobby pay the defendant when there

22 were no people around?

23     A.   No.

24     Q.   Describe how the money was packaged when you saw

25 Bobby paying the defendant?

Ianfolla - People - Direct

1      A.   Usually hundred dollar bills in a white envelope.

2      Q.   Did you see Bobby get out of the car to pay the

3   defendant?

4      A.   Yes.

5      Q.   Where would the payments take place?

6      A.   Right outside the car in the parking lot.

7      Q.   Describe any observations you made of the defendant

8   and Bobby when you saw Bobby get out of the car and join the

9   defendant?

10     A.   They would give a hand shake, a little hug, started

11  talking, as they exchange the money, handshake and a hug, and

12  my cousin would get back into the car and we would leave.

13     Q.   Did you ever see the defendant approach Bobby's

14  car?

15     A.   Yes, he did.

16     Q.   How many times did you see the defendant approach

17  Bobby's car?

18     A.   One time.

19     Q.   Describe the circumstances under which the

20  defendant approached Bobby's car that day?

21     A.   I believe we pulled up.  He was already outside.

22  So, he came over to the car rather than my cousin getting out

23  of the his car.

24     Q.   Did Bobby get out?

25     A.   No.

Ianfolla - People - Direct

1      Q.    What happened then?

2      A.    He came over, he was like, the defendant was, wow,

3   you never travel alone, do you.  My cousin said, no, by the

4   way, this is my cousin, Bobby, my name is also Bobby.  We

5   shook hands and they exchanged the money and we left.

6      Q.    That was the one time you met the defendant?

7      A.    Yes.

8      Q.    Only time you ever spoke with him?

9      A.    Yes.

10      Q.    Had you ever heard of Herva Jeannot before Bobby

11   died?

12      A.    No.

13      Q.    I am directing your attention to the night Bobby

14   died.

15      Did Bobby talk to you about his intention that night?

16      A.    Yes, he did.

17      Q.    What did Bobby tell you he intended to do that

18   night?

19      A.    He intended to go out to Island Park to meet the

20   defendant for the rest of the money he had lost, to pick up

21   the money.

22      Q.    Did he refer to the defendant as Mark?

23      A.    Yes, he did.

24      Q.    What was the approximate time Bobby left for his

25   meeting with the defendant?

Ianfolla - People - Direct

1     A.   It was after eight o'clock.

2     Q.   Was Bobby wearing a sweat shirt when you last saw

3  him that Friday night?

4     A.   Yes.

5     Q.   Describe that sweat shirt?

6     A.   Light gray hooded sweat shirt with a black Mermaid

7  printed on the back and an Unsound logo on the left chest.

8     Q.   Describe the condition of that sweat shirt when you

9  last saw Bobby that night?

10    A.   It was a new sweat shirt.

11    Q.   Was the sweat shirt torn in any way?

12    A.   No.

13    Q.   Was it in good condition?

14    A.   Yes, it was.

15    Q.   Did you eat with Bobby that night?

16    A.   Yes, I did.

17    Q.   What did he have?

18    A.   He had a cheeseburger and French fries.

19    Q.   He had dinner with you?

20    A.   Actually he ate before me, I got to his house, and

21  I was eating when he left.

22    Q.   Describe Bobby's physical condition just before he

23  died?

24    A.   Very good shape.  He was in the gym all the time.

25  I guess he still kept his shape from wrestling so he was in

1     good condition.

2                         MR. HAYDEN:   May I please have this photograph

3          shown to the witness?

4                         THE COURT:   What number is that.

5                         MR. HAYDEN:   That is 25, Your Honor.

6          Q.   Do you recognize that photograph?

7          A.   Yes, I do.

8          Q.   Is that photograph a fair and accurate

9     representation of Bobby Calabrese's build as it was just

10    before he died?

11         A.   Yes.

12         Q.   Was Bobby Calabrese strong?

13         A.   Yes, he was.

14         Q.   How do you know?

15         A.   I watched him wrestle for years, five, six, seven

16    years, and I also played many other sports with him.   I have

17    wrestled with him myself.   I seen him wrestle much bigger

18    people.   I know he's a very strong kid.

19         Q.   Was he fast?

20         A.   Yes, he was.

21         Q.   How do you know?

22         A.   Watching him wrestle and playing baseball,

23    football, basketball, all the other sports with him.

24                         MR. HAYDEN:   Nothing further at this time,

25         Your Honor.

Ianfolla - People - Direct

1          MR. LEMKE:  May I, Your Honor?

2          THE COURT:  Yes, Mr. Lemke.

3   CROSS EXAMINATION

4   BY MR. LEMKE:

5          Q.   As you know my name is Mr. Lemke.  I represent

6   Mr. Orlando.  You know that?

7          A.   Yes.

8          Q.   In fact, it's your testimony that Bobby Calabrese

9   is like a brother to you?

10         A.   Yes.

11         Q.   Hung out with him all the time?

12         A.   Yes.

13         Q.   Over the course say of a week, how often would you

14  hang out with him?

15         A.   I would see him almost everyday after work you

16  know.

17         Q.   I am sorry.

18         A.   After work I would see him almost everyday.

19         Q.   So, back in December 2004, or actually even

20  October, November, four or five times a week you'd hang out

21  with Bobby, correct?

22         A.   Yeah.

23         Q.   Did Bobby work at that time?

24         A.   Not at the time, no.  He was unemployed.

25         Q.   He was unemployed.  So, but you worked, didn't you?

1      A.    Yes.

2      Q.    You got off work at five o'clock back in October,

3  November?

4      A.    No, it would depend on the day.   I work

5  construction, so finish a job you go home early.   If there's

6  a lot of work you work late.   All different.

7      Q.    When you got off you'd go see Bobby?

8      A.    Yeah, most of the times, yes.

9      Q.    You told us Bobby is a runner?

10     A.    Yeah.

11     Q.    What is a runner?

12     A.    Somebody who I guess finds a player, gives them a

13  number to put in the bets and then collects the money from

14  whoever is placing the bets or pays that person.

15     Q.    And, how would those bets be placed?

16     A.    From what I understand I assumed it was by phone.

17     Q.    When you say you understood, you were with him four

18  or five times a day?

19     A.    Yes.

20     Q.    He had a cell phone with him?

21     A.    Yes.

22     Q.    A lot of cell phone calls come in, correct?

23     A.    Nothing, nothing, not over, over calling, no.

24     Q.    How many would you say?

25     A.    I couldn't tell you how many times he got called a

Ianfolla - People - Cross

1    day.  I am sorry.

2         Q.   You were with him at night, right, four or five

3    days a week, correct?

4         A.   Yeah, but I wasn't counting.

5         Q.   You weren't counting.

6    Let me ask you this, more than ten calls?

7         A.   I don't know.  I couldn't tell you that.  I don't

8    know.  I can't say yes to that.

9         Q.   Could you say yes to more than twenty calls?

10        A.   I can't say yes.  I don't know how many times he

11   got calls.

12        Q.   He had a cell phone and, what, somebody would call

13   him and what, place, give him numbers?

14   How did that work?

15        A.   I am not really too familiar with how that works.

16   I was just keeping him company.  I know if there was a number

17   that the person whose gambling could call they place their

18   phone bet.

19        Q.   Right.  And then Bobby would go and payoff these

20   people if they won, correct?

21        A.   Yes, he would.

22        Q.   And, how many people had you met that Bobby was

23   paying off?

24        A.   Not many.  Couple of them were actually friends

25   putting in small bets.

Ianfolla - People - Cross

1    Q.   What type of bets?

2    A.   Small bets.   I don't know.   Football, basketball.

3    Q.   When you say small, how do you know what the bets

4    were?

5    A.   Friends of mine would say I have $25 on the Knicks

6    or whatever, you know.

7    Q.   Then you'd place that bet with Bobby?

8    A.   I didn't place any bets.

9    Q.   And when Bobby would pay out, he had that money

10   handy, didn't he?

11   A.   I am not sure.

12   Q.   Well, you're saying, let's go back, in October of

13   2004 you had met Mark, didn't you?

14   A.   Yes, I did.

15   Q.   And how many people, other people, did you go with

16   Mr. Calabrese to pay off or collect money from?

17   A.   None.

18   Q.   So, Mark was the only one?

19   A.   Yes, he was.

20   Q.   And, in fact, when you went with Mark or went with

21   Bobby to meet Mark, I think the first time you said it was at

22   his place in Farmingdale, correct?

