1    STATE OF NEW YORK :   NASSAU COUNTY

2        COUNTY COURT PART 11

3    - - - - - - - - - - - - - - - - - - - -X

4    THE PEOPLE OF THE STATE OF NEW YORK,        SCI/IND. NO.
                                                 167N-2005
5                        -against-
                                                 TRIAL
6    MARK ORLANDO,
                                     Defendant.
7
     - - - - - - - - - - - - - - - - - - - -X
8
                                 262 Old Country Road
9                                Mineola, New York
                                 June 8, 2005
10

11

12   B e f o r e :

13              HON. DAVID P. SULLIVAN, Supreme Court Justice

14   A p p e a r a n c e s :

15

16          HON. DENIS DILLON
               District Attorney, Nassau County
17             By: ROBERT T. HAYDEN, ESQ.
               Assistant District Attorney
18

19

20          DENNIS LEMKE, ESQ.
               Attorney for Defendant
               114 Old Country Road
21             Mineola, New York   11501

22

23

24                           Mary Ocskai
                             Official Court Reporter
25

**COPY**

MO

Proceedings

1          THE CLERK:  Case on trial, 167N-2005, People of

2   the State of New York versus Mark Orlando.

3       Appearances, please, for the People.

4          MR. HAYDEN:  Robert T. Hayden for the, People

5   Your Honor.

6          THE CLERK:  Representing the defendant.

7          MR. LEMKE:  Dennis Lemke, ready for trial,

8   Your Honor.

9          THE CLERK:  People ready.

10          MR. HAYDEN:  Ready.

11          THE CLERK:  Let the record reflect the

12   presence of Mr. Orlando.  Jury's not in the courtroom at

13   this time.

14          THE COURT:  Any applications before bringing

15   the jury in?

16          MR. LEMKE:  None, Your Honor.

17          MR. HAYDEN:  No.

18          THE COURT:  Bring the jury in.

19          THE COURT OFFICER:  Jury entering.

20          THE CLERK:  Please answer up when you hear

21   your name called.

22       Patricia Bologna.

23          A JUROR:  Present.

24          THE CLERK:  Aileen Nathan.

25          A JUROR:  Present.

Proceedings

```
 1              THE CLERK:  Louis Quaglia.

 2              A JUROR:    Present.

 3              THE CLERK:  Raffat Hayat.

 4              A JUROR:    Present.

 5              THE CLERK:  Sally Turrillbarnes.

 6              A JUROR:  Present.

 7              THE CLERK:  Michael Kirkby.

 8              A JUROR:  Present.

 9              THE CLERK:  Thomas Scarfo.

10              A JUROR:  Present.

11              THE CLERK:  Christopher Delaney.

12              A JUROR:  Present.

13              THE CLERK:  Jennifer Eichstaedt.

14              A JUROR:  Present.

15              THE CLERK:  Robert Herrera.

16              A JUROR:  Present.

17              THE CLERK:  Anthony DiSalvo.

18              A JUROR:  Present.

19              THE CLERK:  Marie Ginobbi.

20              A JUROR:  Present.

21              THE CLERK:  Ora Jenkins.

22              A JUROR:  Present.

23              THE CLERK:  Jennifer Zuzio.

24              A JUROR:  Present.

25              THE CLERK:  And Joseph Tiriro.
```

Proceedings

1        A JUROR:  Present.

2        THE CLERK:   Let the record reflect all the

3    jurors are present and accounted for.

4        THE COURT:  Good morning, ladies and

5    gentlemen.  Thank you for your patience.  The Court had

6    to take care of some unrelated things this morning, but

7    now being able to clear my calendar, we will put in a

8    full day today, and the Court feels it's ahead of

9    schedule.  So, I think I will be coming in with this

10    case, getting it to you, way before what I anticipated,

11    hopefully.  Okay.

12        Mr. Hayden, your next witness.

13        MR. HAYDEN:  Barbara Diamant.

14    BARBARA ROSE DIAMANT, called as a witness by the People,

15    having been first duly sworn by the Clerk of the Court,

16    was examined and testified as follows:

17    DIRECT EXAMINATION

18    BY MR. HAYDEN:

19        THE CLERK:  State your name, spell your last

20    name, give your county of residence.

21        THE WITNESS:  Barbara Rose Diamant,

22    D-I-A-M-A-N-T, Suffolk.

23        THE COURT:  Good morning.

24        THE COURT:  Can everybody hear the witness?

25    Mr. Lemke.

**COPY**

MO

Diamant - People - Direct

1              MR. LEMKE:  Yes, Your Honor.

2       Q.    Good morning.

3       A.    Good morning.

4       Q.    Where do you work?

5       A.    Professional Credit Services.

6       Q.    Where is Professional Credit Services located?

7       A.    It is in Farmingdale off of Route 110.

8       Q.    Describe Professional Credit Services?

9       A.    It's a one-story white building.  It's got about

10   three hundred people.  And it's divided into units that are

11   categorized by clients such as Verizon, Sprint, Chase, et

12   cetera.

13      Q.    Describe the work you do for Professional Credit

14   Services?

15      A.    I represent Sprint and I call people that have

16   unpaid Sprint cell phones bills.  I assist them and give them

17   options to pay back their bills.

18      Q.    Do you know a man named Mark Orlando?

19      A.    Yes, I do.

20      Q.    How do you know Mark Orlando?

21      A.    I had worked with Mark Orlando at Professional

22   Credit Services.

23      Q.    Describe Mark Orlando?

24      A.    Mark Orlando is white, Caucasian, heavy set, brown

25   hair, brown eyes.

Diamant - People - Direct

1      Q.   Do you see Mark Orlando in this courtroom today?

2      A.   Yes, I do.

3           MR. LEMKE:  So stipulated, Your Honor.

4           THE COURT:  Let the record reflect the witness

5      has identified the defendant as Mark Orlando.

6      Q.   How long have you known Mark Orlando?

7      A.   Four years.

8      Q.   Describe the work the defendant Mark Orlando did

9   for Professional Credit Services?

10     A.   Mark Orlando also represented Sprint PCS.  He would

11  call people and give them options on how to pay back their

12  Sprint phone bills as well.

13     Q.   Do you know a man name Herva Jeannot?

14     A.   Yes.

15     Q.   Describe Herva Jeannot?

16     A.   Herva Jeannot is about 5'9", Haitian, muscular,

17  medium build, brown eyes, facial hair.

18     Q.   How do you know Herva Jeannot?

19     A.   I had also worked with Herva at Professional Credit

20  Services.

21     Q.   Describe the work Herva Jeannot did for

22  Professional Credit Services?

23     A.   Herva also represented Sprint PCS and called people

24  and gave them options on how to pay back their Sprint cell

25  phones bills.

1    Q.    Describe any observations you made of a

2    relationship between the defendant and Herva Jeannot.

3    A.    Mark and Herva were very good friends since I have

4    known both of them.  Herva had came later into the job, and

5    he worked in the dialer unit which is not as experienced as

6    desk collector positions.  They didn't really talk then, but

7    Herva then had gotten experience and moved to a desk

8    collector position.

9    Ever since then they were closer to each other and became

10   very good friends.  Mark would pick Herva up to go to work,

11   he would take Herva home.  He would take him home, he would

12   bring him to work, he would go to the gym, he would go to

13   nudey bars.  He would go to regular bars, he would go out

14   with him.  Stuff like that.

15   They were very close friends.  That was the observation I

16   got.

17   Q.    You would see them together a lot at work?

18   A.    Yes.  I would see them together a lot at work.

19   They would go to breaks together.  Sometimes with me and

20   Tommy, whose my boyfriend.  Lunch.  Yeah.  A lot.

21   Q.    You would see them together a lot outside of work?

22   A.    Yes, I would.

23   Q.    For how long a period of time did you observe the

24   defendant and Herva Jeannot spending a lot of time together?

25   A.    For about a year.

Diamant - People - Direct

1      Q.   Do you know a young man named Tommy Flores?

2      A.   Yes, I do.

3      Q.   Who is Tommy Flores?

4      A.   Tommy Flores is my boyfriend.

5      Q.   How do you know Tommy?

6      A.   I had met Tommy at Professional Credit Services

7   where I work.

8      Q.   Did you know a young man named Bobby Calabrese?

9      A.   Yes, I did.

10     Q.   Is Bobby dead?

11     A.   Yes.

12     Q.   How do you know Bobby?

13   Did you meet Bobby through Tommy?

14     A.   (No verbal response.)

15     Q.   Were you aware of a relationship between the

16   defendant and Bobby Calabrese in latent October and November

17   of 2004?

18     A.   Yes, I was.

19     Q.   Describe that relationship?

20     A.   All I knew was Tommy introduced Mark and Bobby to

21   each other and Mark would bet on games such as football,

22   basketball, and if Mark would win Bobby would supply him with

23   the money.  If he would lose then Mark would give money to

24   Bobby.

25   That is all I really knew about that.

Diamant - People - Direct

1     Q.   The defendant was betting through Bobby?

2     A.   Yes.

3     Q.   Did you ever hear the defendant talk about gambling

4  before he met Bobby Calabrese?

5     A.   Yes, I did.

6     Q.   How often would you hear the defendant talking

7  about gambling?

8     A.   Well, around the time I've known Mark, he's always

9  gambled.  He had somebody that he used to be friends with, he

10  would gamble on the same kinds of sports, football,

11  basketball, and he would win.  He was always talking about

12  his winnings.  Stuff like that.

13     As I've known him, he's gotten more addicted to

14  gambling.  He would spend more time behind restaurants and

15  other places, he would gamble, play cards with people.  He

16  would do it on line.  He would play cards as well.  And, he

17  just got more and more into it because he knew he was good at

18  it.

19     Q.   He told you that?

20     A.   Yes.

21     Q.   He spoke about it often?

22     A.   Yes.  It was like a second job to him.

23     Q.   How long had the defendant been talking about

24  gambling before he met Bobby Calabrese?

25     A.   Ever since I met him.

Diamant - People - Direct

1    Q.    How long is that?

2    A.    Four years.  About four years.

3    Q.    Did you see the defendant spend money before he met

4  Bobby Calabrese?

5    A.    Yes, I did.

6    Q.    Where did you see the defendant spend money?

7    A.    Mark would take me out to lunch a lot.  We'd go out

8  with a lot of my friends and he would always spend money on

9  me and my friends.  They never paid for anything.  Just, I

10  had a birthday and he took care of the bus ride for my

11  birthday.  A lot of the liquor.  He put more than half the

12  amount into it.  Food, breakfast, you know, he would just pay

13  for a lot of that.

14    Q.    Where was that bus ride?

15    A.    We went to the city.

16    Q.    Manhattan?

17    A.    Yes.

18    Q.    That was in November of 2004?

19    A.    Yes.

20    Q.    Did the defendant talk about his gambling winnings

21  with you during November of 2004?

22    A.    Yes, he did.

23    Q.    How often would he talk about his gambling

24  winnings?

25    A.    All the time.  If he was up he would pretty much

Diamant - People - Direct

1    brag about it.  Tell me how much he was up, how well he was

2    doing.

3        Q.    Tell the jury what he would say about his gambling

4    winnings?

