Proceedings

1    indictment 167N-2005, People versus Mark Orlando.

2        People ready?

3            MR. HAYDEN:   Ready.

4            THE CLERK:   Defendant ready?

5            MR. LEMKE:   Ready.

6            THE CLERK:   Let the record reflect the

7    presence of Mr. Orlando.   The jury's not present at this

8    time.

9            THE COURT:   Any applications before the jury

10   enters?

11           MR. HAYDEN:   I would like to put on the record

12   that I have given to Mr. Lemke items I have designated

13   as Rosario 113 and Rosario 114.   These are printouts

14   that Detective Kenneth Strigaro used in preparing for

15   his testimony, even though he didn't write these, except

16   for upper notations, bottom of 113, he didn't use them

17   in preparing his testimony, I felt it important Mr.

18   Lemke have them.

19       I have a copy as well for the Court.   That is

20   Rosario 113 and 114.

21           MR. LEMKE:   Acknowledge receipt.

22           MR. HAYDEN:   Added to the materials already

23   provided.

24           THE COURT:   Thank you.

25       Anything further?

Proceedings

1              MR. LEMKE:  Nothing further.

2              MR. HAYDEN:  That is it.

3              THE COURT OFFICER:  Ready for the jury.

4              THE COURT:  Yes.

5              THE COURT OFFICER:  Jury entering.

6              THE CLERK:  Case on trial, indictment

7       167N-2005, People versus Mark Orlando.

8          Again, People ready?

9              MR. HAYDEN:  Ready, Your Honor.

10             THE CLERK:  Defense ready?

11             MR. LEMKE:  Defendant ready, Your Honor.

12             THE CLERK:  Let the record reflect the

13      presence of the jury, the alternates and Mr. Orlando.

14             THE COURT:  Good afternoon, ladies and

15      gentlemen.

16         Mr. Hayden, your next witness.

17             MR. HAYDEN:  Yes, Your Honor.  Steve

18      Loschiavo.

19      STEVE LOSCHIAVO, Police officer, called as a witness on

20         behalf of the People, after having been first duly sworn,

21         and having stated his shield number as 1566, and his

22         command as Bureau of Special Operations, Nassau County

23         Police Department, took the witness stand and testified

24         as follows:

25      DIRECT EXAMINATION

Loschiavo - People - Direct

1    BY MR. HAYDEN:

2              THE CLERK:  Have a seat.  State your name,

3        spell your last name, your shield number and command.

4              THE WITNESS:  Police Officer Steven Loschiavo,

5        L-O-S-C-H-I-A-V-O, shield 1566, Bureau of Special

6        Operations, Nassau County Police.

7              THE COURT:  Good afternoon.

8              THE WITNESS:  Good afternoon.

9              THE COURT:  Mr. Hayden.

10             MR. HAYDEN:  Yes, Your Honor.

11   Q.    Good afternoon.

12   A.    Good afternoon.

13   Q.    How long have you been a member of the Nassau

14   County Police Department?

15   A.    Twenty years.

16   Q.    How long have you been with the Bureau of Special

17   Operations?

18   A.    Eleven years.

19   Q.    Describe for the jury what the Bureau of Special

20   Operations does?

21   A.    We're the tactical team, the SWAT team, of the

22   county, and we also do plain clothes anti crime patrol.

23   Q.    Do you know a man named Mark Orlando?

24   A.    Yes, I do.

25   Q.    Briefly describe Mark Orlando?

COPY   MO

Loschiavo - People - Direct

1      A.   He is a male white, about five eleven, heavy set,

2   brown hair, brown eyes.

3      Q.   Do you see Mark Orlando in this courtroom today?

4      A.   Yes.

5           MR. LEMKE:   So stipulated, Your Honor.

6           THE COURT:   Let the record reflect the witness

7   has identified the defendant as Mark Orlando.

8      Q.   I am directing your attention to around ████ the

9   night of Thursday, ████████████████   Were you working then?

10      Q.   Were you working then?

11      A.   Yes.

12      Q.   How were you dressed?

13      A.   I was in plain clothes.

14      Q.   Were you working with another Bureau of Special

15   Operations officer then?

16      A.   Yes.

17      Q.   Who was that?

18      A.   Officer Kevin McCarthy.

19      Q.   How was he dressed?

20      A.   He was also in plain clothes.

21      Q.   Were you and Officer McCarthy using a motor

22   vehicle?

23      A.   Yes.

24      Q.   Describe it?

25      A.   It's a black four door Grand Prix.

Loschiavo - People - Direct

1    Q.    Did you and Officer McCarthy arrest the defendant

2    Mark Orlando at around 9:10 that Thursday night?

3    A.    Yes.

4    Q.    Describe how that arrest took place?

5    A.    Mr. Orlando left his place of business and drove

6    onto Route 110 in Farmingdale northbound.   Myself and Officer

7    McCarthy in the black Grand Prix followed behind as Mr.

8    Orlando pulled into a shopping center.   I believe it was

9    Airport Plaza Shopping Center.   We proceeded to stop his

10   vehicle in the parking lot.

11   Q.    Describe how the vehicle was stopped?

12   A.    Mr. Orlando was coming to a stop for a stop sign

13   inside the shopping center's parking lot.   As he came to a

14   stop, a marked Nassau County police car came up on my left

15   and pulled in front of Mr. Orlando's car, at the same time, I

16   was behind him with my emergency lights on.

17   Q.    What did Police Officer McCarthy do when the

18   defendant stopped his vehicle?

19   A.    He exited the Grand Prix on the passenger's side

20   and walked around the passenger's side of Mr. Orlando's

21   vehicle towards the front of Mr. Orlando's car.

22   Q.    Was Officer McCarthy armed?

23   A.    Yes, he was.

24   Q.    How?

25   A.    Well, he had his handgun in his holster on his

MO

Loschiavo - People - Direct

1    waist but he also had a G36 which is a long gun, a

2    semiautomatic rifle.

3        Q.   Was he displaying that?

4        A.   Yes.

5        Q.   Was he wearing his badge at the time?

6        A.   Yes, he was.

7        Q.   Describe for the jury how he was wearing his badge?

8        A.   Well, similar to the way I am right now, it's on a

9    chain around his neck, hanging down to his, middle of his

10   chest.

11       Q.   Describe for the jury what you did when the

12   defendant stopped the vehicle he was driving?

13       A.   I existed the driver's side, walked right up to Mr.

14   Orlando's driver's side door, opened it and identified myself

15   and asked him to step out of the vehicle.

16       Q.   Did he say anything?

17       A.   As I got to the door and opened it, his attention

18   was focused straight ahead at the marked police car.  As I

19   opened the door, his head snapped around towards me and he

20   muttered, oh shit, oh shit, and that was basically all he

21   said.

22       Q.   Did he step out of his car?

23       A.   He stepped out, but he was, also went, I directed

24   him down towards the ground.  So, he came out of his car and

25   went right down on his stomach on this ground.

Loschiavo - People - Direct

1    Q.  What happened next?

2    A.  Once he was on the ground, I handcuffed him behind

3    his back, assisted him in getting back to his feet, and at

4    that point, I turned him over to homicide.

