STATE OF NEW YORK : NASSAU COUNTY

COUNTY COURT PART 11

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

MARK ORLANDO,

Defendant.

SCI/IND. NO. 167N-2005

TRIAL

- - - - - - - - - - - - - - - - - - - - -X

262 Old Country Road
Mineola, New York
June 9, 2005

B e f o r e :

HON. DAVID P. SULLIVAN, Supreme Court Justice

A p p e a r a n c e s :

HON. DENIS DILLON
District Attorney, Nassau County
By: ROBERT T. HAYDEN, ESQ.
Assistant District Attorney

DENNIS LEMKE, ESQ.
Attorney for Defendant
114 Old Country Road
Mineola, New York 11501

Mary Ocskai
Official Court Reporter

COPY

MO

THE CLERK: Continued case on trial, 167N-05, People of the State of New York versus Mark Orlando. Appearances for the record.

MR. HAYDEN: Robert T. Hayden for the People. People are ready.

THE CLERK: For the defense.

MR. LEMKE: For Mr. Orlando, Dennis Lemke, 114 Old Country Road, Mineola, New York.

THE CLERK: Let the record reflect the presence of Mr. Orland, sworn jurors and alternates.

THE COURT: Thank you for your patience. I moved to another courtroom hoping it'd be a little cooler. I apologize for that.

Mr. Hayden, call your next witness, please.

MR. HAYDEN: Detective John McHugh.

JOHN McHUGH, detective, called as a witness on behalf of the People, after having been first duly sworn, and having stated his shield number as 624, and his command as the Homicide Squad, Nassau County Police Department, took the witness stand and testified as follows:

DIRECT EXAMINATION

BY MR. HAYDEN:

THE CLERK: State your name, spelling your last, shield number and command.

THE WITNESS: Detective John McHugh,



M-C-H-U-G-H, shield 624, Homicide Squad, Nassau County Police.

THE COURT: Good morning, detective.

THE WITNESS: Good morning, detective.

THE COURT: Mr. Hayden.

MR. HAYDEN: Yes, Your Honor.

Q. Goods morning, detective.

A. Good morning, Mr. Hayden.

Q. How long have you been a member of the Nassau County Police Department?

A. Thirty years.

Q. How long have you been a detective?

A. Seventeen years.

Q. How long with homicide?

A. Eight years.

Q. Do you know a man named Mark Orlando?

A. Yes, I do.

Q. Please briefly describe him?

A. He is a male white, he was thirty-four years old at the time of this case. He is approximately 5'10", about 175 pounds.

Q. Do you see Mark Orlando in this courtroom today?

MR. LEMKE: So stipulated, Your Honor, Mr. Mark Orlando.

THE COURT: Let the record reflect that the

witness has identified the defendant as Mark Orlando.

Q. Do you know a young man named Herva Jeannot?

A. Yes, I do.

Q. Please briefly describe Herva Jeannot?

A. Male black, twenty-three years of age, about 5'9" with a thin built.

Q. Where was Herva Jeannot living in early December of 2004?

A. 159 Sammis avenue in Deer Park, New York.

Q. With whom was Herva Jeannot living with then?

A. His parents.

Q. I am directing your attention to the night of Friday, December 3, 2004.

Did you become involved that night with investigating the shooting death of a young man named Bobby Calabrese?

A. Yes, I did.

[redacted]

[redacted]

[redacted]

A. [redacted]

Q. Where was Bobby Calabrese killed?

A. In the roadway on Broadway south of Georgia Avenue in North Long Beach.

Q. Did you respond to that location?

A. Yes, I did.

Q. [redacted]

A. [redacted]

Q. Describe the area where Bobby was killed?

A. It's a commercial area that's dimly lit. On the west side of the street is a large public storage facility, a limousine business, an auto repair shop. Further north on the street, on the corner of Georgia Avenue is a 7-Eleven. On the east side of Broadway is a boat yard and a vacant nightclub.

Q. Was the storage facility open for business when Bobby was killed?

A. No, it was not.

Q. Was the limo business open when Bobby was killed?

A. No, it was not.

Q. How did you determine that?

A. Through our canvass and walking around the neighborhood, trying to make contact with people in those establishments.

Q. Were you familiar with the area where Bobby was killed?

A. Yes, I was.

Q. Describe your familiarity with that area?

A. I was a police officer and a detective in the precinct that covers that area for twenty years.

Q. Is that the Fourth Precinct?

A. Yes, it is.

Q. Did you see an Infiniti automobile when you arrived at that area?

A. Yes, I did.

Q. Where was the Infiniti?

A. It was parked at the curb line on Broadway facing north.

Q. Describe any observations you made of that Infiniti?

A. It was parked with its engine running and its headlights on.

Q. Did you see Bobby's body?

A. Yes, I did.

Q. Where was Bobby's body?

A. In the roadway, at the rear, several feet away from his automobile.

Q. Was he the registered owner?

A. Yes, he was.

Q. Describe any observations you made of Bobby's body?

A. He was lying in the roadway, face down, with his arms up in front of his head when, I mean, they were on the ground but up in front of his head. His head was facing in a southwesterly direction. He was lying in a pool of blood. He was fully cloth, wearing a gray sweat shirt that had been

cut up the back.

Q. Were you present when Dr. Brian O'Reilly arrived in the area?

A. Yes, I was.

Q. Were you present when Dr. O'Reilly turned over Bobby's body?

A. Yes.

Q. Did Dr. O'Reilly recovered evidence in the upper chest area of Bobby's body?

A. Yes.

Q. What did he recover?

A. A copper bullet jacketing.

Q. What did he do with it?

A. Turned it over to the crime scene detective, Detective Nystrom.

Q. Was a cell phone recovered from Bobby's clothing?

A. Yes, it was.

Q. Where?

A. The front pocket of his sweat shirt.

Q. Was any money recovered from Bobby's clothing?

A. Yes, it was.

Q. What?

A. $20.

Q. Where?

A. Right front pocket of his sweat pants.

Q. Was any money eventually recovered from inside the Infiniti?

A. Yes.

Q. Where was the Infiniti when money was recovered?

A. It was being processed in the Nassau County police facility on Newbridge Road in Bellmore.

Q. How much money was recovered?

A. $39.

Q. Where was the $39?

A. In the victim's wallet.

Q. Where was that?

A. In the area of the console of the Infiniti.

Q. Was any money recovered in the vicinity of Bobby's body?

A. No.

Q. Was any money recovered in the vicinity of the Infiniti?

A. No.

Q. Was any weapon recovered from Bobby's clothing?

A. No.

Q. Was any weapon recovered from the Infiniti?

A. None.

Q. Was any weapon recovered in the vicinity of Bobby's body?

A. No.

Q. Was any weapon recovered in the vicinity of the Infiniti?

A. No:

Q. Was any DNA fingerprint or other forensic evidence recovered at the scene of the murder?

A. No, there was not.

Q. Were you eventually informed of autopsy results involving Bobby Calabrese?

A. Yes, I was.

[redacted]d?

A. [redacted]

Q. When were you informed of the results?

A. On the afternoon of the autopsy, December fourth.

[redacted]

A[redacted]

Q. Was there a cell site tower in the vicinity of the shooting?

A. Yes.

Q. What do you mean by a cell site tower?

A. It's a tower that facilitates equipment that's placed there by the cell phone companies to allow for the reception of ingoing and outgoing cell phone calls.

Q. Where was the closest cell site tower to the vicinity of the murder?

A. North of the scene, about a half mile.

Q. Did you become familiar with telephone numbers while investigating Bobby's death?

A. Yes, I did.

Q. Did you become familiar with the cell phone number [redacted]

A. Yes, I did.

Q. Whose cell phone number was that on the night of the shooting?

A. The defendant's [redacted]

Q. Did you become familiar with the cell number [redacted] [redacted]

A. Yes, I did.

Q. Whose cell phone number was that on the night of the shooting?

A. The victim's [redacted]

Q. Did you become familiar with the telephone number [redacted]

A. Yes, I did.

Q. Whose telephone number was that on the night of the shooting?

A. It's the phone number of the [redacted] dealership on Sunrise Highway in Wantagh.

Q. Did you become familiar with the cell number [redacted] [redacted]

A. Yes. That is the cell phone number for [redacted].

Q. Did you become familiar with the cell phone number [redacted]

A. Yes. That is the cell phone number for [redacted] [redacted].

Q. Did you become familiar with the telephone number [redacted]

A. Yes. That is the home telephone number of [redacted] [redacted].

Q. Are you familiar with a business called Puma's?

A. Yes.

Q. What is Puma's?

A. It's an auto body repair shop.

Q. Where is Puma's?

A. It's located on the west side of Austin Boulevard in North Long Beach, backs up to Industrial Place.

Q. Where is Puma's in relation to the scene of the murder?

A. It's about three quarters to a mile southwest and across Austin Boulevard from the scene.

Q. Are you familiar with a place called McCabe's?

A. Yes, I am.

Q. What is McCabe's?

A. It used to be a restaurant in North Long Beach.

Q. What was it on the night of the murder?

A. It was empty. It had shut down.

Q. Where is McCabe's?

A. That too is also southwest of the scene, across Austin Boulevard, and it also backs up to Industrial Place.

MR. HAYDEN: Your Honor, may I please have 33 and 34 in evidence shown to the witness.

THE COURT: Yes.

THE COURT OFFICER: The witness has People's 33 and 34 in evidence.

Q. Do you recognize those photographs?

A. Yes, I do.

Q. Are those photographs of the vicinity where the murder took place?

A. Yes, they are.

Q. Do the vicinities covered in those photographs include the locations of Puma's and McCabe's?

A. Yes, they are.

Q. Both?

A. Yes, they do.

MR. HAYDEN: May I please have these markers given to the detective.

THE COURT: Yes.

Q. Detective, do you see markers designated Puma's and McCabe's?

A. Yes, I do.

Q. Would you please take one of those markers for both McCabe's and Puma's and place them at the approximate locations of those locations as they are in those photographs?

A. Yes.

MR. HAYDEN: May I have those, please.

Thank you.

