1          THE COURT:  The Court is in recess until

2     2:15.

3               L U N C H E O N   R E C E S S

4               (Afternoon session.)

5          THE COURT OFFICER:  Ready for the jury?

6          THE COURT:  Yes.

7          THE COURT OFFICER:  Jury entering.

8          THE COURT:  Continued case on trial,

9     indictment 167N-2005, People versus Mark Orlando.

10       People ready?

11         MR. HAYDEN:  Ready, Your Honor.

12         THE CLERK:  Defense ready?

13         MR. LEMKE:  Yes, Your Honor.  Ready.

14         THE CLERK:  Let the record reflect the

15    presence of Mr. Orlando, the sworn jurors and

16    alternates.

17       Detective, be reminded you are still under oath.

18         THE COURT:  Good afternoon, ladies and

19    gentlemen.

20         THE COURT:  Mr. Hayden, you may continue.

21         MR. HAYDEN:  Yes, Your Honor.

22    Q.   Did the defendant tell you he didn't know where

23    Bobby Calabrese was killed?

24    A.   Yes.

25    Q.   Did he tell you he didn't know how Bobby Calabrese

1    was killed?

2         A.    Yes.

3         Q.    Did he tell you he didn't know why Bobby Calabrese

4    was killed?

5         A.    Yes.

6         Q.    Did he tell you that Bobby Calabrese was alive and

7    well when he last saw him?

8         A.    Yes.

9         Q.    Did he tell you that he himself was with Herva

10   Jeannot on his way to Wantagh Suzuki when they last saw Bobby

11   Calabrese alive and well?

12        A.    Yes, they were pulling off of Industrial Place onto

13   Austin Boulevard.

14        Q.    Did Detective McHugh begin to reduce what the

15   defendant was saying to writing?

16        A.    Yes, he did.

17        Q.    Describe how Detective McHugh did that?

18        A.    Detective McHugh said now that he told us the story

19   would he like to put it down in writing, to which the

20   defendant replied yes.  He told him he was going to ask him

21   questions.  When he answered them he would put them in

22   narrative form and write them out for him.

23        Q.    What was the approximate time Detective McHugh

24   finished reducing what the defendant was saying to writing?

25        A.    It was about two o'clock in the morning.

1    Q.   What did Detective McHugh do with that written

2    statement?

3    A.   He read the statement out loud to the defendant.

4    He then handed the statement to the defendant and asked the

5    defendant to read it.   If there were any corrections that

6    needed to be made to let Detective McHugh know and he will

7    make the corrections, and to initial the corrections.   When

8    he was done reading it, if he agreed with the contents of

9    each page, sign the bottom of each page, and on the last

10   page, sign his name and his address.

11   Q.   Did you sign each page of the statement?

12   A.   I did, yes.

13   Q.   Detective McHugh as well?

14   A.   Yes.

15       MR. HAYDEN:   May I please have 45 shown to the

16   witness.

17       THE COURT:   Yes.

18       THE COURT OFFICER:   The witness has People's

19   45 for ID.

20   Q.   Is that the defendant's statement?

21   A.   Yes, it is.

22   Q.   Is your signature on each page of that statement?

23   A.   Yes.

24       MR. HAYDEN:   May I please have that back.

25       Thank you.

McGinn - People - Direct

1   Q.  Was the defendant offered anything to eat or

2   drink?

3   A.  Yes, he was.

4   Q.  When was that?

5   A.  At two o'clock in the morning he was offered an egg

6   sandwich from the diner.  We were going to get egg

7   sandwiches.  He refused anything to eat.  At that point, I

8   believe sometime in the morning, he was offered something to

9   eat or drink, I believe that was around 6:50 in the morning.

10  He refused at that point.  At 10:30 in the morning he was

11  offered something again.  I believe he had a glass of water.

12  Around eleven o'clock he had a donut.

13  Q.  Did the defendant use the men's room whenever he

14  asked?

15  A.  Yes, he did.

16  Q.  Describe the defendant's demeanor while you and

17  Detective McHugh was speaking to them then.

18  A.  Relax, composed.  He seemed, you know, okay.  He

19  was talking us.

20  Q.  How was he when he was talking about his gambling?

21  A.  Very enthusiastic when he talking about the

22  gambling.

23  Q.  Did he seemed very excited when talking about the

24  gambling?

25  A.  Writing out the numbers, pointing here, saying this

McGinn - People - Direct

1    is, you bet this, half here, you bet this quarter here.  He

2    was overly enthusiastic about gambling.

3          Q.   Did he remain composed throughout the conversation?

4          A.   Yes, he did.

5          Q.   Did you resume speaking with the defendant?

6          A.   Yes, I did.

7          Q.   What was the approximate times you resumed speaking

8    with him?

9          A.   That was about ten minutes after five in the

10   morning.

11         Q.   Where was the defendant when you resumed speaking

12   with him?

13         A.   He was still in the main interview room in the

14   homicide squad.

15         Q.   Was he left alone from the time he signed his

16   written statement until the time you resumed speaking with

17   him?

18         A.   Yes, he was.

19         Q.   Was he handcuffed when you resumed speaking with

20   him?

21         A.   No, he was not.

22         Q.   Was he handcuffed at any time inside the homicide

23   squad?

24         A.   No, he was not.

25         Q.   Who was present when you resumed speaking with the

McGinn - People - Direct

1   defendant?

2       A.   I was by myself.

3       Q.   Describe the circumstances under which you resumed

4   speaking with the defendant?

5       A.   I knew Detective McHugh was in talking to Mr. Herva

6   Jeannot.  I believe that Herva Jeannot was relaying some of

7   the events that really took place that night.  I went back in

8   and I told Mr. Orlando that Detective McHugh was over there

9   talking to Herva Jamaica and he was probably giving us, you

10  know, other facts that happened that night, the truth as to

11  what happened that night.  Now would be the time for Mark

12  Orlando to tell us what was going on.

13      Q.   Tell the jury what happened when you resumed

14  speaking with the defendant?

15      A.   The defendant just kept saying to me, detective,

16  you don't understand.  You don't understand.  I would ask him

17  what don't I understand.  Explain to me what I don't

18  understand.  His only response was, detective, you don't

19  understand.  You don't understand.  Talk to me.  Tell me what

20  is going on because the only version of events we're going to

21  have is Herva Jeannot's.  If I don't understand something,

22  talk to me and make me understand.  His only response to me

23  was, detective, you don't understand.  This went on for about

24  twenty-five minutes back and forth.  After twenty-five

25  minutes.  I didn't think I was going to get anywhere so I

.MO

McGinn - People - Direct

1    left the room again.

2        Q.    Describe the defendant's demeanor when he kept

3    telling you you don't understand?

4        A.    His demeanor was basically the same as it was all

5    night, relaxed and composed.  You know, he wasn't upset, he

6    wasn't forceful, he was just relaxed and composed, just

7    saying, detective, you don't understand.

8        Q.    What happened next?

9        A.    I went back into the room.  I believe at about six

10   o'clock I went back into the room.  Again, I explained to

11   Mr. Orlando that Herva Jeannot was, in fact, giving up the,

12   what we felt were truer versions of the events of Bobby

13   Calabrese's murder.  That we had a videotape of the spot the

14   meeting took place.  That the meeting did not take place

15   where the defendant originally told us it had taken place.  I

16   told him that Herva Jeannot had given up where the gun was

17   and that the defendant should at this point, if he wants his

18   version of the story told to tell us the truth at this point.

19   Again, the defendant just kept telling me, you don't

20   understand.  You don't understand.

21       Again, I just kept explaining to him, make me

22   understand.  Tell me what I don't understand.  Explain it to

23   me.  This again went back and forth for awhile.  At one point

24   the defendant said to me that he was afraid.  And I asked him

25   what he was afraid of.  He wouldn't tell me what he was

McGinn - People - Direct

1   afraid of.  Again, he went, into you don't understand.

2   Explain to me what I don't understand.  Again --

3        Q.   Let me stop you for a moment.

4        Did his demeanor change at all when he was telling you he

5   was afraid?

6        A.   No.

7        Q.   Did he appear upset then?

8        A.   No, he did not.

9        Q.   Disturbed in any way?

10       A.   No, he didn't.

11       Q.   Same as he had been?

12       A.   Yes.

13       Q.   Composed?

14       A.   Yes.

15       Q.   Not as enthusiastic when talking about the gambling

16   but composed when he was talking about the rest?

17       A.   Yes.

18       Q.   Tell the jury what happened next?

19       A.   I asked him what he was afraid of.  Again he

20   wouldn't tell me what he was afraid of.  I brought up the

21   point that if he was afraid because of the bookmaking aspects

22   of it, that there might be organized crime involved, if that

23   is what he was afraid of, we can protect him.  He said he

24   wasn't afraid so much for himself as he was afraid for his

25   family.

MO

McGinn - People - Direct

1      Again, I explained to him that if he was afraid, whatever

2  reason he was afraid for, we could help protect him and his

3  family if he wanted to give us the version of events that

4  happened that night.  Again he reverted back into, detective,

5  you don't understand.  You don't understand.

6      At one point during that conversation he told me, I don't

7  even sleep in the same room with my wife any more at home.  I

8  don't sleep in the bedroom.  I sleep over at the other end of

9  the house with a shotgun.  I asked him why he was doing

10  that.  And again he went back into, you don't understand, you

11  don't understand.  Kept going back and forth.  Make me

12  understand.  Explain to me what I don't understand.  If

13  you're afraid, if you're afraid for yourself or for your

14  family, we can do something to protect you.

15      Again, this went on for close to fifty minutes, and the

16  most I got out of him was you don't understand.

17      Q.    Did his demeanor ever change?

18      A.    No.

19      Q.    Composed throughout?

20      A.    Yes, he was.

21      Q.    What happened then?

22      A.    I left the room at about 6:50.  I went back into

23  the room at about ten minutes to eight.  About 7:50 in the

24  morning.  ~~And I told him at this point that he was ~~

25  ~~was at that, talking to the other detectives~~



4      THE COURT:  Ladies and gentlemen, you have

5  been permitted to hear testimony about remarks made to

6  the defendant by Detective McGinn about statements

7  allegedly made by Herva Jeannot.  You're to consider

8  this testimony only when considering the circumstances

9  under which the defendant himself may have made

10  statements and for no other purposes.  You are to

11  completely disregard any statement allegedly made by

12  Herva Jeannot when considering evidence against the

13  defendant.

14      Any statement allegedly made by Herva Jeannot is not

15  evidence against the defendant and may never be

16  considered as evidence against the defendant.  You are

17  not to concern yourself with whether Herva Jeannot did

18  or did not make any statements to the police, if he did,

19  what those statement may have been or whether or not

20  they were true.

21      I direct you in this regard and I will direct you

22  again in my closing instructions to you.

23      Continue, Mr. Hayden.

24  Q.   What happened then?

25  A.   After a few minutes of that, Mark Orlando said to

McGinn - People - Direct

1    me, okay, I will tell you the truth.  He then began to tell

2    me another version of events that happened night.

3         Q.    Did you take notes of that further conversation?

4         A.    Yes, I did.

5         Q.    How many pages of notes?

6         A.    Four pages of notes.

7               MR. HAYDEN:    May I please have these four

8         pages which have been marked as 67A, B, C and D for

9         identification shown to the witness.

10              THE COURT:  Yes.

11              MR. HAYDEN:   Thank you.

12              THE COURT OFFICER:  The witness has 67A

13        through D for ID.

14        Q.    Do you recognize those four pages?

15        A.    Yes, I do.

16        Q.    What are they?

17        A.    They're my four pages of the final interview that I

18   did with Mark Orlando.

19        Q.    Would those notes help refresh your recollection

20   about the sequence of the things the defendant said then?

21        A.    Yes.

22              MR. HAYDEN:  With the Court's permission, may

23        Detective McGinn keep those pages there up with him to

24        refresh his recollection, if he needs to refresh his

25        recollection, when recalling the sequence of the things

626

McGinn - People - Direct

1     the defendant said then.

2                    MR. LEMKE:  Again, no objection, Your Honor.

3                    THE COURT:  Yes.

4          Q.    Please describe for the jury what the defendant

5     told you then?

6          A.    The defendant started off by telling me that Herva

7     Jeannot also had a betting line with Bobby Calabrese.    That

8     the defendant Mark Orlando had set up this account for Herva

9     Jeannot.  He gave me his password and he gave me his account

10    number.  He also said that he started off with a $500 betting

11    line, I believe, for $100 a game he was able to bet, and he

12    had lost some money and he arranged to have the betting line

13    raised to a thousand dollars where he could bet $250 a game.

