STATE OF NEW YORK :  NASSAU COUNTY

   COUNTY COURT PART 11

- - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK,   SCI/IND. NO.
                                 167N-2005
              -against-

                              TRIAL
MARK ORLANDO,
                     Defendant.

- - - - - - - - - - - - - - - - - - -X

                   262 Old Country Road
                   Mineola, New York
                   June 10, 2005

B e f o r e:

          HON. DAVID P. SULLIVAN, Supreme Court Justice

A p p e a r a n c e s:

        HON. DENIS DILLON
          District Attorney, Nassau County
          By: ROBERT T. HAYDEN, ESQ.
          Assistant District Attorney

        DENNIS LEMKE, ESQ.
          Attorney for Defendant
          114 Old Country Road
          Mineola, New York  11501

                   Mary Ocskai
                   Official Court Reporter



COPY

MO

Proceedings

1

2        THE CLERK:  Continued case on trial,

3    167N-2004.

4        MR. LEMKE:  For Mr. Orlando, Dennis Lemke, 114

5    Old Country Road, Mineola, New York.

6        THE COURT:  Outside the present of the jury.

7    Was there an application, Mr. Lemke?

8        MR. LEMKE:  Yes, just to renew my application

9    regarding premarked, just four other ones, I have no

10   objection to, but photographs 15, 13, 11 and 12, clearly

11   not only are they graphic, however, I believe the

12   probative value as I see that can certainly be shown

13   with photographs that are in black and white, is

14   clearly, are highly just inflammatory.  They look

15   surreal in part because of the manner in which the head

16   is shaved.

17       I would not object to them all in black and white.

18   I am renewing my application again when they're shown,

19   they'll be a situation.

20       THE COURT:  Specifically what exhibits

21   premarked for identification.

22       MR. LEMKE:  12, 13, 11, 12, 13 and 15.

23       THE COURT:  Okay.  The court has reviewed

24   those photographs and adheres to its earlier decision.

25   Application denied.

Proceedings

```
 1            Mr. Lemke and Mr. Hayden, as was discussed at the
 2      bench, the Court intends to go forward with three
 3      witnesses and then I am going to break for about ten
 4      minutes before the medical examiner takes the stand.
 5      And then I will resume.  Then I will break, no matter
 6      what time that is, at the completion of the medical
 7      examiner's testimony to two o'clock to enable you to
 8      review Mr. Hayden Detective Kovar's potential testimony.
 9            MR. LEMKE:  Yes, Your Honor.
10            THE COURT OFFICER:  Ready, Your Honor?
11            THE COURT:  Yes.
12            THE COURT OFFICER:  Jury entering.
13            THE CLERK:  Continued case on trial,
14      167N-2005.  People of the State of New York versus Mark
15      Orlando.
16         People ready?
17            MR. HAYDEN:  Ready, Your Honor.
18            THE CLERK:  Defendant ready?
19            MR. LEMKE:  Ready.
20            THE CLERK:  Let the record reflect the
21      presence of the defendant Mark Orlando, the sworn jurors
22      and the alternates.
23            THE COURT:  Good morning, ladies and
24      gentlemen.  Again I apologize for the delay.  I have to
25      get the T.V. and everything here, get everything
```

Proceedings

1    together so that once we start we can move

2    continuously.  However, overall in the scheme of things

3    we're moving very rapidly.  So, I thank you for your

4    patience.

5              Mr. Hayden, call your next witness.

6              MR. HAYDEN:  Michael Kuhn.

7    MICHAEL KUHN, detective, called as a witness on behalf of the

8        People, after having been first duly sworn, and having

9        stated his shield number as 559, and his command as

10       Homicide Squad, Nassau County Police Department, took

11       the witness stand and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. HAYDEN:

14             THE CLERK:  State your name, spelling your

15       last name, shield number and command.

16             THE WITNESS:  Detective Michael Kuhn, K-U-H-N,

17       559, Nassau County Homicide Squad.

18             THE COURT:  Good morning.

19             THE WITNESS:  Good morning, Judge.

20             THE COURT:  Mr. Hayden.

21             MR. HAYDEN:  Yes, Your Honor.

22   Q     Good morning, detective.

23   A     Good morning.

24   Q     How long have you been a member of the Nassau

25   County Police Department?



MO

Kuhn - People - Direct

1    A    Approximately thirty-five years.

2    Q    How long have you been a detective?

3    A    Approximately sixteen years.

4    Q    How long with homicide?

5    A    Ten years.

6    Q    I am directing your attention to the night of

7  Friday, December 10 2004.

8        Were you involved then with investigating the shooting

9  death of a young man named Bobby Calabrese?

10   A    Yes, I was.

11   Q    Did you respond to a house that night at 1119

12 Joselson Avenue in Bay Shore, New York?

13   A    Yes, I did.

14   Q    Who was with you then?

15   A    Detective Sergeant Larson, Detective Bruser,

16 Detective DiPietro from my office, two crime scene detectives

17 and two Suffolk County uniform police officers.

18   Q    Who lived at 1119 Joselso Avenue?

19   A    Mark Orlando.

20   Q    Describe the circumstances under which you and the

21 other detectives arrived at the house where Mark Orlando was

22 living?

23   A    We were there to execute a search warrant signed by

24 Judge Cotter.

25   Q    Is that Daniel Cotter?

Kuhn - People - Direct

1     A     Yes, it was.

2     Q     Did you take part in a search of Mark Orlando's

3  room?

4     A     Yes, I did.

5     Q     Was that in accordance with the warrant?

6     A     Yes, it was.

7     Q     Did you recover cash from Mark Orlando's bedroom?

8     A     Yes, we did.

9     Q     How much cash?

10     A     $2,749.

11     Q     Describe the bills you recovered?

12     A     Most of the bills were singles.  However, there

13  were one thousand, one hundred dollar bills, the new type

14  with the large Ben Franklin on them.

15     Q     When you say one thousand, you mean it was one

16  thousand dollars in $100 bills?

17     A     Yes.

18     Q     Describe those $100 bills?

19     A     As I stated they were the newer type bills, they

20  were the large Ben Franklin picture on the bill, in very good

21  condition.

22     Q     Describe where you recovered those bills?

23     A     They were in a shoe box located in a safe which was

24  in the master bedroom in a walk-in closet.

25     Q     Was a gun recovered in Mark Orlando's bedroom?

Kuhn - People - Direct

1      A     Yes, there was.

2      Q     Describe it?

3      A     It was a twelve gauge Mossberg, M-O-S-S-B-E-R-G.

4      Q     Was ammunition of any kind found in the house where

5   Mark was living?

6      A     Shotgun ammunition, there were seven boxes of

7   shotgun shells, twenty-five shells in each box.

8                MR. HAYDEN:  May I please have these two bills

9         which have been marked 42A through 42J shown to the

10        witness.

11               THE COURT:  Yes.

12     Q     Do you recognize those bills?

13     A     Yes, sir.  These are the same bills that were

14   recovered from the box, the shoe box, in the safe.

15               MR. HAYDEN:  Offer those bills in evidence,

16        Your Honor.

17               MR. LEMKE:  No objection, Your Honor.

18               THE COURT:  Mark them into evidence.

19               THE COURT OFFICER:  So marked, Judge.

20               THE COURT:  Thank you.

21               THE COURT:  So marked, Mr. Hayden.

22     Q     Were any ATM receipts recovered inside Mark

23   Orlando's home?

24     A     No, sir.

25               MR. HAYDEN:  Nothing further at this time,

MO

Kuhn - People - Cross

1    Your Honor.

2                THE COURT:  Anything, Mr. Lemke?

3                MR. LEMKE:  Yes.

4    CROSS EXAMINATION

5    BY MR. LEMKE:

6        Q    Detective, when you had executed that search

7    warrant at Mr. Orlando's house, you were looking obviously

8    for any evidence in connection with death of Mr. Calabrese;

9    isn't that correct?

10       A    That's correct, sir.

11       Q    And, you had also looked for, in fact, you

12   recovered a shotgun, correct?

13       A    That's correct.

14       Q    And I think you indicated that there were shells to

15   that shotgun?

16       A    That's correct.

17       Q    There was, I believe, maybe seven boxes of shotgun

18   shells?

19       A    That's correct.

20       Q    Those shotgun shells themselves certainly don't fit

21   into any magnum gun, correct?

22       A    Magnum handgun?

23       Q    That's correct?

24       A    No, sir.

25       Q    You looked for other ammunition, there was no other

MO

Kuhn - People - Cross

1  ammunition other than the shotgun shells; isn't that

2  correct?

3      A    That's correct.

4      Q    And the shotgun itself was found in my client's, I

5  believe, bedroom; isn't that correct?

6      A    That's correct.

7      Q    There was also close to, in fact, there was exactly

8  $2,749, correct?

9      A    That's correct.

10     Q    And, in evidence, I think are the $100 bills?

11     A    That's correct.

12     Q    And the other -- may I have those, please?

13     A    Sure.

14     Q    And, the other $17,000 is still in evidence?

15     A    Yes, sir.

16     Q    Locked up?

17     A    Yes.

18     Q    You didn't bring that over here, did you?

19     A    I didn't, no, sir.

20     Q    You had indicated that they have Ben Franklin on

21  them?

22     A    That's correct.

23     Q    You indicated that certainly there's serial numbers

24  on these one hundred dollar bills, correct?

25     A    That's correct.

Kuhn - People - Cross

1      Q      They're not numerical in any way?

2      A      No.

3      Q      Nothing unique about these $100 bills in any way,

4   correct?

5      A      Other than they're the newer type, no, sir.

6      Q      The newer type as of when?

7      A      I guess it's about two years now.

8      Q      Okay.  So, these one hundred dollar bills now in

9   evidence, other than being produced within the last two

10  years, are not in any way any more unique than any other

11  hundred dollar bill I may have in my pocket or anybody else

12  has in their pocket?

13     A      That's correct.

14                MR. LEMKE:   Thank you.

15                THE COURT:   Anything further, Mr. Hayden?

16                MR. HAYDEN:  No, Your Honor.

17                THE COURT:   Thank you, detective.  Have a good

18       day.

19            (Witness excused.)

20                MR. HAYDEN:  Michael Nigro.

21  MICHAEL NIGRO, detective, called as a witness on behalf of

22       the People, after having been first duly sworn, and

23       having stated his shield number as 903, and his command

24       as the Homicide Squad, Nassau County Police Department,

25       took the witness stand and testified as follows:



1    DIRECT EXAMINATION

2    BY MR. HAYDEN:

3              THE CLERK:  State your name, spell your last

4        name, shield number and command.

