Proceedings

```
 1                    (Afternoon session.)
 2              THE CLERK:  Continued case on trial,
 3    167N-2005, People of the State of New York versus Mark
 4    Orlando.
 5         People ready.
 6              MR. HAYDEN:  Ready, Your Honor.
 7              THE CLERK:  Defense ready?
 8              MR. LEMKE:  Defense ready, Your Honor.
 9              THE CLERK:  Jurors are not present at this
10    time.  The defendant is in the courtroom.
11         Any applications before the jury is brought in,
12    counselor?
13              MR. LEMKE:  No, Your Honor.
14              MR. HAYDEN:  No.
15              THE COURT:  Mr. Hayden, any applications at
16    this time.
17              MR. HAYDEN:  No, Your Honor.
18              THE COURT:  I will bring the jury in.  We will
19    start cross examination, finish it, of the doctor, and
20    then I will, before I remove the jury for a few minutes,
21    I will ask both of you to approach so you can let us
22    know what you intend to do.
23              MR. HAYDEN:  Yes.
24              MR. HAYDEN:  I may want to make a phone call
25    before I make that decision, if I may.
```

MO

Proceedings

1          THE COURT:  Absolutely.

2          THE COURT:  So then at the end of this cross

3     examination or at the end of this witness I will break

4     for ten minutes.

5          THE COURT OFFICER:  Jury entering.

6          THE COURT:  Yes.

7          THE CLERK:  Let the record reflect the

8     presence of the jury and alternates.  The defendant is

9     present.

10        Are the People ready?

11         MR. HAYDEN:  Ready, Your Honor.

12         THE CLERK:  Is the defendant ready?

13         MR. LEMKE:  Ready, Your Honor.

14         THE CLERK:  Doctor, you're still under oath.

15         THE COURT:  Good afternoon, ladies and

16    gentlemen.

17        Mr. Lemke.

18         MR. LEMKE:  Thank you very much.

19         THE COURT:  You're welcome.

20    CROSS EXAMINATION

21    BY MR. LEMKE:

22        Q    Good afternoon, doctor.

23        A    Good afternoon.

24        Q    Doctor, on December 4, 2004, you previously

25    testified that you were involved with determining the cause

MO

DeMartino - People - Cross

1      of death for Mr. Calabrese; is that correct?

2          A    Correct.

3          Q    And, as part of that, you performed an autopsy;

4      isn't that correct?

5          A    Yes, it is.

6          Q    And, I believe you testified that when you first

7      examined the body of Mr. Calabrese, that he was wearing a

8      sweat shirt; isn't that correct?

9          A    Correct.

10         Q    He was also wearing sneakers, I believe, as well,

11     correct?

12         A    Yes, he was.

13         Q    And the light green tank top shirt, I believe,

14     correct?

15         A    Yes.

16         Q    And, one of the notations you made was the age of

17     Mr. Calabrese, correct?

18         A    Correct.

19         Q    Twenty-four years of age, correct?

20         A    Yes.

21         Q    His height measuring sixty-six inches, correct?

22         A    Correct.

23         Q    And his weight 157 pounds, correct?

24         A    Correct.

25         Q    The sweat shirt that he was wearing when he was

MO

DeMartino - People - Cross

1    brought in, he was still wearing that sweat shirt, correct?

2        A    Yes.

3        Q    And, I don't believe you had testified that the

4    back of that sweat shirt was cut; isn't that correct?

5        A    I did not testify to that, yes.

6        Q    Well, it was because it wasn't cut?

7        A    It was cut.  I just was never asked the question.

8        Q    So, the sweat shirt itself was cut from what, in

9    fact, the whole back of that sweat shirt's cut; is that

10   correct?

11       A    Yes.

12       Q    Up to roughly just underneath the hood, I believe;

13   isn't that correct?

14       A    Did you say the back?

15       Q    Yes.

16       A    It was the front of the sweat shirt.

17       Q    Well, when you had the sweat shirt, wasn't the

18   whole back of the sweat shirt cut up?

19       A    It was, the back, I am sorry.  I was getting mixed

20   up.  Yes, it was previously cut.

21       Q    Do you need to refresh your notes, I have no

22   problem.

23       Do you need to refresh your memory?

24       A    No, I was a little confused.  It was the back of

25   the sweat shirt.

DeMartino - People - Cross

1    Q    Okay.  And the back was cut up to the bottom all

2  the way up just roughly underneath the hood; isn't that

3  correct?

4    A    I don't believe I described specifically how high

5  up the cut went, but I believe it went up quite high.

6    Q    Did you make any notations as to where that ended?

7    A    No.

8    Q    And when you began to then examine Mr. Calabrese,

9  there were notations made regarding entrance wounds and exit

10 wounds; isn't that correct?

11   A    Yes.

12   Q    And when you testified regarding the number, just

13 so we're clear, the number that you assigned each entrance

14 wound, was not based in any way on the shot that would have

15 first struck Mr. Calabrese, correct?

16   A    Correct.

17   Q    In fact, as part of your examination, would you be

18 able to tell this jury whether the entrance wound at number

19 three or number two or number one, which had occurred first?

20   A    From the autopsy alone, I could not say.

21   Q    And, in fact, if you refer to what you have as

22 number three, did you make up, I think, a work, autopsy work

23 sheet regarding that?

24   A    I think you're referring to my notes.

25        MR. LEMKE:  Well, if I can have this marked, I

MO

DeMartino - People - Cross

1          think, B, I believe, two pages.

2                    THE COURT:  Defendant's B for identification.

3                    THE COURT OFFICER:  Defendant's B marked for

4          identification.

5               The witness has defendant's B.

6                    MR. LEMKE:  Show it to the doctor, please.

7          Q    Doctor, I may be a little unsure, are those your

8     notes?

9          A    No, they are not.

10         Q    So that illustration there is not yours?

11         A    Correct.

12         Q    Okay.  When you were examining Mr. Calabrese --

13    could I have that back, please -- you observed an entrance

14    wound to the back of Mr. Calabrese's ear which would be the

15    right side of his back of his head, correct?

16         A    Correct.  It was posterior to the ear.

17         Q    Okay.  That is an entrance wound, correct?

18         A    Correct.

19         Q    And, there was no exit wound for that; is that

20    correct?

21         A    Correct.

22         Q    Now, you also examined the right forearm of

23    Mr. Calabrese, correct?

24         A    Yes.

25         Q    And, you also examined that there was a hole, two

MO

DeMartino - People - Cross

1    holes in the sweat shirt on the right arm of Mr. Calabrese,

2    correct?

3        A    Correct.

4        Q    And you had indicated through your examination that

5    the entrance wound would be to the, if I put my hands

6    straight down, for example, the entrance wound was to the

7    outside, correct?

