1    STATE OF NEW YORK :   NASSAU COUNTY

2        COUNTY COURT PART 11

3    - - - - - - - - - - - - - - - - - - - -X

4    THE PEOPLE OF THE STATE OF NEW YORK,      SCI/IND. NO.
                                               167N-05
5                   -against-
                                               TRIAL
6    MARK ORLANDO,
                          Defendant.
7    - - - - - - - - - - - - - - - - - - - -X

8                            252 Old Country Road
9                            Mineola, New York
                             June 13, 2005
10

11

12   B e f o r e:

13             HON. DAVID P. SULLIVAN, County Court Judge

14   A p p e a r a n c e s:

15

16             HON. DENIS DILLON
                   District Attorney, Nassau County
17                 By: ROBERT T. HAYDEN, ESQ.
                   Assistant District Attorney
18

19
               DENNIS LEMKE ESQ.
20                 Attorney for Defendant
                   262 Old Country Road
21                 Mineola, N.Y.  11501

22

23                       Mary Ocskai
                         Official Court Reporter
24

25

MO

Proceedings

1        THE CLERK:  Continued case on trial,

2   167N-2005, People versus Mark Orlando.

3      May we have appearances, please, for the record.

4        MR. HAYDEN:  Robert T Hayden for the People.

5        THE CLERK:  For the defendant.

6        MR. LEMKE:  Dennis Lemke, 114 Old Counsel

7   Road, Mineola, New York, Your Honor.

8        THE CLERK:  People ready?

9        MR. HAYDEN:  Ready, Your Honor.

10       THE CLERK:  Defense ready.

11       MR. LEMKE:  Ready, Your Honor.

12       THE CLERK:  Let the record reflect the

13   presence of Mr. Orlando.  The jury is not in the

14   courtroom at this time.

15       THE COURT:  Just for everybody that is here,

16   what the Court intends to do is to do a precharge

17   conference now on the record with the attorneys.

18      Both sides have seen the suggested verdict sheet?

19       MR. LEMKE:  Yes.

20       MR. HAYDEN:  Yes.

21       THE COURT:  Any objection?

22       MR. HAYDEN:  No.

23       MR. LEMKE:  None, Your Honor.

24       THE COURT:  We will mark it as the next Court

25   exhibit, Mr. Paoli.

Proceedings

```
 1          For the record, after the proceedings concluded on

 2     Friday, the Court, off the record, went over with both

 3     attorneys the charge it intended to give to the jury.

 4     There will be some introductory preface remarks.

 5          Court will discuss the indictment, facts for the

 6     jury.  Law for the Court.  Unanimous verdict.  Verdict

 7     based on evidence alone.  We will again give the charge

 8     with respect to jury note taking.  Juror expertise.

 9     They're not to apply any of their expertise to

10     anything.  No sympathy for the jury.  The jury's not to

11     consider sentence.  Remarks of counsel are not

12     evidence.  Jurors' recollection of the facts govern.

13     They're to disregard any excluded matter.  They're to

14     make no inference from my rulings.

15          I will give the charge on direct and circumstantial

16     evidence.  Then I will give the general charge on

17     credibility of witnesses.  I will give the charge again

18     on police witness.  No greater, no lesser credibility.

19          With respect to the expert witness charge we

20     discussed, I will just give the general charge on expert

21     witness.  I won't name all the detectives that were made

22     experts.

23          Is that acceptable?

24               MR. LEMKE:  Yes.

25               MR. HAYDEN:  Yes, Your Honor.
```

MO

Proceedings

1  THE COURT: I will give the charge with

2  respect to credibility, and someone who has priors, I

3  believe the only witness that testified that there was

4  indication of a prior conduct with the law was Tommy

5  Flores.

6  Is that correct?

7  MR. HAYDEN: Yes.

8  MR. LEMKE: Yes.

9  THE COURT: I will direct them on how to

10 reconcile discrepancies. False in uno, false in

11 omnibus. An overview, sum up the whole credibility

12 evaluation. I will direct them that testimony and

13 charge to be read back and exhibits taken into the jury

14 room. I will give them the charge with respect to the

15 oral statements and the oral statements reduced to

16 writing by detectives.

17 I will give a full charge on voluntariness and

18 whether your client's rights were given to him and

19 weighed. And, of course, that there needs to be

20 corroboration of any such statements. I will again give

21 the jury the limiting instruction with respect to

22 Detective McGinn's statements allegedly made by Herva

23 Jeannot. Give them a general charge on photographs,

24 maps and diagrams.

25 I will give them the CJI charge on motive. Then I

MO

Proceedings

1   will do presumption of innocence, burden of proof,

2   define reasonable doubt.

3       Mr. Lemke, are you asking that the jury be charged

4   begin with the defendant's failure to testify?

5           MR. LEMKE:  Yes, Your Honor.

6           THE COURT:  I will charge the jury on

7   accessorial liability.  And then I will give them the

8   specific law on the only count charged against the

9   defendant Murder in the Second Degree.

10      Now, as I indicated, counsel, we all went over this

11  off the record and now I have done it on the record.  At

12  this time are there any requests to charge or

13  objections?

14          MR. HAYDEN:  No, Your Honor.

15          MR. LEMKE:  None, Your Honor.

16          THE COURT:  Both sides have anything before

17  the jury is brought in?

18          MR. HAYDEN:  No Your Honor.

19          MR. LEMKE:  Nothing further, Your Honor.

20          THE COURT:  Okay.

21      Again, the admonitions, everybody has been

22  cooperative, but I admonish everybody, there's not to be

23  any disruptions during the proceedings.  Any disruptions

24  will be swiftly dealt with.  You will be banded from the

25  proceedings.

MO

Proceedings

1          THE COURT OFFICER:  Ready for the jury, Your

2    Honor?

3          THE COURT:  Yes, ma'am.

4          THE COURT OFFICER:  Jury entering.

5          THE CLERK:  Continued case on trial,

6    indictment 167N-2005, People of the State of New York

7    against Mark Orlando.

8       Again, People ready.

9          MR. HAYDEN:  Ready, Your Honor.

10         THE CLERK:  Defense ready?

11         MR. LEMKE:  Defendant ready.

12         THE CLERK:  Let the record reflect the

13   presence of Mr. Orlando, sworn jurors and the

14   alternates.

15         THE COURT:  Good morning, ladies and

16   gentlemen.

17         Now, bear in mind, that we have allowed note

18   taking, but at this stage of the trial there will be

19   summations.  What the attorneys say is not evidence.

20   So, you should be paying attention to what they say, not

21   so much worrying about taking notes.  This is not

22   evidence.

23      Just so you know how I am going to proceed, Mr.

24   Lemke will sum up.  I will take a five minute break for

25   anybody to use the facilities and then Mr. Hayden will

Proceedings

1    sum up and I will again take the break so everyone can

2    use the facilities.   Then I will charge you on the law.

3        Members of the jury, we have now reached that point

4    where you're about to hear the summation, the closing

5    arguments of counsel.   Following summation, I will

6    charge you or instruct you as to the laws, rules and

7    principles which you must follow during your

8    deliberations in rendering your final verdict.

9        Defendant's attorney, Mr. Lemke, will sum up first,

10   and Assistant District Attorney, Mr. Hayden, will sum up

11   last.

12       Suffice to say during their summations counsel will

13   review the evidence presented at this trial, and will

14   suggest to you certain conclusions which they in their

15   opinion believe may be properly drawn from the

16   evidence.   This is the purpose of summations.

17       If you find a particular analysis of the evidence

18   as suggested by one of the attorneys to be correct and

19   accurate, and if you find the conclusions you're asked

20   to draw therefrom to be logical and sensible, then you

21   may adopt that analysis and/or or conclusion as your own

22   either in whole or in part.   On the other hand, if you

23   find a particular analysis and/or conclusion to be

24   illogical or not warranted, you may disregard the same

25   and draw your own conclusions from the evidence which

MO

Proceedings

1    you find to be credible.

2        Bear in mind, that nothing either counsel may say

3    in their summations is evidence in this case, nor will

4    anything I may say in my instructions on the law be

5    evidence.  You have heard the evidence, you and you

6    alone are the sole and exclusive judges of the facts in

7    this case.

8        Mr. Lemke will now begin his summations.

9            MR. LEMKE:   Thank you.

10       May it please the Court, ladies and gentlemen of

11   the jury, Mr. Hayden, good morning.

12       Before I comment on the evidence in this case or as

13   I will point out the lack of evidence in this case.  On

14   behalf of Mr. Orlando, his family, myself, we would like

15   to thank you for being such attentive jurors.  As you

16   can see now, during that voir dire process, these are

17   very serious charges.

18       You can see also when we discussed during voir dire

19   how significant and important it is to be a fair juror,

20   and a fair jury collectively.  You made sacrifices to be

21   here.  It's been a relatively short trial for charges of

22   such seriousness as Murder in the Second Degree.  You

23   made sacrifices.  Your life has been altered for the

24   rest of your life regarding those sacrifices and your

25   responsibilities here as jurors.  We appreciate that.

Proceedings

1    We appreciate the sacrifices that you have made.

2         Now, before I begin commenting on the evidence or

3    lack of evidence in the case, I get to go first I don't

4    know if it's an advantage or a disadvantage, but I know

5    when I am done, I come back over here, and I sit next to

6    my client, Mark Orlando, Mr. Hayden, will be given the

7    opportunity to stand up and address you.  And he will

8    say, Mr. Lemke makes this argument, Mr. Lemke made that

9    argument.  Mr. Hayden will try to make arguments of his

10   own.  Try to say, well, that argument that Mr. Lemke

11   made doesn't make any sense.  He is going to try to

12   rebut the arguments that I make.  And I don't get a

13   chance to get back up here like you saw during the

14   trial, whose getting in the last word, whose saying what

15   at the end.

16        So, I ask each of you to play devil's advocate for

17   me, for Mark.  Ask yourselves what would Mr. Lemke have

18   said regarding that argument.  It would be nice actually

19   if Mr. Hayden and I could go into the jury room with

20   you, make our arguments, argue with you various points.

21   You know you'd never get a unanimous verdict.  Shouldn't

22   have our opinions count as far as reaching a verdict,

23   but be able to discuss it further.  So, we take the time

24   now to argue to you, submit to you, what the evidence or

25   lack of evidence that is shown in this case.

MO

Proceedings

1      Additionally, during voir dire, during jury

2     selection, you all made promises.  You made promises

3     that you would keep an opened mind throughout this

4     case.  That you would hold the prosecutor to his burden

5     of proof in this case.   That you wouldn't expect me, on

6     behalf of my client, to prove or disprove anything.

7     That you could follow Judge Sullivan's instructions on

8     the law, regarding presumption of innocence, and the

9     other instructions that you're now going to get.

10      Additionally, also, you may have reasonable doubts

11     of your own.  This courtroom is perhaps one the most

12     hottest courtrooms in this courthouse.  You know, I

13     think sat in five different courtrooms.  The fact I am

14     up here now, I think by now you know I am not relatively

15     long, I like to get to the issue, I like to get to the

16     point and ask you to consider that.

17      Consider the instructions that Judge Sullivan will

18     give you.  The fact I don't mention anything doesn't

19     mean that you're not to consider that when you're

20     talking about a reasonable doubt.  You still don't know

21     what reasonable doubts is.  The Judge will instruct you

22     on that.  That in part it is not a whim or a guess or a

23     surmise.  That it's a reasonable doubt, that if you are

24     sitting there talking about the case, deliberating, that

25     somebody will say, well, wait a second, we heard from

MO

Proceedings

1    Mark in his statement he gave to Detective Cereghino how

2    this occurred, or wait a minute, we heard from the EMT

3    when he arrived.  The fact I don't mention it now does

4    not mean you're not to consider it.  It only means I am

5    human.  It's hot in here.  I like to get certainly to

6    the point regarding this.  So, please consider that.

7    Talk about that.

8        The issue for you to consider, I think I hopefully

9    clearly laid out during openings.  You're not going to

10   have to consider whether or not Mark Orlando was

11   somewhere else on December 3, 2004.  You're not going to

12   have to consider, you're not going to have to worry

13   about whether or not this is a self-defense case.

14   You're not going to have to consider lesser included for

15   murder, for manslaughter and so forth.  We discussed

16   that.  I told you in my opening don't waste your time

17   considering any of that.  It's whether or not the People

18   have proven, beyond a reasonable doubt, that Mark

19   Orlando aided and abetted Herva Jeannot in the

20   intentional murder of Mr. Calabrese.

21       There is also no question, no dispute Mr. Calabrese

22   was viciously murdered.  No question about that.  No

23   question about where the murder took place.

24       The question is, has Mr. Hayden proven to your

25   satisfaction, beyond a reasonable doubt, that Mark

MO

Proceedings

1    Orlando knew what was happening, took part in it,

2    encouraged it, as you will get told the definition of

3    aiding and abetting.  Not, after the fact, whether he

4    was scared and threatened for his life and his wife, he

5    went here and there.

6         We will talk a bit about that.  I like to break my

7    summations into three parts.  Basically that is what you

8    need to consider.  That is the sole issue in this case.

9    And I during my summation will not go through ten

10   exhibits of the same spot to show we have this and

11   that.  Because, as I asked to you during voir dire, it's

12   not the quantity or the number of witnesses or

13   photographs, but the quality as to what was said.  How

14   does that help me in making that determination.

15        So, what do we know, let's talk about what is not

16   in dispute, and let's first talk about who was this Mark

17   Orlando.  You heard who Mark Orlando is.  You heard from

18   a number of witnesses.  I may not name the witnesses by

19   name in part because there were a lot of the officers

20   and so forth.  It's, again, not who they are, but what

21   they said in connection to this case.

22        So, when you are deliberating, and somebody's

23   getting perhaps confused one way or the other about what

24   was said, whose Mark Orlando, you have to start off from

25   that, and that point, to determine, have they proven

Proceedings

1   that Mark Orlando has the mental capacity, that Mark

2   Orlando could perform such a vicious aiding and abetting

3   intent.  Was he involved.  Did he know there was a

4   robbery that was going to be committed by Herva

5   Jeannot.

6       Whose Mark Orlando?  Well, you heard he is

7   thirty-four years of age.  You heard from Barbara, and

8   you heard from Tom.  You heard that both of them had

9   worked with Mark for a number of years.  That Barbara

10  has known Mark the longest.  She described Mark.

11      Again, anything I say, if it either strikes you

12  that it may not have been said doesn't mean I am doing

13  it intentionally.  You can ask to have the reporter read

14  it back.

15      But Tommy Flores testifies as does Barbara.

16  Barbara testifies she knows Mark, longest.  That is

17  correct.  Mark was thirty-four years of age back on

18  December 3, 2004.  That Mark lived in Bayshore at that

19  point with his wife who was pregnant.  Not in dispute.

20  That they lived 1119 Joselson Avenue.  Somewhat

21  significant because we know, we learned that Herva

22  Jeannot lives in Deer Park.  And so that Mark would then

23  pick up Herva Jeannot, then drive to Professional Credit

24  Services where they had worked.  And Mr. Hayden will

25  argue in a way that this is a friendship, how could they

MO

Proceedings

1    not know what each one is doing.

2         Clearly you know that many times you have

3    relationships with someone, you know, friends, you know

4    them three or four years, you can be driving that person

5    a number of days, three, four, five days a week, then

6    all of a sudden they do something that seems, I can't

7    believe that person did that.  You wouldn't think that

8    person would be capable of doing that.  Mr. Hayden's

9    going to make those arguments for you to consider.

10        What else about Mark?  We know that Mark now has a

11   three month old daughter.  What is significant about

12   that?  Not sympathy, but his wife was pregnant at the

13   time that Mr. Herva had threatened Mark.  Threatened to

14   kill his wife if he said anything.  Because that is

15   something you're also going to be given to consider.

16   Here's a vicious murder.  Why didn't Mark go to the

17   police.  I think you see now the answer to that.  When I

18   discussed how it was that he gave the first version to

19   the one detective, McHugh, and then to Detective McGinn,

20   finally to Detective Cereghino.  Because everything that

21   Mark Orlando had told Detective Cereghino is

22   corroborated by the sixty or so exhibits introduced into

23   evidence.  Everything here supports what Mark had said.

24        What Mr. Hayden's going to ask you to consider is

25   to speculate, to speculate how the holes got into the

Proceedings

1   sweat shirt, and about the angle of the body, an the

2   manner in which the body was first shot and the first

3   shot that penetrated Mr. Calabrese. But you heard from

4   Mark in that statement to Cereghino. We will talk about

5   each one of those factors because it's all supported by

6   all of this evidence.

7       So, you know that Mark, and most significant, was

8   extremely overweight. I think to the tune of close to

9   seven hundred pounds. That Mark had a number of

10  operations, and then they were trying to conceive,

11  trying to have a child. That Barbara had indicated that

12  Mark, keep in mind, not one of these witnesses ever said

13  that Mark was ever aggressive with anyone. That either

14  he argued with anyone, was violent with anyone, in fact,

15  if anything, maybe he over compensated for himself.

16      What else did Mark do. Mr. Hayden said a number of

17  times, well, you know that mark had money, he had all

18  these winnings, because he told you so. I got up here

19  on cross and asked not only did he tell you so, but he

20  had cash, he held the cash, had it a week before Bobby

21  Calabrese is shot. Because they're going to have to lay

22  out a motive. Judge Sullivan will tell you, and

23  correctly so, Mr. Hayden doesn't have to prove a motive

24  in this case. Not at all. You can consider lack of

25  motive, consider that in determining the viciousness of

Proceedings

1     this murder, whether Herva Jeannot saw an opportunity,

2     who he believed to be a runner, without Mark knowing

3     about it.  We will talk about that because that is what

4     it comes down to.

5        But what else do we know about Mark Orlando.  He

6     was working at the same location, same job about si

7     and-a-half years.  That on a number of occasions, more

8     than a number of occasions, he'd take them to luncheon.