23   A.   Yes.

24   Q.   Bobby drove, didn't he?

25   A.   Yes.

1     Q.    In fact, when you first went there Bobby had to pay

2  off --

3     A.    Excuse me?

4     Q.    Bobby had to pay him off, correct?

5     A.    Yes.

6     Q.    You remember how much that was the first time?

7     A.    No.

8     Q.    Would anything refresh how much it was?

9     A.    No.

10    Q.    Did Bobby ever tell you how much it was?

11    A.    No.  I just know the guy was, he won a lot.

12    Q.    So, but you testified it was hundred dollar bills?

13    A.    Yes, it was.

14    Q.    How did you know he was paying in hundred dollar

15  bills?

16    A.    I don't know exact amounts.  I saw the money being

17  placed into the envelope.

18    Q.    Okay.  You saw the money being placed in the

19  envelope, where, back at Bobby's house?

20    A.    In the car.

21    Q.    Where did Bobby get that money from?

22    A.    Out of his pocket.

23    Q.    He'd take it out of his pocket.  Now, he's

24  counting.  How much was being counted?

25    A.    I didn't keep track.  I was just there for

Ianfolla - People - Cross

1   company.

2       Q.   Okay.  Let's go to the first time you met Mark.  Do

3   you remember what month that was?

4       A.   No, it was in October.

5       Q.   So, October is the first time you meet Mark when

6   you go to Farmingdale, right?

7       That is because Bobby's paying Mark money, isn't he?

8       A.   Yes, he is.

9       Q.   And, you don't know how much that was, do you?

10      A.   No.

11      Q.   Could have been $1,800, could have been $2,500.

12  You don't know, correct?

13      A.   No.

14      Q.   And yet the betting still continues, and the next

15  time you see Mark is about a week later, right?

16      A.   Yes, it is.

17      Q.   And Bobby's paying him again, isn't he?

18      A.   Yes, he is.

19      Q.   He is counting out money again, correct?

20      A.   Yes.

21      Q.   Hundred dollar bills, correct?

22      A.   Yes.

23      Q.   How much that time?  Maybe $4,000?

24      A.   I don't know.

25      Q.   Didn't Bobby ever tell you anything about Mark and

Ianfolla - People - Cross

1    his gambling?

2         A.    That he was a good gambler.

3         Q.    Won a lot of money from him, right?

4         A.    Yes.

5         Q.    Second week you go to meet Mark, it's again money,

6    hundred dollar bills, put into an envelope, correct?

7         A.    No.  Only saw that once.

8         Q.    Other time was cash?

9         A.    No, it was always in an envelope but I only saw

10   money being put in the envelope once.

11        Q.    Second time you went, the money was already in the

12   envelope?

13        A.    No, the first time I went was when I got

14   introduced.  The second time I went he got paid.

15        Q.    First time he was introduced -- you know Tommy

16   Flores?

17        A.    Yes.

18        Q.    You know Barbara?

19        A.    I know her a little bit.

20        Q.    Diamant.

21        Q.    Barbara is Tommy's girlfriend?

22        A.    I know that, yes.

23        Q.    Tommy and Barbara both work with Mark, correct?

24        A.    Yes.

25        Q.    And Tommy introduces Mark to Calabrese, correct?

Ianfolla - People - Cross

1    A.   Yes.

2    Q.   Tommy's also a friend of yours and Bobby, correct?

3    A.   Yes.

4    Q.   Tommy introduces Mark because Mark is a better.  He

5    likes to bet, correct?

6    A.   Yes.

7    Q.   And Calabrese is a runner.  He takes bets?

8    A.   Yes.

9    Q.   So, the first time you go up to meet Tommy

10   Calabrese it's -- Bobby Calabrese it was in maybe October

11   2004?

12   A.   First time to meet who.

13   Q.   Mark.  I am sorry.

14   A.   Was in October, yes.

15   Q.   You go up, Tommy introduces Mark to Bobby, they

16   walk off alone a little bit, don't they?

17   A.   Yes, the walk right to behind the car.

18   Q.   Right there talking a little bit, develope a

19   relationship, Mark is going to establish an account and place

20   bets through Calabrese, correct?

21   A.   Yes.

22   Q.   And the next -- it's only a week goes by, all of a

23   sudden the first week mark is a winner, isn't he?

24   A.   Yes.

25   Q.   So, you go up there, he is paid by Calabrese in

Ianfolla - People - Cross

1    hundred dollar bills.  You don't know how much, it was a

2    pretty thick envelope, wasn't it?

3         A.   I couldn't tell you that.

4         Q.   It's paid to my client up there, correct?

5         A.   Yes.

6         Q.   And that next week now goes by which might be what,

7    the second week of October?

8         A.   Not -- third week.

9         Q.   Maybe --

10        A.   Maybe the third or last week.

11        Q.   Now we're in the third or fourth week and again you

12   went with Bobby almost every week, correct?

13        A.   Yes, I did.

14        Q.   Next time was again he's winning again, Bobby goes

15   up to pay him again, correct?

16        A.   Yes.

17        Q.   You don't know if it's $2,000, $5,000 at that

18   point?  You don't know?

19        A.   No.

20        Q.   But Tommy, I should say Bobby keeps records,

21   doesn't he?

22        A.   I don't know.

23        Q.   You then have payment made to my client, right,

24   occurs up in Farmingdale, correct?

25        A.   Yes.

Ianfolla - People - Cross

1      Q.    Because he won.  You're the loser, you go to his

2      place to pay because he won, correct?

3                      MR. HAYDEN:  Objection.

4                      THE COURT:  Sustained.

5      Q.    Well, you know what the conversation was between

6      Bobby and Mark, do you?

7      A.    When?  What conversation?

8      Q.    When he goes to pay Mark?

9      A.    No.

10     Q.    No.  Okay.  In fact, every time that you went up

11     there was for Bobby to pay Mark, correct?

12     A.    Yes.

13     Q.    You never went with him up there for Mark to pay

14     Bobby, correct?

15     A.    No.

16     Q.    Okay.  So, the second week that Mark wins you go

17     back up to his place to pay Mark or I should say Bobby pays

18     him, correct?

19     A.    Yes.

20     Q.    We go into the third week, which may be the last,

21     of October, and Bobby's up there again, correct?

22                      MR. HAYDEN:  Objection.  Last week of

23          October?  Where did that come from?

24                      THE COURT:  Overruled.

25                      MR. LEMKE:  Thank you, Your Honor.

Ianfolla - People - Cross

1      A.    What is the question.

2      Q.    Sure.  You met mark with Bobby at least I think you

3   said four to five times, correct?

4      A.    I would say four, maybe five times.

5      Q.    So, if we start off towards the middle of October,

6   that would at least two weeks in October, correct?

7      A.    Yes, it would be.

8      Q.    And the first three weeks in November, correct?

9      A.    Yes.

10      Q.    Because then Mark loses some money, going, right

11   after Thanksgiving; isn't that correct?

12      A.    I believe so, yes.

13      Q.    So, let's go week by week.

14      So, you got that into the maybe the third week now, Mark

15   wins again, doesn't he?

16      A.    Yes.

17      Q.    There is a conversation, you don't know what that

18   conversation is between Bobby and Mark, but Bobby comes up to

19   pay Mark, Mark won, correct?

20      A.    Yes.

21      Q.    You remember how much that one was?

22      A.    No, I don't.

23      Q.    When you go up, usually wait in the car, sometimes

24   Bobby would get out, sometimes Mark would come over?

25      A.    No, Mark only came over one time.  Bobby got out of

Ianfolla - People - Cross

1    the car all the other times.

2         Q.    Maybe the other three or four times?

3         A.    Yes.

4         Q.    Gave themselves a hand shake?

5         A.    Little hug.

6         Q.    And they hug each other?

7         A.    Yes.

8         Q.    Money's given.  Only lasts a couple of minutes

9    tops, correct?