5        A.    He was really, you know, he was a professional

6    gambler.  He loves to gamble.  He would say he was always

7    up.  I never heard him mention he was down.  Always up.  He

8    may have been down maybe once or twice a couple of hundred or

9    a thousand but ever since then he was betting huge sums of

10   money on these bets and he would always win.

11       Q.    That is what he told you?

12       A.    That is what he told me.

13       Q.    Did the defendant ever show you his gambling

14   winnings?

15       A.    Yes, he did.

16       Q.    Tell the jury about that?

17       A.    I was at work one day and he called my extension

18   and he showed me this big wad of cash, and I was just

19   dumbfounded because I couldn't believe somebody would bring

20   that kind of money to the job.  I said, like, what are you

21   doing.  He said this is the money I won.  And, it just

22   shocked me, but he brought it to work, a big wad of cash.

23       Q.    Did the defendant talk about spending his gambling

24   winnings in November of 2004?

25       A.    Yes, he did.

1          Q.    What did he tell me you about that?

2          A.    I remember a time specifically we were hanging out

3    in the car just talking after coming back from lunch and I

4    asked him, what do you do with all this money you're winning,

5    and he's like, I'm paying my bills, my credit cards, paying

6    back my debts.

7          And there was another incident in particular that I was

8    at work and he called me because he had just gotten off the

9    phone with one of his relatives.  He was very proud of

10   himself because he had told me that a certain relative of his

11   had lent him money a long time ago, and they never really

12   expected it back, but since he had all this extra money he

13   thought he'd give him $4,000 as far as, you know, doing

14   something good for them, and that was pretty much it.  He was

15   happy he did that for them.

16         Q.    I am directing your attention to the night of

17   Friday, December 3rd of 2004.

18         Did you see the defendant that night?

19         A.    Yes, I did.

20         Q.    Where did you see the defendant?

21         A.    I say him at L.A. Fitness Gym.

22         Q.    Where is L.A. Fitness?

23         A.    It's in Farmingdale off Route 110.

24         Q.    Describe L.A. Fitness for the jury?

25         A.    L.A. Fitness is fairly large.  Has lots of

1    equipment, a swimming pool, racquetball court, Jacuzzi.

2         Q.   Were you with anyone when you saw the defendant?

3         A.   Yes, I was.

4         Q.   Who were you with?

5         A.   With my friend Rory and Tommy and Herva was there.

6         Q.   Was Herva with the defendant?

7         A.   Yes, he was.

8         Q.   Describe any observations you made of Herva Jeannot

9    and the defendant when you saw them together at L.A. Fitness

10   that Friday night?

11        A.   Well, about five, ten minutes before they were

12   about to leave I had walked over to them to say what's up and

13   Herva, Mark was on one of those leg machines.  There was a

14   lot of weight on the machine.  It looked like he was doing

15   more than he normally would especially for a big guy his

16   size.  It looked like he was struggling.  I've never seen him

17   do that before.  I know that Herva had insisted, he said,

18   come on, Mark, we got to go, we got to go, and Mark was, all

19   right, all right, I'm coming, I'm coming.

20        That was really it.

21        Q.   Did you see the defendant and Herva Jeannot leave

22   L.A. Fitness together that night?

23        A.   Yes, I did.

24        Q.   What was the approximate time?

25        A.   About 7:15.

Diamant - People - Direct

```
 1         Q.    Directing your attention to the morning of
 2   Saturday, December 4th, 2994.
 3         Did you learn about Bobby Calabrese's death then?
 4         A.    Yes, I did.
 5         Q.    How did you learn about Bobby Calabrese's death?
 6         A.    I was at the hair salon and I called my boyfriend
 7   Tommy at work to tell him how my hair was coming out.  He was
 8   frantic.  He told me his friend Bobby had gotten shot.  He
 9   said he's dead.  I was like, what are you talking about, what
10   happened.  And he said like, I don't know, he's like, I know
11   Mark owed him some money.  Mark saw him last night.  I just
12   spoke with Mark.  I don't know what's going on.  And I was
13   like, all right, I'm like, you know, I was trying to get
14   information from him, but he really had no information to
15   give me because he didn't really know what was going on, and
16   he's like, I got to go, I got to call you back.  I don't know
17   what's going on.  I was like, you know, I was insisting he
18   stay on the phone, but he wouldn't.
19         So, my next reaction at that point was to call Mark, you
20   know.  Maybe Mark knows.  Mark saw him last night, you know.
21   So, at that point I had spoken to Mark.  I called Mark and I
22   was like, Mark, I'm like, you know, what's going on.  Tommy's
23   all frantic.  He said I saw him last night.  I was like, you
24   spoke to him last night.  He said yeah.  All I know is like,
25   that Bobby had gotten shot in the back of the head three
```

Diamant - People - Direct

1    times and, three times, he's like yeah, three times.  And it

2    was very, it was shocking to me that was said because it was

3    such vivid detail.  I hadn't heard that from anybody before.

4    I had not heard that from my boyfriend Tommy.  How would Mark

5    know something like that.  It didn't click to me at that

6    point.

7        We just kept talking and I was like, who would do

8    something like this, and he's just like, I don't know.  He

9    was very scared, very much like, you know, he's saying, I'm

10   nervous, my number's on his phone.  You know, they're

11   probably going to think I did it.  I was like, you know, just

12   pray, pray for the situation, you know.  You didn't do

13   nothing wrong.  Everything will be fine.  You have nothing to

14   worry about.  You didn't do anything.  He said yeah, I'm just

15   scared, I'm praying for my life.

16       At this point -- and another thing he said that he was

17   willing to cooperate fully with Bobby's family, and that he

18   would be willing to give his cell phone number to Bobby's

19   family and help them in any way he can to cooperate.

20           MR. HAYDEN:  Nothing further at this time,

21       Your Honor.

22           Thank you.

23           THE COURT:  Mr. Lemke.

24           Slow yourself down. Talk into the mike so the

25       jury can hear you.

MO

1    CROSS EXAMINATION

2    BY MR. LEMKE:

3        Q.    I have a couple of questions.

4        A.    It's okay.

5        Q.    If you don't understand I will certainly repeat

6    it.

7        You know Mark for three years, three and-a-half years?

8        A.    Yes, I have.

9        Q.    In fact, he was working at Professional Services

10   before you got there, correct?

11       A.    Right.

12       Q.    And, for all those three years you have known Mark,

13   you've known him to be a gambler?

14       A.    Yes.

15       Q.    He always talked about his winnings, correct?

16       A.    Ah huh.

17       Q.    And he may lose one week but overall he was always

18   winning?

19       A.    Right.

20       Q.    If you took a look at either a month's period or

21   six month period, he was up substantially, wasn't he?

22       A.    Right.

23       Q.    He would talk to you about the winnings he had and

24   he'd talk about what he did with those monies, correct?

25       A.    Yes, he did.

Diamant - People - Cross

1    Q.    He also talked to you about his family, his

2  sisters, and what they do for a living, right?

3    A.    His family, no.

4    Q.    Well, you know he has two sisters?

5    A.    Yes.

6    Q.    They're married, right?

7    A.    Okay.

8    Q.    He's married, correct?

9    A.    Yes.

10    Q.    And during this time if you needed money or Tommy

11  needed money you'd go to Mark and Mark would give it to you,

12  loan it to you, right?

13    You have to answer for the record?

14    A.    Yes.

15    Q.    And, in fact, one time I think you were very

16  surprised that Mark had a wad of hundreds and fifties.

17    Do you remember what it was?

18    A.    No.

19    Q.    Well, do you remember when you first saw that?

20    Was that in November?

21    A.    It was when he had won, yes.  I don't know the

22  exact date or month, but I know it was when he won because it

23  was about, I believe, it was maybe even $17,000.

24    Q.    $17,000?

25    A.    Ah huh.

MO

Diamant - People - Cross

1      Q.   And that would be about a week before

2   Mr. Calabrese's death, correct?

3      A.   No.

4      Q.   You were in the car with Mark, weren't you, and

5   your boyfriend?

6      A.   When?

7      Q.   When there was a bundle of cash you were passing

8   around in the car.

9      Do you remember that?

10     A.   Yeah.  Okay.  Yeah, yes, I do.

11     Q.   You remember that?

12     A.   Yes.

13     Q.   That was a separate time from the $17,000 that he

14   brought into the office that he was showing you?

15     A.   Yes.

16     Q.   That was about a week apart, wasn't it?

17     A.   I can't remember that.  I am sorry.

18     Q.   Well, was it longer than two weeks, Barbara?

19     A.   That I don't remember.

20     Q.   Could have been though a week apart?

21          MR. HAYDEN:   Objection.

22     A.   Could have been.

23          THE COURT:   Overruled.

24     Q.   Could have been, correct?

25     A.   Yes.

Diamant - People - Cross

1      Q.    Within a week you saw close to $28,000 in cash that

2   Mark had shown you and some of that money was used to

3   celebrate your birthday, right?

4                  THE COURT:  Well, you may not know.

5                  MR. LEMKE:  Withdrawn.

6      Q.    You celebrated your birthday by going into the city

7   where the party was?

8      A.    Yes.

9      Q.    You were certainly close with Mark, you went out to

10  lunch quite a bit with everybody?

11     A.    Yes.

12     Q.    At times do you remember whether or not if he was

13  doing some construction work, whether he would ask Tommy to

14  help him and he would get paid money to do side jobs as well?

15     A.    Tommy did help him once in awhile.  He would get

16  fifty bucks.

17                 MR. LEMKE:  Okay.  I have nothing further.

18                 THE COURT:  Mr. Hayden's going to ask you a

19         couple of questions.

20  REDIRECT EXAMINATION

21  BY MR. HAYDEN:

22     Q.    Counsel asked you if Mark was always winning.

23     A.    Yes.

24     Q.    You said he was?

25     A.    Right.

Diamant - People - Redirect

1    Q.    Who told you that?

2    A.    That Mark did, that he's always winning.

3    Q.    You got all the information from Mark?

4    A.    Yes.

5    Q.    He is the one who told you he's always winning?

6    A.    Yep.

7    Q.    Counsel asked you some questions about your

8    knowledge of the defendant's family.

9      Do you remember that?

10   A.    Yes.

11   Q.    Did the defendant ever talk to you about his

12   mother-in-law?

13   A.    Yes, he did.

14   Q.    Would you tell the jury what the defendant told you

15   about his mother-in-law?

16              MR. LEMKE:   I'm objecting.   It's not relevant.

17              THE COURT:   Overruled.

18   A.    Well, he would tell me that the mother-in-law was

19   getting a very big settlement, a very big supplement, and

20   that he'd be coming into a lot of money if he stuck around in

21   his relationship.

22   Q.    What did that mean to him?

23   A.    The money?  A lot.  He's, you know, Mark's very

24   much all about his money.  You know.  And once he gets his

25   hands on it, you know that's --

MO

1    Q.    Did he tell you that was the motive to stay with

2    his wife?

3    A.    Yes, and the baby.

4         MR. HAYDEN:  Nothing further.

5         THE COURT:  Mr. Lemke.

6    RECROSS EXAMINATION

7    BY MR. LEMKE:

8    Q.    Not only did Mark tell you he was winning a lot of

9    money, but you saw it, didn't you?