5    Q.  Did you turn him over to Detective Jack McHugh and

6    Detective Jim McGinn of the Homicide Squad?

7    A.  Yes, I did.

8    Q.  Do you have any further dealings with him?

9    A.  With Mr. Orlando?

10   Q.  Yes.

11   A.  No:

12        MR. HAYDEN:  Nothing further, Your Honor.

13        THE COURT:  Yes.

14   CROSS EXAMINATION

15   BY MR. LEMKE:

16   Q.  Officer, after my client was placed down on the

17   ground and handcuffed, did you either pat him down or frisk

18   him for your own safety?

19   A.  I believe that was done by the homicide detectives

20   before he got in the vehicle.

21   Q.  No weapons, no drugs, or anything was found,

22   correct?

23   A.  I don't believe so, no.

24   Q.  Nothing further.  Thank you.

25   He was very could cooperative?

MO

```
 1        A.    As far as I was concerned, yes.

 2                    MR. LEMKE:  Thank you.  Nothing further.

 3                    THE COURT:  Thank you.

 4                    THE WITNESS:  Thank you.

 5              (Witness excused.)

 6                    MR. HAYDEN:  Detective Kenneth Strigaro.

 7    KENNETH STRIGARO, detective, called as a witness on behalf of

 8         the People, after having been first duly sworn, and

 9         having stated his shield number as 9294, and his command

10         as Electronics Squad, Nassau County Police Department,

11         took the witness stand and testified as follows:

12    DIRECT EXAMINATION

13    BY MR. HAYDEN:

14                    THE CLERK:  Have a seat.  State your name,

15         spell your last name, your shield number and command.

16                    THE WITNESS:  Okay.  My name is Detective Ken

17         Strigaro, S-T-R-I-G-A-R-O, shield number 9242, command

18         is electronics squad.

19                    THE COURT:  Good afternoon.

20         Mr. Hayden.

21                    MR. HAYDEN:  Yes, Your Honor.

22                    THE COURT:  Keep your voice up, detective, so

23         everybody can hear.  Thank you.

24                    THE WITNESS:  Okay.

25         Q.    Good afternoon, detective.
```



Strigaro - People - Direct

1    A.   Good afternoon.

2    Q.   How long have you been a member of the Nassau

3  County Police Department?

4    A.   Twelve years.

5    Q.   How long have you been a detective?

6    A.   Four and-a-half years.

7    Q.   How long have you been with the electronics squad?

8    A.   Four and-a-half years.

9    Q.   Tell the jury about the electronics squad?

10   A.   The electronics squad is a support squad for all

11  the other squads that make up the police department's

12  investigative wing of the command.   We're responsible for

13  any type of electronic surveillance, whether that is audio,

14  video surveillance, could be wiretap, pen register.  We go

15  out on a regular basis and recover videotape evidence from

16  security systems, from various facilities, businesses, homes,

17  we do still images, remake videotapes from the information we

18  gather.  That kind thing.

19   Q.   How long have you been with the electronics squad?

20   A.   Four and-a-half years.

21   Q.   Describe your background in the field of

22  electronics?

23   A.   Prior to becoming a police officer, I studied

24  electrical engineering.  I got my degree, my Bachelor of

25  Science in electrical engineering.  I also was in the

MO

Strigaro - People - Direct

1   Electronic Associates Program at New York Institute of

2   Technology.  That is where I got my Bachelor of Science.  I

3   am also a bench technician.  I took a course back in the

4   early eighties for that.

5        Q.   Did you work before joining the Nassau County

6   police department?

7        A.   Yes, I did.

8        Q.   Where?

9        A.   My immediate employer prior to becoming a police

10  officer was Grumman Arrow Space.  I was an RF engineer for

11  Grumman Air Space.  And prior to that, I was an engineer for

12  Long Island Lighting Company.

13       Q.   Have you become familiar with cell site towers in

14  the course of your work?

15       A.   Yes.

16       Q.   What do you mean by a cell site tower?

17       A.   Cell site tower transmit and receives cite that the

18  cellular companies use to get the telephone conversations

19  from the cell phone that you carry around with you everyday

20  back into their network, and then hand it off to regular

21  telephone lines to complete your call.

22       Q.   Briefly describe how a cell site tower works?

23       A.   Cell site tower, every company does it a little bit

24  differently, but fundamentally speaking a cell site tower is

25  nothing more than a transmit receive meaning that its capable

MO

Strigaro - People - Direct

1    of transmitting signals emanating from it, and receiving

2    signals to it.  The received signals coming to it are from

3    the cell phones we carry around with us on a regular basis.

4    And that information is then transmitted to a whole bunch of

5    computers that run the cellular system through either phone

6    lines, trunk lines, or sometimes they use microwave lengths.

7         Q.   Does a cell site tower take signals from any

8    direction in the immediate vicinity of the tower?

9         A.   It depends on the design of the tower.  Typically

10   most cell site towers have a, try to have a 360 degree

11   pattern of coverage.  Some do not.  Some are specifically

12   targeted for individual areas.  But on a general point of

13   view, most of them try to cover a 360 degree range within a

14   geographical area around the tower.

15        Q.   I am directing your attention to December 4, 2004.

16   Did you become involved then with investigating the death

17   of a young man named Bobby Calabrese?

18        A.   Yes, I did.

19        Q.   Where did Bobby Calabrese die?

20        A.   It was on Broadway in Island Park, North Long

21   Beach.

22        Q.   Did you respond to a storage facility on the block

23   where Bobby died?

24        A.   Yes, I did.

25        Q.   What is the name of the storage facility?

Strigaro - People - Direct

1        A.    I believe it's Central Self Storage.

2        Q.    Where is Central Self Storage located?

3        A.    The address is on Austin Boulevard in North Long

4    Beach, Island Park.  It kind of sits between Austin Boulevard

5    and Broadway.

6        Q.    Is the front on Austin Boulevard?

7        A.    Correct.

8        Q.    Is the rear on Broadway?

9        A.    Yes.

10       Q.    Are there video cameras outside of the facility?

11       A.    Yes.

12       Q.    Is there a video camera facing east from the rear

13   of the storage facility?

14       A.    Yes.

15       Q.    Does that video camera face out across Broadway?

16       A.    Yes.

17       Q.    Is there a video camera facing northeast from the

18   rear of the storage facility?

19       A.    Yes.

20       Q.    Does that video camera intersect Broadway at an

21   angle?

22       A.    Yes.

23       Q.    Describe the system that records what the video

24   cameras cover?

25       A.    The video security system that was installed at the

Strigaro - People - Direct

1   storage facility was a, I believe, thirteen camera video

2   security system.  It had cameras inside and outside the

3   facility, and the images were stored on what is called a

4   digital video recorder or DVR.

5       Q.   Can you set the system in different ways?

6       A.   Yes, you can.

7       Q.   Tell the jury what you mean by that?

8       A.   This particular system is, it's a sophisticated

9   system.  It can have, as far as I can tell, three modes of

10   operation.  It can have what is called a time lapse only mode

11   of operation which means that at a prescribe or

12   pre-programmed period of time the system will automatically

13   just go out and whatever image it has in it's buffer at the

14   time it's going to grab it and store it to the hard drive in

15   the system.