Q. Did you become aware that Bobby was shot three times in the back of the head?

A. Yes, I did.

Q. When did you become aware of that?

A. After the autopsy, in the afternoon of December fourth.

Q. How did you become aware of that?

A. I was advised by Detective Parbee, P-A-R-B-E-E, of the homicide squad who attended the autopsy.

Q. Was that public knowledge on the morning of Saturday, December 4, 2004?

A. No, it was not.

Q. Did you watch a videotape during the course of the investigation?

A. Yes, I did.

Q. When did you watch the videotape?

A. Saturday, December fourth.

Q. Where was the videotape obtained?

A. It was obtained from the public storage, on Broadway, just south of the scene.

Q. By Detective Kenneth Strigaro of the electronics unit?

A. Yes.

Q. Describe that videotape?

A. The videotape showed it was a digital system that showed two cameras, surveillance cameras that were mounted on the rear of the facility. One camera facing directly east out the driveway of the facility onto Broadway, and the second camera facing in a northeasterly direction over the rear of the building also facing Broadway.

Q. Did you watch the videotape?

A. Yes, I did.

Q. Did you have a photograph of a Suzuki Verona automobile while watching the videotape?

A. Yes.

Q. Where did you get it?

A. Off the Internet of the Suzuki web site.

MR. HAYDEN: May I please have this marked as 62 for identification and shown to the detective.

THE COURT OFFICER: People's 62 marked for ID.

The witness has 62 for identification.

Q. Do you recognize that?

A. Yes, I do.

Q. Is that the photograph you had while watching the videotape?

A. It's a photograph I looked at in conjunction with the videotape, yes.

Q. Were you with Detective Strigaro while watching the videotape?

A. Yes.

MR. HAYDEN: People offer that, Your Honor, as 62 in evidence.

MR. LEMKE: No objection, Your Honor. We have seen it.

THE COURT: 62 in evidence.

THE COURT OFFICER: People's 62 in evidence. Do you want it shown back to the witness?

MR. HAYDEN: No, thank you.

Q. Were photographs taken of a Suzuki Verona during the course of the investigation?

A. Yes.

Q. Whose Suzuki Verona was that?

A. Automobile was owned by Mark Orlando's wife.

MR. HAYDEN: May I please have three photographs marked, Your Honor, 63, 64 and 65 for identification.

THE COURT: Yes.

THE COURT OFFICER: People's 63, 64 and 65 marked for identification.

The witness has them.

Q. Do you recognize those photographs?

A. Yes, I do.

Q. Are those photographs of the defendant's wife's Suzuki Verona?

A. Yes, they are.

Q. Are those photographs fair and accurate representations of the way the Suzuki Verona appeared after Bobby was murdered?

A. Yes.

MR. HAYDEN: People's offer those in evidence, Your Honor.

MR. LEMKE:

MR. LEMKE: No objection, Your Honor.

THE COURT: Mark them in evidence.

THE COURT OFFICER: People's 63, 64, and 65 marked in evidence.

Want them shown back to the witness?

MR. HAYDEN: No, thank you.

Q. I am directing your attention to the night of Thursday, December 9, 2004.

Were you involved that night in arresting the defendant?

A. Yes, I was.

Q. What was the approximate time the defendant was arrested?

A. 9:10 p.m.

Q. Who arrested him?

A. Police Officer Loschiavo and Police Officer McCarthy of the Bureau of Special Operations.

Q. Where was the defendant arrested?

A. In the parking lot of the Airport Plaza Mall in Farmingdale.

Q. Where was that in relation to Professional Credit Services?

A. It's not far from there, right off of 110.

Q. Where were you when the defendant was arrested?

A. I was present when he was arrested.

Q. What did you see when the defendant was arrested?

A. I saw him removed from his automobile and handcuffed by the arresting officers after his automobile had been stopped by them.

Q. What did the officers do with the defendant after they arrested him?

A. Turned him over to myself and Detective McGinn.

Q. Is that Detective James McGinn?

A. Yes, it is.

Q. What did you and Detective McGinn do with the defendant?

A. Placed him in our unmarked police vehicle.

Q. Describe that vehicle?

A. It's a 1997 Ford Expedition.

Q. Where did you take the defendant?

A. Took him to the homicide squad at police headquarters in Mineola.

Q. Who was driving?

A. Detective McGinn.

Q. Where were you?

A. Seated in the rear behind Detective McGinn.

Q. Where was the defendant?

A. Seated next to me in the rear seat.

Q. Describe any conversation on the way to police headquarters?

A. When we first got situated in the vehicle with the prisoner, I introduced myself and Detective McGinn to him, told him I wanted to speak to him about the death of Bobby Calabrese, that we would be responding to police headquarters in Mineola, I would speak to him when we got there.

Q. What was his response?

A. He said okay.

[redacted]

[redacted]

Q. Was Herva Jeannot arrested that night?

Case 2:11-cv-03992-ERK Document 8-16 Filed 01/17/12 Page 19 of 91 PageID #: 1044

A. Yes, he was.

Q. Where was Herva Jeannot arrested?

A. Also arrested in Farmingdale.

Q. Vicinity of Professional Credit Services?

A. His place of employment, yes.

Q. Was that at approximately 9:15 that Thursday night?

A. Yes.

Q. Was Herva Jeannot brought to the homicide squad?

A. Yes, he was.

Q. What was the approximate time he arrived?

A. 10:12 p.m.

Q. Where did you place the defendant at the homicide squad?

A. In an interview room in the homicide squad office.

Q. Describe that room?

A. It's a room designated for interview purposes. It's approximately ten feet by ten feet. Has a desk, three chairs, a window, a door that has a window on it that is covered by drapes.

Q. Where was Herva Jeannot placed?

A. He was placed in a chair in that office, interview room.

Q. Describe the room where Herva Jeannot was placed?

A. Herva Jeannot was placed in a second interview room which is located on the other side of the office. That is a

room about ten feet by twelve feet, has a desk, two chairs, and a lounge.

Q. How far was the defendant from Herva Jeannot?

A. About forty feet.

Q. Did you eventually again speak with the defendant?

A. Yes, I did.

Q. Who was present when you began speaking with the defendant?

A. Detective McGinn.

Q. Was the defendant handcuffed when you began speaking with him?

A. No, he was not.

Q. When were the handcuffs removed?

A. I say approximately ten p.m., about ten minutes before we started speaking to him, after we got situated in the office.

Q. Describe any initial conversation with the defendant?

A. I once again introduced myself and Detective McGinn, told him that we were going to speak about the death of Bobby Calabrese, and I told him at that point I was going to give him his rights and to pay attention.

Q. Did you do that?

A. Yes, I did.

Q. What time did you inform the defendant of his

constitutional rights?

A. 10:10 p.m.

Q. Describe how you did that?

A. I read them off of a card, a police department form 233 notification of rights.

Q. Were markings eventually placed on that card?

A. Yes, there were.

Q. Describe those marks?

A. Next to the question, do you understand, the defendant wrote the word yes. He signed his name on two spots on the card. I signed the card, Detective McGinn signed the card, the homicide squad number, and the date on the card also.

MR. HAYDEN: May I please have 44 for identification shown to the witness, Your Honor.

THE COURT OFFICER: Witness has 44 for ID.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. It's the rights card I read to Mark Orlando.

Q. How do you know that?

A. My signature, Detective McGinn's signature, the defendant's signature twice, the homicide squad numbers as well as the date.

MR. HAYDEN: People offer that in evidence,

Your Honor.

MR. LEMKE: No objection, Your Honor.

THE COURT: Mark it in evidence.

THE COURT OFFICER: People's 44 marked in evidence.

Do you want it shown back to the witness?

MR. HAYDEN: Yes, please.

Q. Using 44 in evidence, please read the constitutional rights to the jury the same way you read them for the defendant, and please include any remarks he may have made?

A. Before asking you any questions, you should understand you have the right to remain silent and that any statements you make may be used against you in court. Also you have the right to talk to a lawyer before answering any questions or to have a lawyer present at any time. If you cannot afford to hire a lawyer one will be furnished you if you wish and you have the right to keep silent until you have had a chance to talk with a lawyer.

Do you understand? The defendant wrote the word yes next to that.

Now that I have advised you of your rights, are you willing to answer questions?

He then placed his signature after that.

I have been told by Detective McHugh that I have the

right to remain silent and that any statements I make may be used against me in court. I have been told I have the right to talk to a lawyer before answering any questions or to have a lawyer present at any time. Further I have been advised that if I cannot afford to hire a lawyer, one will be furnished me and I have the right to keep silent until I have had the chance to talk with a lawyer.

I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present.

The defendant also signed his name after that.

Q. When you initially asked do you understand did he respond verbally?

A. Yes. He said the word yes.

Q. When you asked, are you willing to answer questions, did he respond verbally?

A. He also said yes.

Q. Did you or Detective McGinn speak with the defendant after he was informed of his constitutional rights?

A. Yes, we did.

Q. Describe your involvement in the conversation?

A. I asked him some basic pedigree information, questions, his name, which was Mark Orlando. His date of birth, which was September 26, 1970. His home address, which

was 1119 Joselson Avenue in Bayshore. I asked him his home telephone number, his work telephone number, which he provided to me. I asked him if he had a cell phone, he said yes. He also provided me with that telephone number. I asked him what he did for a living. He told me he worked for a collection agency called Professional Credit Services. He worked on the telephones there trying to make collections of delinquent payments for people. I asked him how long he had been working their. He told me he's been working there since 1999. I asked him about his education. He told me he graduated from Holly Trinity High School. He had attended Nassau County Community for about a year and-a-half. I asked him if he had any medical problems or conditions I should be aware of. He told me no, he was healthy, but he had had some stomach reduction surgery. I asked him about his family. He told me he lived with his wife Diana and his mother-in-law also lived in the house. His wife's maiden name was Dunn. He told me his parents were both alive. I asked him where they lived. He said they live in Commack. He told me that they had a family business involving silk flowers, and I believe his father also owned a mirror business at one time. He told me he had two sisters and that one of the sisters was married to a corrections officer.

Q. Describe any further conversation?

A. I asked him how he knew Bobby Calabrese. He told

me that he had been introduced to Bobby Calabrese about six weeks earlier by a friend of his named Tom Flores. Tom Flores was also a friend of Bobby Calabrese. Tom Flores knew that Mark Orlando was a gambler, and he knew that Bobby Calabrese was a runner for a bookmaker. So, Tom had introduced the two of them and they had started to gamble together, Orlando and Calabrese. Bobby Calabrese had provided Mark with an Offshore telephone number 888-866-2590 through which he could place his bets under an account named of POP 1271 with a password of Tom, T-O-M.