14    Again he told me that the last phone call that Mark Orlando

15    made to the 888 number was on Tuesday, 11/30 where he had

16    lost that money.  He said on Wednesday, 12/1, Herva Jeannot

17    knew that Mark Orlando had to pay Bobby $17,000.  And he

18    thought it was going to be done on 12/2.

19        Again, he said they were talking on Thursday, he was

20    talking to Tom Flores and Barbara about going to the gym on

21    Friday and Mark -- excuse me -- that Herva said he was going

22    to go to the gym with them.  Sometime during the day, or on

23    Friday, Herva Jeannot brought a brown bag to work.  During

24    the day, he asked Mark Orlando if he could put the bag in

25    Mark Orlando's car.  Mark Orlando said he could.  While Mark

McGinn - People - Direct

1    Orlando and Tom Flores were standing outside on the steps of

2    Professional Credit Services, Herva Jeannot went over to the

3    car.  I asked him at this point if he was afraid about the

4    money.

5         Q.   Let me stop you for a moment?

6         A.   Sure.

7         Q.   Did he tell you that he and Tom Flores were

8    watching Herva Jeannot place something in the trunk of his

9    car?

10        A.   Yes.

11        Q.   Please proceed?

12        A.   At this point, I asked him where the money was,

13   wasn't he afraid that, you know, the money was sitting in the

14   car unprotected.  He said no, they were standing there

15   watching.  The money was in the glove compartment.  Herva was

16   going to go into the trunk.  He said he watched him and Tom

17   watched as Herva Jeannot hit the button.  The trunk popped

18   open and he placed the bag into the trunk.  He then kind of

19   jumped off.

20        I said, what happened, where did you meet Bobby Calabrese

21   that night and he went into about he was down by STS Tires,

22   made a right turn, went passed Peter's Clam Bar, made a

23   U-turn and stopped by a light by Ruby Tuesdays.  Kind of

24   getting off track here.  Herva told us what happened to the

25   bullets in the gun.  What happened to the bullets and to the

Case 2:11-cv-03992-ERK   Document 8-17   Filed 01/17/12   Page 14 of 89 PageID #: 1130

1   gun.  He said that the bullets were thrown off of the second

2   bridge on the Loop Parkway.  He said the gun was thrown off

3   of a bridge on the Wantagh Parkway that was under

4   construction.  He wasn't sure if it was the first or the

5   second bridge of the Wantagh Parkway, but it was the bridge

6   under construction.

7      At this point he tells me that Herva had claimed to have

8   three guns and that he used another one in a murder, and he

9   told me that that's what he was afraid of for him and his

10   family.  We started talking about the gambling again and we

11   got into, I asked him what he did with some of the winnings

12   or the $10,000 that he was up with the gambling.  He said he

13   had put $6,000 into his checking account, and he had paid

14   certain credit card bills.  He paid $4,000 to the MBNA credit

15   card and $1,500 to the CitiBank credit card, $250 to a

16   Capitol One credit card and then he put $4,000 into the joint

17   account that he had with his wife.

18      We then tried to get back on track, and I asked him what

19   he was wearing the night that he went down to meet Bobby

20   Calabrese.  He said he was wearing white sneakers, a white

21   T-shirt, black sweat pants.  I believe they had H on the hip,

22   and the black suede jacket he was wearing the night he was

23   arrested.  He said that they met by vacant restaurant down

24   there.  He said when he was first went down to Industrial

25   there was a male black in a gray two door Grand AM on a

McGinn - People - Direct

1    silver phone sitting down there.  He didn't think it was a

2    good place to meet because the guy was down there.  So, he

3    went across the street.

4        And at 8:25 he called Bobby Calabrese across from

5    7-Eleven, the 7-Eleven on Austin Boulevard.  The street he

6    was on is by a closed club.  Didn't recall the name of the

7    street at this point.  Said he drove down the block twice.

8    The second time down the block, he made a U-turn and he

9    parked on the side of the street.  He was there for about

10   five minutes before Bobby Calabrese pulled up.  But he was

11   only there a minute or so when Herva Jeannot said he had to

12   get out of the car and go to the bathroom.

13       Herva Jeannot got out of the car.  A couple of minutes

14   after that, Bobby Calabrese pulls up in his car and he pulls

15   up in front of where Mark Orlando was parked by about twenty

16   feet.  When Bobby pulls up, Mark gets out of his car.  Bobby

17   gets out of his car.  The two of them meet between the cars.

18   Mark Orlando gives Bobby Calabrese a hug and he hands him

19   $17,000 from his breast pocket.  He says the next thing he

20   knows he hears a shot ring out right next to his right ear.

21   As that's happening Bobby Calabrese is now falling down to

22   the round.  He then says Herva Jeannot runs passed him and

23   runs up to Bobby Calabrese's car which was running, had the

24   lights on, and the door was open.  Herva Jeannot runs up and

25   he closes the driver's door.  Bobby is now lying in the

McGinn - People - Direct

1    middle of the street between the two cars.  Herva Jeannot

2    then comes back and shoots Bobby Calabrese two more times

3    while he is standing over him.  Both of them then go back

4    into Mark Orlando's car, the Suzuki Verona, after Herva says

5    let's go.  As Mark Orlando is leaving where Bobby Calabrese

6    is laying on the ground he notices that Bobby's feet are

7    still moving.  When they get into the car Mark Orlando now

8    pulls up, and pulls up next to Bobby Calabrese.  Herva

9    Jeannot then gets out of the car and stands over Bobby and

10   attempts to shoot him again.  The gun at that point, I am

11   told, does not fire.  Herva Jeannot then reaches down and he

12   picks up the $17,000 and gets back in the car.

13       That is when the defendant pulls through the tire place,

14   he goes down towards Peter's Clam Bar, makes a U-turn and

15   comes back and he stops at the light in front of 7-Eleven.

16   He sees people over by Bobby.  He is yelling at Herva, they

17   should call the cops for help.  He says he is screaming and

18   cursing at this point.  Herva tell Marks they're not calling

19   the cops and let's go home.  As they're driving down Austin

20   Boulevard, he sees a police car coming in the opposite

21   direction with its lights on.  Herva tells him not to speed.

22   Mark Orlando says at this point he stops at every red light

23   because he knows there are cameras in the lights and they

24   take pictures.  At this point he wants everybody to see or as

25   many people to see he is with Herva Jeannot.  He also said

McGinn -- People - Direct

1    that was the reason that he stopped at the light by 7-Eleven

2    because he know that 7-Eleven has cameras.  They drive to

3    Lido Boulevard to the Loop Parkway.

4        As they're going over the second bridge on the Loop

5    Parkway, Herva tells him to slow down.  He slows down.  Herva

6    then throws the bullets out of the window of the car.  They

7    continue driving.  He says he calls Wantagh Suzuki.  He calls

8    Vivian.  I believe he called Tom Flores and somebody else but

9    I don't recall who he called.  He says because he wants to be

10   seen with Herva Jeannot at this point.

11       As they're driving on the Wantagh Parkway they get to the

12   bridge that is under construction.  Herva tells Mark to

13   stop.  Mark stops in the middle of the bridge.  Herva Jeannot

14   gets out of the car and throws the gun over the bridge into

15   the water.  Again he is calling as many people as possible so

16   people will see him.  That is the reason he stops at Wantagh

17   Suzuki, but there's nobody there.  Everybody is gone.  He

18   then goes over to CitiBank.  He withdraws $300 from the

19   CitiBank ATM.  He says when he pulls into the ATM again he

20   knows there's a camera there.  He wants to be seen with Herva

21   Jeannot.  He knows he would be blocking Herva because of the

22   angle of the camera so he gets out of the car and goes to the

23   trunk to get his wallet.  He then comes back and withdraws

24   $300 from the ATM.

25       As they're driving over to Vivian's house they're on the

McGinn - People - Direct

1    135.  Herva tells Mark to pull into a school at Exit 9.

2    Herva Jeannot dumps his clothes in the dumpster at the

3    school.  They then go to Vivian's.  They spend about forty

4    minutes, thirty to forty minutes at Vivian's, Herva stays out

5    in the car, Mark is in there talking to Vivian, looking at

6    what needs to be done with the pool and the work that needs

7    to be done with the pool.

8         They then leave there and he drives -- he tells me first

9    he drives Herva home.  When he drops Herva in front of the

10   house, Herva tells him to keep his mouth shut or he will kill

11   his wife Diana.  Then he says that before he drove home,

12   drove Herva home, he went by his house with Herva so his

13   mother-in-law would see him with Herva.  He said he stopped

14   at the house and he gave Herva four foreign videotapes.  He

15   then drove him home.

16        I asked him did anything happened while sitting down on

17   the street, if anybody came by, he said, well, while I was

18   sitting on the street where Bobby Calabrese was killed a

19   black Expedition had gone by, a guy on a bicycle had gone

20   by.  I asked him, after Bobby was shot, how much of the money

21   did he get back.  He said that wasn't my money anymore.  I

22   paid Bobby.  I didn't get any of that money.

23        Q.   I am going to take you back to the time the

24   defendant was talking about when the shooting took place.

25        You said that the defendant said that all of a sudden

MO

McGinn - People - Direct

1    there was a gunshot from behind his right ear?

2         A.    That's correct.

3         Q.    Whose right ear?

4         A.    Mark Orlando's right ear.

5         Q.    Mark Orlando was saying that the shot was right by

6    his own right ear?

7         A.    Yes.

8         Q.    He didn't see anything then?

9         A.    No, I did not.

10        Q.    Looking at Bobby?

11        A.    Correct.

12        Q.    Bobby's facing him?

13        A.    Correct.

14        Q.    Shot by his right ear?

15        A.    Yes.

16        Q.    Have you reviewed your notes many times before

17   testifying today?

18        A.    Yes, I have.

19        Q.    I am directing your attention to around nine

20   o'clock that Friday night.  I am sorry, that Friday morning.

21   Did you speak with the defendant then about giving a

22   videotape statement?

23        A.    Yes, I did.

24        Q.    Describe the conversation about giving a videotaped

25   statement?

McGinn - People - Direct

1    A.    I asked the defendant if he wanted to go over to

2 the District Attorney's Office and to give his statement on

3 videotape in front of the district attorney, to which he

4 replied he did not want to.  I told him we have a form that

5 we fill out when somebody refuses to do a video interview and

6 if he would, to please sign it if he is refusing, to which he

7 did.

8         MR. HAYDEN:  May I please have 46 for

9    identification shown to the witness, Your Honor.

10         THE COURT OFFICER:  The witness has 46 for

11    ID.

12    Q.    Do you recognize that?

13    A.    Yes.

14    Q.    What is that?

15    A.    It's the refusal of videotape interview filled out

16 by me, signed as a witness by myself, and signed by Mark

17 Orlando.

18    Q.    How do you know it is?

19    A.    It's got my signature on it with my shield number,

20 got the date of 12/10/04, the time of nine a.m., and it says

21 Refusal of Videotape Interview.

22         MR. HAYDEN:  We offer that as 46 in evidence.

23         MR. LEMKE:  No objection, Your Honor.

24         THE COURT:  Mark it into evidence.

25         THE COURT OFFICER:  46 marked in evidence.

McGinn - People - Direct

1    Do you want it shown back to the witness?

2         MR. HAYDEN:   Yes.   Thank you.

3         THE WITNESS:   Thank you.

4    Q.   Please read that to the jury.

5    A.   Refusal of Videotape Interview.   I have been told

6    by Detective McGinn and understand I can go to the Nassau

7    County District Attorney's Office and discuss the death of

8    Robert Calabrese with an Assistant District Attorney.   I have

9    also been told and understand my discussion with the

10   Assistant District Attorney will be videotaped to accurately

11   record by sight and sound the entire conversation.   After

12   considering this opportunity I have decided not to speak to

13   an Assistant District Attorney about this case.

14        And again it has the date, the time, signature, and

15   witness's signature.

16   Q.   Describe the defendant's physical condition while

17   you were with him?

18   A.   His physical condition was fine.   He appeared

19   healthy.   He was fine, alert.

20   Q.   Describe the defendant's demeanor throughout the

21   time you were with him?

22   A.   His demeanor remained the same except when he

23   talked about his gambling.   When he talked about the gambling

24   he was very enthusiastic, excited about the gambling.   Other

25   than that everything was more or less on an even keel.