5              THE WITNESS:  Detective Michael Nigro,

6        N-I-G-R-O, shield 903, ASSIGNED to the Homicide Squad,

7        Nassau County Police Department.

8              THE COURT:  Good morning.

9              THE WITNESS:  Good morning.

10             THE COURT:  Mr. Hayden.

11   Q      Good morning?

12   A      Good morning.

13   Q      How long have you been a member of the Nassau

14   County Police Department?

15   A      Approximately eighteen years.

16   Q      How long a detective?

17   A      Approximately seven years.

18   Q      How long with homicide?

19   A      I was temporarily assigned July of 2004 which

20   became permanent February of this year.

21   Q      I am directing your attention to the night of

22   Friday, December 10, 2004.

23       Were you involved then with investigating the shooting

24   death of a young man named Bobby Calabrese?

25   A      Yes, sir.

MO

Nigro - People - Direct

```
 1        Q     Did you respond to a house that night at 159 Sammis

 2   Avenue in Deer Park, New York?

 3        A     I did.

 4        Q     Who was with you then?

 5        A     There was Detective Sergeant Herbert Bob, Detective

 6   John Lapine, and I met Detective Michael O'Leary there.

 7        Q     Who lived at 159 Sammis Avenue?

 8        A     That was the residence of Herva Jeannot.

 9        Q     Who was home when you got there?

10        A     When I arrived, his mother was there, his brother,

11   and his sister, and I believe there was some other family

12   members present.

13        Q     Describe the circumstances under which you and the

14   other detectives arrived at the house where Herva Jeannot was

15   living?

16        A     We were going there to do an execution of a search

17   warrant which was signed by Judge Cotter.

18        Q     Daniel Cotter?

19        A     Yes.

20        Q     Did you take part in a search of Herva Jeannot's

21   room?

22        A     Yes, I did.

23        Q     Was that in accordance with the warrant?

24        A     Yes, sir.

25        Q     Did you recover cash inside Herva Jeannot's
```

Nigro - People - Direct

1   bedroom?

2          A     I did.

3          Q     What did you recover?

4          A     Five one hundred dollar bills.

5          Q     Describe those bills?

6          A     They were in fairly good condition with the larger

7   faced Ben Franklin on the front.

8          Q     Describe where you found the five one hundred

9   dollar bills?

10         A     They were located in a shoe box inside Herva

11  Jeannot's closet in his bedroom.   They were located in a shoe

12  box which was on top of a dresser inside the closet.

13         Q     Was that the only money recovered?

14         A     Yes, sir.

15         Q     Was a gun recovered in Herva Jeannot's bedroom?

16         A     There was a gun recovered.

17         Q     Describe that gun for the jury?

18         A     It was a Daisy BB gun which was located on a shelf

19  inside that same closet.

20         Q     Was any other gun found in the house where Herva

21  Jeannot was living?

22         A     No, sir.

23         Q     Was ammunition of any kind found in the house where

24  Herva Jeannot was living?

25         A     No.

Nigro - People - Direct

```
 1        Q     Was a gun manual or other gun paraphernalia found
 2   in the where Herva Jeannot was living?
 3        A     No, sir.
 4              MR. HAYDEN:  May I please have 41 for
 5   identification shown to the witness, Your Honor.
 6        Q     Do you recognize those bills?
 7        A     I do.
 8        Q     What are they?
 9        A     These are the five one hundred dollar bills that I
10   recovered from Herva Jeannot's bedroom.
11              MR. HAYDEN:  People offer those in evidence.
12              MR. LEMKE:  No objection, Your Honor.
13              THE COURT:  Mark them into evidence, please.
14              THE COURT OFFICER:  So marked.
15              MR. HAYDEN:  Nothing further, Your Honor.
16              THE COURT:  Mr. Lemke.
17              MR. LEMKE:  No questions.  Thank you,
18   detective.
19              THE COURT:  Thank you, detective.  Have a good
20   day.
21              THE WITNESS:  You do the same.  Thank you.
22              (Witness excused.)
23              MR. HAYDEN:  James DiBeneditto.
24   JAMES DiBENEDITTO, detective, called as a witness on behalf
25       of the People, after having been first duly sworn, and
```



Nigro - People - Direct

1    having stated his shield number as 749, and his command

2    as the Firearms Identification Section, Nassau County

3    Police Department, took the witness stand and testified

4    as follows:

5  DIRECT EXAMINATION

6  BY MR. HAYDEN:

7            THE CLERK:  State your name, spell your last

8    name, give your shield number and command.

9            THE WITNESS:  Detective James DiBeneditto,

10    D-I-B-E-N-E-D-I-T-T-O, shield number 749.  I work for

11    the Firearms Identification Section of the Nassau County

12    Police Department.

13            THE COURT:  Good morning.

14            THE WITNESS:  Good morning.

15            MR. HAYDEN:  Yes, Your Honor.

16    Q    Goods morning.

17    A    Goods morning.

18    Q    How long have you been a member of the Nassau

19  County Police Department?

20    A    Ten years.

21    Q    How long a detective?

22    A    Since December 2001.

23    Q    How long have you been with firearms?

24    A    Since June of 2000, five years.

25    Q    Describe the training you received in the firearms

DiBeneditto - People - Direct

1    field?

2        A    I received training by the Nassau County Police

3    Department's Firearms Identification Section.  It was a two

4    year training program that involved cartridge case and

5    bullets identification, serial number registrations, firearms

6    operability and functionability, distance gunshot residue in

7    regards to distance determinations.

8        I am also a graduate of the National Firearms Examiner's

9    Academy hosted by the Bureau of Alcohol, Tobacco and

10   Firearms.  That is in addition to the training I have already

11   completed with the Nassau County Police Department.  This

12   training is a twelve month program.  That is, like I said,

13   hosted by the National Firearms Academy, ATF.  That went into

14   a little more in detail in cartridge and bullet

15   identifications, serial number restorations, distance

16   determinations, and other firearms identification area.  Also

17   afforded me the opportunity to visit fifteen, approximately

18   fifteen manufacturing facilities.  That is important so I

19   could understand and know how a firearms is made, what tools

20   are use, what kind of markings that can be left on either a

21   bullet or a cartridge case.

22       I was also afforded the opportunity by the Bureau of

23   Alcohol, Tobacco and Firearms to attend an ammunition tour by

24   Remmington which is a nationally known cartridge and

25   ammunition manufacturer in Arkansas.  That is where it was.

MO

DiBeneditto - People - Direct

1    And I was able to watch how they manufacture bullets, how

2    they make everything, including the gunpowder.  I also am a

3    certified armor in Glock, Smith and Wesson, and in High

4    Point.

5         Q    Describe any experience you have had in the

6    firearms field?

7         A    Okay.  I have analyzed hundreds of bullets and

8    dispatch cartridge cases.  I also did hundreds of cases in

9    regards to firearms operability examinations.  I conducted

10   analysis in distance determinations.  I am also, I also

11   visually examined thousands of firearms in the Smithsonian

12   Institute and Spring Armory Tower.  It's in Massachusetts.

13        Q    Have you examined firearms in the course of your

14   work?

15        A    Yes, I have.

16        Q    Approximately how many?

17        A    Hundreds.

18        Q    Have you examined bullets, spent shell casings and

19   cartridges?

20        A    Yes, I have.

21        Q    Approximately how many?

22        A    That is also in the hundreds.

23        Q    Have you testified as an expert in the firearms

24   field?

25        A    Yes.

MO

DiBeneditto - People - Direct

1    Q    How often?

2    A    Approximately ten times.

3    Q    Where?

4    A    In Nassau County Criminal Court.

5    Q    What do you mean by a cartridge or live round?

6    A    A cartridge is a unit of ammunition that is

7    comprised of four components.

8    Q    Tell us what those components are?

9    A    Those four components are made up of a bullet, a

10   cartridge case, a primer and gunpowder.

11   Q    What do you mean by a cartridge case?

12   A    A cartridge case is what houses the primer, the

13   gunpowder sits inside there and the bullet also gets fitted

14   inside the cartridge case and it all becomes one unit of

15   ammunition.

16   Q    What do you mean by primer?

17   A    Primer is what the firing pin strikes.  What that

18   does, the primer it explodes and causes a flame to shoot into

19   the cartridge case which then ignites the gunpowder.

20   Q    What do you mean by a bullet?

21   A    A bullet is the projectile that exits the barrel of

22   the firearm.  It's what comes out of the gun through the

23   nuzzle of the firearm.  The end of it.

24   Q    Describe the components of a copper jacketed

25   bullet?

DiBeneditto - People - Direct

1      A      Okay.  A copper jacketed bullet has a copper

2   alloyed that usually surrounds a lead core.  A bill cord we

3   call it.

4                  MR. HAYDEN:  Your Honor, may I please have

5         this marked for identification.

6                  THE COURT:  Hasn't been marked?

7         MR. HAYDEN:  No.

8                  THE COURT:  People's 68 marked for

9      identification.

10        Do you want this shown to the witness?

11                 MR. HAYDEN:  Yes.

12     Q      Take a look at that?

13     A      Yes.

14     Q      Is that a display you prepared to help explain the

15  parts of a cartridge and the components of a bullet to the

16  jury?

17     A      Yes, it is.

18     Q      Would that help you explain the parts of a

19  cartridge and parts of a bullet to the jury?

20     A      Sure.

21                 MR. HAYDEN:  I would ask that be introduced

22        into evidence.

23                 MR. LEMKE:  No objection, Your Honor.

24                 THE COURT:  Mark it into evidence as an aid to

25        the jury.

1          THE COURT OFFICER:  People's 68 marked in

2     evidence.

3          MR. HAYDEN:  With the Court's permission, I

4     would ask that Detective DiBeneditto step down before

5     the jury and use that exhibit to explain the parts of a

6     cartridge and the parts of a bullet.

7          MR. LEMKE:  No objection.

8          THE COURT:  Yes.

9     A    When I said this was a unit of ammunition, this is

10    one full unit of ammunition.  Okay.  This is the cartridge

11    case, the silver part is the cartridge case, the copper piece

12    is, that is what we call the bullet.  That is the piece of

13    copper alloyed and lead core, that is the projectile that

14    comes out of the, out of the barrel.  There is the cartridge

15    case.  This is the bullet.  And this is gunpowder, what we

16    call propellent.  Okay.

17    On the head stamp or the flat end of this cartridge case

18    is primer that sits inside the cartridge case.  When the fire

19    pin strikes it, it hits this primer and an explosion occurs

20    causing a flame to shoot through into the cartridge case,

21    right into the cartridge case, igniting this, the gunpowder,

22    causing gases to build up, and as soon as the gases build up

23    enough pressure, it will then exert or expel this bullet out

24    of the cartridge case down the barrel and to the target.

25    Q    Show the jurors the copper jacketed bullet.  Show

MO

DiBeneditto - People - Direct

1   them what you mean by the copper jacket.   Show them where

2   that bullet core is?

3         A      This is the copper jacket.   Okay.   It's the outside

4   part of the bullet.   Inside on this particular bullet you can

5   see the lead, the lead bullet core.   Okay.   That is the

6   grated part, that is, the lead is inside it.   This piece,

7   this copper alloyed surrounds that piece of lead.   It's the

8   harder of the two, harder of the two objects, that material.