8        A    Well, to look at anatomically, correct, you would

9    have your palm facing forward so then the end wound would be

10   back on the forearm.

11       Q    Which would be right here, correct?

12       A    Yes.

13       Q    When you say back forearm, as I am putting my hand

14   straight down coming in this way, correct?

15       A    If your hands's in that position, yeah.

16       Q    About, I think it was three and-a-half inches down

17   from the elbow, correct?

18       A    I believe so.

19       Q    And, there was an exit wound to that coming from

20   the inside of the arm?

21       A    Correct.

22       Q    Correct.  And, while you're performing the autopsy

23   there was another detective, I think, that was there at one

24   point, wasn't there, with you?

25       A    There were detectives, yes.

MO

DeMartino - People - Cross

1      Q    And, based upon your evaluation regarding the

2    entrance wound and the exit wound to the right arm of

3    Mr. Calabrese, and the entrance wound which you have labeled

4    as number three just behind the right ear was consistent with

5    being from the, or would be consistent with the same track of

6    the same bullet, correct?

7      A    Yes.

8      Q    And, in fact, while you're performing the autopsy,

9    you made a notation of that, correct?

10     A    Yes.

11     Q    And, I think Mr. Hayden had asked you on direct

12   that clearly if somebody's facing someone with the gun and

13   it's shot clearly there is no way for that bullet to go

14   through his arm, pass through his arm and into his head if he

15   is facing him, correct?

16     A    Correct.

17     Q    But based on your qualifications and your

18   examination, if I'm facing you and, in fact, if I am facing

19   you, and I am maybe four feet in front of you, and you have a

20   weapon in your hand, the magazine, .44, it's raised, now I am

21   facing you, and if I at the last minute begin to go like

22   this, isn't your findings consistent with the bullet coming

23   in through here, out through the inside, in through the rear

24   of his ear and into the brain?

25       Isn't that correct?

MO

DeMartino - People - Cross

```
 1        A    That would be correct, but at the time --

 2        Q    Isn't that correct, yes or no?

 3        A    Struck, you're not facing me, though.

 4        Q    I am sorry.

 5        A    You would not be facing me at the time the bullet

 6   initially would strike your arm.

 7        Q    Isn't that correct, if I am facing you right now,

 8   my body is facing you, correct?

 9        A    Yes.

10        Q    I am three and-a-half feet from you, correct?

11        A    Yes.

12        Q    You raised a weapon, correct?

13        A    Yes.

14        Q    My body's still facing you, correct?

15        A    Yes.

16        Q    I go like this to protect myself, maybe it'

17   semantics, whether I am facing you or not, isn't it

18   consistent, if the shot is fired, that it goes into here,

19   exits the inside, and goes right into my ear?

20        A    Yes.

21        Q    In fact the track of that shot is consistent as it

22   travels into the head; isn't that correct?

23        A    Correct.

24        Q    From that angle, correct?

25        A    Yes.
```

MO

DeMartino - People - Cross

1      Q     Okay.  Also the other two entrance wounds you had
2      talked about, being one and two, clearly in the back of the
3      head, correct?
4      A     Yes.
5      Q     That at least one of them, not, appeared at least
6      one of them was consistent with the face of Mr. Calabrese
7      being on the ground; isn't that correct?
8      A     Yes.
9      Q     Because the injury for the exit wound was
10     consistent with there not being perhaps an ability for the
11     wound to flush itself out but being on a surface, a road,
12     correct?
13     A     Correct.
14     Q     Now, of course you recorded that as well, correct?
15     A     Yes.
16     Q     And in looking at the sweat shirt in the back, you
17     made a notation this was a large sweat shirt he was wearing,
18     correct?
19     A     Size large, yes.
20     Q     As far as size, correct?
21     A     Yes.
22     Q     I think a bulky, you have a large sweat shirt,
23     bulky, large sweat shirt; is that correct?
24     A     I didn't use the term bulky.  I just said size
25     large.

DeMartino - People - Cross

1    Q    Well, you made a notation in your report, correct?

2    A    I never used the word bulky.

3    Q    Large sweat shirt?

4    A    Yes.

5    Q    And, did you determine or were you involved with

6    determining whether or not there was any bullet wipe?

7    A    No.

8    Q    On the sweat shirt?

9    A    No.

10   Q    Okay.  So, any marks or any notations as to where

11   they were was made by somebody else; isn't that correct?

12   A    I saw what looked to me like bullet wipe, but I am

13   not qualified to actually make that determination.

14   Q    Okay.  But your observation was that it looked like

15   the bullet wipe was in two spots, correct?

16   A    Correct.

17   Q    But yet there was in the back of the sweat shirt

18   since you testified there was four holes to the upper left

19   quadrant of the sweat shirt, correct?

20   A    Correct.

21   Q    And you had also testified if this large sweat

22   shirt, much like if something is folded, that if it's, shots

23   comes through it may certainly go through like, for example,

24   if I use my left hand, if a shot comes in here through it

25   will come in through here, through this finger, then this

MO

1  finger, then I will have almost three entrance wounds and

2  three exit wounds, correct?

3      A    I kind of lost count.  I don't know, ending of six

4  holes, it's possible to have multiple holes if the garment is

5  folded.

6      Q    And if it's bunched, correct?

7      A    Correct.

8      Q    So, you weren't there on December third when the

9  body was first observed, correct?

10     A    Correct.

11     Q    And so your testimony is that if the sweat shirt,

12  this large sweat shirt, is bunched in some way in the back

13  like my jacket is now, let the record reflect, and my hand's

14  up protecting myself, the shot coming through, when I am on

15  that, the ground, could leave one, two holes, before it

16  enters into the head; isn't that correct?

17     A    I think it would if the shirt was bunched, so that

18  the bullet went through it more than once, it would have to

19  leave a minimum of, have to cause a minimum of three holes.

20     Q    Right.  In fact, what you then take a look at the

21  residue, or any bullet wipe, to determine, okay, here's where

22  the first hole was, obviously the second doesn't have any

23  bullet wipe, that had been bunched up, correct?

24     A    Correct.

25     Q    Now, did you wind up removing the sweat shirt?

DeMartino - People - Cross

1        A    Yes.

2        Q    And then I think it was then protected to be

3   analyzed by another unit; is that correct?

4        A    Yes.

5        Q    Also, the shirt itself, or the sweat shirt, you had

6   indicated, maybe not.

7        Withdraw the question.

8        You didn't make notations as to the measurements where

9   each of those holes were, correct?

10       A    I did not describe on the shirt where exactly those

11  perforations were, correct.

12       Q    And so it's your testimony then, let me ask you

13  this, based upon your findings and analyzing those holes,

14  clearly, that sweat shirt was bunched up, correct?