9     In fact Tommy got up an said, well, I buy my share of

10    lunches.  That is fine.  But what was more significant

11    was that Mark was a gambler.  That Mark was always very

12    generous, always bought things, always flashing money,

13    always talking about it, and backing it up.  How so,

14    backing it up.  Tommy told you when he went to the gym

15    Tommy Flores didn't have money.  Mark, use my credit

16    card.  Tommy did.  He said when it was Barbara's

17    birthday, within, a month beforehand, before December

18    third, what did Mark do.  Not only did Mark take time to

19    go to the jewelry store to buy I think a pendant, a

20    heart, but that Mark said, listen, let's take Barbara

21    out.  Let's take her into the city.  So, Mark hooked up

22    with a party bus to go into the city.  Over forty

23    people.  Probably cost thousands.  He had paid for the

24    liquor and beer, so forth, and the bus ride to go in.

25        You heard that, and a number of occasions that any

MO

Proceedings

1    time they needed anything, they could go to Mark.

2    Because this begins to show that there is no motive for

3    Mark.  Why would Mark need to kill, viciously partake in

4    any type of robbery or murder of Calabrese.

5        What else do we learn about Mark which is

6    significant.  Well, he's a gambler.  Not only is Mark a

7    gambler, all right, but Mark gambles well.  That's just

8    not Mark bragging about how he is wining, you have in

9    evidence mark Orlando's gambling records.  This isn't

10   disputed or anything made up from air.  Had all this

11   extra money.  The gambling records as you will sit

12   through and maybe calculate when they came in, because

13   we know that Barbara and Tommy always hung around with

14   Mark and Herva.  They went around together.  They went

15   to barbecues together usually at Mark's house with his

16   wife.  He was always the center of this.  Mark was

17   gambling, always gambling.  You will look through the

18   records because, again, don't have to prove motive.

19   There's a lack of movie.

20       There is no reason for Mark to get involved with

21   killing Mr. Calabrese. They weren't after Mark.  There's

22   been no testimony Mr. Calabrese said, hey, if you don't

23   pay, I have to have guys come out and rough you up a

24   little bit.  Mark, we have to rough you up.  We have

25   none of that involved.  Nothing like that suggested at

MO

Proceedings

1    all.  In fact, there's, you learn, when the money was

2    owed $17,000 that was owed, it's what was paid, as you

3    can see from the gambling records which is documented

4    the first week, pocket 28 to pocket 31.  Short week.

5    Remember what is significant about the gambling records

6    is that you would bet Monday through Sunday, and you

7    would pay up that next Thursday or Friday.  That is

8    significant because my client met Mr. Calabrese, he

9    didn't owe what he had lost on Monday, Tuesday,

10   Wednesday, but he had that Monday to pay, so he went

11   there to pay.

12        But what do we know about the gambling records?

13   Well, the first week, which is in evidence, he won over

14   $8,000.  The week from November, that was three days,

15   the week November first, November seventh, was a bad

16   week, only won $425, but that was due on November

17   eleventh or twelfth because it ended Sunday, pay off

18   Thursday and Friday.  November eighth, November

19   fourteenth, Mark won another $9,800, due to be paid by

20   November eighteenth.

21        There is no question, as in Mark's statement, that

22   many times in this case Mr. Calabrese would come up to

23   Farmingdale.  That is not in dispute.  You now there's

24   that saying suckers walk, you make bets, you win,

25   great.  You could come up to pay me.  I lose, I walk

MO

Proceedings

1    down to pay you.  There's nothing unusual about that.

2    Mr. Calabrese comes up there, he pays off Mark, he pays

3    off Mark $8,000, he pays off $425 the third week.

4    November eighth through November fourteenth, won another

5    $9,800.  You heard from Barbara.  This was Mark's second

6    income along with his and his wife's income.  What about

7    the fourth week.  In fact, the third week, the fourth

8    week, won $9,800.  He was paid around November

9    eighteenth, ninteenth, November fifteenth to November

10   twenty-third, twenty-first, won another $14,500.  That

11   was due and paid to him around November twenty-fifth or

12   twenty-sixth.  How do we know he was paid.  What did

13   Barbara and Tommy tell you.  Barbara tells you five or

14   six days before Mr. Calabrese was shot that they were in

15   the car with Mark, and that Mark was bragging, look,

16   here's all this cash.  They wanted to hold it.  They

17   held it and they passed it around the car, at least ten

18   grand.

19       What else do you hear.  You hear Barbara say that a

20   couple of days, a week before that he had another

21   bundle, $10,000.  A different bundle.  So, you add these

22   figures up, already you're talking close to $32,000 just

23   for that.  And the week that Mark loses, it's in the

24   records, is November twenty-second to November

25   twenty-eighth, about $9,100.  That would be due December

MO

Proceedings

```
 1    second or December third in Mark's statement to
 2    Cereghino.  And there is no question Mark met with
 3    Detective McHugh, and he lied about certain things to
 4    Detective McHugh.  No question, not disputing that.  And
 5    you heard from Detective McGinn, what happened, we will
 6    go over that a little bit, before Mark finally says, now
 7    I feel safe.  Now I can tell you what happened.  I don't
 8    want to be the first one, that Herva Jeannot killed
 9    Calabrese.  I don't want him coming after my family.
10    That is when he gives the third and final statement.
11    It's corroborated what he says about the money.
12          Another thing, Mr. Hayden will get up here and say
13    he's so cold and callous, that none of these officers
14    realized that he had no motive.  The only time it gets
15    emotional.  The only time he's excited is when he's
16    talking about gambling.  You heard that testimony.  Mr.
17    Hayden will say, see this guy there, he's got no remorse
18    whatsoever.  Well, that was, in fact, the case.  Had
19    these officers did not in any way feel that there was
20    any emotion they would have written that down in these
21    notes.  Every detective that got up had ten pages of
22    notes, eight pages notes, six pages of notes.
23    Detective's writing everything down.  Think this was
24    unusual.  Where did you write that down.  It's not
25    anywhere.
```

Proceedings

1    I see the detectives did a good job, excellent job

2    you, now it's playing jury and judge.  I have to

3    cross-examine them.  Wait a second.  Let's take a look

4    at what's in evidence.  Let's look at the exhibits and

5    photographs here now.  Let's take a look at what you

6    need to consider.

7        So, we know it's in his statement, Mark's talking

8    about the gambling because he is being asked about it.

9    He says, listen, sure, I owed him $9,100 that week, but

10   I don't owe him next week.  That is not due.  As a good

11   gambler you ride the waves.  When I'm hot, I'm winning.

12   You bet and bet and bet.  He is up tremendously.  Now he

13   bets week and-a-half, two weeks, he's on a down slide.

14   Bobby cuts off my credit.  I am up now a good $29,000.

15   I pay you back the seventeen, I'm still up.  How do we

16   know there's still money, there's at least close to

17   $3,000 in the safe.  When the police went, there money's

18   in checking, money's in savings.  You heard them talk

19   about, well, he spent that money.

20       Well, if he's up, in this case, as they discussed

21   over twelve or at one point $20,000, $30,000, pays him

22   back, sure he can pay bills, he can do a couple of other

23   things.  And the detectives kept saying, well, he was in

24   debt.  I don't know, giving the inference that maybe he

25   has to foreclose on his house, he is behind in all his

Proceedings

1    credit bills.  That is not the case at all.  You have

2    heard that.  In fact, everything was up to date.  He

3    wasn't in debt as far as the mortgage and foreclosure

4    and so forth, because they need to try to show a motive

5    even though it's not necessary.  Why would he do that.

6    He is up all this money.  Got to go towards that aiding

7    and abetting.  So, you have the gambling records.  It's

8    clear, no foreclosures. There no motive here.  He is up

9    this money.  There is money still in the house.  That is

10   in evidence.

11        So now we have the gambling now leads up to the

12   week into December third.  Well, you heard from Mark in

13   his statement.  Well, what occurred, you heard, also

14   more significantly, from Barbara and Tommy.  You hear

15   that that week, at first they say that they were

16   distancing themselves, Herva and Mark, until on cross

17   examination I said, when you say distancing themselves,

18   you work in the same business that Barbara and, Mark and

19   Herva work with Sprint collections.  And I asked him

20   about the three days up to December third and he tells

21   you that, oh, yeah, you're right, spent all day at lunch

22   on Wednesday.  I think we went to the pub.  Mark drove

23   and bought lunch.  We came back.  On Thursday, oh, yes,

24   Mark drove us to cash our checks.  We hung around,

25   grabbed fast food.  On Friday we went to Applebees, hung

Proceedings

around there. Got off at five o'clock. Mark drove.

Okay.

In his statement as well, because everything that

Mark says to Detective Cereghino is supported by all the

evidence. When they're talking to Mark they're not

arguing with Mark saying we have this and it shows what

happened at this time. Mark is telling them everything

that occurred in that statement to Detective Cereghino

that is now supported by this evidence at a later time.

You didn't hear from somebody later trying to fit in

what you heard from Mark when it counted the most. Then

six days Mr. Calabrese shot and killed.

But he says on that December third, that Mark

leaves about five o'clock, he leaves, he's going to go

down to the gym. In the car is Herva as well as Tommy

and they go to drop Tommy off, then they go to the gym.

Barbara admitted there was a bit of an argument.

Barbara wanted to go with Tommy. They go to the gym.

They leave there. It's Mark and Herva driving to the

gym. They get to the gym. Barbara gets there. Another

friend gets there. Tommy gets there about six. They're

working out. You will see in the statement that is

exactly what time Mark said he got there.

Also said Herva had went to the store. He had to

get some gym clothes. Some things he put in the car

Proceedings

1    earlier that day, we thought it was a gun.  You know,

2    Mr. Hayden will argue, this gun got an eight inch

3    barrel.  That is a long gun.  Long barrel on this that

4    gun.  It's a gun in which when you first look at, what

5    is this.  How could it be hidden.  How Mark could not

6    have seen it.  Take a step back.  Wait a second.  You

7    have Herva.  They got their gym shirts on.  He buys a

8    sweat shirt like the baggy one, and you know what, not

9    so sure he would have seen something like that.

10    Then he gets out, Herva Jeannot, knows nothing

11    about it except he was in the military, living at home.

12    I think there's some people home at that time.  Ever

13    opportunity to make himself some money.  We don't have

14    to prove that.  Just need to say, wait a minute, Herva

15    is there, there is no dispute Herva shot him, and see

16    here it is on December third, they leave work, they go

17    to Tommy's, Tommy's gets dropped off, they go to the

18    gym.  They're all working together, and Barbara says

19    that, sure, Mark's pumping extra weight.  He is there

20    and whose the one that's rushing him.  Herva.  Barbara

21    says Herva keeps saying let's go, let's go.  Because now

22    you got to think actions there are that would in any way

23    support that Mark knew what Herva was intending to do,

24    because that is the issue, and what I am arguing, those

25    reasonable doubts, you can now begin to talk about in

Proceedings

1    deliberations.  Because Mr. Hayden hasn't overcome

2    that.  No matter how many photographs he put in, he

3    brings in a dummy in here to.  Again, ask how come

4    there's not a third arrow.  Why isn't that here.  It

5    doesn't fit into this theory.  They want you to

6    speculate.  They want you to take circumstances evidence

7    and take it to the next step.  You have the, what else

8    do you have.  You have, they're at the gym, they leave

9    the gym.  Mark and Herva.  Mark now tells you that he

10   drives down, and he is going down to Wantagh Suzuki.  He

11   will go down, he's the loser, he will go pay the money

12   to Bobby Calabrese.

13       If this is an intentional murder he was involved in

14   and new about it and aided and abetted, don't you think

15   he would have spoken to Calabrese, two in the afternoon,

16   meet you at eleven o'clock at night, twelve o'clock at

17   night.  Do you think he's going to call Bobby four or

18   five minutes beforehand and say come meet me down here

19   when he knows Bobby Calabrese is having dinner with

20   somebody.  There was a friend that was there.  Do you

21   think he is going to sit there and drive down to Island

22   Park to sit there, knowing he is going to call Bobby, he

23   knows he owes him money, he has to pay him at 8:30 at

24   night.  You know Mr. Hayden will argue this whole thing,

25   he tried to establish some type of alibi, that he is

MO

Proceedings

1    with Herva and, therefore, he went to take out some

2    money, and then he went to the dealership.  Well, we

3    know in Mark's statements that's what happened.  And, I

4    got to ask you to consider this for a second.  He is now

5    going to Island Park.  And Mr. Hayden can argue all he

6    wants, and submit to you that this is a discreet

7    location.

8         Well, I ask you to take a moment and ask

9    yourselves, on a Friday night, at about 8:30, other than

10   perhaps the coliseum perhaps, maybe a stadium, where

11   else would have the most amount of people on a Friday

12   night, starting of the weekend, 8:30 at night, looking

13   for either firewood, beer, cigarettes or food than a

14   7-Eleven, and put that 7-Eleven where there is going to

15   be people all over the place, coming right over the

16   bridge basically and going up a little further north as

17   you can see from all these photographs.  That is the

18   bridge that takes you from Long Beach into Island Park.

19   And now go up on Austin Boulevard, which is, no

20   question, is a main thoroughfare.  Here's the bridge.  I

21   am referring now to People's, one of the People's

22   exhibits, People's 29.

23        And there is no question here's the only way to

24   come in and out.  It's a Friday night.  When you come up

25   to this location, and there's that 7-Eleven that is

Proceedings

```
 1      there, before you lit Long Beach Road, you're coming up

 2      the 7-Eleven, he is talking about fifty feet, on North

 3      Broadway, from the parking lot that is lit up.  If you

 4      take a look at the closeup you will see the right away

 5      there's going to be a location where you had from the

 6      still video, I don't know, seven, eight or nine cars

 7      coming back and forth from the 7-Eleven.  You have a cut

 8      through that comes through.  Is that a location that

 9      you're intending, or you knew what Herva was going to

10      do, you're going to go to, or are you going to pick

11      another spot.  Mr. Hayden's going to argue, wait a

12      second.  All the other times they met were in

13      Farmingdale, maybe over by the parking lot, but that

14      area in Farmingdale, have to worry about cops being

15      around.  Let's go down to the 7-Eleven here.  I don't

16      want to give it to you in the parking lot because of the

17      police and other things.  I'll meet you on the side

18      fifty feet -- you take a look, look at the these.  These

19      are in evidence.  It's a two lane highway each way.

20      Coming up, this is a 7-Eleven, this is Austin

21      Boulevard.  Then you have a little cut through.

22          I ask if you cut through that to come down North

23      Broadway, your headlights are on on the car, are you

24      going to pick a place where as much as they want to

25      argue, did you hear any testimony that the storage place
```

Proceedings

1   was closed at 8:30. None. In fact, you heard the

2   detective say when they get there at 9:30, the gates

3   were closed. We know from the video the gates were open

4   at 8:30. Also saw the limo service. The limo car was

5   either there or was pulling away. Where's those

6   arguments when you're sitting there, I'm not in there

7   with you. Sit there and take up that argument. You can

8   discuss that.

9        Now, you're there, Mark is there. He says he parks

10  the car. When Mark says in this statement how he parks

11  the car, now he is waiting there for a few minutes.

12  That is consistent with the -- I will refer to the

13  video, you know, there's a lot of testimony about

14  stills, but in the context of the time that Mark got

15  there, no question that Mark lied previously when he

16  spoke to Detective McGinn. Not until, what, there's a

17  change in circumstances, not until he feels safe for his

18  wife and unborn child, he says to Cereghino, yes, I

19  parked there. I waited and Herva got out.

20       Remember, not once through all of this did he ever

21  tell these officers he knew what Herva was going to rob

22  Mr. Calabrese or kill Mr. Calabrese. Not once. Says he

23  parks, he is there for a couple of minutes. That is

24  supported by the video. That is supported by the

25  evidence here. People didn't introduce it we would

MO

Proceedings

1   have.  It's here.  He says he is there, that Herva gets

2   out.  Herva is out of the car, says that he takes a

3   piss, urinates.  He is waiting.  Two minutes later, like

4   he does most of the time, Mr. Calabrese pulls up, Mark

5   gets out of the car, and this is now what you have to

6   look at.  This is what you need to begin to say, okay,

7   what are the actions, what do I need to see that is

8   consistent with what Mark says occurs.  That is what you

9   will have to do.  That is what you should do.

10      Mark says he gets out of the car and approaches in

11  between the two cars.  When he approaches Mr. Calabrese,

12  he has in his hands seventeen -- two bundles of money to

13  pay.  He's at least fifty feet down form the 7-Eleven.

14  Here the side street cuts across.  Okay.  Here's the car

15  and it's very significant now to take a look at the way

16  the body's laying with the feet to Mr. Calabrese's car,

17  and the head closer to where Mark was parked because

18  that is significant when you're going to take a look at

19  the T-shirt and the sweat shirt which may be placed on

20  the presenter.  When the bullet holes line up, because,

21  how did that bullet hole get through the left side of

22  the sweat shirt.  How did that happen when it came

23  through.  Well, Mark tells you how that happened and so

24  does this detective.  So does that dummy that was here.

25  Because Mark tells you it's consistent, direct evidence,

Proceedings

1   not speculation about the sweat shirt being pulled over

2   his back and then he must have gotten a shot, then the

3   sweat shirt coming back, Mark tells how he gets out,

4   he's very close to Mr. Calabrese.  Over his shoulder he

5   sees what's in this statement, as he is looking over, he

6   looks over, he says, that he hands him the money, he was

7   standing inches from Bobby, he looks back towards Bobby,

8   he was still facing me, okay, and he began collapsing

9   towards me.  When he first looked up he says he heard

10  him say something.  I took his right hand, we were chest

11  to chest, he handed him the money.  Seconds later Bobby

12  looked passed me.  He said something.  I have no idea

13  what he said, consistent with the medical examiner,

14  consistent with the detective, and consistent with the

15  last detective, regarding the dummy.