10        A.    Yes.

11        Q.    Now, let's talk about November, beginning of

12   November.  Same.  Mark wins again, correct?

13        A.    Yes.

14        Q.    Didn't Bobby tell you he won about $9,000?

15        A.    Didn't discuss how much he won.

16        Q.    Just said he was winning big?

17        A.    Just knew we were going to pay, drop off money.

18        Q.    Didn't Bobby talk to you how this has got to stop,

19   I keep losing to this guy?

20        A.    No.

21        Q.    Where's Bobby getting the money from?

22        A.    I don't know:

23        Q.    Well, now, you take the second week in November,

24   again, Mark wins again, large, correct?

25        A.    Yes.

·Ianfolla - People - Cross

1      Q.    Again, you're going up with Bobby to pay off Mark,

2   right?

3      A.    Yes, I am.

4      Q.    Third week in November, Mark wins big again,

5   doesn't he?

6      A.    What do you mean by big.

7      Q.    Well, at that point I think he was up about

8   $38,000, if you know?

9      A.    Not sure of that.  I know he won.

10      Q.    There are records that are kept that would signify

11   about $38,000.  You wouldn't dispute that, would you?

12            MR. HAYDEN:  Objection.

13            THE COURT:  Sustained.

14      Q.    If you know?

15            MR. HAYDEN:  Objection.

16            THE COURT:  Sustained.  Said he didn't know.

17      Q.    You now go, there's a four week after Thanksgiving,

18   correct?  You don't go up to see Mark, do you?

19      A.    Fourth week after?

20      Q.    I should, Thanksgiving I think was early?

21      A.    Not too sure.  I know I went there four or fire

22   times.

23      Q.    Okay.  Do you remember that the last time you went

24   up there was just before Thanksgiving?

25      A.    I can't recall that.

Ianfolla - People - Cross

1      Q.   And then towards the end of November, Bobby wins?
2  What I mean by that is Mark loses, correct?

3      A.   Yes.

4      Q.   Now, Mark has got to go pay Bobby; isn't that
5  correct?

6      A.   I don't know.  Yeah, I guess he owed him the money,
7  he had to pay it.  Right.

8      Q.   Sure.  And now there is a conversation between
9  Bobby and Mark, correct, if you know?

10     A.   When?

11     Q.   Mark loses money.  He's got to pay Bobby?

12     A.   Yeah.

13     Q.   Bobby says, listen, now he's, come down to my area
14  because I lost.  He's got to pay me?

15             MR. HAYDEN:  Objection.

16             THE COURT:  Sustained.

17             MR. LEMKE:  Withdrawn.

18     Q.   Mark loses now for the first time.  You don't go
19  up to collect money from Mark, do you?  Correct?

20     A.   (No verbal response.)

21     Q.   Never seen Mark pay Bobby?

22     A.   No, I didn't.

23     Q.   It's now the end of November.  You're aware that
24  Mark owes Bobby money; isn't that correct?

25     A.   Yes.

Ianfolla - People - Cross

1    Q.    Okay: And, isn't it on December third, okay, there
2  had not been, to your knowledge, you weren't with Bobby from
3  the last time that you had paid, when you were with Bobby to
4  pay Mark, from when Mark was now going to pay Bobby,
5  correct?

6    A.    I wasn't with Bobby?

7    Q.    That's correct?

8    A.    From the time --

9    Q.    Last time you were up in Farmingdale when he had to
10  pay Mark?

11    A.    Didn't see my cousin until Mark had to pay Bobby?

12    Q.    Yes.

13    A.    No.

14    Q.    So now on December third, you have, you go over to
15  Bobby's house, correct?

16    A.    Yes, I do.

17    Q.    Friday night, correct?

18    A.    Yes.

19    Q.    You're over there four or fire times a week,
20  correct?

21    A.    Yes.

22    Q.    He's like a brother to you, correct?

23    A.    Yes.

24    Q.    When you go over, does he open up a new package and
25  put on a new sweat shirt?

Ianfolla - People - Cross

1    A.   No, he doesn't.

2    Q.   In fact, he's wearing a sweat shirt, he doesn't

3  say, this is a new sweat shirt or anything like that, does

4  he?

5    A.   No.

6    Q.   He doesn't say, does he, how do you like my new

7  sweat shirt?  Do you like it?  Correct?

8    A.   No.

9    Q.   And, now, he finishes his dinner, you're going to

10  have some yourself, and doesn't a phone call come in?

11    A.   No.

12    Q.   A phone call doesn't come in to Bobby?

13    A.   When I got to the house?

14    Q.   Right?

15    A.   He had already finished dinner.  I said I sat down

16  to eat my dinner.

17    Q.   I am sorry.

18    A.   Then I sat down to eat my dinner.

19    Q.   Then didn't the phone call come in?

20    A.   I don't know if a phone call came in.

21    Q.   Well, Bobby was leaving, wasn't he?

22    A.   Yes, he was.

23    Q.   Didn't Bobby tell you that I'm leaving because

24  Mark's got to pay me?  Correct?

25    A.   Said I'm going to meet Mark, yes.

1      Q.   Now, from December third when he leaves the house,

2   he leaves about, what?  This is Friday.  What time does Bobby

3   leave the house that night?

4      A.   Sometime after eight o'clock.  I can't recall the

5   exact time.

6      Q.   What address were you at when you received that

7   phone call?

8      A.   I was at Bobby's house.

9      Q.   Which is where?

10     A.   519 East Erickson Street.

11     Q.   What town?

12     A.   Long Beach, New York.

13     Q.   Long Beach.  So, all you have to do is what, come

14  over the bridge on, what is that, Austin Boulevard, to get to

15  Island Park?

16     A.   Yeah, Long Beach Road.

17     Q.   Long Beach Road?

18     A.   Yes.

19     Q.   How long -- withdrawn.

20  Do you know where Mr. Calabrese was killed, don't you?

21     A.   Yes, I do.

22     Q.   And, how long of a drive is it from that location

23  to where Bobby left his house that night?

24     A.   Five, in between five and ten minutes.  Five

25  minutes.

Ianfolla - People - Cross

1      Q.   Five minutes, right.

2      A.   Yes.

3      Q.   In fact, all he's got to do is get in his car, come

4   right over the bridge and he's right there, correct?

5      A.   Not so simple but, yeah, go over the bridge and up

6   the block a couple of miles.

7      Q.   It's right there?

8      A.   Yeah, it's there.

9      Q.   There is a 7-Eleven that is right there, right?

10     A.   Yes.

11     Q.   And, just, finally, what time did he leave the

12   house?

13     A.   Sometime after eight o'clock.  I can't recall the

14   exact time.

15          MR. LEMKE:  Okay.  I don't think I have

16      anything further.

17          THE COURT:  Mr. Hayden.

18          MR. LEMKE:  Hold on one second.  One other

19      question.

20     Q.   When Bobby was leaving on December 3, 2004 to meet

21   Mark, did he tell you it was because Mark owed him money?

22     A.   I knew he was going to meet Mark to pick up money.

23     Q.   You didn't discuss his business with him, correct?

24     A.   No, I didn't.

25     Q.   How do you know that Mark finally lost?

Case 2:11-cv-03992-ERK   Document 8-13   Filed 01/17/12   Page 67 of 105 PageID #: 852



1      MR. HAYDEN:  Objection.

2      THE COURT:  Overruled.

3   You can answer.

4   A.   How do I know he finally lost?  Because he won,

5   won, won, then he lost.  He said I'm going to meet mark to

6   pick up the money.  He wasn't going to gamble anymore.

7   Q.   Thank you.

8      THE COURT:  Anything further, Mr. Hayden.

9      MR. HAYDEN:  Briefly.

10  REDIRECT EXAMINATION

11  BY MR. HAYDEN:



12  Q.   Do you know the exact dates when you saw Bobby

13  paying the defendant?

14  A.   No, I don't.

15  Q.   Do you know the exact times when you saw Bobby

16  paying the defendant up at Professional Credit Services on

17  Route 110 in Farmingdale?

18  A.   I can't give you an exact tie, no.

19  Q.   Do you remember when specifically it was in

20  November?

21  A.   What do you mean?

22  Q.   Dates?

23  A.   No.  Times, no.  I know it was Thursday or Friday

24  of each week, but I can't say whether it was Thursday or

25  Friday for the specific week.

1                  MR. HAYDEN: Nothing further, Your Honor.

2                  THE COURT: Anything further?

3                  MR. LEMKE: Not at all.

4                  THE COURT: Thank you, sir. You may step

5     down.