10   A.    Yes.

11   Q.    You saw at least $29,000 within a week in November

12   of 2009?

13   A.    $29,000?

14   Q.    $18,000 you said on one day and maybe ten another?

15   A.    Yes.  Chunks of change I saw in the car.  Yes, I

16   did see that.  Right.

17   Q.    You saw another --

18   A.    I don't know exactly when that was, but I did see

19   that also.  He told me how he spent the money on his bills

20   and stuff.  That it was all spent.

21   Q.    That was in 2004, a week or so before Mr. Calabrese

22   died?

23   A.    I don't remember.

24        MR. LEMKE:  Thank you.

25        THE COURT:  Anything further?

MO

Walker - People - Direct

1                    MR. HAYDEN:  Nothing further.

2                    THE COURT:  Thank you very much.  You may step

3          down.

4                    (Witness excused.)

5                    MR. HAYDEN:  Frank Walker.

6     FRANK WALKER, called as a witness by the People, having been

7          first duly sworn by the Clerk of the Court, was examined

8          and testified as follows:

9     DIRECT EXAMINATION

10    BY MR. HAYDEN:

11                   THE CLERK:  State your name, spell your last

12         name, and give your county of residence.

13                   THE WITNESS:  My first name is Frank, my last

14         name is Walker, W-A-L-K-E-R, resident of Nassau County.

15                   THE COURT:  Good morning.

16         Either speak in a loud voice or you can use the mike

17         but you have to get close to it.  Thank you.

18         Mr. Hayden.

19                   MR. HAYDEN:  Yes, Your Honor.

20    Q.    Good morning.

21    A.    Good morning.

22    Q.    How old are you?

23    A.    Sixty.

24    Q.    What is your occupation?

25    A.    Car salesman.

COPY  MO

Walker - People - Direct

1    Q.   Do you know a man named Mark Orlando?

2    A.   Yes, I do.

3    Q.   How do you know Mark Orlando?

4    A.   Mark Orlando purchased two or three automobiles

5    from our dealership when I was employed there.

6    Q.   Was that in Wantagh Suzuki?

7    A.   Yes, it was.

8    Q.   How long have you known Mark Orlando?

9    A.   I would have to say approximately two to two

10   and-a-half years.

11   Q.   Have you spoken with him a number of times in

12   person?

13   A.   Yes, I have.

14   Q.   Have you spoken with him a number of times over the

15   telephone?

16   A.   Yes, sir.

17   Q.   Do you see Mark Orlando in this courtroom today?

18        MR. LEMKE:  So stipulated.

19   A.   Yes.

20        THE COURT:  Let the record reflect the witness

21   has identified the defendant as Mark Orlando.

22        MR. HAYDEN:  Thank you, Your Honor.

23   Q.   I am directing your attention to December of 2004.

24   Were you working at Wantagh Suzuki then?

25   A.   Yes, I was.

Walker - People - Direct

1   Q.   Where is Wantagh Suzuki located?

2   A.   Wantagh Suzuki is located on Sunrise Highway in

3   Wantagh.  Across the street would be Wantagh Avenue.  It's

4   right on the corner of Wantagh Avenue and Sunrise Highway.

5   Q.   Where is Wantagh Suzuki with respect, with relation

6   to Island Park?

7   A.   I would have to take a guess.  It's probably about

8   ten, twelve miles away.

9   Q.   Describe Wantagh Suzuki to the jury?

10  A.   Wantagh Suzuki is a small dealership.  They sell

11  new Suzukis and used cars.

12  Q.   Had the defendant done business at Wantagh Suzuki

13  before December of 2004?

14  A.   Yes, sir.

15  Q.   Describe the business the defendant had done before

16  December of 2004?

17  A.   Well, when I was there, I believe Mark purchased

18  three automobiles that I know of, a Suzuki XL7, a used Ford

19  Explorer, and the last one I know of was a new Verona which

20  is a Suzuki four door.

21  Q.   I am directing your attention to the night of

22  Friday, December 3, 2004.

23  Were you working that night at Wantagh Suzuki?

24  A.   Yes, I was.

25  Q.   What were your hours that Friday?

Walker - People - Direct

1     A.   Approximately one p.m. to nine p.m.

2     Q.   Was there a refund check for the defendant at

3  Wantagh Suzuki that night?

4     A.   No, sir.

5     Q.   What was closing time at Wantagh Suzuki that Friday

6  night?

7     A.   Nine p.m.

8     Q.   I am directing your attention to 8:39 that Friday

9  night.

10    Did you take a telephone call at Wantagh Suzuki then?

11     A.   Yes, sir, I did.

12     Q.   Was your number at Wantagh Suzuki 516-785-7000?

13     A.   Yes, sir.

14     Q.   Who was on the line when you answered that call?

15     A.   Mark Orlando.

16     Q.   Did he identify himself?

17     A.   Yes, sir, he did.

18     Q.   Did you recognize his voice?

19     A.   Yes, sir.

20     Q.   Describe any conversation after you answered the

21  defendant's call then?

22     A.   When I answered the telephone, he did say this is

23  Mark Orlando.  He wanted to know if Ralph was there.  He was

24  looking to come in to pick up some type of refund check.

25     Q.   Ralph is the owner?

Walker - People - Direct

1    A.   Correct.  Yes, he is.

2    Q.   What happened then?

3    A.    At that time I asked Mark to hold on, I went into

4    the back office.  Ralph was in his office.  I told Ralph that

5    Mark Orlando was on the phone and that he wanted to come in

6    to pick up some type of a check.  Ralph at that time told me

7    to go back and tell him he wasn't there.  And, of course, he

8    could, tell him that he can come in at any time tomorrow, and

9    he would have the check there for him.

10   Q.   What happened next?

11   A.   I went back to the phone, back on the phone, I

12   explained to Mark that Ralph was not there, and also that I

13   looked in the back office, I didn't see any envelope with his

14   name on it, but I told Mark that I am quite sure if he came

15   in at any time tomorrow that Ralph would have the check for

16   him.

17   Q.   What did the defendant say?

18   A.    At that time he just said this was bull shit and he

19   hung the phone up.

20   Q.   Was that the last time you spoke with the defendant

21   that night?

22   A.   Yes, sir.

23   Q.   Did you see the defendant at all that night?

24   A.   No, sir.

25   Q.   Describe the defendant's tone of voice while you

1    were speaking with him on the phone that night?

2         A.    It was the same as Mark Orlando in prior

3    occasions.  He was just very abrupt, almost, almost

4    arrogant.

5         Q.    Did you detect anything unusual about anything he

6    said?

7         A.    No, sir.

8         Q.    Anything unusual about his tone of voice?

9         A.    No, sir.

10        Q.    Sounded like he always did?

11        A.    Yes, sir.

12        Q.    Did the defendant eventually pick up a refund

13   check?

14        A.    Eventually he did, yes, sir.

15        Q.    Did he come in the following day?

16        A.    No, sir.

17        Q.    Didn't see him that Saturday sat?

18        A.    No, sir.

19        Q.    When did he come in?

20        A.    I believe the next time I saw Mr. Orlando was

21   Monday, latent afternoon, early evening.

22              MR. HAYDEN:  Nothing further, Your Honor.

23              MR. LEMKE:  May I, Your Honor?

24              THE COURT:  Yes, Mr. Lemke.

25   CROSS EXAMINATION

Walker - People - Cross

1   BY MR. LEMKE:

2       Q.   On December third, Mr. Walker, it was a Friday

3   evening, wasn't it?

4       A.   Yes, sir.

5       Q.   And, there was a call that came in from Mark,

6   correct?

7       A.   Yes, sir.

8       Q.   And, Ralph was a sales rep that was there,

9   correct?

10      A.   Ralph is the owner of the establishment.

11      Q.   You were a sales rep?

12      A.   Yes.

13      Q.   There was a check that was, in fact, to be either

14  waiting for Mr. Orlando if not that night then another day,

15  correct?

16      A.   Yes, sir.

17      Q.   When Mr. Orlando called, you went in and, in fact,

18  had a brief conversation with Mr. Orlando, correct?

19      A.   I had a brief conversation with Ralph, the owner.

20      Q.   Well, you had a brief conversation with Mark on the

21  phone?

22      A.   Yes, on the phone.

23      Q.   How long was that conversation before you put him

24  on hold?

25      A.   Maybe thirty seconds, forty seconds.

MO

Walker - People - Cross

1    Q.   So, thirty to forty seconds, okay.  He is on hold?

2    A.   Yes, sir.

3    Q.   And that's, you accept the call, and he says, hi,

4    it's Mark Orlando, may I speak to Ralph, correct?

5    A.   Correct.

6    Q.   You put him on hold?

7    A.   Yes.

8    Q.   He is on hold thirty, forty seconds.  You go to

9    talk to Ralph?

10   A.   Actually now the conversation that I had with Mr.

11   Orlando when he originally called lasted about thirty to

12   forty seconds at that time, then I put him on hold.

13   Q.   Then you went into the other room?

14   A.   Correct.

15   Q.   And during those thirty to forty seconds, he asked

16   for Ralph, correct?

17   A.   Correct.

18   Q.   You go into the other room and talk to Ralph.

19   You're talking to Ralph about Mr. Orlando?

20   A.   Yes, sir.

21   Q.   How long is that conversation?

22   A.   If it lasted a minute or two.

23   Q.   So, maybe, let's be fair, a minute and-a-half?

24   A.   That is fair.

25   Q.   So, now, for about a minute and-a-half, you're

MO

Walker - People - Cross

1   talking to Ralph?

2       A.   Correct.

3       Q.   Ralph tells you to lie?

4       A.   Correct.

5       Q.   Tell Mr. Orlando we're not here and maybe get the

6   check tomorrow?

7       A.   Yes, sir.

8       Q.   And then you go back after this minute and-a-half

9   or two minutes, you pick up the phone, you tell Mark we don't

10  have the check, correct?

11      A.   Yes, sir.

12      Q.   And, you talk to him about another ten, fifteen

13  seconds.  He said this is bull shit, and he hangs up, right?

14      A.   Yes, sir.

15      Q.   Now, when was the first time you asked, you were

16  asked about this conversation between yourself and Mr.

17  Orlando?

18      A.   Repeat that, please.

19      Q.   Yes, when was the first time somebody asked you

20  about your conversation with Mr. Orlando?

21      A.   The first time was when one of the detectives from

22  Nassau County came into the dealership, and that is when I

23  was asked about the conversation.

24      Q.   Do you remember when that was?

25      A.   No, sir.  No, I don't.

Walker - People - Cross

1     Q.    Do you remember whether it was in the December or

2     January, February of this year?

3     A.    I would have to say it was, from the time I

4     received that phone call, I would have to say it was two

5     weeks, maybe.

6     Q.    Maybe two weeks.  When did you leave the Wantagh

7     Suzuki dealership?

8     A.    I left January, I believe it was like January

9     ninth.  I am not sure.

10     Q.    '05, of this year?

11     A.    Yes.

12     Q.    So, obviously, it had to be between December third

13     and January ninth?