16       There is another mode of operation called event or alarm

17   mode of operation and this mode of operation, it takes into

18   account that certain activity that a particular camera sees

19   triggers the system to record those images, and when there is

20   no activity on any camera at any particular time it doesn't

21   record anything.

22       And then there is a third mode of operation which is the

23   combination of both the time lapse and the event or alarm

24   mode in which when there is no activity on any cameras, it

25   sits in this time lapse mode where it's just going to wait

Strigaro - People - Direct

1  predefined period of time going to grab an image and if

2  there's any activity, it automatically drops out of that time

3  lapse mode and goes into that event mode where it's going to

4  grab the images that it sees as pertinent images to record.

5     Q.   How does the system define that activity?

6     A.   The system in this particular DVR, it's based on a

7  sensitivity setting, and it's also based on how many or how

8  much of the screen actually changes from light to dark.  This

9  particular unit was set at a mid-range setting.  So, it would

10  take a fair amount of change in light or change in contrast

11  from light to dark in order for it to trigger it to record.

12     Q.   How was the storage company system set in December

13  of 2004?

14     A.   The storage company system was set up to operate in

15  a time lapse plus event alarm configuration.  In the time

16  lapse mode it was programmed to record an image approximately

17  ever thirty-six seconds and in the event mode I think it was

18  about every two and-a-half to three seconds, and if there was

19  a lot of activity going on, it would record an imagine about

20  once a second.

21     Q.   I am going to ask the following questions based on

22  the settings as they were in December of 2004.

23     Do you understand?

24     A.   Yes.

25     Q.   Did the systems sometimes record images

MO

1   continuously?

2        A.   Well, I guess the answer to that is yes and no.

3   The way the system is set up is that if it sees activity,

4   depending on the level of activity, it records an image about

5   once a second.  If it's a lot of activity.  If you consider

6   that continuous, then the answer is yes.  But, really it's

7   taking discreet images about once a second for a lot of

8   activity.  For less activity it takes an image about every, I

9   guess it's two and-a-half, three seconds.  Then if there is

10  no activity at all, obviously it's doing it about every

11  thirty-six seconds.

12       Q.   There would always be intervals between images?

13       A.   Always.

14       Q.   Does the system sometimes stop recording visual

15  images as time continues to run?

16       A.   Yes.

17       Q.   What do you mean by that?

18       A.   Again, the way the system works is that there is

19  one master clock that the system basically takes, every image

20  that it comes, that comes into it and records it, and what it

21  does is it records the image that comes in.  It tell us what

22  camera recorded, then it puts a time date stamp on.  Also a

23  water mark on it for authenticity.

24       But every camera in the system can trigger the unit to

25  record at any given time.  So, if you're looking at one

1    particular camera and there is no activity on it, but one of

2    the other twelve cameras the systems has working sees

3    something that has activity on it, it makes the system clock

4    run although the image that you're looking at at that

5    particular time is not moving or not changing.  So, it gives

6    the appearance that the clock is moving but no images are

7    being updated.

8        Q.  So, the system would continue holding a signal

9    frame?

10       A.  Yes, it holds the frame on play back until the next

11   frame replace it.

12       Q.  So, let's say you have an automobile in the image.

13   You'd just be looking at that automobile and time would be

14   passing?

15       A.  If the automobile does not move enough or something

16   changes enough in that image to cause the system to update

17   it, it will stay on that image until whatever activity on

18   that camera causes it to record a new image or in this

19   particular case, approximately thirty-six seconds go by, it's

20   automatically going to update it with whatsoever's in front

21   of it.

22       Q.  There are times when time would just jump on the

23   videotape?

24       A.  That's correct.

25       Q.  When I say videotape, that is incorrect.  It's the

Strigaro - People - Direct

1    images in the system; is that right?

2        A.   It's images of the system stored, correct.

3        Q.   The system is not recording a video tape; is that

4    right?

5        A.   That's right.

6        Q.   It's recording it in a hard drive?

7        A.   That's right.

8        Q.   Describe how a person gains access to this system's

9    visual images?

10       A.   This particular system was a stand alone system.

11   So, you gain access to the images that was, that was stored

12   on the hard drive through the front panel.

13       Q.   Is there a date and time displayed on images

14   recorded by the storage company's digital system?

15       A.   Yes.

16       Q.   Was the time accurate in early December of 2004?

17       A.   No.

18       Q.   How was the time inaccurate?

19       A.   The time was off by about an hour.

20       Q.   How did you determine that the time was not

21   accurate?

22       A.   General rule of thumb when you do enough of these

23   the first thing you do is you look when you get to the

24   location at what it's doing in front of you at that time,

25   real time, and you check to see what the date and time it has

Strigaro - People - Direct

1    programmed into it.  And in this particular instance the date

2    was correct but when I compared it to the time I had on my

3    wristwatch it was off by about an hour.

4        Q.   It was off an hour; isn't that correct?

5        A.   Approximately an hour, yes.

6        Q.   Was this on daylight savings time?

7        A.   It appears to be that way.

8        Q.   At the time, of course, it was standard time?

9        A.   That's correct.

10       Q.   Should have been standard time?

11       A.   Correct.

12       Q.   So, on the videotape everything is an hour ahead?

13       A.   That's right, from the actual time.

14       Q.   Once again I said videotape?

15       A.   DVR.

16       Q.   It's the imagine from the hard drive from the

17   system?

18       A.   Correct.

19       Q.   Was the system sometimes recording visual images

20   between eight o'clock and nine o'clock on the night of

21   Friday, December 3, 2004?

22       A.   Yes.

23       Q.   How did you determine that?

24       A.   What I did was, through the front panel of the unit

25   I went into the search mode of the system.  I entered the

MO

Strigaro - People - Direct

1    time and date of interest on December the third for two

2    particular cameras that the system recorded on.  Once you

3    enter the information in and you ask it to search its

4    database for that, if it finds any matches for the parameters

5    you input into it, it automatically brings them on the

6    screen, asks if you want to display, you hit yes.  You choose

7    whatever camera you want.

8         In this case I did it for one camera at a time, and when

9    I asked it to play back the information, it just

10   automatically plays back whatever it has stored for that

11   camera for that particular time.

12        Q.   Did the system sometimes record visual images

13   continuously with intervals between each frame, between eight

14   o'clock and nine o'clock that Friday night?

15        A.   Yes.

16        Q.   How did you determine that?

17        A.   Again, based on the input parameters you put in, it

18   brings back any information that this has based on the start

19   date and time, the stop date and time that you're requesting,

20   and it just automatically plays them for you.

21        Q.   Was the time running as the system recorded visual

22   images continuously with intervals, between each frame,

23   between eight o'clock and nine o'clock that Friday night?

24        A.   Yes.

25        Q.   Did the system sometimes hold still images with the

1   time running between eight o'clock and nine o'clock that

2   Friday night?

3        A.   Yes.

4        Q.   Were there gaps in time where nothing was

5   recorded?

6        A.   Yes.

7        Q.   Did the system record visual images between 8:35

8   and 8:36 that Friday night?

9        A.   Yes.

10       Q.   How did you determine that?

11       A.   Again, as I stated to you before, by putting in the

12  start and stop times and the start and stop dates, I

13  originally put in, I think, as a search parameters, somewhere

14  around, because the time was off by an hour, I put in from

15  nine p.m. to approximately ten p.m., and it played everything

16  that had recorded or was stored on this hard drive during

17  that time frame and it did come up with information during

18  that period of time.