As I said for the next six weeks Orlando gambled through that 888 number. He claimed that he was up about $10,000, over the course of that six weeks. That recently he had started to lose money gambling. So that on the Tuesday prior to the murder, he had shot down the line. He was no longer gambling. I asked him if that was a result of his wife finding out he was gambling again. He said no, he had started to lose, and he just decided it was time to shut it down. I asked him what he bet on, told me he bet on college and professional football and basketball.

I had a discussion with him about gambling on basketball games. I told him I was a big sports fan. I thought gambling on basketball, you know, was a ridiculous bet as far as I was concerned. It was the only sport where in the final minutes the other team will let people score uncontests as

long as they have enough of a margin they know they're going to win, baseball they bring in a pitcher, football they'll still play defense. In basketball, if you're up a substantial number of points, they'll still let you score, because they know you don't have enough time to get enough point to beat them.

My point was, if you allowed those points to be scored it would have an affect on the point spread. If enough points are allowed to be scored uncontested you can lose the bet. So, I didn't think that was a good bet. He told me he didn't know what I was talking about as far as gambling. That you don't bet on the final score on a basketball game. You bet on the over/under, the quarter, the half, that at times he could have six or eight different bets going on within one game.

I asked him about the payments during the six weeks he was gambling with Bobby Calabrese. He told me that every time he was due to collect, Bobby Calabrese would meet him out in Farmingdale in the vicinity of Professional Credit Services, in the parking lot and they would make their payments.

He explained to me that on Friday night, December third, he had gone to Island Park to make his payment to Bobby Calabrese because he was supposed to make it on Thursday, but he was unable to do so because he had worked until nine p.m.

and his wife, he took his wife out after that. So, he had called, Bobby told him he couldn't make the payment on Thursday, he told him he'd hook up with him on Friday. He had called him on Friday during the day and told him he would meet him in Island Park because he was going to be out picking up a check at Wantagh Suzuki.

I asked him, what he had done with his winnings during the course of this six weeks, he told me he had paid some bills. Paid some credit cards, put some money in the bank, and he had also put some money into his wife's account in the bank. I asked him about Friday night.

I asked him about Friday, December third, if he had worked that day. He told me he had worked. That after work he had gone to a gym, L.A. Fitness on Route 110, he had gone there with a coworker, a good friend of his, by the name of Herva Jeannot. When they went to the gym, there were also some other friends of his and coworkers there, Barbara Diamant, Tom Flores, I believe another girl. He said worked out, Herva had worked out. And at about 7:15 p.m. or 7:30 p.m., he drove down to Island Park with Herva to meet Bobby Calabrese that evening.

He was driving his wife's 2004 Suzuki Verona. I asked him why he wasn't driving his own car which was a 1991 Cougar. He told me that the car was old, beat up looking, had tinted windows, it looked like a crack head's car. He

also had problems with his driver's license so he wouldn't drive that car at night because he was afraid of being stopped by the police.

He and Herva left the gym on Route 110. They drove down the Loop Parkway through Long Beach. When he got to the Long Beach Bridge at about 8:25 p.m., he called Bobby Calabrese on his cell phone and told him he would meet him over on Industrial Place by Puma's, that he was just going over the bridge. Bobby told him he'd be right up there. He told me he and Herva parked on Industrial Place. I asked him if they had gone directly to Industrial Place after they came across the Long Beach Bridge. He said yes. I said, you didn't drive around at all. He said no. I said are you familiar a 7-Eleven in that area. He said yes. I said, were you over by that 7-Eleven at all. He said no. Said they drove over the Long Beach Bridge directly to Industrial Place where they waited to meet Bobby.

I asked him how he knew Industrial Place and the Island Park area since he lived in Suffolk and Herva lived in Suffolk. He told me that his father had owned an auto body repair shop on Industrial Place about twenty years prior. His wife had lived in the Island Park/Long Beach area, and that he had a very good friend who lived on Knickerbocker Avenue in Island Park. I asked him if Herva new that area. He said no. Herva did not know that area as far as he knew.

After they parked on Industrial Place, a couple of minutes later, Bobby Calabrese pulled up, in an automobile. He was by himself. He didn't know whether the car was an Infiniti or Lexus, but he believed it was Bobby's car because he had seen him drive it on prior occasions when he made the payments out in Farmingdale. Bobby pulled up, they were driver's door to driver's door. They spoke for about a minute. He handed Bobby $17,000 in two, what he described as bricks. Oné brick being $10,000, the second brick being $7,000. I asked him, ever got out of the automobile. He said no.

I asked him if Herva ever got out of the automobile. He said no. I asked him if he had introduced Herva to Bobby at that time. He said no. He just handed him the money. They spoke for less than a minute and Bobby then drove away, made a left onto Austin Boulevard, heading towards Oceanside. They made a right heading towards Long Beach, and he went back through Long Beach and up the Loop Parkway.

I said to him, that was a lot of money you were carrying. Is there any possibility you had a weapon with you. He said no, I didn't have anything with me. I said no guns. He said no, no gun. I said did Herva have a weapon or gun of any type. No. I asked him if he had ever seen Herva with a gun. And he said no.

They drove through Long Beach up the Loop Parkway. He

called the Wantagh Suzuki car dealership in an attempt to get some type of a check that he was owed. He started to explain to me, how that all came about, about a trade-in of cars and a negative credit problem he got as a result. That is why he was owed that money. He had called the dealership just as he was leaving Island Park. He went up to the Suzuki dealership, however, it was closed. When he had called the dealership, they told him that the owner Ralph was not in, that he would not be able to get his check that evening. He then drove up to the dealership, but it was closed.

He stopped at a CitiBank branch located on Sunrise Highway in Wantagh. He had to get money because he just paid everything to Bobby Calabrese. He needed some cash. He withdrew $300.

He then drove up to route 135 to Plainview 14 Main which was the home of a coworker Vivian Borushik. Mark Orlando explained to me that Vivian had some work done on her yard, a fence, a pool, and a deck, Mark had assisted her in having that done and he wanted to, she wanted him to come and look at some additional work and to see the pool and things of that sort. So, they had driven up there and looked at her yard. He then went home. He got home about 10:30 p.m.

I asked him how he found out that Bobby Calabrese had been killed. He told me that Tom Flores had called him on Saturday morning and told him that Bobby had been killed. He

said at that time he told Tom Flores to give his cell phone number to Bobby's family or anyone else that wanted to know. I said why would you do that. He said I wanted to tell anybody that wanted to know that I had paid Bobby and when I left him he was alive.

I asked him if he remembered a telephone conversation with Barbara Diamant on that same Saturday. He said yes. I said, when you spoke to Barbara, at the time you spoke to Barbara did you know how Bobby had been killed and he said know, he did not know at that time.

Q. Did he talk to you about his debts?

A. Yes, he did. He explained to me that he had about ten outstanding debts total. He told me he had a mortgage on his home of $307,500. He had a car loan for $299 a month. He had about $20,000 in credit card bills on two credit cards. And he had a $25,000 loan to have a built in pool installed in his home. I asked him how much his home was valued at. He told me it was valued at about $350,000. I said to him, you have a lot of debts versus your equity in that home based on what you're telling me. I said maybe your house is worth, you know, more than you think, and he said to me, detective, you haven't seen the neighborhood my house is in my. House is worth what I told you, about $350,000.

Q. Did he speak about his debts in greater detail with Detective McGinn?

A. Yes, he did. I had asked Detective McGinn to speak to him in reference to his debts. And also in reference to the car situation at Wantagh Suzuki which resulted in this refund check being issued.

Q. Did you speak with him about getting lost in the vicinity of the murder?

A. I asked him if he was familiar with that area. He told me he was quite familiar with that area. As I said, his father owned this body shop of some sought down on Industrial Place about twenty years earlier. His wife's family lived down in the Island Park/Long Beach area. His wife lived down in that area for a period of time. He traveled through there on many occasions as we discussed, locations and streets and businesses. He was very familiar with all of that.

Q. And would not get lost?

A. Absolutely not.

Q. That is what he said?

A. Absolutely not. That is what he said.

Q. Did he tell you how he got to Island Park that night?

A. Told me he drove in his wife's 2002 Suzuki Verona and the route they took was Route 110 to the Southern State Parkway to the Wantagh Parkway to the Loop Parkway, which then brings you out into Long Beach, over the Long Beach Bridge directly to Industrial Place.

Q. Did he talk to you about what he did with his winnings through Bobby?

A. Told me he had paid some credit card bills, paid some other bills, and put some money in his bank account and put some money in his wife's bank account.

Q. Did he tell you there was anything unusual when he went to the Borushik's?

A. Not at all. She was a friend of his, a coworker, he went there, he had been, she had been asking him to go there for a period of time. He decided since he was out that evening, even though it was dark, he would stop by.

Q. Nothing unusual happened while he was there?

A. No. He looked at the yard, the pool, the fence, and that was it. Herva waited in the automobile he said.

Q. You testified that he said he always met Bobby out at the place where the defendant worked; is that right?

A. Yes.

Q. Did he tell you that was win or lose?

A. Either way, win or lose.

Q. That is what he said?

A. That is what he said. He said Bobby was a runner, and that is the agreement that they had.

Q. Did he tell you he had no idea what happened to Bobby?

A. After I spoke to him about the telephone calls on

that Saturday involving Tom Flores and Barbara Diamant, and he told me that because of those phone calls his wife had found out he was gambling again, and she had become quite upset with him, threatened to leave him, he ended that part of the conversation by saying to him, that's all you know about the death of Bobby Calabrese, you met him, you paid him, he drove away towards north Long Beach, you drove south through Long Beach, he drove towards Oceanside, you went through Long Beach, through the parkway, and did what you described to me, and he said yes.

MR. HAYDEN: With the Court's permission, may the detective step down in front of the jury?

THE COURT: Yes.

Q. Using 33 and 34 in evidence, please show the jury the relative locations of Puma's, McCabe's and the scene of the murder?

A. The scene, the general area where the murder happened, McCabe's is southwest of the scene. This being Austin Boulevard. This is the other side of Austin Boulevard. This being Puma's, also located on Austin Boulevard. Further south the road that runs down both of these is Industrial Place.

Q. You would drive down in the direction of the scene of the murder to get to Oceanside?

A. Yes.

Q. Just show the jurors at the far end there.

A. The scene, McCabe's, a vacant restaurant, which is southwest, there's Austin Boulevard. So, it's on the other side of Austin Boulevard from the scene, Puma's further south also located on Austin Boulevard. The road that runs through both of those establishments is Industrial Place.

Q. Please retake the witness stand.

Did the defendant write anything while you and Detective McGinn were speaking with him then?