636

McGinn - People - Direct

1    Q.   His demeanor remained the same?

2    A.   Yes.

3    Q.   Remained calm and composed?

4    A.   Yes.

5         THE COURT:   Mr. Lemke.

6    CROSS EXAMINATION

7    BY MR. LEMKE:

8    Q.   Good afternoon.

9    A.   Good afternoon.

10   Q.   You took quite a bit of notes, correct?

11   A.   Yes.

12   Q.   My client remained calm throughout the night.  Did

13   you ever write that?

14   A.   No, I did not.

15   Q.   In fact, you spent a lot of time with him, didn't

16   you, detective?

17   A.   Yes.

18   Q.   Anything you thought was significant you reduced

19   and recorded, correct?

20   A.   Anything he said, yes.

21   Q.   And you made no notations anywhere about my

22   client's demeanor throughout that night, correct?

23   A.   That's correct.

24   Q.   Also regarding when you first met Mr. Orlando, that

25   was on December ninth, would that be correct?

McGinn - People - Cross

1      A.    That's correct.

2      Q.    And when you were speaking to him or before you

3   were introduced, you knew -- you were with another detective

4   speaking to my client at about ten o'clock that night?

5      A.    Little after ten, yes.

6      Q.    I think you also testified that there were rights

7   known as Miranda rights read to my client; isn't that

8   correct?

9      A.    That is correct.

10      Q.    And, there had been a lot of discussion regarding

11   gambling with my client; is that correct?

12      A.    Yes.

13      Q.    And, in fact -- could I have People's, I think it's

14   39 in evidence.

15      In speaking with my client, there were a number of

16   conversations you had regarding his gambling and what he owed

17   and how much he won; isn't that correct?

18      A.    Yes.

19      Q.    Now, I ask that you take a look at People's 56 in

20   evidence.

21                 THE COURT OFFICER:   The witness has 56 in

22      evidence.

23      Q.    Now, do you recognize that at all, detective?

24      A.    No, I don't.

25      Q.    Has a date on the bottom of it, December 6, '04.

MO

McGinn - People - Cross

1    Do you see that?

2        A.   Yes.

3        Q.   You spoke to my client on December ninth, is that

4    correct, of '04?

5        A.   That's correct.

6        Q.   You had a discussion regarding gambling records; is

7    that correct?

8        A.   That's correct.

9        Q.   And, is it your testimony these records were not

10   before you, correct?

11       A.   That is correct.

12       Q.   You didn't ask my client about any specific days or

13   weeks from anything that was before you, correct?

14       A.   I don't understand what you're asking, Mr. Lemke.

15       Q.   Well, your conversation with Mr. Orlando when he is

16   asking how much he won on one week and the next week, that

17   came from Mr. Orlando, correct?

18       A.   That's correct.

19       Q.   You didn't have this document consisting of

20   thirty-five pages, which is in evidence, which is my client's

21   gambling bets within those five, six weeks, correct?

22       A.   This is the first time I am seeing these pieces of

23   paper that you put in front of me, sir.

24       Q.   Have you had any discussion regarding the bets that

25   were won with these records?

MO

639

McGinn - People - Cross

1    A.    With these records?

2    Q.    Right.

3    A.    No.  I never discussed these records or seen these

4    records before you just handed them to me.

5    Q.    When Mr. Orlando's talking to you about how much he

6    is winning, certainly these records may corroborate what he

7    won, correct?

8              MR. HAYDEN:  Objection.

9              THE COURT:  Sustained.

10   Q.    You're saying you never saw those records?

11   A.    That is, yes, that is what I said.

12   Q.    You're not the carrying detective, correct?

13   A.    That is correct.

14   Q.    So, it wouldn't be your responsibility in reviewing

15   any evidence to look at such gambling records, correct?

16   A.    That would be correct, yes.

17   Q.    So, now, when you're first speaking to my client,

18   the Miranda warnings are read and he is cooperative.  I

19   believe he is answering the questions asked of him; isn't

20   that correct?

21   A.    He is answering the questions, yes.

22   Q.    He is in a, I think, ten by ten interview room over

23   at headquarters; isn't that correct?

24   A.    Yes.

25   Q.    And when you first go in, I don't think he's

MO

McGinn - People - Cross

1 handcuffed at that time, is he?

2  A. No, he is not.

3  Q. And he is there, he is sitting at a, I believe, a

4 desk that is in that room; isn't that correct?

5  A. Yes.

6  Q. And I think there is a number of chairs that you

7 sit down at, Detective McHugh sat at as well?

8  A. Three chairs, yes.

9  Q. As you're talking to him, you're asking him about

10 Bobby Calabrese, correct?

11  A. Yes.

12  Q. I think you previously testified first, I guess,

13 two hours you're in the room with Detective McHugh, and

14 you're taking some notations; correct?

15  A. Yes.

16  Q. And, during that conversation that lasted I think

17 two hours that you were in there; isn't that correct?

18  A. It was actually a little longer than two hours,

19 but, yes, we were in there.

20  Q. Okay.  Initially I guess before the other detective

21 began reducing the conversation to a written form, which is

22 now in evidence, there's about two hours of conversation,

23 correct?

24  A. Yes.

25  Q. And, then at about I would think maybe ten minutes

MO

McGinn - People - Cross

1    after twelve, which would be December tenth, you're still in

2    there with Detective McHugh, correct?

3        A.   Yes.

4        Q.   And, Detective McHugh begins to write down a

5    statement?

6        A.   Yes.

7        Q.   Correct?

8        A.   Yes.

9        Q.   My client's telling you about his relationship with

10   Herva Jeannot, correct?

11       A.   Yes.

12       Q.   And Bobby Calabrese, correct?

13       A.   Yes.

14       Q.   His family, everything that, in essence, gets

15   reduced to this first statement, correct?

16       A.   Yes.

17       Q.   He denies having any involvement with the death of

18   Mr. Calabrese, correct?

19       A.   Yes.

20       Q.   He denies having any knowledge, correct?

21       A.   That's correct.

22       Q.   He denies having any gun or knowing that Herva had

23   a gun, correct?

24       A.   At this point, he's denying anything to do with the

25   murder of Bobby Calabrese, yes.

McGinn - People - Cross

1      Q.    And that is reduced into written form, correct?

2      A.    Correct.

3      Q.    Then he signs that form, correct?

4      A.    That's correct.

5      Q.    That ends at about two o'clock, correct?

6      A.    Yes.

7      Q.    In the morning?

8      A.    Yes.

9      Q.    And then from two o'clock to 5:10 he is left alone,

10     correct?

11     A.    Yes.

12     Q.    And, about, what, thirty to forty feet across the

13     way Herva Jeannot is with the other detectives in another

14     room; isn't that correct?

15     A.    That's correct.

16     Q.    Mr. Orlando's left alone for about three hours, and

17     then you go back in about ten minutes after five, that's

18     December 10, 2004, correct?

19     A.    Yes.

20     Q.    You go in, you're with again your pad to take

21     notes; isn't that correct?

22     A.    Yes.

23     Q.    And now you begin to talk with Mr. Orlando telling

24     him, listen, Mr. Jeannot is here, he's talking with some

25     detectives, now is your time to tell us what really went

McGinn - People - Cross

1    down, correct?

2          A.    Yes.  Words to that effect, yes.

3          Q.    This is at about 5:10, correct?

4          A.    That's correct.

5          Q.    And, he says, detective, you don't understand,

6    correct?

7          A.    Correct.

8          Q.    And you say to him, well, Mark, I don't understand

9    what you mean, you don't understand.   Why don't you explain

10   it to me.  And he says, you don't understand.   He doesn't

11   say anything other than that.  He says, detective, you don't

12   understand, correct?

13         A.    Correct.

14         Q.    You try to figure out what he means so you're

15   asking, you're prying, Mark, what do you mean, tell me.

16   Maybe I can assist you.   Tell me what you mean, and he says,

17   detective, you don't understand.   Correct?

18         A.    That's correct.

19         Q.    You tell Mark, are you afraid of the Mafia?

20   Are you afraid that there's a organized crime behind

21   this, that you're afraid for your wife and perhaps your

22   unborn child and family?  We can perhaps protect you.   Okay.

23   Is that during that conversation?

24         A.    No, sir.

25         Q.    Well, you talk to him ten minutes after five to

McGinn - People - Cross

1  5:35, twenty-five minutes?

2      A.   That's correct.

3      Q.   The only thing of substance you can recall during

4  those twenty-five minutes are you asking Mark, tell me what

5  you mean, and all Mark is saying is, detective, you don't

6  understand.   Correct?

7      A.   That's correct.

8      Q.   Now, we just went back and forth like there for

9  about four minutes, but this carried on for twenty-five

10  minutes, correct?

11      A.   Yes.

12      Q.   Until, you said to yourself, I don't think I'm

13  getting anywhere, he's not telling me what is concerning him,

14  and you leave the room; isn't that correct?

15      A.   That's correct.

16      Q.   At about 5:40 Mark is taken to the bathroom,

17  correct?

18      A.   Yes.

19      Q.   He is placed back into this interview room,

20  correct?

21      A.   Yes.

22      Q.   And at six o'clock, you go back in there again?

23      A.   Yes.

24      Q.   And when you go back in, you begin to say him,

25  Mark, you know, Herva's over there, why don't you tell us,

McGinn - People - Cross

1    tell us, what is happening.  Tell us what you remember, what

2    are you afraid of.

3        Isn't that correct?

4        A.  Yes.

5        Q.  He again tells you, detective, you don't

6    understand, I can't tell you, you don't understand,  Correct?

7        A.  He said, you don't understand.  Never said I can't

8    tell you.  He said you don't understand.

9        Q.  You again begin to say, Mark, what is it, you start

10   throwing out, is that when you start asking about organized

11   crime?

12       A.  Sometime during that conversation, yes.

13       Q.  Are you afraid, I think you said, for your family?

14   He said no, it's not organized crime I'm afraid of?

15       A.  That is not what he said.

16       Q.  He says you don't understand at this point, doesn't

17   he?

18       A.  That's correct.

19       Q.  And, this conversation now goes on for another

20   fifty minutes, doesn't it?

21       A.  Yes.

22       Q.  And you're telling him, you're sitting across from

23   Mark, you are looking at Mark, you're telling Mark tell us

24   what happened.  Okay.  I don't believe you.  Tell us what

25   happened and all he is doing is looking at you, detective,

McGinn - People - Cross

1    you don't understand; isn't that correct?

2        A.    That's correct.

3        Q.    That goes on for another fifty minutes.  You're

4    sitting there, you're trying to talk to him, you're trying to

5    get him to tell you what is he afraid of.  What, tell me,

6    convince me, talk to me, make me understand what I don't

7    understand.  Try me.  Correct?

8        A.    That's correct.

9        Q.    And then after that fifty minutes you walk out of

10   that room, don't you?

11       A.    Yes.

12       Q.    He is still there, he hasn't told you what his fear

13   is, he hasn't told you what you don't understand; isn't that

14   correct?

15       A.    I am sorry.  I didn't get the first part of that.

16       Q.    During that entire fifty minutes, he doesn't tell

17   you what you don't understand, he doesn't tell you what he is

18   afraid of, does he?

19       A.    No, he does not.

20       Q.    Then you leave the room, I guess, about 7:40 now,

21   he then goes to the bathroom again; isn't that correct?

22       A.    Yes.

23       Q.    No one's going in and out of that room with him

24   from 6:50 to 7:40 in the morning; isn't that correct?

25       A.    That's correct.

MO

McGinn - People - Cross

1    Q.   You go back in at about 7:50; isn't that correct?

2    A.   Yes.

3    Q.   Now, you're in there for about an hour, from 7:50

4    to 8:50, correct?

5    A.   Yes.

6    Q.   And I think initially didn't Detective Brosnan go

7    in with you initially?

8    A.   At 7:50, yes.

9    Q.   Okay.  But I don't believe he stayed the whole

10   time?

11   A.   No, he did not.

12   Q.   Correct?

13   A.   Correct.

14   Q.   You tell him, listen, I think you testified on

15   direct, that Herva Jeannot admitted that Herva shot him but

16   you paid him; is that correct?

17   A.   That's correct.

18   Q.   My client looks at you and begins to tell you,

19   okay, what happened, doesn't he?