9         Q      What type of cartridge is that?

10        A      This is a .44 magnum.   It's a very large bullet.

11        Q      Please retake the witness stand.

12   What do you mean by a revolver?

13        A      A revolver is usually a handgun.   It's a firearm

14   that has a cylinder.   Okay.   Inside that cylinder houses

15   chambers, and inside those chambers fits this one unit of

16   ammunition.   It usually has five or six chambers inside of

17   it.   When the shooter pulls the trigger, the cylinder will

18   revolve around allowing the chamber to line up with the

19   barrel so the bullet can then travel down the barrel and come

20   out of the gun.

21        Q      What happens to the shell casing of a cartridge

22   barrel fired in a revolver?

23        A      It will stay with the firearm.   It does not exist

24   out of the cartridge.

25        Q      What happens to the bullet?

MO

724

DiBeneditto - People - Direct

1    A    The bullet will expel out of the barrel or the

2    nuzzle end of the barrel.

3        Q    Are you familiar with the term bullet wipe?

4        A    Yes.

5        Q    What do you mean by bullet wipe?

6        A    Bullet wipe is, will be a discoloration of a bullet

7    hole entry.  It's usually light to dark gray.  It surrounds

8    the bullet hole entry that is caused by lead filing that is

9    inside the barrel.  Lubricant or other type of, sometimes

10   even the lead of the bullet will then surround that copper or

11   that lead and that will get placed onto that bullet hole

12   entry it's the shape of a ring usually.

13       Q    Are you familiar with the term particulate?

14       A    Yes.

15       Q    What do you mean by particulate?

16       A    Particulate is primarily unburned, partially burned

17   or burnt gunpowder.

18       Q    I am directing your attention to around 1:45, on

19   the early morning of Saturday, December 4th, of 2004.

20       Were you involved then with investigating the shooting

21   death of a young man named Bobby Calabrese?

22       A    Yes, I was.

23       Q    Were you in the vicinity of Broadway and North Long

24   Beach then?

25       A    Yes, I was.

MO

DiBeneditto - People - Direct

1       Q      Did you obtain evidence then?

2       A      Yes, I did.

3       Q      Did the evidence comprise of a copper jacket of a

4    bullet?

5       A      Yes, it did.

6       Q      How was the copper jacket contained when you

7    received it?

8       A      It was contained in a clear plastic box that was

9    placed in a brown paper bag.

10      Q      Who did that?

11      A      Detective Nystrom of the crime scene search

12   section.

13      Q      Were you there when he did it?

14      A      Yes.

15      Q      What did you do with the copper jacket when

16   Detective Nystrum gave it to you?

17      A      I placed it in my coat pocket.

18      Q      I am directing your attention to around 1:45 that

19   Saturday afternoon.

20      Were you involved with the investigation then?

21      A      Yes.

22      Q      Were you at the medical examiner's office then?

23      A      Yes, I was.

24      Q      Were you down in the morgue?

25      A      Yes, I was.

DiBeneditto - People - Direct

1    Q    Did you obtain evidence then?

2    A    Yes, I did.

3    Q    Did the evidence comprise of two copper jackets,

4    three metal cores and some bullet fragments?

5    A    Yes.

6    Q    How did you obtain the two copper jackets, the

7    three metal cores and the bullet fragments?

8    A    I received them in a closed plastic container by

9    Dr. DeMartino.

10   Q    Were you there when he contained those items?

11   A    Yes.

12   Q    Did Dr. DeMartino mark the evidence before he gave

13   it to you?

14   A    Yes, he did.

15   Q    How, how did he do that?

16   A    Based of the bullets or the bullet jacket fragments

17   he put MD2, MD3, and he also labeled the outside of the

18   plastic containers by bullet, bullet 1, 2, 3, and I believe

19   fragments.

20   Q    What did you do with the containers and evidence

21   after Dr. DeMartino gave them to you?

22   A    I brought them back to the firearms identification

23   section for analysis.

24        MR. HAYDEN:  May I please have 53 for

25        identification shown to the witness.

MO

727

DiBeneditto - People - Direct

1          THE COURT:  Yes:

2          THE COURT OFFICER:  The witness has 53 for

3     ID.

4     Q    Do you recognize the contents of that clear plastic

5     bag?

6     A    Yes.

7     Q    What are they?

8     A    These are the plastic containers that I received

9     from Dr. DeMartino.  These are the paper bags that I

10    received.  I received these four in one paper bag, and then

11    this is the plastic container that Detective Nystrom from the

12    crime scene search section gave me and that was also in a

13    paper bag.

14    Q    That paper bag is in there too?

15    A    Yes, there's two paper bags.

16         MR. HAYDEN:  People offer the contents of that

17    clear plastic bag in evidence.

18         MR. LEMKE:  No objection, Your Honor.

19         THE COURT:  Mark it in evidence.

20         THE COURT OFFICER:  People's 53 marked in

21    evidence.

22         Do you want it shown back to the witness?

23         MR. HAYDEN:  No, thank you.

24         Okay.  May I please have 26 for identification

25    shown to the witness?

MO

DiBeneditto - People - Direct

1          THE COURT:  Yes.

2          THE COURT OFFICER:  The witness has 26 for

3     ID.

4     Q     Do you recognize the contents of that clear plastic

5     bag?

6     A     Yes, I do.

7     Q     What do you recognize it to be?

8     A     This is the bullet jacket fragments that was

9     recovered by, recovered at the crime scene.  And these are

10    the lead fragments and the bullets fragments that was

11    recovered by Dr. DeMartino during the autopsy.  These are the

12    lead fragments also.

13    Q     Was it you who contained that evidence in that

14    clear plastic bag?

15    A     Yes, it is.  I know that due to the fact my

16    initials are on each corner, and I labeled each item JD.

17         MR. HAYDEN:  People offer that in evidence,

18    Your Honor.

19         MR. LEMKE:  No objection, Your Honor.

20         THE COURT:  Mark it in evidence.

21         THE COURT OFFICER:  People's 26 marked in

22    evidence.

23         Do you want it shown back to the witness?

24         MR. HAYDEN:  Yes.  Thank you.

25         MR. HAYDEN:  With the Court's permission, Your

MO

1      Honor, may the detective step down and describe to the

2      jury the contents of that clear plastic bag?

3              MR. LEMKE:  No objection.

4              THE COURT:  Go ahead.

5      A      This is the bullet jacket fragment, this was

6  recovered from the crime scene.  This is the piece of copper

7  jacket that I explained to you that surrounds the lead core.

8  Okay.  This was a piece of lead core that separated from a

9  bullet jacket fragment.  This is the bullet jacket fragment.

10  That is the bullet core.  This is lead.  This is copper.

11  Copper alloyed.  Okay.

12      Show you over here.  Bullet fragment.  That is a bullet

13  jacket.  That is the lead bullet core.

14      Q      How did it come apart like that?

15      A      Upon impact it will sometimes separate.  That is

16  basically what happens during impact depending on what it

17  strikes.  It will leave its, it will leave its jacket and

18  separate.

19      Q      Both separated parts would tear through the target?

20      A      Yes, both will enter.

21      Q      Fragments?

22      A      Usually, yes.

23      Q      Please retake the stand.

24      Did you microscopically examine the bullet jackets and

25  metal cores?

DiBeneditto - People - Direct

A    Yes, I did.

Q    Describe how you did that?

A    By use of a comparison microscope which is basically two microscopes sharing an optical bridge that allows me to look at two images simultaneously under the same magnification.

Q    Describe any observations you made?

A    I observed on the bullet jackets striations which are scratches across the surface, and I was able to identify the bullet jackets to one another.

Q    Tell the jury what you're talking about when you say striations.  What is that?

A    Okay.  Striations are, when a barrel is manufactured, the manufacturer will cut grooves into a barrel.  Now, those grooves, when a firearm is discharged, those grooves, the raised portion are called lands.  So there the grooves cut into this piece of metal.  The raised portion of those grooves are called lands.

Now, what happens, when the firearm is discharged, the firearm, the bullet will then take up that riffling or those grooves and those lands impressions and they'll take up that and it will be imparted onto that bullet.

And, that is what I am looking at.  Those series of scratches.  I am looking at that to identify a bullet.

Q    Each gun will have these lands and grooves inside

DiBeneditto - People - Direct

1   the barrel?

2       A   Yes, each gun.

3       Q   And, in each gun the lands and grooves will be

4   different?

5       A   Yes.  Each firearm will have its own unique

6   signature.

7       Q   And, as each bullet comes down through the barrel,

8   the unique set of lands and grooves will be imprinted on the

9   bullet?

10      A   Yes.

11      Q   Help identify it for future reference?

12      A   Yes.

13      Q   Based upon your training and experience, and upon

14  your microscopic examination of the three bullets, did you

15  form an opinion, with a reasonable degree of scientific

16  certainty, about whether they were fired from the same

17  handgun?

18      A   Yes.

19      Q   What is that opinion?

20      A   That the bullet jacket fragments exhibit sufficient

21  quantity and quality of matching striation patterns for a

22  positive identification or a common source firearm.

23      Q   I am directing your attention to around 5:44 that

24  Saturday afternoon.

25      Were you involved with the investigation then?

MO

DiBeneditto - People - Direct

1     A     Yes.

2     Q     Did you obtain Bobby Calabrese's clothing then?

3     A     Yes, I did.

4     Q     How did you obtain it?

5     A     I obtained it in a brown paper bag.

6     Q     Did the clothing include a hooded pullover sweat

7  shirt?

8     A     Yes, it did.

9     Q     Would you describe it?

10     A     A gray sweat shirt that had a mermaid on it, that

11  also ha the word Unsound.  It had, it had defects, which I

12  mean, holes, on the front of the sweat shirt.  It had a, on

13  the front of the sweat shirt it had also had a tear right

14  down by where the hood and the sweat shirt actually meet.

15  And then also the pocket was also kind of torn.  It was

16  pulled.  And then on the back of the sweat shirt, there were

17  two bullet hole entries that the, and that had also two more

18  holes that looked like there was a path that the bullet

19  traveled before it struck the victim.

20     Q     And the right sleeve?

21     A     The right sleeve had one hole and another hole

22  which appeared to be the exit hole.

23     Q     I am directing your attention to around 3:19 on the

24  afternoon of Wednesday, December 22, 2004.

25     Were you involved with the investigation then?

MO

DiBeneditto - People - Direct

1       A     Yes, I was.

2       Q     Did you obtain a handgun then?

3       A     Yes, I did.

4       Q     How did you obtain it?

5       A     I received it in our firearms clothing room.  It

6    was a white bucket that had, I believe, emergency shower

7    tester on it, and the gun was in water when I received it.

8                   MR. HAYDEN:  Your Honor, may we approach for a

9          moment.