15       A    I would say that's the most likely scenario.

16       Q    Okay.  Thank you.  I have nothing further.

17            THE COURT:  Mr. Hayden.

18            MR. HAYDEN:  Sure.  Sure.

19  REDIRECT EXAMINATION

20  BY MR. HAYDEN:

21       Q    Doctor, would you step down just a moment before

22  the jury.

23       There were a lot of questions about bunched up.

24       Now, if the garment were like this, the bullet would

25  leave a hole here, and a hole here, and then if it went

DeMartino - People - Redirect

```
 1    through the garment at this point, just beyond that point, it

 2    would be three holes, one, two, behind it, and one through;

 3    is that right?

 4         A    Correct.   That is what I meant when I said they

 5    would have to be a minimum of three holes for the bullet to

 6    enter the body, and for it to leave more than one hole, if it

 7    was bunched like that, you'd have to have a minimum of three

 8    holes.

 9         Q    A single fold could leave you with three holes?

10         A    Sure.

11         Q    If it were like that; is that right?

12         A    Correct.

13         Q    Okay.   Please retake the witness stand.

14              MR. HAYDEN:   Nothing further, Your Honor.

15              MR. LEMKE:   Nothing at all.   Thank you,

16    doctor.

17              THE COURT:   Doctor, have a good day.

18              THE WITNESS:   Thank you.

19         (Witness excused.)

20              THE COURT:   Counsel, approach the bench,

21    please.

22              (Whereupon, there was a bench conference held

23    off the record.)

24              THE COURT:   Ladies and gentlemen, we're going

25    to take an approximately fifteen minute break.   Going to
```

Proceedings

1    bring you back in the room.  Same admonitions apply.

2    Don't discuss the case amongst yourselves or with anyone

3    else.

4         You will be in the jury room.  Try to stick to that

5    fifteen minutes as possible.

6              THE COURT OFFICER:  Leave your note pads on

7    the chair if you're taking notes and follow me out.

8              THE COURT:   We will resume in fifteen

9    minutes, Mr. Hayden.

10             MR. HAYDEN:  Yes, Your Honor.

11        (Whereupon, there was a brief recess in the

12    proceedings.)

13             THE CLERK:  Continued case on trial, 167N-05,

14    People versus Mark Orlando.

15        People ready.

16             MR. HAYDEN:  Ready, Your Honor.

17             THE CLERK:  Defense ready?

18             MR. LEMKE:  Defense ready.

19             THE CLERK:  Let the record reflect the

20    presence of the defendant, the jurors are not in the

21    courtroom at this time.

22             THE COURT:  Mr. Hayden, do you want quantities

23    to be heard with respect to the next witness?

24             MR. HAYDEN:

25             MR. HAYDEN:  Yes Your Honor.

MO

Proceedings

1          People propose to introduce through Detective Scott

2     Kovar, a mannequin that Detective Kovar has used to

3     demonstrate that the trajectories of the bullets that

4     hit the left side of the back of Bobby Calabrese's head,

5     he's prepared that with a sweat shirt, over the upper

6     part of the mannequin, to show how those bullets could

7     have left the holes that were left and left the aligning

8     wounds that were left, and that is really the only

9     purpose of this, to show the jurors how the one bullet,

10    for example, could have left three holes as was

11    discussed with Dr. DeMartino by both defense counsel and

12    myself.

13         It's a piece of demonstrative evidence to

14    demonstrate to the jurors what his testimony is all

15    about.  How the bullet holes in the sweat shirt and the

16    wounds could have lined up as they had.  Limited purpose

17    for which this exhibit is offered.

18         In addition, there is a chart that has been made,

19    this is based on measurement that Detective Kovar took

20    of the sweat shirt that is already in evidence.  The

21    demonstration is based on Detective Kovar's measurements

22    of the sweat shirt in evidence, and on the autopsy

23    report, and the measurements that Dr. DeMartino took,

24    those measurements also came in evidence through Dr.

25    DeMartino's testimony.

MO

Proceedings

1        And, any objections the People submit counsel would

2    have to this exhibit would go to its weight and not its

3    admissibility for the limited purpose for which we're

4    offering it.  It's a very limited purpose.

5             THE COURT:  Mr. Lemke.

6             MR. LEMKE:  Your Honor, at this point I would

7    object to, I believe, first time this was available was

8    yesterday, clearly we're more than halfway, three

9    quarters of the way through the trial.  Anything that is

10   documented as demonstrative may very well be, for

11   example, a weapon that is introduced in evidence, the

12   sweat shirt that may be in evidence, that was to be

13   taken out and paraded to the jury and shown where the

14   particular holes, how it would be bunched up, that is

15   demonstrative evidence, to come in now and have me for

16   the first time see a mannequin with a sweat shirt

17   without having the ability to previously examine it,

18   look at it, have anybody else I need to examine that as

19   well is clearly prejudicial.  I don't see, it's clearly

20   something which I did not have proper notice of, in this

21   matter, and therefore I would object to that certainly

22   at this time.

23            THE COURT:  The Court will give you an

24   opportunity to have any adjournment necessary if you

25   feel it necessary to bring in your own expert to review

Proceedings

1   this and rebut it.

2        The application by the People is granted.  The

3   Court feels, if anything, the arguments by defense

4   counsel would go to weight.  There's clearly an issue

5   before this jury with respect to the shots and the

6   trajectory thereof, and the Court feels this would be

7   probative and would demonstrate to the jury and help

8   assist them in understanding the arguments and evidence

9   before them.

10        Accordingly, defense counsel's application to

11   preclude this is denied.  People's application is

12   granted.

13        Anything further?

14            MR. HAYDEN:  Just need a little time to set

15   up.

16            THE COURT:  Go ahead.

17        (Whereupon, there was a brief recess in the

18   proceedings.)

19            THE COURT:  Ready for the jury, Mr. Hayden?

20            MR. HAYDEN:  Yes, Your Honor.

21            THE COURT:  Mr. Lemke.

22            MR. LEMKE:  Yes, Your Honor.

23            THE COURT OFFICER:  Ready for the jury, Your

24   Honor.

25            THE COURT:  Yes.  Thank you.

MO

Proceedings

```
 1                    THE COURT OFFICER:  Jury entering.

 2                    THE CLERK:  Let the record reflect the

 3        presence of the jury, alternates, counsel, defendant.

 4                  People ready.

 5                    MR. HAYDEN:  Ready, Your Honor.

 6                    THE CLERK:  Defense ready?

 7                    MR. LEMKE:  Defense ready, Your Honor.

 8                    THE COURT:  Thank you for your patience,

 9        ladies and gentlemen.

10             Mr. Hayden, call your next witness.

11                    MR. HAYDEN:  Scott Kovar.

12        SCOTT J. KOVAR, detective, called as a witness on behalf of

13             the People, after having been first duly sworn, and

14             having stated his shield number as 698, and his command

15             as the Forensics Evidence Bureau, Nassau County Police

16             Department, took the witness stand and testified as

17             follows:

18        DIRECT EXAMINATION

19        BY MR. HAYDEN:

20                    THE CLERK:  State your name, spell your last

21             name for the record, your shield number and command.

22                    THE WITNESS:  Detective Scott J. Kovar,

23             K-O-V-A-R, shield 698, Forensic Evidence Bureau, Nassau

24             County Police Department.

25                    THE COURT:  Good afternoon.
```