16      If I am Mr. Orlando, I am talking to Mr. Calabrese,

17  Herva Jeannot may be five feet from Mr. Calabrese, and

18  Mr. Jeannot takes a firearm.  It's now within the

19  forty-eight inches that each of these witnesses

20  testified to, and everything Mark said.  A shot is

21  fired.  Now, I am Mr. Calabrese, here, there is no

22  question Bobby's looking in this way.  Each one of the

23  officers, detectives said if I am facing him, there is

24  no entrance wound to the front of the head.  There is no

25  question.  We're not disputing that.  We're not

Proceedings

```
 1        disputing it's an entrance wound to the cheek.  As I
 2        said with each one of these witnesses, if I am facing
 3        you, and Mr. Hayden's plays semantics with the evidence,
 4        there's a shot that comes at me, I said to each of these
 5        officers, I am standing facing here, I see, all of a
 6        sudden this other person with a gun, it's raised, I go
 7        like this with my right hand over like this to protect
 8        myself, going to be what anybody does, he comes down,
 9        the first shot's fired, coming from the outside of the
10        arm through the inside.
11            Remember the bullet wipe.  The bullet wipe outside
12        of the sleeve is consistent with coming in, consistent
13        with what Mr. Orlando said, comes down into the back of
14        the ear without going through the sweat shirt, without
15        going through the head, because when the, remember, the
16        body's in here, two arrows, where's the third arrow.
17        So, obviously, couldn't put an arrow in because it
18        doesn't, it's not consistent with what they want you to
19        speculate that that is what it is.  You heard from
20        Mark.  Now, the body comes down forward.  In Mark's
21        statement he says he goes to grab him as he leans
22        forward, as he's coming down, he tries to grab him, five
23        seconds, ten seconds.  The whole thing lasted a couple
24        of seconds.  We know Mr. Calabrese is 5'6", 157 pounds.
25        He is wearing a double X sweat shirt.  He falls down to
```

Proceedings

1     the ground.  Herva Jeannot comes over.  Mark's still in

2     shock.  Mark tells you, consistent with the medical

3     examiner's report, consistent with all the People's

4     witnesses, that Herva Jeannot comes over, shoots him

5     twice in cold blood.  No question, horrific.  Consistent

6     with the bullet wipe from the back of the sweat shirt as

7     you look at it, consistent with the sweat shirt being up

8     where his cheek comes down, face falling, hits the

9     ground, sweat shirt's coming down, coming up, top comes

10    down.  Now the second shot to the head, the one you will

11    see the bullet wipe.  Look at it.  It will be lined up.

12    You're going to have three folds, goes to the back of

13    the head and remains in the head.  The other one comes

14    through, when it comes through, only comes through once

15    inside of the sweat shirt.

16         So, you got this huge sweat shirt, falls to the

17    ground, consistent with what Mark says.  Now you have

18    the second shot.  Nothing inconsistent here.  There's no

19    speculation that he is pulling on one side of the sweat

20    shirt, pulling on the other side, it's way up over his

21    head.  Now he falls down, his body is there, first shot

22    killed him, whether his body's convulsing.  Head's

23    inside.  Second shot come down.  That is how it comes

24    out.  That is not inconsistent.  That is a reasonable

25    doubt when you're back there.

Proceedings

1      Okay.  Now we know how the shooting took place.

2  What happens now.  Mark also tells you he's in shock.

3  He gets into his car.  Herva's there.  You say anything

4  your wife's dead.  He goes, he stops for a second, that

5  is in statement, consistent with the video.  The brake

6  lights you have now stopping.  Mark says within two

7  minutes or three minutes, in his statement, I want you

8  to know that Herva is with me.  Here's a guy who never

9  thinks for a minute will pull something like this.  He

10 robs him and he's saying this isn't the first person and

11 not the last.  Say anything, your wife's dead.

12      Now, Mark, what does he do.  He's petrified,

13 fearful, what is he thinking?  Now he starts calling Tom

14 Flores.  Tom says Mark wasn't the same.  Wasn't the

15 same.  Now he wants everybody to see him with Herva.

16 So, the time comes, Herva says something, he can say

17 this is what happened.  Consistent with of this.  Now,

18 he calls them.  He calls Suzuki Wantagh.  Look at the

19 phone records.  The phone records show that first call

20 is a minute and eight seconds long.  He called Wantagh

21 Suzuki and asked for Ralph.  Asked about a check.  He's

22 now running all over the place calling everybody he can

23 call.  Goes to the ATM so he can show that Herva was

24 with him.  So whoever's going to believe that Herva's

25 with him.

Proceedings

1    Now he's petrified.  He tells the police where the

2    gun is.  They recovered that.  Tells him everything.

3    Everything he tells him Cereghino is writing down, about

4    how he was so afraid, so afraid, that he had the shotgun

5    recovered in his house, as he was sleeping in the living

6    room in the house dozing off and on.

7        Again, the arguments I make here are for you to

8    consider.  It certainly may be a situation where it's

9    long, I don't mean to be long winded and put anybody to

10   sleep.  However it certainly needs to be addressed,

11   certain issues for you to consider.  What happens next.

12   For that week, he distances himself.  He doesn't drive

13   Herva, he is petrified, he's afraid.  He says to the

14   detective, you don't understand.  How do we get to this

15   third statement.  How do we get here.  He gets picked

16   up, cooperates fully, when he gets arrested he has no

17   weapons, no guns, no ammunition with him.  They take him

18   to headquarters, remember the time line.  He is over at

19   headquarters.  Remember, they want you to speculate.

20   There's no DNA.  There's no hair fibers, nothing

21   underneath the finger.  The police said there was no

22   injuries to Mark at all.  Again, for you to consider,

23   whether or not that is relevant.  Consider whether or

24   not you should speculate.  Again, whether he can prove

25   they aided and abetted.  He gets picked up and goes back

MO

1    to the precinct.  He says that throughout the first I

2    think time line, remember he gets brought in about ten

3    o'clock.

4        As he is speaking with the first detective, McHugh,

5    he gives a statement.  Told you at the outset that

6    statement is a lie.  Doesn't want to be that first

7    person to tell the detectives so that Herva Jeannot can

8    either show his family Mark gave a statement that said

9    that he killed him, rather not say anything so my wife

10   and unborn child would not be hurt, would not be killed,

11   he saw him viciously kill somebody, threaten to kill

12   again.  He is there two hours, two o'clock, gives that

13   statement.  Then from two o'clock to five o'clock as you

14   remember not much is going on.  Mark's in there.  Then

15   five o'clock Detective McGinn comes in.

16       This is critical.  What changes.  What changes Mark

17   from lying to McHugh about not being present when

18   Calabrese is shot and killed.  He starts saying, Mark,

19   tell me what happened.  Tell me what happened.  And Mark

20   Orlando sitting there saying, Detective McGinn, you

21   don't understand.  You don't understand.  We all now

22   understand because Herva threatened to kill his wife and

23   unborn child and then kill him.  He didn't know he was

24   planning to rob Calabrese.  He didn't know he was going

25   to shoot him.  So, Mark tells the detective twenty-five

.Proceedings

1    minutes, five o'clock to 5:25, you don't understand.

2    Tell.  Is it the Mafia.  Are you afraid they're going to

3    come after you.  You don't understand.  I can't tell

4    you.  This isn't, I can't tell you, because I was there,

5    I was part of it.  This is, I'm afraid.  I saw what he

6    did, I had no idea what he was doing, that he was

7    planning to do that and now I am scared.  I am afraid.

8    You don't understand.

9        Detective McGinn leaves and comes back in and says,

10   oh, Herva Jeannot, he's giving it up.  Another forty

11   minutes, goes back and forth, back and forth, you don't

12   understand.  I can't tell you.  You don't understand.

13   Until McGinn tells Mark, he's giving it up.  He admits

14   he shot him and he says you paid him.  You know what,

15   you now have, also in evidence, hundred dollar bills

16   that were taken from my client's house during the search

17   warrant.  Anything unique, numerically in any way.

18   Again, for the People to get up here and ask you to

19   speculate, oh, he paid him, Mark Orlando had the money,

20   this is no movie.  Herva Jeannot took the opportunity,

21   knew Mark said he was going to pay him.  Hey, Mark,

22   don't worry about it.  Not your money.  Then Mark says,

23   okay.  Told you he killed him.  Good.  I can now protect

24   my family.  We don't have to worry about any statements

25   that are shown to Herva Jeannot's family.  I am the one

MO

Proceedings

1    that said first he killed him.  He tells Detective

2    Cereghino now what occurred.  There's no more reason to

3    fear for his family.

4         So, now, you're left with all of the exhibits in

5    evidence, you're left hearing Mark tell you in his

6    statement to Cereghino what occurred and why he went to

7    all these places, why he kept the ATM receipt.  Not to

8    set up an alibi, putting himself there, using his cell

9    phone, picking a place.  Certainly very busy aiding and

10   abetting.  He was driving away afterwards being afraid.

11   What should I do now.  It's what occurred, what happened

12   before.  Have they proven he was aware of what was

13   happening.  That is what you need to consider.  Whether

14   the People have proven that beyond a reasonable doubt,

15   that is what the aiding and abetting is.  Not that Mr.

16   Calabrese was viciously shot and killed.  He was.  There

17   is no question about that.  Just as horrific and

18   horrible as that is, it's just as horrific convicting an

19   innocent person.  That is what you're selected here for,

20   to look at the evidence.  And during voir dire I asked

21   you about those questions, these types of concerns we

22   had.

23        My job is just about over.  I went through what I

24   wanted to discuss with you, maybe a little longer than I

25   thought, significant for you to consider all that.  But

Proceedings

1    my job is just about done.  When I sit down, I sit down

2    next to Mark and I am done.  It's now for you to listen

3    to Mr. Hayden ask you to speculate how this and that

4    happened.  And then to listen to the Judge's

5    instructions, and maybe tomorrow, a week from now, two

6    weeks from now you will have the time to discuss this

7    with family members and friends.  Talk about all the

8    evidence in this case.  Now is the time as jurors,

9    individually and collectively, to discuss and talk about

10   all this.  Take a look at the exhibits.  Take a look at

11   the locations and the businesses that are there and the

12   phone calls that are made, and the lack of a motive.

13   All of these things.  We're confident, very nervous, but

14   very confident, if do you that, you will come back with

15   the only verdict in this case and that is that Mark

16   Orlando is not guilty.

17         Thank you.

18         Thank you, Your Honor.

19         THE COURT:  As I instructed you, ladies and

20   gentlemen, we'll take a brief recess now.  Same

21   admonitions.  Don't discuss the case among yourselves or

22   with anybody else.

23         Everybody please remain seated in the gallery, and

24   we will bring you back in a few minutes and we will hear

25   Mr. Hayden's summation.

Proceedings

1          THE COURT OFFICER:   Leave your note pads on

2    the chair and follow me out.

3          THE COURT: We will resume in approximately

4    five minutes.

5          THE COURT OFFICER:   Ready for the jury, Your

6    Honor.

7          THE COURT:   Everybody ready?

8          MR. HAYDEN:  Yes.

9          MR. LEMKE:  Yes.

10          THE COURT OFFICER:   Jury entering.

11          THE COURT:  Case on trial, indictment

12    167N-2005, People versus Mark Orlando.

13      People ready.

14          MR. HAYDEN:  Ready, Your Honor.

15          THE COURT:  Defense ready.

16          MR. LEMKE:  Defendant ready.

17          THE CLERK:  Let the record reflect the

18    presence of Mr. Orlando, the sworn jurors and the

19    alternates.

20          THE COURT:  Everyone in the jury, can you see

21    the screen?  Yes.   Okay.

22      Mr. Hayden.

23          MR. HAYDEN:  We're sorry, we owe all of you an

24    apology.  We got it all wrong.  Much more than that,

25    this poor defendant.  He didn't do anything.  He was

MO

Proceedings

1    there.  Doesn't mean he did anything.  He just happened

2    to be there, just happenstance, when the other guy did

3    it.  That is what happened.  You know what he is.  He is

4    a victim just like Bobby.

5        Can you imagine how terrified he must have been,

6    realizing, I'm next.  You got to kill me.  He killed

7    Bobby.  Bobby didn't even know.  Got to kill me.  I can

8    tell the police everything.  I can identify him.  I was

9    right there.  If I turn my back on him I'm dead.  He

10   must have been so frightened, he have been frozen with

11   fear.  He must have been so terrified he must have felt

12   like running for his life, as best he could, down to the

13   7-Elven only sixty feet or so away.  He must have been

14   shouting bloody murder.  That is human.  I think that is

15   self-preservation.  That is what is going on here.

16   Don't think he planned it.  Forget the $17,000.  There

17   was no $17,000 motive.  Forget that.

18       You don't think Herva Jeannot needed an accomplice,

19   do you.  Why would Jeannot need an accomplice.  Why

20   would Herva Jeannot need someone to get him in and out

21   of that unfamiliar area.  Why would Herva Jeannot need

22   someone to lure Bobby into that desolate corner of Long

23   Beach with the promise of a $17,000 payment.  Why would

24   Herva Jeannot need someone to distract Bobby.  You know

25   Bobby's senses were going to be on high alert.  He's

Proceedings

1  going to be making a $17,000 collection.  Very sensitive

2  to what is going on around him.  It is a quiet, still,

3  relatively desolate corner of North Long Beach.  Herva

4  didn't need an accomplice.  Who cares if Bobby notices

5  Herva approaching.  Why would Herva need an accomplish.

6  Why would Herva need someone to get up close to Bobby,

7  someone who could get a grip on Bobby, someone to get a

8  hold of him, someone to get that sweat shirt over his

9  head, immobilize him.  Someone who could hold him

10  relatively still, make him a stationery target so Herva

11  could get in between him with that .44 caliber Magnum

12  and take a clean, accurate shot, which is what he did.

13      He didn't need an accomplice.  Why would Herva need

14  an accomplice.  Why would Herva need to get out of

15  there.  Why would he need a wheelman.  Why does he need

16  that getaway driver.  He doesn't need that getaway

17  driver.  It's so much more fun.  You're going to love to

18  do an execution murder where you got no way out, and

19  stand there with a smoking gun in his hand with the

20  victim's dead body there and have nowhere to go,

21  because, remember, Herva couldn't count on the

22  defendant.  He's just an eyewitness.  He's just an

23  innocent bystander.  Herva had no idea what the

24  defendant was going to do.  The defendant would have

25  been just as unpredictable as Bobby himself.  Herva

Proceedings

1   didn't need an accomplice. You know what he needed, he

2   needed an eyewitness. That is what he needed. He

3   needed someone who knew him well, someone who could

4   identify him to the police. Someone who could tell them

5   everything about that night or the following day or the

6   following week or the following month or the following

7   year. Herva would never have known when the defendant

8   was going to tell the police what had happened. But he

9   knows sooner or later it's going to happen. I guess

10  Herva enjoyed living on the edge. He likes taking

11  risks.

12      Now your common sense tells you that is not so.

13  That is not so reasonable. Your common sense tells you

14  that there's absolutely no way in this world that Herva

15  Jeannot would ever have executed Bobby Calabrese in

16  front of this defendant unless this defendant was right

17  in the middle of it, unless he could count on this

18  defendant to get him in and out of that unfamiliar

19  area. Unless he could count on this defendant to lure

20  Bobby into that roll in he first place. Unless he could

21  count on the defendant to distract Bobby. Bobby doesn't

22  know him. He could certainly count on the defendant to

23  get a grip on Bobby, to hold him and make sure he didn't

24  get away. To make sure there's relatively enough space

25  to get a clean, fatal shot in. Unless Herva was

Proceedings

1        absolutely certain he could count on this defendant to

2        be his getaway driver, which of course, is exactly what

3        the defendant did.  That is your common sense talking.

4        All you had to do is listen and the whole thing will

5        come together.

6             How do you know the defendant planned it.  Ask

7        yourselves, who is he.  Let's consider who he is.  He is

8        arrogant.  The witnesses told you so.  He is a big

9        spender.  The witnesses told you so.  Always liked

10       showing off expensive purchases.  The witnesses told you

11       so.  Always out there spending his winnings.  Deeply in

12       debt.  Multiple car payments, $370,000 mortgage.

13       Payment on an in-ground swimming pool.  Living beyond

14       his means.  Multiple credit cards payments.  Not the

15       kind of guy who should be a compulsive gambler.

16       Spending money to charter a bus to drive Barbara Diamant

17       and her friends all around Manhattan island, picking up

18       the tab at the restaurant, picking up the tab at the

19       nudey bars, the night clubs, showing off.  I'm a

20       professional gambler.  This Professional Credit thing,

21       I'm a professional gambler.  I am a big man.  Look at

22       this.  Look at this wad.  Check it out.  Look at this

23       wad of cash.  Look what I'm flashing around.  Defense

24       counsel referred you to those gambling records.

25       Remember those gambling records.  You know what they

Proceedings

are.  They show you how compulsive he was.  They show
you thirty-two consecutive days he placed bets 689 bets
over thirty-two consecutive days.  Sundays, holidays,
Thanksgiving day, an average of twenty-one bets a day.
Thirty-two consecutive days.  That is who he is.

Do you think he saved his winnings from Bobby?  He
told everybody everything he spend his winnings from
Bobby on.  This is a compulsive gambler.  He's going to
keep winning.  He's not going to lose.  Why save
anything.  The next ten thousand is right around the
corner.  He is not saving anything.  And then he starts
losing and he loses big.  He is $17,000 in the hole.
What's he going to do now. He doesn't have it.  He can't
make the payment.

We know he is at least ten thousand short.  How do
we know that.  Because of what he told Tommy Flores.
Know what he told him.  Remember that.  Talked to Tommy
Flores about making those two sure fire bets.   Can't
miss.  This is your compulsive gambler talking.  Sure
thing, two $5,000 bets, make that $10,000 right back.
Back in the game.  Only problem, Bobby's not taking
those bets.  Can't do it.  Not going to take the bets.
The defendant needed another solution.