6                  THE WITNESS: Have a good day.

7                  THE COURT: Take care.

8          (Witness excused.)

9                  MR. HAYDEN: Tommy Flores.

10   TOMMY FLORES, called as a witness by the People, having been

11     first duly sworn by the Clerk of the Court, was examined

12     and testified as follows:

13   DIRECT EXAMINATION

14   BY MR. HAYDEN:

15                  THE CLERK: Have a seat. State your name,

16     spell your last name, give your county of residence.

17                  THE WITNESS: Tommy Flores, F-L-O-R-E-S.

18                  THE CLERK: County.

19                  THE WITNESS: County of Suffolk.

20                  THE COURT: Thank good. Mr. Hayden.

21                  MR. HAYDEN: Yes, Your Honor.

22     Q.   Good afternoon.

23     A.   Good afternoon.

24     Q.   How old are you?

25     A.   Twenty-five.

COPY    MO

Flores - People - Direct

1    Q.   Where do you work?

2    A.   Professional Credit Services.

3    Q.   Where is Professional Credit Services?

4    A.   It's located in Farmingdale, Suffolk County, Long

5    Island, New York.

6    Q.   Describe Professional Credit Services?

7    A.   It's a collection environment.  It's divided into

8    two sides, legal side and regular collection side.  Our

9    company has about three hundred and twenty employees all

10   together.

11   Q.   Describe the building where Professional Credit

12   Services is located?

13   A.   It's a cooperate building for the most part.  It's

14   one level all around.  It's a big white building, huge

15   parking lot.  Share the parking lot with the movie theatre

16   across the street.

17   Q.   Describe the work you do for Professional Credit

18   Services?

19   A.   I represent Chase Manhattan Bank.  I work on all

20   the portfolios of delinquent credit card accounts, early

21   nineties up to the current date.

22   Q.   Have you been convicted of driving while impaired?

23   A.   Yes, I have.

24   Q.   When was that?

25   A.   About three years ago.

Flores - People - Direct

1    Q.    Have you been convicted also of driving while

2    intoxicated?

3    A.    Yes, I have.

4    Q.    When was that?

5    A.    Last year.  May 23, 2004.

6    Q.    Do you know a man named Mark Orlando?

7    A.    Yes, I do.

8    Q.    How do you know Mark Orlando?

9    A.    Mark worked at Professional Credit Services.  He

10   was there before I started.

11   Q.    Describe him?

12   A.    Heavy set guy, Italian, Caucasian, about four

13   hundred pounds.

14   Q.    Do you see Mark Orlando in this courtroom today?

15   A.    Yes.

16   Q.    Please point him out and describe to the jury what

17   he is wearing today?

18           MR. LEMKE:  So stipulated, Your Honor.

19           THE COURT:  Let the record reflect the witness

20       has identified the defendant.

21   Q.    Describe the work the defendant did for

22   Professional Credit Services?

23   A.    The defendant worked on a Sprint portfolio,

24   collected on delinquent cell phone accounts.

25   Q.    He would make calls?

Flores - People - Direct

1      A.   Yes, he would.

2      Q.   To people in debt?

3      A.   Yes, he would.

4      Q.   Describe your relationship with the defendant as it

5   was in early December of 2004?

6      A.   Mark was closer with my girlfriend before I got

7   there and, you know, at that time, considered him a friend,

8   someone who worked with us, you know.  We'd seen each other

9   working forty hours a week, with someone we went on breaks

10  with from time to time, you know, hung out socially, spoke on

11  the phone from time to time.

12     Q.   Do you know a man named Herva Jeannot?

13     A.   Yes.

14     Q.   Describe Herva Jeannot?

15     A.   Herva's about 5'11", six feet, maybe 160, 170

16  pounds, Haitian, dark skin.

17     Q.   How do you know Herva Jeannot?

18     A.   Also worked at Professional Credit Services.

19     Q.   Describe the work Herva Jeannot did for

20  Professional Credit Services?

21     A.   Herva also worked on the Sprint unit collecting old

22  cell phone Sprint accounts.

23     Q.   Describe your relationship with Herva Jeannot as it

24  was in early December of 2004?

25     A.   I was really never close with Herva.  We spoke from

Flores - People - Direct

1   time to time, you know, courtesies to each other, talked

2   about sports, you know, the job.  Things like that.

3       Q.   Describe any observations you made of the

4   relationship between the defendant and Herva Jeannot in

5   2004?

6       A.   Ever since I started working there everyone knew,

7   everyone in the company knew they were very close.  You know,

8   very good friends.  Always hanging out, always chitchatting

9   with each other.  Hung out at work, on breaks, outside of

10  work as well.

11      Q.   How often would you see the defendant and Herva

12  Jeannot together?

13      A.   Quite a bit.  Herva didn't have a car for quite

14  sometime and Mark used to pick him up from work and pick him

15  up from his house, drive him to work, or take him home at

16  times as well.

17      Q.   Where would you see the defendant and Herva Jeannot

18  together?

19      A.   Mostly at work.  They hung out socially outside of

20  work.  They went to clubs, bars, nudey bars together.  Mark

21  used to lend his car to Herva at times.

22      Q.   Gymnasium?

23      A.   At the gym as well.

24      Q.   Do you know a young woman named Barbara Diamant?

25      A.   Yes.

Flores - People - Direct

1    Q.    Who is she?

2    A.    Girlfriend.

3    Q.    How do you know bar?

4    A.    I met her at Professional Credit Services.

5    Q.    Do you know a young man named Bobby Calabrese?

6    A.    Yes, I did.

7    Q.    Is Bobby dead?

8    A.    Yes, he is.

9    Q.    When did he die?

10   A.    December 3, 2004.

11   Q.    How do you know Bobby?

12   A.    I grew up with Bobby since seventh grade.  Since

13   the first day I started school we hit it off.  You know, we

14   grew up together.  Me, him, his cousin.  Middle school, high

15   school, college.  As we got older we were part, we always

16   touched bases with each other, holidays.  We went out

17   together, birthdays, things like that.

18   Q.    Was Bobby a wrestler?

19   A.    Yes, he was.

20   Q.    When did he wrestle?

21   A.    Ever since I know Bobby he's been wrestling.

22   Probably one of the best wrestlers I know.

23   Q.    Where did he wrestle?

24   A.    Wrestled for Long Beach, wrestled for Kellenberg

25   High School.

Flores - People - Direct

1      Q.   How good was he?

2      A.   County, always in some type of tournament.  You

3  know, had metal everywhere, trophies.

4      Q.   Was Bobby involved in a gambling business?

5      A.   Yes, he was.

6      Q.   Describe Bobby's involvement in that gambling

7  business?

8      A.   Bobby, basically, met up with you and either paid

9  you if you won or collected money from you if you owed money,

10  lost money on a gambling debt.

11      Q.   Did you introduce the defendant to Bobby

12  Calabrese?

13      A.   Yes, I did.

14      Q.   When did you do that?

15      A.   Sometime late October 2004.

16      Q.   Describe what happens when you introduced the

17  defendant to Bobby Calabrese?

18      A.   Bobby and his cousin Rob came to my house.  It was

19  nighttime.  Mark was working the late shift to nine o'clock.

20  Picked me up at my house and we drove to Professional Credit

21  Services at the parking lot where he then met mark.  They

22  went off to the side, spoke for a little while, exchanged

23  numbers.  That was really it Bobby.  Asked me about it.  I

24  said this is where he works.  He's an okay guy.  I know he

25  gambles an awful lot, and Bobby decided to take him on.

MO

Flores - People - Direct

1      Q.   Had the defendant talked about gambling before you

2   introduced him to Bobby?

3      A.   Yes, he did.

4      Q.   How long had the defendant been talking about

5   gambling before you introduced him to Bobby?

6      A.   Mark always was talking about gambling, you know,

7   ever since I started working there.  He would always talk

8   about how good he was at it.  It was basically his second

9   job, you know, he was a professional gambler.

10     Q.   Did you see the defendant spend money during the

11  months you knew him?

12     A.   Mark was always spending money, you know, always

13  throwing money around, talking about money, flashing money.