14     A.    Yes, sir.

15     Q.    And, at that point you came in, you spoke to one of

16     the detectives, correct?

17     A.    Yes, sir.

18     Q.    And, it's your memory at this point that my client

19     was arrogant and abrupt?

20     A.    Yes, sir.

21     Q.    Okay.  Thank you, Mr. Walker.

22                  THE COURT:  Anything further, Mr. Hayden?

23                  MR. HAYDEN:  No, Your Honor.

24                  THE COURT:  Thank Mr. Walker.

25                  (Witness excused.)

1       THE COURT:  Ladies and gentlemen, I am going

2   to take a few minute break because we have, as you know,

3   I apologize for that, we're moving courtrooms.  We're

4   staying in this courtroom but we have to get the T.V.

5   and equipment up here.  It would be like five or ten

6   minutes.

7       MR. HAYDEN:  There's one other witness.

8       THE COURT:  You have one more witness.  All

9   right.  We will do that in a minute.  Is that all

10  right?  Got one witness.

11      You can call, you don't need the equipment.  Go

12  ahead.

13      MR. HAYDEN:  Charles Costello.

14  CHARLES COSTELLO, JR., detective, called as a witness on

15  behalf of the People, after having been first duly

16  sworn, and having stated his shield number as 68, and

17  his command as Latent Fingerprint Section, Nassau County

18  Police Department, took the witness stand and testified

19  as follows:

20  DIRECT EXAMINATION

21  BY MR. HAYDEN:

22      THE CLERK:  Have a seat.

23      State your name, last name, shield number and

24  command for the record.

25      THE WITNESS:  Thank you.  Detective Charles



Costello - People - Direct

1        Costello, Jr., C-O-S-T-E-L-L-O, shield number 68, Nassau

2    County Police Department, Latent Fingerprint Section.

3    Retired.

4                    MR. HAYDEN:  May I proceed?

5                    THE COURT:  Yes.

6        Q.   Good morning.

7        A.   Good morning.

8        Q.   Are you retired from the Nassau County Police

9    Department?

10        A.   Yes, I am.

11        Q.   When did you retire?

12        A.   February 17, 2005.

13        Q.   How long were you a member of the Nassau County

14    Police Department?

15        A.   Almost thirty-two years.

16        Q.   Were you a detective when you retired?

17        A.   Yes, I was.

18        Q.   How long were you a detective before you retired?

19        A.   I was assigned to the detective division in July

20    1984.

21        Q.   What was your last assignment with the Nassau

22    County Police Department?

23        A.   I was a member of the Latent Fingerprint Section as

24    a latent fingerprint examiner.

25        Q.   How long did you work with the Latent Fingerprint

Costello - People - Direct

1   Section?

2       A.   Over twenty years.

3       Q.   Describe your work with the Latent Fingerprint

4   Section?

5       A.   As a member of the Latent Fingerprint Section I was

6   charged with receiving, processing, safeguarding, evaluating,

7   and identifying fingerprint evidence.  I would receive

8   evidence from various law enforcement agencies within the

9   boundaries of the County of Nassau, the villages, the cities

10  within those boundaries, the state, various state agencies of

11  the United States of America and federal law enforcement

12  agencies and foreign countries and I would process evidence

13  for identifiable latent impressions.  I would identify

14  individuals by fingerprints, missing persons, identify them

15  by fingerprint, deceased persons, identify them by

16  fingerprint, unknown persons, identify them from

17  fingerprint.

18      I was also charged with the identification of victims of

19  disasters that would take place within the borders of Nassau

20  County.

21      Q.   Describe any training you received in the analysis

22  of latent fingerprints?

23      A.   When first assigned to the Latent Fingerprint

24  Section I was given training by members already assigned to

25  the unit in the receiving, safeguarding, processing,

MO

Costello - People - Direct

1    evaluation and identification of fingerprint evidence.   I

2    attended a one week basic latent fingerprint classification

3    school sponsored by the FBI.   I attended an advanced one week

4    latent fingerprint school sponsored by the FBI.   I have

5    attended the advance three week administrative latent

6    fingerprint school sponsored by the FBI at the FBI Academy in

7    Quantico, Virginia.   I have attended advance palm

8    identification school sponsored by the New York State

9    Department of Criminal Justice Services in Albany, New York.

10   I have attended various computerized fingerprint school

11   sponsored by the Print Trak, T-R-A-K, Corporation.   I have

12   attended additional computerized fingerprint schools

13   sponsored by the Morpho, M-O-R-P-H-O, Corporation.   I have

14   attended, I am a New York State Qualified License Latent

15   Print Examiner.   I am a New York State Division of

16   International Association of identification.   I'm a member of

17   that.   I am a member of the International Association for

18   Identification.   I am a New York State Department of Criminal

19   Justice Services, certified police instructor, in that

20   capacity.   I taught fingerprints and evidence handling to

21   individuals, new police officers, recruits, new investigators

22   of various law enforcement agencies, detectives, and others

23   as requested by my department.   I gave demonstrations,

24   relative to fingerprints as requested by my department.

25       I have a Bachelor of Science degree from State University

1   of New York.  I have an additional five college credits in

2   the Science of Fingerprints from the University of Virginia.

3       I have previously testified in Grand Jury, District

4   Court, County Court and Federal Court, relative to my

5   fingerprint work.  I have read books, magazine, articles,

6   newspaper articles, other journals brought to my attention

7   relative to the science of fingerprints.

8       Q.   How many latent fingerprints have you examined?

9       A.   In excess of a million.

10          MR. LEMKE:   Your Honor, I would ask that

11   Detective Costello be qualified as an expert.

12          MR. HAYDEN:   No objection.

13          THE COURT:   So qualified.

14          MR. LEMKE:   Thank you.

15       Q.   Tell the jury what you mean by a latent

16   fingerprint?

17       A.   Latent fingerprint is an unintentional recording of

18   an area of friction skin that comes in contact with an item.

19   Friction skin is the ridge, you would call them lines in your

20   fingers, on the soles of your hands, friction skin on the

21   underside of your hands and soles of your feet.  When you

22   touch an item, the transfer medium, whether it be sweat,

23   perspiration, normal perspiration, liquids, any kind of

24   grease or other substance that may be on your friction skin

25   when you touch an item.  If I was to touch this coil metal

1    rod that is holding up the mike, I would be transferring,

2    possibly be transferring something from the area skin that

3    comes in contact with that coil.  Depending on what, how it

4    is held, whether or not that would actually take place, if

5    there was anything on my fingers.

6        It's again, it's an accidental recording or leaving of

7    friction skin area on an object when it's touched.

8        Q.    Does a person leave a latent fingerprint every time

9    he touches something?

10       A.    No.  In the great majority of cases people do not

11   leave identifiable latent impressions when an item is

12   touched.  Great many reasons for that.  On a hot, very hot

13   day such as the last few days you can be perspiring very

14   heavily.  When you touch something, you possibly touch that

15   item and slide based on that perspiration that is on there,

16   sliding motion would create a smudge.  That smudge would now

17   obliterate in the ridge detail high low areas of the skin.

18   Again it will be pressure.  If this microphone stand had

19   weight to it, I had picked it up with this small amount of

20   area, had I come in contact, that pressure would press the

21   ridges, the high area of that friction skin into the lower

22   areas which are called the furrows thereby obliterating or

23   smudging.  Again, in its own way, the detail I would be

24   looking for as a latent examiner and possibly later

25   identify.

Costello - People - Direct

1    It could be winter time, cold outside, possibly have

2    gloves on, heavy gloves, that when you touch something there

3    is no friction skin that come in contact with an item.  I can

4    have my hands in my pocket and as I pulling my hands out of

5    my pocket, whatever might be on my hands, whether it's sweat

6    or other transfer medium is now possibly left in my pocket.

7    So when I do touch something, there is nothing left to touch

8    or to transfer during that touching that takes place.

9        The type of item that you pick up also has a great deal,

10   whether or not you will leave an identifiable impression.

11       Q.    I am directing your attention to December of 2004.

12   Did you become involved then with investigating the

13   shooting death of a young man named Bobby Calabrese?

14       A.    Yes, I did.

15       Q.    Did you examine items recovered during the course

16   of the investigation?

17       A.    Yes, I did.

18       Q.    Did the items include five $100 bills recovered

19   from the bedroom closet of a young man Herva Jeannot?

20       A.    Did I examine five $100 bills, yes.

21       Q.    Did you examine each of those bills?

22       A.    Yes, I did.

23       Q.    How did you examine them?

24       A.    Used a chemical process called DFO, a derivative of

25   Ninhydrin, N-I-N-H-Y-D-R-I-N, which what it does, it reacts

MO

Costello - People - Direct

1   with the amino acid or proteins that are in the sweat or

2   perspiration that may be placed on that item, in this case,

3   the money.  I applied the chemical to the money, I put a hot

4   iron over it as a catalyst, I then had to look at it under an

5   alternate light source which is different light in order to

6   fluoresce, to try to make it glow so to speak in the dark.

7        So, that is what the DFO will do with the latent

8   impression on the paper, paper item, it would fluoresce.  I

9   would look at it under magnification to try to recover

10  identifiable latent impressions.

11       I did each five $100 bills I received to process and I

12  received negative results.  In other words, I did not recover

13  any identifiable impressions on those five $100 bills.

14                 MR. HAYDEN:  May I please have 41 for

15       identification shown to the witness, Your Honor.

16                 THE COURT OFFICER:  Witness has 41 for ID.

17       Q.   Do you recognize the contents of that clear plastic

18  container?

19       A.   It's the plastic container with evidence tape and

20  my initials over it, which I sealed with plastic evidence

21  tape, I sealed the plastic container, I have the homicide

22  number, 52104, on the outside of the plastic, and that is

23  where I placed each one of those $100 bills after

24  processing.

25       Q.   Do you see some of your fingerprint chemicals on

MO

Costello - People - Direct

1    those bills?

2         A.    Purplish pinkish color you see is part of the

3    reaction process of the chemical.

4         Q.    Did the items you examined include a blue cigarette

5    lighter recovered by Detective David Nystrom at the scene of

6    the murder?

7         A.    Yes.

8         Q.    How did you examine the blue lighter?

9         A.    Blue lighter I applied cyanoacrylate which is super

10   glue.  Super glue which all of us use.  What I do with super

11   glue or with the cigarette lighter, I put it in a vacuum

12   chamber, I mount it in a such a way that the fumes from the

13   super glue would adhere to any of the surfaces of the

14   cigarette lighter.  I put the super glue on a warming plate,

15   like a coffee mug plate you would have to keep your coffee

16   warm.  I put a little tin, metal tin on there, I placed the

17   glue in there.  When you put the heat on it, that acts as a

18   catalyst to fume or polimerized the super glue into a fuming

19   agent which then adheres to any moisture or other material

20   that may be on the item you are processing.  In this case it

21   was the cigarette lighter.