19       Q.   Did the system record any moving images with

20  intervals between each frame between 3:35.08 and 8:26 that

21  Friday night?

22       A.   No.

23       Q.   Did you retrieve visual images between eight and

24  nine o'clock that Friday night?

25       A.   Yes.

Strigaro - People - Direct

1       Q.    Describe for the jury how you did that?

2       A.    On this particular case, there was no output device

3    that was hooked up to this unit.  No output device meaning no

4    VCR, no CD burner, no DVD burner.  Typically meaning we used

5    to off load videos from video systems.  This is not

6    uncommon.  What I had done was I had brought with me a

7    portable videotape recorder and what I had done was I

8    accessed the port where the video comes out of the DVR and

9    goes to the local monitor there where you can view what is

10   going on, and I tapped into that so that whatever we were

11   seeing, and the screen was being recorded to my portable

12   video recorder, and I recorded all the information that we

13   had at that time.

14      Q.    Did you transfer those visual images to a

15   videotape?

16      A.    Yes.

17      Q.    What times are covered by that videotape?

18      A.    I believe it's approximately-- well, the time stamp

19   on the tape itself is approximately I'd say like 9:10

20   thereabouts to about 9:45, but the reality of it is it was

21   8:10 to 8:45.

22      Q.    Is there anything missing that was recorded from

23   between those times?

24      A.    No.

25      Q.    How did you compose the videotape?

Strigaro - People - Direct

1        A.    Like I said, when I got there I hooked up the

2   portable videotape recorder, not knowing what I had when I

3   first got there, whether there was a lot of information still

4   unknown because this was early on in the investigation.  I

5   just hit the record button on my portable tape player and

6   just recorded everything we were doing as we were searching

7   the database on the DVR as in the play back mode.  If there

8   was anything of any interest to any of the detectives that

9   were at the scene, I was able to freeze frame it, go

10  backwards, you forwards, go backwards a few frames, fast

11  forward, just going through the investigation trying to

12  identify anything that was of any interest to any of the

13  detectives at that time.

14        Q.    Those pauses are part of the videotape?

15        A.    Yes.

16        Q.    Those pauses weren't from the system itself, they

17  were from you?

18        A.    Some of the images were as a result of me manually

19  pausing the system from playing.  Other ones it's just a

20  natural way the systems works.

21        Q.    Is there anything on the videotape you composed

22  that is not from the storage facility recording system?

23        A.    No.

24        Q.    Is everything between the times you recorded the

25  storage facility system included in your videotape?

MO

Strigaro - People - Direct

1    A.   Yes.

2    Q.   Anything missing?

3    A.   No.

4    Q.   Have you watched the videotape you composed?

5    A.   Yes.

6    Q.   Have you watched it a number of times?

7    A.   Yes.

8    Q.   When did you last watch it?

9    A.   Today.

10   Q.   Has the videotape been marked?

11   A.   Yes.

12   Q.   How?

13   A.   The tape is marked with the, I believe it's the

14   homicide number, the date I was called down to the location,

15   a general description of some of the information on the tape,

16   and my initials, my shield number and my command.

17            MR. HAYDEN:  Your Honor, may I please have

18        this videotape that has been marked 57 for

19        identification shown to the witness.

20            THE COURT:  Yes.

21            THE COURT OFFICER:  The witness has 57 for ID.

22   Q.   Do you recognize that?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is a VHS copy of the tape that I made the day

Strigaro - People - Direct

1    I went down to the storage facility.

2         Q.   Is that a fair and accurate representation of the

3    visual images recorded by the storage facility's security

4    system?

5         A.   Yes.

6         Q.   Is there any difference between the visual images

7    on that videotape and the visual images recorded by the

8    storage facility security system?

9         A.   No.

10             MR. HAYDEN:  People offer that in evidence.

11             MR. LEMKE:  No objection, Your Honor.

12             THE COURT:  People's 57 in evidence.

13             THE COURT OFFICER:  People's 57 marked in

14        evidence.

15        Q.   Did you take photographs of the security camera

16   facing east and northeast?

17        A.   Yes.

18             MR. HAYDEN:  Your Honor, may I please have

19        these three photographs, 58, 59 and 60 shown to the

20        witness.

21             THE COURT:  Yes.

22             THE COURT OFFICER:  The witness has 58, 59 and

23        for ID.

24        Q.   Do you recognize those photographs?

25        A.   Yes.

MO

494

Strigaro - People - Direct

1  Q. Did you take them?

2  A. Yes.

3  Q. What do those photographs depict?

4  A. The first photograph depicts the two cameras that

5 are mounted on the rear of the storage facility.   One facing

6 east looking out the back gate towards Broadway.   The other

7 camera faces in the northeast direction looking at the

8 northeast corner of their property out further onto Broadway.

9     THE COURT:  What exhibit number is that.

10     THE WITNESS:  That is 58.

11     THE COURT:  58 that was?

12     THE WITNESS:  Right.

13  A. 59 shows basically the, what the camera that looks

14 east sees, the back gate and Broadway.   And 60 basically

15 shows what the camera facing northeast sees looking up in the

16 direction on Broadway.

17  Q. Are those photographs fair and accurate

18 representations of the appearance and location of the east

19 and northeast video cameras as they were when you first saw

20 them?

21  A. Yes.

22     MR. HAYDEN:  Offer them in evidence, Your

23 Honor.

24     MR. LEMKE:  No objection, Your Honor.

25     THE COURT:  People's 58, 59 and 60 in

Strigaro - People - Direct

1      evidence.

2                    THE COURT OFFICER:  People's 58, 59 and 60

3      marked in evidence.

4           Do you want them shown to the witness?

5                    MR. HAYDEN:  No, I'd like to have them.

6                    May I approach the presenter, Your Honor?

7                    THE COURT:  Yes.

8           Q.    Detective, please step down to the side of that

9      presenter.  Stand to the right of it as you're facing it,

10     please.

11          I am now placing 58 on the presenter.

12          Please describe for the jurors what that photograph

13     depicts?

14          A.    This is basically the two cameras, there's the east

15     facing camera and the northeast facing camera that is mounted

16     on the rear of the storage facility in Island Park, Long

17     Beach.

18          Q.    I am now placing 59 on the presenter.

19          Please describe what that depicts.

20          A.    This is a general view shot of what the east camera

21     basically looks at from its point of view.  I am a little bit

22     to the side of it, but it looks out the back driveway

23     entrance outside onto Broadway.

24          Q.    I am now -- there's a fence prominently displayed

25     in that photograph; is that right?

Strigaro - People - Direct

1      A.   That is a gate, yes.

2      Q.   There's a gate to the side.  Was it open into the

3  side when the video system was recording on the night of

4  Friday, December 3, 2004?

5      A.   Yes, it was.

6      Q.   So, you wouldn't see it this way?

7      A.   That's right.

8      Q.   This would be open in the middle; is that right?

9      A.   Correct.

10     Q.   I am now placing 60 on the presenter.

11  Describe what that depicts?

12     A.   This is just a general view shot of what the

13  northeast camera field of view or point of view would be

14  showing.  It was trying to pick up this northeast area of the

15  storage facility property and beyond the gate out onto

16  Broadway.

17          MR. HAYDEN:  Your Honor, with the Court's

18     permission, may I play this videotape for the jury, and

19     with the Court's permission, may Detective Strigaro use

20     that remote and pause the video wherever necessary to

21     explain to the jury what is going on, and what the

22     videotape depicts?