A. Yes, he did.

Q. How did that happen?

A. While we were speaking to him, he asked for a piece of paper and a pen. We provided him with a pad and a pencil. As we were speaking, he took notes concerning our discussion about gambling. In those notes he explained to us certain days of the week, where the weeks gambling ended, when the payments were due, amounts.

He also wrote a description of his events that evening, where he went, who he saw. The Wantagh Suzuki information also. He also drew a map showing Puma's. He also drew something relative to Vivian Borushik's fence and pool.

MR. HAYDEN: May I have these four sheets of paper marked 66A, B, C and D for identification.

THE COURT OFFICER: They were previously marked 49A, B, C and D for identification.

The witness has 49A, B, C and D for ID.

Q. Do you recognize those sheets?

A. Yes, I do.

Q. What are they?

A. They're the notes that Mark Orlando took during my interview of him.

Q. How do you know that?

A. Based on the information that I described that included in these notes and Mr. Orlando's signature, initials on the pages.

MR. HAYDEN: People offer those, Your Honor, as 49A, B, C and D in evidence.

MR. LEMKE: We have seen them. We have no objection.

THE COURT: Mark them into evidence.

THE COURT OFFICER: People's 49A, B, C and D have been marked in evidence.

Do you want them shown back to the witness, counsel?

MR. HAYDEN: No, thank you.

Q. Did you begin reducing what the defendant was saying to writing?

A. Yes, I did.

Q. When did you begin reducing what the defendant was saying to writing?

A. 12:10 a.m.

Q. Describe for the jury how you reduced what the defendant was telling you to writing?

A. Based on the details that the defendant had given me, I would construct a sentence based on those facts, say the sentence back to him, if he agreed with the contents, I would then continue in narrative form.

Q. When did you finish reducing what the defendant was telling you in writing?

A. Just before two a.m.

Q. What did you do with the defendant's written statement?

A. I road it back to him.

Q. What happened then?

A. I asked, I had said to him, if you have anything that you want change or correct or that's incorrect, let me know. As I read it back to him, he did ask me to make a couple of corrections, which I did, and he also asked me to make an addition which I did.

Q. Describe that addition?

A. He asked that a line be admitted indicating that Detective McGinn was also present during that statement.

Q. Describe the correction?

A. He had me change where it said, Bobby Calabrese was a book maker. He had me change it to a runner. And he also

had me change a line where I said he paid off his credit cards to made a payment -- Id' have to see the statement to make the exact change, but it had to do with that.

Q. Did the defendant sign each page of that statement?

A. Yes, he did.

Q. When did he sign it?

A. After he read it and initialed the changes.

MR. HAYDEN: May I please have this statement premarked 45 for identification shown to the witness.

THE COURT: Yes.

THE COURT OFFICER: The witness has 45 for ID.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. It's a written statement I took from Mark Orlando on December 10, 2004.

Q. Do you recognize the contents?

A. Yes, I do.

Q. Whose signatures are those?

A. My signature, Detective McGinn's signature as well as the defendant's signature.

MR. HAYDEN: Offer that, Your Honor, as 45 in evidence.

MR. LEMKE: No objection.

THE COURT: Mark it in evidence.

THE COURT OFFICER: People's 45 is marked in evidence.

MR. HAYDEN: With the Court's permission, may I read this statement for the jurors?

MR. LEMKE: No objection.

THE COURT: Yes.

MR. HAYDEN: Homicide 521, 2004, December 10, 2004. Statement of Mark Orlando. My name is Mark Orlando, I am thirty-four years old and I was born on September 26, 1970. I live at 1119 Joselson Avenue, Bayshore, New York, with my wife Diana.

I have been told by Detective McHugh I have the right to remain silent and that any statement I make may be used against me in court. I have been told that I have the right to talk with a lawyer before answering any questions or to have a lawyer present at any time.

Further, I have been advised if I cannot afford to hire a lawyer, one will be furnished me and I have the right to keep silent until I have had the chance to talk with a lawyer.

I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present.

About six weeks ago I met a guy named Bobby Calabrese from Long Beach. I was introduced by my friend Tom Flores who I work with at Professional Credit Services in Farmingdale. Tom told me that Bobby was a runner for a bookmaker and I am a gambler. A day or two later Bobby called me. I don't know whether he called me on my cell (631) 882-3428 or at my work number of (631) 393-9563 he gave me a number to call my bets into, (888) 866-2590, an account name of POP, P-O-P, 1271, and a password of Tom. I bet pro and college football and pro basketball on my account. The first week I won eight hundred and change. The second week I won $1,065. Week three I won $8,700. On week three Bobby only paid me $7,600 or $7,800. He rolled the rest over to the next week. I would usually square up with him at the end of the week. In week four, I won $17,900 and Bobby paid me all $17,900, and he still owed me from week three. I gave him a $300 tip. Week four was Thanksgiving. On week five I lost $8,700. And the following week I lost $9,100.

All of my meetings with Bobby up to this point were in Farmingdale. I owed Bobby $8,700 which was due on Thursday, December 2, 2004, on Monday and Tuesday, November twenty-ninth and thirtieth, I lost $9,100, which would be due on Thursday, December 9, 2004. When

I lost a lot of money on Tuesday night, November 30, 2004, I decided to shut down my gambling line. I called Bobby on his cell which was (516) 790-4461 and told him to shut down my line. He left a voice mail. I spoke to Bobby on Wednesday and Thursday, November first and second, 2004. Even though I owed Bobby $7,000, I am still up $10,000 for the six weeks.

MR. LEMKE: Your Honor, that is December first not -- that is my objection.

THE COURT: Mr. Hayden.

MR. HAYDEN: I read, I spoke to Bobby on Wednesday and Thursday, December first and second, 2004.

THE COURT: Thank you.

MR. LEMKE: Thank you.

MR. HAYDEN: I couldn't meet Bobby on Thursday night, because I worked until nine p.m. Then I went out with my wife. On Friday, December third, 2004, I went to work at eight a.m. during the afternoon Bobby called me at work and we agreed to meet that night. I told Bobby, I would be out and about and I'd go to Wantagh Suzuki. Bobby said he was going to have dinner at 6:30 p.m., and I told him I would say call him when I got near Island Park that night.

After work, Friday, I went to L.A. Fitness on Route

110 in Farmingdale. I went there with some friends and coworkers, Tom Flores, Barbara Diamant, Herva Jeannot and Rory Hoffman was with me. Herva is a good friend of mine. He works with me and he lives in Deer Park. About 7:15 or 7:30 p.m. I left the gym with Herva. We drove to Island Park in my wife's silver Suzuki Verona. I drove through Long Beach from the Loop Parkway and when I was crossing the Long Beach Bridge I called Bobby from my cell. It was 8:25 p.m.

I told Bobby to meet me on Industrial Place in Island Park by a building that used to be a restaurant. I parked facing out toward Austin Boulevard. About five minutes later, Bobby pulled up in his Infiniti or Lexus. He was alone. He pulled up next to me side by side. We never got out of the car. I had the $17,000 I owed Bobby. I had a brick of $10,000, and a brick of $7,000. I talked to Bobby for about a minute and I handed him the money through the window of his car. We both drove out to Austin Boulevard. Bobby made a left towards Oceanside, and I made a right to go through Long Beach on the Loop Parkway.

I left Island Park at 8:30 p.m. When I went into Island Park that night, after I went over the bridge, I drove directly to Industrial Place where I waited for Bobby. I know Industrial Place because my father used

to own a body shop there, and my wife used to live in Island Park. I didn't drive around. I knew exactly where I was going. I called Wantagh Suzuki to see about picking up a check they had for me. I drove up the Wantagh Parkway and went to Wantagh Suzuki, but it was closed. The door was locked and it was nine p.m. Then I went to CitiBank on Sunrise Highway in Wantagh and used the ATM. I then drove to my friend's house, Vivian Borushik in Plainview to look at her pool, fence and some other construction work. I then drove Herva home to Deer Park. It was about 10:30 p.m. I then drove home.

The $17,000 that I paid Bobby that night is the same $17,000 that Bobby had paid me when I won gambling. I still have $1,000 of my winnings from Bobby in my safe. Some of the money I won with gambling I used to pay towards my credit cards and I put a couple of thousand dollars in my wife's account.

On Saturday morning, I got a call at home from Tom Flores. He told me that Bobby was dead. He didn't say how it happened. I told Tom I had met Bobby the night before, and he should give me, he should give my cell number to Bobby's family so I could tell, whoever it was, what had happened at my meeting with Bobby.

That morning, which was my wife's birthday, she

found out that I was gambling with a bookmaker. My wife was very angry at me for gambling, and she told me that she would leave me if she weren't pregnant with my child. In the morning, Barbara Diamant also called me.

All I knew at that point was that Bobby was dead. I didn't know how he was killed.

I am present at the Nassau County Police Department homicide squad where I am giving this statement to Detective McHugh who is writing it for me. I have read it and it is the truth.

Detective McGinn is also present and I wanted his name added.

Q. Was the defendant offered anything to eat or drink that night?

A. Yes, he was.

Q. When was that?

A. A little after two a.m. he was offered an egg sandwich which he refused. He had some water. He explained to us he had difficulty digesting some foods due to his stomach surgery.

Q. Did the defendant use the men's room whenever he asked?

A. Yes, he did.

Q. Describe the defendant's physical condition while you were with him that night?

A. He appeared fine, healthy, had no complaints.

Q. Describe the defendant's demeanor while you were with him that night?

A. He was calm, responsive to my questions, overly enthusiastic in describing his gambling and eager to describe the night's events.

Q. Did the defendant's demeanor ever change while you were around him that night?

A. No, it did not.

Q. Did the defendant remain composed throughout the conversation?

A. Yes.

Q. Was an ATM receipt recovered during the course of the investigation?

A. Yes.

Q. Who recovered it?

A. Detective Cereghino from the homicide squad.

Q. When it was recovered?

A. December 10, 2004.

Q. Where was it recovered?

A. In Mark Orlando's desk at his place of employment, Professional Credit Services in Farmingdale.

Q. Describe this ATM receipt?

A. It's an ATM receipt from the CitiBank branch in Wantagh dated December 3, 2009, at 9:12 p.m., showing a

withdrawal of $300 cash.