20   A.   Not immediately.  After a few minutes, yes.

21   Q.   Well, you're writing notes to that effect, correct?

22   A.   Yes.

23   Q.   And, part of the notes that you take is that on

24   December third, page nine, my client, during the break, Herva

25   Jeannot went to his car and put some type of gym bag in the

MO

McGinn - People - Cross

1      trunk?

2          A.    It wasn't a gym bag.  It was a brown backpack.

3          Q.    He also tells you, okay, that his fear was that

4      Herva kept threatening to kill his wife and unborn child?

5          A.    Not kept threatening.  He told me that he did

6      threaten to .

7          Q.    Well, in fact, you recorded that down in your

8      notes, correct?

9          A.    Yes, I did.

10         Q.    That Herva threatened Mark that he would kill, he

11     would kill his wife and unborn child?

12         A.    He said, he didn't say anything about the unborn

13     child.  He said if Mark doesn't keep his mouth shut he will

14     kill his wife Diana.

15         Q.    Were you present when my client was speaking to

16     Detective Cereghino?

17         A.    No, I wasn't.

18         Q.    So, while you're now having this conversation from

19     7:50 to 8:50, you're making notations and you begin also to

20     talk about his finances again, don't you?

21         A.    Yes.

22         Q.    And in talking about the finances my clients never

23     tells you that his house is in foreclosure or that there's

24     bill collectors or debt collectors coming after him at all,

25     correct?

McGinn - People - Cross

1     A.   That's correct.

2     Q.   In asking about his finances he says I own a house,

3  I have about a $375,000 mortgage on the house?

4     A.   That is not during the 7:50 to 8:50 interview.

5  That is the earlier one.

6     Q.   During that early one he doesn't say he is in debt,

7  he has money problems or anything else, does he?

8     A.   No.

9     Q.   In fact he tells you he has car payments of $399 a

10  month, correct?

11     A.   Yes.

12     Q.   You're asking him about other payments he has, he

13  has MBNA, he owes on a credit card that he had paid, I think

14  he has A minimum, he paid $400, a little extra?

15     A.   I don't know what his minimums were.  When I asked

16  him about the debts he told me he had an outstanding debt

17  with MBNA for $14,000.  He was paying $400 a month.  I don't

18  know if that was meaning the minimum payment or what that

19  was.

20     Q.   When you're saying outstanding debt, these are all

21  current, aren't they?

22     A.   Yes.

23     Q.   He didn't tell you he is behind, these are what he

24  pays each month, correct?

25     A.   That is what he was saying.

McGinn - People - Cross

1     Q.   Didn't say they're behind, correct?

2     A.   That's correct.

3     Q.   And, he talks you about the MBNA charge card he has

4     with CitiBank and the pool he had I think a construction loan

5     on that was put in his house, correct?

6     A.   Yes.

7     Q.   He is also I think at some point when he is

8     discussing earlier as well perhaps later regarding the

9     gambling again, correct?

10    A.   I am not sure what you're asking me when you're

11    saying the discussion earlier and perhaps later.  I am not

12    following that.  I am sorry.

13    Q.   You have in your notes password, POP 1274,

14    password, correct?

15    A.   Correct.

16    Q.   That my client gave you that, correct?

17    A.   That's correct.

18    Q.   Also talked to you about not only his gambling but

19    that he was up significantly over the course of his dealings

20    with Mr. Calabrese, correct?

21    A.   That's correct.

22    Q.   He goes on to now tell you about how he went down,

23    he was going to meet Bobby, that he was at the gym that

24    Friday, December third.

25    Tells you that, correct?

McGinn - People - Cross

1     A.   Yes.

2     Q.   He tells you that he drove on, I think, North

3  Broadway, I think once or twice, doesn't he?

4     A.   He never said the name of the street.

5     Q.   But he says he went down and I think turned around?

6     A.   Went down, made a U-turn, went down the block once,

7  second time he came down the block, he made a u-turn.

8     Q.   Now, now you didn't ask him, you didn't tell him,

9  Mark, did you go around twice?  He volunteered that to you,

10  didn't he?

11     A.   Yes.

12     Q.   Didn't have a video before you where you knew that

13  there was a car that turned around twice, so you could

14  confront Mark with that information, correct?

15     A.   When I was speaking to him did I have a video in

16  front of me?

17     Q.   Right.

18     A.   No.

19     Q.   You had no knowledge, independent knowledge until

20  Mark told you that he pulled an U-turn and then parked on the

21  side of the street, correct?

22     A.   I am sorry.  I lost the question.

23     Q.   When Mark tells you about how he was in Island Park

24  and he pulled a U-turn on the street, okay, you had no

25  independent knowledge of that, correct?

McGinn - People - Cross

1    A.   Yes, I did.

2    Q.   You had seen the video?

3    A.   A portion of the video, yes.

4    Q.   Okay.  So, you knew that their had been this U-turn

5    with this car that the investigation believed was Mark's car,

6    correct?

7    A.   That's correct.

8    Q.   Okay.  When Mark tells you about that U-turn, right

9    -- withdrawn.

10   Did you have to confront Mark?

11   Did you say to Mark while he's talking to you, between

12   this time frame in the morning, did you tell Mark, Mark,

13   listen, we have a video, and we saw this car pull in around

14   and make a U-turn, or did Mark say to you, when I got there I

15   pulled in and made a U-turn?

16   A.   It's kind of almost a three part question.

17   Q.   Okay.

18   A.   At six o'clock in the morning when I was speaking

19   to him, I told him that we had a video.  Again, between 7:50

20   and 8:50, I again told him we had a video.  And that we knew

21   where the gun was, and things like that.  I did not

22   specifically tell him that the car in the video makes a

23   U-turn or goes down the block twice.

24   Q.   Right.  Now, you also didn't tell Mark that the car

25   in the video, when it pulled away from the curb, made, it

1    appeared to make a stop after Mr. Calabrese had arrived,

2    correct?

3         Did I confuse you?

4         A.   Yes.

5         Q.   You seen the video?

6         A.   Yes.

7         Q.   In the video there is a portion within that video

8    where Mr. Calabrese's car pulls up in front of this other

9    car, correct?

10        A.   Correct.

11        Q.   And that at a certain particular time, this other

12   car pulls away from the curb, correct?

13        If you remember the video?

14        A.   Yes.

15        Q.   And then it stops for a second, correct?

16        A.   Yes, correct.

17        Q.   Okay.  Did you at that time tell Mark that the

18   video that I saw ha the car pull away from the curb and stop,

19   why don't you tell me what that is about, or did Mark

20   voluntarily tell you, listen, this is what happened, I

21   parked, you were there for a few minutes, I pulled away, I

22   had to stop, Herva said stop and opened up the door.

23        Do you understand the question?

24        A.   It's a long question, but he never told us me that

25   Herva said to stop.  He told me that when he pulled, when he

McGinn - People - Cross

1   left where Bobby Calabrese was, he saw his legs were still

2   moving.  He said then they, himself and Herva, got back into

3   his car and he pulled up and he stopped by Bobby's body.  He

4   didn't tell me that Herva told him to stop.

5        Q.   There is a written statement that was given by my

6   clients, a second one, with Detective Cereghino.

7        You're aware of that statement, correct?

8        A.   I know there was a statement taken.  I am not aware

9   of the contents of that statement.  I have never read that

10  statement.

11       Q.   You never read the statement?

12       A.   No, I did not.

13       Q.   And, as you sit here now, the conversation you had

14  with Mark, did you reduce that to writing for my client to

15  sign?

16       A.   No, I did not.

17       Q.   So, you're unaware what is discussed between my

18  client and Detective Cereghino, but you never told Mark

19  during your conversation between the hours of 7:50 and

20  roughly 8:50 that this car appeared to have stopped, correct?

21       A.   Again, that was like a three part question: .  I am

22  not sure which one, you know, in the order in which I should

23  answer that.

24       If you want to give me the question again.

25       Q.   In simplest form, did you tell Mark, what you saw

McGinn - People - Cross

1    in the video?

2         A.   No, I did not.

3         Q.   Okay.  And your conversation you said the

4    information you got from Mark, correct?

5         A.   Again, I am sorry.  I don't understand what you're

6    asking.

7         Q.   Well, the information you just testified here to

8    this jury was based on what Mark told you during this

9    conversation between 7:50 and 8:50, correct?

10        A.   Yes.

11        Q.   Okay.  All right.  And now, as you have this

12   conversation, do you ask him a little bit further regarding

13   the gun that was used by Mr. Jeannot?

14        A.   As to what with the gun?

15        Q.   Had he seen him with it before, where the gun came

16   from.  Did you have any conversation with Mark regarding that

17   at all?

18        A.   No, I did not.

19        Q.   In fact, didn't Mark tell you that he didn't know

20   that Herva Jeannot was going to rob him or kill him; isn't

21   that correct?

22        A.   Yes.

23        Q.   In fact, he told you all he was doing was going

24   down there to pay off his debt, because he was up so much in

25   his winnings, he cut off the line and he was paying Bobby

MO

McGinn - People - Cross

1        Calabrese, correct?

2             A.   He said he wanted to go down and pay Bobby

3        Calabrese, yes.

4             Q.   In fact, didn't you ask him how he was coming down

5        there to pay him?

6             A.   Yes.

7             Q.   And he told you that usually Bobby comes up to pay

8        him, but Bobby was going out to dinner and that Mark was

9        going to go down and wind up going to Wantagh Suzuki, he

10       would stop down there to pay him?

11            A.   They would meet up later.

12            Q.   Mark unfortunately was a loser within the last week

13       so he had to go down and pay him?

14            A.   Actually the last two weeks, but, yes.

15            Q.   The last two weeks he also discussed with you that

16       the manner in which payment are owed, run from say, maybe

17       Friday to say Tuesday, that may be paid that Friday, was that

18       specifically discussed with you?

19            A.   I believe it was on Thursdays that the debt or

20       winnings were paid.  I believe the week ran up to Sunday and

21       then that following Thursday the winnings or losses were

22       either collected or paid.

23            Q.   He had discussed that with you, didn't he?

24            A.   Yes.

25            Q.   Mark, in fact, told you actually doesn't owe the

McGinn - People - Cross

1    full $17,000.  I owe only perhaps it was $8,100 or something

2    like that, and that the other money, $9,100 would not be due

3    until the following week?

4         A.   The $8,700 that he lost in week five, payments on

5    that was due on 12/2, Thursday 12/2.  The additional $9,100

6    he lost on the twenty-ninth and the thirtieth, would not, the

7    payment on that would not be due until 12/9, Thursday, 12/9.

8         Q.   Not once during your conversation did Mark tell you

9    Bobby Calabrese or anybody else had ever threatened him, that

10   he had to pay or else?

11        Mark never made any remarks like that at all, correct?

12        A.   That's correct.

13        Q.   It was only until you came in at 7:50 that you

14   advised Mark what Jeannot, had said, that Mark then said,

15   okay, I can tell you now what happened; isn't that correct?

16        A.   No.  I told him at six o'clock in the morning that

17   Herva told us where the gun was.  I told him at six o'clock

18   in the morning that there was a videotape of where the actual

19   meeting occurred.  It wasn't until 7:50, when I told him that

20   Herva had admitted that he did the shooting, but that Mark

21   Orlando had paid Herva to do it.

22        Q.   So, the first time that anything was said to Mark

23   that Herva finally admitted that Herva shot and killed Bobby

24   Calabrese was at eight o'clock?

25        A.   Approximately, yes.

McGinn - People - Cross

1      Q.   Okay.  And it's at that time that Mark says,

2  doesn't tell you, you don't understand, doesn't say, I don't

3  want to talk to you, at that point he has a conversation with

4  you for the next hour; isn't that correct?

5      A.   That's correct.

6      Q.   And then it's at that point thereafter, if you

7  know, that Detective Cereghino came in and then took a

8  written statement from Mark, if you know?

9      A.   It was later, later that morning, yes.

10     Q.   Thank you, detective.

11     A.   You're welcome, sir.

12 REDIRECT EXAMINATION

13 BY MR. HAYDEN:

14     Q.   I want to take you back to the cross examination of

15 the initial conversation when you and Detective McHugh were

16 speaking with the defendant.

17     The defendant never told you Herva Jeannot was involved

18 in anything, did he?

19     A.   Yes.  He told me, he didn't tell us that Herva

20 Jeannot was involved in anything.

21     Q.   He told you he wasn't with -- he was with Herva

22 Jeannot?

23     A.   Yes.

24     Q.   They were moving away from the Long Beach

25 vicinity?