10                  THE COURT:  Yes.

11             (Whereupon, there was a bench conference held off

12         the record.)

13                  THE COURT:  Ladies and gentlemen we're going

14         to take like a two minute break.  Same admonitions

15         apply.  Don't discuss this case among yourselves or with

16         anyone else.

17             Please take the jury out.

18                  THE COURT OFFICER:  Leave your note pads on

19         the chair.

20                  THE COURT:  You can step down.

21             (Whereupon, there was a recess in the proceedings.)

22                  THE COURT OFFICER:  Ready for the jury.

23                  THE COURT:  Yes.

24                  THE COURT OFFICER:  Jury entering.

25                  THE CLERK:  Let the record reflect the

MO

DiBeneditto - People - Direct

```
 1          presence of counsel, defendant and the jury.
 2                    THE COURT:  I said two minutes and I stuck to
 3          that time.
 4               Mr. Hayden.
 5                    MR. HAYDEN:  Yes.
 6               May I have 55 in evidence shown to the witness.
 7                    THE COURT:  Witness has 55 in evidence.
 8          Q    Do you recognize that?
 9          A    Yes, I do.
10          Q    What is that?
11          A    This is the white bucket the firearm was sitting in
12     water and I know it is because of my initials and dates I
13     opened it.
14          Q    Was it sealed when you obtained it?
15          A    Yes, it was.  It was sealed with red tape.
16          Q    You broke the seal?
17          A    Yes, I broke the seal.
18          Q    Describe the gun you received?
19          A    I received a Smith & Wesson Model 29.  It's an
20     eight inch barrel.  It's a heavy firearm.  It's, basically,
21     it's a hunting firearm when the barrel is that long.
22          Q    What is the serial number?
23          A    I believe it's BCA9255.
24          Q    How do you reach the serial number?
25          A    On this particular firearm it has a rubber grip.
```

MO

DiBeneditto - People - Direct

1    That rubber grip needs to be removed.  It's on the butt of

2    that firearm.

3                    MR. HAYDEN:  May I please have 40 for

4         identification shown to the witness.

5                    THE COURT:  Yes.

6                    THE COURT OFFICER:  The witness has 40 for ID.

7    Q    Do you recognize that?

8    A    Yes, I do.

9    Q    Is that the handgun you obtained?

10   A    Yes, it is.

11   Q    Do you recognize other contents of that clear

12   plastic bag?

13   A    Yes, I do.  These are the tests that I took to make

14   my identification and to also let me know the firearm is

15   operable.

16                   MR. HAYDEN:  People would offer that in

17        evidence, Your Honor.

18                   MR. LEMKE:  No objection, Your Honor.

19                   THE COURT:  Mark it in evidence.

20                   THE COURT OFFICER:  People's 40 marked in

21        evidence.

22              Do you want it shown back to the witness.

23                   MR. HAYDEN:  Yes, please.

24   Q    Tell the jury what you mean by the caliber of the

25   gun?

DiBeneditto - People - Direct

1      A      The caliber of a gun is measured from the barrel

2      from hand to hand and that will give me the caliber.   It's

3      usually measured, it is measured in thousands of an inch.

4      Q      What do you mean when you say 44 caliber?

5      A      It's a designation, but this particular bullet and

6      barrel are measured at 4.1 one thousandths of an inch.

7      Q      What is the significance of the term magnum.   When

8      you say 44 magnum revolver?

9      A      It's a, more gunpowder that is added to the

10     cartridge to add more power to the ammunition component.

11     Q      What does that mean?

12     A      It means there's more power, more veracity, the

13     bullets will travel at a faster speed.

14     Q      Did you weigh the 44 magnum in evidence?

15     A      Yes, I did.

16     Q      How much does it weigh?

17     A      3.66 pounds.

18     Q      Did you determine the trigger pull?

19     A      Yes, I did.

20     Q      What do you mean by trigger pull?

21     A      This particular firearm fires in single action and

22     double action.   Single action means pulling of the hammer

23     back, then pulling of the trigger.   Also double action means

24     it run continuous, pull of the trigger will allow this

25     firearm to discharge.   Now, the trigger pull, when I measured

DiBeneditto - People - Direct

1    the trigger pull, it takes, it is measured in how many pounds

2    it takes to pull back this trigger to discharge.

3        Q    Tell the jurors how you determine that?

4        What kind of a device do you use?

5        A    We use static weights.  It's weights that are

6    placed on a hock and that hock gets placed on the trigger,

7    and whatever weight pulls down that trigger and makes the

8    firearm discharge will tell me how much, how many pounds of

9    pressure it takes for me to pull that trigger and to

10   discharge that gun.

11       Q    What was the trigger pull in single action?

12       A    Three to three and-a-half pounds.

13       Q    Once again, that would be, you cock back the hammer

14   so it sits in a cocked back position and then you pull the

15   trigger; is that right?

16       A    That's correct.

17       Q    What is the trigger pull in double action?

18       A    Around eleven to eleven and-a-half pounds.

19       Q    That means you take the gun and you pull the

20   trigger straight through?

21       A    That's correct.

22       Q    And that takes back the hammer and sends the hammer

23   forward; is that right?

24       A    That's correct.

25       Q    And the hammer hits the primer an ignites the gun

DiBeneditto - People - Direct

1   powder, and that propels the projectile out of the nuzzle at

2   the end of the barrel; is that right?

3        A    Yes, that's correct.

4        Q    You test fired the 44 Magnum revolver?

5        A    Yes, I did.

6        Q    How many times?

7        A    Approximately four times, five times.

8        Q    Describe for the jury how you did that?

9        A    When we test a firearm we want to recover the

10   bullets and the cartridge cases so we use what we call a

11   ballistics water tank.  All it is it's a long tank that has

12   water in it, and what that does is it helps or aids us in

13   recovering the bullet in the best condition possible.  We try

14   to get it to being in a pristine position so we can identify

15   it on the comparison microscope so we can analyze it.

16        Q    Was there a quick recoil when you fired the 44

17   Magnum revolver?

18        A    Yes, this firearm has a very strong recoil, a very

19   strong kick.

20        Q    Tell the jury what you're talking about?

21        A    When you shoot a gun sometimes the gun will, you

22   can shoot, it will kick back a little bit.  What I mean by

23   kickback, this particular firearm, when I shoot it, it will

24   come back at you.  It's a very powerful firearm.

25        Q    Describe how you held the 44 Magnum revolver while

MO

DiBeneditto - People - Direct

1    you were test firing it?

2        A    When I test fired this firearm I used two hands to

3    test fire a 44 Magnum.

4        Q    Show the jurors what you mean.  How did you hold

5    it?

6        A    I would hold it like this.  So, to help me to

7    rebound from that recoil so I can keep my gun on the target.

8        Q    Did you recover bullets that were test fired from

9    the revolver?

10       A    Yes, I did.

11       Q    Are those the bullets that are contained in that

12   clear plastic bag?

13       A    Yes, it is.

14       Q    Did you microscopically compare the test fired

15   bullets with the three bullets recovered during the

16   investigation?

17       A    Yes.

18       Q    Describe for the jury how you made those

19   comparisons?

20       A    By the use of the comparison microscope again.  I

21   compared my tests to the evidence that was submitted, from

22   the medical examiners's office, and from the crime scene,

23   bullet jacket fragment.

24       Q    Describe how you used the microscope to make a

25   comparison?  How you line up the test bullets.  How do you

MO

DiBeneditto - People - Direct

1    line up the bullets recovered from Bobby?

2        A    You would take the bullet and you would, the

3    evidence stays on the left hand side so I never get

4    confused.  So, you place the bullets on the left hand side,

5    the evidence, and your tests on the right.  Now, I explained

6    before the comparison microscope.  We have binoculars that

7    you're able to look with both eyes.  You have one piece of

8    evidence here, one piece of evidence here, and one test

9    here.  And you're able to move those back and forth so you

10   can look at the lands and the grooves and you're able to make

11   an identification that way.

12       Q    Based upon your training and experience and upon

13   your comparison of the test fired bullets with the bullets

14   recovered during the investigation, did you form an opinion

15   with a reasonable degree of scientific certainty whether the

16   recovered bullets were fired from the same 44 Magnum revolver

17   as the test fired bullets?

18       A    Yes.

19       Q    What is that opinion?

20       A    My opinion is that they showed no exhibited

21   sufficient amount of quantity and quality of matching

22   striation patterns from my test to my evidence to tell me

23   this particular firearm did fire those bullet jackets.

24       Q    Did you examine Bobby Calabrese's sweat shirt?

25       A    Yes, I did.

DiBeneditto - People - Direct

1    Q    Did you examine it with a naked eye?

2    A    Yes, I did.

3    Q    Describe any observations you made with the naked

4    eye?

5    A    It was a very bloody T-shirt.  I mean the sweat

6    shirt, excuse me, it was very bloody, a large amount of blood

7    on the arm.  There was a bullet whole entry on one side,

8    bullet whole exist on the opposite side.  There was a bullet

9    whole, there was a defect in the front of the sweat shirt.

10   There was also a tear in the top piece.  Then on the back of

11   it, I saw two more bullet hole entries that had very distinct

12   bullet wipe and there was two other defects in that sweat

13   shirt.

14   Q    You said there were two other defects?

15   A    Yes.

16   Q    What do you mean by that?

17   A    There's other holes there that lined up with one of

18   the other, with the bullet hole entry.

19   Q    They were tears?

20   A    Yes, sir, they were tears.

21   Q    Did you examine the sweat microscopically?

22   A    By the use of a stereo microscope.

23   Q    How did you do that?

24   A    It's a lower, the stereo microscope is a lower

25   magnification microscope, and what I would do I would examine

DiBeneditto - People - Direct

1    over the bullet hole entries and what I would look for is

2    that particulate, I would look at the bullet wipe, and I

3    would try to come up with some kind of a pattern that I could

4    look at so I could determine what kind of a distance I am

5    looking at.

6        Q    Describe any observations you made while examining

7    the sweat shirt microscopically?

8        A    I observed, I observed particulate grouping,

9    particulate around the bullet hole entries in the back of the

10   sweat shirt, both bullet hole entries.  Also saw a strong

11   indication of bullet wipe or a discharge or indicators there

12   was a bullet that passed through this sweat shirt.

13       Q    Once again what do you mean by particulate?

14       A    Partial burn or unburned gunpowder.

15       Q    Did you conduct tests to determine the nuzzle to

16   gun distance between the 44 magnum, the nuzzle of the barrel

17   of the 44 magnum and the sweat shirt?

18       A    Yes.

19       Q    What do you mean by the nuzzle?

20       A    The nuzzle is the end of the barrel.  It's where

21   the bullet exits.

22       Q    What do you mean by nuzzle to garment distance?

23       A    That exit point end of that nuzzle to the target

24   where clothing or the victim might be.