Proceedings

```
 1                    THE WITNESS:  Good afternoon.

 2                    THE COURT:  Mr. Hayden.

 3                    MR. HAYDEN:  Yes, Your Honor.

 4          Q    Good afternoon, detective.

 5          A    Good afternoon.

 6          Q    How long have you been a member of the Nassau

 7    County Police Department?

 8          A    Approximately twenty-three years.

 9          Q    How long a detective?

10          A    Approximately fifteen years.

11          Q    How long with the forensic evidence bureau?

12          A    Twenty-one years.

13          Q    Have you been involved with criminalistics?

14          A    Yes, I have.

15          Q    What do you mean by criminalistics?

16          A    I am assigned to the criminalistics section of the

17    laboratory in which we analyze trace evidence found at the

18    scene of a crime.  Trace evidence can include such things as

19    hair and fibers, paint chips, glass chips, physical

20    impression evidence such as footwear impressions, tire

21    tracks, gunshot residue, and crime scene reconstruction.

22          Q    Have you worked with clothing?

23          A    Yes, I do.

24          Q    On a regular basis?

25          A    Yes.
```

Kovar - People - Direct

1    Q    Describe any training you had in the field of

2    criminalistics?

3    A    I have a B.S. Degree in biology from the College of

4    Environmental Science and Forestry.  I am currently finishing

5    my masters in forensic science from John Jay College,

6    primarily in the field of criminalistics.  I have taken

7    numerous courses, undergraduate, and at the graduate level in

8    criminalistics, and I am a diplomate of the American Board of

9    Criminalistics.  And, I also teach a basic criminalistics

10   course and a forensic microscopy course as an adjunct

11   instructor at Pace University in their forensic science

12   department.

13   Q    Describe any experience you had in the field of

14   criminalistics?

15   A    I have taken lots of work shops and courses, and

16   also done hundreds of cases over the years.

17   Q    How many times have you examined clothing in the

18   course of your work?

19   A    Thousands of times.

20   Q    Have you examined the clothing of shooting

21   victims?

22   A    Yes, I have.

23   Q    How often?

24   A    Hundreds of times.

25   Q    Have you worked with autopsies reports in the

Kovar - People - Direct

1      course of your work?

2           A    Yes, I have.

3           Q    How many times?

4           A    I would say over a hundred.

5           Q    Have you worked with medical examiners?

6           A    Yes.

7           Q    How often?

8           A    Same amount, over a hundred.

9           Q    Have you worked with firearm experts in the course

10     of your work?

11          A    Yes, I have.

12          Q    How often?

13          A    Probably in the thousands.

14          Q    Have you prepared demonstrative exhibits for

15     courtroom display?

16          A    Yes, I have.

17          Q    How often?

18          A    I would say depending on what you term courtroom

19     display, I would say thousands of times.

20          Q    Have you testified as an expert in this field?

21          A    Yes, I have.

22          Q    How many times?

23          A    Approximately seventy-five times.

24          Q    Where have you testified?

25          A    In all the courts of Nassau County, County Court

Kovar - People - Direct

1    District Court, Family and Traffic Court.  Also in Federal

2    Court out in Melville.  And also in Kings County Court.

3         Q    Have you become involved in investigating the

4    shooting of a death young man named Bobby Calabrese?

5         A    Yes, I did.

6         Q    Have you examined an article of clothing during the

7    course of the investigation?

8         A    Yes, I did.

9         Q    Describe that item of clothing?

10        A    It was a Lee sweat shirt, ultra weight sweat

11   shirt.  It was distributed buy or sold by a surf shop in Long

12   Beach and had the logo Unsound on the back, and also the name

13   of Unsound on the front of the sweat shirt.  It was a double

14   XL large sweat shirt.

15             MR. HAYDEN:  May I please have 35 in evidence

16        shown to the witness.

17             THE COURT:  Yes.

18             THE COURT OFFICER:  The witness has 35 in

19        evidence.

20        Q    Do you recognize that?

21        A    Yes, I do.

22        Q    Is that the sweat shirt you examined?

23        A    Yes, it is.

24        Q    How do you know it is?

25        A    It's got my name and shield number on it, and I

Kovar - People - Direct

1    recognize the sweat shirt.

2         Q    Do you recognize the condition of the sweat shirt?

3         A    Yes, I do.

4         Q    Describe how you examined this sweat shirt that is

5    35 in evidence.

6         A    The first thing I did was I laid it out on a table

7    and I examined it stereo microscopically.  That is a low

8    power magnification microscope.  I am looking for, first,

9    tears and defects in the article.  And then I also took

10   notice of some holes.  I also took a SEM adhesive stub where

11   I lift particles around the holes that I could test later on

12   to see if there's gunshot residue or not.  I did that.  And,

13   then I placed pins in the locations where I saw partially

14   burned and unburned particle grains around the holes and

15   recorded that as well photographically.  And then we compared

16   the medical examiner's report, the wound tracks documented by

17   the medical examiner, with these bullet holes in the garment

18   to determine the bullet trajectories.

19        Q    Describe any observations you compiled while

20   examining People's 35 in evidence?

21        A    The sweat shirt had a pretty large tear at the

22   front of the V neckline portion of the seam.  It was pulled

23   apart.  And also the left front pocket was pulled away from

24   the seam as far as defects.  There were a number of holes in

25   the sweat shirt.  There's at least four or so holes in the

MO

Kovar - People - Direct

1    back of the sweat shirt, and then one hole in the back of the

2    sleeve and the front, or two holes on the arm and right arm.

3    And also a hole in the front of the sweat shirt.

4        Q    Did you do measurement of what you observed in

5    People's 35 in evidence?

6        A    Yes, I did.

7        Q    Describe for the jury how you did that.

8        A    Just using a metric ruler.  I measured the

9    distances, usually two, two coordinates from the midline of

10   the sweat shirt, let's say, and from, inferior from the

11   neckline, for instance.

12       Q    And you include those holes when you were

13   measuring?

14       A    Yes.

15       Q    Have you prepared an exhibit to show the jurors the

16   measurements you made?

17       A    Yes, I have.

18       Q    Has it been enlarged?

19       A    Yes.

20       Q    Has it been mounted?

21       A    Yes.

22            MR. HAYDEN:  May I have this marked 71 for

23       identification, please, and shown to the witness.