How do you know he paid Herva.  Why else would
Herva do it, if not for $500, those five Ben Frankins

Proceedings

1    hundred dollar bills in Herva's shoe box a week after

2    the execution murder.  Just so happens the defendant has

3    ten of his own back in the shoe box.  Of course he paid

4    him.  He's not doing it as a favor.  And they conspired

5    together.  They're together.  Sure, they had lunch with

6    other people at Professional Credit Services, but during

7    those breaks, they'd always be off by themselves.  Never

8    did it before.  They'd be talking in a corner

9    cavalierly in a corner of the hallway just talking.

10   Talking about what.  How to get it done, that execution

11   murder.  This is a step up for these two.  The plan is

12   beautiful in its simplicity.  Know what we're going to

13   do, what we're going to do is we're go to set up a

14   meeting with Bobby.  We're going to kill him and tell

15   everybody, you cover me, I cover you, .  I pay Bobby all

16   $17,000, debt's gone, it's clean, no more, don't come to

17   me, I paid it.  Then we tell everybody, great, he was

18   fine when we left.  We met over by Industrial Place,

19   over by McCabe's, and then we all drove out.  Bobby in

20   his car, he is fine, nobody's with him, and I'm in my

21   car.  Herva's with me, and then I turn right, I head

22   over to Long Beach on my way to Wantagh Suzuki.  Bobby

23   turns left going to Oceanside.  It just so happens it

24   take him by the seen of the murder, and people are going

25   to believe that somebody must have waited there, maybe

Proceedings

1   another payment, maybe another collection, whoever

2   killed him, took the $17,000.  But I already paid him.

3   Then we go onto business as usual.  We behave like

4   nothing's wrong.  Like we didn't do anything.  Go out to

5   Wantagh Suzuki, business as usual, to get the check.

6   Then I go over to a CitiBank branch, you know, got my

7   card, got my PIN number, instant alibi.  Here I am.

8   It's 9:12 Friday night.  You know where I was.  I am

9   just making an ATM withdrawal.  Think I just killed a

10  guy.  Got to be kidding.  Going out to see the

11  Borushiks.  They know us both.  Vivian works with us.

12  I'll hang out there.  Behave like nothing's wrong.

13  Everything's just fine.  Going to be beautiful.  Then

14  after that, I take you home, when people come to us, I

15  cover you, I alibi you, you alibi me.  Beautiful.

16      How do you know he planned it.  Because he knew,

17  his father lived there twenty years, his wife grew up

18  there.  He spent time there.  Had friends there.  Told

19  detectives Herva on the other hand knew nothing about

20  the area.  Best we know he's never been there.  No

21  evidence he was ever there.  Can't commit an execution

22  murder in an area you know nothing about.  Don't know

23  the major thoroughfares, don't your way in, your way

24  out.  Tough area down there.  A lot of different towns

25  converge, ocean inlets, bridges, tough getting around

Proceedings

1        there.

2              How do you know the defendant set it up.  You got

3        that videotape.  That's the most inadequate videotape.

4        You're disappointed.  I understand.  You see, that is

5        the thing.  Wow, we're going to see the scene of the

6        murder goes by.  And then you come up with nothing.  But

7        it's not entirely nothing.  What you see is you see the

8        defendant driving Herva around, showing him everything,

9        setting it up.  Selecting just the right area, quiet,

10       dark enough.  Once you realize we're on daylight savings

11       time on the video, when in reality it should have been

12       on standard 9:18 should be 8L18, 8:18.51, we have the

13       view from the east camera and we're looking out over

14       Broadway.  Here comes the Suzuki, 8:18.51.  You can see

15       the defendant's large head behind the steering wheel.

16       He is driving along and then he proceeds northbound and

17       he's picked up by the northeast camera.  You will see

18       something very interesting the detective picked up.

19       There's like an obstruction along the back of the

20       plate.  What is that.  What is going on with that.  Very

21       hard to make it out on the video.  It's just like a

22       shadow.  The defendant goes by and eventually the seen

23       of the murder.  Check it out.  Moves on.

24             Now the next frame of interest comes at 8:19.

25       Defendant has looped around.  He likes this area.  Now

Proceedings

1     we're going to make certain.  Now the northeast camera

2     picks up the defendant's headlights coming south and you

3     see the defendant make a U-turn and pull up right by the

4     seen of the murder.  He likes what he sees.  A couple of

5     boat yards, boarded of building, dark, no activity.

6     Looking good.  Defendant pulls away.  Does another

7     loop.  While he is looping around to come back, the

8     phone records show 8:23 he calls Bobby and obviously

9     tells Bobby this is where we're going to meet.  Come

10    meet me here, south of the 7-Eleven.  Meet me there.

11    Then we're at 8:25, and at 8:25 we have more interesting

12    frames.  You see once again the defendant coming towards

13    the northeast camera.  You see the defendant's

14    headlights coming toward the northeast camera.  You see

15    the defendant make a loop, make that U-turn, come

16    around, park and stop.  The lights are on.  And then the

17    lights are off.  Why are the lights off.  Why turn the

18    lights off.  That is when Herva gets out and takes a

19    position along side the car.  Ducks down, no one

20    notices.  The lights come back on and we're waiting.

21    We're all waiting for Bobby.  And then, 8:34.58, east

22    camera picks up Bobby.  Picks up the Infiniti going by,

23    going northbound.  Then the northeast camera picks up

24    the Infiniti's distinctive rear portion, and you see

25    Bobby pull in towards the defendant, pulling in front of

MO

Proceedings

1    the defendant, 8:35.05, and basically loses any coherent

2    frames until it picks it up at 8:35.53 when we see the

3    defendant moving out around Bobby's body.  And then at

4    8:36.52 we have Brian Atkinson coming by.  That is the

5    next car coming by and you first see him going passed

6    the east camera, then you pick up, goes passed the

7    northeast cameras, you see his headlights by Bobby's

8    dead body laying on the cold hard surface of the road.

9    It's then about 8:39 and you have Mrs. Cardineau coming

10   by in the black car.  You see as she moves passed the

11   east camera into the northeast camera her headlights

12   pick up Bobby's dead body.

13        Let's get back to that license plate.  Interesting

14   piece of evidence for Columbo fans.  What is going on

15   there.  It's not on there.  When the Suzuki Verona is

16   eventually taken into police headquarters, it's not

17   there.  What is that obstruction.  What is that shadow

18   that goes down?  I submit to you it's a strip of tape.

19   If anybody hears the gunshots and they see the car they

20   can't take a plate number down because the plate's

21   obstructed.  Away you go.  The police stop you, I don't

22   know, maybe some kids put it there.  I don't know.  Take

23   it off, officer, gee, I'm not sure how it wound up

24   there.  Once we get far enough away from the murder you

25   take it off yourself.  It's done.

Proceedings

1    And there's another question.  Why are we trying so
2  hard to get to a secluded that area because it is really
3  secluded once you get south of 7-Eleven.  It's dark.
4  Why.  The defendant talks about looking for the discreet
5  end.  That is what the video is going to show.  He has
6  not said we're looking for a discreet area, we're up on
7  Industrial, but we saw people up there, saw a truck up
8  there, it's no good.  Why.
9    During counsel's opening statement counsel said
10  well, they always would meet in a discreet area.  That
11  is not so.  They never did.  They were always meeting at
12  times in broad daylight, in a public parking lot.
13  Public parking lot for Profession Credit Services.
14  Bobby parked by the front, they would sit and wait about
15  a hundred feet from the front door.  They waited for the
16  defendant to come out.  When the defendant came out,
17  Bobby would get out of the Infiniti and walk over to the
18  defendant, there'd be the hug, and then the passage of
19  the envelope with the bills.  That would be it.
20  Nobody's looking to avoid people.  People were coming
21  out of the front door the whole time.  People are
22  hanging around the parking lot.  People would be going
23  to their cars.  So, they never saw a secluded area
24  before.
25    Why did they look for such a secluded area that

Proceedings

1    night?  Because they were going to kill him.  Because

2    they were going to execute him.  That was what was

3    different that night.  That is why they were looking for

4    a secluded area.  And the defendant tried to explain it

5    away to the police.  He told the police, well, you see

6    what happened was, we met in North Long Beach that night

7    because I was going to pick up this check from Wantagh

8    Suzuki.  So, I told Bobby, gee, it makes sense now for

9    us to meet in North Long Beach if I'm picking up the

10   check from Wantagh Suzuki.  If Bobby's willing to go all

11   the way out to Farmingdale, to Professional Credit

12   Services, to pay the defendant, he would have met the

13   defendant anywhere to collect $17,000.  And Wantagh

14   would have been the halfway point.  Halfway between

15   Professional Credit Services and Bobby.  They could have

16   met in the Wantagh Suzuki parking lot.  Hey could have

17   met in the CitiBank parking lot.   They could have met

18   anywhere they choose.  The defendant selected this

19   discreet desolate secluded area because the whole idea

20   wasn't paying off $17,000, it wasn't.  There was no

21   $17,000.  The whole idea was executing Bobby and

22   eliminating that debt.

23        How do you know the defendant planned the whole

24   thing.  Have to use your common sense, your good

25   judgment, your experience and your intelligence.  That

MO

Proceedings

1    is why you're here.   The defendant wants you to believe

2    he is just an innocent bystander.   Doesn't mean he wants

3    you to believe that.   He wants you to believe that he's

4    gone to pay Bobby $17,000.   Once you believe that, you

5    know, at a certain point it's good night, he's going to

6    clear the deck, gets that debt off his shoulders.   Going

7    to get that load off his mind.   He is going to go out

8    there and that is what he is going to do.   That is what

9    he wants you to believe, and he is with his best

10   friend.   He is with Herva.   Always hanging out together,

11   at work, after work, nudey bars.   These guys are tight.

12   He is going to make Bobby, he likes Bobby, had a good

13   relation with Bobby.   Bobby always paid when he won.

14   They always hugged.   This is a good knew.   And he pays

15   Bobby, the debt's covered, what a relief.   And he hugs

16   Bobby and the next thing he knows he hears the roar of

17   the gunshot from behind his right ear and Bobby goes

18   down.   Then he realizes it's Herva.   And Herva goes over

19   to the car and shuts the Infiniti door, comes back, and

20   leans over and fires two bullets into Bobby's head while

21   the defendant is standing there watching.

22        How do you use your common sense.   Well, ask

23   yourselves, what would an innocent bystander in that

24   situation have done.   How would an innocent bystander

25   have reacted to that situation.   Your common sense tells.

MO

Proceedings

you that an innocent bystander would have been in
shock.  I am not talking about gee, Yankees lose to the
Royals again shock.  I'm talking about clinical shock.
I'm talking about, I can't take my next breath shot.
I'm talking about, I can't compose a coherent thought
shock.  I'm talking about I can't articulate a sentence
thought shock.  I'm talking about my life has been
shattered and will never be the same shock.  I'm talking
about my world has been turned upside down shock.  I'm
talking about, I'm devastated shock, I will never get
over this.  I'm talking about, I have been thrust into a
nightmare role which I'll never escape.  Okay.  That is
what your common sense tells you an innocent bystander
would have done.  That is how he would have reacted to
something like that.

How about our defendant.  What did he do.  He's
just seen Herva gun down Bobby.  He's just watched Bobby
die, I mean just watched him die.  Herva says let's go
and what does he do?  He climbs into the Verona.  Herva
climbs into the passenger's seat along side of him.  The
defendant starts to drive around Bobby's dying body.
The defendant tells Herva he notices his feet was still
moving, there was a little life left in him, reflex
reaction anyway.  So I stopped.

Now, defense counsel tries to read into some

Proceedings

1   testimony, tries to say Herva was threatening him.  I'm
2   going to kill you and your wife and your unborn child,
3   but that comes from nowhere.  That is not what the
4   defendant said.  Defendant's making up a story.  It's
5   stuff for him.  He didn't mention anything like that.
6   He just says, I noticed his feet were moving so I
7   stopped.  Herva got out, Herva went over to the body and
8   tried to shoot him a couple more times, but the gun
9   wouldn't go off.  So, Herva got back in.  I drove him
10  away.
11       Is that the behavior of an innocent bystander in
12  shock over what he's just seen?  Is that behavior of a
13  man who unexpected watch Bobby die, out of the blue,
14  some big surprise, out of nowhere.  No.  That is the guy
15  who planned it.  Wasn't upset by watching Bobby die.
16  That was what was supposed to happen.  That is what he
17  paid Herva to do, to do his dirty work for him.
18  Couldn't do it himself.  He is not upset.  He is happy.
19  The debt disappeared before his eyes.  Right on.
20  Now  what.  Now, we're driving, getting off of Austin
21  Boulevard, cutting behind the 7-Eleven, heading south,
22  going towards Long Beach, heading towards Wantagh Suzuki
23  now.  It's about three minutes after this execution
24  murdered.  It's three minutes after he stood and watched
25  Bobby die.  Now what.  He gets on his cell phone.  He is

Proceedings

1    not complaining.   He is using the cell phone calling

2    whoever he wants, he's calling Wantagh Suzuki, gets

3    Frank Walker, I want Ralph.   I want the owner.   I'm

4    coming to pick up a refund check.   I want Ralph.   Put

5    him on the phone.   Okay.   Frank Walker comes back, he's

6    not here, he's gone.   We're closed up for the night.

7    So, I don't see the check.   Don't come out, going to

8    have to get it tomorrow.   The defendant's tone of voice

9    is like normal, abrupt, arrogant, he way he always was.

10   Not upset, very composed.   Very calm.

11        Is that the behavior of an innocent bystander who

12   just watched a young man die.   Is that a man in clinical

13   shock.   Is that a man whose life has been shattered

14   forever.   Of course not.   That's the guy who planned

15   it.   That's the guy who set it up.   That is the guy who

16   wanted it to happen.   That is the guy who was ready to

17   alibi Herva, and he's expecting Herva to alibi him.

18   That is a man so cold and hard and so calculating he's

19   methodically piecing together this after-the-fact

20   alibi.

21        Where do we go now.   We're on the road driving

22   along like a getaway driver.   Now we go over the Loop

23   Parkway and we're going over a bridge, and Herva tosses

24   away the ammunition.   Tosses away the shell casing.

25   Everything's now gone.   Guns unloaded.   We continue on.

Proceedings

1   We go onto the Wantagh Parkway.  We hit the Sloop

2   Channel Bridge, get up on the crest and the defendant

3   stops.  Herva gets out the front passenger's door.

4   Herva goes to the edge of the bridge.  Herva takes

5   the .44 magazine revolver, tosses it, into forty feet of

6   water and the revolver sits down below forty feet of

7   water.

8       Now Herva's outside.  Is the defendant saying he

9   can't hurt me now, I got to get out of here, he's going

10  to kill me too.  Got to kill me.  Can't let me live.

11  I'm out of here.  I don't care about the passenger's

12  door.  I don't care if it blows off.  I'm out of here.

13  No, no.  What the defendant, the getaway driver do.

14  Waits.  Herva comes back, climbs into the front

15  passenger seat and away they go.  And then it's out to

16  Wantagh Suzuki.  But what a shame.  They were closed.

17  No one was their to see him and Herva.  That part of the

18  alibi didn't come together.

19      Now, we got CitiBank.  Can't lose at CitiBank.

20  What do you do at CitiBank?  You take your card, got

21  your PIN number, you make a transaction, and bingo, 9:12

22  Friday night.  I'm at CitiBank.  Me having anything to

23  do with the execution murder, I'm doing an ATM

24  withdrawal.  What are you crazy.  I had nothing do with

25  that.  Then it's onto Plainview.  Now we get further

MO

Proceedings

1   away from the scene of the murder to see the Borushiks.

2   Cell calls 9:14, 9:18, 9:19.18, sets it up.  We're

3   coming over.  Forget it's late on a Friday night.

4   Forget it's early December.  Perfect time to look at the

5   deck around the pool.  Forget the fact we're intruding

6   on the Borushiks lives, we're coming in.  Here we come,

7   Herva and me.  Now it's 9:26.  Now he's calling Tommy

8   Flores, calling Tommy to talk about the defendant's

9   efforts to retrieve the refund check.  Why would Tommy

10  Flores care about that.  What difference does it make.

11  Who cares.  Can you think of a more boring topic.  Got

12  to make a call.  Why.  Because no one saw him at Wantagh

13  Suzuki.  Got the call in to Frank Walker.  Frank Walker

14  confirming to the police he called, he called me like

15  9:39, and told me that he was going out to Wantagh

16  Suzuki to pick up the refund check.  No one at the

17  Wantagh Suzuki to confirm this.  Now he calls Tommy

18  Flores, and told Tommy he went to Wantagh Suzuki and I

19  couldn't get in because it was closed.  Of course the

20  defendant sounded strange during that conversation.

21      Now we're pulling up outside Borushiks house and

22  the defendant gets out of the car and Herva stays in the

23  car.  The defendant walks into the Borushiks home and

24  starts talking with them.  Everything is fine.  And you

25  have proof beyond any reasonable doubt that the

MO

Proceedings

1    defendant was right in the middle of it.  Why.  Do you

2    think if the defendant were really an innocent

3    bystander, an eyewitness, who had just seen Herva

4    execute Bobby out on the street, that Herva would have

5    let the defendant go into the Borushik's house on his

6    own where he could have begged the Borushiks to shut the

7    door, lock the door.  You know Herva killed this guy.

8    He is outside in the car.  He is going to kill me.

9    Going to call the cops.  Give me the phone.  I'll call

10   them.  Herva doesn't mind the defendant going in and

11   speaking with the Borushiks.  He wants the defendant, he

12   has no ideas they're part of the alibi.  Eventually

13   Herva himself goes in and they talk, it's fine, it's

14   normal.  They talk about the pool.  She vacuums the

15   guy's feet.  It's business as usual.  Execution murder.

16   Guy was composed.  He was fine.  Just talking about the

17   pool.