14  Telling how much he spent on doing something at his house,

15  how much he paid on his watch, you know, always talking about

16  some type of money.

17     Q.   Where did you see the defendant spend money?

18     A.   November 2004 was my girlfriend's birthday.  It was

19  his idea to take out a bus and go out to the city, go

20  clubbing in the city.  Mark paid for most of the bus and the

21  liquor as well.  I shared the liquor with him.  For the most

22  part he did put up most of the money for it.

23     He would take my girlfriend out before me and her started

24  talking.  He would always take her out to eat a lot and pay

25  for her and her friends.  Things like that.

Flores - People - Direct

1    Q.    Did the defendant talk to you about placing bets

2  through Bobby?

3    A.    Yes, all the time.  Mark very arrogant, you know.

4  He would always tell people about his bets.  He was always

5  winning.  The only time I ever remember Mark being down was

6  the first time he started betting with Bobby, probably the

7  first week.  Ever since then he's always telling me or people

8  at the job, you know, how much money he made on last night's

9  game, or prior, things like that.

10   Q.    Referring to his betting with Bobby?

11   A.    Absolutely.

12   Q.    Did the defendant ever show you his winnings?

13   A.    Yeah.  Mark always carried an awful lot of money

14  with him.  Even before Bobby, you know, he used to carry

15  money with him.  He had money after he started dealing with

16  Bobby.  He keeps money in his trunk, in his pocket, at his

17  desk, you know.  Used to always flash it around.

18   Q.    Did the defendant tell you what he did with his

19  winnings after he started betting with Bobby?

20   A.    Yeah.  At one point Mark was up.  Bobby came and

21  gave him approximately $18,000 and, you know, mark was

22  telling us about it, what he had done with the money, how he

23  had paid bills, credit card bills, he had given money to

24  family.  Gave his wife some money.  All types of things he

25  was doing with the money.  Doing things in his house.  Things

MO

Flores - People - Direct

1    like that.

2        Q.   I direct your attention to early in the week of

3    Monday, November 29, 2004.

4        What did the defendant say then about his gambling

5    through Bobby Calabrese?

6        A.   Mark was not himself that week.  He had told me he

7    was down some money with Bobby, nine thousand from one week

8    and about eight thousand from another week.  Added up to

9    about $17,000, and he was stressed out about it.

10       Q.   I direct your attention to Thursday, December 2,

11   2004.

12       Did the defendant drive you to work that day?

13       A.   Yes, he did.

14       Q.   Did he talk to you about his gambling with Bobby

15   Calabrese as he was driving to work?

16       A.   Yes, he did.  Mark picked me up at my house on the

17   way to work telling me how his wife had found his gambling

18   books and he had shut down the gambling with Bobby, and he

19   was a little upset.  He had told me that he had two locked

20   bets, $5,000 each, and he wanted to place them and Bobby

21   wouldn't let him, and he couldn't understand why.  And I had

22   told him, you know, how can you expect him to allow you to

23   place these bets, you know, knowing you're not going to

24   gamble anymore.

25       Q.   Did he talk about making a comeback through those

Flores - People - Direct

1     two $5,000 bets?

2          A.   Yeah, he was.   I guess that is what his intentions

3     were.

4          Q.   Is that what he said?

5          A.   He was down.   He wanted to place those bets in

6     order to try to come back some of the money he had lost.

7          Q.   Directing your attention to the night of Friday,

8     December 3, 2004.

9          Did you see the defendant that night?

10         A.   Yes, I did.   We had worked, we left work and met

11    him at the gym.   Seen Mark at the gym that night with Herva.

12         Q.   What gym was that?

13         A.   It's called LA Fitness off Route 110.   It's a big

14    classy gym.   It has indoor basketball courts, racquetball,

15    Jacuzzi, pool.

16         Q.   Where is LA Fitness with respect to Professional

17    Credit Services?

18         A.   Anywhere from two to five minutes away.   It's off,

19    also off 110, little north, on the borderline of Suffolk

20    County.

21         Q.   Where is LA Fitness with relation to North Long

22    Beach?

23         A.   Nowhere near it.   Have to take two different

24    parkways in order to get there.

25         Q.   Describe what you saw while you were observing the

1    defendant and Herva Jeannot together at LA Fitness that

2    Friday night?

3        A.   Mark was picking up an awful lot of weight that

4    night.  We had joined the gym.  He had a baby coming on the

5    way and he was trying to lose some weight, you know, stay

6    around for the baby and, you know, he was always complaining

7    about the weight.  The weight he was picking up at the gym

8    that night when he was working out was extra heavy, you know,

9    on his back, on his legs.  He was picking up an awful lot of

10   weight that night.

11       Q.   What happened then?

12       A.   Throughout the workout Herva, the whole time, you

13   know, kept rushing him along telling him that he had to go

14   somewhere, he had to go somewhere, you know, and so they

15   eventually left at about anywhere from 7:15, 7:30.

16       Q.   How did the defendant respond when Herva kept

17   telling him they had to go somewhere?

18       A.   You know, he was, in a minute, you know, he was

19   going along with it.

20       Q.   Did you see the defendant and Herva Jeannot leave

21   together?

22       A.   Yes, I did.

23       Q.   What was the approximate time you saw the defendant

24   and Herva leaving together?

25       A.   Me and my girlfriend friend left the gym about

Flores - People - Direct

1    quarter to eight.  They must have left 7:15, 7:30:

2         Q.   I am directing your attention to 9:26 that Friday

3    night.

4         Did you receive a telephone call then?

5         A.   Yes, I did.

6         Q.   Who called you?

7         A.   Mark Orlando.

8         Q.   Where were you when the defendant called?

9         A.   I was at home.

10        Q.   How did the defendant reach you?

11        A.   Called my cell phone number, 516-902-1019.

12        Q.   Did you recognize the defendant's voice?

13        A.   Yes, I did.

14        Q.   Had you spoken to him many times over the telephone

15   before that call?

16        A.   Yes, I have.

17        Q.   Describe any conversation when the defendant

18   reached you at your cell phone, 902-1019?

19        A.   Mark had called and, you know, he was telling me

20   that he was coming back from a dealership, that he was

21   supposed to pick up some money, and that the guy who was

22   supposed to leave him a check wasn't there.  And it wasn't

23   all there, he was frantic, he was frazzled, he's very quick

24   with his words, always handles a conversation very well.  He

25   just wasn't all there.

Flores - People - Direct

1    I had asked him what he was doing the following day, and

2    he had told me it was his wife's birthday.  I asked him if he

3    was doing anything special for her, he said no.  And I even

4    told him, you know, about a restaurant that me and my

5    girlfriend went to before.  I told him the name of it.  I had

6    asked him if he had been there, and he was not even

7    acknowledging the question.  He wasn't there.  He was like,

8    yeah, no, no, yeah, yeah, I was there.  Yeah, yeah, I have

9    been there.  And then my girlfriend had spoke to him

10   briefly.

11        Q.   Did the defendant say anything about Herva Jeannot

12   during that call?

13        A.   No.

14        Q.   Did you expect the defendant call then?

15        A.   No, I did not.  I knew about the incident with the

16   dealership, you know.  I had heard Mark on the phone that

17   week speaking to the guy at the dealership but I had no

18   interest in it at the time.

19        Q.   Did you have any interest at all in the defendant's

20   efforts to he retrieve that refund check?

21        A.   No, I did not.

22        Q.   I am directing your attention to the morning of

23   Saturday, December 4, 2004.

24        Did you learn then about Bobby Calabrese's death?

25        A.   Yes, I did.

Flores - People - Direct

1     Q.   How did you learn that?

2     A.   I was at work that morning.  My brother had called

3  me up and told me that Bobby was shot and killed.

4     Q.   Describe any observations you had made of the

5  defendant and Herva Jeannot during the days before Bobby

6  died?

7     A.   During the eight hour shift, you get two ten minute

8  breaks in the morning.  We always walked towards the

9  cafeteria in a group, you know.  Everyone would be talking.

10  And that week, you know, they kept to themselves.  They

11  walked with us and kind of went off to themselves talking

12  while we went inside the cafeteria.  They were very distant.