22        I then, after the processing, I took the cigarette

23   lighter out, I identified it for identifiable impressions,

24   again with that alternate light source I described, visually,

25   just with the naked eye, and then I used a chemical called

Costello - People - Direct

1  brilliant yellow which is a fluorescent dye, applied it to the

2  cigarette lighter, looked at it with the alternate light

3  source, again in those different wave bands of light in order

4  to fluoresce the latent impression that may be on that

5  cigarette lighter.

6      All those attempts were negative.  In other words, no

7  identifiable impressions were recovered on the cigarette

8  lighter.

9      And then I applied a gray fingerprint powder to the

10 cigarette lighter again to try to recover identifiable

11 latents.  Again I was unsuccessful.  There were no

12 identifiable impressions on the cigarette lighter.

13     Q.    Describe for the jury the effect of submerging in

14 salt water any potential latent fingerprint?

15     A.    Never recovered identifiable impressions on an item

16 placed in salt water of any kind for any length of time.  The

17 corrosive action of the salt on a metal item, even just on

18 any item placed in salt water, you have the current, which

19 creates a washing motion or moving motion and the material

20 liquids, possibly sweat or other transfer medium, would be

21 diluted to a point where anything I would be looking for

22 would most likely or would be washed away.

23     You have the silt in any sort of pond or ocean, lake,

24 wherever the item was placed or dropped.  That would again be

25 like a rubbing motion on that item.  Plus the way it's

Costello - People - Direct

1    situated in that, deep into that silt more possibly deep into

2    that silt, it would again be a friction motion on the item

3    that I would want to be looking for and it would be of no

4    value to me.

5              MR. HAYDEN:  Nothing further, Your Honor.

6              THE COURT:  Mr. Lemke.

7    CROSS EXAMINATION

8    BY MR. LEMKE:

9         Q.   Detective, based on your qualifications as an

10   expert, and regarding People's 1, could you tell this jury

11   whether or not, in fact, there was any fingerprints of Mr.

12   Orlando on any of those $100 bills?

13        A.   I said no identifiable impressions compared to

14   anyone.

15        Q.   So, therefore, your answer is no, there is no

16   fingerprints of Mr. Orlando found on those bills?

17        A.   Nothing identifiable.  There were no identifiable

18   prints that I could compare to, let's say, his fingerprints.

19        Q.   So, the answer is, there are none there?

20        A.   His fingerprints, I wouldn't know if he touched it

21   or not.

22        Q.   Mr. Orlando's fingerprints are not on any of those

23   $100 bills, correct?

24        A.   Not that I can identify.

25        Q.   Thank you.  There are no fingerprints on that of a

1   Mr. Calabrese, are there?

2        A.   No.   There were -- again, there were no, I can

3   touch these and not leave an identifiable impression.

4        Q.   Yes.  You could touch them and leave an impression

5   and then tell this jury my fingerprints are on there, you

6   found them, correct?

7        A.   If that happened.

8        Q.   I understand that.  My question to you, based on

9   your qualifications as an expert, you examined these $100

10  bills, you tested them, and Mr. Orlando's fingerprints are

11  not on them, correct?

12       A.   Nothing to identify, no.

13       Q.   Mr. Calabrese's fingerprints are not on those

14  bills, correct?

15       A.   Nothing identifiable.

16       Q.   Thank you.

17  REDIRECT EXAMINATION

18  BY MR. HAYDEN:

19       Q.   Try to clarify for a moment here.

20       There are no identifiable fingerprints on these bills; is

21  that correct?

22       A.   There was nothing I can use to compare to anyone.

23  It would be of no value, any ridge structure might have been

24  there was of no value to me to compare to anyone's

25  fingerprints.

Costello - People - Redirect

1    Q.   Of course that doesn't mean no one touched those

2    bills?

3    A.   No.   Again, as I said, when you touch an item you

4    don't always leave an identifiable fingerprint.

5              MR. HAYDEN:   Nothing further.

6    RECROSS EXAMINATION

7    BY MR. LEMKE:

8    Q.   There is no evidence put before this jury

9    Mr. Calabrese touched those, correct?

10    A.   I can't say who touched them.

11    Q.   You can't tell this jury Mr. Orlando touched them,

12    can you?

13    A.   Again I can't say who touched them.

14    Q.   If the fingerprints were on there, you could tell

15    the jury, yes, I found fingerprints?

16              MR. HAYDEN:   Objection.

17              THE COURT:   Sustained.   Sustained.

18              MR. LEMKE:   Thank you.

19              THE COURT:   No further questions?

20              MR. LEMKE:   None at all.

21              THE COURT:   Thank you.   Have a good day.

22              (Witness excused.)

23              THE COURT:   Ladies and gentlemen, now we will

24         take that ten minute break I just discussed with you

25         earlier so I can get the equipment up here.

MO

Proceedings

1        Again, the same admonition I gave you always apply.

2    Do not converse among yourselves or with anyone else

3    anything about the case.  We will go -- the officer will

4    take you back to the jury room, hopefully, within ten

5    minutes.  Okay.  Thank you.

6        (Whereupon, there was a brief recess in the

7    proceedings.)

8             THE COURT OFFICER:  Ready for the jury?

9             THE COURT:  Yes, Your Honor.

10            MR. LEMKE:  Yes, Your Honor.

11            THE COURT OFFICER:  Jury entering.

12            THE CLERK:  Continued case on trial,

13   167N-2005, People versus Mark Orlando.

14        People ready?

15            MR. HAYDEN:  Ready, Your Honor.

16            THE CLERK:  Defendant.

17            MR. LEMKE:  Defendant ready.

18            THE CLERK:  Let the record reflect the present

19   of Mr. Orlando, the sworn jurors and the alternates.

20            THE COURT:  Mr. Hayden, call your next

21   witness.

22            MR. HAYDEN:  Norman McCloy.

23   NORMAN C. McCLOY, Police officer, called as a witness on

24       behalf of the People, after having been first duly

25       sworn, and having stated his shield number as 305, and

MO

McCloy - People - Direct

1          his command as Aviation Bureau, Nassau County Police

2          Department, took the witness stand and testified as

3          follows:

4     DIRECT EXAMINATION

5     BY MR. HAYDEN:

6                    THE CLERK:  Have a seat.

7               State your name, spell your last name, give your

8          shield number and command.

9                    THE WITNESS:  Officer Norman C. M-C-C-L-O-Y,

10         shield number 305, Aviation Bureau.

11                   THE COURT:  Good morning.

12              Mr. Hayden.

13                   MR. HAYDEN:  Yes, Your Honor.

14         Q.   Good morning, officer.

15         A.   Good morning.

16         Q.   How long have you been a member of the Nassau

17    County Police Department?

18         A.   Thirty-three years.

19         Q.   You're with the Marine Air Bureau?

20         A.   Marine aviation Bureau, yes.

21         Q.   Briefly describe your work with the Marine Aviation

22    Bureau for the jury?

23         A.   Well, I am a police diver for the marine Aviation

24    Bureau.  I dive for evidence, recover bodies, and recover

25    lost cars, boats, investigate accidents.



McCloy - People - Direct

1    Q.   Weapons?

2    A.   Weapons searches.

3    Q.   Describe any experience you had in the underwater

4    recovery of evidence?

5    A.   Oh, for the last seventeen, eighteen years I have

6    been diving for them we have recovered numerous weapons,

7    bodies and cars.

8    Q.   I am directing your attention to Monday, December

9    13, 2004.

10   Were you involved then with investigating the shooting

11   death of a young man named Bobby Calabrese?

12   A.   Yes, I was.

13   Q.   Did you respond to the Sloop Channel Bridge during

14   the course of the investigation?

15   A.   Yes, I did.

16   Q.   Describe the circumstances under which you

17   responded to the Sloop Channel Bridge?

18   A.   We had received information that a weapon was

19   thrown off the bridge at which point we responded and started

20   our search for that weapon.

21   Q.   Was construction taking place along the Sloop

22   Channel Bridge?

23   A.   Yeah, in the west side of the bridge there was

24   heavy construction, barges with heavy cranes, heavy

25   equipment, and I believe they're building a new bridge on

McCloy - People - Direct

1   that site there just to the west of the exiting bridge.

2           Q.    Did you use a boat to get to the Sloop Channel

3   Bridge?

4           A.    Yes, we did.

5           Q.    Describe that boat for the jury?

6           A.    It's one of the Nassau County marine boats, number

7   4.   It's one of our patrol boats.   It's also our, one of our

8   dive vessels we dive off of.

9           Q.    Briefly describe it?

10          A.    It's a thirty-six foot Harris, twin diesel.

11  Basically that is it.   Patrol boat.   Police patrol boat.

12          Q.    Have a cabin?

13          A.    Yes, it has a cabin.

14          Q.    What was the approximate time you arrived at the

15  bridge?

16          A.    Arrived some point around 8:30 because we have a

17  window with the tide I believe was 9:30.

18          Q.    How many men were with you?

19          A.    It was seven divers I believe.

20          Q.    How deep is the Sloop Channel?

21          A.    Well, at that particular point which I would assume

22  you're referring too along that bridge where we searched is

23  about forty feet deep.

24          Q.    Did you and other divers go into the water that

25  Monday?

McCloy - People - Direct

1        A.    Yes, we did.

2        Q.    Did you conduct a search for a  .44 caliber Magnum

3    revolver?

4        A.    Yes, we did.

5        Q.    Describe for the jury how you conducted that

6    search?

7        A.    First of all, any search, they're all different.

8    Each one is unique, but this particular one, the information

9    that was given to us, it was thrown off the east side of the

10   bridge.  So, we have to set up a grid, there are pattern

11   search lines, and we go down, and we're systematically

12   searching the bottom for this weapon, where it would be

13   thrown, and we started with the most probable area and then

14   start expanding out further and further.

15       Q.    When you say a grid pattern, tell the jury what

16   you're talking about?

17       A.    We have what we call jack-stay search.  It's a

18   doubling redundant search, two of us, one line, one person

19   searching, the second person, after we have moved the line,

20   and we systematically grid off an area and use lines because

21   most of time we have either zero visibility or very limited

22   visibility.  We all do it by hands or feel.  If we have the

23   luxury of some visibility, in that particular case the

24   visibility was about a foot, saw that weapon during the

25   search, but we keep moving the line over as we go back and

McCloy - People - Direct

1  forth and search an area and we're usually pretty confident

2  when we search an area what we're searching is there or not

3  there.

4      Q.   Describe what you found while you were involved in

5  that search?

6      A.   During our, my search, I did come across a Smith &

7  Wesson .44 caliber with an eight inch barrel.  It was sitting

8  there on the bottom, at which time point we dive, dive with a

9  team, my partner, I grabbed him, because it was on my side of

10  the line.  We stopped the search, we mark our search line so

11  we can identify it from the surface, exactly where we found

12  this weapon on the bottom, and then at that point we bring

13  this weapon up to the surface for evidence recovery.

14      Q.   Did you do that?

15      A.   Yes, I did.

16      Q.   What did you do with the revolver?

17      A.   After I retrieved it from the bottom, I bring it up

18  to the surface, then we have a little support vessel, and

19  which there was a Sergeant Magnifico in that support vessel,

20  I was in the water, I handed him the weapon at this point.

21      Q.   Is that Sergeant Greg Magnifico?

22      A.   Yes.

23      Q.   Did you ever lose custody of the revolver from the

24  time you recovered it until the time you handed it to

25  Sergeant Magnifico?

McCloy - People - Direct

1    A.    No, never lost possession of it at all.

2         MR. HAYDEN:  May I please have this item which

3    has been marked as 40 for identification shown to the

4    witness.