23          THE COURT:  Yes.

24     (Whereupon, People's exhibit 57 in evidence was

25     played in open court.)

Strigaro - People - Direct

1    A.   Okay.  I missed that, so hang on.

2    This is the east camera on the night of occurrence and

3    what you are seeing is all of the information that the

4    digital video recorder captured at that time.

5    Let me rewind it real quick for you.

6    This just shows the taillights of a car going by.  This

7    car happened to be parked in the limo facility right next

8    door.

9    What you will see is at times the images go forward and

10   backwards and what that is a function of, at the time I was

11   making this recording, there are other detectives there with

12   me.  We didn't know what we had at the time.  So, as an image

13   went passed the screen, somebody would say, what is that and

14   we'd stop and we'd look at it and we continue along.

15   This image here we stopped at for a little while.  The

16   detectives that were working with me at the time thought this

17   car was of significance.  It appears as though based on their

18   investigation that this car was a car of interest to them at

19   that time.

20   Q.   Detective, just got to speak up so the jury can

21   hear you.  Turn to them and pause and speak loudly.

22   A.   Okay.

23   Q.   Did you hear up to this part?  Okay.

24   Again, this image is frozen on the screen here

25   intentionally.  What we would, we were doing at the time was

MO

Strigaro - People - Direct

1   as an image came up on the screen, sometimes I would stop it,

2   I'd freeze it, we would talk about it, see if it was of any

3   interest to anybody.

4       Again here's another car travelling southbound on

5   Broadway.  We really didn't know what we had at the time so

6   anything that passed in front of this camera we tried to

7   capture that image because it could be significant later on.

8   That is why sometimes you see the images jump passed you.

9   Other times they just kind of sit there for a while.

10      You have to keep in mind that the way the system is

11  working it's recording an image about, depending on, once

12  every two seconds, once every second.

13      So, sometimes you will see maybe just the front of a car

14  on the left side of the screen.  When, if it goes to grab

15  another image, the car is moved a certain amount of

16  distance.  All you see is the back of the car.

17      This is just a guy driving by on a bicycle.

18      Didn't know what that was.

19      Another car travelling southbound.

20      Again, it's going back and forth because I am trying to

21  move the frames to see what, capturing the best image of the

22  vehicle such that down the road if this happens to be

23  something of interest to the investigating detective, try to

24  get the best image possible to try to enhance it, blow it up,

25  whatever needs to be done, to aid in the investigation.

Strigaro - People - Direct

1        Again here's another car travelling southbound and the

2   same thing, we will just freeze it to just look at it, and

3   then move along.

4        Here's another car.   These are all the images.   This is

5   everything that was captured from this camera that was

6   recorded to that DVR that night anything that happened in

7   front of this camera field of view, from the time frame I put

8   in, which was about ten after eight until about a quarter to

9   nine, it recorded.

10       This image here is the victim driving northbound on

11  Broadway.   The reason why we knew that at the time was this

12  car had some distinctive wheels, and as soon as the

13  investigating detective saw it they said that is the victim.

14       Here another car travelling northbound.   This is shortly

15  after the victim drove up the street.   And again this is

16  another northbound car.   I believe this is one of the last

17  cars.

18            THE COURT:   Keep your voice up.

19       A.   This is one of the last cars we recorded that

20  night.

21       Okay.   This is the, this was the northeast camera.   This

22  videotape starts at about, the clock says 9:13.   It's

23  approximately 8:13, 8:13 at night.   And again based on the

24  picture that you saw, this is looking at the northeast part

25  of the storage facility property and beyond the fence.

1    Here you will see, this is actually somebody that works

2    in the limo company next door.  He just gets in his car.  You

3    will see him drive away.

4        Here's one of those cars just driving southbound on

5    Broadway that you saw from the east camera angle.

6        What I want to show you at this point is, if you see

7    really nothing on the screen is changing, but if you can see

8    this monitor, the time up here is sequencing and that is the

9    normal operation for this digital video recorder because even

10   though this northeast camera doesn't see anything on it that

11   is going to trigger it to update this image, one of the other

12   twelve cameras that the system is recording sees something,

13   and it forces the system's clock to move.  That is why

14   sometimes even though there's nothing changing on this

15   screen, the clock up on the top is moving along.

16       Okay.  This was the car I pointed out to you on the east

17   camera, the car of interest that I talked about.  This is

18   that car now entering into the northeast camera field of

19   view.  For some reason the car stops here for a minute and

20   then it's gone.  This is just another car travelling

21   southbound on Broadway.  Okay.

22       This car now you see that is travelling southbound on

23   Broadway is now doing a U-turn to head northbound on

24   Broadway, and the reason why I am bringing that to your

25   attention is this is that same car of interest, the car that

MO

Strigaro - People - Direct

1    I pointed out to you earlier.  The reason we know this, there

2    is a distinct black line that bisects the license plate on

3    this vehicle that no other car on the videotape that was

4    captured that night demonstrates other than this vehicle.

5    That is how we can correlate this car to the other car, or

6    this image to the other image.

7        Okay.  Now, he left northbound again and again you're

8    going to see their screen's not moving, but the clock is

9    still moving along.  This is the way this video recorder is

10   programed.  This is normal operation.

11       Okay.  Again, same car, car of interest, coming back down

12   south on Broadway again, making the U-turn, and again we know

13   it's that car because of that distinct line no other car in

14   this video, you can watch this a thousand times, has that

15   black line on it.

16       Now he is pulling along side the curb, parking it

17   appears.

18       Now, if you just notice the car back up a little bit

19   further, looks like there is an obstruction right here.  You

20   can only see part of the car.  There's actually a Cadillac

21   parked, an older Cadillac that is parked on the curb right

22   here, and the car, for whatever reason, backs up closer to

23   the Cadillac.

24       Now, what you are seeing is, appears though the car is

25   gone, the car, the headlights, all the lights on the car is

MO

Strigaro - People - Direct

1   turned over.  It's still there.  Headlights turn back on.

2   The change in light triggers the DVR to record something.

3       This is just another one of the cars travelling

4   southbound on Broadway.

5       Again there's another one that we pointed out earlier

6   with the east camera.

7       All right.  This is now the victim entering the view of

8   the northeast camera.

9       Here you see the victim pulling in front of this parked

10  vehicle.

11      Now, the victim's car is parked on the curb.

12      Now you see this vehicle is now pulling away from the

13  curb in or between the camera and the victim's vehicle stops

14  at this point, hits their brakes, drives away.

15      This is the first vehicle travelling northbound or

16  southbound on Broadway that is going to come across the body

17  in the road.

18      As you can see, the car stops right along side where the

19  body was.

20      And, this is the last car that I showed you on the east

21  camera going northbound.

22      Right here it appears as though these shadows are images

23  of people that are now coming over to see what happened.