Q. Was that the only ATM receipt recovered from the place where the defendant worked?

A. Yes.

Q. Was the defendant's house searched?

A. Yes.

Q. Any ATM receipt recovered there?

A. No.

Q. Any receipt recovered from the defendant's clothing when he was arrested?

A. No.

Q. Did the defendant provide directions where to find the murder weapon?

A. Yes, he did.

Q. What did he tell you?

A. It was thrown into the water off the bridge under construction on the Wantagh Parkway.

Q. Was the murder weapon recovered there?

A. Yes, it was.

MR. HAYDEN: No further questions, Your Honor.

MR. LEMKE: May I, Your Honor?

THE COURT: Yes.

MR. LEMKE: Thank you.

DIRECT EXAMINATION

BY MR.LEMKE:

Q. Detective, good morning.

A. Good morning.

Q. Would you be considered the carrying detective on this case?

A. Yes.

Q. For the jury, a carrying detective is a detective that is assigned a particular investigation, in this case, being part of a homicide, you'd be the one that would ask the other detectives or the police officers to perform certain tasks; is that correct?

A. That would be part of it, yes.

Q. And part of it would be for them to report back to you any information they may have gathered?

A. Yes.

Q. Report back to you; is that correct?

A. Yes.

Q. On December third of '04, this case became your case for investigating purposes, correct?

A. Yes.

Q. You had responded to a location in North Long Beach/Island Park I think you indicated about 9:30?

A. 9:30 I got there.

Q. That would be at night, correct?

A. Yes.

Q. I think you indicated that in the course of your investigation, in particular I think December fourth, you had the opportunity to review a video from the storage facility; is that correct?

A. Yes.

Q. When I say video, it was actually produced by the electronics unit under your direction, but it was stills or images taken from a computer base; is that correct?

A. Yes.

Q. In reviewing that, you also did a canvass of the area for any witness that may have been eyewitnesses to this event; is that correct?

A. Yes.

[redacted]

A. Yes.

Q. Now, when you arrived at about 9:30, I think you indicated that the storage lot was closed at that point?

A. The facility itself was closed.

Q. When you say closed, you saw the videotape, correct?

Withdrawn.

Still images were taken from the storage center. The gate was open; isn't that correct?

A. Yes.

Q. On the camera facing eastbound?

A. That's correct.

Q. When the storage facility closes, that gate is closed, isn't it?

A. I don't know that.

Q. Well, you arrived at 9:30, correct?

A. Yes.

Q. 9:30 the storage facility was closed?

A. There was no response from anyone on the premises. Yes, it was closed.

Q. But at 8:30 you don't know if it was closed, correct?

A. 8:30 the police weren't involved. I wouldn't know.

Q. 8:30 it could very well have been open?

A. Could have been, yes.

Q. And, in fact, when you had arrived you had already arrived after the sweat shirt Mr. Calabrese was wearing was cut open, correct?

A. Sweat shirt had been cut prior to my arrival, yes.

Q. The emergency personnel had been there already?

A. Yes.

Q. I think police officers were there as well, correct?

A. Yes.

Q. Okay. And, during the course of this investigation, over the next week, you had received either cell phone numbers, you were able to check perhaps what Mr. Calabrese had been up to days or weeks before, so that you could determine, anyone that you'd like to talk to that could be associated with the death of Mr. Calabrese; would that be correct?

A. That would be part of the investigation, yes.

Q. And then on December ninth, there was a determination Mr. Orlando be placed under arrest and be brought in for questioning; am I correct?

A. Yes.

Q. And, in fact, he was placed under arrest, you were present when he was arrested, correct?

A. Yes.

Q. Didn't resist the arrest, correct?

A. No, he did not.

Q. In fact, he was permitted to leave in his car from his work place, drive perhaps about a mile halfway, then when the lights went on to, or the unmarked vehicle placed its lights on, he pulled over?

A. He pulled over when another police vehicle pulled up in front of him. I didn't pull over and respond to the, to the car behind. That is my belief. I believe he pulled over in response to the car in front of him.

Q. You were following the car Mr. Orlando was driving, correct?

A. Yes.

Q. You didn't observe any police vehicles put on any lights at all, correct?

A. I saw the lights on, yes.

Q. That was before Mr. Orlando pulled over, correct?

MR. HAYDEN: Objection to the pulled over. That is coming out of nowhere.

THE COURT: Overruled.

Q. You were following Mr. Orlando, correct?

THE COURT: Overruled. Can you answer the question or do you want him to rephrase?

THE WITNESS: I can answer the question.

Q. Thank you.

A. There were three police vehicles there. One pulled in front of him, one was directly behind him, and then I was behind that one. When the vehicle pulled in front of him with its lights on he stopped.

Q. So, it wasn't if Mr. Orlando was avoiding any police pursuit at all, he was driving, then the officers, one pulled in front of him, the other one behind him, that is, of course, when he stopped?

A. Prevented any chance of something you're describing occurring, yes.

Q. Thank you. He also at that point was then asked to get out of the car, correct?

A. Yes.

Q. Didn't struggle with any of the other officers as far as you could observe?

A. That's correct.

Q. Then was escorted back by yourself and by one other officer, Detective McGinn, I believe?

A. Escorted back to headquarters.

Q. I believe you said headquarters?

A. Yes.

Q. When he gets back, there is no conversation, I believe, in the vehicle, correct?

A. I had a conversation with him.

Q. Basically telling him, regarding the death of Mr. Calabrese, you wanted to talk to him, correct?

A. And our introduction. Yes, that is it.

Q. There was nothing said by Mr. Orlando, there wasn't any further conversation, correct?

A. I instructed, I instructed him I would speak to him when we got back to Mineola.

Q. Then when you get back to Mineola, you begin to have a conversation with Mr. Orlando, correct?

A. Yes.

Q. You and officer, I should say, Detective McGinn,

correct?

A. Yes.

Q. And that first conversation lasted about two hours as far as the time frame, from about ten o'clock that night, the night I believe, that is the Thursday night; isn't that correct?

A. Yes.

Q. Until about midnight, would that be correct to say?

A. It actually started at 10:10 and it goes till 12:10. Yes, two hours.

Q. That would be two hours and twenty minutes about, correct?

A. Two hours about, 12:10, I mean, 10:10 p.m. to 12:10 a.m.

Q. I am sorry. About two hours?

A. Right.

Q. And that conversation gets codified in writing which Mr. Hayden just read to this jury, correct?

A. Could you clarify what you mean by codified.

Q. You reduce it to writing?

A. Yes.

Q. You wrote down everything you felt was significant, but you didn't write down everything?

A. That would be impossible.

Q. And, in fact, you write down the statement, Mr.

Orlando signs that statement, correct?

A. Yes.

Q. I think he signed it on each page, I believe?

A. Yes.

Q. And you testified as part of the conversations that you had regarding his family, regarding gambling, a number of things, correct?

A. Yes.

Q. And during your course of speaking to my client, not once did he ever mention that he was involved with the shooting of Mr. Calabrese, correct?

A. No.

Q. Didn't mention that Herva Jeannot had shot Mr. Calabrese, correct?

A. No.

Q. In fact, nothing at all about how he even knew that Mr. Calabrese was killed, correct?

A. No.

Q. Now, at about two o'clock, I am sorry, about twelve o'clock that night, he is then left in that room, correct? The interview room, if I may call it that?

A. You're saying what time?

Q. About twelve o'clock, ten after twelve now into the morning of Friday morning, which would be December tenth?

A. No, he was left, I leave him after two a.m.

Q. Well, between twelve and two a.m., what occurs?

A. We had a conversation that I have described and then I took a written statement from him.

Q. That takes another two hours?

A. Yes.

Q. You speak to him from ten to ten Thursday night through about, I should say, twelve o'clock midnight; correct?

A. I start speaking to him at 10:10 p.m., and I start taking a written statement from him and continuing the discussion to facilitate that statement at about ten minutes after twelve.

Q. Then at about ten minutes after twelve you reduce it to writing which Mr. Hayden just read to this jury?

That is completed about two clock?

A. Yes.

Q. Now, during that time, where he was brought in, didn't he request a call be made to his wife and family to let them know where he was?

A. He declined to make a call to his wife.

Q. He declined. You asked him and he said no?

A. Yes.

Q. You reduced that in writing somewhere; is that correct?

A. It's in Detective McGinn's notes I believe.

Q. McGinn was present during that?

A. Yes.

Q. So, during these four hours then you're with Mr. Orlando, Mr. Detective McGinn is also with you, correct?

A. Yes.

Q. Just about the whole time, correct?

A. Yes.

Q. At two o'clock now that Friday morning, you leave Mr. Orlando; isn't that correct?

A. (No verbal response.)

Q. You step out, I think Detective McGinn also steps out, correct?

A. Yes.

Q. And, based on the part of this first statement, there had been a consent search later, signed the form, signed by Mr. Orlando, to search his home; isn't that correct?

A. There was a consent for his place of employment.

Q. And, also his home, wasn't there?

A. I know we got a search warrant. Whether he had done a consent, I don't recall.

Q. And, in fact, as a carrying detective you're aware that there were certain things recovered from his house; isn't that correct?

A. Yes.

Q. Okay. Do you recall what some of those items were?

A. Some clothing, sneakers, shotgun, some ammunition for that shotgun, some currency.

Q. Currency which was found in the safe?

A. Yes.

Q. Just about under $2,800 in cash, correct?

A. $2,749, yes.

Q. And, I think there was a receipt of something, Wantagh Suzuki as well?

A. Yes.

Q. That was the safe where Mr. Orlando indicated he had taken the cash from to pay Mr. Calabrese; isn't that correct?

A. Yes, he told me that.

Q. Now, from two o'clock when you step out of the interview room, Herva Jeannot is present in the homicide squad, correct?

A. Yes, he is.

Q. Same floor as Mr. Orlando, correct?

A. Yes.

Q. You testified about forty feet from another room, across the way, correct?

A. Yes.

Q. You can see from one door to the other, they're

both open, whose in each room, correct?

A. You could if you were standing in the perfect spot.

Q. The answer is yes?

MR. HAYDEN: Objection.

THE COURT: Sustained.

Q. Standing in the wrong spot you can't see; is that right?

A. The way the rooms are designed, if the defendant is seated where he should be in the interview, you can't see each other.

Q. This eight hours or seven hours he is permitted to go to the bathroom, he is taken out of that room, isn't the other room right in his view as you come out that door and the other interview room is right across the office, correct?

A. We take measures to prevent that from occurring. We keep the doors closed. We know when people are being moved for a variety of reasons to prevent that, also for security reasons.

Q. Would it be correct to say that from the time that Mr. Orlando was there, ten o'clock that night to two in the morning, that you took precautions so my client did not see Herva Jeannot?