659

McGinn - People - Redirect

1      A.    Yes.

2      Q.    They were heading out to Wantagh Suzuki?

3      A.    Yes.

4      Q.    They left Bobby alive and well?

5      A.    Yes.

6      Q.    He was providing an alibi for Herva Jeannot?

7                MR. LEMKE:   Your Honor, I would ask that the

8      District Attorney not ask leading questions.

9                THE COURT:   Overruled.

10     A.    Yes.

11     Q.    Defense counsel asked you a couple of questions

12     about he never said why he was afraid, assuming of course he

13     was afraid.

14     Did you ever see any manifestation of fear in him?

15     A.    No, I did not.

16     Q.    His demeanor never changed?

17     A.    Demeanor never changed.

18     Q.    He is talking about, I'm afraid, but he looks like

19     he did the whole conversation?

20     A.    Except when he was talking about his gambling, he

21     was enthusiastic.

22     Q.    He was composed?

23     A.    Yes.

24     Q.    Talking about how afraid he was, but he was

25     composed?

660

McGinn - People - Redirect

1          A.   Yes.

2          Q.   Calm; is that right?

3          A.   Yes.

4          Q.   Defense counsel asked you about POP 1274 and

5     implied that was Mark talking about Mark's gambling.  What

6     did POP 1274 refer to?

7          A.   POP 1274 is the account number that was established

8     by the defendant for Herva Jeannot with a password.

9          Q.   Defense counsel asked you a lot of questions about

10    what the defendant told you when Bobby was shot.  He told you

11    that all he knew initially was he heard a gunshot from behind

12    his right ear; is that right?

13         A.   Yes.

14         Q.   Then he told you Bobby went down; is that right?

15         A.   Yes.

16         Q.   Then he told you he saw Herva Jeannot run over to

17    Bobby's car; is that right?

18         A.   Yes.

19         Q.   Shut the driver's door of Bobby's car?

20         A.   Yes.

21         Q.   Come back to Bobby's body?

22         A.   Yes.

23         Q.   Leaned down and fired two more bullets into Bobby's

24    head?

25         A.   Yes.

MO

McGinn - People - Redirect

| | | |
|---|---|---|
| 1 | Q. | While he himself was standing there watching? |
| 2 | A. | Yes. |
| 3 | Q. | Told you Herva said, let's go? |
| 4 | A. | Yes. |
| 5 | Q. | They went? |
| 6 | A. | Yes. |
| 7 | Q. | The two of them got into the Suzuki Verona? |
| 8 | A. | Yes. |
| 9 | Q. | The defendant was driving? |
| 10 | A. | Yes. |
| 11 | Q. | The defendant drove around Bobby's body? |
| 12 | A. | Yes. |
| 13 | Q. | The defendant noticed that Bobby's feet were still |
| 14 | moving, a little sign of life in him? |
| 15 | A. | Yes. |
| 16 | Q. | The defendant stopped? |
| 17 | A. | Yes. |
| 18 | Q. | Herva didn't say anything? |
| 19 | A. | Yes, that's correct.  He did not say anything. |
| 20 | Q. | Herva got out? |
| 21 | A. | Yes. |
| 22 | Q. | Herva went over to Bobby's body? |
| 23 | A. | Yes. |
| 24 | Q. | Herva tried to shoot again? |
| 25 | A. | Yes. |

MO

McGinn - People - Redirect

1    Q.    But the gun wouldn't go off?

2    A.    That's correct.

3    Q.    The defendant sat behind the steering wheel of the

4  car?

5    A.    Yes.

6    Q.    Engine about running?

7    A.    Yes.

8    Q.    Waited for Herva?

9    A.    Yes.

10   Q.    Herva went back and got in along side the

11  defendant?

12   A.    Yes.

13   Q.    The defendant drove away?

14   A.    Yes.

15   Q.    Is that what the defendant told you?

16   A.    Yes.

17   Q.    Defense counsel made a remark during cross

18  examination about the defendant saying he was so far up in

19  his winnings that he went there to pay Bobby.

20       Did he ever say he was so far up in his winnings that he

21  wanted to pay Bobby?

22   A.    Never said he was so far up, but said he was

23  ahead.  He was still winning.

24   Q.    Defense counsel talked about why Bobby wound up in

25  North Long Beach.  Why they had the meeting in North Long

MO

McGinn - People - Redirect

1    Beach.  And, defense counsel said something about it's

2    because the defendant was going to pay Bobby.

3        Do you remember that questioning?

4        A.   Yes.

5        Q.   Did the defendant say that he met Bobby in North

6    Long Beach because the defendant was out and about and

7    happened to be stopping at Wantagh Suzuki that night, so he

8    decided to come and meet Bobby in North Long Beach?

9        A.   He had made arrangements to meet with Bobby there

10   in North Long Beach because he was going to go to Wantagh

11   Suzuki that night.

12              MR. HAYDEN:   Nothing further, Your Honor.

13   RECROSS EXAMINATION

14   BY MR. LEMKE:

15       Q.   Detective, it took you from five o'clock in the

16   morning to six speaking with my client, and they then from

17   six o'clock, I am sorry, from 5:10, 5:40?

18       A.   5:35, sir.

19       Q.   5:35, and then from six o'clock, you went back in,

20   to 6:50, trying to get Mark Orlando to talk about the death

21   of Bobby Calabrese; isn't that correct?

22       A.   Yes.

23       Q.   And you got nothing but you don't understand,

24   correct?

25       A.   Yes.

1    Q.    And then among other things then you go back in?

2    A.    Right.

3    Q.    Then you go back in at 7:50, correct?

4    A.    Yes.

5    Q.    You talked to him for an hour where now he just

6    spills out everything; isn't that correct?

7    A.    He tells me another version of the story, yes.

8    Q.    He tells you how he is there, correct?

9    A.    Yes.

10   Q.    Tells you he said no idea that Herva was going to

11   rob Mr. Calabrese, correct?

12   A.    Correct.

13   Q.    Tells you he said no idea Herva had a gun,

14   correct?

15   A.    That's correct.

16   Q.    And yet here he is now admitting he is there, he is

17   admitting he's in the car, and yet you immediately decide,

18   let me write this down, since he is so cooperative and let

19   him sign this statement like he just did hours earlier with

20   the other detective; isn't that what you do?

21   A.    No.

22   Q.    No.  In fact, you leave, and it's not until an hour

23   and-a-half later that Detective Cereghino goes in at 10:30 to

24   now take a written statement from my client; isn't that

25   correct?

McGinn - People - Recross

1      A.   Yes.

2      Q.   The next day you leave at nine o'clock, without

3   going back in to talk to Mark again, do you?

4      A.   That's correct.

5                MR. LEMKE:   I have nothing else.

6                THE COURT:   Anything further, Mr. Hayden?

7                MR. HAYDEN:   No, Your Honor.

8                THE COURT:   Thank you, Detective.   Have a good

9      day.

10               THE WITNESS:   You too.

11               (Witness excused.)

12               THE COURT:   Mr. Hayden, call your next

13     witness.

14               MR. HAYDEN:   Detective James Cereghino.

15   JAMES CEREGHINO, detective, called as a witness on behalf of

16     the People, after having been first duly sworn, and

17     having stated his shield number as 561, and his command

18     as the Homicide Squad, Nassau County Police Department,

19     took the witness stand and testified as follows:

20   DIRECT EXAMINATION

21   BY MR. HAYDEN:

22               THE CLERK:   State your name, spelling your

23     last name, give your shield number and command.

24               THE WITNESS:   My first name is James, last

25     name Cereghino, C-E-R-E-G-H-I-N-O, shield number 561, I



Cerighino - People - Direct

1     am a detective assigned to the Homicide Squad of the

2     Nassau County Police Department.

3               THE COURT:  Good afternoon.

4               THE WITNESS:  Good afternoon, Your Honor.

5               THE COURT:  You may proceed.

6               MR. HAYDEN:  Yes, Your Honor.

7     Q.   Good afternoon, detective.

8     A.   Good afternoon, Mr. Hayden.

9     Q.   How long have you been a member of the Nassau

10    County Police Department?

11    A.   A little over twenty-eight years.

12    Q.   How long a detective?

13    A.   Eighteen.

14    Q.   How long with homicide?

15    A.   Little over seven years.

16    Q.   Know a man named Mark Orlando?

17    A.   Yes, sir.

18    Q.   Briefly describe him?

19    A.   He's a male while, thirty-four years, about 5'10",

20    heavy build.

21    Q.   See him in this courtroom today?

22    A.   Yes.

23               MR. LEMKE:  So stipulated.

24               THE COURT:  Let the record reflect the witness

25    has identified the defendant as Mark Orlando.

Cerighino - People - Direct

1          Q.    I am directing your attention to the morning of

2     Friday, December 10, 2004.

3          Were you involved that morning with investigating the

4     death of a young man named Bobby Calabrese?

5          A.    Yes, I was.

6          Q.    Did you speak with the defendant that morning?

7          A.    Yes, I did.

8          Q.    What was the approximate time you began speaking

9     with the defendant?

10         A.    It was about ten a.m.

11         Q.    Where did you speak with the defendant?

12         A.    In the main interview room of the homicide squad at

13    headquarters, 1490 Franklin Avenue, Mineola, New York.

14         Q.    Describe that room?

15         A.    It's ten foot by ten foot, desk, three chairs, a

16    filing cabinet, and the only door into the place is the top

17    half there is a window and the adjoining wall next to it,

18    half window, and half plywood.

19         Q.    Who was present when you spoke with the defendant?

20         A.    It was just the defendant and myself.

21         Q.    Was the defendant handcuffed then?

22         A.    No, he was not.

23         Q.    Describe the circumstances under which you spoke to

24    the defendant?

25         A.    I was asked by the investigating detective in the

Cerighino - People - Direct

1    case, Detective McHugh, to go in and take a statement from

2    Mr. Orlando as to what the final version of his, of the

3    events of December third when Mr. Calabrese was killed.

4        Q.   Describe any initial conversation with the

5    defendant?

6        A.   I entered the room as I said.  He was alone.  I

7    reintroduced myself to him because the prior night when he

8    had been brought in I was the one who took him into the room,

9    searched him and took the handcuffs off him.  I told him I

10   was going to take a statement from him as to what his last

11   version was, but before doing so I was going to notify him,

12   give him notification of his rights.

13       Q.   Did you do that?

14       A.   Yes, sir, I did.

15       Q.   How?

16       A.   By using departmental form 233 Notification of

17   Rights.

18       Q.   Were any markings eventually placed on the card?

19       A.   Yes.

20       Q.   Describe those markings?

21       A.   After I read him his rights, I gave him an

22   opportunity to read the card.  I asked him if he understood

23   and he said yes.  At that time after the question do you

24   understand I asked him to put yes and sign his name.

25   Initially he went to the bottom of the card and not in the

Cerighino - People - Direct

1     proper place.  At that time I asked him, I wanted him to

2     answer the question, do you understand.  He did put yes, and

3     then signed it.  I then took the card back from him and asked

4     him now are you willing to speak to me without an attorney

5     being present.  He said yes.  I gave him the card back after

6     that question, he put the word yes and signed his name.

7                    MR. HAYDEN:  May I please have 47 for

8          identification shown to the witness, Your Honor.

9                    THE COURT OFFICER:   The witness has People's

10         47 for ID.

11         Q.   Do you recognize that?

12         A.   Yes, sir, I do.

13         Q.   What is it?

14         A.   This is the rights card that I used on December 10,

15    2004 to advise Mr. Orlando of his rights.

16         Q.   How do you know that?

17         A.   By his print, his signature, my signature, my

18    shield number, and where I indicated the date and the time on

19    the top.

20                    MR. HAYDEN:  People offer that statement in

21         evidence, Your Honor.

22                    MR. LEMKE:  No objection, Your Honor.

23                    THE COURT:  Mark it into evidence.

24                    THE COURT OFFICER:  People's exhibit 47 marked

25         in evidence.

Cerighino - People - Direct

1      Do you want it shown back to the witness?

2      MR. HAYDEN:  Yes, please.

3      Q.   Using that card in evidence, please read the

4  constitutional rights for the jury the same way you read them

5  for the defendant, and please include any response he may

6  have made?

7      A.   As I stated, I told him I was going to advise him

8  of his rights.  I asked him to pay attention to me.  When I

9  made sure he was looking at me I stated, before asking you

10  any questions, you should understand you have the right to

11  remain silent, and that any statement you make may be used

12  against you in court.