25       Q    Describe the tests you conducted.

DiBeneditto - People - Direct

1     A     I conducted a test by test firing what we call a

2  snail trap, small version of a trap, which the shooter would

3  shoot of a range, just a small little piece I would shoot in

4  so the bullet would disintegrate into that snail trap.

5     What I did was, I shot at contact, near contact, and by

6  near contact I mean a half inch to three inches, six inches,

7  nine inches, fifteen inches, eighteen inches, twenty-four

8  inches, thirty-six inches and forty-eight inches.

9     Q     Based on your training and experience and upon your

10  microscopic examination of the sweat shirt, and upon the

11  tests you conducted with the 44 Magnum, did you form an

12  opinion, with a reasonable degree of scientific certainty,

13  about the nuzzle to garment distance between the 44 Magnum

14  revolver and Bobby Calabrese's sweat shirt?

15     A     Yes.

16     Q     What is that opinion?

17     A     My opinion, it's not less than six inches and not

18  more than forty-eight inches.

19     Q     Describe the basis for that opinion?

20     A     I visually compared my tests that I conducted to

21  my, to the evidence, sweat shirt.

22             MR. HAYDEN:  With the Court's permission, may

23         Detective DiBeneditto step down before the presenter,

24         Your Honor.

25             MR. HAYDEN:  I will now place People's 10 in

DiBeneditto - People - Direct

1      evidence on the presenter.

2                    THE COURT:   Yes.

3      Q     Do you see bullets wipe in that photograph?

4      A     Yes.

5      Q     Show the jurors the bullet wipe depicted in that

6      photograph?

7      A     Bullet wipe usually like I said might be gray to

8      dark gray.   This is the peripheral area of the bullet hole

9      entry.   There's a very strong indication of bullet wipe.

10     Q     It appears in the photograph as a circle around the

11     bullet hole itself; is that right?

12     A     That's correct.

13     Q     Something you might have put there with a lead

14     pencil?

15     A     That's correct.

16     Q     But it's actually from the bullet itself?

17     A     Right.

18     Q     Please retake the witness stand.

19     Nothing further at this time.   Thank you.

20                    MR. LEMKE:   May I?

21                    THE COURT:   Yes, Mr. Lemke.

22     CROSS EXAMINATION

23     BY MR. LEMKE:

24     Q     Good morning, detective.

25     A     Good morning, sir.

DiBeneditto - People - Cross

1    Q    Detective, based on your training and now the

2    evaluation of the sweat shirt which is now in evidence, in

3    simplest form, there is a, basically a residue that was left

4    on the sweat shirt, correct?

5    A    That's correct.

6    Q    That residue is either, for an simpler way to put

7    it, gunpowder?

8    A    Are you talking about the ring around the bullet

9    hole entry.

10    Q    Yes.

11    A    That could be lubricant, it could be lead filings

12    inside that barrel, it could be different things, but it

13    appears to be lead.

14    Q    But it gives you a clear indication of whether or

15    not a firearm was discharged within a perimeter of the body;

16    is that correct?

17    A    I don't base my opinions just on the bullet wipe.

18    Base it also on the amount of particulates, the grouping of

19    particulates.

20    Q    And based on everything that you based your opinion

21    on, clearly this weapon was fired within four feet to no

22    closer than six inches; isn't that correct?

23    A    That's correct.

24    Q    Because if the barrel of the weapon would be placed

25    up against the neck of somebody, that would leave certainly a

MO

DiBeneditto - People - Cross

1    different demarcation?

2         A    On the wounds or clothing?

3         Q    On either.

4         A    On clothing it would give me an indication of a

5    stellate shape, star shape pattern.

6         Q    You did not have that?

7         A    I did not have that.

8         Q    That is why you can tell this jury it had to be the

9    closest six inches away, correct?

10        A    Based on those tests that I shot, yes.

11        Q    And, if somebody, for example, is standing about

12   five feet away from the deceased and the deceased is

13   standing, and the weapon is then held up another foot

14   and-a-half, and then fired, therefore about three and-a-half

15   feet from the deceased, that would also be consistent with

16   your findings, correct?

17        A    Not five feet, approximately four feet.

18        Q    Forty-eight inches?

19        A    That's correct.

20        Q    If I am standing five feet away, and I raise the

21   weapon which is in evidence as you have said, this can be

22   discharged with one hand?

23        A    It can, yes.

24        Q    Also be again discharged with two hands, correct?

25        A    That's correct.

MO

DiBeneditto - People - Cross

Q    And clearly the trigger power depending how the weapon is held, if I am holding this weapon, which is in evidence, up, foot and-a-half from my body, or three and-a-half feet from the deceased, that is consistent with your findings?

A    Yes, that's correct.

Q    Were you also able to evaluate the paths of the bullet through the sweat shirt, in through the body, that would be the medical examiner, you didn't make any evaluation or opinions, the one that was given to me at the crime scene?

Yes?

A    I was able to identify that to my tests, that particular bullet jacket fragments was a common source of the ones that came from his body.  And also I was able to identify that as being a positive identification to the one from the crime scene to this firearm.

Q    No, no.  My question is, were you able to determine from your looking at, for example, the sweat shirt, the manner in which it came through the shirt, the, where -- withdrawn.

The sweat shirt I looked at it had a bullet wound, a couple of holes in the right sleeve; isn't that correct?

A    Right.

Q    And you evaluated and examined that, correct?

DiBeneditto - People - Cross

1    A    That's correct.

2    Q    You're able to tell that the bullets entered from

3    basically the outside of the sweat shirt, correct?

4    A    Yes, it was in this kind of a way when it struck

5    and then exited.

6    Q    Right.  So, in other words, if I am standing like

7    this, this so the record reflects, my right hand's up against

8    my head, it's consistent with the gun powder residue on the

9    outside coming in, correct?

10    A    It's consistent with.

11    Q    Because on this side there was no residue so

12    clearly that is the entrance wound?

13    A    That would be my exit.  That would be my exit.

14    Q    That is consistent with your findings, correct?

15    A    That's correct.

16    Q    Okay.  And when you went to the medical examiner's

17    office, were you involved with any of the determinations as

18    to this one bullet that came in from the end, and entered the

19    back of his ear?

20    Were you involved in any of that?

21    A    I was aware of it, yes.

22    Q    So, you're there, you're with the medical examiner,

23    you're evaluating not only the sweat shirt but you're where

24    examination, based on your qualifications as an expert, so

25    forth, it's consistent with the firing of this weapon because

DiBeneditto - People - Cross

1    the power behind it, that if I am holding my right hand as we

2    discussed over my head to protect myself, it's consistent

3    with the bullet coming from the outside, exist wound on the

4    inside, it's still powerful enough to come into the back of

5    my ear.

6        Isn't that correct?

7        A    That is correct.

8        Q    Okay.  In fact, that is what you had found when you

9    evaluated the sweat shirt at that point with the body of

10   Mr. Calabrese, correct?

11       A    That's correct.

12       Q    And then while you were there, you also found two

13   other bullet wounds that went through the sweat shirt

14   consistent with two shots then that were fired a little lower

15   to the, basically, the base of the skull; isn't that correct?

16       A    That is correct.

17       Q    And that would be consistent with somebody standing

18   perhaps, perhaps over the body and pulling the trigger twice;

19   isn't that correct?

20       A    Possibly, yes.

21       Q    In fact, the weapon is powerful enough that one of

22   those bullets could have gone through, in fact, the skull and

23   exited the face, correct?

24       A    That's correct.

25       Q    In this case one of them did, it exited the left

MO

DiBeneditto - People - Cross

1    cheek?

2        A    No, it exited the cheek.

3        Q    Consistent with somebody standing over him and

4    pulling the trigger?

5        A    I don't know how consistent that is.

6        Q    That would be for the medical examiner?

7        A    Yes.

8        Q    With the entrance and the exist wounds, correct?

9        A    He would be able to make those determinations.

10       Q    Okay.   Thank you.

11               THE COURT:   Anything further, Mr. Hayden.

12               MR. HAYDEN:   No, Your Honor.

13               THE COURT:   You can step down.   Have a nice

14   day.

15               THE WITNESS:   Thank you.

16           (Witness excused.)

17               THE COURT:   Ladies and gentlemen, we're going

18   to take a en minute break while we set up for the next

19   witness.   My same admonitions apply.   Don't discuss the

20   case amongst yourselves or with anyone else.   You're

21   going to be taken back into the jury room for about ten

22   minutes.

23               THE COURT OFFICER:   Leave your note pads on

24   the chair.

25           (Whereupon, the following takes place outside the

Proceedings

1        presence of the jury.)

2                THE COURT:  Before we start the next witness,

3        if there's anyone wants to leave the courtroom, feel

4        free to leave now.

5            Mr. Lemke, during this ten minutes, approach, Mr.

6        Hayden.

7            (Whereupon, there was a discussion held off the

8        record.)

9                THE CLERK:  Let the record reflect the

10       presence of the jury and the alternates, counsel's

11       present and the defendant is present.

12               THE COURT:  Both sides ready to continue?

13               MR. HAYDEN:  Yes.

14               MR. LEMKE:  Yes.

15               THE COURT:  Mr. Hayden, call your next

16       witness.

17               MR. HAYDEN:  Dr. Michael DeMartino.

18   DR. MICHAEL DeMARTINO, called as a witness by the People,

19       having been first duly sworn by the Clerk of the Court,

20       was examined and testified as follows:

21   DIRECT EXAMINATION

22   BY MR. HAYDEN:

23               THE CLERK:  Have a seat.  State your name, an

24       spell your last name for the record.

25               THE WITNESS:  Michael DeMartino,



MO

752

Proceedings

| 1 | D-E-M-A-R-T-I-N-O. |
| 2 | THE COURT:  Good morning, doctor. |
| 3 | THE WITNESS:  Good morning. |
| 4 | THE COURT:  Mr. Hayden. |
| 5 | MR. HAYDEN:  Yes, Your Honor. |
| 6 | Q    Good morning. |
| 7 | A    Good morning. |
| 8 | Q    Are you a doctor licensed to practice medicine in |
| 9 | the state of New York? |
| 10 | A    Yes, I am. |
| 11 | Q    Do you specialize in forensic pathology? |
| 12 | A    Yes, I do. |
| 13 | Q    What do you mean by pathology? |
| 14 | A    Pathology is a specialty of medicine, and it's |
| 15 | involved basically in simply with making diagnoses by |
| 16 | examining tissue and body fluids. |
| 17 | Forensic pathology is a subspecialty of pathology and it |
| 18 | basically is involved with the, applying the practice of |
| 19 | medicine and pathology to legal issues. |
| 20 | Q    Describe your educational background? |
| 21 | A    After college, I went to medical school, State |
| 22 | University of New York, Downstate Medical City which is in |
| 23 | Brooklyn, New York.  After medical school I did an internship |
| 24 | in pediatrics, and then a residence in anatomical and |
| 25 | clinical pathology at North Shore University Hospital in |

MO

Proceedings

1    Manhasset.  After that I did a fellowship in forensic

2    pathology at the Nassau County Medical Examiner's Office.