24            THE COURT OFFICER:  People's exhibit 71 marked

25       for identification.

Kovar - People - Direct

1           The witness has 71 for ID?

2      A    Okay.

3      Q    Do you recognize that?

4      A    Yes, I do.

5      Q    What is it?

6      A    That is the courtroom display I had of the

7  measurement I made on the holes of the sweat shirt.

8      Q    Is that a fair and accurate display of your

9  measurement?

10     A    Yes, it is.

11          MR. HAYDEN:  People offer it in evidence, Your

12  Honor.

13          MR. LEMKE:  No objection, Your Honor.

14          THE COURT:  Mark it in evidence.

15          THE COURT OFFICER:  People's 71 marked in

16  evidence.

17      Do you want it shown to the witness?

18          MR. HAYDEN:  May I, with the Court's

19  permission, have the witness step down and display this

20  exhibit to the jury?

21          THE COURT:  Yes.

22          THE COURT OFFICER:  Jurors are have having

23  problems seeing.

24          THE COURT:  Can you move it closer to the

25  jury?

Kovar - People - Direct

1              Mr. Lemke, you can if you have to move.

2         Q    Just describe what it depicts?

3         A    Okay.  The bottom two pictures show the sweat shirt

4    sort of an overall view of, one on the left side of the

5    diagram, the bottom shows the back view of the sweat shirt,

6    the right side shows the front view of the sweat shirt, and

7    then the one on top is just an enlarged portion of the back

8    view, close up view of the holes in the back of the sweat

9    shirt.

10             You will notice this mermaid looking logo that's

11   presented on the screen, to the back of sweat shirt, that's

12   just from the surf shop that sells the sweat shirts, but just

13   before that I have what I labeled hole number one, and that

14   is, the numbers don't correspond to any sequence of rounds.

15   It's just for description purposes, bullet hole number one

16   exhibits what is known as bullet wipe.  When a bullet goes

17   through clothing, sometimes the clothing wipes the bullet

18   clean.  You get lubricant and gunshot residue powder around

19   the ring, around the hole.  And that is a good indication

20   that that's the first hole that was made through that, any

21   kind of garment.  You see that bullet hole number one, I

22   measured it, it was 50 millimeters left of the midline of the

23   sweat shirt, and about a 130 millimeters inferior of the

24   neckline.  Here.  And it appears to be just above the logo of

25   the mermaid.

MO

Kovar - People - Direct

1   Hole number two also exhibits the bullet wipe, and you

2   will see there's a dark ring around that hole also indicating

3   that is the first thing that that bullet hit probably.  It's

4   measured, I measured it at 85 millimeters here left of the

5   midline and 100 millimeters inferior of the neckline.  So,

6   it's about an inch or two above the hole number one to the

7   lateral side.

8       Hole number three, which I labeled number three, is 95

9   millimeters left of the midline, 80 millimeters inferior to

10  the neckline.  It sits just above hole number one, two, no

11  bullet wipe, and later on you will see that I stuck pins to

12  represent, or right next to all the unburnt particle grain.

13  There was very few unburnt particle grain.

14      Number three, I'll explain why that is important later.

15      Hole number four is actually starting into the hood

16  already and it's 20 millimeters above the neckline into the

17  hood, 70 millimeters left of the midline.

18      So, those are the holes basically on the back of the

19  sweat shirt.  There's four holes there.  Also in the back,

20  right sleeve, there is what we call, I call, hole number

21  five.  That was measured about 150 millimeters from the end

22  of the cuff pretty much along the midline of the sleeve, and

23  you could label this hole, I think I called it hole number

24  seven which was the front of that corresponding hole in the

25  front of the sleeve which the bullet passed through.

MO

Kovar - People - Direct

1      And then finally hole number six here is 60 millimeters

2   right of the midline, 135 millimeters inferior neckline of

3   the front of the sweat shirt.

4      The reason why I said the amount of unburnt particle

5   grain was important around hole number three, I believe that

6   is a fold in the sweat shirt.  If you have a fold in an

7   article of clothing, a bullet can go through and actually

8   make an additional hole in the sweat shirt or in the

9   clothing.  That is what I believe happened here.

10      This sweat shirt is pulled up, and there's a fold here,

11   and this round which first went in through hole number one,

12   then goes through the fold, causes hole number three, and

13   then reenters back into the hood.  There was a few particle

14   grain, number four, into number four, then becomes, the wound

15   track on the lateral side of decedent's head which goes

16   across his head and exits his cheek bone on the right side,

17   and is basically what we call a shored round.  It was stopped

18   by the cement on the street.  That is where the bullet jacket

19   from that bullet was recovered, right inside it, made it come

20   out -- step back a second.

21      It comes back, labeled hole number six in the front of

22   the sweat shirt.  So, that is actually also an indication

23   that sweat shirt is pulled up.  This whole number six is

24   basically corresponding up by decedent's check bone.

25      Another round goes through hole number one, does not go

1    through any other folds in the sweat shirt, and enters into

2    the decedent's back of his head.  That is the one more on the

3    left side of the head, but more medial towards the midline

4    also going across the decedent's head.  It doesn't exit the

5    cheek bone.

6         There is a round that goes through the back of the

7    sleeve of the sweat shirt.  There is a number of particle

8    grains present there.  It then comes through the front of the

9    arm of the sweat shirt and then, I believe, reenters back in

10   and becomes, doesn't go through the hood of the sweat shirt,

11   but goes through the head of the decedent on the right side.

12        Q    Please retake the witness stand.

13        Have you reviewed Bobby Calabrese's autopsy report

14   during the course of the investigation?

15        A    Yes, I have.

16        Q    Have you reviewed the position of the bullet wounds

17   to Bobby's body?

18        A    Yes, I have.

19        Q    Have you prepared an exhibit to demonstrate how

20   bullet holes to the back of Bobby Calabrese's sweat shirt

21   aligned with wounds to the left side of his head?

22        A    Yes, I have.

23        Q    Describe for the jury how you did that?

24        A    I didn't feel that that poster you saw showed that,

25   how that sweat shirt pulled up and the folds in the sweat

MO

Kovar - People - Direct

1    shirt.  I wanted to make it clear to you how the holes in the

2    clothes were made by these bullet trajectories so I actually

3    purchased an exemplar sweat shirt from that surf shop, the

4    same size as the decedent was wearing.  And then I measured,

5    accurately measured from this exhibit we looked at, the

6    decedent's sweat shirt.

7        I used the same measurements and made holes in the

8    exemplar sweat shirt.  Then using the medical examiner's

9    measurements I placed, it's actually the sticky puddy type of

10   material on portions of this mannequin, then put rods through

11   so I would be able to see the trajectories how, in the sweat

12   shirt, was pulled up at the time.