18       Now we move on.  Now what does the defendant do.

19   The defendant drive Herva home.  Think about that.

20   Once again you have proof beyond any reasonable doubt

21   that the two of them were right in the middle of this

22   together.  Why.  If the defendant is an innocent

23   bystander, who now realizes that Herva is a cold blooded

24   killer, you think the defendant's going to drive him

25   home where his wife is, where his mother-in-law is.  You

MO

Proceedings

1    got to be kidding me.  I thought he was so afraid of

2    what was going to happen to his familiar, he's driving

3    him home.  Think about that.  That alone establishes his

4    guilt beyond a reasonable doubt.  When he gets him home,

5    he takes him up to his room.  He has a story about that

6    for the police.  He says, he took him up to his room.

7    Thought his family might confirm that happened.  So, I

8    took him up to my room.  I gave him some porno tapes.

9    He paid him.  That is when he paid him.  That is why he

10   brought him room there.  That is where the money passed

11   hand.  We don't know how much, but it was at least five

12   hundred, far less than the $17,000.  That was what is

13   going on up there.  And then he drove Herva to Herva's

14   place.  And now everything is fine.  The ammunition is

15   long gone.  The gun is sitting below forty feet of

16   water.  Herva Jeannot is unarmed.  Herva is now at home

17   inside the, you know, that daze of BB gun.  That is

18   where he is.  That is where Herva is now.  Of course,

19   what is the defendant going to do.  He is free of

20   Herva.  He is running to the police station, help me.

21   This guy just killed Bobby Calabrese.  I am telling you

22   to help me.  He is on the cell phone right then.  Can't

23   hurt him now.  Please, officer, you got to do something

24   for me.  No, it's business as usual.  But not away.

25   Because we're pretending, remember, we're pretending we

MO

Proceedings

1    don't know anything about what happened with Bobby.

2    Bobby was killed.  My God, Bobby's dead.  Oh, no.  You

3    got to wait for somebody to come to you.  Can't let on

4    you know anything.  So Tommy Flores calls.  Tommy Flores

5    had a very human reaction to Bobby's death.  His life

6    was shattered.  You saw him up on that witness stand.

7    You saw he will never forget Bobby's death because it

8    hits hat human level.  It meant something to him.  Not

9    like this defendant who wasn't upset in the slightest.

10   Conducted business as usual.  Remained composed the

11   entire time.  When Tommy calls, hey, the defendant,

12   Tommy, Bobby's dead, oh man.  You know, they might blame

13   me.  Them did you meet him.  Because the defendant

14   didn't say anything about it at the time.  Did you meet

15   him.  Did he see him.  Yeah, I saw him.  I paid him the

16   whole seventeen.  Met by McCabe's on Industrial Place,

17   and everything was fine.  When I left him he's driving

18   towards Oceanside.  He is alone, alive and well.  I

19   think people might blame me.  I am nervous, you know,

20   you know.  What I want to do, I want to speak to Bobby's

21   family.  I want them to know I am cooperating.  I paid

22   him.  You want arrogance.  You want a cold, hard

23   calculating person.  He wants to sit down with Bobby's

24   family.  He wants to look them in the eyes.  He wants to

25   tell them, your son, brother, was fine.  I was with

MO

Proceedings

1    him.  I'm cooperating.  He was just fine.  I paid him.

2        You have to look hard to try to come up with

3    coldness like that.  This isn't a innocent bystander.

4    That is a cold blooded killer.

5        Let's talk about when Barbara called Barbara

6    called.  She was upset.  Tommy was destroyed.  I can't

7    get anything out of him.  I know you met him.  I want to

8    talk to you about it.  Can you tell me anything about

9    what happened.  Defendant's so arrogant, couldn't help

10   himself, couldn't help himself.  He had to show off.  He

11   had to show off what he knew.  Yeah, he was shot three

12   times in the back of the head.  Guess what.  The police

13   didn't know that.  The autopsy had not been completed.

14   Hadn't begun when that conversation took place, when the

15   defendants told her he was shot three times in the back

16   of the head.  He identified himself as one of the

17   killers.  Then the waiting game continued.  The police

18   are coming, sooner or later they're getting here.  He's

19   got to be ready for them.  Herva and I are going to

20   alibi each other.  It's going to be fine.  Hold it

21   together.  Stay calm, composed.  Stay cool.

22        Defense counseling during opening statement said

23   that you're going to learn that he didn't go to the

24   police for a week after the execution murder.  He never

25   went to the police.  They brought him in.  Works for

Proceedings

1    Professional Credit Services making telephone calls to

2    people in debt.  He persuaded people to pay debts who

3    don't want to pay.  He convinces people it's in their

4    best interest to pay debts.  He figures he can convince

5    anybody of anything including these police officers.

6    So, he sits down.  This is fine.  He's not upset.

7    Bobby's dead.  Set the whole thing up.  And he's

8    actually enthusiastic.  Forget entirely the man is

9    buoyant talking about gambling.  Got McHugh asking, what

10   are you talking about, sure you bet professional

11   basketball in the final score.  What is wrong with you.

12   You bet the quarters, you bet the half, you don't bet

13   that final score.  He is going on and the story's

14   spinning out.  It's beautiful.  I was with Herva.  I

15   paid him, Herva will tell you.  I paid him all $17,000,

16   hugged him, both drove out to Austin Boulevard.  I went

17   right, he went left going towards Oceanside.  That is

18   the last I know, officer.  And, he signs the written

19   statement.  Figures, okay, when do I go home?  He sits

20   and waits.  Waits and waits.

21        Hours go by.  Here comes Detective McGinn.  Not

22   only the problem here is that they're not buying it,

23   they got a video.  Look, we know you didn't meet him

24   where you say you met him.  We know you met him at the

25   scene of the murder, you and Herva were there.  We know

Proceedings

that. Tell me the truth. What are you talking about.
Got the phone records. We know what you're saying is
not so. Talk to me. You wouldn't understand. You
wouldn't understand. Detective, you wouldn't
understand. Make me understand. Talk to me. Tell me
the truth. I'll understand. Tell me the truth. Talk
to me.

Defense counsel paints a very simply picture. You
don't understand because he's a afraid. He's afraid of
Herva. That guy brought home after the execution. He's
afraid of that guy. Doesn't want to talk. We have a
different take on what he's doing. What's that all
about. He's buying time. He said he needs another
story. Got no fall back position. He's got to say
something. Don't know what to say. Got to find out
what they know, how am I going to tell this story in a
way they're going to believe. So, you don't
understand.

Detective says he was calm throughout, never
upset. He was fine. Just give him time. He's is got
to think it through. Detective McGinn leaves, comes
back a little later, you wouldn't understand, I'm
afraid. I'm afraid. What are you afraid of. Talk to
me. We will protect you. You wouldn't understand. I'm
afraid. And Detective McGinn finally says, look,

MO

Proceedings

1    Herva's giving it up.  Herva's telling us everything.

2    So, come on.  He's telling us he did the shooting and

3    you paid him.  And the defendant realizes the time is

4    now.  I don't care what story I had together at all.  I

5    am telling the story and he laches into it and he can't

6    get it straight.  Defense counsel manages to gloss over

7    the first version of the second story.  Let's not gloss

8    over the first version of the second story.  Remember

9    that one.  He had no time to work it out, it's time to

10   think it through. , so he gets rolling and his big pitch

11   is I knew nothing about it.  That is all he is thinking

12   about.  Not thinking about the detail, not thinking

13   about the ramifications of what he's saying.  It's, I

14   knew nothing about it.

15       So, he said I'm standing there with Bobby, paying

16   Bobby, I hold Bobby and the next thing I know, there's

17   this gun shot by my right ear.  Nothing about seeing

18   Herva, not the first time around.   He's just working

19   out XXX of his head here and Bobby goes down.  I'm

20   faced, we're face to face, and he goes down on the

21   road.  And then after he goes down, I see Herva moving

22   on to Bobby's car, shutting the driver's door, comes

23   back and puts two more bullets in Bobby's head.  Herva

24   says, let's go.  I'm driving Herva around Bobby body.  I

25   see the feet moving.  I stop.  Herva gets out, Herva

MO

Proceedings

1   leans down and try to shut him again but the gun doesn't

2   work.  About to get back in the car and Herva leans down

3   and take the $17,000.

4       Now, what went wrong with that story.  There is no

5   $17,000.  So, when the defendant is running through the

6   story he doesn't mention it because it's not there.  It

7   doesn't exist.  He's spinning his wheels as best he

8   could.  It's not working.  There is no $17,000.  But as

9   he's telling the story, the detective realizes, oh, my

10  God, what's Herva's motive.  Why is Herva doing this.

11  Sure, I'm telling him I had nothing to with it.  Why is

12  Herva doing it.  Then he leave the $17,000 in the story

13  but this comes out like an afterthought.  Like they're

14  about to take off and Herva reaches down and grabs the

15  $17,000.  If that was Herva's motive that would have

16  been the first thing he'd do.  Hold the gun, give me the

17  $17,000, then kill or shoot him, watch him go down,

18  reach down, then take the $17,000.  Or he would have put

19  all three bullets into Bobby, then taken the $17,000.

20  He certainly wouldn't have waited until the defendant

21  stopped unexpectedly because Bobby's feet were moving,

22  then get the $17,000.  He couldn't keep the story

23  straight.

24      Now, they asked him, you want to talk to an

25  Assistant District Attorney.  Do you want to speak with

Proceedings

1    an Assistant District Attorney.  Do you want to go on

2    videotape.  That videotape would be available for

3    courtroom presentation.  The defendant refuses.  The

4    defendant refuses because you can't control the

5    videotape.  What's on it is what's on it.  But I will

6    give a second written statement.  You can control that.

7    You don't have to sign it unless you're satisfied.  You

8    can make corrections.  You can make additions, you can

9    run the show.  Then he goes into the second version of

10   the second story, the more embellished version.  Add

11   more facts, develop it, but it still comes out in a calm

12   way.  Once again, he runs through the story with

13   Detective Cereghino, but he doesn't think of the

14   $17,000.  Why, because there's no $17,000, and this time

15   he's way down the road.  Detective Cereghino wanted a

16   motive.  He then noticed that Herva has the money.  He

17   must have picked it up.  He doesn't mention it because

18   it wasn't there.  Here's another interesting thing for

19   you.  Kind of hard to hide this fellow.  You can't carry

20   this gun in your pocket, you can't carry this gun in

21   your waistband.  If you did, you couldn't walk.  Why

22   doesn't the defendant notice the gun?  He can't tell the

23   detective he saw the gun.  He has to tell the story in

24   such a way that he never saw the gun.  Now, he remembers

25   to put together the first part of that, I didn't see the

Proceedings

1    gun story, but not the second part.  What he tell us the

2    detective is, I'm with Tommy at work.  My trunk is

3    locked.  Herva comes over.  Herva asks if he could have

4    my keys.  He wants to open the trunk.  I watch him go

5    over to the trunk and opened up the truck.  He put a bag

6    in there.  Well, it must have been a pretty big bag

7    carrying that gun.  And he shuts the trunk and we're

8    suppose to believe that must have been the gun.  The

9    only problem is, when he is telling the story to

10   Detective McGinn, and he is telling the story to

11   Detective Cereghino, the gun disappears.  Where did it

12   go.  It never comes out.  Remember, he couldn't have

13   seen it, so he can't admit Herva's carrying it the

14   entire time.  Where did to come from.  If it's in the

15   trunk, when did Herva get it.  The defendant is sitting

16   in the driver's side, engine's running, the key's in the

17   ignition, Herva gets out to take a piss.  Now Herva's

18   gone.  Well, when did he get the gun, if the gun is in

19   the trunk.  I mean, surely, the defendant would have

20   noticed Herva come back to the trunk.  Surely he would

21   have noticed Herva open the trunk.  How is Herva going

22   to open the trunk.  Doesn't have the keys are in the

23   ignition.  A oh.  Surely he would have noticed that the

24   light on the dashboard when he went to the trunk.  He

25   doesn't mention Herva getting the gun from the trunk,

Proceedings

1    because Herva didn't get the trunk from the gun.  Herva

2    had the gun the entire time inside the car.

3        The defendant had a real problem with this

4    statement.  These statements, you know, what is the real

5    problem.  If he really noticed a bystander, why in God's

6    name is he putting together that alibi.  Oh, boy.  How

7    am I going to explain that away.  How am I going to

8    cover that up.

9        Well, he's a smart guy.  Comes up with a halfway

10   decent story.  He says, the reason I kept running around

11   was because he wanted to be seen with him, because

12   people would know I met Bobby, I want them to know Herva

13   was there too so they would know, when I told them that

14   Herva did it, they'd be able to check with people and

15   realize, yes, I had been with Herva.  That is why I ran

16   around with Herva trying to be seen by as many people as

17   possible.  The only problem with that story is if that

18   were so, the first thing the defendant would have done

19   once he was rid of Herva is tell the police look, Herva

20   did it, I want you to know that.  I need protection from

21   him.  If you want to confirm that Herva was with me, all

22   you have to do is talk to these people, they'll tell

23   you.  The defendant doesn't do that.  He is not trying

24   to get him arrested.  He is alibiing Herva.  He is

25   protecting Herva.  He's got another problem too.  While

Proceedings

1   telling these two versions of the second story he wants

2   to divorce himself from Herva and Bobby.  He wants to

3   step back.  He wants to stand clear of this like he had

4   nothing to do with it.  Well, it's a hard story to

5   tell.  You can't tell detectives that he saw Herva

6   coming up behind Bobby with the gun in his hand because

7   why wouldn't the defendant have warned Bobby.  Why

8   wouldn't the defendant have run off himself not knowing

9   what Herva was going to do with the gun.  Why wouldn't

10  the defendant have told the story that way.  And he

11  can't tell detectives what really happened because what

12  really happened is, he got to Bobby and with that hug he

13  yanked Bobby's sweat shirt over his head and pulled him

14  sharp to the left.  Can't tell that story.  That puts

15  him in the middle of it.  So, he tells the story two

16  different ways trying to divorce himself from what is

17  going on.    The first story, of course, is I am just

18  standing there.  I paid Bobby.  I hugged Bobby and gun

19  shot goes off behind my right ear.  Of course the

20  shooter would have to have been facing Bobby because the

21  defendant is facing Bobby and the shooter is behind

22  him.  That is the first story.  Then the second story

23  comes around and the second story is, this is the more

24  embellished version, this is I am standing facing Bobby

25  and Bobby's facial expression changed.  I didn't catch

Proceedings

1    what Bobby said, I looked around and there's Herva.

2    Herva's extending his hands towards Bobby, facing Bobby,

3    and the gun goes off.  And I look at Bobby, and Bobby's

4    still facing me, still face to face.  Defense counsel

5    left that out when talking about the second statement to

6    the Detective Cereghino.  He looked at it.  You see

7    that.  So, we're facing one another and Bobby goes

8    down.  That would mean if you disregard defense

9    counsel's testimony, and if you concerned yourself with

10   what the defendant told the detectives, that Herva and

11   Bobby would have been facing one another, in both

12   versions of the second story and you know that can't be

13   so.  Because you know all three bullets tore into

14   Bobby's head from behind.  Contradicts what the

15   defendant was stating and you realize that each time the

16   defendant spoke with detectives, he was trying to

17   deceived them and that effort to deceive them alone

18   establish his guilt beyond any reasonable doubt.

19       How could you be certain the defendant did more

20   than just plan this whole thing.  How can you be certain

21   that the defendant did more than just set up Bobby.  You

22   can be certain of that, first of all, because who Bobby

23   was.  Bobby was tough.  So tough he was not going down

24   without a fight.  Bobby was a wrestler.  He wasn't just

25   a good wrestler, he was a state champion out of

MO

Proceedings

1        Kellenberg High School.  He realized, of course, that

2        Bobby would have been more than able to get away, to

3        save his life, given half a chance.  You realize that

4        Bobby would have been more than able to resist, to fight

5        back, to save his life, given half a chance.  You

6        realize, of course, he wasn't given half a chance.  You

7        realize, of course, one man couldn't have executed Bobby

8        that way.  You realize it had to be two men.  Had to

9        have been Herva who fired the fatal shots and you had to

10       have the defendant.  It was his $17,000.  He was able to

11       lure Bobby to that desolate corner of North Long Beach.

12       He was able to get Herva in and out.  Herva was the

13       dependent on him.  That area was unfamiliar to Herva.

14       You had to have the defendant to distract Bobby.  So,

15       Bobby wouldn't have noticed Herva approaching, despite

16       the fact his senses were on high alert under those

17       circumstances.  Had to have the defendant to serve as

18       the wheelman.  Somebody had to get Herva out of there.

19            How do you know the defendant still did more.  You

20       know that because of the sweat shirt.  The sweat shirt

21       speaks volumes to you.  First of all, you know that that

22       sweat shirt was torn, ripped in very significant ways.

23       Four inches down the neck.  Bobby cared about himself.

24       His photograph shows you that.  Bobby told you that

25       sweat shirt was in excellent condition when Bobby left

Proceedings

1    him that night.  Like new.  Well, something yanked that

2    sweat shirt down the middle and tore it, indicative of a

3    violent struggle, and the pocket was yanked, ripped and

4    torn as well, indicative of a violent struggle.  And

5    then, of course, the sweat shirt wounds up over Bobby's

6    head.  The neck was over the top of Bobby head.  How do

7    you know that.  I know that because Officer Vozzo told

8    you.  Officer Vozzo was the first officer on the scene.

9    He found Bobby.  He found Bobby down on the cold hard

10   surface of the road.  Dead.  The neck of the sweat shirt

11   over the top of his head and bullet holes to the back of

12   the sweat shirt aligning with bullet wounds to the left

13   side of the back of Bobby's head.  That is where Dan

14   Brooks found Bobby's body, the first paramedic on the

15   scene.  He had to cut away Bobby's sweat shirt just to

16   get to the back of his head.