13     Q.   Did they involve you in any conversations?

14     A.   No.

15     Q.   Did they involve Barbara?

16     A.   No, they did not.

17     Q.   Did you see them involve anyone else?

18     A.   No.

19     Q.   Did you telephone the defendant that Saturday

20  morning after you learned about Bobby's death?

21     A.   Yes, I did.  I was at work when my brother had

22  called me, and once I got off the phone with him I had called

23  Mark.  Mark had to meet with Bobby sometime that week.  He

24  would always tell me when he was meeting up with Bobby.  He

25  was always happy, he was always picking up money.  Never once

Flores - People - Direct

1  during that whole week, never mentioned he was going to meet

2  up with Bobby that week.

3      I asked him if he had seen Bobby the prior night.  He

4  said yes.  I told him that Bobby was killed.  And, you know,

5  he was shocked.  He said he really liked Bobby.  He couldn't

6  believe what happened.  And, he was, you know, wanted to know

7  what to do.  He had told us tell Bobby's family, to give them

8  his number and tell them to call him.  He wanted to

9  cooperate.  He wanted to make things right.

10      Q.  How did you reach the defendant when you called him

11  then?

12      A.  I called him from work.

13      Q.  How did you reach him?

14      A.  On his cell phone.

15      Q.  Did you call him again that Saturday?

16      A.  I spoke to him a few times and I couldn't really

17  speak because I was at work.  When I went home that morning,

18  prior to calling Mark again, I had spoken to my brother and

19  told him How mark had met up with him that night.  My brother

20  just told us to question him, you know, put him on the spot,

21  ask him whatever you can.  See if you could get as much

22  information as possible.

23      So when, I he went home that afternoon, I called Mark

24  again and asked him a couple of questions about the

25  incident.  I had asked him where they met.  Mark had said

MO

Flores - People - Direct

1    they met in Island Park by Puma Auto Body Shop, he said by

2    the old restaurant.  His wife was in the background and he

3    asked her what restaurant it was.  She was the old McCade's.

4    .I had asked him how long had he spoke for and he told me

5    thirty seconds.  He paused and said two minutes.

6        I had told him, I had asked him, how he paid Bobby, what

7    did he give him back, and he had told me he had given Bobby

8    the same exact money that Bobby gave to him the prior week.

9    Mark that week had, prior week, had made a comment, an issue

10   about Bobby, how Bobby was paying him.  It was large bills.

11   It was twenties, tens, fives.  I asked him how did you pay

12   him, fives tens, twenties, and he said the money I got from

13   the safe is the money I had paid him with.

14       Q.   Did he tell you when they met?

15       A.   Yeah.  He had met about eight, 8:30 checked the

16   cell phone.  I believe it was 8:20.

17       Q.   Did the defendant say he was learning of Bobby's

18   death from you?

19       A.   Yes, he was.

20       Q.   Did the defendant tell you what Bobby did after the

21   payment?

22       A.   Yeah.  I asked him, when I asked him what they

23   spoke about, he said that they spoke about Atlantic City.

24   The following week Mark was planning a big bus trip to

25   Atlantic City.  He wanted to take us, along with Bobby, with

Flores - People - Direct

1   them, to show him a token of appreciation.  He had told me

2   that Bobby even told him what he ate that night.  Bobby had

3   filet mignon that night.

4       Q.   Did he tell you where Bobby was when the defendant

5   last saw him that night?

6       A.   Yeah.  He said after they exchanged the money,

7   Bobby got in his car and drove towards Oceanside.  Then Mark

8   had driven towards Long Beach.  That was it.

9       Q.   Driving towards Oceanside, would that have taken

10  Bobby passed the 7-Eleven intersection of Austin Boulevard

11  and Georgia Avenue?

12      A.   I believe it would.

13      Q.   Did you ever see Herva Jeannot place anything into

14  the trunk of the defendant's car the week before Bobby died?

15      A.   No, I did not.

16      Q.   The day Bobby died?

17      A.   No, I did not.

18          MR. HAYDEN:  Nothing further at this time,

19      Your Honor.

20          MR. LEMKE:  May I?

21          THE COURT:  Mr. Lemke.

22  CROSS EXAMINATION

23  BY MR. LEMKE:

24      Q.   Good afternoon, Mr. Flores.

25      A.   Good afternoon.

Flores - People - Cross

1     Q.   Am I correct to state that Mark Orlando flashed a

2   lot of money around?

3       Isn't that correct?

4     A.   Yes.

5     Q.   You have known Mark for how many years?

6     A.   I have been working at Professional Credit Services

7   for about a year, nine months prior about, probably about

8   thirteen, fourteen months.

9     Q.   During that time I think you said that Mark's

10   arrogant?

11     A.   Correct.

12     Q.   Always bragging about all the money he won and

13   gambling is basically his first profession, correct?

14     A.   His second profession.

15     Q.   In fact there are times that Mark even showed you

16   the money that Bobby had paid him, correct?

17     A.   Correct.

18     Q.   In fact, there was one time that you and Barbara

19   were in mark's car and you were holding that money to see

20   what it felt like to hold so much cash?

21     A.   Yes.

22     Q.   In fact, wasn't that right after Thanksgiving?

23     A.   I know it was about a week before everything

24   happened.

25     Q.   Okay.  So, a week before everything happened,

Flores - People - Cross

1   meaning, December third, was when Mr. Calabrese was killed,

2   correct?

3       A.   Correct.

4       Q.   About a week before would be maybe the

5   twenty-seventh of November of 2004, correct?

6       A.   I don't know the dates specifically, but, an

7   approximation, correct.

8       Q.   And, you were in Mark's car, correct?

9       A.   Yes.

10      Q.   Barbara was in Mark's car?

11      A.   Correct.

12      Q.   Do you remember if anybody else was in his car?

13      A.   Herva.

14      Q.   And when -- four of you in the car, correct?

15      A.   Correct.

16      Q.   Mark was bragging again because Bobby just paid him

17   about another $10,000; isn't that correct?

18      A.   Correct.

19      Q.   Made about 37, $38,000 that Mark was paid over the

20   course of the previous four to five weeks; isn't that

21   correct?

22      A.   Correct.

23      Q.   And you took the money and you passed it around and

24   you were counting it?

25      A.   Just passed it around.  He allowed us to hold it.

Flores - People - Cross

1       Q.   You took, clearly you went through the hundreds and

2    fifties?

3       A.   There were a lot of bills in there.

4       Q.   Barbara held it?

5       A.   Everyone held it.

6       Q.   This is a week before Mr. Calabrese was shot and

7    killed, right?

8       A.   (No verbal response.)

9       Q.   In fact, when is Barbara's birthday?

10      A.   First of November.

11      Q.   And there was a party you wanted to plan for

12   Barbara?

13      A.   Correct.

14      Q.   This is only about thirty days before the death of

15   Mr. Calabrese?

16      A.   Correct.

17      Q.   And, you thought it would be nice, you talked to

18   Mark, you and Mark are good friends.  You talked about

19   things?

20      A.   Yes.

21      Q.   You talked about his family, correct?

22      A.   Yes.

23      Q.   He hoped to have a child some day?

24      A.   Yes.

25      Q.   They tried for many years trying to get pregnant;

Flores - People - Cross

1    is that right?

2         A.    Yes.

3         Q.    And, in fact, they went through high risk

4    pregnancies, correct?

5         A.    Yes.

6         Q.    Mark talked to you about invitro with his wife?

7              MR. HAYDEN:  Objection.

8              THE COURT:  Sustained.

9         Q.    You know, you're very close to Mark, you know about

10   his family, don't you?

11        A.    I know about his relationship between him and his

12   wife.

13        Q.    You knew she was pregnant?

14        A.    Yes, I did.

15        Q.    After trying she finally became pregnant back in

16   December, I guess, maybe she was six and-a-half months

17   pregnant, I believe, correct?

18        A.    About.

19        Q.    In fact, you had been over to Mark and Gianna's

20   house?

21        A.    Been over to the house.

22        Q.    You and Barbara?

23        A.    Correct.

24        Q.    When you wanted to throw the party for your

25   girlfriends, it was suggested that maybe getting a party bus

Flores - People - Cross

1    and going into Manhattan would be a good idea?

2        A.   It was Mark's idea.

3        Q.   It would be about forty people going in?

4        A.   About.

5        Q.   Mark said, listen, I'm winning, I have a lot of

6    money, I will pay for most of it, correct?