5         THE COURT:  Yes.

6         THE COURT OFFICER:  The witness has People's

7    40 for ID.

8    Q.    Do you recognize that?

9    A.    Yes, I do.

10   Q.    Is that the gun you recovered?

11   A.    That is the gun I recovered because, well, it

12   appears to be the gun I recovered because one thing I did

13   notice it had a scope mounted on it with no scope.  I

14   remember, specifically remember that and this gun has that.

15   Q.    Any difference between that gun and the gun you

16   recovered?

17   A.    As far as I know it's the exact same weapon and

18   it's got a little bit of the rust because the gun was

19   starting to rust.

20        MR. HAYDEN:  Nothing further, Your Honor.

21   Thank you.

22        THE COURT:  Anything, Mr. Lemke?

23        MR. LEMKE:  No questions.  Thank you.

24        THE COURT:  Thank you, officer.  You can step

25   down.  Have a good day.

Magnifico - People - Direct

1                    THE WITNESS:  You too.

2               (Witness excused.)

3                    MR. HAYDEN:  Sergeant Greg Magnifico.

4     GREG MAGNIFICO, Sergeant, called as a witness on behalf of

5          the People, after having been first duly sworn, and

6          having stated his shield number as 471, and his command

7          as Marine Aviation Unit, Nassau County Police

8          Department, took the witness stand and testified as

9          follows:

10    DIRECT EXAMINATION

11    BY MR. HAYDEN:

12                   THE CLERK:  State your name, spell your last

13         name, give your shield number and for nor the record.

14                   THE WITNESS:  Sergeant Greg Magnifico,

15         M-A-G-N-I-F-I-C-O, shield 471, Marine Aviation Bureau.

16                   THE COURT:  Good morning.

17                   THE WITNESS:  Good morning.

18                   THE COURT:  Mr. Hayden.

19                   MR. HAYDEN:  Yes, Your Honor.

20    Q.   Good morning, sergeant.

21    A.   Good morning, sir.

22    Q.   How long have you been a member of the Nassau

23    County Police Department?

24    A.   Approximately nineteen years.

25    Q.   How long have you been a sergeant?

COPY    MO

1    A.   Approximately thirteen years.

2    Q.   How long have you been with the Marine Aviation

3   Bureau?

4    A.   Approximately seven years.

5    Q.   Briefly describe your work with the Marine Aviation

6   Bureau?

7    A.   Assigned as a patrol supervisor and I am also in

8   charge of the underwater search recovery team.

9    Q.   Describe any experience you had for the underwater

10   recovery of evidence?

11   A.   I have several underwater dives under my belt

12   searching for anything from bullets to bodies, cars, and I

13   have also taken special schooling or received training in

14   police diving.

15   Q.   I am directing your attention to Friday, December

16   10, 2004.

17   Did you become involved then with investigating the

18   shooting death of a young man named Bobby Calabrese?

19   A.   Yes, I did, sir.

20   Q.   Did you respond to the Sloop Channel Bridge during

21   the course of the investigation?

22   A.   Yes, sir.

23   Q.   Where is the Sloop channel Bridge?

24   A.   Sloop Channel Bridge is the southern most bridge on

25   the Wantagh Parkway.  It's the first bridge, if you are

1    coming from Jones Beach would be the first bridge north

2    towards the mainland.

3        Q.    Describe the circumstances under which you

4    responded to the Sloop Channel Bridge.

5        A.    I received a call from the homicide squad and they

6    told me that a gun was thrown over the temporary bridge which

7    is the Sloop Channel Bridge, that was used in a homicide and

8    they asked me to search for it.

9        Q.    How did they guide you to that bridge?

10       A.    They said it was the, pretty much the bridge under

11   construction, which is, there's a temporary bridge there,

12   because they're building a new permanent bridge.

13       Q.    Was it under construction?

14       A.    There is a bridge under construction now, yes,

15   sir.

16       Q.    Did you use a boat to get to the Sloop Channel

17   Bridge?

18       A.    Yes, sir.

19       Q.    Describe it?

20       A.    We used Nassau County Marine 4 which is a

21   thirty-six foot Harris XXX downies type work boat.

22       Q.    When did you arrive there?

23       A.    On the tenth at approximately around two o'clock.

24       Q.    Were other men with you then?

25       A.    Yes, sir.

Magnifico - People - Direct

```
 1        Q.    How many?

 2        A.    I believe on that date there were approximately

 3   maybe five.

 4        Q.    How deep is the Sloop channel bridge in the

 5   vicinity of the bridge?

 6        A.    Approximately forty feet at high tide.

 7        Q.    Did any divers go into the water that morning?

 8        A.    No, no driver in the water.

 9        Q.    Why not?

10        A.    The conditions didn't warrant putting divers in the

11   water.  It was kind of like a victory at sea out there, high

12   waives, high winds, rain, and it just wouldn't allow for me

13   to safely put in divers and remove divers that day.

14        Q.    Did you return to the bridge that weekend?

15        A.    No, sir.

16        Q.    Why not?

17        A.    The weather conditions didn't warrant returning to

18   the bridge.  Also, boat traffic and things like that.  It's

19   too hard to dive the bridge on busy weekends.

20        Q.    Did you return to the bridge Monday morning,

21   December thirteen?

22        A.    Yes, sir.

23        Q.    Describe the weather that morning?

24        A.    It was raining that morning, but the window had

25   died down, it was overcast, and it turned out to be a nice
```

Magnifico - People - Direct

1       day that day.

2              Q.    How deep was the water that morning?

3              A.    Approximately forty feet.

4              Q.    Describe visibility under the water that morning?

5              A.    It was zero to one foot at best.

6              Q.    Describe the boats you were using that morning?

7              A.    That time we also took Nassau County Marine 4

8       there, but we also brought a thirteen foot inflatable Zodiac

9       we use as a work platform.

10             Q.    When did you arrive that morning?

11             A.    Excuse me.

12             Q.    When did you arrive?

13             A.    Approximately 7:30, eight o'clock around that

14      vicinity.

15             Q.    Describe what you and the divers did when you

16      arrived that morning?

17             A.    First thing we did, we got there, we secured Marine

18      4, then we took the little Zodiac, the thirteen foot Zodiac,

19      and what we did, we went out and we laid our pattern lines

20      which we use to dive with along side of the bridge.

21             Q.    What happened then?

22             A.    Once the current subsided, because there is a very

23      strong current, and you can't really dive because of the

24      current we put divers on the Zodiac transported them to the

25      pattern lines and they begun their search of the bottom.

MO

Magnifico - People - Direct

1        Q.  Describe how they conducted that search?

2        A.  What they do is it's basically the type of search

3    we call jack-stay search.  They'll be two anchors on the

4    bottom with a rope line in between the two anchors and then a

5    line leading to a float on the surface.  So, what the divers

6    do, they go down the floated line to the bottom, once they

7    get on the bottom, one diver's on each side, will swim one

8    end of the line, and once they get to one end of the line

9    they're searching as they're swimming, once they get to the

10   next anchor, they move the anchor, depending on what we're

11   looking for, and the visibility, a certain amount of feet, in

12   this case it was probably maybe two feet because that is all

13   you can see, and then they, you swim back down the line, move

14   that anchor over and just continue.  You're kind of

15   zigzagging your way around the bottom.

16       Q.  What happens while they were searching?

17       A.  While they were searching they came across a gun.

18       Q.  Who did?

19       A.  Officer Norman McCloy and Officer Frey who was with

20   him as his partner down there.

21       Q.  What did they do with the gun?

22       A.  They surfaced and they handed me the gun.

23       Q.  Officer McCloy?

24       A.  Officer McCloy did, yes, sir.

25       Q.  Describe what you did with the gun?

1      A.   I took in the gun, I was in the Zodiac, the work

2    boat at the time, I took it and I brought it over to Marine 4

3    which was our stationery boat which we were using as kind of

4    our central location.

5      Q.   What did you do with it there?

6      A.   Filled it, put a, got a bucket of water, filled it

7    with some water from the area and placed the gun in the

8    bucket.

9      Q.   Why a bucket with salt water?

10     A.   Needed to stay in the same environment so it

11   doesn't corrode or deteriorate any further than it already

12   had.

13     Q.   That livid corrosion?

14     A.   Keeps it in the same environment where it was

15   found.  Yes, it does limit corrosion because the air would

16   make it rust faster if it was dry.

17     Q.   What did you do with it then?

18     A.   We finished our dive, packed up our gear, then we

19   transferred everyone back to Marine Park, not Marine Park,

20   Marine Bureau Base.

21     Q.   Describe that facility?

22     A.   It's kind of our base of operation.  It's two big

23   buildings, which is our shop, which is where we do our

24   maintenance, we have our, always keep our, all our equipment

25   there pretty much except for the boats and that is our hub of

Magnifico.- People - Direct

1    operation.

2            Q.    Write there on the water?

3            A.    It's on the water in Bay Park, correct.

4            Q.    What did you do with the gun when you got there?

5            A.    We brought the gun into the office, and once we

6    took it out of the bucket, we put it in a container, poured

7    the salt water into the container, and notified the

8    detectives to come and get the gun.

9            Q.    Briefly describe the container?

10           A.    The container was pretty much a cooler.  That is

11   what it was.

12           Q.    What happened then?

13           A.    Detective Brosnan came and took the gun and he took

14   it to headquarters for processing.

15           Q.    Did he take it in the cooler?

16           A.    Yes, sir.

17           Q.    Describe the gun?

18           A.    It was a large Smith & Wesson revolver.

19           Q.    .44 Magnum?

20           A.    Yes, sir.

21           Q.    Did you ever lose custody of that revolver from the

22   time Officer McCloy gave it to you until the time it was

23   released to Detective Brosnan of the homicide squad?

24           A.    No, sir.

25                 MR. HAYDEN:    May I please have this shown to

MO

Magnifico - People - Direct

1      the witness, Your Honor.

2                  THE COURT OFFICER:  The witness has People's

3      44 for ID.

4      Q.    Do you recognize that?

5      A.    Yes, sir.

6      Q.    Is that the revolver Officer McCloy recovered?

7      A.    Yes, it is.

8      Q.    Is that the revolver that was released to Detective

9      Brosnan of homicide?

10     A.    Yes, it is.

11                 MR. HAYDEN:  Nothing further, Your Honor.

12                 THE COURT:  Mr. Lemke.

13                 MR. LEMKE:  No questions, Your Honor.

14                 THE COURT:  Thank you, sergeant.  Have a nice

15     day.

16          (Witness excused.)

17                 THE COURT:  Mr. Hayden.

18                 MR. HAYDEN:  William Brosnan.  I am sorry.

19     May I have a recall for a moment.  I am sorry.

20                 THE COURT:  Want to recall the sergeant.

21                 Recall on Sergeant Magnifico.

22                 MR. LEMKE:  No objection, Your Honor.

23                 THE COURT:  You're still under oath.  Have a

24     seat.