24      And, that is it.

25       Q.    Detective, would you take that back to 8:35,

1       please.   Rewind it.

2           A.    Okay where in 8:35.

3           Q.    As close to 8:35.00 as you can get it?

4           A.    Okay.  8:35.00.

5           Q.    What I would ask you to do is run it and please

6       pause -- you testified that that system holds single images

7       and time passes.

8           Show the jurors what you mean using that time sequence

9       between 8:35 and 8:36.

10          A.    Okay.  Here you're going to see the victim come

11      up.  I just jumped passed it.  Let me move that back.

12          Okay.  If you notice the time right now it's saying

13      9:35.05 which is 8:35, approximately 08.  The next frame that

14      you're going to see the system record is 935.33.

15          What happened is, it was not enough change in light

16      anywhere in this picture to trigger this system to record

17      anything.  So, this was the last image it saw that had not

18      activity, enough change in light to get the system to record

19      and, 9:35.33 something else in this field of view or in any

20      other camera in the system caused the clock to start running

21      again.

22          So, it appears as though this image is frozen but the

23      clock is still moving.

24          The next image that this thing captures is the car over

25      on the side, parked on the side, and that is at 9:35.44.

1    Q.   Does it hold that single image for awhile?

2    A.   Yes.

3    Q.   Show the jurors what you mean?

4    A.   The clock is advancing at this time.  The image is

5  not changing.  It's going up to 50, and at 9:35.50, this car

6  starts to move which has enough change in light that the

7  system detects it as motion and starts, this camera starts

8  recording again.

9    Q.   Would you take it back again before the vehicle

10 behind starts moving?

11   A.   Okay.  Do you want me to stop.

12   Q.   Just stop when it's holding a still image.

13 Stop on that again?

14   A.   Right there.

15   Q.   When it's holding a still image?

16   A.   Okay.

17   Q.   Now, things are happening that you don't see; is

18 that right?

19   A.   Correct.

20   Q.   All you're stuck with is this single image?

21   A.   Yes.

22   Q.   Anything could be happening outside of what is

23 going on in that single image, that is just an image what the

24 camera had recorded some time before?

25   A.   All you know based on this videotape is that the

Strigaro - People - Direct

1    system did not detect enough change in light, in the overall

2    picture to warrant it to start recording again.  And what it

3    does is it takes the last image that it records and just

4    displays it on the screen until it's got a new image to

5    update it.

6          Q.    There are things happening you don't see?

7          A.    Very possibly.  I mean, it jumps from 9:35.00 to

8    9:35.33, 32.

9          Q.    Then holds a still image?

10         A.    Again.

11         Q.    For many seconds more?

12         A.    Right.

13         Q.    Is that right?

14         A.    That's correct.

15               THE COURT:  You can continue.

16               MR. HAYDEN:  Yes, Your Honor.

17         Q.    Have you played still representations of individual

18    frames of the videotape in evidence?

19         A.    Yes.

20         Q.    Describe how you did that?

21         A.    In our office we have an video capture tool.  It's

22    basically a computer that has a video card in it.  You play a

23    videotape in the machine, the videotape goes into the video

24    card of the computer and then with software you are able to

25    freeze an image and then print it out.

Strigaro - People - Direct

1       Q.     That is what you did?

2       A.     Yes.

3              MR. HAYDEN:  Your Honor, may I please have

4       these items which have been marked 61A through 61Q shown

5       to the witness.

6              THE COURT:  Yes.

7              THE COURT OFFICER:  Witness has 61A through

8       61Q for ID.

9       Q.     Do you recognize those?

10      A.     Yes.

11      Q.     What are they?

12      A.     These are the still images that I captured from

13      that videotape.

14      Q.     Are they fair and accurate representations of

15      individual frames of the videotape that have been introduced

16      in evidence?

17      A.     Yes.

18      Q.     Is there any difference between those

19      representations and the individual frames of videotape?

20      A.     I'd say no.

21             MR. HAYDEN:  The People offer those, Your

22      Honor, as 61A through 61Q in evidence.

23             MR. LEMKE:  No objection, Your Honor.

24             THE COURT:  Mark them into evidence.

25             THE COURT OFFICER:  People's exhibits 61A

MO

Strigaro - People - Direct

1      through 61Q have been marked in evidence.

2           Do you want them shown back to the witness?

3                     MR. HAYDEN:  No.  No, thank you.

4           May I please have 54 in evidence given to the

5      witness, Your Honor.

6                     THE COURT:  Yes.

7                     THE COURT OFFICER:  The witness has 54 in

8      evidence.

9           Q.   Are these the AT&T Wireless Telephone records?

10          A.   Yes.

11          Q.   Using those records in evidence, do you see

12     references to cell site towers?

13          A.   Yes, I do.

14          Q.   Do you see a call placed at 8:23 on the night of

15     Friday, December 3, 2004?

16          A.   Yes, I do.

17          Q.   What cell site tower was involved in the placement

18     of that call?

19          A.   Site tour ID is 06536 which is an AT&T Wireless

20     cell tower on Oceanside Boulevard in Oceanside.

21          Q.   Do you see a called placed at 8:39 that Friday

22     night?

23          A.   Yes, I do.

24          Q.   What cell site tower was involved in the placement

25     of that call?

Strigaro - People - Direct

1        A.    Cell ID 06536 which is again is Oceanside Boulevard

2   in Oceanside.

3        Q.    Do you see a call placed at 8:41 that Friday

4   night?

5        A.    Yes, I do.

6        Q.    What cell site tower was involved in the placement

7   of that call?

8        A.    Same cell tower as before, Oceanside Boulevard,

9   Oceanside.

10       Q.    Do you see a call placed at 9:14 that Friday

11  night?

12       A.    Yes, I do.

13       Q.    What cell site tower was involved in the placement

14  of that call?

15       A.    The cell ID is 01782, and that's Park Avenue in

16  Wantagh.

17       Q.    Do you see a call placed at 9:18 that Friday

18  night?

19       A.    Yes, I do.

20       Q.    What cell site tower was involved in the placement

21  of that call?

22       A.    That cell ID is 05096 which is in South

23  Farmingdale.  I think it's Langdon Boulevard.

24       Q.    Do you see a call placed at 9:19 that Friday

25  night?

MO

Strigaro - People - Direct

1        A.    Yes.

2        Q.    What cell site tower was involved in the placement

3    of that call?

4        A.    Cell ID 05096 South Farmingdale.

5        Q.    Do you see a call placed at 9:26 that Friday

6    night?

7        A.    Yes, I do.

8        Q.    What cell site tower was involved in the placement

9    of that call?

10       A.    Tower ID is 11205.   That's I believe Adams Avenue

11   in Bethpage.

12            MR. HAYDEN:   Nothing further at this time,

13       Your Honor.

14            MR. LEMKE:   May I?

15            THE COURT:   Yes, Mr. Lemke.

16   CROSS EXAMINATION

17   BY MR. LEMKE:

18       Q.    Good afternoon, detective.

19       A.    Good afternoon.

20       Q.    Regarding the images that have been shown just

21   moments ago, in People's, I believe 57, so I can fully

22   understand, so the jury can fully understand, we have a

23   camera that are strategically placed on the Self Storage

24   building, correct?