A. Yes.

Q. Okay. Now, it's now two o'clock in the morning,

Friday, you and Detective McGinn step out, my client's left there basically alone for about the next three hours; would that be correct?

A. Yes.

Q. So, about five in the morning; is that correct?

A. Somewhere around five, yes.

Q. And at five in the morning, Detective McGinn goes back in to talk to Mr. Orlando; is that correct?

A. Yes.

Q. And he goes in at five o'clock and he is there for about a half hour?

A. I don't know that.

Q. In fact, you weren't present so you don't know exactly what that conversation was?

You weren't present for that conversation. Let me leave it at that. Correct?

A. I was not, that's correct.

Q. And that conversation you don't know then, that would be for Detective McGinn, how Detective McGinn was in with my client after five o'clock in the morning. Would that be correct?

A. That would be correct.

Q. And, at some point in time, you're made aware by Detective McGinn of what Mr. Orlando had to say; isn't that correct?

A. Yes.

Q. And, Detective McGinn then goes back in again at about maybe seven in the morning.

Would that be correct?

A. I don't know that.

Q. Okay. That would be for Detective McGinn?

A. Yes.

Q. And then there is another conversation with Mr. Orlando by Detective McGinn, and that is relayed to you also, correct?

A. Yes.

Q. And then, based on that, you ask Detective Cereghino to then go in at about nine in the morning, I believe, to speak to my client; isn't that correct?

A. Yes.

Q. And Detective Cereghino speaks to my client and then takes which would actually be a third statement, a second written statement, from my client, correct?

A. A second written statement, yes.

Q. And you weren't present for those oral statements, that statement made by my client when it's reduced by Detective Cereghino?

You weren't present?

A. No.

Q. You're aware of the contents of what is in that

statement, correct?

A. Yes.

Q. That statement, that last one, ended at about eleven o'clock in the morning, correct?

A. I don't know that.

Q. That would be Detective Cereghino?

A. Yes.

Q. As you sit here now, you're aware of the three different statements, correct?

A. I don't know what you're classifying or making a third statement from. I know of two written and I know of the interviews.

Q. Okay. Now, during the time that the other two detectives are speaking to my client, that would be at your direction?

A. Myself and my supervisor.

Q. And for the time that you had spoken to my client, I think you indicated that he was cooperative, correct?

A. I didn't describe him as cooperative.

Q. Did he answer your questions?

A. He was responsive to my questions.

Q. So, when you say he is not cooperative, you asked him a question, he gave you an answer, it may not be the truth, maybe that is why you're saying he is not cooperative, but he answered it?

A. He was responsive to my questions, but he was not cooperative because he didn't tell me the truth, yes.

Q. That would be a determination perhaps made by the jury or Detective Cereghino as to what the truth would be. Would that be correct?

MR. HAYDEN: Objection.

THE COURT: Sustained.

MR. LEMKE: Withdrawn.

Q. As far as cooperation?

MR. HAYDEN: Objection.

THE COURT: Sustained.

MR. LEMKE: Withdrawn.

Q. If a question is asked, and there is an answer given, let's define what cooperation means. He cooperated with you?

MR. HAYDEN: Objection.

A. No, he did not.

THE COURT: Sustained.

Q. You asked him a question, he answered it?

THE COURT: Mr. Lemke, I think that he has answer that question. Let's move on.

MR. LEMKE: It's been kind of --

THE COURT: I know. I think you went through it. So --

Q. The four hours you were with him, do you tell him,

you're a liar, I don't like that answer, I don't believe that. Is that what happened?

A. No, I did not.

Q. So, you're asking him to tell you about gambling and he is answering, you're writing it down, correct?

A. That was part of it, yes.

Q. You asked him how he knows Bobby, you're writing that down?

A. Yes.

Q. You asked him about the gambling, how he was up and how he won, and you recorded that as well?

A. Yes.

Q. And, I think your answer was that he was overly enthusiastic I think was your word?

A. Yes.

Q. Correct?

A. I describe him as overly enthusiastic relative to describing his gambling, yes.

Q. I have nothing further.

Thank you detective.

THE COURT: Thank you Mr. Lemke.

MR. HAYDEN: Thank you. Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. HAYDEN:

Q. Did you take notes during the initial conversation

with the defendant?

A. Yes, I did.

Q. How many pages of notes?

A. I took two.

Q. Did Detective McGinn take notes?

A. Yes, he did.

Q. How many pages?

A. Six.

Q. Have you reviewed all of those notes before testifying today?

A. Yes, I have.

Q. Many times?

A. Yes.

Q. Now, you testified during cross examination that the defendant never told you that Herva Jeannot did anything that night; is that right?

A. That's correct.

Q. Not involved with the shooting?

A. Correct.

Q. He told you Herva Jeannot was not involved in the shooting; is that right?

During that initial conversation, you took the statement, he told you that Herva Jeannot had nothing to do with the shooting?

A. No, he didn't tell me that.

Q. During the initial conversation, he told you he was with Herva Jeannot?

A. Right.

Q. Herva was with him?

A. Correct.

Q. He provided an alibi for Herva Jeannot?

A. Yes, he did.

Q. He told you Herva Jeannot had nothing to do with this; is that right?

A. Yes.

Q. During that initial conversation, that is what I am talking about, the conversation with you and Detective McGinn, he supported an alibi for Herva Jeannot?

A. Yes, he did.

MR. HAYDEN: Nothing further, Your Honor.

RECROSS EXAMINATION

BY MR. LEMKE:

Q. He provided an alibi. Is that your testimony now, detective?

A. That he provided an alibi for Herva Jeannot?

Q. Is that what you just testified to?

A. Yes.

Q. And so by telling you that he went there, he met Bobby, he was there at the time of his death, that Herva was with him, that is an alibi?

MR. HAYDEN: Objection. Didn't say he was with him at the time of the death.

THE COURT: Sustained.

Q. That was an alibi, detective?

A. The meeting that took place at a different location, the victim's after he left him, and the events after that, after they left Island Park and throughout that evening.

Q. Then three hours later, he certainly didn't give an alibi, did he?

MR. HAYDEN: Objection.

THE COURT: Sustained. Sustained.

Q. You're familiar with the statements that he gave to Cereghino, aren't you?

A. Yes.

Q. And, as you testified here, you didn't believe his first statements, clearly a lie?

A. Yes.

MR. LEMKE: Thank you.

THE COURT: Anything further from this witness.

MR. HAYDEN: No, Your Honor.

THE COURT: You may step down. Thank you, detective.

(Witness excused.)

THE COURT: At this time everybody in the gallery, going to take fifteen minutes, intend to resume just about noon. Let everyone use the facilities or whatever. Remember my admonitions throughout, all apply here, particularly, do not converse among yourselves or with anyone else about the subject matter of this case. Follow the officer, please.

THE COURT OFFICER: Leave your pads on the seat if you're taking notes.

THE COURT: I intend to resume at noon.

(Whereupon, there was a recess in the proceedings.)

THE CLERK: Continued case on trial. 167N-2005.

People of the State of New York against Mark Orlando.

Let the record reflect the jury is not in the courtroom at this time.

THE COURT: Mr. Lemke, did you want to be heard with regard to some anticipated testimony that is about to be elicited.

MR. LEMKE: There has been a prior ruling by this Court with the testimony at this time and the anticipated testimony of Detective McGinn, that there's a period during his conversation with Mr. Orlando that he brings into focus what the codefendant Mr. Herva

Jeannot had said regarding the shooting of Mr. Calabrese. That there was payment for that and a number of other things.

I believe it's been limited by this Court, to a conversation with my client, that McGinn can testify that Herva had said he shot Mr. Calabrese, and that my client had paid him. I am certainly placing my objection to that on the record now. I believe there's still going to be a curative instruction by this Court. I will ask that be read to the jury, but I just wanted my objection so noted. I will not object in front of the jury, but I am placing my objection on the record now.

THE COURT: Your objection is noted. There will be a curative instruction, it will be a limiting instruction to the jury that any testimony in that regard will not be offered for the truth of the contents therein, but rather explain to the jury what is going on during the interrogation of your client.

Is that it?

MR. LEMKE: Yes, Your Honor.

THE CLERK: Ready for the jury, Your Honor?

THE COURT: Yes.

THE COURT OFFICER: Ready for the jury?

THE COURT: Yes.

THE COURT OFFICER: Jury entering.

THE CLERK: Continued case on trial, 167N-2005, People versus Mark Orlando.

People ready to proceed?

MR. HAYDEN: Ready, Your Honor.

THE CLERK: Defense ready?

MR. LEMKE: Ready.

THE CLERK: Let the record reflect the presence of Mr. Orlando and the jury and alternates.

THE COURT: Good afternoon. We're going to go another half hour then I will break for lunch.

Call your next witness.

MR. HAYDEN: James McGinn.

JAMES McGINN, detective, called as a witness on behalf of the People, after having been first duly sworn, and having stated his shield number as 785, and his command as Homicide Squad, Nassau County Police Department, took the witness stand and testified as follows:

DIRECT EXAMINATION

BY MR. HAYDEN:

THE CLERK: Have a seat.

State your name, spell your last name, give your shield number and command.

THE WITNESS: Detective James McGinn, M-C-G-I-N-N, shield number 785, Homicide Squad, Nassau



County Police Department.

THE COURT: Good afternoon, detective.

Just speak into the mike.

Mr. Hayden.

MR. HAYDEN: Yes, Your Honor.

Q. Good afternoon, detective.

A. Good afternoon.

Q. How long have you been a member of the Nassau County Police Department?

A. Eighteen years.

Q. How long have you been a detective?

A. Twelve years.

Q. How long with homicide?

A. Four years.

Q. Do you know a man named Mark Orlando?

A. Yes, I do.

Q. Briefly describe him?

A. He's a male white, approximately 5'10", about three hundred and fifty pounds, thirty-four years of age.

Q. Do you see Mark Orlando in this courtroom today?

A. Yes, I do.

MR. LEMKE: So stipulated, Your Honor.

THE COURT: Let the record reflect the witness has identified the defendant as Mark Orlando.

Q. I am directing your attention to the night of

Thursday, December 9, 2004.

Were you involved that night in arresting the defendant?