13      Also you have the right to talk to a lawyer before

14  answering any questions or to have a lawyer present at any

15  time.  If you cannot afford to hire a lawyer, one will be

16  furnished you, if you wish, and you have the rights to keep

17  silent until you had a chance to talk with a lawyer.

18      At that time I asked him do you understand.  He said

19  yes.  I gave him the card.  I asked him to read it.  Then

20  asked him to put yes after do you understand.  He started to

21  put it on the bottom of the card.  He put the first two

22  letters Y-E and I asked him to, after the do you understand,

23  at that time I corrected him and asked him to put it after

24  the question, do you understand.

25      At that time he printed the word yes, and signed his

MO

Cerighino - People - Direct

1    name.

2        I then took the card back and said, now that I have

3    advised you of your rights, are you willing to answer

4    questions.  He indicated yes.  I gave him the card back, he

5    printed the word yes and signed his name again.

6        Q.   Did you speak with the defendant after informing

7    him of his constitutional right?

8        A.   Yes, I did.

9        Q.   Did you reduce what he was telling you to writing?

10       A.   Yes, I did.

11       Q.   Did you do that immediately?

12       A.   Yes, sir.  I basically just asked him some pedigree

13   questions, put it on top of the statement, I then

14   incorporated his rights into it, then I started with the

15   statement.

16       Q.   Describe how you reduced what he was saying then to

17   writing?

18       A.   I started off with how he started gambling with the

19   deceased.  I would ask him a question, he would answer it.

20   At this time I would tell him I was going to put it down on

21   paper.  If he agreed, if he agreed with it, I would put it on

22   the paper.   I'd write it down.

23       Q.   Is that what you did?

24       A.   Yes, sir.

25       Q.   Were corrections made to the statement that the

Cerighino - People - Direct

1    defendant gave you?

2         A.   Yes, sir.

3         Q.   How did that happen?

4         A.   The defendant requested that numerous corrections

5    be made.  Some were made during the taking of the statement,

6    and some were made upon the completion of the statement when

7    he had a chance to review it.

8         Q.   Those statements are reflected on -- those

9    corrections are reflected on the statement?

10        A.   Yes, sir.

11        Q.   What did you do when you finished reducing what the

12   defendant was telling you to writing?

13        A.   I read it to him, I gave him an opportunity to read

14   it, he agreed with the contents, he wanted something added to

15   it, I added what he wanted, and once he was satisfied with

16   the statement I asked him to sign the bottom of each page,

17   which he did.

18        Q.   What was the approximate time he signed each page

19   of the statement?

20        A.   It was right around noon.

21        Q.   Did you sign each page of the statement as well?

22        A.   Yes, I did.

23             MR. HAYDEN:  May I please have 48 for

24   identification shown to the witness, Your Honor.

25             THE COURT:  Yes.

MO

Cerighino - People - Direct

1          THE COURT OFFICER:  The witness has 48 for

2     identification.

3     Q.   Do you recognize that?

4     A.   Yes, sir.

5     Q.   What is it?

6     A.   This is the statement that Mr. Orlando gave me on

7     December tenth, that I reduced to writing, and which he

8     corrected and ultimately signed.

9     Q.   Do you recognize the contents?

10    A.   Yes, I do.

11    Q.   And the signatures?

12    A.   Yes, sir.

13         MR. HAYDEN:  The People offer that, Your

14    Honor, as 48 in evidence.

15         THE COURT:  Mr. Lemke, any objection.

16         MR. LEMKE:  No objection.  Thank you.

17         THE COURT:  Mark it into evidence.

18         THE COURT OFFICER:  People's 48 marked in

19    evidence.

20         MR. HAYDEN:  With the Court's permission, may

21    I read this to the jury.

22         THE COURT:  Yes.

23         MR. HAYDEN:  Homicide number 52104.  Statement

24    of Mark Orlando.   December 10, 2004.

25         My name is Mark Orlando.  I am thirty-four years

1   old.   I was born on September 26, 1970.   I live at 1119

2   Joselson Avenue, Bayshore, New York, with my wife Diana

3   and my mother-in-law.   My phone number is (631)

4   242-3051.   My cell phone number is (631) 882-3428.   I

5   work at Professional Credit Services in Farmingdale as a

6   collections agent.

7       I have been told by Detective Cereghino that I have

8   the right to remain silent and that any statements I

9   make may be used against me in court.   I have been told

10  that I have the right to talk with a lawyer before

11  answering any questions, or to have a lawyer present at

12  any time.   Further, I have been advised if I cannot

13  afford to hire a lawyer, one will be furnished me, and I

14  have the right to keep silent until I have had the

15  chance to talk with a lawyer.

16      I understand my rights and make the following

17  statements freely and voluntarily.   I am willing to give

18  this statement without talking with a lawyer or having

19  one presents.

20      About six weeks ago a friend of mine told me that he

21  knew a guy that I can place bets with.   I wanted to bet

22  on pro football, college football and pro basketball  My

23  friend called the guy and a couple of days later he

24  introduced me to him.   My friend's name is Tom Flores.

25  He introduced me to Bobby Calabrese.   I started betting

Cerighino - People - Direct

1    a couple of hundred dollars a game.  I won every week.

2    I started betting about fifty bets a week.  My line

3    started at $1,000 a week.

4        That was the most I was allowed to lose.  After two

5    weeks the line went up to $3,000.  The following week it

6    went up to $5,000.  The last week and two days I had no

7    limit.  Over the first four weeks I won approximately

8    $28,000.  First couple of weeks when I won, Bobby would

9    meet me at my job to pay me.  Usually he would come to

10   my job on Thursdays, but sometimes he couldn't make it,

11   and Bobby and I would meet on Fridays or it would roll

12   over to the next week.

13       Bobby gave me a code and a password and phone number

14   to call to make the bets.  Another guy I work with,

15   Herva Jeannot also wanted to make some bets.  I called

16   and spoke to Bobby about it.  He gave me another code

17   and password Herva, and I gave it to him.  Herva never

18   met Bobby.  When Herva lost over the last two weeks, it

19   was my responsibility to meet Bobby.  Herva owed Bobby

20   about $1,000 and I was supposed to meet with Bobby on

21   Thursday, December 3, 2004.  I owed Bobby $8,700 for

22   bets placed between November 22nd and November 28th.

23   That money was due December second.

24       I placed more bets on November 29th and 30th and

25   ended up owing $9,100.  That money wasn't due until

Cerighino - People - Direct

1    December ninth because I had won about $8,000 earlier.

2    I owed a total of about $17,000.  Bobby owed me that

3    $800 as part of the money I had won earlier.  Because I

4    owed $17,000, I called Bobby on November 30th and left a

5    message with him to shut my line down permanently.  It

6    was about eleven p.m. on the 30th.  I spoke with Bobby

7    the next day and confirmed that my line was shut down.

8    On Thursday, I spoke with Bobby and made plans to meet

9    with him on Friday to pay him my $17,000 which would

10   have covered the money I owed him, I owed from last

11   week, the $800 Herva owed, and 95 percent of the money I

12   owed from November 29th and 30th.

13       I had to go to Wantagh Suzuki dealership on Friday

14   on Sunrise Highway and Wantagh Avenue.  So, I told Bobby

15   I would meet him at Island Park.  On Friday, I went to

16   work at eight a.m.  I had the $17,000 in two bundles

17   with rubber bands.  I locked the money in the glove

18   compartment of my wife's 2004 Suzuki Verona.  I took my

19   wife's car because I knew I was going to Island Park and

20   I have no license.  I got out of work about five p.m.,

21   Herva and I went to Target to buy a sweats shirt because

22   we were going to a gym to work out.  I had my work out

23   clothes so I waited outside while Herva went into

24   Targets.  I was driving the Suzuki when he got his sweat

25   shirt at the Target on 110.

Cerighino - People - Direct

1    I drove us to the gym, L.A. Fitness, on Route 110,

2    Farmingdale.  We did a long workout and left the gym at

3    7:15 to 7:30.  Herva knew I had to meet Bobby so he came

4    along for the ride.  I spent more time at the gym than I

5    thought so I was running late.  I had called Ralph at

6    Wantagh Suzuki earlier in the day to let him know that I

7    would be coming by that night to pick up a check.  After

8    leaving the gym, Herva and I went down 110 to the

9    Southern State to the Wantagh Parkway, around the needle

10    to the Loop to Lido Boulevard to Long Beach.

11    At about 8:20, I pulled onto Industrial Boulevard.

12    I knew the spot because it was a busy spot, and it was

13    on the corner.  My father had worked on Industrial

14    twenty years ago.  The restaurant that I had remembered

15    was closed.  My wife used to live in Island Park so I

16    knew the area when I pulled down Industrial Boulevard.

17    There was one body shop that was open.  I saw one

18    guy pulling a truck into the shop.  It was behind the

19    Hess gas station.  I also saw a black man sitting in a

20    two door gray car facing Austin Boulevard on the side

21    road by the public storage, on the side of the

22    restaurant.  I didn't like the spot because of the guy

23    sitting in the car so I drove over to the street behind

24    the 7-Eleven and the tire store, because I knew it would

25    be discreet.  I called him when I got to that road and

678

Cerighino - People - Direct

1    told him where I was.  I don't remember if I told him

2    that Herva was with me.  I pulled up by the 7-Eleven to

3    look around to make sure that it was safe and nobody was

4    around.  I didn't want my back to 7-Eleven so I turned

5    around and looked at a Cadillac parked on the street.  I

6    made sure nobody was in the Cady.  I parked in front of

7    the Cady and waited for Bobby.  I was in the driver's

8    seat and Herva was in the passenger's seat.

9        About two minutes before Bobby showed up, Herva

10   excused himself.  He said he had to take a piss.  He

11   went towards the back of my car, on the passenger side,

12   I didn't pay attention to him.   About a couple of

13   minutes later, no more than five, Bobby showed up.  He

14   parked about twenty feet in front of my car.  I got out

15   of the my car.  Bobby got out of his car, a Lexus.  As I

16   walked up to Bobby, I didn't know where Herva was.

17   Bobby and I met between the two cars.  We hugged each

18   other.  I handed him the two  bundles of cash with my

19   right hand.  He took it with his right hand.  We were

20   chest to chest when I handed him the money.

21       Seconds later Bobby looked passed me.  He said

22   something.  I have no idea what it was.  I was facing

23   7-Eleven.  I turned my head to the right.  I saw Herva

24   about five feet behind me slightly to my right.  I saw

25   something in Herva's right hand.  I heard a loud boom.

MO

Cerighino - People - Direct

1    I knew it was a gunshot.  I was still standing inches

2    from Bobby.  I looked back towards Bobby.  He was still

3    facing me and he was collapsing face forward toward the

4    ground.  My left arm caught part of him as he fell to

5    the ground.  Bobby was wearing a sweat shirt and jeans.

6    He wasn't wearing anything on his head.  I knew that

7    Herva had shot Bobby and Bobby was barely hurt.  Herva

8    then stood over Bobby and shot Bobby two more times.

9    Herva was leaning over Bobby's head when he shot him the

10   second and third time.

11   Herva went over to Bobby's car and closed the

12   driver's door.  I went back to my car and got in.  Herva

13   came back and got in the passenger's side.  He still had

14   the gun in his right hand.  He put the gun on the floor

15   by his feet.  I looked over at Bobby and I could see his

16   feet still moving.  I said to Herva, you fucken shot

17   Bobby, he's still alive.  Herva said, let's go.

18   I pulled out left around Bobby.  Herva said stop.

19   When Herva opened his door, I could see Bobby's body.

20   Herva got out.  He pointed the gun at Bobby again and I

21   heard click, click, click, but no gunshots.  Herva got

22   back in the car.  I pulled in the driveway of a tire

23   store.  At this time, I looked over at Herva and I saw

24   that he had the two bundles of cash that H had given to

25   Bobby.  I made a right turn and went passed Peter's Clam

Cerighino - People - Direct

1    Bar.  When we got to the traffic light, Herva and I were

2    arguing.

3        I made a U-turn at the dump to go back to the

4    scene.  I made a left turn at Ruby Tuesdays.  I came up

5    a back road and stopped at the light by 7-Eleven.  I was

6    facing Austin Boulevard.  I stopped there because I knew

7    7-Eleven had cameras, because I wanted the cameras to

8    catch me and Herva in the car together.  While I was

9    stopped at the light I saw people with Bobby.  I made

10   the left turn, I wanted as many people as possible to

11   see me with Herva I made the left turn, and drove

12   towards Long Beach.