3        Q    Describe your professional background?

4        A    After completing my fellowship at the Nassau County

5    Medical Examiner's Office, which was in 1990, I initially was

6    employed by the Suffolk County Medical Examiner as deputy

7    medical examiner.  I stayed there for about fifteen months

8    until I returned to the Nassau County Medical Examiner's

9    Office where I worked as a Deputy Medical Examiner until a

10   couple of years ago when I became deputy chief medical

11   examiner.

12       Q    Describe your work as a deputy chief medical

13   examiner?

14       A    First of all the medical examiner is involved with

15   investigating and certifying death when it occurs under

16   certain conditions.  And those conditions would be if a death

17   occurs suddenly or unexpectedly or if a death occurs due to

18   unnatural causes of any kind, when trauma is involved, it

19   involves the medical examiner.  Any death that occurs under

20   suspicion circumstances.  Any death where a person was not

21   under the care of a physician.

22       These are all the kinds of deaths that we're involved

23   with, and it's our function to investigate the circumstances

24   surrounding the death and also to ultimately certify the

25   cause and manner of death.

MO

Proceedings

1      As deputy chief medical examiner my additional roles are

2   to supervise the pathologists, substitute for the chief

3   medical examiner when the chief medical examiner is not

4   available, and also to be an active participant in

5   investigating and certifying medical examiner deaths.

6      Q    Did you perform autopsies?

7      A    Yes, I do.

8      Q    Tell the jury what you mean by an autopsy?

9      A    An autopsy is an examination of a dead body.  And

10  it involves examining the remains both externally and

11  internally, documenting all of the significant findings or

12  absence of findings.  It may involve taking photographs,

13  doing any number of other studies based upon the nature of

14  the death.   It also involves an internal examination which

15  basically involving making surgical incisions on the body and

16  examining all of the internal organs.

17     Q    How many autopsies have you performed?

18     A    I personally have performed well over three

19  thousand.

20     Q    I am directing your attention to Saturday, December

21  4, 2004.

22     Did you perform an autopsy that day on a young man named

23  Bobby Calabrese?

24     A    Yes, I did.

25     Q    Briefly describe Bobby Calabrese?

Proceedings

1      A     Just very briefly he was a white male, consistent

2   with stated age of twenty-four years.  He was sixty-six

3   inches in height, he weighed 157 pounds.

4      Q     Did you examine him externally and internally?

5      A     Yes, I did.

6      Q     Describe the observations you made while examining

7   Bobby's right forearm?

8      A     When I examined his right forearm I noted the

9   presence of a gunshot wound.

10     Q     Where was it?

11     A     It involved the proximal forearm which is closer,

12  close to the elbow, three and-a-half inches below the elbow.

13  The bullet entered the back of the forearm and it went

14  through the forearm without hitting bone and produced a large

15  gaping exit wound on the front or the central surface of the

16  forearm.  When I say front, I mean with the palm facing

17  forward.  That would be the front.

18     Q     How did you determine the entry wound from the exit

19  wound?

20     A     Well, the exit wound was, as I mentioned, a large

21  gaping irregular wound which one never sees in an entrance

22  wound.  There was no confusion whatsoever that the entrance

23  wound was on the back of the forearm.

24     Q     Describe how you determine an entry wound?  What

25  does that mean?

Proceedings

1   A   An entry wound has a more regular round usually

2   appearance, has marginal abrasions, sometimes there's soot

3   stippling or searing associated with the wound.

4   Q   And the exit wound?

5   A   An exit wound does not have any of those things.

6   Often times it's irregular.  A lot of times it's larger than

7   the entrance wound.

8   Q   Why is that?

9   A   Because as a bullet is going through the body a

10  number of things can happen.  The bullet can be tumbling, the

11  bullet could become deformed, the core and jacket can

12  separate, and as the bullet is exiting the body it's not

13  going to be going through the skin, its subcutaneous tissues

14  as a regular, in the same kind of first position it does when

15  it enters the body.  It could begin rotating.  So, it's

16  coming out sideways or deformed, and all of this can cause

17  the exit wound to appear much larger than the entrance wound.

18  Q   Do you determine wound track for a wound like

19  that?

20  A   Yes.

21  Q   What was the wound track?

22  A   Basically it was going back to front and a

23  horizontal plane.

24  Q   Describe any observations you made while examining

25  Bobby Calabrese's head?

757

Proceedings

1      A    When I examined his head, there was obviously

2   deformity of his head due to extensive fractures of his skull

3   and his facial bones, and that was a result of three gunshot

4   wounds.

5      Q    Where were those wounds?

6      A    Two of them were on the back of the head, and they

7   were both to the left of the midline.

8      I can give you the exact measurement if you want.  I am

9   going to refer to a copy of my autopsy report, if you want

10  that.

11                 MR. HAYDEN:  With the Court's permission.

12                 MR. LEMKE:  No objection, Your Honor.

13                 THE COURT:  Yes.  Is it marked for ID?

14                 MR. HAYDEN:  No, we should mark it.

15                 THE COURT:  People's 69 for identification.

16                 THE COURT OFFICER:  People's 69 marked for

17      ID.

18         The witness last 69.

19                 THE COURT:  You can refer to those, doctor.

20                 THE WITNESS:  Thank you.

21                 THE COURT:  You're welcome?

22      A    There were a total of four gunshot wounds.  Just

23  summarize.  There was three to the head and one to, in the

24  forearm I already described, and I just want to state they

25  were arbitrarily numbered for the purposes of my description

MO

Proceedings

1    in the report and don't indicate the order of fire.

2         What I described as gunshot wound number one was on the

3    back of the head, to the left of the midline.  And that was

4    four and-a-half inches from the top of the head, two and two

5    quarters to the left of the midline.  And that consisted of

6    an entrance wound with a marginal abrasion.  And no

7    surrounding soot or stippling was seen on the body.  There

8    was no searing associated with it.  There was some small

9    radiating lacerations emanating from the margins of the wound

10   however.

11        Q    Did you measure the wound?

12        A    In diameter?

13        Q    Yes.

14        A    Yes, I did.  And that would was three eighths of an

15   inch in diameter.

16        Q    Did you determine a wound track?

17        A    Yes, I did.

18        Q    What was the wound track?

19        A    The projectile entered the head and perforated the

20   brain, and the direction of the bullet as it was going

21   through the head was back to front slightly left to right and

22   slightly upward.

23        Q    Did it exist?

24        A    Yes, it did.

25        Q    Tell the jury about that?

1      A      That bullet existed his head through a large gaping

2   crescent shape exit wound on the superior right cheek.

3      Q      The entry wound was considerably more regular than

4   the exit wound?

5      A      Correct.

6      Q      Describe the wound you designated number two?

7      A      That wound was also a gunshot wound to the head,

8   and the gunshot would of entrance was on the back of the head

9   on the left side, and the entrance wound was located one inch

10  to the left of the midline and six inches from the top of the

11  head.

12     Q      Describe the track of that wound?

13     A      That bullet produced a similar wound track in that

14  it entered the head and perforated the brain, and it then

15  actually was recovered from the body.  It did not exit the

16  body.  It was recovered from him, from the tissues of the

17  right cheek.  The superior right cheek.

18     Q      Describe the appearance of that wound to the back

19  of Bobby's head?

20     A      That wound was somewhat irregular having more

21  distinct and larger radiating lacerations.  Otherwise it had

22  a marginal abrasion and had characteristics of a typical

23  entrance wound.  The lacerations in this particular case

24  were, in my opinion, a result of the extensive fracturing of

25  the underlying skull, and the formation of a temporary cavity

Proceedings

1    as the bullet enters the body.

2        Q    What was the diameter of that entrance wound?

3        A    Well, again, it was irregular because of the

4    radiating lacerations, and they range from one quarter to one

5    and-a-quarter inches.  So, actually the whole wound measured

6    up to one and-a-quarter inches.

7        Q    What would -- those entered the back of the Bobby's

8    head; isn't that correct, both of those?

9        A    Correct.

10       Q    One exited through his right cheek; is that right?

11       A    Correct.

12       Q    That is the one you designated number one; is that

13   right?

14       A    Well, that bullet that exited his cheek I did

15   recover, but it was not from the body.  It was outside of the

16   body, and that I designated number one, and I recovered a

17   bullet core.

18       Q    Describe how you recovered that bullet core?

19       A    As he was being initially examined, actually before

20   the autopsy, as he was being examined and undressed the

21   bullet was found underneath his sweat shirt between his sweat

22   shirt and his right shoulder.

23       Q    Once again, that bullet entered from the back of

24   Bobby's head, exited through his right cheek, and the core of

25   that bullet alone was recovered by you outside in the sweat

MO

Proceedings

1    shirt; is that correct?

2        A    Well, it was between his sweat shirt and his right

3    shoulder outside of his body.

4        Q    And the second bullet, the one you designated

5    number two, that entered a half inch from the midline, six

6    inches from the top, and that bullet never exited Bobby's

7    head?

8        A    I believe it was one inch from the midline and,

9    yes, it is correct, it did not exit his head, and I recovered

10   that from the tissues of his right cheek.

11       Q    Describe the third wound?

12       A    The third gunshot wound to his head consisted of an

13   entrance wound that was on the right side of the head.  That

14   was posterior or behind the right ear by one and-a-half

15   inches, and that consisted of a somewhat irregular elongated

16   wound and had a total size of three quarter inches by one

17   quarter inch.  And that bullet entered his head and also

18   produced a wound track through his brain.  And the bullet

19   which consisted of a separated core and jacket was recovered

20   from the superior aspects of the left parietal lobe of his

21   brain.

22       Q    What does that mean?

23       A    It means that the bullet entered his head, went

24   through his brain, but didn't make it out of his head.

25   Remained in his head.  And I recovered the bullet from within

Proceedings

1   the brain matter on the left side.

2        Q    All three bullets that struck Bobby's head hit the

3   back of his head; is that right?

4        A    Yes.

5        Q    Only one of those bullets exited Bobby's head?

6        A    Correct.

7        Q    That bullet exited through the right cheek; is that

8   right?

9        A    Correct.

10       Q    Did you mark each of the bullets you recovered?

11       A    Yes, I did.

12       Q    Describe for the jury how you did that?

13       A    I marked the bullets with my initials MD, and the

14   numbers corresponding to the numbers that I designated when I

15   described the wounds.

16       Q    How did you contain the bullets after you recovered

17   them?

18       A    After they were recovered, and after I put my

19   initials and numbers on them, they were photographed and then

20   put in plastic containers which were labeled.

21       Q    How did you label them?

22       A    With a label, machine that produces the labels, and

23   then on the labels was written bullet number 1, 2 and 3, and

24   also my initials were put on the labels.