13       Q    Describe how you determined the location of the

14   bullet wound as you depict them on this mannequin?

15       A    The bullet wounds, I followed Dr. DeMartino and Dr.

16   O'Reilly's notes and the autopsy report of the wound tracks

17   and used those measurements as exact measurements and

18   measured it on the mannequin and placed a, basically X there,

19   and then made my display.

20       Q    You used those autopsy report measurements to

21   locate each of the wounds?

22       A    That's correct.

23       Q    Describe the exhibit you prepared and what it's

24   supposed to show?

25       A    I really wanted a three dimensional type of display

MO

Kovar - People - Direct

1    so we got a mannequin, it's a natural size mannequin that can

2    articulate pretty much like the human form can.  It's used by

3    art students to sketch the human form.  And, I, using the

4    autopsy report and measurements accurately measured the

5    mannequin and then I placed holes in the sweat shirt to the

6    same measurements I measured on the decedent's sweat shirt

7    and then I basically brought it here today for you to see.

8         Q    Would you step down, please?

9         A    Yes.

10        Q    Take a look at that.  Do you recognize it?

11        A    Yes, I do.

12        Q    What is it?

13        A    This is the courtroom display I made for you

14   today.

15        Q    Is that a fair and accurate representation of the

16   way the holes to the back of Bobby's sweat shirt aligned with

17   the wounds to the left side of the back of Bobby's head?

18        A    Yes, it is.

19             MR. HAYDEN:  I offer that in evidence.

20             MR. LEMKE:  Brief voir dire.

21             THE COURT:  Yes

22   VOIR DIRE EXAMINATION

23   BY MR. LEMKE:

24             MR. LEMKE:  Detective, you may take the stand.

25             The project you're now referring to, when for

MO

Kovar - People - Direct

1 the first time did you put this together?

2    THE WITNESS:  It was probably, getting the

3 mannequin, I would say probably within the last two

4 weeks.

5    MR. LEMKE:  When for the first time did you

6 have the sweat shirt?

7    THE WITNESS:  Also probably two weeks ago.

8    MR. LEMKE:  And when for the first time, you

9 brought the mannequin I take it back to headquarters?

10    THE WITNESS:  Yeah, within that time period,

11 correct.

12    MR. LEMKE:  When you say it was last week, it

13 was more like a week ago?

14    THE WITNESS:  Mannequin was a week ago.  The

15 sweat shirt showed up the same time.

16    MR. LEMKE:  You didn't get the mannequin until

17 we started trial here, after hereafter we started.

18    THE WITNESS:  I don't know the actual start of

19 the trial.  I am not sure.

20    MR. LEMKE:  Well, the trial started, jury

21 selection, last Tuesday.

22    THE WITNESS:  I would think the mannequin was

23 in by then.

24    MR. LEMKE:  Did you make any notations as to

25 when that mannequin came in?

MO

Kovar - People - Direct

1        THE WITNESS:  I have the bill of sale.

2        MR. LEMKE:  Do you have that with you?

3        THE WITNESS:  Don't have it with me, but I do

4    have a bill of sale for it.

5        MR. LEMKE:  And, could you tell the jury where

6    you got it?

7        THE WITNESS:  I bought it at Pearl Paint, the

8    art supply store.

9        MR. LEMKE:  And, in fact, when you purchased

10   it, did you go and ask for perhaps a body type fitting

11   the one of Mr. Calabrese?

12       THE WITNESS:  No.  I knew from the Internet

13   they only had one natural size male mannequin and this

14   is it.

15       MR. LEMKE:  So, you ordered a body type which

16   doesn't fit Mr. Calabrese to begin with, correct?

17       THE WITNESS:  It's pretty close.  It's about

18   the same height as Mr. Calabrese was.

19       MR. LEMKE:  Do you remember what height Mr.

20   Calabrese was?

21       THE WITNESS:  I believe he is 5'7".

22       MR. LEMKE:  If I told you 5'6", would that

23   refresh your recollection?

24       THE WITNESS:  Right.  That's correct,

25   sixty-six inches.

Kovar - People - Direct

1        MR. LEMKE:  The dummy's 5'8"?

2        THE WITNESS:  That is the way they list it on

3    the catalog.  The height of the dummy is not critical.

4        MR. LEMKE:  What about the weight of the

5    dummy?

6        THE WITNESS:  I would say the same.  Weight is

7    certainly not critical in this case.

8        MR. LEMKE:  Well, let me you ask you this.

9    You have a sweat shirt for this mannequin,

10    correct?

11    You made sure it was extra large, double X, I

12    believe?

13        THE WITNESS:  Right.

14        MR. LEMKE:  Because that is the size of

15    evidence, number 35, in evidence; isn't that correct?

16        THE WITNESS:  That's correct.

17        MR. LEMKE:  And, did you take 35 to put it on

18    this mannequin?

19        THE WITNESS:  No on this one, no.

20        MR. LEMKE:  No.  And, did you confer with the

21    medical examiner regarding the track marks that you, I

22    think indicated, in the head of this man?

23        THE WITNESS:  Yes, I did.

24        MR. LEMKE:  In fact, you took whatever

25    measurements you could find, correct?

Kovar - People - Direct

1          THE WITNESS:  From his autopsy report,

2     correct.

3          MR. LEMKE:  And so now you take the sweat

4     shirt and you put it on this dummy, correct?

5          THE WITNESS:  Correct.

6          MR. LEMKE:  And the measurements you used were

7     from notations that were made, correct?

8          THE WITNESS:  From the actual autopsy report.

9          MR. LEMKE:  And, I think, just one more

10    question, I think you had indicated that the sweat shirt

11    was bought down from, only one location this sweat shirt

12    is sold at; is that correct?

13         THE WITNESS:  It's a Lee sweat shirt.  So, you

14    can get a Lee ultra weight sweat shirt from a number of

15    distributors.  If you wanted to one with the actual log

16    of the surf shop I guess you'd have to get it from

17    them.

18         MR. LEMKE:  Right.  Did you happen to check

19    when Mr. Calabrese purchased that sweat shirt?

20         THE WITNESS:  No, that was not done.

21         MR. LEMKE:  It wasn't done.  Told you it was

22    purchased eight months ago, would that refresh your

23    recollection in any way?

24         THE WITNESS:  Wouldn't make a difference to

25    me.

MO

Kovar - People - Direct

1        MR. LEMKE:  Because you didn't check on that,

2   did you?

3        THE WITNESS:  I don't know if they actually

4   have records of who purchased the sweat shirt at the

5   surf shop.

6        MR. LEMKE:  You or anybody else didn't ask?

7        THE WITNESS:  Not that I'm aware of.

8        MR. LEMKE:  Subject to further cross, Your

9   Honor.

10        THE COURT:  Mark it into evidence.

11        THE COURT OFFICER:  People's 70 marked in

12   evidence.