17       How do you know.  This is Bobby's tank top,

18   undershirt.  Even though the neck area was torn, the

19   undershirt was not pulled up over Bobby's head.  So, you

20   have virtually no blood along the front of the

21   undershirt.  There's spots of blood, there's smears of

22   blood, but really relatively little.  It's mostly up

23   around the neck area.  The sweat shirt, on the other

24   hand, is soaked with blood.  Why.  Because it was pulled

25   up over Bobby's head as Bobby laid dying, blood from the

Proceedings

egregious wound to his right cheek, bled and soaked the
front of his sweat shirt. How do you know. How do you
know the sweat shirt was up over Bobby's face as he laid
on the cold hard surface of the road. Because one of
those bullets that was fired, his face, his right cheek,
leaving this wound, and then came out through his sweat
shirt leaving this hole, this explosive holes that
virtually matches the wound to Bobby's cheek. Here you
get a better idea of the positions of the wound, of the
hole in the sweat shirt, the sweat shirt is up over
Bobby's head to the point where the hole fits right over
the wound.

How do you know there is may violent struggle going
on here. There's a hole to Bobby's sweat shirt. It's
on the right sleeve. It's low down on the right sleeve
just over the cuff. This is the wound. The wound is
much higher up on the forearm, right by Bobby's elbow.
This gives you a better idea of the relative positions.
Here's the hole down by the bottom of the sleeve, just
beyond the cuff. Here's the wound to Bobby's forearm,
up by the top, up by the elbow. What does that tell
you. That tells you there is a violent struggle going
on before first shot's ever fired. During the course of
that violent struggle, somebody yanks Bobby's right
sleeve back. Because, you know, Bobby's not wearing it

Proceedings

1     up by his elbow, not that night.   It's cold, it's windy,

2     you're on the ocean.   There's water all around you.

3     That is Bobby's only source of warmth.   He's got the

4     tank undershirt underneath.   So, of course, Bobby

5     wouldn't yank his sleeve up.   We all know that this is

6     the first shot.   The shot's through the forearm that

7     goes into the back of Bobby's head behind his right

8     ear.   So, you know somebody yanked that sweat shirt up

9     over Bobby's head.   Who did it.   Wasn't Bobby.   Cold

10    night.   He's not yanking that sweat shirt above his

11    head.   Certainly not under attack by Herva Jeannot.

12    Herva Jeannot didn't do it.   Herva Jeannot's hands are

13    occupied.   He is holding the gun like this.   It's

14    heavy.   When you're in the jury room ask for this.   Try

15    to hold this.   It's heavy.   Jim DiBeneditto told you

16    there's a tremendous kick in that gun.   A tremendous

17    recoil.   Herva had some service experience.   That is how

18    you hold that gun if you want an accurate shot to get

19    off an accurate shot, and Herva got off a heck of an

20    accurate shot, all three shots right to the head.

21         Herva didn't have free hands to go fooling around

22    with the sweat shirt let's say Herva held the gun with

23    one hand.   It's still heavy and Herva would have to get

24    the sweat shirt up over Bobby's head from behind Bobby.

25    You know Herva's always behind Bobby because all three

906

Proceedings

1    bullets hits Bobby from behind, and if Herva's coming up

2    on Bobby, trying to get that sweat shirt over Bobby's

3    head, Bobby moves forward. You can't do it. That

4    leaves one person. That is our defendant.

5        So, how does it happen. What happens here. What

6    happens here is the defendant gets out of the car.

7    Bobby gets out of the car. Defendant's glad, hey,

8    what's up. Yeah. All right. I got it. I got it.

9    Then the mandatory hug. Now, he's got him where he

10   wants him. Takes his left hand, takes the bottom of the

11   sweat shirt and yanks it up and to the left. Why to the

12   left. Because he's got to get out of the range of the

13   shot. He's got to get away. Herva's on the right.

14   He's got to get to the left and the sweat shirt goes up

15   to the point where it's over the right here and Bobby is

16   now struggling to get his right forearm back. Only way

17   to protect himself. Can't see. He's desperately

18   struggling as he's pushing the bottom of the sweat shirt

19   up around the head area so that the ear's behind the

20   right ear is open and Bobby is being pulled to the left

21   undoubtedly struggling, and going down like that, and

22   Herva's able to come up and get off that clean fatal

23   shot.

24       Now, what happens. Now, Bobby pitches forward. We

25   don't know what angle he is to the car. We know this

MO

Proceedings

1    violent struggle is taking place.  We know the neck of

2    the sweat shirt is torn.  Sweat shirt is torn.  The

3    defendant's trying to get control of Bobby.  No way you

4    can figure out where Bobby would be positioned with

5    relation to the car.  This is a an intensive violent

6    struggle.  Bobby is struggling for his life.  These are

7    the last moments of his life.  But Bobby goes down.  The

8    sweat shirt, of course, slips back over Bobby's back,

9    and folds.  And now the sweat shirt is still over the

10   top of Bobby's head and you got Herva who comes and

11   shoots two more bullets.  You have the one bullet, of

12   course, that leaves the three holes, and the other

13   bullet that slams directly in, and all three shots are

14   right on the money.  This whole thing happened like

15   clock work.  In order for it to work at all you had to

16   have two of them working together, to go like clock

17   work.  What it did, it cost Bobby's his life.  Bobby was

18   no saint.  How many of us are saints.  Bobby did things

19   he shouldn't have done.  Bobby should never have been

20   involved in that gambling business.  In the end it was

21   that gambling business that killed him.  But just as

22   Bobby was involved in that gambling business, that

23   doesn't mean he wasn't a human being.  He was a human

24   being just like the rest of us.  He had a right to live

25   just like the rest of us.  He had family and friends who

Proceedings

1    loved him, cared for him, and who will love and care for

2    him until the day they die, just like the rest of us.

3    He had hopes and dreams, however immature, and was aged

4    twenty-four, just like the rest of us.  Until this

5    defendant, hired man, took Bobby's life.  Bobby

6    Calabrese was a human being.  No more care, concern,

7    compassion, basic human decency, rag doll you toss in

8    the garbage.  Deliberations is like a jigsaw puzzle,

9    when you fit those pieces together, the picture is going

10   to come through, you know you can see when that picture

11   becomes clear, you're going to see this defendant for

12   who he was, for the arrogant boastful man he was.  For

13   the compulsive gambler he was.  For the man who dug

14   himself a hole and had no way out.  A man who was at

15   least $10,000 short.  For the man who desperately wanted

16   to place two sure $500 bets.  He was upset so this

17   defendant turned to Herva Jeannot.  See them conspiring

18   together during their break times.  See them work it all

19   out.  You're going to see the defendant lure Bobby to

20   that desolate corner of North Long Beach.  You're going

21   to see the defendant grab handling Bobby.  You're going

22   to see him portray him hugging Bobby and then this

23   explosion of violence, several seconds of intense

24   violent hot violence as Bobby's desperately struggling

25   for his life.  The defendant struggling to keep Bobby

Proceedings

1    contained, to hold him, set him up for Herva.  You're

2    going to see Bobby with that sweat shirt over his head.

3    You're going to see Bobby as the darkness set in.

4    You're going to see Bobby as the emptiness set in.

5    You're going to see Bobby as realization set in, he was

6    going to die in a matter of seconds.  It wasn't a thing

7    he could do about it.  See Bobby as the realization set

8    in, that he was going to die, not among people who loved

9    and cared for him, but among men who his young life, as

10   precious as it was to him, meant absolutely nothing.

11   They didn't even dislike him.

12       When that picture becomes clear to you at the end

13   of the trial, return to this courtroom, stand, face that

14   man, and hold him responsible for what he did to Bobby

15   Calabrese.  Find him guilty as charged of Murder in the

16   Second Degree, intentional murder, because that is what

17   he did.

18       THE COURT:  Everybody in the gallery, remain

19   seated until the jury leaves the jury box.

20       We're going to take a ten minute break and then I

21   am going to bring you back and charge you on the law.

22   Remember my admonitions.  You're not to discuss this

23   case among yourselves.  Follow the officer.

24       THE COURT OFFICER:  Leave your note pans on

25   the chair and follow me out.

Proceedings

1        THE COURT OFFICER:  We're going to take

2   approximately a ten minute break then the Court is going

3   to instruct the jury on the law.

4        (Whereupon, there was a recess in the proceedings.)

5        THE CLERK:  Case on trial, indictment

6   167N-2005, People versus Mark Orlando.

7        People ready.

8        MR. HAYDEN:  Ready.

9        THE CLERK:  Defendant.

10        MR. LEMKE:  Yes.

11        THE CLERK:  Let the record reflect the

12   presence of the defendant, defense counsel and Assistant

13   District Attorney.  The jury is not present at this

14   time.

15        THE COURT:  Court's going to charge the jury

16   now.  I think it will be, I don't know, approximately

17   forty minutes.  I just ask during the course of my

18   instructing them on the law you please remain seated.

19   Of course, if you have to use the facilities, that is

20   understandable, but to the best of your ability try to

21   remain seated so the jury can concentrate on the law.

22        THE COURT OFFICER:  Ready for the jury?

23        THE COURT:  Yes.

24        THE COURT OFFICER:  Jury entering.

25        THE CLERK:  Case on trial, indictment

Proceedings

1   167N-2005, People against Mark Orlando.

2          Again, People ready?

3              MR. HAYDEN:  Ready, Your Honor.

4          THE CLERK:  Defense.

5          MR. LEMKE:  Ready.

6              THE CLERK:  Let the record reflect the

7   presence of the jury, alternates, and the defendant.

8              THE COURT:  Good afternoon, ladies and

9   gentlemen.  Thank you for your patience.  I know it's

10  very hot in here.

11        At this time I am going to instruct you on the law

12  that you're to follow during the course of your

13  deliberations.

14        Members of the jury, it is now my duty to instruct

15  you on the law applicable to this case.  Before doing

16  so, however, I would like to commend you for your

17  attention, patience, and devotion to duty as citizens of

18  the community.

19        I would also like to commend the attorneys for all

20  sides for the very able manner in which they have each

21  carried out their function as advocates.

22        We're now fast approaching that part of the trial

23  in which you're to take a more active role.  Up to this

24  point, you have listened to the evidence as it has been

25  presented to you.  At the conclusion of my instructions

Proceedings

1    on the law, it will become your duty to weigh that

2    evidence and decide what the facts are.

3        Trial by jury in criminal cases form the very basis

4    of the true administration of justice.  It is the

5    procedure by which we calmly, rationally and

6    dispassionately endeavor to ascertain the truth.  It is

7    a duty which requires the utmost fairness, honesty and

8    courage.

9        You as jurors and I as the Court have a heavy

10   responsibility, to assure that a just result is reached

11   both on the law and the facts.  I shall now relate to

12   you the principles of law applicable to this case.

13        I charge you that the bringing of an indictment by

14   a Grand Jury does not in any way either prove or

15   disprove the defendant's guilt.  The indictment cannot

16   be considered by you as any proof whatsoever of the

17   defendant's guilt or of any fact tending to prove his

18   guilt.  The indictment is only an accusation.  It is a

19   charge of criminal activity against a defendant brought

20   by the Grand Jury and serves only as the mechanism for

21   bringing the defendant to trial.  The fundamental duty

22   of a jury is to determine the facts.  You are a fact

23   finding body and it is for you and you alone to

24   ascertain where the truth lies.  Indeed, you are the

25   sole and exclusive judges of the facts, and in that

MO

Proceedings

1    field you are supreme and no one may invade your
2    province.
3         On the other hand, and with equal emphasis, I
4    charge you that you must accept the law as I give it to
5    you whether you agree with the law as give it to you or
6    not.  You are bound to abide by it.
7         The process by which you arrive at your verdict
8    requires two steps.  First, you must determine from all
9    the evidence, including exhibits, what the facts are.
10   Second, you must apply the law I give you to the facts
11   as you have determined them to be.  The conclusion you
12   then reach will be your verdict.  Whatever the verdict
13   may be in this case, it must be by unanimous vote of the
14   jury.  In other words, all twelve of the deliberating
15   jurors must agree on the verdict.
16        It is essential that you base your verdict upon the
17   evidence and the evidence alone as you heard it from the
18   mouths of the witnesses and from the various exhibits
19   which were admitted into evidence.  Under no
20   circumstances should you indulge in speculation or
21   guesswork.  You're not to consider anything outside of
22   the evidence.
23        With respect to jurors who have taken notes, any
24   notes taken are only an aid to your memory, and must not
25   take precedence over your independent recollection.

MO

Proceedings

1    Those jurors who chose not to take notes, must rely on

2    their own independent recollection and must not be

3    influenced by any notes that another juror may take.

4    Any notes you take are only for your own personal use in

5    refreshing your recollection.  Notes serve merely as an

6    aid to the juror's memory.  They are in no way superior

7    to a juror's recollection.  Notes may not be used as an

8    authority to persuade your fellow jurors as to what a

9    particular witness did or did not say.

10         A juror's notes are not a substitute for the

11   recorded transcript of the testimony or for any exhibit

12   received in evidence.  If there is a discrepancy between

13   a juror's recollection and his or her notes regarding

14   the evidence, you should ask to have the relevant

15   testimony read back, or the exhibit produced in the jury

16   room.

17         In addition, a juror's notes are not a substitute

18   for the detailed explanation I will give you of the

19   principles of law that govern this case.  If there's a

20   discrepancy between a juror's recollection and his or

21   her notes regarding those principles, you should ask me

22   to explain those principles again and I will be happy to

23   do so.

24         Again, any notes taken are confidential and shall

25   not be available for examination or review by any party

MO

915

Proceedings

1    or other person.  After the jury has rendered its

2    verdicts we will collect the notes and destroy them.

3        In evaluating the evidence and the issues

4    presented, you should use your common sense, knowledge

5    and experience just as you would in making decisions in

6    your daily life.  When I speak of knowledge and

7    experience in this context, I mean the sort of knowledge

8    and experience that an average person would acquire in

9    life.

10       Some of you, however, may have something more than

11   ordinary knowledge or experience in a certain area.

12   Indeed, it may be that you have developed a special

13   expertise in a certain area well beyond what an average

14   person would have.  If you have such a special

15   expertise, and if it relates to some material issue in

16   this case, it would be wrong for you to rely on that

17   special expertise, to inject into your deliberations

18   either a fact that is not in evidence, or inferable from

19   the evidence or an opinion that could not be drawn from

20   the evidence by a person without that special

21   expertise.  The reason it would be wrong to do so is

22   that you must decide this case only on the evidence

23   presented to you in this courtroom as I have already

24   instructed you.

25       Therefore, with respect to any legal issue in the

MO

Proceedings

case, you must not use any special expertise you have to invert into the deliberations evidence that has not been presented in this courtroom during the trial.

You are not to be affected by sympathy or other considerations outside of the evidence or by what the reactions to your verdict may be. Whether it be popular or unpopular, whether it pleases or displeases anyone. You must decide this case solely upon the evidence and render a fair and impartial verdict without fear, without favor, and without sympathy.

You may not consider or speculate about matters relating to sentence or punishment. That is a matter I alone must determine under our rules of law. I charge you that you are not to consider or discuss any matters relating to sentence or punishment during your deliberations. As I have said, your verdict is to be based upon the evidence and the evidence alone. The openings, summations, arguments and remarks of counsel are not evidence, and may not be considered by you as evidence. They are merely arguments put forth by the respective lawyers in which they're telling you what they believe to be the conclusions you should draw from the evidence.

If the attorneys during the course of their summations or I in my charge should allude to the facts

Proceedings

1    and your recollection of those facts disagree with the

2    attorneys or my recital of them, disregard what we say.

3    It is your recollection, understanding and evaluation of

4    the facts which govern.  Remember, you are the sole

5    judge of the facts, what the facts are, and of which

6    facts you will accept in arriving at your verdict.

7        At times during the trial, I have sustained

8    objections to questions asked without permitting the

9    witness to answer or where an answer was made,

10   instructed that it be stricken from the record and that

11   you disregard it and dismiss it from your minds.  You

12   may not draw any inference from an unanswered question

13   nor may you consider testimony which has been stricken

14   in reaching your decision.

15       Once again, I repeat, the law requires that your

16   verdict be based solely upon the competent evidence

17   before you.  Such items as I have excluded from your

18   consideration were excluded because they were not

19   legally admissible.  I have endeavored to preside

20   impartially, without influencing you in your

21   determination of the facts.  It is for you to say what

22   the facts in this case are, and whether the defendant is

23   guilty or not guilty.

24       During the course of the trial, it has been

25   necessary for me to rule on the admission of evidence

MO

Proceedings

1   and on motions made with respect to applicable law.  You

2   must not infer from any such ruling I have made or from

3   anything that I have said during the course of the trial

4   that I have an opinion of this case.  Any opinion of

5   mine would in any way be irrelevant since it is your

6   findings of facts and determination of guilt or lack of

7   guilt which controls.

8       There are two types of evidence, direct evidence

9   and circumstantial evidence.  Evidence is direct when a

10  witness testifies to a fact from his own knowledge of

11  that fact, through one of his or her five senses.

12  Circumstantial evidence is evidence of facts which are

13  inferred, deduced or which otherwise flow from other

14  direct evidence.  There is no distinction between the

15  value or weight of direct and circumstantial evidence.

16      Now, what is the difference.  Let me give you an

17  example.  Suppose in a particular trial one of the

18  parties has to prove that it was raining on a certain

19  morning.  To do this, counsel calls a witness who

20  testifies that on the morning in question he walked to

21  the subway, and that while doing so, he saw rain falling

22  from the ski, felt it striking his face and clothes, and

23  heard it splashing on the sidewalk.  This would be

24  direct evidence.  Seen and felt by this witness that it

25  was raining that particular morning.

919

Proceedings

1      Therefore, the main question for you to decide is

2    whether that witness is telling the truth, is lying or

3    is honestly mistaken.  If you find he is telling the

4    truth, then you have resolved the issue and the fact is

5    that it was raining.  You do not have to draw any

6    inferences or conclusions.

7      To reiterate direct evidence is evidence of facts

8    observed by the five senses of the witness.