7        A.   Correct.

8        Q.   You just chip in, perhaps for maybe some of the

9    alcohol, but don't worry, I'll take care of things, correct?

10       A.   Yes.

11       Q.   Mark did that with everything, correct?

12       A.   With everything that night.

13       Q.   For lunches, when you went out for lunch?

14       A.   Mark always tried to pay for my lunch and things

15   like that but he knows that never flies with me, not the way

16   I did things.  Mark bought me lunch, I bought him lunch the

17   next day.

18       Q.   Not saying anything's wrong.

19     Mark was the gratuitous one.  He was always paying, he

20   always had money?

21       A.   Always.

22       Q.   So, on the week before December third, I think you

23   told this jury that Mark was trying to be by himself that

24   week?

25     Is that what you said?

MO

Flores - People - Cross

1     A.    The week Bobby passed away.

2     Q.    Yeah, the week before.

3     A.    Him and Herva were by themselves.

4     Q.    Let me ask you this.

5     On December third, let's start with that Friday.  That

6     was a Friday, correct?

7     A.    Correct.

8     Q.    During lunch time -- you had certain hours you work

9     within your unit at the collection agency?

10    A.    Correct.

11    Q.    Barbara worked with Mark?

12    A.    Correct.

13    Q.    And, there would be two late nights, I believe, at

14    the collection agency, correct?

15    A.    Yes.

16    Q.    Until nine o'clock at night?

17    A.    Yes.

18    Q.    And Saturday at least once a month?

19    A.    Yes.

20    Q.    Required to go in and maybe work from nine to

21    twelve?

22    A.    A ha.

23    Q.    And mark lived out in Suffolk, correct?

24    A.    Correct.

25    Q.    And, if you know he lived there with his wife,

Flores - People - Cross

1    correct?

2         A.    Yes.

3         Q.    They had a house there?

4         A.    Yes.

5         Q.    And, he would drive in -- Herva didn't have a car,

6    correct?

7         A.    Yes.

8         Q.    He'd pick up Herva at times and bring him into the

9    office, correct?

10        A.    Yes.

11        Q.    And, did you work the late night as Mark worked?

12        A.    I work Tuesday and Thursday.

13        Q.    Tuesday and Thursday, same as Mark?

14        A.    Yes.

15        Q.    December third, that was a Friday, correct?

16        A.    A ha.

17        Q.    And before --

18              THE COURT:   Excuse me.  You have to say yes or

19        no?

20        A.    Yes.

21        Q.    You also went to the gym that night?

22        A.    Yes.

23        Q.    And, didn't Mark drive you home to get your stuff

24    to go to the gym?

25        A.    Yes, he did.  Barbara picked me up at my house.

Flores - People - Cross

1      Q.    In fact, Barbara was upset with you?

2      A.    Correct, because she didn't want me to go with Mark

3   because she was down the house.

4      Q.    Barbara was going to go to the gym with one other

5   friend?

6      A.    Yes.

7      Q.    That is where you went?

8      A.    A ha.

9      Q.    During lunch day?

10      A.    Yes.

11      Q.    That Friday do you remember going to lunch with

12   Mark and you and Barbara?

13      A.    I don't remember.  I believe we did, but I don't

14   remember it.

15      Q.    You went to Applebees?

16      A.    Yes, we did.

17      Q.    The day before, Thursday, December second.

18   Remember that day working?

19      A.    A ha.  Yes, I do.

20      Q.    Mark was at work?

21      A.    Yes, he was.

22      Q.    Four of you were basically pretty good friends,

23   Herva, yourself, Barbara, correct, and you?

24      Correct?

25      A.    Correct.

Flores - People - Cross

1    Q.   In fact, the day before, which is December second,

2    remember going out to lunch with the four you have?

3    A. ·  Yes.   Wasn't the four of us.

4    Q.   I'm sorry?

5    A.   When we went to Applebees it was me, Mark and

6    Barbara.

7    Q.   Do you remember the day before going also to lunch

8    with Mark?

9    A.   I don't recall where we went.

10   Q.   How about Fulton Street Pub?

11   A.   There you go.

12   Q.   Now, so, he's spending, Mark's spending all this

13   time with you on Thursday and all this time with you on

14   Friday; is that correct?

15            MR. HAYDEN:   Objection, all this time.

16            MR. LEMKE:   Withdrawn.

17            THE COURT:   Sustained.

18   Q.   When you· get tó work, you have to work, you can't

19   just hang around?

20   A.   Correct.

21   Q.   As soon as you get a break you were altogether?

22   A.   During the ten, course of the ten minute break,

23   like I said, we always walked together, speak together in a

24   group, and during that time we were not together.   Mark did

25   distance himself.

1    Q.    For the ten minutes he distanced himself from you

2    but yet on that Thursday you went together to the Fulton

3    Street Pub, on Friday you went to Applebees, and Friday,

4    after work, he took you home, you were going to the gym

5    together; is that correct?

6    A.    Correct.

7    Q.    What about the Wednesday before?   How about

8    December first.   Do you remember that day?

9         Isn't that check cashing day?

10   A.    Yes.

11   Q.    Do you remember going with Mark, Mark drove you and

12   Barbara to cash your checks?

13   A.    Correct.

14   Q.    You spent all lunch together that day.   In fact,

15   you went to the Dime Bank where Barbara cashed her check?

16   A.    Correct.

17   Q.    Then you went to cash your check?

18   A.    Correct.

19   Q.    You guys were all together that day too?

20   A.    Yes.

21   Q.    Didn't distance himself then, did he?

22   A.    No, he did not.

23   Q.    Now, prior, or in fact, during the year 2004 -- you

24   know that Mark's certainly a gambler?

25   A.    Right.

Flores - People - Cross

1    Q.    I think you testified to that, right?

2    A.    Yes.

3    Q.    He placed bets either through other runners,

4    correct?

5    A.    Correct.

6    Q.    And those runners would be responsible to take that

7    money perhaps to someone else in the organization, correct?

8    A.    I believe so.

9    Q.    And, those other individuals either collected the

10   money or paid out the money, and sometimes take what is known

11   as a vig, if you know what that is?

12   A.    No, I do not.  Not familiar with the terminology.

13   Q.    Well, during the year 2004, Mark would perhaps

14   place bets either at Off Shore Betting, if he could, right?

15   You have to answer?

16   A.    Yes.

17   Q.    Or basically anywhere Mark could place a bet he

18   would do that?

19   A.    A ha.

20   Q.    He's extremely successful?

21   A.    Correct.

22   Q.    And, when if you lose during a week, you would be

23   responsible to pay that the following week; isn't that

24   correct?

25   A.    Yes.

Flores - People - Cross

1      Q.   So, here Mark has been winning all this time.

2   First time really he has have to pay back anything would be

3   for that one week, the betting for that Monday, Tuesday

4   perhaps Wednesday, Thursday and Friday?

5      A.   Yes.

6      Q.   That would be due that following Monday, Tuesday,

7   in some cases, Thursday or Friday?

8      A.   Whenever he met up with Bobby.

9      Q.   Okay.  Now, the $10,000 that you held in your hand

10  just a week before Bobby's death, that was Mark's money,

11  wasn't it?

12     A.   Yes.

13     Q.   You didn't see him throwing it and buying leather

14  jacket or throwing it on anything else, did you?

15     A.   No, that week he just told us he paid a couple of

16  bills with it.  He had given money to family, along with his

17  wife.

18     Q.   In cash?

19     A.   I don't know.

20     Q.   In fact, he always had all this money to pay, in,

21  fact, his house bills correct?

22          MR. HAYDEN:  Objection.

23     A.   I don't know about Mark's finances.

24          THE COURT:  Overruled.

25     Q.   If you know.

Flores - People - Cross

1  A. (No verbal response.)

2  Q. You also know too in your relationship I think Mark

3 -- couple more questions -- that you also associated with

4 Mark out of the office?

5  A. Yes, it was.

6  Q. You would also go, when you're talking about going

7 out to dinner and out to clubs, barbecues, you were with Mark

8 and Barbara as well?

9  A. Correct.

10  Q. Herva would get rides, relied on Mark to get

11 various rides?

12  A. Either Mark or his brother, but he would get rides

13 everywhere.