25                 THE WITNESS:  Yes, sir.

1          MR. HAYDEN:  Your Honor, may I please have 36,

2    37, 38, and 39 for identification shown to the sergeant.

3          THE COURT:  Yes.

4          THE COURT OFFICER:  Witness has People's 36 to

5    39 for ID.

6    Q.   Sergeant, do you recognize those four photographs?

7    A.   Yes, sir.

8    Q.   Are those aerial photographs of the Sloop Channel

9    Bridge, the vicinity where that .44 Magnum revolver was

10   recovered?

11   A.   Yes, sir.

12   Q.   Are those photographs fair and accurate

13   representations of the land and water configurations as it

14   was when the gun was recovered?

15   A.    It looks a lot nicer in the pictures than it does,

16   than it did that day, but, yeah, but, that is where we found

17   the gun, yes, sir.

18   Q.   Do you see the location where the gun was recovered

19   in each of those four photographs?

20   A.   Yes, sir.

21         MR. HAYDEN:  People's offer those in evidence,

22   Your Honor.

23         MR. LEMKE:  No objection.  We have seen them,

24   Your Honor.  Thank you.

25         THE COURT:  Mark them People's 36 through 39

Magnifico - People - Direct

1    in evident.

2              THE COURT OFFICER:  People's 36, 37, 38, 39

3    have been marked in evidence.

4              MR. HAYDEN:  May I have those returned to the

5    witness.

6              MR. HAYDEN:  Thank you.

7              MR. HAYDEN:  Your Honor, with the Court's

8    permission, may Sergeant Magnifico use these yellow

9    markers to indicate on each one those photographs the

10   location where the gun was recovered.

11             THE COURT:  Yes.

12             MR. HAYDEN:  Your Honor, may he step down and

13   display these photographs to the jury.

14             THE COURT:  Yes.

15             THE COURT:  You can step down.

16             MR. HAYDEN:  Just step to the side here.

17   Q.    Now placing 36 on the presenter.

18   Would you please describe for the jury what that

19   depicts?

20   A.    This is center span of the bridge where we found

21   the gun right approximately here in the water.

22   Q.    To the left is where that construction is?

23   A.    Correct.  There's the, this, if you can see the

24   pilings here, this is the new permanent they're going to be

25   building.  And here's all the construction where they're all

MO

Magnifico - People - Direct

1   doing all the work of putting the pilings and things like

2   that.

3       Q.   How far from the east side of the bridge was the

4   gun recovered?

5       A.   Approximately forty feet.

6       Q.   Would current affect the position of the gun?

7       A.   Yes, sir.

8       Q.   Now placing 37 on the presenter.

9   Describe what that depicts?

10      A.   This is the east side of the bridge.  This is where

11  we ran our pattern lines, started here, started, and worked

12  our way in because we were told it was in the center span and

13  this is approximately where we found the gun, approximately

14  here.

15      Q.   How do you know it was there?

16  How are you able to locate it in relation to the bridge?

17      A.   Center span, if you can see, these white things are

18  the channel markers, center span of the bridge, and also a

19  big white five mile an hour sign top of, to the bridge right

20  here.

21      Q.   What direction were you looking?

22      A.   You're looking east to west.  Here's south Jones

23  Beach, Nassau County, mainland would be over here.

24      Q.   That would be to the right of the photograph as

25  you're facing it?

MO

Magnifico - People - Direct

1   A.   Correct.

2   Q.   Now placing 38 on the presenter.

3   What does that depict?

4   A.   It's the bridge looking from a southwest vantage

5   point with north being that way, south being that way, you

6   can see the five mile an hour sign on the picture, and we

7   found the gun approximately right over here.

8   Q.   Finally placing 39 on the presenter.  Describe what

9   that depicts?

10   A.   Okay.  The same bridge, the Sloop Channel Bridge,

11   Wantagh 3, looking south with Jones Beach being back over

12   here, see the five mile an hour sign.  Also see things, white

13   things are channel markings.  We found the gun right

14   approximately here.

15   Q.   Would you just stay there for a moment.

16   Has the Sloop channel bridge been designated on this

17   satellite map?

18   A.   Yes, sir.

19   Q.   Would you point that out to the jury?

20   A.   (Indicating.)

21   Q.   Is that a fair and accurate representation where

22   the bridge was, where the gun was recovered?

23   A.   Yes, correct, sir.

24          THE COURT:  What exhibit is that, Mr. Hayden?

25          MR. HAYDEN:  I am sorry, Your Honor.  This is

MO

1       29, Your Honor.

2                    THE COURT:   Thank you.

3       Q.    Please retake the witness box?

4                    MR. HAYDEN:   Nothing further, Your Honor.

5       Thank you.

6                    THE COURT:   Mr. Lemke.

7                    MR. LEMKE:   Nothing, Your Honor.

8                    THE COURT:   Thank you, sergeant.

9                    THE WITNESS:   Thank you.

10                   (Witness excused.)

11                   MR. HAYDEN:   William Brosnan.

12      WILLIAM BROSNAN, detective, called as a witness on behalf of

13           the People, after having been first duly sworn, and

14           having stated his shield number as 309, and his command

15           as Homicide Squad, Nassau County Police Department, took

16           the witness stand and testified as follows:

17      DIRECT EXAMINATION

18      BY MR. HAYDEN:

19                   THE CLERK:   Have a seat.

20           State your last name, shield number and command.

21                   THE WITNESS:   William F. Brosnan,

22           B-R-O-S-N-A-N, shield 30, presently assigned to the

23           homicide squad.

24                   THE COURT:   Good afternoon 309.

25      Q.    Good afternoon, detective.



COPY   MO

1      A.    Good afternoon.

2      Q.    How long have you been a member of the Nassau

3   County Police Department?

4      A.    I am in my thirty-third year.

5      Q.    How long have you been a detective?

6      A.    I'm in my twenty-third year.

7      Q.    How long in homicide?

8      A.    I am in my thirteenth year.

9      Q.    I am directing your attention to Monday, December

10  13, 2004.

11     Did you take custody of a handgun that day?

12     A.    Yes, sir, I did.

13     Q.    When was that?

14     A.    It was sometime in the late afternoon.  I am

15  guessing around three or four o'clock.

16     Q.    Where was that?

17     A.    It was at the marine bureau in East Rockaway.

18     Q.    Briefly describe the handgun?

19     A.    Handgun is a 44 magazine Smith & Wesson eight inch

20  barrel.

21     Q.    Describe the circumstances under which you took

22  custody of that gun.

23     A.    I was notified by the marine bureau they recovered

24  that weapon and they were preserving it or safeguarding it at

25  the marine bureau, they needed a person from homicide to

1    respond and collect that weapon.  I did that.

2         Q.    Describe how the revolver was contained when you

3    got there?

4         A.    The gun was still in sea water inside a cooler.

5         Q.    Did you take the cooler and the revolver?

6         A.    I did.

7         Q.    Keep it the way it was?

8         A.    It was, yes.

9         Q.    What did you do with it then?

10        A.    I brought it to the lab at police headquarters

11   where it was transferred into a container.

12        Q.    Describe that container?

13        A.    Container is a five gallon bucket, white.

14        Q.    Did you keep it in the same sea water in which you

15   obtained it?

16        A.    Yes.

17        Q.    Did you seal that container?

18        A.    I did.

19        Q.    Tell the jury how you did that?

20        A.    I put the cover on it and sealed it with evidence

21   tape.  I signed that or initial that evidence tape with my

22   initials and my shield number.

23             MR. HAYDEN:  May I please have this marked as

24        55 for identification and shown to the witness.

25             THE COURT OFFICER:  People's 55 has been

MO

1          marked for identification.

2                  The witness has 55 for ID.

3          Q.    Do you recognize that?

4          A.    Yes, sir.

5          Q.    Is that the container you used for the revolver you

6     received?

7          A.    Yes.

8          Q.    Do you see those red, that red tape that is on that

9     container?

10         A.    Yes, it's red evidence tape.  It's marked evidence.

11         Q.    Did you put it there?

12         A.    Yes.

13         Q.    Did you mark it?

14         A.    I did.

15         Q.    See your markings?

16         A.    Yes, on both sides.  It's WFB, 309, and again on

17    other side.

18                  MR. HAYDEN:  People offer that as 55 in

19         evidence.

20                  MR. LEMKE:  No objection.  We have seen it.

21                  THE COURT:  People's 55 in evidence.

22                  THE COURT OFFICER:  People's 55 is marked in

23         evidence.

24                  MR. HAYDEN:  May I please have 40 shown to

25         Detective Brosnan, Your Honor.

Brosnan - People - Direct

```
1                    THE COURT:  Yes.

2                    THE COURT OFFICER:   The witness has People's

3          40 for ID.

4      Q.    Do you recognize that?

5      A.    Yes, sir.

6      Q.    Is that the revolver you received at the marine

7  bureau?

8      A.    Yes, sir.

9      Q.    Is that the revolver that you placed in the

10 container you just identified?

11     A.    Yes, sir.

12                   MR. HAYDEN:  Nothing further, Your Honor.

13         Thank you.

14                   THE COURT:  Mr. Lemke.

15                   MR. LEMKE:  No questions.   Thank you,

16         detective.

17                   THE COURT:  Thank you, detective.   Have a nice

18         day.

19                   THE WITNESS:  Thank you, Judge.

20                   MR. HAYDEN:  Bob Shaw.

21 BOB SHAW, detective, called as a witness on behalf of the

22         People, after having been first duly sworn, and having

23         stated his shield number as 643, and his command as

24         Computer Crime Section of the Crimes Against Property

25         Squad, Nassau County Police Department, took the witness
```

COPY  MO

Shaw - People - Direct

1          stand and testified as follows:

2     DIRECT EXAMINATION

3     BY MR. HAYDEN:

4                    THE CLERK:  State your name, spell your last

5          name, give your shield number and command.

6                    THE WITNESS:  My name is Robert Shaw, S-H-A-W,

7          shield 643, Computer Crime Section of the Crimes Against

8          Property Squad.

9                    THE COURT:  Good afternoon.

10         Mr. Hayden.

11         Q.    Good afternoon, detective.

12         A.    Good afternoon.

13         Q.    How long have you been a member of the Nassau

14    County Police Department?

15         A.    Twenty-six years.

16         Q.    How long have you been a detective?

17         A.    About seventeen years.

18         Q.    How long have you been with the CAP squad?

19         A.    About seven years.

20         Q.    Tell the jury what the CAP squad is?

21         A.    The CAP squad is Crimes Against Property which

22    includes forgery, computers, property recovery and auto

23    squad.

24         Q.    Describe your work for the CAP squad?

25         A.    My squad is, my particular job is, I do computer

1    examinations.  I do forensic examinations on computers and

2    any other high tech equipment like that.

3         Q.    Describe any training you had in gaining access to

4    computer files?

5         A.    I have had training from numerous, in numerous,

6    different areas of computers.  By the FBI, the National White

7    Collar Crime Center.  I am certified as computer forensic

8    expert by the International Association of computer

9    specialists .