25       A.    Yes.

Strigaro - People - Cross

1  Q. And one's placed so it's going east over North

2 Broadway and South Broadway, correct?

3  A. Yes.

4  Q. And ones heading more kind of a northeast, correct,

5 over South and North Broadway, correct?

6  A. Yes.

7  Q. And the images that are then taken, and more

8 importantly the ones that are going, looking east across

9 North and South Broadway, you began to start reducing those

10 images, okay, on this video.  This new video I think you

11 started doing that at a time at about 8:10 p.m. on December

12 third?

13  A. Approximately, yes.

14  Q. You say approximately.  There is a clock that's

15 shown, visibly displayed on this video, correct?

16  A. Correct, yes.

17  Q. And, that had a time of I think it was maybe 9:10?

18  A. I believe so, yes.

19  Q. But you have been able to determine that it, in

20 fact, it was 8:10?  It didn't reset itself because of either

21 standard time or daylight savings time, correct?

22  A. Yes.

23  Q. So, if we go with 8:10, and referring to the east

24 camera, that area is all lit up, correct?

25  A. Yes.

Strigaro - People - Cross

1      Q.   And that is depicted in the video, correct?

2      A.   Correct.

3      Q.   And, at about 8:10, there is a limo, you said the

4   first car is a limo?

5      A.   Yes.

6      Q.   And where was that -- that limo was going, right

7   there, parking right there?

8      A.   In that particular instance that car we first

9   picked it up on the field of view from the northeast camera.

10   It was actually parked in the parking lot which is directly

11   north of the storage facility.  It leaves its parking lot,

12   makes a right hand turn, and travels southbound on Broadway

13   and enters the field of view of the eastbound camera.

14      Q.   Okay.  So, if you take the two cameras as it's

15   situated, you're able to determine, if you take a look at the

16   northeast corner, you may see a vehicle coming down, right,

17   and then it leaves that view, or leaves that zone of viewing

18   from that camera, and it can be picked up in the east camera,

19   correct?

20      A.   Yes.

21      Q.   And vice versa, if a car's coming up north on

22   Broadway, it enters into the zone of influence or the zone

23   itself, the camera clicks, gets an image, the vehicle leaves,

24   and then is picked up by the northeast camera, correct?

25      A.   That would be correct.

Strigaro - People - Cross

1     Q.   At about 8:10 that night the limo service, as far

2  as we can tell, is open, isn't it?

3     A.   I don't know whether it was open or not.

4     Q.   Well --

5     A.   I can't say.

6     Q.   There is a limo business right there, correct?

7     A.   Yes.

8     Q.  Parked, or that location is directly across from

9  where Mr. Calabrese was found; isn't that correct?

10    A.   I believe so.  It's a little bit south of where he

11  was found.

12    Q.   In fact, Mr. Calabrese was further up, closer to

13  7-Eleven, correct?

14    A.   I believe so.

15    Q.   And, in fact, when that limo leaves the gates, you

16  had also testified, to the storage facility, were open,

17  correct?

18    A.   Night of December third at that time they were

19  open.

20    Q.   The storage place was open as far as you know,

21  correct?

22    A.   I don't know whether the storage facility was open

23  at that time.

24    Q.   Well, the first vehicle comes by, you're able to

25  determine that is the limo that comes through, correct?

MO

Strigaro - People - Cross

1      A.    Yes.

2      Q.    And then I notice there's about eight other cars

3   that are now coming either going north or south, correct?

4      A.    I didn't count the number but there are cars that

5   care travelling north and south.

6      Q.    Those are the vehicles that would be picked up, and

7   if you looked at the time, that is the actual time that that

8   vehicle is depicted in the frame, the still frame, correct?

9      A.    Correct.

10      Q.    And these cameras are either light censored or

11   moving censored?

12      Would that be correct to say?

13      A.    For lack of a better term, yes, that's correct.

14      Q.    Any time there is either movement or a light, the

15   camera is activated, that is why it's picking up, for

16   example, the person on the bicycle?

17      A.    Yes.

18      Q.    It picks up perhaps a moving vehicle or its

19   headlights or taillights, correct?

20      A.    Yes.

21      Q.    Or perhaps if the headlights are at the northeast

22   camera and towards the end there, individuals that walk in

23   front of those headlights that also pick up a change in

24   movement, and you'd have a still picture taken as well,

25   correct?

Strigaro - People - Cross

1    A.   That's correct.

2    Q.   See the time, if you, if the jurors were to take a

3    look at the upper right hand time, any time there be a change

4    of movement, that is an accurate time minus the hour,

5    correct?

6    A.   If the camera is, or I shouldn't say the camera,

7    it's not a function of the camera.  It's the function of the

8    DVR.  The cameras are dumb.  They sit there and take in

9    everything.  The DVR is the actual brains of the system.  And

10   based on its programming parameters that has it put into it,

11   if there's enough change in light given the field of view of

12   that particular camera it records an image.

13   Q.   Okay, but the time itself, when you're looking at

14   it, there's a time that Mr. Calabrese's vehicle comes up

15   north, correct, on North Broadway, correct?

16   A.   Yes.

17   Q.   And, your able, to identify that with the other

18   detectives, you have photographs of Mr. Calabrese's vehicle,

19   and you're able to decide that is his car, and then it leaves

20   that area and pulls into the northeast camera, correct?

21   A.   Yes.

22   Q.   And there's a time that that vehicle pulls over,

23   correct?

24   A.   Yes.

25   Q.   And there is also a time recorded where the other

Strigaro - People - Cross

1    vehicle had already been there for perhaps maybe four to five

2    minutes; is that correct?

3         A.    Approximately, yes.

4         Q.    And, the still imaginary shows that the lights on

5    that vehicle, at first, not Mr. Calabrese, the other one,

6    when it parked, first they were shut off, correct?

7         A.    When it first parked I believe the car you're

8    talking about, the lights stayed on.

9         Q.    But then they went off, correct?

10        A.    Yes.

11        Q.    Then they went back on again, correct?

12        A.    Yes.

13        Q.    Before Mr. Calabrese's car ever got there,

14   correct?

15        A.    Yes.

16        Q.    And that is recorded on the imagery, and the time

17   of that is recorded, correct?

18        A.    Yes.

19        Q.    Now, after Mr. Calabrese's car is there to the

20   point that the car behind it pulls out is about forty two

21   seconds; isn't that correct?

22        A.    Say that again.

23        Q.    When Mr. Calabrese's car pulls up along the curb,

24   there is a picture taken, there's a time that is associated

25   with that, correct?

Strigaro - People - Cross

1      A.   Yes.

2      Q.   And then there is another time where that car, not

3   Mr. Calabrese's, the other one pulls away from the curb,

4   correct?

5      A.   Yes.

6      Q.   About forty-one seconds later, correct?

7      A.   I am not sure of the exact time but there's a time

8   period between the car pulling up and stopping and then the

9   other car pulling away.

10     Q.   That would be recorded on the upper right hand

11  corner, correct?

12     A.   Yes.

13     Q.   Now, when the car apparently stops, the brake

14  lights go on, that is why there is another image, correct?

15     A.   It appears as though activation of the brake lights

16  was enough to trigger it to record an image.

17     Q.   So, wasn't that car either stopped for a second or

18  two, certainly depicted in this picture, correct, or the

19  imaginary?