A. I was present when he was arrested, yes.

Q. Who arrested the defendant?

A. Bureau of Special Operations, Police Officer Loschiavo and McCarthy.

Q. When was he arrested?

A. He was arrested at ten minutes to nine in Farmingdale.

Q. Where?

A. It was at Airport Plaza Shopping Center in Farmingdale.

Q. Was that 9:10 that night?

A. Yes, 9:10, yes.

Q. Where were you when the Bureau of Special Operations officers arrested the defendant?

A. I was in a police vehicle just behind the Bureau of Special Operations vehicle.

Q. Were you watching while he was arrested?

A. Yes.

Q. Was he handcuffed when he was arrested?

A. Yes, he was.

Q. What did the Bureau of Special Operations officers do with the defendant?

A. After he was arrested, he was turned over to

Detective McHugh and myself.

Q. What did you do with him?

A. We placed him in the back of our police vehicle.

Q. Describe that vehicle?

A. It's a 1997 tan Ford Expedition.

Q. Where did you take the defendant?

A. We took him to police headquarters in Mineola to the homicide squad.

Q. Who drove?

A. I did.

Q. Where was Detective McHugh?

A. Sitting directly behind me in the rear seat.

Q. Where was the defendant?

A. Next to Detective McHugh on the passenger's side of the rear seat.

Q. Describe any conversation on the way to police headquarters?

A. Detective McHugh introduced himself and I to the defendant, told him we wanted to talk to him about the death of Bobby Calabrese, and that when we got to the office, we would speak to him about it.

Q. What did the defendant say?

A. I believe he responded okay.

Q. What time did the defendant arrive at the homicide squad?

A. That was 2150 which is ten minutes to ten.

Q. Describe the layout of the homicide squad?

A. You first walk into it, it's a large office area with desks, pictures, desk for each detective. It has a supervisor's, two supervisors office, and two interview rooms.

Q. Where was the defendant placed at the homicide squad?

A. He was placed in the main interview room which is the southeast corner of the homicide office.

Q. Describe that room?

A. The room is approximately ten feet by ten feet, has a desk, three chairs, filing cabinet, a window with a curtain on it, a door that closes and locks. The door also has a window with a curtain on it.

Q. Was a man named Herva Jeannot arrested that same night?

A. Yes, he was.

Q. Was he arrested at the vicinity of Professional Credit Services?

A. Yes, he was.

Q. About 9:15 that night?

A. I believe so but I am not sure on that.

Q. Was Herva Jeannot brought to the homicide squad?

A. Yes, he was.

Q. What was the approximate time he got there?

A. I believe he got there at about twelve minutes past ten.

Q. Where was Herva Jeannot place?

A. He was placed in the secondary interview room in the homicide squad.

Q. Describe that room?

A. That room is probably about eight by eight. Again it contains a desk with three chairs and there's also a cot type couch in there.

Q. Where is one interview room with relation to the other?

A. They're directly across from each other. One is on the east side of the office, the other is on the west side of the office.

Q. Did you eventually take part in a conversation with the defendant?

A. Yes, I did.

Q. Who was present when the conversation began?

A. Detective McHugh.

Q. Was the defendant handcuffed when the conversation began?

A. No, he was not.

Q. Did you take notes of your initial conversation with the defendant?

A. Yes, I did.

Q. How many pages of notes did you take?

A. Six pages.

Q. Would those notes help refresh your recollection about the sequence of the things the defendant said?

A. Yes.

MR. HAYDEN: May I please have 66A through F for identification shown to the witness, Your Honor.

THE COURT: Yes.

THE COURT OFFICER: The witness has People's 66A through F for ID.

Q. Do you recognize those notes?

A. Yes, I do.

Q. Are those your notes of the initial conversation with the defendant?

A. Yes.

MR. HAYDEN: With the Court's permission, may Detective McGinn refer to those notes whenever need be to refresh his recollection about the sequence of the things the defendant said?

MR. LEMKE: No objection, Your Honor.

THE COURT: Yes.

THE WITNESS: Thank you.

Q. Was the defendant initially informed of his constitutional rights?

A. Yes, he was.

Q. Who did that?

A. Detective McHugh.

Q. How did he do that?

A. He did that by reading the rights to the defendant from a police form called PDCN 233. It's a notification of rights.

MR. HAYDEN: May I please have 44 in evidence shown to the detective?

THE COURT: Yes.

THE COURT OFFICER: The witness has People's 44 in evidence.

Q. Do you recognize that?

A. Yes, I do.

Q. Is that the card Detective McHugh used to inform the defendant of his constitutional rights?

A. Yes, it is.

Q. Is your signature on that card?

A. Yes, it is.

Q. Describe any conversations that took place after the defendant was informed of his constitutional rights?

A. We first asked him basically, Detective McHugh asked basic pedigree information which I document such as the defendant's name, Mark Orlando, his address, which was 1119 Joselson Avenue in Bayshore, date of birth, which was

7/27/70. We asked for cell phone number, work phone number, home phone number. He provided them. We asked who his employer was, which he told us it was Professional Credit Services, 500 Bicounty Drive, Bicounty Boulevard, Suite 350 in Farmingdale, New York. He was asked how long he was employed there. He had been employed there since '99. He was asked who he lived with. He said he resided there with his wife Diana. Her maiden name was Dunn. He supplied her date of birth. Also said he resided with his mother-in-law whose first name was Nellie. And again her last name was Dunn. He was asked about his educational background. He said he had gone to Nassau Community College for about a year and-a-half. Maybe a little bit less. And he majored in accounting there. He also graduated from Holy Trinity High School in 1988. He was asked about his parents, to which he gave the name Mark and Rita Orlando. Gave their home address, phone number.

He also talked about being involved in a family business. Regee Silk Creations and also Graham Mirror Manufacturers. They used to have a place in the flee market in Levittown. Also a store in Levittown. He said he had two sisters. Gina and Rita, and that Rita was married to a corrections officer by the name of Michael Goodman.

Q. Describe any further conversation?

A. Detective McHugh then asked about his relationship

with Bobby Calabrese. Wanted to know how he met Bobby Calabrese, and his relationship with Bobby. He explained to us that he was introduced to Bobby Calabrese by a friend and coworker by the name of Tom Flores. Tom introduced the two of them because he knew that Mark was a gambler and that Bobby Calabrese was a runner for a bookmaker, and that they'd be able to have a business arrangement placing bets. I believe it was the following day or the day after that, that Bobby Calabrese either called Mark Orlando on his cell phone or his business phone and they set up a business arrangement.

Bobby Calabrese had supplied Mark Orlando with an account number, a password, an 888 number to place his bets on. He started placing bets with Bobby Calabrese. He did it for about six weeks beginning in October. First week that he gambled with him he won I believe it was $871. Second week he gambled with him he won about $1,065. Third week he gambled with him he won about $8,700. The fourth week he had a very good week. He won $17,900. I am sorry, the fourth week it $8,700. Fourth week $8,700.

I am sorry let. Me go through that again.

First week was $870. Second week was $1,065. Third week was $8,700. Fourth week was $17,900. Fifth week he lost $8,700. And the sixth week he lost $9,100.

He explained that whenever he won that the weekend on a

Sunday and that the wages were either paid or owed sometime that following week most likely on a Thursday. He explained most of it, because he had won, Bobby used to come out and meet him and pay him out by Professional Credit Services. He explained to us that the wages that he lost on the week ending 1/28, payment on that $8,700 was due on December second. He continued to bet on the twenty-ninth and the thirtieth, which would start a new week. And in those two days is when he lost the $9,100. That money would not have been due until December ninth. But being that he had lost the $8,700 and the $9,100, he voluntarily shut down his line with Bobby Calabrese on the thirtieth. So that he would lose anymore money.

He had agreed to meet Bobby Calabrese, he was going to meet him on the second of December to pay, and wanted to pay everything at once, even though $9,100 of that money wasn't due until the ninth. He wanted to settle everything up. He was going to meet with him on the second of December, but he wound up working a twelve to nine that day. Twelve in the afternoon until nine at night. He wound up going out afterwards with his wife so he didn't meat Bobby Calabrese that day.

He said that Wantagh Suzuki owed him money. He was going to Wantagh Suzuki to pick up money on Friday. So, he had called Bobby Calabrese and agreed to meet Bobby Calabrese

down at Island Park either before or after he was going to Wantagh Suzuki. He said that Herva Jeannot took a ride with him. That when they left work on Friday and agreed to meet Bobby Calabrese they went to the gym afterwards. That Herva Jeannot, Mark Orlando, Tom Flores, Barbara Diamant and Rory Hoffman I believe is his name went to L.A. Fitness on 110 after work. They weren't meeting Bobby until later on that night.

At about 7:15, 7:30, Herva Jeannot and Mark Orlando left L.A. Fitness. They drove down Route 110 to the Southern State Parkway. Southern State Parkway, Wantagh, to the Loop, down Lido Boulevard and into Island Park. He said when he got into the Island Park area, he went directly to Industrial Boulevard where he was going to meet Bobby Calabrese. He said that at about 8:25, he called Bobby Calabrese and told him where he was, and that they were going to meet there.

He was only there a few minutes when Bobby Calabrese pulled up. He said he was sitting in his car with Herva and Bobby pulled up in his car. It was either an Infiniti or Lexus. They pulled side by side, driver's door to driver's door. He said they talked for a couple minutes, that the money was exchanged, he gave Bobby the $17,000 even though, I believe, the total debt was $17,000, either eight hundred or one hundred, one of the weeks Bobby Calabrese had paid him he was short some money. So, Bobby Calabrese still owed him

money. So, the total debt he was paying that night was $17,000. He said he paid the $17,000.

They talked for a minute. He said Bobby pulled out. Bobby made a left on Austin Boulevard, went towards Oceanside. He pulled out of Industrial Place, made a right on Austin Boulevard and went back into Long Beach to get back onto the Loop Parkway.

He was asked if he had called anybody after he left the Island Park area and he said between 8:40 and nine o'clock he had called Wantagh Suzuki because he wanted to make sure that his check was there. He also called I believe his wife. He called Vivian Borushik, a friend of his, because they were going to go over there after Wantagh Suzuki, and he called Tom Flores. He said when he called Wantagh Suzuki, he always dealt with the owner Ralph down there. That Ralph wasn't in and he had told the workers he wanted his check. He was on his way down there. They got down there a little bit late. Said he got there a minute after nine. The place was closed. So, he couldn't pick up his check.

From Wantagh Suzuki they drove to the CitiBank on Sunrise Highway and he withdrew $300 from the ATM machine. He said it was exactly 9:12 he withdrew the money from the ATM machine. Said he doesn't normally save the ATM receipts, he doesn't normally save his receipts, but that night he saved the receipt and he believed it was in his desk somewhere at

work.