13       While I was driving, I saw a police car with its

14   lights on come the other way.  I kept driving.  I made

15   the left turn at Pier I Imports.  I stopped at every red

16   light because I know that the red lights take pictures

17   of your car.  I wanted people to know that Herva was in

18   the car with me.  I get on the Loop Parkway.  At the

19   second bridge Herva put his window down and threw the

20   bullets from the gun out the window.  I head towards the

21   needle at the beach.  I kept on the Wantagh Parkway.  I

22   started calling people like the Suzuki dealership and

23   Vivian.  I wanted as many people as possible to see

24   Herva with me.

25       When I called the Suzuki dealership, I asked for

Cerighino - People - Direct

1    Ralph.  I was told he wasn't in.  I asked for my check.

2    They said they didn't see it.  I told them I was on my

3    way.  While heading up the Wantagh Parkway, Herva told

4    me to stop at the bridge that is being repaired.  I

5    stopped the car in the right, almost at the top of the

6    bridge.  Herva got out and threw the gun toward the

7    water.  The gun had a long barrel.  Herva got back in

8    the car and said let's go.  I also called Tom Flores,

9    my wife and Vivian.  I didn't tell them what happened.

10   By the time we got to Suzuki they were closed.  It was

11   about nine or 9:01 p.m.  The lights were on but the

12   doors were locked.  I needed that check for $1,600 to

13   put in the bank for my wife.  A couple of days later I

14   went back and got the check.

15       I then drove to CitiBank to withdraw $300 and to get

16   my picture taken.  I went to the drive-up.  It's on

17   Sunrise Highway.  There was a girl standing there at the

18   drive-up.  When she finished and walked away, I pulled

19   up and got out of the car.

20       I popped the trunk and got my wallet from my gym

21   bag.  I know the camera takes a picture of my car when I

22   pull up, so I knew there would be a clear picture of

23   Herva plus what he is wearing.  I make the withdrawal

24   and get back in the car with Herva.  I drive east on

25   Sunrise Highway.

1    I called Vivian to let her know I am on my way.  I

2    told her Herva was with me.  I was supposed to go to

3    Vivian's house in Plainview to see her new pool.  She

4    wanted to ask me about fences.  When we got there, Herva

5    didn't want to go in the house.  I went in without him.

6    I was there about thirty minutes.  I looked at the

7    pool.  We talked about the fence.  Herva eventually

8    comes into the house.  I talked to Vivian and her

9    husband.  Vivian vacuumed my feet because I was getting

10   dirt in the house.

11   Herva and I left and went to my house.  I didn't

12   drop him off at his house because I wanted my

13   mother-in-law to see him.  I told him to come to my

14   house because I was going to give him four porno

15   videos.  After I gave him the videos I drove him home.

16   While I was driving, while I was driving him, Herva

17   threatened my wife.  He said that this wasn't the first

18   person he had killed and it won't be the last.  If you

19   open your mouth, that includes your wife.  After I drove

20   him home, I went home.

21   The next day Tom Flores called me and told me that

22   Bobby was dead.  I told him that I saw Bobby the night

23   before.  I was with Herva, and I wanted to reach out to

24   Bobby Calabrese's family, to let them know that I saw

25   Bobby last night.  I told him that I met Bobby on

1  Industrial Boulevard and paid him the money.  After I

2  spoke to him I called Herva and told him that Bobby was

3  dead.  We argued about this.  I didn't ask him about the

4  money.  I told Herva that I told to Tom that we had met

5  with Bobby, we paid him, and he was okay when we leave.

6        I dictated this statement to Detective Cereghino at

7  the homicide squad and he has written it for me.  I have

8  read it and it is the truth.  I would like to add that

9  when Herva and I were on the Seaford/Oyster Bay last

10  Friday night on the way to Vivian's we got off at Exit

11  9.

12        There's a school there with a dumpster.  Herva told

13  me to pull in so he could throw away his clothes.  He

14  had changed his clothes after the shooting and he wanted

15  to throw away the clothing he had been wearing.  Herva

16  wanted me to change my clothes but I refused because

17  there was no reason for me to change my clothes.

18  Q.    The defendant's statement reads, we were chest to

19  chest when I handed him the money.  Seconds later Bobby

20  looked passed me.  He said something.  I have no idea what it

21  was.  I was facing 7-Eleven.

22  Did the defendant say he and Bobby Calabrese were face to

23  face when the first shot was fired?

24  A.    Yes, sir.

25  Q.    The defendant's statement reads, I turned to my

Cerighino - People - Direct

1    right, I saw Herva about five feet behind me, slightly to my

2    right.  I saw something in Herva's right hand.  I heard a

3    loud boom.  I knew it was a gunshot.

4        Did the defendant say that Herva Jeannot was five feet

5    behind the defendant when Herva fired the first shot?

6        A.    Yes, sir.

7        Q.    Slightly to the defendant's right?

8        A.    Yes, sir.

9        Q.    Did the defendant say Herva was facing Bobby as

10   Herva approached from behind the defendant?

11       A.    Repeat that, please.

12       Q.    Did the defendant say Herva was facing Bobby as

13   Herva approached from behind the defendant?

14       A.    He never said he was approaching.  He stated that

15   he was behind Mr. Orlando about five feet, but he was facing

16   the victim, with the defendant facing the victim.

17       Q.    Herva was facing the victim when Herva fired the

18   first shot?

19       A.    Yes, sir.

20       Q.    Did the defendant draw a diagram while you were

21   reducing what he was saying to writing?

22       A.    Yes, sir.

23       Q.    Describe for the jury how that happened?

24       A.    As he started explaining about the Cadillac and his

25   car and Bobby's car and where everyone was standing, at that

Cerighino - People - Direct

1    time I gave him a blank piece of paper and a pen and I asked

2    him to draw exactly the way it was and where the Cadillac

3    was, put where his car was, also where Bobby's car pulled up,

4    and he put exactly where each person was standing.  With

5    Bobby facing south, the defendant right with him because he

6    demonstrated how he gave him the money while I was taking the

7    statement.  And he stated where Herva was when he turned over

8    his shoulder and looked at him.

9              MR. HAYDEN:  May I please have 52 for

10       identification shown to the witness, Your Honor.

11             THE COURT OFFICER:  Witness has 52 for ID.

12   Q.   Do you recognize that?

13   A.   Yes, sir.

14   Q.   What is it?

15   A.   This is the drawing made by Mr. Orlando, that was

16   done while I was taking the statement.

17             MR. HAYDEN:  We offer that as 52 in evidence.

18             MR. LEMKE:  No objection.

19             THE COURT:  Mark it in evidence.

20             THE COURT OFFICER:  People's 52 in evidence.

21        Do you want it shown back to the witness?

22             MR. HAYDEN:  No, thank you.

23   Q.   Did the defendant have anything to eat or drink?

24   A.   About eleven o'clock he was offered a donut which

25   he took and then towards the end of the statement, he was

Cerighino - People - Direct

1  offered lunch.  I believe it was a turkey and cheese on white

2  which someone was going out to get.  They brought it back

3  just prior to the end of the statement.  It was sitting on

4  the desk while the defendant and I were signing each page.

5      Q.  Did the defendant use the men's room whenever he

6  asked?

7      A.  Yes.

8      Q.  Describe the defendant's physical condition while

9  you were with him?

10     A.  I would say he was calm but anxious.

11     Q.  Did you recover evidence involving Mark Orlando

12  during the investigation of Bobby Calabrese?

13     A.  Yes, I did.

14     Q.  When did you recover evidence involving Mark

15  Orlando?

16     A.  It was a little after five p.m. on December 10,

17  2004.  I responded out to the place of employment where

18  Mr. Orlando worked.  I spoke to the owner.  I advised him Mr.

19  Orlando had already given a consent search to search his work

20  area.  I asked Mr. Forster if he would give a consent search

21  in an effort to recover evidence.  Mr. Forster agreed to do

22  so, but just asked that it be limited to the exact work areas

23  of Mr. Orlando and Mr. Jeannot.

24     Q.  Describe the evidence you recovered?

25     A.  The new work area where Mr. Orlando did his

Cerighino - People - Direct

1    business, I recovered his wallet, an ATM receipt dated

2    December third, timed 9:12 p.m.  I also recovered a couple of

3    notebooks.

4         Q.   Describe the circumstances under which you

5    recovered those items?

6         A.   I was directed that the ATM receipt would be there,

7    and that is why I responded there to recover it.

8              MR. HAYDEN:  May I please have 43 for

9         identification shown to the witness, Your Honor.

10             THE COURT:  Yes.

11             THE COURT OFFICER:  The witness has 43 for ID.

12        Q.   Do you recognize that?

13        A.   Yes, sir, I do.

14        Q.   What is it?

15        A.   This is the CitiBank ATM withdrawal slip for the

16   withdrawal of $300 on December 3, 2004 at 2112 hours, which

17   would be 9:12 p.m.

18             MR. HAYDEN:  We offer that in evidence.

19             MR. LEMKE:  No objection, Your Honor.

20             THE COURT:  Mark it in evidence.

21             THE COURT OFFICER:   People's exhibit 43

22        marked in evidence.

23        Do you want it shown back to the witness?

24             MR. HAYDEN:  No, thank you.

25        May I please have 50 and 51 for identification shown

Cerighino - People - Direct

1    to the witness?

2           THE COURT:  Yes.

3           THE COURT OFFICER:  The witness has 50 and 51

4    for identification.

5    Q.   Do you recognize those documents?

6    A.   Yes, sir, I do.

7    Q.   Would you take a look at the document that has been

8    marked 50 for identification.

9    A.   Yes, sir.

10    Q.   You got that one?

11    A.   Yes.

12    Q.   What is that one?

13    A.   This is the consent search form that was signed by

14    the defendant.

15    Q.   What is 51?

16    A.   This is the consent search form that I asked Mr.

17    Forster, the owner of Professional Credit Services, to sign

18    at approximately five p.m., on December tenth.

19           MR. HAYDEN:  Your Honor, the People offer both

20    50 and 51 in evidence.

21           MR. LEMKE:  No objection.

22           THE COURT:  Mark them in evidence.

23           THE COURT OFFICER:  People's exhibits 50 and

24    51 marked in evidence.

25    Do you want them shown to the witness?

Cerighino - People - Direct

1          MR. HAYDEN:  You can just leave them.

2          Nothing further at this time, Your Honor.

3          THE COURT:  Thank you.

4          MR. LEMKE:  Thank you.

5    CROSS EXAMINATION

6    BY MR. LEMKE:

7        Q.   Good afternoon, detective.

8        A.   Good afternoon, sir.

9        Q.   Detective, just a few questions.

10       On December 10, '04, that is when you went in at about

11   10:30, isn't that correct, to speak with Mr. Orlando?

12       A.   It was ten a.m.

13       Q.   In the morning.  It was ten a.m.?

14       A.   Yes, sir.

15       Q.   In fact, there's a log that is usually kept, isn't

16   that correct, or notations that were made when anyone went in

17   to speak to Mr. Orlando; is that correct?

18       A.   I am unaware of that, sir.

19           MR. LEMKE:  If I can have this marked for

20       identification purposes, please.

21           THE COURT:  Defendant's A for ID.

22           THE COURT OFFICER:  So marked.

23       Q.   Detective, just take a look at that.  I don't know

24   if that is familiar to you.

25       Is that your writing on that at all?

MO

Cerighino - People - Cross

1        A.   No, it's not.

2        Q.   Okay.   That may have been recorded by another

3   detective?

4        A.   Excuse me.

5        Q.   That may have been recorded, if you know, by

6   another detective?

7        A.   Yes, sir.

8             MR. LEMKE:   Okay.   Could I have that back,

9        please.

10       Q.   Now, at, I guess, you're saying ten a.m., when you

11  first met Mr. Orlando?

12       A.   Yes, sir.

13       Q.   But you had met him, I believe, the previous

14  evening; isn't that correct?

15       A.   When he initially came into the office, yes, sir.

16       Q.   In fact, when he was brought in, I think you had

17  patted him down to make sure he didn't have drugs or weapons

18  on him?

19       A.   Take the handcuffs off.

20       Q.   You did that?

21       A.   Yes.

22       Q.   There was no weapons or drugs found on Mr. Orlando,

23  correct?

24       A.   No, sir.

25       Q.   Mr. Orlando was fully cooperative with you when you

1   searched him at that time, correct?