25       Q    Were fragments recovered as well?

MO

Proceedings

1      A    Yes.

2      Q    Were the fragments recovered?

3      A    They were recovered from within the brain.

4      Q    Tell the jury what you mean by fragment?

5      A    Well, when a bullet strikes something it could

6    break apart into fragments or small pieces. Some of them

7    could be very small and they often are found coinciding with

8    the wound track through the object that it's striking, and

9    that is what happened in this case, and those fragments were

10   recovered and submitted separately.

11              MR. HAYDEN:  Place I please have 53 in

12        evidence shown to the witness, Your Honor.

13              THE COURT:  Yes.

14              THE COURT OFFICER:  Witness has People's 53 in

15        evidence.

16     Q    Do you recognize the contents of that clear plastic

17   bag?

18     A    Yes, I do.

19     Q    Describe for the jury what they are?

20     A    There are four plastic containers in here, as I was

21   just describing, that are labeled, and each of the labels I

22   initialed, and also states what the contents of the

23   containers are, in this case as I said bullet 1, 2 and 3, and

24   fragments.

25              MR. HAYDEN:  May I please have 26 in evidence

MO

Proceedings

1          shown to the witness?

2                    THE COURT:  Yes.

3                    THE COURT OFFICER:   The witness has People's

4          26 in evidence.

5          Q      Do you recognize the contents of that clear plastic

6     bag?

7          A      Yes, I do.

8          Q      What are they?

9          A      There are five separate bags here.   Four of them

10    contain bullets or fragments I recovered when I did the

11    autopsy.   One envelope contains the first bullet core, or the

12    bullet core I labeled number one.   The second one contains

13    the core and jacket which was labeled two.   And the third one

14    contains the core and jacket which was labeled three.   The

15    fourth one contains the bullet fragments.   The fifth envelope

16    contains the bullet jacket fragments that was recovered from

17    the crime scene.

18                    MR. HAYDEN:  With the Court's permission, Your

19          Honor, may Dr. DeMartino step down before the jury and

20          describe for them where the contents of that clear

21          plastic bag were recovered during the course of the

22          autopsy.

23                    THE COURT:  Yes.

24    Q      Would you step down, doctor?

25                    THE COURT:  Take the exhibit with you.

MO

Proceedings

1              Please precede.

2      A      Everyone see?

3      This first envelope contains the jacket that was

4  recovered from the scene.  This I did not recover from the

5  body.  The second one contains the core that I recovered from

6  between his sweat shirt and his right shoulder.  This third

7  envelope contains the separated core and jacket which was

8  recovered from his right cheek.  Fourth envelope contains

9  bullet number three which consists of a separated core and

10  jacket which I recovered from his brain.  These are bullets

11  fragments that were recovered from his brain.

12     Q      Thank you, doctor.

13     Describe for the jury how you determined that each of

14  the wounds to the back of Bobby's head was an entry wound?

15     A      Well, I described what entrance wounds look like

16  and they ha those characteristics of entrance wounds, and

17  another thing that was seen which I did not mention before,

18  was that with an entrance wound, particularly to the head,

19  where the bullet is striking the skull which is a flat bone,

20  and if it's struck perpendicularly by the bullet, one sees a

21  pattern of bevelling on the skull.

22     Q      What do you mean by that?

23     A      What I mean by that is the edge of the defect

24  through the skull is not going to be perfectly straight going

25  through it.  It's going to be angled and it's going to be

Proceedings

1    angled in a particular way depending on which direction the

2    bullet is going in.  And if it's an entrance wound, one sees

3    typically inward bevelling.

4        And, in the wound that I examined, there was evidence of

5    inward bevelling to all three of them which indicates that

6    they were all entrance wounds.

7        Q    How did you determine that the wound to Bobby's

8    right cheek was an exist wound?

9        A    Well, partially because when I examined his head, I

10   was able to see that there was a wound track going from the

11   entrance wound on his head, the back of his head, going to

12   that area, and also the wound itself which I described as

13   being large and irregular, you know, was classic for an exit

14   wound.

15       Q    Based upon your training and experience, and upon

16   your examination of the exit wound to Bobby's face, did you

17   form an opinion, with a reasonable degree of certainty,

18   whether Bobby's face was against a hard surface when the

19   bullet that cause that exit wound was fired?

20       A    I would say it's very possible, it's consistent

21   with the right cheek up against something flat and hard at

22   the time that the bullet exited.

23       Q    Why do you say that?

24       A    Well, because the wound was associated with some

25   contusion around his margins and also one does see that kind

MO

Proceedings

1    of irregularity, a large gaping defect in that kind of a,

2    what is called a shored exit wound.

3        Q    Based upon your training and experience, and upon

4    your examination of Bobby Calabrese, do you have an opinion,

5    with a reasonable degree of certainty whether the bullet that

6    entered Bobby's head from his right ear could have first

7    passed through his right forearm?

8        A    I think it's entirely possible.

9        Q    Why do you say that?

10       A    Well, first of all, if one when examining him,

11   positioned his right arm up against the side, the right side

12   of his head, which I did, it was possible to line up the

13   wounds in such a way that they lined up.

14       Secondly, the entrance wound on the right side of his

15   head behind his right ear was somewhat elongated, somewhat

16   irregular, which is consistent with an entrance wound formed

17   by a bullet that was either deformed or was tumbling.  So, it

18   had some characteristics of an entrance wound, but it was

19   somewhat irregular which can be explained again if there's

20   some kind of abnormal motion of the bullet as it's entering

21   the head.

22       Q    Based upon your training and experience, and upon

23   your examination of Bobby Calabrese, do you have an opinion,

24   with a reasonable degree of certainty, whether the shooter

25   could have been facing Bobby from more than five feet away

Proceedings

1    when he fired the bullets and bullet core you recovered?

2    A    No, they couldn't have been facing each other,

3    looking at each other.

4    Q    Why is that?

5    A    Because there is no entrance wound on the front of

6    his head.

7    Q    Based upon your training and experience, and based

8    upon your observations of Bobby Calabrese, did you form an

9    opinion, with a reasonable degree of certainty, about the

10   cause of his death?

11   A    Yes, I did.

12   Q    What is that opinion?

13   A    My opinion is he died as a result of the multiple

14   gunshots wounds to his head which perforated his brain and

15   fractured his skull.

16   Q    Did you examine Bobby Calabrese's sweat shirt the

17   day of the autopsy?

18   A    Yes, I did.

19   Q    Describe any observation you made while examining

20   Bobby Calabrese's sweat shirt?

21   A    Well, the pertinent observations were that there

22   were multiple perforations on the sweat shirt that were

23   consistent with being caused by a bullet.

24   Q    Did you observe any tears to the sweat shirt?

25   A    I observe a tear on the front of the sweat shirt,

Proceedings

1    from the collar going down vertically for four inches, yes.

2        Q    Describe the location of each of the bullet holes

3    in Bobby Calabrese's sweat shirt?

4        A    There were three wholes on the back of his sweat

5    shirt on the upper left part of the back of his sweat shirt.

6    Two of those holes had a circumferential area of dark

7    discoloration.  The third one did not.

8        There was also a perforation on the back of his hood.

9    The sweat shirt had a hood, and on the back of the hood to

10   the left of the midline was a forth perforation.

11       There was also an irregular perforation on the upper

12   right chest area of the sweat shirt, and there were

13   perforations to the distal front and back right sleeve.

14       Q    Did you observe blood on Bobby Calabrese's sweat

15   shirt?

16       A    I observed what appeared to be blood, yes.

17       Q    Where?

18       A    I believe I observed it scattered throughout the

19   shirt.

20       Q    The front?

21       A    I am going to refer to my description.

22       I just described there's extensive scattered apparent

23   blood staining of the garment.  I didn't specify exactly what

24   part of it were blood stained.

25       Q    Based on your training and experience, and upon

MO

Proceedings

1    your examination of Bobby Calabrese's sweat shirt, do you

2    have an opinion, with a reasonable degree of certainty, about

3    whether more than, more than one of the bullet holes could

4    have been caused by a single bullet?

5         A    I think it's possible that one bullet could, could

6    cause more than one hole through a garment, and in this case,

7    I think it's very possible that one of the bullets, actually

8    two the bullets, produced more than one hole.

9         Q    Tell the jury how that can happen?

10        A    Well, first of all, the holes on the right sleeve,

11   I think as I described, there's one on the front and back of

12   the distal right sleeve.  I think that could have occurred by

13   a bullet entering and exiting his arm.  So, a single bullet

14   would cause two holes there.

15        But also on the upper left back area of the shirt, it's

16   possible that a bullet could cause more than one perforation

17   if the garment is folded.  So, you're going to have the

18   bullet going through layers of material.

19        Q    Based upon your training and appearance, and upon

20   your examination of Bobby Calabrese's sweat shirt, do you

21   have an opinion, with a reasonable degree of certainty,

22   whether the positions of the bullet holes in Bobby

23   Calabrese's sweat shirt were consistent with the sweat shirt

24   having been pulled over his head from in front of him and to

25   his left?

Proceedings

1      A     Yes, it is consistent.

2      Q     Describe the basis for that opinion?

3      A     Well, the basis of my opinion is that I, first of

4    all, have described the wounds on the body, and knowing that,

5    I positioned the shirt in such a way to see how the holes

6    could have lined up through the shirt with the wounds on the

7    body.  And, when doing so, it clearly can only line up if the

8    sweat shirt was pulled in the fashion that you're

9    describing.

10     Q     Were photographs taken the day of the autopsy of

11   Bobby's bullet wounds and clothing?

12     A     Yes.

13     Q     Were photographs taken of the bullets you

14   recovered?

15     A     Yes.

16              MR. HAYDEN:  Your Honor, may I please have 11

17        through 24 for identification shown to the witness,

18        please.

19              THE COURT:  Yes.

20              THE COURT OFFICER:  The witness has 11 through

21        24 for ID.

22     Q     Do you recognize those photographs?

23     A     Yes, I do.

24     Q     Are those photographs taken during the course of

25   the autopsy of Bobby Calabrese's body?

Proceedings

```
 1        A    Yes.

 2        Q    Are those photographs fair and accurate

 3   representation of Bobby's body, his clothing, and the bullets

 4   you recovered as they were the day of the autopsy?

 5        A    Yes, they are.

 6             MR. HAYDEN:  The People offer those

 7   photographs in evidence, Your Honor.

 8             MR. LEMKE:  Yes, Your Honor.

 9             THE COURT:  No objection?

10             MR. LEMKE:  Based on your ruling, none, Your

11   Honor.

12             THE COURT OFFICER:  People's exhibit 11

13   through 24 marked in evidence.

14        Do you want them shown back to the witness?

15             MR. HAYDEN:  No.  May I have them, please.

16             With the Court's permission may Dr. DeMartino

17   step down by the presenter.

18             THE COURT:  Yes.

19        Q    Please stand to the right of the presenter.

20             MR. HAYDEN:  Your Honor, may the record

21   reflect I am now going to place the photograph to the

22   right of exhibit 11 on the presenter.

23        Q    Please describe to the jury what that depicts?

24        A    That depicts the gunshots wound of entrance, what I

25   described as gunshot wound number one, on the left side of
```

Proceedings

1   the back of the head.