13   DIRECT EXAMINATION

14   BY MR. HAYDEN:

15        Q    Please step down, detective.

16   Detective, you positioned Bobby's body in a certain way,

17   the mannequin in a certain way, while displaying it on this

18   table.

19        Did you determine how to position the mannequin in

20   accordance with the photograph in evidence?

21        A    Yes, I did.

22        Q    Was that People's exhibit 5 in evidence?

23   Let me show it to you?

24        A    Yes, it is.

25        MR. HAYDEN:  May I display it to the jury,

MO

Kovar - People - Direct

1      Your Honor?

2      Q      Detective, using that exhibit in evidence, show

3  the jury what it's intended to demonstrate?

4      A      These rods are to show the path of the bullets, the

5  trajectories.  You will see they're pretty parallel before I

6  move them.  I believe they're in sequence with each other.

7  The weapon being at the location sort of here.

8           THE COURT:  Just speak up, detective, please.

9      A      The weapon being somewhere here in this orientation

10 and both rounds not being fired in sequence with each other.

11 One of these rounds, the more lateral one, goes through and

12 actually comes out, exits the decedent's cheek bone, which I

13 don't know if you can see it from where you're sitting, but I

14 have another little rod here exhibiting the, showing that

15 round coming through the hole in the front of the sweat

16 shirt, then into the ground here, and the bullet is recovered

17 right here.  The jacket of that bullet is recovered right

18 here.  And so, you know, that the decedent, that is one of

19 the last shots, the decedent wasn't moving.  That is, this is

20 the way the body is found, and this is where the bullet was

21 recovered.

22     This is the position of the sweat shirt.  The only

23 difference really it's cut up by the EMT, cut around both

24 holes, but I think, no question, these are one of the last

25 two rounds that were fired.  These are the last two rounds

MO

Kovar - People - Direct

1    fired.   That makes this round through the arm the first one

2    fired.

3        To clear up the amount of holes in the folds in the

4    sweat shirt, take these rods off, we can pull this up, you

5    can see there's now, four holes in the back of this, the

6    sweat shirt.   These had the two, that had the bullet wipe,

7    hole number one and two.   These here are the, told you, hole

8    number three.   That is folded over.   It then goes through

9    this hole here, which is number four in the hood.   That one

10   round make those three holes.   So, I think it does a good

11   representation of showing you that that one round made those

12   three holes.

13       Then this would, you know, I believe, just goes through

14   the sweat shirt here.   That is the one more medial, closer to

15   the midline, just above the logo of the mermaid, then goes

16   right into the decedent's left head, on the left side goes

17   across, but does not exit the cheek bone.

18       Q    Show the jury where Bobby's head is within the

19   confines of the sweat shirt?

20       A    Hard to see through.   The hood is down, but here,

21   the portion of the head here.   So, the back portion of where

22   you can see on that poster we showed you, the holes are

23   really positioned back here, about six inches down on the

24   back, are now up by the back of head.   And this sweat shirt

25   is pulled up.   So, there is no question that somebody pulled

Kovar - People - Direct

1    that sweat shirt up prior to these rounds going through the

2    clothing and decedent.

3         Q    Please retake the witness stand.

4              MR. HAYDEN:  Nothing further at this time,

5    Your Honor.  Thank you.

6    CROSS EXAMINATION

7    BY MR. LEMKE:

8         Q    Detective, come back down.

9         A    Yes.

10        Q    Perhaps you can explain to this jury then how a

11   shot that is fired entered into, I am pointing to the

12   mannequin's right arm on the outside, would come through the

13   hole right on the inside -- there's a hole on each side,

14   correct?

15        A    Yes.

16        Q    And going to the portion of his back right ear

17   which is where a shot was, correct?

18        A    Correct.

19        Q    Without going through the hole of sweat shirt if

20   it's not below his head?

21        A    Right.  This round here, one thing that is

22   interesting about the hole here that is in his sweat shirt,

23   it's only 150 millimeters or so from the end of the cuff.

24   But, in fact, the round that goes through the decedent's arm

25   about three inches or so from the elbow.  This is actually

Kovar - People - Cross

1   pulled up like that.  Okay.

2               MR. HAYDEN:  Let the record reflect the right

3       arm is pulled up so that the hole, if you will, is

4       roughly about three and-a-half inches down from the

5       elbow.

6               THE COURT:  Let the record so reflect.

7       A    I think you're right, counselor, in that the hood

8   is not over the head like this.  In fact, it might be pulled

9   away from the head because this round that goes through the

10  arm, then reenters to the right side of the head doesn't go

11  through the hood, goes into the head and the hood is not up

12  at that time.

13      Q    Well, you now displayed this as Mr. Hayden has

14  asked you with his head hidden underneath the top of this;

15  isn't that correct?

16      A    Right, like it's shown here.

17      Q    I don't see that?

18      A    Because the EMT cut it off.

19      Q    You weren't there, correct?

20      A    I was there.

21      Q    When they cut it?

22      A    No, I was there after they cut it.

23      Q    After they cut it.  And what I am asking you to

24  tell this jury, explain to me, how if this is the body you're

25  saying it is, that this shot went in through here, when I say

MO

Kovar - People - Cross

```
1    the right arm, up three inches from the elbow and entered

2    behind his ear, if this sweat shirt, as you say, this is a

3    double X sweat shirt?

4         A    Yes.

5         Q    That is the size you examined, in evidence, 35?

6         A    That's correct.

7              THE COURT:  You have to speak up.

8         A    Yes.

9         I fit this, actually I think the round on the sleeve of

10   the right arm went through the sleeve and the body when he

11   was standing.

12        Q    When he was standing.  Thank you.

13        In fact, came in -- you can go back up.  Thank you.

14        Based on your expertise, the decedent was standing when

15   the first shot's fired probably within, based upon the bullet

16   wipe that was found, from testimony earlier, from a weapon,

17   within forty-eight or four feet, correct?

18        A    Yeah.  There was no bullet wipe on that though, but

19   I think that is a very conservative estimate, four feet.

20   There's a lot of unburnt particle grains around that whole.

21   Basically what the firearm examiner said after, four feet.

22   He did not find any more particulate matter on his test

23   firings, you know.  It was within four feet.

24        Q    Four feet would be consistent?

25        A    Consistent and very conservative.  Probably closer.
```

1    Q    If he is standing and his hand's up, based upon, I

2  don't see an arrow here into this other bullet wound in the

3  other side of the head.

4    Did you do that for any particular reason?

5    A    Because he would be standing.  This is exhibiting

6  the last two rounds coming through the body.

7    Q    Well, could you then stand this up.

8    Did you put a bullet track in the head from when he is

9  standing up to show the jury it's consistent with the track

10  coming through the arm, out of the arm and into the head with

11  the sweat shirt down.