9      On the other hand, suppose the witness did not

10   testify that he felt rain and instead he testifies that,

11   that is, he offers direct evidence that after entering

12   the subway and getting on the train he saw passengers

13   later enter at various other stations carrying wet

14   umbrellas and having wet clothes.  Form this direct

15   evidence you may draw an inference or conclusion that it

16   was raining.  The point is that the inferences and

17   conclusions are facts the same as if established by

18   direct evidence.

19      In other words, circumstantial evidence is evidence

20   of facts which are inferred, deduced or which flow from

21   other direct evidence.  Thus, instead directly proving

22   the particular fact in question.  Circumstantial

23   evidence establishes a set of surrounding circumstances

24   from which the main fact may logically be inferred.

25      In terms of the example I have just given you, it

MO

Proceedings

1   is direct evidence for the witness to say that on the

2   way to the subway it was not raining.  It is direct

3   evidence for the witness to say, while riding on the

4   subway, I saw other people enter with wet clothes.  The

5   circumstantial evidence, that is the inference, that you

6   draw from their direct testimony is that after the

7   witness entered the subway, it rained.  The difference

8   therefore between direct and circumstantial evidence is

9   that circumstantial evidence requires you to take two

10   steps before concluding a fact is proven.

11       First, the facts from which the inference is to be

12   drawn must be proven by direct evidence.  Second, the

13   inference to be drawn from the facts you find to have

14   been proved by the direct evidence may not be based on

15   conjecture or speculation, but must flow naturally and

16   logically from those proven facts.

17       Although you may consider only the testimony of the

18   witnesses as you have heard it in this courtroom, and

19   the exhibits which have been admitted in evidence, the

20   law does not require you to accept all the evidence I

21   have admitted even though it is competent.

22       In determining what evidence you will accept, you

23   must make your own evaluation of the testimony given by

24   each of the witnesses, and determine the degree of

25   weight you choose to give to that testimony.  There is

Proceedings

1    no magical formula for doing this.  Each of you bring to

2    this courtroom all of the knowledge, experience and

3    background you have acquired in your everyday lives, of

4    sizing up people and deciding whether or not they are

5    telling the truth.  These same tests that you use in

6    your everyday affairs are the tests you should apply to

7    your deliberations.

8         Remember, you are also the sole judges of the

9    credibility of the witness who has appeared before you.

10   In reaching your conclusions as to what weight you will

11   give to the testimony of any witness, you may take into

12   consideration that witness's demeanor on the stand, and

13   manner of testifying.  The witness's relationship to the

14   case, the witness's interest, if any, in the outcome of

15   the case.  The motive, if any, the witness may have for

16   testifying truthfully or falsely.  The probability of

17   the story told by the witness.  Any prior acts of his

18   conduct committed by the witness.  Any prior

19   inconsistent statements made by that witness.  The

20   physical condition of the witness at the time of the

21   alleged incident.  And any other factor which in your

22   judgment assists you in arriving at the significance of

23   witnesses' credibility.

24        Again, as we mentioned all during jury selection

25   and again here now, you will recall that certain police

Proceedings

1    officers have testified in this case.  You should use

2    the same tests in evaluation their testimony as you

3    would use in evaluating the testimony of any other

4    witness.  In other words, the mere fact that a witness

5    is a police officer does not require that their

6    testimony be given any greater or lesser credibility

7    than that of any other witness.  You will recall that

8    numerous witnesses gave testimony concerning their

9    qualifications as an expert in their particular field.

10   Where scientific, technical or other specialized

11   knowledge will assist the jury to understand the

12   evidence, or to determine a factor in issue, our law

13   permits a witness qualified as an expert by knowledge,

14   skill, experience, training or education to state his or

15   her opinion on questions in controversy, upon the trial

16   for the information of the Court and jury.

17        Please understand that the opinions stated by the

18   experts and testified to before you were based upon

19   particular facts as the expert himself or herself

20   observed them or as the attorney who questioned him or

21   her asked such expert to assume.

22        To assist you in deciding any question in

23   controversy at trial, you may consider the opinion of

24   any expert together with the reasons given for such

25   opinion, if any.  You may also consider the

Proceedings

1    qualifications and credibility of such expert.  You may

2    reject an expert's opinion if you find the facts to be

3    different from those which serve as a basis for his or

4    her opinion.  You may also reject an expert's opinion,

5    if after careful consideration of all the evidence in

6    the case, expert and otherwise, you disagree with the

7    expert opinion.

8         In other words, you and you alone are to form your

9    own opinion or draw your own conclusions as to any

10   question in controversy in the case.

11        There was some testimony that a witness Tommy

12   Flores has a prior driving while intoxicated and driving

13   while impaired.  You may consider when a witness has

14   been convicted of a crime, or has engaged in criminal

15   conduct, and if so, whether and to what extent it

16   affects the truthfulness of that witness's testimony.

17   You're not required to reject the testimony of a witness

18   who has been convicted of a crime, or who has engaged in

19   criminal conduct, or to accept testimony of a witness

20   who has not.  You may, however, consider whether a

21   witness's criminal conviction or conduct has affected

22   the truthfulness of the witness's testimony.

23        In considering credibility, if you find a

24   discrepancy between the testimony given by the various

25   witnesses, it is your duty to reconcile such discrepancy

Proceedings

1     if you're able to do so.  However, if you cannot, then

2     you may determine that you will believe one witness's

3     story and not another's.  In this way, you decide which

4     of the witnesses you will believe and what weight you

5     will accord their testimony.  You must keep in mind that

6     the weight you give to the evidence is not dependent

7     upon the number of witnesses to a given fact, but rather

8     upon the credibility you give to the testimony of each

9     witness to that fact.

10    As I have already told you, use the knowledge you

11    have acquired in your everyday life in sizing up people

12    and in deciding whether or not they're telling the

13    truth.  If you find any witness has willfully testified

14    falsely as to any material fact, you may completely

15    disregard that testimony, or you may, if you wish, give

16    credence to so much of that testimony as you find

17    supported by other credible testimony given by such

18    witness.  You may accept all of such witness's

19    testimony, accept that which you have found he or she

20    has testified falsely to, or none of it, or part of it.

21    That is entirely for you to determine.  Remember, it is

22    the quality of the evidence and not the quantity of

23    evidence which controls.

24    Questions are not evidence.  It is the answers

25    given to the questions that constitute evidence.  An

Proceedings

1    inference or suggestion contained in a question does not

2    render such a fact when the answer negates the inference

3    or suggestion.  Reconcile inconsistencies in the

4    testimony if you're honestly able to do so.  Do not

5    arbitrarily reject the testimony of any witness.

6    Consider each witness's testimony carefully.  Determine

7    whether you will accept it or reject it in whole or in

8    part, and give it such weight as you think it is

9    rightfully entitled to.

10       By the processes which I have just described you as

11   the sole judges of the facts will determine which of the

12   witnesses you believe, what portion of their testimony

13   you accept, and what weight you will give to that

14   testimony.  If you find that you're unable to agree what

15   the testimony of any particular witness was, or what any

16   portion of that testimony may have been, then you, as

17   the forelady, should send a note to the Court, and I

18   will have the testimony read back to you.

19       Also, if you find that my explanation of the law is

20   not clear in your mind, upon request I will explain the

21   law again.  If you wish to see any of the exhibits

22   admitted into evidence, including photographs, maps,

23   diagrams, records, et cetera, again, the forelady should

24   send a note requesting those items.

25       Proof has been produced by the People of certain

Proceedings

1     oral statements allegedly made by the defendant as well

2     as oral statements allegedly made by the defendant which

3     were reduced to writing by Detectives McHugh, Cereghino

4     and McGinn relative to the charges against the defendant

5     which the People claim are of an inculpatory nature.

6     These are the principles of law which you must utilize

7     in considering these statements.

8          The law provides that statements made by a

9     defendant may be used in evidence against him if they

10    were made voluntarily by the defendant.   The burden of

11    proving this beyond a reasonable doubt is upon the

12    People.   You must first determine from all of the facts

13    and circumstances, whether the alleged statements were

14    made by the defendant.   If you determine that the

15    statements were not made by the defendant, then you're

16    not to consider them in your deliberations.   On the

17    other hand, if you find, beyond a reasonable doubt, that

18    the defendant did make the statements, then you must

19    consider whether they were made voluntarily.   That is,

20    without compulsion and not under the influence of fear,

21    threats or other pressures exerted upon the defendant.

22         If you're satisfied beyond a reasonable doubt that

23    the defendant did voluntarily make the statements

24    introduced by the People, then you may consider the

25    statements allegedly made by him, and determine what the

Proceedings

1    contents of the statement actually was, and whether or

2    not the statements given by him were true.  The

3    statements if found by you to have been made by the

4    defendant to be true would constitute direct evidence.

5    Conversely, if you're not satisfied that the defendant

6    voluntarily made the statements, then you must disregard

7    the statements.  In that case, whether or not the

8    statements are true is not material and the contents of

9    the statements should not be considered by you.  And you

10   must exclude them from your deliberations and not allow

11   them to influence your decision.

12        If you determine that the statements were made

13   voluntarily by the defendant, then you must consider and

14   determine another question and that is whether

15   defendant's constitutional rights were violated, in

16   obtaining the statements allegedly made by him.  If the

17   statements were made in response to questioning by a

18   public servant or by a person then acting under his

19   direction or in cooperation with him while the defendant

20   was in police custody, commonly referred to as custodial

21   interrogation then the statements may not be considered

22   by you unless the defendant was first advised of certain

23   constitutional rights.

24        I charge you that the defendant was in police

25   custody on December 9th and 10th, 2004 when the

Proceedings

1     aforementioned detectives were speaking with him.   If

2     you find that the defendant while in police custody was

3     interrogated by the police, then the defendant must have

4     received certain admonitions before you may consider the

5     statements in evidence against him.   The law requires a

6     person who is interrogated when he is in police custody

7     must be warned, one, that he has the right to remain

8     silent.   Two, that any statement he makes may be used in

9     evidence against him in court.   Three, that he has the

10    right to consult an attorney and to have his attorney

11    with him during the interrogation.   And, four, that if

12    he is indigent a lawyer will be appointed to represent

13    him.   The warnings need not be word for word as those I

14    have given you or in the same order.   But each of the

15    above warnings must be given and the substance of each

16    of the warnings must be included even though the order

17    and arrangements may be different.

18         With reference to these warnings which are required

19    to be given to the defendant, the question as to whether

20    or not such warnings were given, or whether they were

21    given correctly and completely is one for you to decide

22    from the evidence you have heard.   If you find that the

23    defendant while in police custody was interrogated by

24    the police and was advised of his constitutional rights,

25    then you are to determine whether the defendant

Proceedings

1    knowingly, understandingly, and voluntarily waived his

2    constitutional rights.

3        An expressed statement that the defendant did not

4    want an attorney followed closely by the giving of a

5    statement could constitute a waiver.  A valid waiver

6    will not be presumed simply from the fact that a

7    statement was eventually obtained.  Actual physical

8    violence or threats are not necessary to a finding that

9    a defendant will was overborne in obtaining the waiver

10   of constitutional rights from him.  Such factors as the

11   age, education and experience of the defendant may be

12   considered.

13       If you are satisfied beyond a reasonable doubt that

14   the defendant did knowingly, understandingly and

15   intelligently waive his constitutional rights, then you

16   may consider the statements allegedly made by him and

17   determine what the content of the statements actually

18   were, and whether or not the statements given by him

19   were true.  The statements if found by you to have been

20   made by the defendant and to be true would constitute

21   direct evidence.

22       Conversely, if you're not satisfied that the

23   defendant waived his constitutional rights, then you

24   must disregard the statements.  In that case, whether or

25   not the statements are true is not material and the

Proceedings

1   contents of the statement should not be considered by

2   you and you must exclude them from your deliberations

3   and not allow them to influence your decision.

4        However, before you can consider any statements

5   against the defendant, even if you should find that the

6   defendant admitted the crime in his statements, you must

7   find that there were some other independent evidence

8   that the crime charged was committed.  The additional

9   proof to warrant a conviction based on the defendant's

10  statement may be direct or circumstantial.  You must be

11  satisfied beyond a reasonable doubt by the evidence

12  outside of defendant's statements that the crime charged

13  was, in fact, committed by someone.

14       You have been permitted to hear testimony about

15  remarks made to the defendant by Detective McGinn about

16  statements allegedly made by Herva Jeannot.  You're to

17  consider this testimony only when considering the

18  circumstances under which the defendant himself may have

19  been -- consider this statement only when considering

20  the circumstances under which the defendant himself may

21  have made statements and for no other purpose.  You are

22  to completely disregard any statement allegedly made by

23  Herva Jeannot when considering evidence against the

24  defendant.  Any statement allegedly made by Herva

25  Jeannot is not evidence against the defendant and may

Proceedings

1    never be considered as evidence against the defendant.

2    You are not to concern yourselves with whether Herva

3    Jeannot did or did not make any statements to the police

4    and if he did, what those statements may have been or

5    whether or not they were true.

6        Among the exhibits received in evidence were

7    photographs.  These photographs purport to depict

8    various locations relevant to the issues in the case.

9    These photographs were received in evidence to assist

10   you in making your evaluation of the testimony relating

11   to the locations, scenes or objects depicted therein.

12   You are the sole judges of the accuracy of these

13   photographs and you are the sole judges of the weight to

14   be given to such photographs.

15       Among those photographs taken and admitted into

16   evidence were photographs involving the crime scene, and

17   also taken during the autopsy of the victim.  You may

18   find them to be grim and unpleasant.  However, they have

19   been admitted into evidence because these photographs

20   are relevant to the issue of cause of death.

21       I now charge and I emphasize that you're not to

22   dwell upon these photographs, that when you view them,

23   please do so quickly, calmly and unemotionally.  I

24   charge you you must make your determination of the

25   weight, if any, that you may see fit to give to these

Proceedings

1    photographs objectively without emotion and without

2    prejudice.

3        Also, among the exhibits received in evidence, were

4    diagrams and maps.  These diagrams and maps were

5    received in evidence to assist you in making your

6    evaluation of the testimony relating to the locations,

7    scenes or objects depicted therein.  You are the sole

8    judges of the accuracy of the diagrams and maps.  And

9    you are the sole judges of the weight to be given to

10   such diagrams and maps.

11       Motive is that which proves a person engaged in

12   conduct to do an act.  It is the reasons which motivate

13   conduct.  Motive may be good or bad.  Criminal intent on

14   the other hand is the state of mind which accompanies

15   the criminal conduct or act.  A person acts with

16   criminal intent when his conscious objective is to

17   engage in conduct which the law forbids.  Criminal

18   intent is an essential element of the crime charged and

19   must be proved by the People beyond a reasonable doubt.

20   On the other hand, motive is not an element of the crime

21   charged.  Therefore, the People have no obligation to

22   prove that the defendant had a reason or reasons to

23   commit the crime.  Nevertheless, the existence of

24   motive, or the lack of motive, when established by

25   evidence, is a consideration for the jury.

Proceedings

1       For example, if you find from the proof that the

2   defendant had a motive to commit the crime charged, that

3   is a circumstance you may wish to consider as tending to

4   establish guilt.  On the other hand, if the proof

5   establishes that the defendant had no motive to commit

6   the crime charged, that is a circumstance you may wish

7   to consider as tending to establish the defendant's

8   innocence of the crime charged.

9       We turn now to the constitutional safeguards

10  surrounding every person accused of a crime.  The

11  defendant has plead not guilty and by that plea of not

12  guilty puts in issue each and every allegation charged

13  in the indictment.  A fundamental legal principle which

14  is applicable in every criminal case is known as the

15  presumption of innocence.  The law provides that the

16  defendant starts this trial with a presumption in his

17  favor, that he is innocent of the crime charged.  This

18  presumption of innocence follows him throughout the

19  entire trial and remains with him until such time as you

20  find it has been overcome by proof of guilt beyond a

21  reasonable doubt.  The trial began with no evidence

22  against the defendant, and the presumption of innocence

23  standing alone requires you to find the defendant not

24  guilty unless you find that the People have proven

25  beyond a reasonable doubt that the defendant is guilty

MO

Proceedings

1    of the crime charged.

2         As I previously stated the defendant has plead not

3    guilty to the crime charged in the indictment.  A plea

4    of not guilty is a denial of each and every allegation

5    in the indictment.  Under our system of laws, the People

6    have the burden of proving to your satisfaction, beyond

7    a reasonable doubt, each and every element of the crime

8    with which the defendant is charged.  This burden

9    remains upon the prosecution throughout the trial, and

10   never shifts to the defendant.  No defendant is required

11   to prove his innocence.  The defendant does not have to

12   of prove anything.  I repeat, each element of any charge

13   submitted to you must be proved by the People beyond a

14   reasonable doubt.

15        The standard of proof required in every criminal

16   case, is proof of guilt beyond a reasonable doubt.  That

17   does not require the people to prove the defendant

18   guilty I don't understand all possibility after doubt or

19   beyond a shadows after doubt.  It requires the People to

20   establish defendant's guilt, only beyond a reasonable

21   doubt:  Therefore, before you may convict the defendant,

22   each of you must be satisfied that the credibility I

23   find is sufficient to convince you beyond a reasonable

24   doubt that the defendant is in fact guilty and that the

25   defendant is in fact the person who committed the crime

Proceedings

1    charged.  A doubt of the defendant's guilt to be a

2    reasonable doubt must be a doubt for which some reason

3    can be given.  The doubt to be reasonable must therefore

4    arise because of the nature and quality of the evidence

5    in the case, or from the lack or insufficiency of the

6    evidence in the case.  The doubt to be a reasonable

7    doubt should be one that a reasonable person in a matter

8    of this importance would be likely to entertain because

9    of the evidence or because of the lack or insufficiency

10   of the evidence notice case.  A reasonable doubt our law

11   says is an actual doubt.  One which you are conscious of

12   having in your mind after you have considered all the

13   evidence in the case, or lack of evidence in the case.