14  Q. Herva, you weren't really friendly with Herva?

15  A. Not, just, you know, polite to each other.  Didn't

16 really hand out unless Mark was with us.

17  Q. Did Herva talk about his military service in any

18 way?

19  A. I knew Herva was in the service.   I don't know

20 what branch he was in or anything like that.

21  Q. You knew he was in some type of assigned weaponry?

22 If you know?

23  A. I had no knowledge of that.

24  Q. But you know he was in the service?

25  A. I knew about some type of service.

Case 2:11-cv-03992-ERK  Document 8-13  Filed 01/17/12  Page 99 of 105 PageID #: 884

1      Q.   Also the gym you went to, Mark paid for that gym,

2  didn't he?

3      A.   He put it on his credit card.  I gave him the money

4  for it.  Because I didn't have a credit card at the time for

5  the first payment, for the first month.

6      Q.   Mark had a credit card, you went to the gym, and

7  Mark said, fine, put it on my credit card, no problem, pay me

8  when you want to pay me?

9      A.   Correct.  Mark was trying to lose weight for the

10  baby  and, you know, I told him I'd help him try to lose

11  weight.  I didn't want to sign up for the gym yet.  I needed

12  a few more weeks to save up money to sign up for the gym, and

13  he wanted to go to the gym to start the program, start losing

14  weight.  So, he had told me don't worry about it, put it on

15  my credit card, give me the money for it later.  He did it

16  for the first payment at the gym.

17      Q.   Because he always had money?

18      A.   He never paid for it.

19      Q.   You reimbursed him?

20      A.   Absolutely.

21      Q.   In fact I think you asked Mark to go to Tri-County

22  to buy jewelry for Barbara?

23      A.   That's correct, for Barbara's birthday.

24           MR. LEMKE:  Just one moment. I don't think I

25  have any further questions.  One other question.

Flores - People - Cross

1      Q.    When you were at the gym that night, I think it's
2    clear that you were there working out.   Mark was working out,
3    and Herva was working out, correct?
4      A.    Correct.
5      Q.    It's your testimony that it was Herva who kept
6    saying, Mark, let's go, let's go?
7      A.    Yes.
8      Q.    Mark said don't worry about it.   I'm working out,
9    right?
10      A.    It wasn't like that.   Mark was telling him, okay,
11    okay, we're going.   Just calm down.
12      Q.    Hold on.   Hold on.
13      A.    Exactly.
14      Q.    In fact, when you then speak to him, maybe an hour
15    and-a-half later, you had indicated that Mark wasn't the
16    same, was he?
17      A.    No, he wasn't.
18      Q.    Something was wrong with him?
19      A.    Correct.
20      Q.    Clearly you could identify that, you knew it was,
21    something happened.   You knew Mark wasn't himself?
22      A.    Correct.
23              MR. LEMKE:   Okay.   Thank you.
24              THE COURT:   Mr. Hayden.
25              MR. HAYDEN:   Yes, Your Honor.

Flores - People - Redirect

1    REDIRECT EXAMINATION

2    BY MR. HAYDEN.

3        Q.    I want to take you back to your testimony about

4    Mark and Herva distancing themselves during the day before

5    Bobby died.  You mention that you went to lunch with Mark on

6    Wednesday, Thursday and Friday.

7        Tell the jury where it was that you saw the defendant and

8    Herva Jeannot distancing themselves from you, Barbara and

9    other employees at Professional Credit Services?

10       A.    It was during the course of the ten minute break we

11   get in the morning at about ten o'clock.  There is a

12   cafeteria in the back of the work place.  We usually all take

13   a walk from our desks into the cafeteria.  And, as we were

14   walking towards the cafeteria, Mark and Herva were talking

15   the whole time.  They kind of went off towards the out

16   doors.  That was the time that he was distancing himself from

17   us.

18       Q.    Stayed away from you?

19       A.    Correct.

20       Q.    And Barbara?

21       A.    Yes.

22       Q.    And other employees?

23       A.    Yes.

24       Q.    Now, you testified during cross examination that

25   Mark was extremely successful as a gambler; is that right?

Flores - People - Redirect

1    A.    Yes.

2    Q.    Where did you get that information?

3    A.    Mark.  Mark would say how good he was.  Mark had

4    the folder with him, notes of who was playing, where, what

5    the spread was, what their record was.  He said that was a

6    second job, that was he was a professional gambler.

7    Q.    You were asked during cross examination about the

8    defendant's relationship with his wife.

9    Describe the defendant's relation with his wife.

10   A.    Mark was having some problems with his wife.  We'd

11   go out sometimes, you know, myself, Mark, Barbara, after work

12   and, you know, he'd drink and he wouldn't call her, he'd come

13   home late.  You know, Mark didn't care.  You know.  He said

14   he was going to get his own apartment.  He didn't care about

15   the baby.  That all she was just there for the baby.  You

16   know, that that is all it was.  You know, basically they was

17   just having problems.

18   Q.    Ever see him with other women?

19   A.    Seen mark at nudey bars, you know.  Absolutely with

20   other woman.  I believe he had, you know, spoke to one of my

21   girlfriends, but I never seen myself, no.

22         MR. HAYDEN:  Nothing further, Your Honor.

23   RECROSS EXAMINATION

24   BY MR. LEMKE:

25   Q.    Mark just didn't talk about winning money, he had

Flores - People - Recross

1   the money.  You have seen the thousands of dollars, ten

2   thousands he said?

3        A.   Correct.

4        Q.   You seen him buy things, correct?

5        A.   Yes.

6        Q.   You seen him loan people money, correct?

7        A.   Correct.

8        Q.   He didn't talk a big story, he backed it up, didn't

9   he?

10       A.   With the money.

11       Q.   As far as his wife, he talked to you about the baby

12   on the way and the pressure that came with it?

13       A.   Yes.

14       Q.   Thank you?

15            THE COURT:  Anything further?

16            MR. HAYDEN:  No.

17            THE COURT:  You may step down.

18        (Witness excused.)

19            THE COURT:  Counsel, approach.

20        (Whereupon, there was a bench conference held off

21   the record.)

22            THE COURT:  Ladies and gentlemen in the

23   gallery, please remain seated until the jury leaves the

24   room.

25            Ladies and gentlemen, we're going to close for the

Proceedings

1   day at this point.  I'm asking you to come at nine

2   o'clock and you're directed to be here at nine o'clock

3   otherwise the Court will have to take certain measures

4   with respect to that.  Everybody understand that.  So,

5   everybody's directed to be back here at nine o'clock.

6       I'm going to give the admonition again.  I wish you

7   all a good night.  You must not converse among

8   yourselves or with anyone else upon any subject

9   connected with the trial.  You must not read or listen

10  to any accounts or discussions of the case in the event

11  it is reported by the newspapers or other media.  You

12  must not visit or view the premises or place where the

13  offense charged was allegedly committed, or any other

14  premises or place involved in the case.

15      Prior to your being discharged you must not request,

16  accept, agree to accept or discuss with any person the

17  receiving or accepting of any payment or benefit in

18  consideration for supplying any information concerning

19  the trial.

20      You must promptly report to the Court any incident

21  within your knowledge involving an attempt by any person

22  improperly to influence any member of the jury.

23      You shall not access the Internet or Worldwide Web

24  by any means available to you for the purposes of either

25  learning about the case or to learn about the law and

MO

Proceedings

1    legal issues concerning the case.

2        You will leave your books there.  We will take them

3    and we will return them to whoever's taking notes in the

4    morning.  Nine o'clock promptly.

5        The case is moving at a good pace and I want to keep

6    it moving that way.  I wish you all good a night.

7        Thank you.

8        (Whereupon, the following takes place outside the

9    presence of the jury.)

10        THE COURT:  As you know I instructed the jury

11    to return at nine.  I hope to get going by 9:15, 9:30.

12    If counsel would both check in with my chambers in the

13    morning, I will be in early.  The trial will resume in

14    Judge LaPera's courtroom tomorrow unless you hear

15    differently from me.  I believe that is on the third

16    floor.

17        THE COURT OFFICER:  Yes.

18        THE COURT:  For the people in the gallery.

19    Counsel, have a good night.

20        (Whereupon, the trial was adjourned to June 8,

21    2005.)

22

23

24

25