10        Q.    Describe any experience you had in gaining access

11   to computer files?

12        A.    I have been doing it for seven years.  I have done

13   hundreds of examinations.

14        Q.    Are you familiar with the term hard drive?

15        A.    Yes.

16        Q.    What do you mean by hard drive?

17        A.    Hard drive is a magnetic storage device typically

18   found in computers and enables you to save data on your

19   computer.

20        Q.    Are you familiar with the FTK Imager Forensic

21   software?

22        A.    Yes, I am.

23        Q.    What is that?

24        A.    It's a program we use to create a forensic image of

25   an evidence drive, hard drive.

Shaw - People - Direct

1    Q.   What does that do?

2    A.   What it does is it takes the data which is on the

3    evidence drive and it creates a forensic copy that the

4    forensic software can understand.  It's an exact copy of the

5    original but in a format that the forensic software can

6    understand.

7    Q.   I am directing your attention to Saturday, December

8    4, 2004.

9    Did you become involved that day with investigating the

10   shooting death of a young man named Bobby Calabrese?

11   A.   Yes, I did.

12   Q.   Did you go to Bobby Calabrese's home that day?

13   A.   Yes, I did.

14   Q.   Where did Bobby Calabrese live?

15   A.   In Long Beach.  I believe it was 519 East Harrison

16   or something like that.

17   Q.   519 East Harrison Street?

18   A.   I think so.

19   Q.   Did you obtain Bobby Calabrese's computer?

20   A.   Yes, I did.

21   Q.   Describe Bobby Calabrese's computer?

22   A.   It was an -- all I took from the house was the

23   tower which is the main component that stores the data.  It

24   was an HP tower type computer, one of the tall ones.

25   Q.   Where did you take Bobby Calabrese computer?

MO

Shaw - People - Direct

1    A.    Back to my lab.

2    Q.    Describe what you did with Bobby Calabrese's

3  computer?

4    A.    Well, once I, I get it into the lab, in this

5  particular case, I removed the hard drive and hooked it up to

6  my forensic computer.  We can create this image using the FTK

7  program.

8    Q.    You retrieved records from Bobby Calabrese's

9  computer?

10    A.    Yes, I did.

11    Q.    Describe the records you retrieved?

12    A.    Well, in this particular case, I believe we

13  retrieved some gambling records.

14    Q.    Are those records under the designation Player Pop

15  1271 Greater Wages?

16    A.    Yes, they are.

17          MR. HAYDEN:  May I please have this paperwork

18  marked as 56 for identification and shown to the

19  witness?

20          THE COURT:  Yes.

21          THE COURT OFFICER:  People's exhibit 56 marked

22  for identification.

23      The witness has 56 for ID.

24    Q.    Do you recognize those records?

25    A.    Yes, I do.

Shaw - People - Direct

1     Q.    Are those the records you retrieved using the

2  number 1271?

3     A.    Yes.

4     Q.    Are those records identical to those stored in

5  Bobby Calabrese's computer?

6     A.    Yes, sir.

7              MR. HAYDEN:  The People offer those in

8      evidence, Your Honor.

9              MR. LEMKE:  No objection, Your Honor.

10             THE COURT:  People's 56 in evidence.

11             THE COURT OFFICER:  People's 56 is marked in

12     evidence.

13         Want them?

14             MR. HAYDEN:  Nothing further, Your Honor.

15     Thank you.

16             THE COURT:  Mr. Lemke.

17  CROSS EXAMINATION

18  BY MR. LEMKE:

19     Q.    The gambling records referred to as People's 56 in

20  evidence, you had a chance obviously to review them, correct?

21     A.    Yes.

22     Q.    And when you say you took gambling records off this

23  tower, there were other records that you had also retrieved?

24     A.    Other records?

25     Q.    Yes.

Shaw - People - Cross

1    A.    No, I don't believe so.

2    Q.    Let me ask you this.

3    There is a tower or a computer retrieved from Bobby

4    Calabrese's house, correct?

5    A.    Yes.

6    Q.    And that tower is provided to you to basically

7    search for certain items, correct?

8    A.    Yes.

9    Q.    And you're advised to search that computer in

10   particular for a certain file number, correct?

11   A.    Well, not exactly.  Would you like me to explain?

12   Q.    Yes?

13   A.    What we do is, because a computer's hard drive is

14   such a voluminous thing you have to search for very, it's,

15   you know, when you're searching for text or documents, very

16   often you have to search for something very particular.  When

17   we ask the investigating detective what he is looking for,

18   and he provides the number 1271, I am able to input that in

19   my software.  Then it kicks out every place 1271 shows up.

20   Now, that number can show up randomly, or it can also

21   show up in the name of a document.  So, there were many

22   instances where the number 1271 could come up.  These are

23   what I retrieved.

24   Q.    Okay.   Now, 1271 was given to you by the carrying

25   detective or a detective in this case, correct?

1      A.   Yes.

2      Q.   You had the tower of Mr. Calabrese, and you were

3 told specifically to only look for an account under Player

4 Pop 1271, correct?

5      A.   Well, that was the number I was given.  I wasn't

6 told specifically to only look for that.  When I was asked to

7 look for that, that is what I looked for.  When I found it I

8 turned it over.

9      Q.   You know that is a file, if you know, from Mark

10 Orlando?

11     A.   I don't know that.  I just turned it over.  I don't

12 know much about gambling either.

13     Q.   On the record you retrieved and you basically down

14 loaded it and printed that in, only in, only started, I

15 think, end of October, correct?

16     A.   Yes.  It's marked 28 October to 6 December.

17     Q.   Was that because there were no other entries

18 beforehand, from October twenty-eighth or that's all that was

19 entered in by perhaps Mr. Calabrese?

20     A.   Those were only records I retrieved.  I went

21 through everything for that particular time period, for that

22 number.

23     Q.   Okay.  But yet you were not asked to search for

24 other gambling accounts or other wages that were on this

25 computer?

MO

Shaw - People - Cross

1    A.    Yes, it was, there was gambling involved but this

2    was the only account number I had.  Any other references

3    would, could be many references to gambling, I did not find

4    any other records, but I was not given any other account

5    numbers.

6    Q.    Right.  That is my point.  You were not given any

7    other account numbers or anyone else that may have been

8    gambling to search from that computer, correct?

9    A.    Correct.

10   Q.    You were specifically asked to search for Player

11   Pop 1277?

12   A.    Yes.

13   Q.    Had you, through your calculations, in evidence, if

14   you can take a look at People's 56 in evidence.

15   Could that be shown to the detective?

16   THE COURT:  He has it.

17   Q.    This individual known as Player Pop 1271, from

18   October 28th of 2004, do you see that first entry?

19   A.    Yes, I do.

20   Q.    Okay.  And that would indicate that at about 6:17

21   that evening there was a bet; is that correct?

22   A.    Yes, I believe so.

23   Q.    Straight wage in the amount of 825, $825; is that

24   correct?

25   A.    Yes, if you say so.

Shaw - People - Cross

1      Q.   And the game involved -- I am sorry?

2              THE COURT:  He said --

3      A.   If you say so.  As I said I am not an expert on

4  the gambling records.  I am reading, I am agreeing with you,

5  but ==.

6      Q.   Is there anything that would refresh your

7  recollection?

8      In other words, are you familiar -- I will rephrase it,

9  Your Honor.

10     These are, as you know, gambling records, correct?

11     A.   That is what I was lead to believe they are, yes.

12     Q.   Player Pop 1271 Graded Wages, correct?

13     A.   Yes.

14     Q.   And they were from October 28, 2004, correct?

15     A.   Yes.

16     Q.   It ran through the early portion of December of

17  2004, correct?

18     A.   That is what the heading says, but in reality it

19  looks like it ends end of November.

20     Q.   Yes, November 30, 2004 is the last time anything

21  was found regarding Player Pop 1271, correct?

22     A.   Yes, that is the last thing I found on that

23  computer.

24     Q.   So, the letter that's, in fact, the cover page of

25  these records that say October 28, 2004 to December 5, 2004,

MO

Shaw - People - Cross

1    is incorrect, correct?

2        A.    I don't know that is incorrect.  That may be the

3    way the program spits it out, period it's recording.

4        Q.    All you found was the last wage of November 30th?

5        A.    That is it.

6        Q.    Correct.  You had the opportunity to either

7    accumulate the winnings and losses regarding this document?

8        A.    No.

9        Q.    You have no clue what, whether this individual was

10   up 30,000, down twelve, no clue?

11       A.    Well, my job is to find the evidence.  I turn it

12   over to the investigating detective who can figure out

13   whether it is evidence or not.

14       Q.    Okay.  Thank you.

15              THE COURT:  Anything further?

16   REDIRECT EXAMINATION

17   BY MR. HAYDEN:

18       Q.    Do you remember when it was you were given the

19   number 1271?

20       A.    Exactly, no.  It was, it was, it wasn't the

21   original day.  It was subsequent to that.  It's at some

22   point.

23       Q.    Sometime later?

24       A.    Sometime later.  While I was doing my examination

25   we were, we were always asking the detective give us more

Shaw - People - Redirect

```
 1    information, if you can tell us more we can look for it and
 2    at some point he a came up with that number and gave it to me
 3    and I searched for it.
 4                    MR. HAYDEN:  Nothing further.
 5                    THE COURT:  Mr. Lemke, anything further?
 6                    MR. LEMKE:  Nothing else.  Thank you.
 7                    THE COURT:  Have a nice day.
 8              (Witness excused.)
 9                    THE COURT:  Want to approach for a minute,
10        counsel.
11                    (Whereupon, there was a discussion held off
12        the record.)
13                    THE COURT:  I ask you to remain seated until
14        the jury leaves the courtroom.
15        We're going to break for lunch to two o'clock.  I
16        can endeavor to find another courtroom for this
17        afternoon if you are too hot.  If you're comfortable
18        then I will stay here.  I know we're moving from place
19        to place.
20        At this time I am going to admonish you again, same
21        admonition you will hear every time we take a lunch
22        break or break for the evening.  You must not converse
23        among yourselves or with anyone else upon any subject
24        connected with the trial.  You must not read or listen
25        to any accounts or discussions of the case in the event
```

Proceedings

1     it is reported by newspapers or other media.  You must

2     not visit or view the premises or place where the

3     offense charged was allegedly committed or any other

4     premise or place involved in the case.

5          Prior to your being discharged, you must not

6     request, accept, agree to accept or discuss with any

7     person the receiving or accepting of any payment or

8     benefit in consideration for supplying any information

9     concerning the trial.

10          You must promptly report to the Court any incident

11    within your knowledge involving an attempt by any person

12    improperly to influence any member of the jury.  You

13    shall not access the Internet or Worldwide web by any

14    means available to you for the purposes of either

15    learning about this case or to learn about the law and

16    legal issues concerning this case.

17          Have a good lunch.  We will resume at two o'clock.

18    Thank you.

19          (Whereupon, the following takes place outside the

20    presence of the jury.)

21               THE COURT:  Court stands in recess until two

22    o'clock.

23                L U N C H E O N    R E C E S S

24               (Afternoon session.)

25               THE CLERK:  Continued case on trial,

MO