20     A.   It could have been.

21     Q.   Now, when I went -- sometimes we see the first

22  video with the lights and cars going back and forth, that

23  was, I think you had indicated you and the other detectives

24  were playing with it to try to get either a better angle of

25  the car or see the car and so forth, correct?

Strigaro - People - Cross

1          A.    Yes.

2          Q.    You didn't take a first imaginary, just go right

3    through for the half hour and put that tape to the side, and

4    then go and try to play back and forth, you took the

5    imaginary as you were asking or asked to go back and forth,

6    correct?

7          A.    That particular camera, that's correct.

8                     MR. LEMKE:   Nothing further.   Thank you.

9                     THE COURT:   Mr. Hayden, anything further?

10                    MR. HAYDEN:   Just briefly, Judge.

11   REDIRECT EXAMINATION

12   BY MR. HAYDEN:

13         Q.    Counsel on cross examination went into what

14   activates the system, what spurs the system to record an

15   image.

16         Just describe that again for the jury, it's not just

17   simple light or simple movement, it's a significant enough

18   change to trigger the system; is that right?

19         A.    In this particular DVR, the level that requires the

20   system to be triggered to record was set at a mid-range

21   level.   Meaning that if, in this particular instance, it

22   would require a fair amount of change in light in a

23   substantial area in order to get the DVR to trigger to

24   record.

25         In this particular situation, the actual screen that, or

Strigaro - People - Redirect

1    image that is captured by any particular camera gets divided

2    into a matrix.  A number of boxes going across horizontally,

3    a number of boxes going vertically.

4        This particular DVR, with that sensitivity setting, in

5    order for it to capture information or start to record, would

6    require change in light in probably two to three of those

7    boxes in order for it to record.

8        Q.   As far as the limo place is concerned.  You see a

9    vehicle drive away from the vicinity of the limo place

10   heading south on Broadway; is that right?

11       A.   Yes.

12       Q.   That is before you see the vehicle of interest?

13       A.   That's correct.

14       Q.   That is the last activity you see anywhere near

15   that limo place; is that right?

16       A.   During the time frame I searched, that's correct.

17       Q.   As far as the time depicted on the images recorded

18   by the system, if that time is no more accurate than the

19   system's time was accurate, in other words, if that clock was

20   off by several seconds, by twenty seconds, by thirty seconds,

21   that would be reflected in the time you have there.  There is

22   no guarantee that that time is accurate to the second; is

23   that right?

24       A.   You mean to actual time, is that what you're

25   talking about?

Strigaro - People - Redirect

1      Q.     Yeah.  We don't know the time recorded is

2   necessarily accurate to the second?

3      A.     Well, the time inputted into the system is only as

4   accurate as the person that puts it in initially and then as

5   the system, you know, operates, just as with any computer or

6   electronic device, the time can, you know, wonder around.  It

7   can go slower.  It can go faster than the actual time.  So,

8   it's only an approximation.

9              MR. HAYDEN:  Nothing further, Your Honor.

10  RECROSS EXAMINATION

11  BY MR. LEMKE:

12     Q.     Detective, it's your testimony now that this

13  complicated system you spent about an hour instructing us on

14  how it works, the timing is wrong?

15             MR. HAYDEN:  Objection.  That is not the

16      testimony.

17             THE COURT:  Overruled.

18     Q.     Or was the time correct?

19     A.     The times on the digital video recorder are

20  approximate times that it recorded.

21     Q.     Could you step down with the Court's permission,

22  please.

23     Could you go to 8:35, please.

24     A.     8:35 what?

25     Q.     Is that 8:35.08?  8:35.08?

Strigaro - People - Recross

1       A.      That is 8:35.08.

2       Q.      Okay.  What time does it read?

3       A.      It reads 9:35.08 p.m.

4       Q.      We know it's 9:35 based on you check it with your

5    time, your watch, when you were there?

6       A.      Right.

7       Q.      Now, go to the next time.  There's an image.

8    Records another image at 9:35.33, which would be twenty-five

9    seconds later?

10      A.      Correct.

11      Q.      Is that correct?

12          In other words, that is twenty-five seconds from the time

13   the car was first there until now there's that movement

14   again.  It's not three minutes?

15      A.      You're absolutely right.  That's correct.

16      Q.      So, the number, as it changes from 9:35 to 9:36,

17   that is only a minute, that is not five minutes or ten

18   minutes, that is sixty seconds in this case, fifty-two

19   second, forty-two seconds, correct?

20      A.      Correct.

21              MR. LEMKE:  Thank you.

22              THE COURT:  Anything further.

23              MR. HAYDEN:  No, Your Honor.

24              THE COURT:  Thank you.

25              THE WITNESS:  You're welcome.

Proceedings

```
 1              THE COURT:  Have a good day.

 2              THE COURT:  Counsel, approach the bench,

 3     please.

 4         (Whereupon, there was a bench conference held off

 5     the record.)

 6              THE COURT:  Ladies and gentlemen in the

 7     gallery, I'd ask you to remain seated until the jury

 8     leaves the courtroom.

 9         As you saw I just had a conference at the bench.

10     We're moving into some witnesses now that will probably

11     be more lengthy.  So, accordingly, instead of breaking

12     that up I am going to break for the day, get out of here

13     early, beat the traffic, and resume tomorrow.  Get a

14     full day.  As I told you this morning, I am not only on

15     schedule, I am ahead of schedule.

16         So, I'm going to give you the same admonition you

17     hear every time we break.  You must not converse among

18     yourselves or with anyone else upon any subject

19     connected with the trial.  You must not read or listen

20     to any accounts or discussions of the case in the event

21     it is reported by newspapers or other media.  You must

22     not visit or view the premises or place where the

23     offense was allegedly committed, or any other premises

24     or place involved in the case.

25         Prior to your being discharged, you must not
```

MO

Proceedings

1    request, accept, agree to accept, or discuss with any

2    person the receiving or accepting of any payments or

3    benefits in consideration for supplying any information

4    concerning the trial.  You must promptly report to the

5    Court any incident within your knowledge involving an

6    attempt by any person to improperly to influence any

7    member of the jury.

8         You shall not access the Internet or Worldwide Web

9    by any means available to you for the purpose of either

10   learning about this case or to learn about the law or

11   any legal issues concerning this case.

12        I am going to tell you that we should report back

13   tomorrow at approximately 9:15.  Okay.  Pushing it back

14   a little bit because by the time we get it altogether

15   and get going, it's usually closer to ten.  So, be here

16   about 9:15.

17        Remember what I have told you.  Probably encounter

18   it to some degree with respect to the parking.  Although

19   some vacations are taking place now, so maybe it's not

20   that bad, I am not sure.  But you might want to still

21   come early, grab some coffee or whatever.

22        All right.  We will get a full day in tomorrow, and

23   we're doing good.  We're ahead of schedule.  Have a

24   great night.

25        (Whereupon, the following takes place outside the

Proceedings

1        presence of the jury.)

2                THE COURT:   Court's in recess until tomorrow.

3        We will try to get started by ten.   Okay.   Have

4        everybody ready.   Let's get going.

5            (Whereupon, the trial was adjourned to June 8,

6        2005.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25