He said after they left the CitiBank ATM machine, they got onto 135 which is the Seaford/Oyster Bay Expressway and drove over to Vivian's house. Once at Vivian's house he said that Herva stayed in the car, and he went into Vivian's house for about thirty or forty minutes. He was over Vivian's to look at some work that was done. I believe Vivian had a pool installed, and he was looking at the distance between the fence and the pool. There was a deck there I think needed to be taken care of and some brick work that needed to be done, and he went over there to look at that. Said they were over there thirty, forty minutes. He then went out to the car where Herva was. He then drove Herva home.

He said when he left Bobby Calabrese, Bobby Calabrese was fine. He said that the following morning, I believe it was around ten o'clock he was home, he got a phone call from Tom Flores. Tom Flores told him that Bobby Calabrese was dead. He didn't say what happened to him or how he was killed, but that Bobby Calabrese was dead. Mark Orlando told him to reach out to the Calabrese family to give him his phone number because he was probably the last person to see him alive. That he wanted to get out in front of this to let the family know he wasn't involved in this and that when he saw him he was fine and they left the area.

There were numerous phone calls that morning. Barbara

Diamant who was Tom Flores' girlfriends also called Mark Orlando at home to tell him that Bobby Calabrese had been killed. With all of the phone calls that were coming into the house, Mr. Orlando told us his wife now knew he was gambling begin with a bookmaker and she became very upset and told him if she wasn't pregnant with his child she would leave him over the gambling.

Q. Describe any further conversation?

A. We talked in depth about the gambling. He was very enthusiastic when talking about the gambling. I also asked him to elaborate on the situation at Wantagh Suzuki. Why they owed him money. Why it was important for him to pick up that check. He started to explain about the cars he had purchased from Wantagh Suzuki started to get a little confusing. So, I asked him to slow down, and we went into it. He said the first car he purchased from Wantagh Suzuki was a 2004 Verona. He had traded in a '98 Navigator for that car. Then the second car he purchased from them was 2001 Ford Expedition. He had that for a couple of months, but the gas prices hit and it was just too expensive, so, he traded the Expedition in for a Suzuki XL7. He kept the Suzuki OX7 for a short period. I believe it was a week or two. And he was like, look at the size of me. The Suzuki LX7 just didn't fit me. The truck was too small for me. So, he traded that back in and then I also traded in the first

2004 Verona he purchased from them for an updated one. When he did that, he just gave them back the XL7. Only had the 2004 upgraded Verona that his wife drives now.

He said in the confusion and stuff that he started getting phone calls from Norfork Bank and from American Suzuki and they had asked him what car he was making payments on. He said e only had one car from them and he only needed to make payments on one car. He felt there was something wrong and he was dealing with Ralph, the owner at Suzuki. In the meantime, he attempted to refinance his house to get a better rate and he found out he couldn't do it. He wanted to restructure at the time and get a better rate. He found out he couldn't refinance because his credit rating had been messed up by Wantagh Suzuki. He had worked out a deal with Ralph from Wantagh Suzuki that they would give him a check for $1,600, and that they would give him a letter to clear his credit rating.

Q. What else did he say?

A. We talked about his debts. I asked him about his debts. He said he had about ten outstanding debts. He had a mortgage. The mortgage was about $307,500 of which his states were $1,729 a month. Additionally he had to pay $3,200 a year in taxes. He also had the car payment. He owed about $19,000 on the car. That payment was $399 a month. He had a debt with an MBNA credit card, $14,000

payment on that being $400 a month. He had another debt with CitiBank which was around $4,500 on the credit card. That payment was $300 a month. He also had a $25,000 loan over twenty years he took out for a pool he had in his yard. That was about $259 a month.

When he was asked about going down to Island Park, how he knew that area, he said his best friend's wife lived on Knickerbocker which was right around the corner from there. His father used to work in Oceanside. He knew the area. His father used to own a body shop called Bilmar in Island Park. He said his wife grew up in the Island Park/Long Beach area. He knows that area. He wasn't lost down there. He drove right to Industrial Boulevard and parked and waited to meet Bobby.

He was asked about any bank accounts he had, he has. He said he has a joint account at CitiBank on Conklin Avenue in Farmingdale with his wife. He also has an individual bank account at CitiBank. He said some of the money from his gambling winnings went into the those bank accounts to pay some credit card debt.

He was asked about gambling records. He said he probably has some gambling records left in his desk. He stated that when they were on Industrial Place there was a shop that was open down there. When he was asked why he took his car down there, I mean his wife's car down there, the Verona, because

he was now driving a '91 Cougar, he said he didn't have a license and with the tinted out windows on his '91 Cougar it looked like a crack head's car. He didn't want to get pulled over because he didn't have a license.

Q. Talk about the ten separate debts?

A. He said he had about ten outstanding debts but just went into the ones I talked about.

Q. What else did he say?

A. He said he had driven Herva home, when they were in front of Herva's house, Herva had called his girlfriend from in front of house at about 10:30 and that he had called his wife.

Q. Anything else?

A. No, I believe that is about it from the initial interview.

Q. Did the defendant take notes during the course of the conversation?

A. Yes. Not so much take notes, but when he was explaining things in the beginning of the interview, there was a pad on the table. He asked for a pencil. When he started talking about the gambling and he wrote out explaining everything to us, as he explained it he was writing things down.

MR. HAYDEN: May I please have People's exhibits 49A through D shown to the witness, Your Honor.

THE COURT OFFICER: The witness has People's 49A through D for identification.

Q. Do you recognize those notes?

A. Yes, I do.

Q. Are those the defendant's notes?

A. Yes, they are.

Q. Using those notes in evidence, describe for the jury what the defendant was saying while he was taking those notes?

A. As he was taking those notes, he is writing out six weeks, he knows Bobby for six weeks. Started talking about the gambling. He is listing weeks one through five on here as to how much he was winning and losing, he put his password and his account number down on here. He was talking about how you bet on different games. There was one point in the conversation where we were talking about the gambling and about sports. Detective McHugh said he was a bit of a sports enthusiast. Mr. Orlando must not be a real good gambler. He said he bet on pro football, college football and pro basketball.

Detective McHugh says, you know, a good gambler never bets on the final score of, never bets on basketball because it could be, the outcome of the game could be affected, one team doesn't care if the other team scores a few points because you're not going to cover your point spread. Mr.

Orlando said he didn't know what he was talking about because you never bet on the final score. You bet on different, you bet on the quarter score, the half time score, the over/under. That was all. Did it different. Things he demonstrated over here.

Again, on the back of that one page, he was writing out the weeks and explaining to us how the weeks worked with the gambling. He wrote out the last week where he started, or the first week where he started to lose money, and that was, that was the twenty-sixth through twenty-sixth, twenty-seventh and twenty-eighth. He showed us that the week ends on the twenty-eight and a new week begins on the twenty-ninth which would be a Monday. So, when he lost in week five, he lost the $8,700, that that payment would be due on the second of December. Then the new week starts, whatever is won or lost in that week, which would be the twenty-ninth and the thirtieth, or all the way up through the third of December would not be due, payment, whether he was receiving payment or had to make a payment, that wouldn't be due until the ninth of December.

He showed us, he circled the last two dates that he bet, which was the twenty-ninth and the thirtieth, in which those two days he lost $9,100 in those two days. He said on the thirtieth, that is when he shut down his line, because he didn't want to lose any more money.

Q. What page is that?

A. It's on the back of exhibit number 49A.

Q. Would you move on to 49B, please. Tell us what he was saying as he was taking those notes?

A. On 49B, he is explaining, I believe he worked eight to five that day. They went to L.A. Fitness. They were there, there were five people that went to L.A. Fitness. Wrote down the names of the people that went. Barbara Diamant, Tom Flores, Herva Jeannot and Rory Hoffman. Got down one ten, something about Ruby Tuesdays. I don't remember that. He says 7:15, &;30 they left. They went down Route 110 to the Southern State Parkway to the Wantagh Parkway, to the Loop Parkway to Lido Boulevard. At about 8:25 he goes to Industrial Boulevard. He actually draws a diagram of Industrial Boulevard and where certain places are. The public storage on Industrial Boulevard. I believe it's a restaurant that was shut down. And I believe it's Puma's auto body that he wrote. And actually drew a little map where the street was and where he was parked and where he met, where he said he met Mr. Calabrese.

Q. Would you move on to the next page, please.

A. Next page is, I believe, this is a little map or a diagram of Vivian Borushik's backyard, where the pool was, where the fence was, how close it was to the fence and stuff.

THE COURT: What exhibit is that?

THE WITNESS: That is exhibit 49C.

THE COURT: Thank you.

A. Again there's a Friday eight to five. I believe he said he was working Friday eight to five on that. He's got 12/4 date and 12/3 date. The 12/3 date being the date he paid the money, and the 12/4 being the date he's told about Bobby Calabrese's death.

Q. Would you move on to the next page, please?

What is that for the record?

A. That is 49D, and it has Wantagh Suzuki. It's got it circled. Says close. It says Vivian Borushik in Plainview. It also has the ATM CitiBank on Sunrise. I am not sure what some of that writing is. And then again it's got 9:12, which is the time he says he withdraw the money from the ATM and he has that circled. And then he has 135 again to Plainview which is the route they took to Vivian Borushik's house.

Q. Told you that time?

A. Yes.

THE COURT: I think at this time I am going to break because of the hour.

Ladies and gentlemen in the gallery, please remain seated until the jury leaves the courtroom.

We're going to break, ladies and gentlemen, to 2:15. Okay. You must not converse among yourselves or

with anyone else upon any subject connected with the trial. You must not read or listen to any accounts or discussion of the case in the event it is reported by news or other media. You must not visit or view the premises or place where the offenses charged was allegedly committed, or any other premises or place involved in the case. Prior to your being discharged you must not request, accept, agree to accept, or discuss with any person the receiving or accepting of any payment or benefit in consideration for supplying any information concerning the trial. You must promptly report to the Court any incident within your knowledge involving an attempt by any person improperly to influence any member of the jury. You're not to access the Internet or Worldwide Web by any means available to you for the purposes of either learning about this case or to learn about the law and legal issues concerning this case.

Have a nice lunch.

THE COURT OFFICER: Please leave the note pads on your chairs and follow me out.

THE COURT: Detective, you may step down. We will resume at 2:15. Don't discuss your testimony with anyone.

THE WITNESS: Okay.