2      A.   Yes, sir.

3      Q.   Now, in the morning when you go in to speak with

4   Mr. Orlando, you had I believe gone home to sleep for about

5   three hours perhaps, about, correct?

6      A.   Yes, sir.

7      Q.   You came back to work that morning, spoke to one of

8   the other detectives, perhaps, who asked you to go and speak

9   to Mr. Orlando, correct?

10      A.   I wasn't asked to speak to Mr. Orlando.  I was

11   asked to take a statement from him as to his final version of

12   the event of December third.

13      Q.   Okay.  You went in and he fully cooperated with

14   you, correct?

15      A.   He cooperated as to his version of the events, yes,

16   sir.

17      Q.   You began to make notations, or I should say reduce

18   it to a written form; isn't that correct?

19      A.   I reduced it to a writing.  There were no notes.

20      Q.   So, in this case, I think you said there were no

21   notes taken, you just reduced it as it was being told to you,

22   correct?

23      A.   Yes.

24      Q.   As it's being written, you're talking to

25   Mr. Orlando, and that is reduced into what is now in

Cerighino - People - Cross

1    evidence, correct?

2        A.    Yes.

3        Q.    And part of that conversation that you had with

4    Mr. Orlando, not once did he ever tell you that he knew that

5    Herva Jeannot was going to attempt, in fact, go to rob

6    Mr. Calabrese, correct?

7        A.    No, sir.

8        Q.    Not once did Mr. Orlando tell you that he knew

9    Herva Jeannot was planning to either shoot or kill

10   Mr. Calabrese; isn't that correct?

11       A.    Yes, sir, he did not.

12       Q.    In fact, Mr. Orlando told you he was there to pay

13   off part, in fact, most of the gambling debts he owed

14   Mr. Calabrese, correct?

15       A.    Yes.

16       Q.    He had told you throughout the statement that you

17   reduced that he wanted to be seen by as many people as

18   possible; isn't that correct?

19       A.    Yes, sir.

20       Q.    So that, if anything was to ever happen to him,

21   that your investigation may very well show Mr. Orlando was

22   with Herva Jeannot, correct?

23       A.    Never reduced it to stating if anything happen to

24   him.

25       Q.    Well, in the statement, it's recorded that Herva

1   would kill his wife or him if he ever said anything,

2   correct?

3       A.   He stated that at the end of the statement, and

4   upon reviewing it, he took himself out of it.  He said he

5   threatened to harm him or his wife.  At that time he asked

6   that he be removed and that the threat was only against his

7   wife.

8       Q.   That he'd only kill his wife; isn't that correct?

9       A.   Yes.

10      Q.   True?  And that, were you present as well when Mr.

11  Orlando indicated that Mr. Jeannot had killed before and this

12  may not be the last person he killed?

13      A.   He stated that Mr. Jeannot had stated that, but he

14  provided no evidence to back it.

15      Q.   You mean he didn't provide you with some other

16  person he had killed, correct?

17      A.   It was merely something that Mr. Jeannot had stated

18  to him.

19      Q.   Right.  In fact, that was significant enough to

20  write down in the statement, correct?

21      A.   Your client thought so, yes, sir.

22      Q.   He was cooperative in speaking to you at this hour,

23  wasn't he?

24      A.   Yes, sir.  He gave me his version and I put it on

25  paper.

MO

Cerighino - People - Cross

1    Q.   Just about everything he told you you write down;

2    isn't that correct?

3    A.   Yes.

4    Q.   When it was done and it was recorded, that had

5    ended at about maybe eleven o'clock?

6    A.   It was noon, maybe a little bit after.   Took him

7    approximately two hours.

8    Q.   And the end of that, you didn't ask him if he

9    wanted to speak to the District Attorney's Office or be

10   videotaped, did you?

11   A.   No, sir.

12           MR. LEMKE:   I have nothing further.   Thank

13   you.

14           THE COURT:   Mr. Hayden.

15   REDIRECT EXAMINATION

16   BY MR. HAYDEN:

17   Q.   You just testified during cross examination about

18   threats.

19   What exactly was that threat?

20   A.   The threat that he would kill the defendant's

21   wife.

22   Q.   When did he tell you that threat took place?

23   A.   It was an eight page statement.   He gave it to me

24   on the seventh page as they were driving to Vivian's house.

25   Q.   Did he tell you that Herva Jeannot had made any

1    threat to him after Herva Jeannot fired that first shot and

2    Bobby Calabrese collapsed to the surface of the road?

3        A.   No, sir.

4        Q.   Did he tell you Herva Jeannot made any kind of a

5    threat after Herva Jeannot stood over Bobby's body, leaned

6    down and fired two more bullets into Bobby's head?

7        A.   No.

8        Q.   Did he tell you that Herva Jeannot made any kind of

9    a threat when the defendant got into the Suzuki Verona and

10   Herva got in along side of him?

11       A.   No.

12       Q.   Did he tell you that Herva Jeannot had made any

13   kind of threat when the defendant drove Herva Jeannot away

14   from the scene of this execution murder?

15       A.   No, sir.

16       Q.   Did the defendant tell you Herva Jeannot made any

17   kind of threat as the defendant was driving out onto the

18   Wantagh Parkway?

19       A.   No, sir.

20       Q.   Did the defendant tell you that Herva Jeannot made

21   any kind of a threat back there at the scene when the

22   defendant stopped so Herva Jeannot could get out and try to

23   put a couple more shots into Bobby Calabrese?

24       A.   No, he did not.

25       Q.   Did he say anything about a threat when the

MO

1    defendant stopped along the Sloop Channel Bridge so Herva

2    Jeannot could get out and then waited for Herva Jeannot when

3    he went over to the edge of the bridge and tossed the weapon

4    down into the water below?

5        A.   No, sir.

6        Q.   Did he say anything about Herva Jeannot making a

7    threat as the defendant drove Herva Jeannot into Wantagh to

8    Wantagh Suzuki?

9        A.   No.

10       Q.   Did he say anything about Herva Jeannot making a

11   throat at the defendant when he drove Herva Jeannot to the

12   Wantagh CitiBank branch and the defendants got out and made a

13   $300 withdrawal?

14       A.   No.

15       Q.   Did he say anything about Herva Jeannot making any

16   threat as the defendant continued to make cell phone calls as

17   the defendant was driving along into Wantagh and then out to

18   Plainview?

19       A.   No, sir.

20       Q.   Did he say anything about Herva Jeannot making a

21   threat as the defendant drove Herva Jeannot out to Vivian

22   Borushik's house?

23       A.   No, sir.

24       Q.   Did the defendant say anything about Herva Jeannot

25   making any threats when the defendant drove Herva Jeannot to

MO

Cerighino - People - Redirect

1    his own home?

2         A.   At that time he did, yes, sir.

3         Q.   I mean to the defendant's own home?

4         A.   Not to his own home.

5         Q.   The defendant told you he watched Herva Jeannot

6    execute Bobby Calabrese with three shots to the head, and

7    then he told you he drove Herva Jeannot to his own home?

8         A.   Yes, sir.

9         Q.   Where his family was?

10        A.   Yes, sir.

11        Q.   This is the family he was afraid Herva was going to

12   hurt?

13        A.   Yes, sir.

14        Q.   So, when did the threat finally appear on the

15   scene?  When did that happen?

16        A.   It was near the end of the statement while he was

17   being driven home.

18        Q.   The very ends?

19        A.   Yes, sir.

20        Q.   That is when he told you?

21        A.   Yes, sir.

22        Q.   And that was where the threat was in the sequence

23   of events?

24        A.   Yes, sir.

25             MR. HAYDEN:  Nothing further, Your Honor.

Cerighino - People - Redirect

1    RECROSS EXAMINATION

2    BY MR. LEMKE:

3        Q.   Did you ask my client, Mr. Orlando, when was the

4    first time Mr. Jeannot threatened to kill his wife or him?

5        A.   I never asked him that specifically.  I went

6    through each version of events as he gave them to me, and at

7    this point, as he is being, he is driving him home, that is

8    when he stated that while they're in the car, after he got

9    rid of the gun, that is when he threatened him.

10       Q.   There is no mistake my client told you that Herva

11   would kill him or his wife if he said anything; isn't that

12   correct?

13       A.   Again, yes, sir, but upon reviewing the statement,

14   he took the threat away from him.  He said he wasn't

15   threatened.  That was --

16       Q.   Listen to the question.

17       A.   Sure.

18       Q.   You're talking to my client.

19       A.   Yes, sir.

20       Q.   For about an hour.  That is all it is.  Isn't that

21   correct?

22       A.   About two hours.

23       Q.   Okay.  Two hours.  You first start talking to him,

24   it's reduced to writing, correct?

25       A.   No.  The statement took about two hours.  We

MO

Cerighino - People - Recross

1    started almost immediately.

2        Q.   Mr. Orlando doesn't tell you that Herva threatened

3    him a week later or three days after Herva Jeannot killed

4    Mr. Calabrese, does he?

5        A.   No, sir.

6        Q.   No.  Mr. Orlando doesn't tell you that Herva

7    Jeannot called him up on Saturday, the next day, and said,

8    you know what, I'm thinking about things, Mark, if you say a

9    word I'm going to kill your wife, or I'm going to kill you?

10       Mr. Orlando doesn't tell you that, does he?

11       A.   No.

12       Q.   Mr. Orlando tells you that while he is talking to

13   you and within a very short period of time after

14   Mr. Calabrese was killed in cold blood, there is no question

15   about that, that Mr. Orlando is threatened by Herva Jeannot;

16   isn't that correct?

17       A.   That he was threatened?

18       Q.   Yes?

19       A.   Again, yes, he states he was threatened, and then

20   he took the threat off himself --

21       Q.   Finish what you said, detective.

22       A.   As I said, yes, he did state that Herva Jeannot

23   threatened him and his wife.  Upon revising his statement,

24   before he signed it, he wanted the threat to be taken off him

25   to just read threatened my wife.  It was, it was me and my

Cerighino - People - Recross

1   wife just became threatened my wife.

2      Q.  So, he threatened to kill his wife?

3      A.  That is what your clients told me.

4      Q.  Right.  In fact, you wrote the statement down,

5   correct?

6      A.  Yes.

7      Q.  And, then, at this point my client then signed it,

8   correct?

9      A.  Upon the completion of the statement, his reviewing

10   it, making certain corrections, yes.

11      Q.  There is no mistake that in the statement that you

12   wrote of my client, he told you, whether it's page one or

13   five or eight, that Herva Jeannot threatened to kill his

14   wife; isn't that correct?

15   If he said anything?

16      A.  Yes, sir.

17      Q.  Thank you.

18            THE COURT:  Anything further, Mr. Hayden.

19            MR. HAYDEN:  No, Your Honor.

20            THE COURT:  Again, ladies and gentlemen in the

21   gallery, remain seated.

22   Detective, you can step down.  You're excused.

23   We are going to break for the day and resume again

24   tomorrow morning 9:15.  As I told you, we're moving very

25   quickly and I am confident that this case will be given

Proceedings

1       to you, much sooner than we had told you the parameters

2       would be.

3           I am going to give you the same admonitions.

4       Please, you must adhere to them.   You must not converse

5       among yourselves or with anyone else upon any subject

6       connected with the trial.   You must not read or listen

7       to any accounts or discussions of the case in the event

8       it is reported by newspapers or other media.   You must

9       not visit or view the premises or place where the see

10      offense charged was allegedly committed, or any other

11      premises or place involved in the case.   Prior to your

12      discharge, you must not request, accept, agree to

13      accept, or discuss with any person the receiving or

14      accepting of any payment or benefit in consideration for

15      supplying any information concerning the trial.

16          You must promptly report to the Court any incident

17      within your knowledge involving an attempt by any person

18      to improperly influence any member of the jury.   You

19      cannot access the Internet or Worldwide Web by any means

20      available to you for the purpose of learning about this

21      case or to learn about the law and the legal issues

22      concerning this case.

23          Have a wonderful evening.   See you tomorrow at 9:15.

24              THE COURT OFFICER:   Jurors taking notes, leave

25      your note pats on the chair and follow me out.

Proceedings

1        (Whereupon, the following takes place outside the

2    presence of the jury.)

3            THE COURT:  Be in this courtroom, possibly be

4    here before ten.  I will try to start at ten o'clock.

5        Court's in recess.

6        (Whereupon, the trial was adjourned to June 10,

7    2005.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25