2        Q    Show the jurors what about that wound tells you

3   it's an entry wound?

4        A    It's hard to see in the picture, but the margin of

5   the wound is abraded and that is a characteristic on a

6   finding of an entry wound.   It is, even though it is

7   irregular to a small degree, much more round than you would

8   see in typical exit wounds.

9             MR. HAYDEN:   May the record reflect, Your

10        Honor I, am not placing the photograph to the right of

11        exhibit 12 on the presenter.

12       Q    Describe what that depicts?

13       A    That is the entrance wound, gunshot wound number 2,

14   and as I described it's a much more irregular wound, has

15   these lacerations, but over here, you can see a marginal

16   abrasion an that is very, in this case, diagnostic of an

17   entry wound, and as I described earlier, these lacerations

18   are a result of an underlying skull fracture and formation of

19   a temporary cavity that was formed when a bullet is going

20   through an object.

21       Q    Do you see bullet wound number one in that

22   photograph?

23       A    Yes.

24       Q    Point that out to the jury?

25       A    Bullet number one is here.

Proceedings

1      Q      Just tell the jury again the path of that bullet

2    wound, number one, to the you were left corner of that

3    photograph as you're looking at it on the screen?

4      A      The path of the wound track is going back to front,

5    left to right, and slightly upwards.

6      Q      Is that the bullet that travels out and exists

7    through Bobby's right cheek?

8      A      Yes.

9                 MR. HAYDEN:  May the record reflect I am now

10        displaying the photograph on the left side of 12 to the

11        jury.

12      Q      Using that photograph, showing the jurors, explain

13    to them what told you that was an entry would?

14      A      As I already describe there's a marginal abrasion

15    here.  Abrasion here.  And that, in combination with the

16    inward bevelling of the skull, which you cant see in this

17    picture, is diagnostic that that is an entrance wound.

18      Q      Actual point of entry is where?

19      A      The actual point of entry would be in this area

20    here.

21                 MR. HAYDEN:  May the record reflect, Your

22        Honor, that I am now going to display the photograph on

23        the left side of exhibit 13 to the jury.

24      Q      Describe to the jury what that depicts?

25      A      This depicts what I called gunshot would number

MO

Proceedings

1 three. This is the entrance wound. This is the right ear.

2 Here's behind the right ear entrance wound as I described is

3 somewhat elongated, somewhat irregular.

4     Q   Tell the jury what told you that it was an entry

5 wound?

6     A   Well, I, again, same thing. There's an abrasion

7 associated with the wound and also you can't see in the

8 picture, but was also diagnostic of whether there was a

9 presence of inward bevelling.

10           MR. HAYDEN: I am now displaying the

11     photograph to the right of 13.

12     Q   Describe what that photograph depicts?

13     A   This photograph shows the right side of the

14 decedent's face, and on the superior right cheek is the exit

15 wound by gunshot wound number one, this area here.

16     Q   Explain to the jury what told you that was an exit

17 wound?

18     A   Exits wounds because of its irregularity, it's

19 large size, the absence of any kind of soot stippling,

20 searing or marginal abrasion, and it also coincided with the

21 wound track of bullet wound number one which entered the back

22 of his head.

23           MR. HAYDEN: May the record reflect, Your

24     Honor, I am now going to display 14 in evidence.

25     Q   Describe to the jury what the photograph to the

Proceedings

1    right of that exhibit shows?

2        A    The photograph shows the back of the decedent's

3    right forearm, and you can see a gunshot wound did match the

4    gunshot wound entrance here, just a little bit distal to the

5    elbow on the back of the right forearm.

6        Q    And the photograph to the left?

7        A    That is a close up of the entrance wound.

8        Q    What tells you that that is an entry wound?

9        A    Very round punched out wound cookie cutter like

10   wound.  It has a marginal abrasion.

11              MR. HAYDEN:  Your Honor, I am now going to

12       display the photograph to the right of exhibit 15.

13       Q    Describe for the jury what that depicts?

14       A    This is a picture of the front of his right forearm

15   showing the exit wound on the proximal area of the front of

16   his forearm.  That would be this area here.  This large

17   gaping defect.

18       Q    How do you know that is an exit wounds?

19       A    Again, as I already described the lesion, its large

20   gaping wound, it has the characteristics of an entrance wound

21   such as a large gaping appearance, and it also did not have

22   any marginal abrasion.

23       Q    What causes all that damage?

24       A    Well, when a bullet, especially if its relatively

25   powerful round, enters an object, there is a transfer inside

MO

Proceedings

1    of energy to the bullet to the surrounding object, in this

2    case it's tissue, human tissue.  And what happens is a

3    temporary cavity is formed and it can basically rip apart the

4    tissue as we see here.  Causes gaping defects.

5            MR. HAYDEN:  I am now going display 16, Your

6        Honor.

7        Q    Describe for the jury what that photograph depicts?

8        A    This is a photograph of his sweat shirt showing a

9    perforation on the distal right sleeve.

10       Q    Is that entry or exit?

11       A    I believe that's the entry.

12           MR. HAYDEN:  I am now going to display the

13       photograph to the left of 17.

14       Q    Is that a fair and accurate depiction where the

15   hole behind Bobby's right ear was?

16       A    Yes.

17           MR. HAYDEN:  I am now going to display the

18       photograph on the right side of 17.

19       Q    What does that depict?

20       A    This is a photograph of his sweat shirt showing the

21   front of the sweat shirt.

22       Q    Where was the tear you described?

23       A    It extended from the collar area downward.  So, it

24   would be in this area here.

25           MR. HAYDEN:  I am now going to display the

Proceedings

1       photograph to the left of 18 in evidence.

2       Q     What does that depict?

3       A     This is a photograph of the back of the sweat shirt

4  showing the upper portion, left side, and here's the lower

5  part of the back of the hood.

6       In this picture we see four holes that are marked by

7  arrows.  Three of them are on the upper left back area and

8  one of them is on the lower left part of the hood.

9               MR. HAYDEN:  I am now going to display the

10          photograph to the right side.

11      Q     Does this depict the four holes about which you

12  testified?

13      A     Yes.  This is a close-up photograph of the same

14  thing I described.

15              MR. HAYDEN:  I am now going to display the

16          photograph at the bottom of exhibit 19.

17      Q     What does that depict?

18      A     This shows the sweat shirt, again, front of the

19  sweat shirt.  And what you can see here, this is the tear on

20  the front of the shirt extending downwards from the collar in

21  the midline.  Arrow is pointing to this perforating defect on

22  the upper right chest area.

23              MR. HAYDEN:  I am now going to show the

24          photograph at the top of 19.

25      Q     What does that depict?

MO

Proceedings

1        A      This is a close up of the perforation on the upper

2   right chest area.

3        Q      That perforation would be consistent with the

4   explosive power of an exit wound?

5        A      Yes.

6               MR. HAYDEN:   Now going to display the

7        photograph to the right of exhibit 20.

8        Q      What is that?

9        A      That is a photograph of a tank type shirt that he

10  was wearing underneath the sweat shirt.   And, you can see

11  here there's some separation at the seam of the collar on the

12  back to the left of the midline.

13              MR. HAYDEN:   I am now going to display top

14       photograph of 21 in evidence.

15       Q      What does that depict?

16       A      It's the same shirt that I described on the

17  previous photograph with a close up of the tear involving the

18  seam of the collar on the back of the shirt, the left of the

19  midline.

20              MR. HAYDEN:   I am now going to show the bottom

21       of 21.

22       Q      What is that?

23       A      It's a close up of the same thing showing the tear

24  of the collar.

25              MR. HAYDEN:   I am now going to display the

MO

Proceedings

1    bottom photograph on 22.

2        Q    What is that?

3        A    This is a photograph of the bullet core and jacket

4    that were recovered from his right cheek that correspond to

5    what I described as bullet wound number two.

6        Q    This didn't exit Bobby's head, this was recovered

7    from inside his head; is that right?

8        A    Correct.

9        Q    In the area of his right cheek?

10       A    Correct.

11                MR. HAYDEN:  Now going to display top

12       photograph of exhibit 23.

13       Q    What is that?

14       A    This is a photograph of the bullet four and bullet

15   jacket that were recovered from within the brain substance of

16   the decedent.  That was corresponding to what I described as

17   bullet wound number three.

18       Q    Where was this recovered?

19       A    From his brain, the right parietal lobe of his

20   brain.

21                MR. HAYDEN:  I am now going to dis --

22       A    Left parietal lobe.

23       Q    That is the left?

24       A    Correct.

25                MR. HAYDEN:  I am now going do display he

Proceedings

1      photograph at the bottom of 23.

2      Q    What is that?

3      A    This is a photograph of the core that was recovered

4   from outside of his body, that was found between his sweat

5   shirt and his right shoulder, and also from the bullet

6   fragments that were recovered.

7             MR. HAYDEN:  I am now going to display exhibit

8      24 in evidence.

9      Q     What is that?

10     A    This show the fragments that were recovered.

11     Q    Please retake the witness stand.

12            MR. HAYDEN:  Nothing further, Your Honor.

13   Thank you.

14            THE COURT:  Could you approach the bench,

15     counsel.

16        (Whereupon, there was a bench conference held off

17     the record.)

18            THE COURT:  Ladies and gentlemen in the

19   gallery, please remain seated while the jury leaves the

20   courtroom.

21        We're going do break now to two o'clock.  You must

22   not converse among yourselves or with anyone else upon

23   any subject connected with the trial.  You must not read

24   or listen to any accounts or discussions of the case in

25   the event it is reported by newspapers or other media.

Proceedings

1    You must not visit or view the premises or place where

2    the offense charged was allegedly committed or any other

3    premises or place involved in the case.

4        Prior to your being discharged, you must not

5    request, accept, agree to accept, or discuss with any

6    person the receiving or accepting of any payment or

7    benefit in consideration for supplying any information

8    concerning the trial.

9        You must promptly report to the Court any incident

10   within your knowledge involving an attempt by any person

11   to improperly influence any member of the jury.

12       You shall not access the Internet or Worldwide Wide

13   by any means available to you for the purposes of either

14   learning about this case or to learn about the law and

15   legal issues concerning the case.

16       See you at two o'clock.

17           THE COURT OFFICER:  Okay.  Jurors leave your

18   note pads on the chairs and follow me to out.

19           (Whereupon, the following takes place outside

20   the presence of the jury.)

21           THE COURT:  Doctor, you may step down.  Thank

22   you.

23       Mr. Hayden, Mr. Lemke, approach the bench.

24       Court's in recess until two o'clock.

25           L U N C H E O N   R E C E S S

MO