12    Could you have done that?

13    A    Could have done that, yes.

14    Q    You didn't do that?

15    A    No.

16         MR. LEMKE:  Nothing else.

17         MR. HAYDEN:  Something else.

18  REDIRECT EXAMINATION

19  BY MR. HAYDEN:

20    Q    If the sweat shirt was grabbed from behind by a

21  bigger person and yanked back exposing the right side of the

22  back of the head, like that, could that account for why the

23  first shot didn't leave a hole in the back of the sweat

24  shirt?

25    A    Yeah.  I think something is pulling on that sweat

MO

Kovar - People - Redirect

1    shirt.  If you just do a defensive kind of thing like this,

2    it's probably going to go through the back of the hood of the

3    sweat shirt.  You need somebody pulling that hood away from

4    the head so that the bullet does not go through the hood of

5    the sweat shirt.

6        Q    It would be consistent with someone big and heavy

7    in front of the victim grabbing the sweat shirt from behind

8    and yanking it up over the head, and the first shot going in

9    as the victim tried to protect himself, and then as the

10   victim went down, the sweat shirt settling back, and then the

11   two final shots being fired into the victim's head.  Would

12   that be consistent?

13       A    Yes, it would.

14            MR. HAYDEN:  Nothing further.

15   RECROSS EXAMINATION

16   BY MR. LEMKE:

17       Q    So, it's now your testimony, detective, when I was

18   standing, that now this shirt is pulled over his entire head

19   and it exposed the side of his neck all the way up like this

20   and then all of a sudden, this shirt bounces back.

21       Is that what your testimony is?

22       A    I can't say that.

23       Q    You were there?

24       A    No, I was not there.

25       Q    You don't know?

MO

Kovar - People - Redirect

1    A    I know the hood was not in the trajectory of that

2    first round.  I know that there was tears in the hood to show

3    force being pulled on the front of the hood and on the pocket

4    of that sweat shirt, and I know that the arm was up.  And

5    that sleeve was pulled down like this when that round came

6    through.

7    Q    Let me ask you this.  You know that the tearing,

8    you said this tearing on the sweat shirt in the front,

9    correct?

10    A    Correct.

11    Q    You don't know whether that was cut previously for

12    any reason, do you?

13    A    I do not know.

14    Q    You can't tell us this, in fact, it was torn during

15    December third, correct?

16    A    Well, it doesn't appear to be cut.  It's torn.

17    When it was torn I can't say.

18    Q    No, no, because you didn't check when the sweat

19    shirt was purchased, correct?

20    A    I don't know when he purchased that sweat shirt.

21    Q    You didn't examine any fibers or anything else that

22    would determine when it was torn, correct?

23    A    I wouldn't be able to do that with fiber

24    examination.

25    Q    Would you be able to determine whether or not the

MO

1   fabric was washed before, whether that fabric has been frayed

2   as a forensic pathologist?

3         A      I never dated a tear.

4         Q      You didn't do it in this case, correct?

5         A      That's correct.

6                MR. LEMKE:  Nothing further.

7                MR. HAYDEN:  Nothing further.

8                THE COURT:  You can step down, detective.

9   Thank you.

10               (Witness excused.)

11               THE COURT:  Approach the bench, counsel.

12         Take that evidence off and approach the bench,

13  counsel.

14               (Whereupon, there was a bench conference held off

15  the record.)

16               THE COURT:  Mr. Hayden.

17               MR. HAYDEN:  People rest, Your Honor.

18               THE COURT:  Thank you.

19               MR. LEMKE:  Defense rests, Your Honor.

20               THE COURT:  Ladies and gentlemen, at this time

21  I am going to send you home for the weekend.  I'm going

22  to admonish you, we will return 9:15 on Monday.  We will

23  have closing remarks by counsel and then I will charge

24  you on the law.  So, as you can see, we have gotten the

25  case to you much earlier than the parameters which I

Proceedings

1    told you during jury selection.

2         You must not converse among yourselves or with

3    anyone else upon any subject connected with the trial.

4    You must not read or listen to any accounts or

5    discussions of the case in the event it is reported by

6    newspapers or other media.  You must not visit or view

7    the premise or place where the offence charged was

8    allegedly committed, or any other premises or place

9    involved in the case.

10        Prior to your being discharged, you must not

11   request, accept, agree to accept, or discuss with any

12   person the receiving or accepting of any payments or

13   benefits in consideration for supplying any information

14   concerning the trial.

15        You must promptly report to the Court any attempt

16   by any person to improperly influence any members of the

17   jury.

18        You shall not access the Internet or Worldwide Web

19   by any means available to you for the purposes of either

20   learning about this case or to learn about the law and

21   legal issues concerning this case.

22        Have a good weekend.  We will reconvene 9:15

23   Monday.  The officer will take a lunch order from you

24   because I intend to do summations and go right into the

25   charge.

MO

Proceedings

1    Okay.  Have a good weekend.

2        THE COURT OFFICER:  Those jurors taking notes

3    please leave your note pas on the chair and follow me

4    out.

5        (Whereupon, the following takes place outside the

6    presence of the jury.)

7        THE COURT:  Applications.

8        MR. LEMKE:  Yes, Your Honor.

9    Your Honor, just so the record is clear, I would

10   have had the opportunity to move for a trial order of

11   dismissal regarding count two in the indictment after

12   the People had rested, rather than make the argument out

13   of the presence of the jury and then have them come back

14   and make arguments again, I will basically make

15   arguments to both for a trial order of dismissal.

16       Clearly the count which is the aiding and abetting

17   charge, Murder in the Second Degree, I would merely at

18   this point argue at the end of the People's case, even

19   taking the evidence in the light most favorable to the

20   People, they have not made out any prima facie case, and

21   for that reason I would ask this Court to grant my

22   application for a trial order of dismissal.

23       In the event that is denied, now that we have

24   rested, standard changes, it's whether or not the

25   evidence testified to, if believed credible, could

MO

Proceedings

1   suffice in fact and could render a verdict of guilty

2   and, therefore, I ask the, same arguments, for a trial

3   order of dismissal.

4           THE COURT:  Both applications are denied.

5       9:15 the jury comes back.  By the time we take

6   their order, I get everything together, probably ten

7   o'clock.  And, I intend to do both summations and go

8   into the charge.  If it does seem like it's getting

9   lengthy I will break at the appropriate time for people

10  to use the facility, but my thinking is I'd like to keep

11  going.  But again if I do feel that, because of the

12  length, I have to break I will do it at the appropriate

13  time, that there is no prejudice to anybody.

14          MR. HAYDEN:  Yes.

15          THE COURT:  Court's in recess.  Have a good

16  evening.

17      (Whereupon, the trial was adjourned to June 13,

18  2005.)

19

20

21

22

23

24

25

MO