14   If after doing so, you then feel uncertain and not fully

15   convinced of the defendant's guilt, you are also

16   satisfied that in entertaining such a doubt, you are

17   acting as a reasonable person should act in a matter of

18   this importance, then that is a reasonable doubt which

19   the defendant is entitles today the benefit.  Therefore,

20   the first duty of each juror is to consider and weigh

21   all the evidence in the case, and decide which evidence

22   you believe is credible and worthy of your

23   consideration.  The next duty of each juror is to

24   determine whether he or she has a reasonable doubt of

25   the defendant's guilt as I have defined that term to

MO

·Proceedings

1    you.  If in doing so you find that the People have not

2    proven the defendant's guilt beyond a reasonable doubt

3    you must find the defendant not guilty.  On the other

4    hand, if you're satisfied that the People have proven

5    the defendant's guilt beyond a reasonable doubt, you

6    must find the defendant guilty.

7         The defendant did not testify in this case.  I

8    charge you that the fact that he did not testify is not

9    a factor from which any inference unfavorable to the

10   defendant may be drawn.

11        I will now charge you on accessorial liability.

12   Our law recognizes that two or more individuals can act

13   jointly to commit a crime.  And that in certain

14   circumstances each can be held criminally liable for the

15   acts of the other.  In that situation, those persons can

16   be said to be acting in concert with each other.  Our

17   law defines the circumstances under which one person may

18   be criminally liable for the conduct of another.  That

19   definition is as follows.

20        When one person engages in conduct which

21   constitutes an offense, another person is criminally

22   liable for such conduct when acting with the state of

23   mind required for the commission of that offense, he

24   solicits, requests, commands, importunes, or

25   intentionally aids such person to engage in such

Proceedings

1    conduct.

2        In this case, in order for the defendant to be held

3    criminally liable for the conduct of another, you must

4    find beyond a reasonable doubt that he acted with the

5    state of mind required for the commission of the crime.

6    And that he intentionally aided another person to engage

7    in that crime.  If it is proven beyond a reasonable

8    doubt that the defendant is criminally liable for the

9    conduct of another, the extent or degree of the

10   defendant's participation in the crime does not matter.

11   A defendant proved beyond a reasonable doubt to be

12   criminally liable for the conduct of another in the

13   commission of a crime is as guilty of the crime as if

14   the defendant personally had committed every act

15   constituting the crime.

16       The People have the burden of proving beyond a

17   reasonable doubt that the defendant acted with the state

18   of mind required for the commission of the crime, and

19   either personally or by acting in concert with another

20   person committed each of the remaining elements of the

21   crime.

22       As you know, the People contend the defendant acted

23   in concert with Herva Jeannot who is not on trial here.

24   You must not draw any inference from his absence.  You

25   must not allow the absence to influence your verdict.

Proceedings

1   You are here to determine whether the People have proven

2   beyond a reasonable doubt that the defendant on trial is

3   guilty of a charged crime.

4   Now I will charge you on the specific count.  The

5   only count is murder in the second degree.  Under our

6   law, a person is guilty of murder in the second degree

7   when with intent to cause the death of another person,

8   he causes the death of such person.

9   The term intent used in this definition has its own

10  special meaning in our law.  I will now give you the

11  meaning of that term.  Intent means conscious objective

12  or purpose.  Thus a person acts with intent to cause the

13  death of another when that person's conscious objective

14  or purpose is to cause the death of another.

15  In order for you to find the defendant guilty of

16  this crime, the People are required to prove from all

17  the evidence in the case beyond a reasonable doubt both

18  of the following two elements.

19  One, that on or about the third day of December,

20  2004, in the County of Nassau, the defendant Mark

21  Orlando individually and aiding and abetting and being

22  aided and abetted by Herva Jeannot caused the death of

23  Robert Calabrese.

24  And, two, that the defendant Mark Orlando did so

25  with the intent to cause the death of Robert Calabrese.

MO

Proceedings

1       Therefore, if you find that the People have proven

2   beyond a reasonable doubt both of those elements, you

3   must find the defendant guilty of the crime of Murder in

4   the Second Degree.  On the other hand, if you find that

5   the People have not proved beyond a reasonable doubt

6   either one or both of these elements, you must find the

7   defendant not guilty of the crime of Murder in the

8   Second Degree.

9       As I have previously charged you, your verdict must

10  be unanimous.  That is, all twelve of the deliberating

11  jurors must agree on the verdict.

12      Juror number one has been designated as the

13  foreperson and will have the task of seeing that your

14  deliberations are conducted in an orderly fashion and to

15  report to the Court your questions, requests and your

16  final determination.

17      It is your duty as jurors to consult with one

18  another, and to deliberate with a view to reaching an

19  agreement if you can do so without violence to your

20  individual judgment.  Each of you must decide the case

21  for yourselves but must do so only after impartially

22  considering the evidence along with your fellow jurors.

23  In the course of your deliberations, do not hesitate to

24  re-examine your own views, and change your opinion if

25  you're honestly convinced it is erroneous.  Do not

MO

1    surrender your on honest conviction as to the weight or

2    effect of the evidence solely because of the opinions of

3    your fellow jurors or for the mere purpose of returning

4    a verdict.  There is no fixed procedure for you to

5    follow during your deliberations.

6        However, you should proceed in such a way that each

7    juror has an equal opportunity to express his or her

8    views.  You're attitude at the outset of your

9    deliberations is important.  It is seldom helpful for a

10   juror upon entering the jury room to announce an

11   emphatic opinion on the case or a determination to stand

12   for a certain verdict.  When a juror does that at the

13   outset, individual pride may become involved and the

14   juror may later hesitate to recede from an announced

15   position even when shown it is incorrect.  You're not

16   partisans, you're the impartial judges of the facts.

17   Your sole interest is to ascertain the truth from the

18   evidence in the case.  Now is the time to withstand any

19   urge or tendency to base your decision on anything other

20   than the facts which you have heard presented and my

21   instructions regarding them.  You must consider only the

22   evidence in this case, the testimony and the exhibits,

23   and you must apply to that evidence the law as I have

24   given it to you.  Your verdict will then be determined

25   by the conclusion that you reach, no matter whom the

1    verdict helps or hurts.

2         This case is important.   It is important to the

3    defendant, it is important to the People.   It is

4    important that justice be done in all events to the

5    defendant and to the People.   Make sure whatever your

6    verdict is you return it is free from passion,

7    prejudice, sympathy or any other improper motive.

8         We will have a verdict sheet that will go into the

9    jury room with you.   I know your lunch is here.   You

10   will eat and then you will commence your deliberations.

11        THE CLERK:   Retire the jury.   The alternates

12   will stay behind.   The alternate will stay behind.   The

13   twelve jurors will follow the court officer.

14        THE COURT OFFICER:   Follow me out.   Take your

15   note pads with you.

16        Three alternate jurors remain seated for a moment.

17        (Whereupon, the following takes place outside

18   the presence of the deliberating jury.)

19        THE COURT:   As alternates it's very difficult

20   because now your roll is you will stay together, but you

21   cannot discuss the case between yourselves or with

22   anyone else.   Okay:   So, it's a difficult position to be

23   in but we commend you for your service.

24        I am going to keep you.   You're going to get your

25   lunch, and you will be kept together.   But at this point

Proceedings

1   you cannot deliberate.  You can't discuss the case in

2   any way amongst yourselves.  Okay.

3       Do you have a court officer?

4       THE CLERK:  Yes, we do.

5   (Whereupon, the following takes place outside the

6   presence of the jury.)

7       THE COURT:  Are there any exceptions or

8   objections to the charge?

9       MR. HAYDEN:  None.

10      MR. LEMKE:  No.

11      THE COURT:  Additional requests?

12      MR. LEMKE:  None, Your Honor.

13      MR. HAYDEN:  No, Your Honor.

14      THE COURT:  We discussed the release of the

15  alternates.

16      MR. LEMKE:  Yes, Your Honor.

17      THE COURT:  Do both sides consent that if

18  there's a notes from the jury for the exhibits, the

19  officer can enter the jury room, we don't have to

20  reconvene, we can have the exhibits brought into the

21  room for them?

22      MR. LEMKE:  Yes.

23      MR. HAYDEN:  Yes.

24      THE COURT:  Anything further?

25      THE CLERK:  That is it.

943

Proceedings

1          (Jury deliberations.)

2          THE CLERK:  Continued case on trial,

3     indictment 167N-05, People versus Mark Orlando.

4        People ready?

5          MR. HAYDEN:  People ready, Your Honor.

6          THE CLERK:  Defendant ready?

7          MR. LEMKE:  Defendant ready, Your Honor.

8          THE CLERK:  Let the record reflect the

9     presence of Mr. Orlando.  The jury is not in the

10    courtroom at this time.

11         THE COURT:  Before the jury gets here, we have

12    a note.  I have marked it as Court exhibit number XII.

13    They asked to observe the gun.  That's been done.  They

14    want the gambling records.  Already given to them.  All

15    written statements to police by the defendant.  That's

16    been given to them.  Surveillance video, viewing of cars

17    and storage vicinities.  That is set up here to show

18    them now out here in the courtroom.  View of sweat shirt

19    on the dummy.  The demonstrative evidence referred to

20    that's been given to them.  They'll be instructed that

21    is not an exhibit that they can tamper with or remove

22    the sweat shirt.  Picture of Bobby after being shot.  I

23    am going to instruct them that the Court intends to give

24    them the crime scene photos of the victim, and if they

25    want anything more than that they should alert us via

MO

Proceedings

1    letter from the forelady.

2        Do you want to be heard with respect to that.

3        MR. LEMKE:  Only regarding the dummy with the

4    sweat shirt.  I had objected to that coming into

5    evidence.  The Court overruled my objection and now I am

6    thinking about it, ruling it to be used for

7    demonstrative purposes only.  So, if the jury has that

8    in the deliberating room, deliberating, it's for

9    demonstrative purposes only, they should be able to move

10   that sweat shirt around and determine whether or not the

11   angle of the first shot is consistent with that.  I mean

12   why is that in evidence except for demonstrative

13   purposes.  You can't sit there and limit them, tell them

14   you can't move it in different angles of how a shot can

15   be made.

16       So, initially my response would be they couldn't,

17   but that is evidence that is brought in for

18   demonstrative purposes.  It's not, for example, as the

19   sweat shirt was, I think People's 35, but that is one

20   thing.  If they start speculating to that, once my

21   objection is overruled, now what is happening is exactly

22   what I thought would happen now.  It's demonstrative.

23   It's in evidence.  You have a dummy in evidence with

24   arrows that were pointed to various bullet tracks.  They

25   want to move the sweat shirt around, I don't understand

Proceedings

1    how they couldn't be asked to do that in a demonstrative

2    setting.

3        I think they should be able to use that for that

4    purpose.

5        MR. HAYDEN:  We believe it was put into

6    evidence to demonstrate the way two bullets went through

7    the back of the sweat shirt, and into the left side of

8    Bobby's head.  No other purpose.  And, for the jurors to

9    manipulate the sweat shirt at this point would be

10   distorting the purpose for which the exhibit was

11   introduced in the first place.

12       THE COURT:  Your objection is noted for the

13   record.  It's overruled.  The Court will not allow the

14   jury to take that evidence and start basically creating

15   their own exhibit which becomes something that is not in

16   evidence, but rather they'll be instructed that that was

17   for the limited purpose for which it was offered.

18       Your objection is noted for the record.

19       MR. LEMKE:  Right.  But also, Your, Honor on

20   redirect Mr. Hayden pulled up that sweat shirt to the

21   point almost over the head so shots could be seen

22   through the neck.  So, there's testimony to that.  To

23   tell they can't pull it up as testified to, again, you

24   have my objection.

25       THE COURT:  Yes.  Objection overruled.

Proceedings

1    The Court intends to answer these requests of the

2    jury as I have just indicated.  Show them the video and

3    then because of the lateness of the day, the Court has

4    no choice but to release the jury until tomorrow.  I

5    will charge them with respect to that.  They'll be

6    ordered to reconvene at nine a.m. tomorrow.

7                THE COURT OFFICER:  Ready for the jury?

8                THE COURT:  Yes, ma'am.

9                THE COURT OFFICER:  Jury entering.

10               THE CLERK:  Continued case on trial,

11   indictment 167N-05, People versus Mark Orlando.

12       People ready?

13               MR. HAYDEN:  Ready, Your Honor.

14               THE CLERK:  Defense ready?

15               MR. LEMKE:  Defendant ready.

16               THE CLERK:  Let the record reflect the

17   presence of Mr. Orlando, the jurors and the alternates.

18               THE COURT:  Good afternoon, ladies and

19   gentlemen.

20       I received a note from the jury.  We marked it as

21   Court exhibit XII wherein it asks to observe the gun,

22   gambling records.  We have done both of those requests.

23   We met most of those requests.  All written statements

24   to police by defendant.  We gave you that.  Surveillance

25   video, viewing of cars and storage vicinities.  We're

Proceedings

1    about to do that for you.  View of sweat shirt that was

2    on dummy.

3        That is demonstrative evidence that the Court

4    admitted.  I put that in there with you.  You're not to

5    manipulate it in any way.  You apply the testimony to

6    that exhibit.

7        Picture of Bobby after being shot.  The Court

8    intends to give you the crime scene photos of the victim

9    on the street.  If the Court has not met your request or

10   if there is something additional you want, just put it

11   in a letter, send it to me, and I will meet that

12   request.

13       At this point, we're going to play the video for

14   you.  I am going to sit over here so I can see it.

15       Mr. Hayden, will you play the tape.

16           MR. HAYDEN:  Yes, Your Honor.

17       (Whereupon, the requested video in evidence was

18   play in open court.)

19           THE COURT:  Ladies and gentlemen, at this

20   time, we're going to break for the evening.  I ask

21   everybody in the gallery to please remain seated while

22   the jury leaves the courtroom.

23       I am going to instruct you specifically now that

24   you're a deliberating jury with respect to rules you

25   must adhere to until you come back tomorrow.  I already

Proceedings

1    told you, I will provide you with what you requested in

2    your letter, and if there's something additional or we

3    didn't provide you with the right things you're looking

4    for, let me know in the a letter tomorrow morning.

5        Members of the jury, today's court session is now

6    drawn to a close, and I am about to excuse you for the

7    day.  You must return tomorrow, Tuesday, at nine a.m.

8    The law requires that before I excuse you, I review with

9    you the rules you must follow over the course of this

10   recess.  These rules are designed to guarantee the

11   parties a fair trial and are generally the same ones you

12   were required to follow prior to deliberations, but the

13   law requires that I restate them, and at this stage in

14   order to emphasize their importance.

15       The reason for the emphasis is that you're in a

16   critical stage.  You're in the process of

17   deliberations.  You're not being sequestered.  That

18   means you're not being kept together overnight where we

19   can have greater assurance that you will follow the

20   rules.  You are being permitted to go home after

21   deliberations have begun.  There may now be a greater

22   temptation, for example, to discuss the case with

23   someone else or to go to the scene.  You must resist

24   that temptation to discuss the case with someone else or

25   to visit the scene.  It would not only violate my order

Proceedings

1    but also violate the oath you took to follow rules.

2         The rules are as follows:  Deliberations must be

3    conducted only in the jury room when all jurors are

4    present.  Therefore, all deliberations must now cease

5    and must not be resumed until all twelve of you have

6    returned and are together again in the jury room.

7         During the recess, do not discuss the case among

8    yourselves or with anyone else.  You remain under

9    obligation not to request, accept, agree to accept or

10   discuss with any person the receiving or accepting of

11   any payment or benefit in return for supplying any

12   information concerning the trial.

13        You must promptly report to me any attempts by any

14   person to converse with you about the case, or to

15   influence you or any other member of the jury.  You must

16   not visit or view the place where the crime charged was

17   allegedly committed or any other place discussed in the

18   testimony.  You must not read, view or listen to any

19   accounts or discussions of the case reported in any news

20   media.

21        Now ladies and gentlemen, I want you to understand

22   why these rules are so important.  The law does not want

23   you to talk to anyone about the case or permit anyone to

24   talk to you about the case because only the twelve of

25   you are authorized to render a verdict in this case.

Proceedings

1    Only you have been found to be fair, and only you have

2    promised to be fair.  No one else has been so

3    qualified.  The law also does not permit you to visit a

4    place discussed in the testimony.

5         First, you cannot always be assure that the place

6    is in the same condition as it was on the day in

7    question.  Second, even if it were in the same

8    condition, once you go to a place discussed in the

9    testimony to evaluate the evidence in light of what you

10   see you become a witness not a juror.  As a witness, you

11   may now have an erroneous view of the scene that is not

12   subjected to cross examination by either party.  That is

13   not fair.

14        Finally, the law requires that you not read or

15   listen to any news accounts of the case should there be

16   any.  You must decide this case on the evidence

17   presented in this courtroom.  You are not to decide the

18   case based on some reporter's view or opinion.

19        Again, I trust you understand and appreciate the

20   importance of following these rules, and in with your

21   oath and promise to me, I know you will do so.

22        At this time, folks, you're going to follow the

23   officers instructions.  Same rules apply to the

24   alternates.  All be back here tomorrow at nine o'clock.

25   We will take a lunch order and resume deliberations.

951
Proceedings

1        Have a good evening.

2             THE COURT OFFICER:  Jurors, please follow me

3    out.

4             (Whereupon, the following takes place outside the

5    presence of the jury.)

6             THE COURT:  Mr. Lemke, any objection?

7             MR. LEMKE:  No, Your Honor.  Thank you.

8             THE COURT:  Mr. Hayden, anything.

9             MR. HAYDEN:  No, Your Honor.

10            THE COURT:  Court is in recess till nine

11   o'clock tomorrow morning.  We will continue

12   deliberations using this courtroom.

13            (Whereupon, the trial was adjourned to July 14,

14   2005.)

15

16

17

18

19

20

21

22

23

24

25

MO