**D.A. COPY**

To be argued by:
Kerry Bassett, Esq.
Time requested: 15 minutes

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT
--------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                              Respondent,

                                                          Ap. Div. Dkt. No.
        -against-                                         2005-8854
                                                          Nassau Ind.
                                                          167N-05

MARK ORLANDO,

                              Appellant.

--------------------------------------------------------------------------X


**APPELLANT'S BRIEF**


Kerry Bassett
Bassett & Bassett, P.C.
Attorneys for Appellant
320 Carleton Avenue, Suite 4200
Central Islip, New York 11722
(631) 234-2511

# TABLE OF CONTENTS

CPLR 5531 STATEMENT...............................................................4

QUESTIONS PRESENTED.........................................................6

PRELIMINARY STATEMENT......................................................9

STATEMENT OF FACTS...........................................................10

POINT ONE
PURSUANT TO *PEOPLE V. ROGERS,* THE APPELLANT'S RIGHT TO COUNSEL WAS VIOLATED, AND THE HEARING COURT SHOULD HAVE SUPPRESSED THE APPELLANT'S ALLEGED STATEMENTS TO POLICE...............................................................63

POINT TWO
REVERSAL IS REQUIRED BASED ON *BRUTON V. UNITED STATES* AND *CRAWFORD V. WASHINGTON*..........................................70

POINT THREE
THE STORAGE FACILITY VIDEOTAPE SHOULD NOT HAVE BEEN ENTERED INTO EVIDENCE BECAUSE IT VIOLATED THE BEST EVIDENCE RULE.............................................................78

POINT FOUR
THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO USE A MANNEQUIN AS DEMONSTRATIVE EVIDENCE.............84

POINT FIVE
THE PROSECUTOR'S SUMMATION WAS IMPROPER AND PREJUDICIAL...........................................................87

POINT SIX
THE PROSECUTION'S FAILURE TO NOTIFY THE APPELLANT THAT NASSAU COUNTY POLICE RECOVERED $17,000.00 DURING THE COURSE OF THE INVESTIGATION CONSTITUTES A DISCOVERY VIOLATION....................................................89

POINT SEVEN
THE TRIAL COURT IMPROPERLY CHARGED THE JURY…………....91

POINT EIGHT
THE APPELLANT WAS NOT AFFORDED MEANINGFUL………….100
REPRESENTATION BR TRIAL COUNSEL

POINT NINE
THE COURT SHOULD REACH THE ISSUES ON THE MERITS……105

CONCLUSION………………………………………………………...106

CERTIFICATE OF COMPLIANCE……………………………………107

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT
------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                    Respondent,

    -against-

MARK ORLANDO,

                                    Appellant.

------------------------------------------------------------------------X

Ap. Div. Dkt. No.
2005-8854
Nassau Ind.
167N-05

## STATEMENT PURSUANT TO CPLR 5531

1.    The County Court Indictment Number was 167N-05.

2.    The full names of the original parties are the People of the State of New York against Mark Orlando.  There has been no change.

3.    This action was commenced in the Nassau County Court by the filing of Indictment number 167N-05.

4.    Appellant was charged with one count of Murder in the Second Degree, in violation of Penal Law §125.25(1).  A jury trial began on May 31, 2005 (Sullivan, J.).  On July 14, 2005, the jury returned a guilty verdict.  On August 18, 2005, the Appellant was sentenced to a term of imprisonment of twenty-five years to life.

4

5.   This appeal is from a judgment of conviction of the County Court, Nassau County (Sullivan, J.), dated August 18, 2005, and from all pre-trial orders (Honoroff, J.).

6.   The Appellant's co-defendant, Herve Jeannot, was tried separately for Murder in the First Degree and was convicted. On November 1, 2006, the County Court, Nassau County (Berkowitz, J.) sentenced Mr. Jeannot to life in prison. His matter is currently being appealed.

## QUESTIONS PRESENTED

1.     According to the hearing court, the Appellant was arrested for outstanding misdemeanor warrants issued by a Nassau County District Court judge.   The Appellant was represented by counsel on those misdemeanor cases.  Pursuant to *People v. Rogers,* did the hearing court err in suppressing the Appellant's statements to police, taken in violation of his right to counsel?

2.     The County Court permitted the prosecution to illicit testimony from a member of the Nassau County Police Department, who testified that a nontestifying co-defendant, Herve Jeannot, had confessed to killing Bobby Calabrese because the Appellant paid him to do so.   Jeannot was tried separately and the effect of hearing his confession *did not* result in the Appellant implicating himself in the murder of Bobby Calabrese.   The testimony was fundamentally prejudicial, and a violation of *Bruton v. United States* and *Crawford v. Washington.*  Was the testimony harmless error?

3.     Did the County Court err when it permitted the prosecution to use and manipulate a mannequin as demonstrative evidence, with no advanced warning to defense counsel, and then refuse to allow the jury to manipulate the mannequin during deliberations?

4.     A videotape was created by the Nassau County Police Department by utilizing still photographs taken by a storage facility security camera system. Did the introduction of the video tape violate the Best Evidence Rule, and was it properly authenticated by the People?

5.     During summation, the prosecutor hypothesized that the Appellant placed a piece of tape over his automobile license plate to obscure its view. There was no evidence produced at trial to support the prosecutor's remarks. Coupled with all other trial errors, did the prosecutor's improper statements prejudice the Appellant and deny him a fair trial?

6.     While testifying, Detective Michael Kuhn stated that he recovered $17,000.00 during the Calabrese investigation. The Nassau County District Attorney's theory of the case was that the Appellant paid his co-defendant $4,000.00 to kill Calabrese because he did not have $17,000.00 to extinguish his gambling debt. Did the prosecutor's failure to disclose the $17,000.00 violate Criminal Procedure Law Section 240.20, and substantially prejudice the Appellant?

7.     The Court's instructions to the jury were incomplete, confusing, and misleading. Did the jury charge violate the Appellant's right to a fair trial?

8.     Was trial counsel's performance so far below the standard of meaningful representation to render his service ineffective?

9.      In the interest of justice, should this Honorable Court reach all issues on the merits?

## PRELIMINARY STATEMENT

Appellant Mark Orlando appeals from a Judgment of conviction entered in the County Court, Nassau County, on August 18, 2005, sentencing him to twenty-five years to life for Murder in the Second Degree.

Appellant is presently incarcerated at the Clinton Correctional Facility in Dannemora, New York.

Appellant was represented by Dennis Lemke, Esq., at the time of trial and sentence. Bassett & Bassett, P.C. was retained to represent the Appellant after sentencing.

The People of the State of New York are represented by Kathleen Rice, District Attorney of Nassau County.

Co-defendant Herve Jeannot was tried separately after a joint suppression hearing was held. He was represented by William Aronwald, Esq. at trial. On August 11, 2006, Herve Jeannot was convicted of Murder in the First Degree and Criminal Possession of a Weapon in the Second Degree and subsequently sentenced to life in prison. He is presently incarcerated at the Great Meadow Correctional Facility in Comstock, New York. His case is being appealed.

## STATEMENT OF FACTS

Nassau County Indictment 167N-05 charged Appellant with one count of Murder in the Second Degree, in violation of Penal Law §125.25(1), for the killing of twenty-four year-old Bobby Calabrese ("Calabrese" or "decedent"), a money collector for a local bookmaker. On December 3, 2004 at 8:40 in the evening, Calabrese was shot in the head and died in an alley in North Long Beach, in Nassau County.

<u>Pre-trial hearings</u>

Hearings for the Appellant and his co-defendant Herve Jeannot (hereinafter "Jeannot") were conducted before the County Court, Nassau County (Honoroff, J.) on April 18-21, 2005.[1] The hearing was to address probable cause, admissibility of statements attributed to the co-defendants, and physical evidence recovered as to the Appellant. The Court would also review the sufficiency of the search warrants, previously under Judge Donnino's purview. H.2-3.

Nassau County Police Officer Steven Loschiavo testified that he was working on December 9, 2004 with Officer Kevin McCarthy. Officer Loschiavo was informed that the Appellant was involved in a homicide. H. 23. Officer Loschiavo testified that the police had arrest warrants for the

---

[1] Numbers preceded by the letter 'H' refer to pages of the hearing transcript.

Appellant and Jeannot, though later admitted that he did not have an arrest warrant for the Appellant and was unsure if anyone had an arrest warrant for the Appellant. H. 23, 28-29. Officer Loschiavo was informed that the Appellant had two existing warrants for Aggravated Unlicensed Operation of a Motor Vehicle, and was wanted for his involvement in a homicide. Officer Loschiavo did not know where the Aggravated Unlicensed Operation of a Motor Vehicle warrants originated from, and he arrested the Appellant under orders to do so by his Lieutenant. H. 30-31.

Special Operations officers stopped the Appellant as he was driving. H. 24. The Appellant got out of the car, was placed on his stomach, and handcuffed. Detectives McHugh and McGinn took control of the Appellant and put him in their car. H. 26.

On December 3, 2004, Homicide Detective John McHugh testified that he arrived at the crime scene in North Long Beach at approximately 9:30 p.m. H. 38-40.

The decedent was laying face-down in the road, adjacent to a running car. He was fully clothed, wearing a grey hooded sweatshirt pulled over his head. H. 41.

An autopsy performed on December 4, 2004 revealed that the decedent died of three gunshot wounds to the head. H. 42.

On December 4, 2004, Det. McHugh watched a video from Central Self-Storage, a facility near the crime scene. The surveillance tape showed a Suzuki Verona driving on Broadway three times within ten to fifteen minutes before the decedent's death. The Suzuki was parked, and then the decedent's car was visible parked in front of the Suzuki. Figures could not be seen on the video, and then the Suzuki left the crime scene. H. 48. On December 5, 2005, Det. McHugh learned that the Appellant's wife owned a Suzuki. H. 49.

On December 6, 2004, Det. McHugh learned that the co-defendants both had outstanding Nassau County warrants. H. 50.

On December 9, 2004, Det. McHugh attended the pre-arrest briefing. H. 92. Det. McHugh told the Special Operations officers that they had warrants for the co-defendants and wanted the men arrested. H. 95.

Later that evening, the Appellant was arrested. Once the Appellant was given to Dets. McHugh and McGinn, Det. McGinn drove the Appellant to Nassau County Police Headquarters. While Det. McGinn drove, Det. McHugh introduced them and told the Appellant that they were arresting him for Calabrese's death and would question him at Headquarters. H. 54.

They arrived at 9:50 p.m. The Appellant was put in one of two interrogation rooms in the squad. H. 54.

Det. McHugh spoke with the Appellant with Det. McGinn present. Det. McHugh advised the Appellant of his *Miranda* rights. The Appellant stated he understood his rights and agreed to speak with the detectives. H. 60.

The Appellant said that he knew the decedent through a friend. For the past six weeks, the Appellant had been placing bets with the decedent. H. 61. The Appellant won approximately ten thousand dollars over a six week period. H. 132-133. The Appellant would place bets through an offshore number. His account number was "Pop1271" with a password of "Tom." H. 61.

The Appellant lost $8,700.00 in the week of December 3, and it was due to be paid to the decedent either Thursday or Friday. The Appellant also owed the decedent $9,100.00 for losing bets placed earlier that same week, but that was not due until the following week. The decedent owed the Appellant $800.00 from a prior pay-off. In total, the Appellant owed $17,000.00. H. 61. The Appellant said that he kept his gambling winnings in a safe. H. 133.

The Appellant could not meet the decedent on Thursday, December 2 and suggested they meet in Island Park on Friday, December 3, because he already had plans to be at Wantagh Suzuki that evening. H. 61-62.

13

On Friday evening, the Appellant and Jeannot went to LA Fitness. After an hour and a half, they left to meet the decedent. When the Appellant was at the Long Beach Bridge, he called Calabrese and told him he was in Island Park, suggesting they meet by the old "McQuade's." H. 62.

The Appellant parked and saw the decedent pull up. The Appellant handed the decedent the money owed. The last time the Appellant saw the decedent, he was heading north. The Appellant drove to his home in Suffolk County. H. 63.

The Appellant called Wantagh Suzuki as he left Island Park to see if a refund check was waiting for him. The check was not prepared. The Appellant stopped at Wantagh Suzuki on the way home and found the dealership closed. H. 63.

The Appellant then stopped at an ATM because he just paid the decedent $17,000.00 and needed cash. H. 63.

The Appellant, with Jeannot still in the car, stopped at Vivian Barushik's home to see the brickwork she recently had installed in her home. H. 64.

Det. McGinn asked the Appellant about his gambling activity with the decedent. H. 64. The Appellant took a writing pad from the Detectives and penned four pages of notes. H. 65.

At approximately 12:10 a.m., Det. McHugh began writing a statement for the Appellant. Det. McHugh asked the Appellant questions, waited for the answer, and then incorporated it into a statement. H. 67. Just before 2:00 a.m., Det. McHugh finished writing the statement. He read it aloud to the Appellant and the Appellant read it to himself. Corrections were initialed. H. 68.

The Appellant asked that an addendum be added, and then he signed all pages, as did the detectives. H. 68.

At approximately 4:30 a.m. on December 10, 2004, Det. McHugh bean interrogating Jeannot, who was in the other interview room. H. 70. Det. Partee accompanied Det. McHugh. Prior to this, Dets. Partee and Trillo interrogated Jeannot. Jeannot had admitted to shooting and killing the decedent. Det. McHugh entered the interrogation room because he wanted to know if anyone else was involved in the homicide. H. 71, 98, 100.

After being advised of his rights again, Jeannot was still willing to speak to the officers. Jeannot said he killed Calabrese because the Appellant paid him $4,000.00 to do so. H. 72.

Jeannot claimed that on December 1, 2004, while at work, the Appellant said he was in debt to "Bobby" for $17,000.00, did not have the money to pay him, and had to kill him. The Appellant said he'd meet with

the decedent Friday or Saturday evening in Island Park. Later that week the Appellant said he had plans to meet with the decedent that evening and would try to kill him. H. 72.

Jeannot claimed that after work, they drove to Amityville to purchase a coat. As they were driving to LA Fitness, the Appellant asked Jeannot to kill Calabrese, because it would be easier and he could get paid $4,000.00. Jeannot agreed to kill Calabrese. H. 73.

In the evening of December 3, 2004, the Appellant and Jeannot arrived in Island Park, and Appellant took out a gun from a black bag in the rear seat. Jeannot saw that the .44 caliber gun was loaded with six copper jacketed bullets.

The Appellant asked Jeannot to get a gun in case the decedent arrived with someone else. Jeannot tried to get a gun from someone in Uniondale, but could not do so. H. 74.

The Appellant noticed that a nearby collision shop was open. He was concerned about video cameras in the junkyards, so they moved. The two men drove by convenience store that appeared dark. They drove around the block a few times and then parked. The Appellant called the decedent, who said he would be there in five minutes. Jeannot got out of the car and hid behind the rear passenger fender. H. 74-75.

A few minutes later, a car pulled up in front of the Appellant's car. The Appellant got out and talked with Calabrese. Jeannot circled around the Appellant's car and approached the decedent from behind. Calabrese saw Jeannot, fell to the ground, and held onto the Appellant's leg. H. 75. Jeannot fired one shot in Calabrese's head and fired two more bullets. Jeannot and the Appellant got back into the Appellant's car, made a sharp left-hand turn, cut through a car repair shop, and headed through Long Beach. H. 75.

On Loop Parkway, Jeannot threw bullets and shell casings off a bridge. At another bridge, Jeannot threw the gun in the water. The Appellant informed Jeannot that they should be seen by as many people as possible. They stopped by Wantagh Suzuki to pick up a check, but the dealership was closed. They stopped at an ATM, and went north on the Seaford-Oyster Bay Expressway. They decided to visit co-worker Vivian Barushik. Before arriving at her home, Jeannot threw his clothing in a dumpster in a schoolyard. H. 75.

The two men visited with Vivian, and then drove to the Appellant's home, where the Appellant paid Jeannot four thousand dollars in cash. The Appellant then dropped Jeannot off at home. H. 76.

Jeannot told Det. McHugh that he paid off a student loan, purchased clothing, and had five hundred dollars left in a shoebox in his room. H. 76.

From five to six a.m., Det. McHugh wrote the statement. Det. McHugh read it aloud, and then Jeannot read it to himself. Jeannot signed every page. H. 77. Jeannot refused to give a videotape statement. H. 78-79.

Det. McHugh admitted that no witness ever came forward to say that a Suzuki was seen leaving the crime scene at approximately 8:30 on December 3, 2004. H. 113. Det. McHugh also admitted that no eyewitness has come forth identifying the Appellant at the crime scene. H. 114.

Det. McHugh claimed that when he viewed the storage facility video, he could see neither a passenger, nor a license plate. H. 117.

Det. McHugh admitted that the Nassau County Police Department *did not have arrest warrants for the co-defendants; he intended to have them "picked up" for outstanding warrants.* H. 118.

Det. McHugh admitted that he did not witness the Appellant leaving his place of employment on the night he was arrested, and he did not see the Appellant commit any traffic infractions before his automobile was stopped by Special Operations officers. H. 122.

When the Appellant was taken into custody, Det. McHugh did not ask him if he wanted an attorney. H. 125. Det. McHugh did not "recall" the

Appellant asking to speak to his attorney, Barry Philips, Esq., but did recall an attorney calling later that day. H. 125.

The Homicide Bureau blotter reflects that Barry Philips, Esq. called, representing the Appellant, at 3:15 p.m. the afternoon after the Appellant's arrest. H. 126-127.

Det. McHugh testified that he was not involved in the Appellant's second written statement, which was taken by Detective Cereghino. H. 140.

Homicide Detective James McGinn testified that he drove the Appellant and Det. McHugh to Headquarters when the Appellant was arrested. H. 176. After they arrived, the Appellant was placed in an interrogation room. H. 177.

The Appellant described his betting history with the decedent. H. 180. Calabrese drove to Professional Credit Services on Thursdays to pay the Appellant his winnings. The Appellant voluntarily closed his gambling line. H. 180.

The Appellant was supposed to meet the decedent on December 2, 2004, to pay him the money he was owed. The Appellant's losses for bets made until November 28 were due on December 2. The Appellant lost $9,100.00 on November 29 and 30, which would not be due and owing until

19

December 9. The Appellant, however, had the cash to pay the decedent the entire $17,000.00 he was owed. H. 181.

The decedent wanted to meet on December 3, and the Appellant agreed. H. 181.

On Friday, December 3, the Appellant went to LA Fitness with Jeannot and other co-workers. The Appellant and Jeannot left at approximately 7:30 to meet the decedent. H. 181-182.

The Appellant drove to an industrial area in Island Park, and the decedent arrived five minutes later, pulling up next to the Appellant's automobile. H. 182. The Appellant handed the decedent $17,000.00 through the windows. The Appellant left through Long Beach heading for Wantagh Suzuki. H. 182.

The Appellant attempted to contact Wantagh Suzuki and others between 8:40 and 9:00 p.m. H. 182. When the two men arrived at Wantagh Suzuki, the dealership was closed. H. 182. The Appellant then stopped at an ATM. He later left the ATM receipt on his work desk. H. 183. The two men then drove to a friend's home and visited with her for thirty minutes. The Appellant drove Jeannot home and called his wife while in front of Jeannot's house. H. 183.

The Appellant signed a written statement once Det. McHugh completed it. H. 187. At 5:10 a.m., Homicide detectives spoke with the Appellant again. Det. McGinn told the Appellant that Det. McHugh was speaking to Jeannot, who admitted to killing Calabrese. Det. McGinn warned that if the Appellant wished to give his side of the story, now was the time to do so. H. 188. The Appellant continued to repeat, "you don't understand." After twenty-five minutes, Det. McGinn left the room. H. 189.

At six a.m., Det. McGinn returned. The Appellant said he was afraid for his family and slept with a shotgun. Det. McGinn offered protection for the Appellant's family if organized crime was involved. H. 190.

Det. McGinn left the interrogation room at 6:50 and returned at 7:50 a.m. H. 190. He said that Jeannot confessed to killing Calabrese, to the location of the gun and the bullets, how the decedent was killed, and that the Appellant paid him $4,000.00 to commit murder. H. 190-191.

The Appellant informed Det. McGinn that he was afraid that Jeannot will hurt the Appellant's wife Diana, and their unborn child, because he saw that Jeannot was capable of shooting someone in cold blood. H. 208, 214.

The Appellant agreed to talk. Jeannot knew that the Appellant was going to pay the decedent $17,000.00 the night he died. H. 191. Some time

21

on Friday, December 3, 2004, Jeannot came into Professional Credit Services with a brown paper bag and asked the Appellant if he could put it in his trunk. H. 192. The Appellant watched Jeannot put the bag in the Appellant's trunk. H. 192.

The Appellant told Det. McGinn that Jeannot threw bullets out the window while they were on Loop Parkway, and threw the gun out the window while they were on Wantagh Parkway. The Appellant said he was afraid of Jeannot and his family. H. 193.

The Appellant told Det. McGinn that he and Jeannot drove down a street near Austin Blvd. in Island Park twice; they made a U-turn, pulled over, and parked. Jeannot told the Appellant he needed to relieve himself and got out of the car. A few minutes later, the decedent arrived. H. 194. The Appellant got out of the car to speak to Calabrese, and the two men met in the middle of the street. The Appellant hugged Calabrese, and they spoke. The Appellant took $17,000.00 out of his breast pocket and handed it to Calabrese. H. 194.

The Appellant heard a gunshot pass by his ear. The decedent dropped to the ground, and the Appellant saw Jeannot running toward Calabrese's car. The car door was still open. Jeannot closed the door, and shot Calabrese two more times. The Appellant and Jeannot then got back in the

Appellant's Suzuki and started to drive away. H. 195. The Appellant told Jeannot that Calabrese's feet were still moving. Jeannot got out of the car and attempted to shoot Calabrese again, but the gun wouldn't fire. Jeannot reached down and grabbed the $17,000.00 that the Appellant just gave Calabrese. H. 195. Jeannot got back in the car. The Appellant drove away. H. 195.

The Appellant told Det. McGinn that he wanted to be seen with Jeannot, and that he stopped at every light because lights have cameras. H. 196.

Jeannot threw bullets out the window as they drove over a bridge. Jeannot then told the Appellant to stop and he threw the gun into the water. H. 196.

Jeannot threw his clothes in a school dumpster near their co-worker Vivian's home. After they finished their visit with Vivian, the Appellant drove Jeannot home. Jeannot told the Appellant to keep his mouth shut or he would kill the Appellant's wife. H. 196.

The Appellant told Det. McGinn that he did not get any portion of the $17,000.00 back; that money was Calabrese's, and he paid it. H. 197.

The Appellant *never* admitted to taking part in Calabrese's killing. H. 217.

Homicide Detective Cereghino testified that he interrogated the Appellant at 10:00 a.m. on December 10, 2004. No one else was present. H. 273. The Appellant agreed to give a statement and his *Miranda* rights were read. H. 273.

Det. Cereghino went to Professional Credit Services to recover the Citibank ATM receipt dated December 3, 2004. H. 283.

At the close of the hearing, the People argued that the officers had probable cause to arrest the co-defendants because they had valid Nassau County warrants. The People also alleged that the police observed the Appellant driving without a valid license. H. 345-346.

On April 21, 2005, the parties returned for the Court's ruling. H. 362. The Court determined that Police Officer Loschiavo apprehended the Appellant based on an outstanding warrant. H. 373. The Court determined that all of the statements and physical evidence attributed to the co-defendants were admissible. H. 373.

<u>Trial</u>

The People alleged that Mark Orlando was a habitual gambler who had won thousands of dollars placing bets with Calabrese, but recently lost and owed $17,000.00 to Calabrese's bookmaker. The People alleged that

the Appellant paid Jeannot $4,000.00 to kill Calabrese, because the Appellant did not have $17,000.00 to settle his debt.  T. 183.[2]

The People claimed that Mark Orlando arranged to meet Calabrese to settle his debt, but had no intention of paying him the money he was owed. The People alleged that Jeannot accompanied the Appellant to the meeting with Calabrese, and hid behind the Appellant's car, waiting for Calabrese to arrive.  When Calabrese's car pulled up, he got out and Mark Orlando gave Calabrese a hug, signaling to Jeannot to fire the revolver he held.  Mark Orlando allegedly pulled Calabrese's hooded sweatshirt over his head so he couldn't see Jeannot approaching with the gun.  Jeannot then allegedly fired, killing Calabrese.  T. 183-184.  The People claimed that Mark Orlando's plan was simple: kill Calabrese, tell everyone he already paid Calabrese that night, and that someone must have killed him and taken the $17,000.00 payment.  T. 186.

The People convinced a jury that its theory of the case was true; that Mark Orlando paid Jeannot a mere $4,000.00 to kill Mr. Calabrese because he did not have $17,000.00.  However, the testimonial and demonstrative evidence adduced at trial does not support the People's theory.  Detective Michael Kuhn would testify that the police recovered $17,000.00 during the

---

[2] Numbers preceded by the letter 'T' refer to pages of the trial transcript.

course of the homicide investigation (though the Appellant was never given any notice that such evidence was in police custody.) T. 711. The Nassau County Crime Laboratory could not detect any blood evidence on Mark Orlando's clothing.

The People's theory that Mark Orlando arranged to have Calabrese killed because he couldn't pay his debt is implausible, because the death of the bookmaker's runner does not extinguish Mark Orlando's debt.

Detective David Nystrom testified that at nine p.m. on December 3, 2004, he was called to a crime scene in North Long Beach, to document the scene through photography, video, and sketching. Many other police officers had arrived before Det. Nystrom. T. 238-239, 265.

The crime scene was in a commercial area. The area was poorly lit and is lightly traveled at night. A convenience store is located at the corner of Austin Blvd., Georgia Avenue, and Broadway. T. 235.

When Det. Nystrom arrived, he saw a gray Infiniti sedan, engine running, parked on the east side of Broadway, facing north, about sixty feet south of the convenience store. T. 235. Calabrese was lying face down in the roadway, just south of the gray Infiniti, wearing gray sweats. Calabrese's arms were up around his head and there appeared to be multiple gunshots to the back of his head. The deceased's sweat shirt was cut up the

center, and there were bullet holes in the back of the sweat shirt, which was pulled up around his head and neck. T. 236. Det. Nystrom was not present when the decedent's sweat shirt was cut. T. 272. Det. Nystrom did not speak to the person who cut the decedent's sweat shirt. T. 272.

Other than a twenty dollar bill that was recovered from Calabrese's right front pocket of his sweat pants, no money or weapon was recovered from Mr. Calabrese's vicinity, or the Infiniti. T. 236-237.

Det. Nystrom photographed the scene. After he was finished "processing" the scene, a Medical Examiner's physician examined Calabrese. He turned the decedent over and felt through the blood on the roadway and the front of Calabrese's body, recovering a copper jacketing portion of a bullet from the front of Calabrese's sweat shirt. T. 244.

Det. Nystrom packaged the bullet fragment in a plastic bag and handed it to Detective DiBeneditto, from ballistics. No other bullets or fragments were recovered from the scene. T. 245.

No other forensic evidence such as DNA or fingerprints was recovered from the crime scene. T. 246.

Some time after December 3, 2004, Det. Nystrom examined the decedent's car. T. 278. Reddish material was removed from the outside of

the rear window of the automobile and determined to be the decedent's human tissue. T. 247.

The Infiniti's exterior door handles, windows and body passages were examined for fingerprints, but none were located. T. 247.

Calabrese's wallet was recovered from the Infiniti, and it contained personal papers, thirty-nine dollars, and the decedent's driver's license. T. 248.

Christina Rasmussen, a Cingular Wireless representative, testified that she serves as the custodian of records for Cingular and is familiar with subscriber records. T. 286. The Appellant was the AT&T Wireless subscriber using cell phone number (631) 882-3428 in December 2004. T. 288. On Friday, December 3, 2004, he made seven phone calls to various telephone numbers. T. 288-290.

Police Officer Peter Vozzo testified that at 8:45 p.m. on December 3, 2004, he responded to North Long Beach after receiving a radio transmission. T. 292.

Officer Vozzo was the first police officer to respond to the crime scene and he saw the decedent lying in the street. T. 293. Calabrese showed no signs of life. Officer Vozzo noticed a substantial amount of blood

surrounding Calabrese, who was lying face down with his arms over his head. T. 293-294.

The decedent was wearing a gray hooded sweat shirt. Officer Vozzo noticed several large holes in the midsection of the back of the sweat shirt with a substantial amount of blood also on the rear of the sweat shirt. T. 294. The neck of the sweat shirt was pulled over the top of the decedent's head. T. 294. The decedent's t-shirt was not pulled up. T. 299.

Officer Vozzo made sure the area was protected so officers could respond and gather evidence. He called for assistance and an ambulance. T. 299-300.

When Ambulance Medical Technician Daniel Brooks responded to Officer Vozzo's call, several officers were present at the scene. T. 300. Officer Vozzo did not touch the decedent, but AMT Brooks did. Even though Officer Vozzo determined that Calabrese was dead, AMT Brooks began to cut the decedent's sweat shirt. T. 301. Officer Vozzo explained that even though he was sure Calabrese was dead, it was up to AMT Brooks to determine what, if anything could be done for the decedent. T. 301.

AMT Brooks testified that he had been employed as an AMT with Nassau County Police for eleven years, and was an emergency medical

technician for almost twenty years. He is charged with treating the sick and injured when 911 is called for emergencies. T. 303.

AMT Brooks was working on December 3, 2004, driving in a police ambulance. AMT Brooks responded to a radio call at 8:43 p.m. for an intoxicated person, with subsequent calls for a person possibly shot. T. 304. When AMT Brooks arrived at the crime scene, Officer Vozzo was present and another squad car was down the street, blocking the road. AMT Brooks was the first medical technician to arrive. T. 305.

When AMT Brooks first noticed the decedent, he was lying in the middle of the street with no signs of life. As AMT Brooks approached the decedent, he noticed a large pool of blood, a running car in the vicinity, and the decedent's sweat shirt that seemed to be pulled up over the top of his head. T. 305-306.

In order to determine whether there was any life in the decedent, AMT Brooks reached up to the top of the hood to see of there was anything in it. There wasn't, so he cut the hood of the sweat shirt around the top, avoiding the bullet holes, and pulled the two pieces apart and peered at the decedent's head. T. 306. AMT Brooks testified that he cut the sweat shirt hood on the side, to check for a pulse. T. 314. AMT Brooks testified that he

cut the back side of the sweat shirt from the bottom to the top of the hood. T. 319.

Four bullet holes in the sweat shirt were consistent with four bullet holes in the decedent's head. AMT Brooks never saw the decedent when he was placed on his back, and is not responsible for the significant tear in the front of the sweat shirt. T. 321.

AMT Brooks observed what appeared to be several bullet holes and no signs of life. T. 306. After checking the decedent's pulse, Calabrese was pronounced dead. T. 306-307.

AMT Brooks was not present when the decedent was turned on his back, or when he was moved to search for anything under his body. AMT Brooks was also not present when the decedent's body was turned over again for crime scene to take photographs. T. 310.

Robert Ianfolla, the decedent's cousin, testified that on December 3, 2004, Calabrese worked for a bookmaker. Mr. Calabrese was employed to locate prospective gamblers, and pick up money from and drop off winnings to betters. T. 325, 333.

Ianfolla was present when Mark Orlando and Calabrese met for the first time, when a mutual friend, Tommy Flores, arranged an introduction.

The Appellant and the decedent met at Professional Credit Services, where the Appellant and Flores were employed. T. 325.

Ianfolla accompanied Calabrese to Professional Credit Services four to five times to pay the Appellant the proceeds of his wagers. T. 326. Whenever Ianfolla was present, Calabrese paid the Appellant his winnings in front of Professional Credit Services, with people milling around. On one occasion, Calabrese commented to Mark Orlando that he never traveled alone; Ianfolla was always with him. T. 328-239.

Incredulously, even though Ianfolla saw Calabrese four to five times a week and loved him like a brother, Ianfolla claimed he did not know the identity of the bookmaker Calabrese illegally took bets for. T. 343.

On December 3, 2004, Ianfolla was visiting Calabrese at his family home. After eight p.m., Calabrese announced that he was going to Island Park to collect money Mark Orlando owed the bookmaker. T. 330. Calabrese was wearing a new, untorn gray hooded sweat shirt. T. 330. Ianfolla claims he did not know how much money Mark Orlando owed Calabrese; he just knew for once, Calabrese did not have to pay the Appellant, and that the Appellant was not going to gamble any more. T. 350.

Tommy Flores testified that he worked with the Appellant and had known him for about thirteen months. T. 369. Flores had a criminal record of Driving While Ability Impaired and Driving While Intoxicated. T. 352-353.

Flores and Orlando were friends and would socialize during breaks and after work. Flores also knew co-worker Jeannot, though they were never close. Mark Orlando took Jeannot to work every day. T. 354.

Flores knew Calabrese was employed as a runner for a bookmaker and he introduced him to Orlando because Flores knew the Appellant gambled. T. 357-358.

The Appellant often spoke about the bets he placed with Calabrese. T. 359. Flores recalled one instance when Calabrese paid the Appellant approximately $18,000.00. T. 359.

Right before Thanksgiving, Flores, his girlfriend, the Appellant and Jeannot were sitting in the Appellant's car, each holding the money Orlando won from Calabrese. T. 369. Flores knew that the Appellant had won $38,000.00 in the past four to five weeks placing bets with Calabrese. T. 370.

Flores claimed that during the week of November 29, 2004, the Appellant was not "himself" and owed nine thousand dollars for one week

of wagering, and eight thousand dollars for another week of poor betting. T. 360.

On Thursday, December 2, 2004, the Appellant picked up Flores to drive him to work and was talking about gambling with Calabrese. Flores claimed that the Appellant's wife found his gambling books, and that the Appellant told Calabrese he wasn't going to gamble any more. T. 360.

On December 3, 2004, Flores, the Appellant and Jeannot left work and went to the local gym. T. 362. During the Appellant's work-out, Jeannot "rushed" the Appellant along, telling the Appellant he had to go somewhere. The Appellant and Jeannot left the gym between 7:15 and 7:30 in the evening. T. 362.

Later that evening, at 9:26 p.m., Flores received a telephone call from the Appellant on his cell phone. The Appellant stated he was returning home from a car dealership, and was supposed to pick up money but the appropriate dealership representative was not working. The Appellant sounded frantic; frazzled. T. 363.

On December 4, 2004, Flores was working when his brother called and informed him that Calabrese was dead. T. 365. Flores telephoned the Appellant after he left work and asked if he saw Calabrese the night before.

The Appellant answered that he did see Calabrese, and was shocked to learn that he was killed. T. 366.

Later that evening, Flores again contacted the Appellant to find out details of his meeting with the decedent.   The Appellant stated he met Calabrese around 8:20 or 8:30 and paid him the money he was owed from cash the Appellant held in his home safe. T. 367. The Appellant told Flores that Calabrese left and headed towards Oceanside, and the Appellant left in the Long Beach direction. T. 368.

Barbara Diamont testified that she worked with the Appellant, Jeannot, and her boyfriend, Tommy Flores, at Professional Credit Services. T. 394-395. Barbara was aware that in October or November of 2004 Flores introduced Calabrese to Orlando and that the Appellant placed bets with the decedent. T. 396. The Appellant would often tell Diamont about his gambling winnings. T. 398.

On December 3, 2004, at roughly 7:15 p.m., Diamont saw the Appellant and Jeannot at L.A. Fitness.   T. 400.   The Appellant was exercising and Jeannot was rushing the Appellant to leave. T. 401.

Diamont learned of Calabrese's death on December 4, 2004. Flores called her on her cellular phone and stated that Calabrese had been shot. Flores told Diamont that the Appellant owed Calabrese money and had met

with him the night before. T. 402. Diamont called the Appellant, who stated he saw Calabrese the night before. The Appellant knew that Calabrese had been shot in the head three times. T. 402-403. Diamont was surprised that the Appellant knew details about the homicide that Flores did not. T. 403. The Appellant was worried that law enforcement would think he had a role in Calabrese's death. T. 403.

Diamont recalled the Appellant winning roughly $29,000.00 about a week before Calabrese died. T. 409.

Frank Walker testified that he is a car salesman at Wantagh Suzuki and became acquainted with the Appellant when he purchased two or three cars from the dealership over a two year period. T. 411.

On December 3, 2004, the Appellant spoke to Walker, and asked whether a refund check was available to be picked up. Walker advised the Appellant to come in the next day to pick up the check. T. 412. The Appellant replied, "this is bull shit," and hung up. The Appellant picked up the refund check the following Monday evening. T. 415.

Detective Charles Costello, Jr. was deemed an expert witness in latent fingerprint identification by the County Court and affirmed that after testing five (5) one hundred dollar bills recovered from Herve Jeannot's bedroom,

he could *not* detect the Appellant's fingerprints or the decedent's fingerprints. T. 426, 430-431.

Nassau County Police Officer Norman McCloy, assigned to the Marine Aviation Bureau, was involved in the investigation of the Calabrese death. T. 434-435. On Monday, December 13, 2004, Officer McCloy and other divers responded to the Sloop Channel Bridge in Wantagh, Nassau County. Officer McCloy testified that he recovered a .44 caliber handgun in the water near the bridge. Officer McCloy confirmed that the weapon shown to him by the prosecutor was the same weapon he recovered on December 13, 2004. T. 438-439.

Nassau County Police Sergeant Greg Magnifico, assigned to the Marine Aviation Bureau, testified that on Friday, December 10, 2004, he was asked by the Homicide Bureau to locate a gun off the Sloop Channel Bridge. T. 441-442. Due to weather conditions, Marine Aviation Bureau divers were unable to search for the weapon until Monday, December 13, 2004.

When Officer McCloy recovered a .44 caliber weapon gun, Ser. Magnifico placed the weapon in a bucket of sea water, to limit corroding, and took the weapon to the Marine Bureau Base. Det. William Brosnan

37

arrived and took the gun to Nassau County Headquarters for processing.  T. 447, 455.

Nassau County Police Officer Bob Shaw, assigned to the Computer Crime Section, testified that he examined the contents of Bobby Calabrese's computer, recovered from the home he shared with his parents.  T. 460.

Officer Shaw recovered what appeared to be gambling records with the following: "Player Pop 1271."  Oddly, Officer Shaw was *not* asked to recover *every* gambling record on Calabrese's computer.  Additionally, Shaw was *not* asked to examine the contents of Calabrese's computer to attempt to discover who Calabrese worked for.  T. 462-465.

Officer Shaw did not know if gambling records labeled "Player Pop 1271" pertained to Mark Orlando, and could not determine whether the gambler identified as "Player Pop 1271" was in debt to Calabrese or was winning.  T. 464, 467.

Police Officer Steve Loschiavo he arrested the Appellant on December 9, 2004.  T. 471-474.  Officer Loschiavo stopped the Appellant's vehicle.  The Appellant stepped out of his car and fell to the ground on his stomach.  T. 475.  Officer Loschiavo handcuffed the Appellant, assisted him to his feet, and was placed in the custody Homicide detectives.  T. 476. Officer Loschiavo testified that the Appellant was cooperative and when

searched, was not found in possession of a weapon or illicit substances. T. 476.

Detective Ken Strigaro, assigned to the electronics command of the Nassau County Police Department, testified that on December 4, 2004, he responded to the Central Self Storage facility on the block where the decedent was found. T. 477-481. Central Self Storage had video cameras outside the facility facing east and northeast from the rear of the facility. T. 481. The security system was a thirteen-camera system, with some of the cameras located outside the building. The cameras would take images that were stores on a digital video recorder, or DVR. T. 482. Det. Strigaro stated that the security system was sophisticated; it had three modes of operation. The third operational mode was a combination of the time-lapse and the event or 'alarm" mode in which when there is no activity on any cameras, the system sits in time lapse mode, but can automatically drop out of that mode if there's any activity. T. 482-483.

In December 2004, the storage facility was set in the third operational mode. The system was set to take time-lapsed images approximately every thirty-six seconds and every two and one half to three seconds in the event or alarm mode. If there was a lot of activity, the system would record images about once a second. T. 483. According to Det. Strigaro, the event

mode of the third operational system is triggered when a certain portion of the screen changes from dark to light. Only a fair amount of light would trigger the system. T. 483.

Det. Striago admitted that the security system never produced a videotape, or a tape of actual time passing. Instead, Det. Strigaro *created* a tape of the images stored on the DVR. The cameras *never* produced an actual "real-time" videotape of the scenes outside the facility. T. 485-486.

Det. Strigaro admitted that the storage facility's date and time displayed on the recorded DVR images was inaccurate in December 2004. Det. Strigaro noted that the time was "off" by approximately one hour. T. 486. Det. Strigaro came to this conclusion by checking the programmed time with his wrist watch. T. 487. Det. Strigaro simply assumed that the incorrect time was due to the system not reflecting that it was Standard Time, and not Daylight Savings Time. T. 487.

Det. Strigaro determined that the system recorded images on the DVR between eight o'clock and nine o'clock on the night of Friday, December 3, 2004, by examining the "search" mode of the system. The Detective entered the time and date of interest (December 3, 2004) for two of the thirteen cameras that the system recorded on. T. 487-488. According to Det. Strigaro, once you ask the system to locate images from the database, the

system finds any matches for the inputted parameters, automatically brings them on the screen, and allows you to display them.  T. 487-488.  Det. Strigaro requested this from the database one camera at a time.  T. 488.

Det. Strigaro testified that the system captured images between 8:35 and 8:36 p.m. on the night of December 3, 2004.  T. 489.  Det. Strigaro retrieved images between eight and nine p.m.  T. 489.  That night, there was no recording device capturing the images, such as a VCR or DVD or CD burner.  Therefore, Det. Strigaro had to *create* a videotape.  T. 490.  The times covered by the created videotape are 9:10 p.m. to 9:45 p.m., although Det. Strigaro stated it was "actually" 8:10 to 8:45.  T. 490.

When Det. Strigaro responded to the storage facility to create the videotape, he was able to manipulate the recording by freeze-framing an image, going backwards and forwards.  Det. Strigaro taped all of the distortions he created in the timeline of the images.  T. 491.

The created videotape was entered into evidence and played for the jury.  T. 496.  Det. Strigaro testified that the pauses in the video were created by him, often in response to one of the investigating Detectives' request to re-examine an image.  T. 497.

Det. Strigaro testified that he captured the decedent's car driving northbound on Broadway.  T. 499.  Det. Strigaro also took note of a car

traveling southbound on Broadway that made a U-turn to head northbound on Broadway. The Detective claimed that it was the same car that could be seen earlier on the tape. T. 500-501. Det. Strigaro pointed out that the car that made the U-turn has a distinct black line that bisected the license plate, and this is how the Nassau County Police Department differentiated this vehicle from others captured on the DVR. T. 501. Assistant District Attorney Hayden then played the created videotape for the jury in its entirety. T. 501.

Det. Strigaro admitted that the videotape displays approximately eight other cars traveling northbound or southbound on the tape. T. 513.

A car parked near the storage facility and it was captured on the DVR. T. 515. The lights on the car were off and then turned back on before the decedent's car arrived on the scene and was recorded by the cameras. T. 515. After the decedent's car arrives, approximately forty-two second lapse until the other car pulls out. T. 515. The car the stopped as it was pulling away, which caused the DVR to store another "event" image. T. 516.

Det. Strigaro admitted that rather than simply record all of the images from the DVR onto one videotape, unaltered, he choose to manipulate the images to record exactly what he wanted to see. T. 517.

Homicide Detective John McHugh testified that on December 3, 2004, at 9:30 p.m., Det. McHugh responded to North Long Beach. T. 527-528. The area was commercial and dimly lit. On the west side of the street is a large public storage facility, a limousine business, and an auto repair shop. Further north on the street, on the corner of Georgia Avenue, was a convenience store. T. 528. Det. McHugh testified that the limousine business and storage facility were not opened when Calabrese died, at approximately 8:36 p.m. T. 528.

When Det. McHugh arrived at the crime scene, an Infiniti, with engine running and head lights on, was parked at the curb, facing north. T. 529. The decedent was lying in the roadway, face down, with his arms on the ground, up near his head. Calabrese was several feet away from the Infiniti, fully clothed, wearing a gray sweat shirt that had been cut up the back. T. 530.

Det. McHugh was present when Dr. O'Reilly arrived at the crime scene and flipped the decedent's body over. T. 530. A cell phone and twenty dollars was recovered from Calabrese's body. T. 530. Thirty-nine dollars was recovered from the Infiniti. T. 531. Det. McHugh denied that any other money was recovered from the vicinity of Bobby Calabrese's body or the Infiniti. T. 530.

43

On December 4, 2004, Homicide Detective Partee attended the autopsy performed on Bobby Calabrese, and told Det. McHugh that the decedent had been shot in the head three times. T. 536.

On December 4, 2004, Det. McHugh watched a videotape created by Detective Strigaro, which consisted of recorded images captured by the public storage facility's two surveillance cameras. T. 537. From the videotape, Det. McHugh became interested in a Suzuki Verona, which police later learned was owned by the Appellant's wife. T. 538.

Between December 3 and December 4, 2004, the Nassau County Police Department could not locate an eye-witness to the death of Calabrese. T. 571.

After the Defendant was arrested on December 9, 2004, Det. McHugh took custody of the Appellant, and placed him in a police vehicle. T. 541. As Detective McGinn drove the car back to Police Headquarters, Det. McHugh explained that the Nassau County Police wanted to speak to the Appellant about Bobby Calabrese's death. T. 541. At Headquarters, the Defendant was placed in a ten foot by ten foot interrogation room. T. 542.

Co-defendant Jeannot was also arrested on December 9, 2004 as he left work. Jeannot was transported by other officers to Headquarters and put in a second interview room. T. 542-543.

44

A few minutes after ten p.m., Det. McHugh, in Det. McGinn's presence, read the Appellant his *Miranda* warnings and told him to pay attention. T. 543. The Appellant understood his rights and agreed to speak to the Detectives. T. 546.

The Appellant told the Detectives that he knew Calabrese, having been introduced six weeks earlier by mutual friend Flores. T. 547-548. Calabrese had provided the Appellant with an offshore telephone number, through which he could place bets under an account named POP 1271 with a password, "Tom." T. 542.

The Appellant explained that for the next six weeks, he gambled through the number and was up about $10,000.00, but recently had started loosing money. As a result of the loss, the Appellant had shut down the line on the Tuesday prior to Calabrese's death. T. 548. The Appellant denied that his wife found out about his gambling; he simply thought he should stop. T. 548.

The Appellant told the Detectives that Calabrese paid the Appellant's winnings where the Appellant worked. T. 549. However, when the Defendant was due to pay Calabrese, the Appellant drove to Calabrese's vicinity. T. 549.

On Friday, December 3, 2004, the Appellant called Calabrese and told him he could meet in Island Park later that evening.  T. 550.

The Appellant had paid bills, put money in the bank, and put money in his wife's bank account, with his gambling winnings.  T. 550.

The Appellant said that on Friday, December 3, 2004, he worked during the day, and went to L.A. Fitness afterwards with Jeannot.  T. 550. The two met co-workers there.  The Appellant and Jeannot left between 7:15 and 7:30 p.m. to meet Calabrese.  T. 550.

The Appellant drove his wife's Suzuki Verona because his 1991 Cougar was old, and in poor condition.  T. 550.  The Appellant and Jeannot drove through Long Beach.  When the Appellant got to the Long Beach Bridge at about 8:25 p.m., he called Calabrese on his cell phone and told him they would meet him on Industrial Place by "Puma's".  Calabrese stated he would meet them in a few minutes.  T. 561.

The Appellant drove straight to Industrial Place to meet Calabrese.  T. 561.  The Appellant waited and saw Calabrese's car pull up.  They spoke, and then the Appellant handed Calabrese $17,000.00 in two "bricks."  They did not get out of their cars.  T. 552.

The Appellant denied carrying a weapon, and stated that Jeannot did not have one, either.  T. 552.  After Calabrese departed, the Appellant left

46

the area, traveling east through Long Bean back to Loop Parkway. The Appellant called Wantagh Suzuki in an attempt to get a refund check he was owed. As he was driving, the Appellant called the dealership, asked for Ralph, and was told Ralph was not available, and that the Appellant could not pick up the refund check that evening. When the Appellant arrived at the dealership, it was closed. T. 552-553.

The Appellant stopped at a Citibank branch on Sunrise Highway in Wantagh to take money from his account via the ATM machine. T. 553. The Appellant then drove to Plainview to the home of co-worker Vivian Barushik. Ms. Borushik had just installed a pool and deck, and the Appellant was interested in having that work done as well. They left and the Appellant drove Jeannot home. The Appellant arrived at his residence at 10:30 p.m. T. 553.

The Appellant told the Detectives that Flores called him the next morning and told him that Calabrese was dead. The Appellant offered to speak to the Calabrese family, and instructed Flores to offer the Appellant's cell phone number should they wish to speak to him. T. 554.

The sum and substance of the Appellant's interrogation was reduced to writing and admitted into evidence at trial as People's Exhibit 45. T. 561.

Det. McHugh stated that not everything the Appellant said was included-only portions the *Detectives* believed pertinent. T. 576.

The Appellant's oral and written statements *do not* allege that he or Jeannot were involved in Calabrese's death. T. 577. After speaking with the Appellant for roughly four hours, and after reducing the Appellant's interrogation to writing, Det. McHugh left the interview room at two a.m. T. 578.

Det. McHugh reasonably believed that the Appellant did not know that Jeannot was present at Headquarters as he was being interrogated and as his statement was being drafted. T. 581.

An ATM receipt was recovered from the Appellant's work desk, showing that at 9:12 p.m. on December 3, 2004, an ATM withdrawal was made. T. 569.

The People expected to call Detective James McGinn to testify after Det. McHugh. Appellant's counsel, Dennis Lemke, Esq., objected to portions of Det. McGinn's anticipated testimony. Mr. Lemke objected to Det. McGinn being permitted to testify about Jeannot's confession to detectives, in which Jeannot stated he killed Calabrese because the Appellant paid him to do so. Counsel asked that his objection be noted for the record,

stating that he would not object at the time of Det. McGinn's testimony. T. 591.

Homicide Detective James McGinn testified that as he and Det. McHugh were speaking to the Appellant before his statement was written about his gambling winnings. Over six weeks, the Appellant was "up" roughly ten thousand dollars, even after his losses. T. 601.

The Appellant was left alone for three hours. At 5:10 a.m., Det. McGinn entered the room. T. 619-620. Det. McGinn told the Appellant that Jeannot was next door, speaking to Det. McHugh. T. 620. Det. McGinn told the Appellant he should truthfully explain his side of the story. T. 620.

The Appellant repeated, "You don't understand" to Det. McGinn. Det. McGinn asked the Appellant to explain. The Appellant repeated that Det. McGinn "didn't understand" for nearly thirty minutes. T. 630-621. Det. McGinn then left the room. T. 621.

Det. McGinn entered the Appellant's interrogation room at six a.m. He informed the Appellant that Jeannot was confessing to the facts of the killing. Jeannot told Police where the murder weapon was located. Det. McGinn informed the Appellant that the Police were aware that the meeting with Calabrese did not take place at Industrial Park; that the Police had a

videotape of the spot the meeting occurred. T. 621. The Appellant repeated,
"You don't understand." T. 621.

The Appellant explained to Det. McGinn that he was afraid for his
family. T. 620-622. The Defendant told Det. McGinn that he did not sleep
in bed with his wife, but slept at the other end of the house with a shot gun.
T. 623.

Det. McGinn left the interrogation room at 6:50. At 7:50, Det.
McGinn re-entered the Appellant's room and informed him that Jeannot was
talking to the other Detectives. Jeannot gave a statement, implicating
himself in the murder. Jeannot confessed that he was the murderer, but that
Mark Orlando had paid him to do it. 623-624.

The Court interrupted Det. McGinn and gave the jurors the following
instruction:

> The Court: Ladies and Gentlemen, you have been
> permitted to hear testimony about remarks made to the
> defendant by Det. McGinn about statements allegedly made by
> Herve Jeannot. You're to consider this testimony only when
> considering the circumstances under which the defendant may
> have made statements and for no other purpose. You are to
> completely disregard any statement allegedly made by Herve
> Jeannot when considering evidence against the defendant.
> Any statement allegedly made by Herve Jeannot is not
> evidence against the defendant. You are not to concern
> yourself with whether Herve Jeannot did or did not make any
> statements to the police, if he did, what those statements may
> have been or whether or not they were true. T. 624.

After hearing of Jeannot's confession, the Appellant changed his statement to Det. McGinn, *but did not implicate himself in the Calabrese shooting.* The Appellant explained that on Thursday, December 2, 2004, during the work day, Jeannot asked the Appellant if he could put a brown paper bag in the Appellant's car. The Appellant agreed. While the Appellant *and* Flores stood on the steps of Professional Credit Services watching, Jeannot placed the brown paper bag in the Appellant's trunk. T. 627.

The Appellant told Det. McGinn that on the night of Calabrese's death, the Appellant was wearing white sneakers, a white T-shirt, black sweat pants, and the black suede jacket he was wearing the night he was arrested. T. 628.

At 8:25 p.m., the Appellant was across the street from the North Long Beach 7-Eleven. He called Calabrese to arrange the meeting and waited five minutes until Calabrese arrived. T. 629. Jeannot got out of the Appellant's car. A few minutes later, Calabrese arrived. The Appellant and Calabrese got out of their cars. The Appellant gave Calabrese a hug and handed him $17,000.00. The Appellant then heard a shot ring next his right ear. T. 629.

Calabrese fell to the ground and Jeannot ran past the Appellant towards Calabrese's car. Jeannot closed the Infiniti's open door, walked

back to Calabrese, who was lying in the middle of the street, and shot him two times.

The Appellant and Jeannot got back into the Suzuki, and Jeannot ordered the Appellant to leave.  Jeannot got out of the car again and attempted to shoot Calabrese, but the gun would not fire.  T. 630.  Jeannot reached down, picked up the $17,000.00, and got back in the Suzuki.  T. 630.

As the Appellant drove away, he screamed at Jeannot that he would call the police.  Jeannot told the Appellant that they would not call anyone, and would go home.  T. 630.  The Appellant, in fear, decided that he wanted as many people as possible to see him with Jeannot.  T. 630.

As they drove over Loop parkway, Jeannot told the Appellant to slow down.  Jeannot threw the bullets out of the window of the car.  T. 631.  As they drove over a bridge on the Wantagh Parkway, Jeannot ordered the Appellant to stop.  Jeannot threw the gun over the bridge into the water.  T. 631.

The Appellant attempted to call as many people as possible, and tried to stop at Wantagh Suzuki, but the dealership was closed.  T. 631.  The Appellant then withdrew money from a Citibank ATM, knowing that a camera will record him being seen with Jeannot.  T. 631.

As they drove to a co-worker's home, Jeannot ordered the Appellant to pull into a school parking lot. Jeannot placed his clothes in a dumpster. They then arrive at Ms. Barushik's home. Jeannot stayed in the car as the Defendant looked around her home. T. 632.

When the Appellant dropped Jeannot off at home, Jeannot threatened the Appellant to keep his mouth shut, or he would kill the Appellant's pregnant wife. T. 632.

The Appellant told Det. McGinn that Jeannot kept all of the $17,000.00 he paid Calabrese. T. 632.

Det. McGinn's never reduced the aforementioned interrogation to writing. T. 654. Even though the Appellant was cooperative and gave a truthful account of Calabrese's death, Det. McGinn made the Appellant wait at least an hour before a written statement was taken by Det. James Cereghino. T. 664.

Det. McGinn admitted that he never examined the gambling records found on Calabrese's computer in an attempt to learn who Calabrese worked for, even though he was the lead detective on the case. T. 632.

Det. McGinn never asked the Appellant if he was afraid to explain what happened the night of Calabrese's death because of organized crime,

even though Det. McGinn is well aware that gambling might have played a part in Calabrese's death. T. 643.

Det. McGinn admitted that on the night of Calabrese's death, the Appellant did not owe the bookmaker $17,000.00, he owed $8,700.00. The following week, the Appellant's remaining losses would be due and owing. Calabrese never threatened the Appellant with physical violence if he did not pay his debt. T. 657.

Det. Cereghino testified that he was assigned to the Calabrese investigation on December 10, 2004 and spoke to the Appellant at ten in the morning. T. 667. The Appellant and Det. Cereghino were alone in a small interrogation room. T. 667. Det. McHugh asked Det. Cereghino to take a statement from the Appellant on his "final" version of the Calabrese death. T. 668.

Det. Cereghino entered the interrogation room, took off the Appellant's handcuffs, and told the Appellant he would take his final statement. First, Det. Cereghino read the Appellant his *Miranda* rights. T. 668.

Even though the Appellant was not handcuffed and was capable of writing his own statement, Det. Cereghino penned the statement.

Corrections were made as the statement was being drafted and after completion. T. 671-672.

The statement was admitted into evidence as People's 48 and read for the jury to hear by Assistant District Attorney Hayden. T. 673-684.

After writing the Appellant's statement, Det. Cereghino located an ATM receipt on the Appellant's work desk, the Appellant's wallet and notebooks. T. 687.

Nassau County Detective Michael Kuhn testified that on December 10, 2004, he went to the Appellant's home in Suffolk County with other members of the Nassau Police Department and two uniform Suffolk County Police Officers, to execute a search warrant. T. 707.

In accordance with the search warrant, Det. Kuhn recovered $2,749.00 in cash from the Appellant's bedroom. The cash was located in a safe in the Appellant's bedroom closet. T. 708. A shotgun and ammunition was also recovered. T. 709. The ammunition was suitable for the shotgun only; it would not fit into a magnum handgun. T. 710.

*Det. Kuhn also testified that he located $17,000.00, but did not bring that evidence to court.* Det. Kuhn testified that the $17,000.00 was still "locked up," presumably in the Nassau County Police Department's

evidence locker.   T. 711.   There is no mention of said evidence in any discovery paperwork produced by the People and provided to the Appellant.

Nassau County Police Detective Michael Nigro testified that on December 10, 2004, he traveled with other officers to Jeannot's home in Suffolk County to execute a search warrant. T. 713-714.

Det. Nigro recovered five one hundred dollar bills from Jeannot's bedroom. T. 715. The recovered currency was duly admitted into evidence as People's exhibit 41. T. 716.

Nassau County Detective James DiBeneditto, assigned to the Firearms Identification Section, testified that after examining the .44 caliber revolver recovered by Police from the waters off Wantagh Parkway, and after examining the sweat shirt that Calabrese was found in on the night he died, Det. DiBeneditto calculated that Calabrese's killer was standing between six to forty-eight inches away. T. 717-719, 743.

New York State licensed forensic pathologist Michael DeMartino, Nassau County's Deputy Chief Medical Examiner, performed an autopsy on the decedent on December 4, 2004. T. 753-754. Calabrese had a gunshot wound on his right forearm. The bullet entered the back of the forearm and went through without hitting bone, producing a gaping wound on the central surface of the arm. T. 755.

Dr. DeMartino noticed that Calabrese suffered three gunshot wounds to the head.   One shot entered Calabrese's head and exited through his cheek. Det. DeMartino recovered the bullet when he examined the decedent at the crime scene.  The bullet was found in the decedent's sweat shirt.  T. 759-760.  A second gunshot wound (not labeled for chronology) to the head was recovered inside the decedent's cheek.  T. 760.  A third gunshot wound to the head was recovered from the decedent's brain.  T. 761.

Dr. DeMartino concluded that the shooter could not have been facing Calabrese from more than five feet away.  Dr. DeMartino opined that the shooter and Calabrese were not facing each other, since Calabrese did not have an entrance wound on the front of his head.  T. 768.  The decedent died from multiple gunshot wounds to the head.  T. 768.

After Dr. DeMartino concluded his testimony, the jury was escorted to an ante-chamber outside the courtroom.  The People made a last-minute application, requesting that a Police Detective be permitted to testify with the use of a mannequin, to demonstrate to the jury how, if the decedent's sweat shirt was pulled up over the decedent's head, one bullet's trajectory could cause several bullet holes in the sweat shirt.  T. 797-798.  The People alleged that the mannequin and corresponding chart had a limited purpose,

and any objection should be to the weight of the evidence and not its admissibility. T. 799.

Counsel for the Appellant argued that the People had ample time to prepare a mannequin prior to trial, but did not inform defense counsel or the Court of such evidence until the end of the trial. Counsel urged the Court to reject the People's "dummy," arguing that he did not have sufficient time to examine the mannequin, or have an expert examine the alleged demonstrative evidence. T. 799. The Court immediately granted the People's application, allowing the Appellant "an opportunity for an adjournment" if Counsel believed it necessary to bring in an expert and rebut the evidence. T. 799-800.

The Court held there was an issue before the jury with respect to the trajectory of the gun shots, and the demonstrative evidence would be helpful to the jury. T. 800.

Nassau County Detective Scott Kovar, assigned to the Forensic Evidence Bureau, testified that he worked in the criminalistics section of the laboratory. T. 802. Det. Kovar stated that he examined the sweat shirt Calabrese was wearing when he was shot. T. 805. Det. Kovar explained that he noticed holes in the sweat shirt, and was able to lift particles from the

holes in order to test the garment to determine whether it contained guns hot residue. T. 806.

Det. Kovar also placed pins in the locations where he saw partially burned and unburned particle grains around the holes and recorded them and took pictures of them. Det. Kovar then compared his findings with that of the medical examiner's report, to determine bullet trajectories. T. 806.

Det. Kovar determined that there were four holes in the back of the sweat shirt, and two holes in the arm of the right sleeve. T. 807. Det. Kovar surmised that that sweat shirt was pulled up when bullets passed through the garment, which created an additional hole in the clothing. T. 812.

In an effort to demonstrate to the jury how the bullet holes passed through Calabrese's sweat shirt, Det. Kovar purchased a same-size exemplar garment from a surf shop. Kovar then measured the placement of the bullet holes on Calabrese's sweat shirt, and placed holes in the exemplar sweat shirt in the same positions. T. 813.

In an effort to create a "three dimensional display" for the jury, Det. Kovar purchased a "natural-sized" mannequin that he claimed could articulate the human form. T. 814. Det. Kovar admitted, however, that the mannequin was two inches taller than Calabrese, and did not accurately

reflect Calabrese's weight. Nevertheless, Det. Kovar insisted such specifics were not necessary for the mannequin's use to be relevant. T. 817.

Det. Kovar held the mannequin and offered his opinion that Calabrese's sweat shirt was over his head when he was killed. T. 822. Det. Kovar surmised that some one "big and heavy" grabbed the sweat shirt from behind and yanked it over Calabrese's head. As Calabrese fell to the ground, the sweat shirt settled back, and then two final shots were fired into the victim's head. T. 826. However, Det. Kovar conceded that he was not present for the Calabrese killing; that he surmised someone "big and heavy" was involved because of tearing on the sweat shirt; that the sweat shirt could have been torn prior to the homicide, and perhaps from washing. Det. Kovar also admitted that he did not know when Calabrese purchased his sweat shirt, and that when he examined Calabrese's sweat shirt, it was full of holes and large tears. T. 827.

After Det. Kovar was excused, the prosecution and defense rested. T. 828.

During summation, the prosecutor reminded the jury that the storage facility security cameras showed the Appellant riding in his wife's Suzuki. The prosecutor mentioned that the Suzuki's license plate was "obstructed," though there was no testimony to support this claim. The prosecutor,

comparing the jury to Columbo, the television detective, invited the jury to speculate that the alleged obstruction was a piece of tape that the Appellant put on the license plate to prevent anyone from taking the plate number should they witness the murder. T. 879-880. The prosecutor mentioned that when the Suzuki was taken to Police Headquarters, there was no obstruction on the license plate. T. 880.

During deliberations, the jury requested the see several exhibits, including the mannequin created by Det. Kovar. The County Court informed the prosecutor and defense counsel that he would allow the jury to observe the mannequin during deliberations, but would admonish the jury that they could not adjust or touch the exhibit. Defense counsel objected, noting that since the mannequin was admitted into evidence as a demonstrative aide, the jury should be able to move it. T. 943-946.

Later during deliberations, the jury asked the trial court whether they could perform an "experiment" using a sweat shirt a juror brought to court. Defense counsel objected to the jury's request, but asked the Court to reconsider allowing the jury to move the mannequin. T. 953. Specifically, defense counsel reminded the Court that during Det. Kovar's testimony, the prosecutor pulled up the sweat shirt on the mannequin, and argued that Jeannot shot Calabrese after the Appellant pulled the victim's sweat shirt

61

over his head, exposing his neck.  Defense counsel argued that since the prosecution was able to manipulate the demonstrative evidence to support its theory of the crime, the jury should be able to test the prosecution's theory, using the same device.  Additionally, defense counsel noted that the jury must be lingering on the issue, since they sought instruction on the issue from the court more than once. T. 954.  The trial court denied defense counsel's application, holding that to do otherwise would be allowing the jury to create new demonstrative evidence. T. 955.

On July 14, 2005, the jury found the Appellant guilty of Murder in the Second Degree.  T. 962.  The jury was polled and was unanimous.  T. 962-964.

On August 18, 2005, the Appellant appeared before the County Court (Sullivan, J.) and was sentenced to twenty-five years to life.  S. 38-39.[3]

The Appellant now appeals his conviction.

---

[3] Numbers preceded by the letter 'S' refer to pages of the sentencing minutes.

62

# POINT ONE

## PURSUANT TO *PEOPLE V. ROGERS,* THE APPELLANT'S RIGHT TO COUNSEL WAS VIOLATED, AND THE HEARING COURT SHOULD HAVE SUPPRESSED THE APPELLANT'S ALLEGED STATEMENTS TO POLICE

The Right to Counsel Clause in the State Constitution is more restrictive than that guaranteed by the Sixth Amendment to the United States Constitution. New York Constitution, Article I, Section 6 provides, "In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him."

The indelible right to counsel arises from the provision of the State Constitution that guarantees due process of law, the right to effective assistance of counsel and the privilege against compulsory self-incrimination. See, N.Y. Const., art. I, §6; *People v. Bing,* 76 N.Y.2d 331 (1990). The Right to Counsel applies only to custodial interrogations. *People v. Bertolo,* 65 N.Y.2d 111 (1985).

There are two well-defined situations in which the right to counsel is said to attach indelibly under the State Constitution and a waiver, notwithstanding the client's right to waive generally, will not be recognized

unless made in the presence of counsel.  The first, similar to the Federal right, deals with waivers after formal proceedings have been commenced. *People v. Ramos,* 99 N.Y.2d 27 (2002); *People v. Bing,* 76 N.Y.2d 331 (1990).  The second, recognized only in New York, relates to uncharged individuals in custody who have retained or requested an attorney.  Police authorities may not question them in the absence of counsel.  *People v. Groce,* 100 N.Y.2d 318 (2003).

*People v. Rogers* (48 N.Y.2d 167 (1979)) established the important protection and principle that once a defendant in custody on a particular matter is *represented by or requests* counsel, custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is sought or obtained, must cease.  The defendant may not waive the right to counsel in the absence of an attorney with respect to the unrelated matter. *People v. Rogers, supra, People v. Burdo,* 91 N.Y.2d 146 (1997); *People v. Steward,* 88 N.Y.2d 496 (1996).

The Court's holding in *Rogers* was grounded in the New York State Constitution and predicated on several important policy considerations.  The Court stated,

> "Our acknowledgement of an accused's right to the presence of counsel, even when the interrogation concerns unrelated matters, represents no great quantitative change in the protection we have extended to the individual as a shield

against the awesome and sometimes coercive force of the State...[T]he attorney's presence serves to equalize the positions of the accused and sovereign, mitigating the coercive influence of the State and rendering it less overwhelming. That the rule diminishes the likelihood of a waiver or self incriminating statements is immaterial, to our system of justice." *People v. Rogers,* 48 N.Y.2d at 173.

Where the police know that a suspect is represented by counsel on pending charges, or where the police know that charges are pending but fail to make inquiry that would disclose that counsel has been assigned or retained, any custodial questioning of the suspect by them in counsel's absence is barred. *People v. Bertolo,* 65 N.Y.2d 111 (1985).

In this case, the Appellant was arrested on December 9, 2004 by Bureau of Special Operations Officers of the Nassau County Police Department, who were accompanied by Homicide Detectives McHugh and McGinn. The Appellant was arrested for two outstanding misdemeanor traffic warrants, issued by Nassau County District Court Judge Feichter, though clearly the Nassau County Police Department used the outstanding warrants as an excuse to bring the Appellant into custody for the death of Calabrese.

At the Appellant's pre-trial hearing, Officer Loschiavo and Det. McHugh testified that they arrested the Appellant for outstanding Nassau County District Court warrants. Det. McHugh specifically admitted that the

65

Nassau County Police Department *did not have arrest warrants for the co-defendants; he intended to have them "picked up" for outstanding warrants.* H. 118.  Officer Loschiavo testified that he was informed that the Appellant had two existing warrants for Aggravated Unlicensed Operation of a Motor Vehicle, and that he was wanted for his involvement in a homicide.  H. 30-31.

When the Appellant was taken into custody, Det. McHugh did not ask him if he wanted an attorney.  H. 125.  Det. McHugh did not "recall" the Appellant asking to speak to his attorney, Barry Philips, Esq., but did recall an attorney calling later that day.  H. 125.

The Nassau County Homicide Bureau blotter reflects that Barry Philips , Esq. called, representing the Appellant, at 3:15 p.m. the afternoon after the Appellant's arrest.  H. 126-127.

The County Court, Nassau County (Honoroff, J.) determined that Police Officer Loschiavo apprehended the Appellant based on *outstanding warrants.* H. 373.

The Appellant had previously retained counsel for the Vehicle and Traffic Law violation charges emanating from the Nassau County District Court.  Barry Philips, Esq. was retained by the Appellant and appeared on his behalf on these traffic-related matters many times.

66

New York law prohibits the questioning of a defendant on any matter, whether related or unrelated, when a defendant is in custody on the charge upon which the right to counsel has indelibly attached. *People v. Burdo,* 91 N.Y.2d 146 (1997); *People v. Rogers,* 48 N.Y.2d 167 (1979); *People v. Madison,* 22 A.D.3d 684 (2nd Dep't, 2005).

Despite the fact that the Appellant was represented by counsel for two counts of unlawful operation of a motor vehicle, the charges giving rise to the warrants upon which the Appellant was arrested, and despite the fact that the Nassau County Police Department knew, should have known, or should have inquired whether the Appellant was represented by counsel, the Appellant was questioned by detectives, on and off, for over fourteen hours, about the Calabrese investigation. The Appellant was never given an opportunity to contact his attorney, and the officers never contacted him on the Appellant's behalf.

The Appellant allegedly dictated inconsistent statements to Detectives McHugh and Cereghino, and the Appellant and the detectives endorsed each page and signed the statements when they were completed.

Clearly, the County Court (Honoroff, J.) erred in determining that the Appellant's statements were admissible at trial. The Nassau County Police arrested the Appellant for two outstanding misdemeanor Vehicle and Traffic

Law warrants, and an attorney, Mr. Phillips, had previously filed a notice of appearance on those matters, and had appeared in Nassau County District Court on the Appellant's behalf. *"Rogers* establishes and still stands for the important protection and principle that once a defendant in custody on a particular matter is *represented by or requests* counsel, custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is sought or obtained, must cease." *People v. Burdo,* 91 N.Y.2d 146 (1997) *quoting, People v. Steward,* 88 N.Y.2d 496 (1996).

Notwithstanding that the Appellant's statements about the Calabrese death might pertain to a matter unrelated to the formal representation on a pending charge upon which the Appellant was in custody, suppression is mandated under *Rogers,* which, in the absence of a counseled waiver, bars further custodial interrogation of a suspect "on any matter." *People v. Burdo,* 91 N.Y.2d 146 (1997); *People v. Bing,* 76 N.Y.2d 331 (1990).

A claimed deprivation of the State Constitutional right to counsel may be raised on appeal, notwithstanding that the issue was not preserved by having been specifically raised in a suppression motion or at trial, provided there is an adequate factual record sufficient to permit appellate review.

*People v. Kinchen,* 60 N.Y.2d 772 (1983).   Clearly, the record is clear enough for this Court to decide this issue on the merits.

The Appellant's conviction should be reversed and this matter remanded to the County Court with the direction that the Appellant's statements are suppressed.

## POINT TWO

## REVERSAL IS REQUIRED BASED ON *BRUTON V. UNITED STATES* AND *CRAWFORD V. WASHINGTON*

During the trial, the prosecutor improperly elicited testimony from Detective McGinn regarding an inculpatory statement allegedly made by co-defendant Herve Jeannot. Specifically, Det. McGinn testified that he entered the Appellant's interrogation room after learning from other Nassau County Police detectives that co-defendant Herve Jeannot gave a statement to Det. Partee. Jeannot allegedly confessed to killing Calabrese, but claimed that the Appellant paid him to commit the murder. T. 623-624.

Det. McGinn then explained that the Appellant agreed to change his initial statement, placing himself and Jeannot at the scene of the crime. The Appellant allegedly explained to Det. McGinn that Jeannot killed Calabrese, but that the Appellant did not know Jeannot was planning to commit murder. Most importantly, while placing himself and Jeannot at the crime scene, the Appellant *never* inculpated himself in the Calabrese killing.

After Det. McGinn described the sum and substance of Jeannot's confession, the County Court advised the jury that Jeannot's statement could not be considered as evidence against the Appellant. Rather than craft a remedy that would allow Det. McGinn to testify as to the Appellant's changed version of the facts of the Calabrese killing *without* the mention of

70

Jeannot's confession, the Court allowed Det. McGinn to testify that a non-testifying co-defendant inculpated the Appellant.

The trial court's meager instruction to the jury, ordering the fact-finders to disregard the important or prejudice of Jeannot's confession, was an attempt to "unring" a bell. What's worse, the County Court was consulted prior to Det. McGinn taking the stand, and the Court gave the prosecutor permission to inquire as to Jeannot's confession. Det. McGinn's prejudicial testimony was not an unplanned, spontaneous event.

Jeannot's confession was the most damning evidence against the Appellant, and wholly prejudiced the Appellant's right to a fair trial. Det. McGinn should have simply testified to the Appellant's new version of the events leading up to Calabrese's death, with no mention of Jeannot's confession that implicated the Appellant. The error was not harmless and the Defendant must be afforded a new trial.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The United States Supreme Court has held that this bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas,* 380 U.S. 400 (1965). An unavailable witness's out-of-court statement may be admitted so long as it has adequate

71

indicia of reliability--*i.e.,* falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66, 100 S.Ct. 2531. Where testimonial statements are at issue, the only indicia of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation. Therefore, an out-of-court statement of a witness that is testimonial in nature is barred under the Confrontation Clause unless the witness is unavailable *and* the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington,* 541 U.S. 36, 59 (2004).

The County Court determined that the prosecution was permitted to illicit Jeannot's confession from Det. McGinn to explain the effect on the detective, and not for the truth of the matter. The County Court cited *Tennessee v. Street* (471 U.S. 409 (1985)) in support of his position. T. 591.

The trial court erred in relying on *Tennessee v. Street.* In *Tennessee,* the United States Supreme Court determined that a defendant's right under the Confrontation Clause of the Sixth Amendment were not violated by the introduction of an accomplice's confession for *rebuttal* purposes. In *Tennessee,* the prosecution was permitted to question a sheriff about the accomplice's confession, *after* the defendant testified that he was coerced into confessing after he was read the accomplice's confession by the sheriff.

72

The United States Supreme Court essentially stated that the defense opened the door to the sheriff testifying about the accomplice's confession.

Here, unlike *Tennessee* and its New York State progeny, the Appellant *never* testified (nor did defense counsel intimate) that his subsequent statement was coerced by Det. McGinn. Furthermore, unlike *Tennessee* and its New York State progeny, the Appellant's subsequent statement was not inculpatory; it was *not* a confession.

Jeannot's out-of-court statement, as recounted by Det. McGinn (who was not even present for Jeannot's "confession") was testimonial in nature, constitutes a *Crawford* violation, requires reversal, and the Appellant is entitled to a new trial.

Det. McGinn's testimony recounting the alleged confession of Jeannot also runs afoul of the United States Supreme Court's holding in *Bruton v. United States* ( 391 U.S. 123 (1968)). In *Bruton,* the Supreme Court held that the statement of a non-testifying co-defendant could not be admitted into evidence against a defendant. Additionally, the Supreme Court noted that a trial court's limiting instruction may not erase the prejudice of the co-defendant's statement. *Id.,* 391 U.S. at 132.

As the fundamental right embodied in the Confrontation Clause is the right to cross-examine one's adverse witness, it is nothing short of a denial of

73

due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when the jury is determining the latter defendant's guilt or innocence. *See, Cruz v New York,* 481 US 186 (1987); *Bruton v United States,* 391 US 123 (1968).   The fact that the Appellant's second written statement, arguably made in response to Det. McGinn telling the Appellant about Jeannot's confession, was later entered into evidence does not validate the erroneous introduction of Jeannot's confession. *People v. Ahmad,* 225 A.D.2d 629 (2nd Dep't, 1996).

An alleged violation of the Confrontation Clause, such as a *Crawford* or *Bruton* violation, is subject to a harmless error analysis. *People v. Hardy,* 4 N.Y.3d 192 (2005).   Constitutional error requires reversal unless the error's impact was "harmless beyond a reasonable doubt." *Id.,* 4. N.Y.3d at 198; *Schneble v Florida,* 405 US 427, 430 (1972).   The court's review of a constitutional error is based on the entire record, and involves a determination of the "probable impact of the codefendant's admission on the minds of an average jury." *People v Hamlin,* 71 NY2d 750 (1988), citing *Harrington v California,* 395 US 250 (1969).   Ultimately "however overwhelming may be the quantum and nature of other proof, the error is not harmless...if there is a reasonable possibility that the [error] might have

contributed to the conviction." *People v Crimmins,* 36 NY2d 230, 240-241 (1975).

"When considering harmless error in a *Bruton* case, the court must determine on the basis of its own reading of the record the probable impact of the codefendant's admissions on the 'minds of an average jury' and whether they were sufficiently prejudicial to defendant to require reversal of the conviction and a new trial. *Harrington v. California,* 395 U.S. 250 (1969); *People v. Hamlin,* 71 N.Y.2d 750 (1988); *People v. Khan,* 200 A.D.2d 129 (2nd Dep't, 2004). Relevant considerations in this review include the comprehensiveness of Appellant's statement and the extent to which it explains the Appellant's participation in the crime without reference to the codefendant's statement; whether the statement is corroborated or contradicted by objective evidence; and, whether the Defendant has repeated or repudiated the substance of the statement on subsequent occasions. *People v. Eastman* 85 N.Y.2d 265 (1995); *Schneble v Florida,* 405 US 427 (1972); *Cruz v New York,* 481 US at 191-192, *People v Hamlin,* 71 NY2d, at 758.

Particularly significant in review of the nature of the error in this case is the impact of Jeannot's inculpatory statement on the Appellant's repudiation of his previous statement. Although the Appellant does not

75

implicate himself in the killing of Calabrese, the Appellant does place himself at the crime scene as Jeannot shot his victim. Other than Jeannot's confession implicating the Appellant, the People offered no other proof that the Appellant was actively involved in the death of Calabrese. Rather, the People hypothesize that the Appellant pulled Calabrese's sweat shirt over his head to prevent Calabrese from seeing Jeannot approaching with a gun. However, relevant police witnesses testified to the poor condition of Calabrese's sweat shirt, and that it was impossible to determine if pulls in the sweat shirt were a result of the Appellant pulling on it.

Furthermore, Jeannot's confession is not corroborated by any physical evidence. The People failed to admit any physical evidence that demonstrated that the Appellant played a part in the Calabrese killing. The Appellant's clothing was not found to have any trace of Calabrese's blood or bodily fluids, despite the People's argument that the Appellant "hugged" Calabrese immediately before Jeannot shot him; the Appellant's wife's Suzuki was not found to have any trace of the Appellant's DNA; the People failed to produce a single eye-witness to the shooting; the prosecution could not produce any evidence that the Appellant paid Jeannot any money, let alone $4,000.00, to kill Calabrese.

The Appellant has maintained his innocence from the moment he was arrested and interrogated by a barrage of Nassau County Police Officers. Despite learning of Jeannot's confession (itself produced after a merciless interrogation by Nassau County Homicide detectives, and after Jeannot initially denied Appellant's involvement in the killing) the Appellant has *never* admitted to any knowledge that Jeannot intended to kill Calabrese, nor any participation in the killing.

The County Court's limiting instruction did not cure the taint of Jeannot's confession. The Appellant was granted a severance to *protect him* from the introduction of Jeannot's confession. The trial court's instruction to the jury negated the purpose of the severance, and unduly prejudiced the Appellant.

The Appellant's conviction should be reversed, a new trial ordered, and the County Court ordered to limit the testimony of Det. McGinn, preventing the mention of the Jeannot confession.

# POINT THREE

## THE COURT ERRED BY PERMITTING THE PEOPLE FROM ENTERING THE STORAGE FACILITY VIDEOTAPE INTO EVIDENCE

The images captured on the DVR by the storage facility security cameras were concocted into a videotape that was manipulated by Detective Ken Strigaro and subsequently played for the jury. The Detective admitted that rather than simply downloading all of the images between eight and nine p.m. on the night that Mr. Calabrese died, he downloaded images from two exterior cameras, and then recorded them onto a videotape. Additionally, Detective Strigaro could have simply recorded all of the images from those two videotapes in sequential order. Instead, Det. Strigaro recorded as he paused images, backed them up, and forwarded them.

A.    The tape violates the Best Evidence Rule

The People's use of a manipulated videotape, that had to be *created* by the Nassau County Police Department for use at the trial, was improper and violates the Best Evidence Rule. Quite simply, the police created a videotape with distorted images. The storage facility did not utilize an "output" device such as a VCR or a DVD recorder. Therefore, Det. Strigaro had to create a videotape by picking and choosing the images he wanted the jury to view. The jury saw a videotape of images that Det. Strigaro admitted

78

he adjusted to suit the investigation; rather then a videotape of all of the captured images by the two exterior cameras.

The best evidence rule requires production of an original writing where its contents are in dispute and sought to be proven. *Schozer v. Wm. Penn Life Ins.,* 84 N.Y.2d 639, 643 (1994). At its genesis, the rule was primarily designed to guard against mistakes in copying or transcribing the original (Fisch, New York Evidence § 81). In New York, the definition of a "writing" parallels the formulation supplied by the Federal Rules of Evidence and now includes photographs and X-rays (*Schozer,* at 645; *see* Fed. Rules Evid. 1001[2]) as well motion pictures and videotapes (*Id.*).

Under a long recognized exception to the best evidence rule, secondary evidence of the contents of an unproduced original may be admitted upon threshold factual findings that the proponent of the substitute has sufficiently explained the unavailability of the primary evidence and that the derivative proof "is a reliable and accurate portrayal of the original." *Schozer,* at 644-645. In *Schozer,* in an action on an insurance policy, the defendant lost the X-ray of the plaintiff's chest after the defendant's radiologist had reviewed and analyzed it. Based thereon, the trial court precluded the defendant from introducing the radiologist's report and testimony concerning what the X-ray had showed. After the Appellate

Division affirmed, the Court of Appeals reversed and granted a new trial. In *Schozer* the Court of Appeals held that the trial court should not have precluded the radiologist's report and testimony without having given the defendant the opportunity of establishing that such testimony correctly reflected all of the contents of the original substantially and with reasonable accuracy. *Id.*

Here, there was no "original" videotape, DVD, or CD created by the security system. Instead, this Court must examine the novel issue of whether the Nassau County Police Department's doctored videotape constitutes an "original." Clearly, based on the principles of Best Evidence and the *Schozer* case, this Court cannot deem the manipulated, created tape of the Nassau County Police Department an "original" image that conforms to the Best Evidence Rule. Det. Strigaro admitted that he could have created a videotape with the uninterrupted images captured by the security cameras. Instead, he *choose* to create a videotape that altered the images as they were captured by the cameras. The Detective could have easily created a videotape with the uninterrupted images and created a second videotape for investigative purposes only that depicted the images being distorted by the Police. Detective Strigaro did not do so, and the manipulated videotape was improperly played for the jury.

In effect, the Court asked the jury to take Det. Strigaro's word that he did not alter the images any further and that he did not leave any images out. Most importantly, the jury watched as the investigating detectives backed up images, paused the video over certain images, and forwarded the images.

This Court cannot find that the Best Evidence Rule violation was one of the "sheerest technicality" that did not prejudice the Appellant and did not affect the fairness of his trial. Compare, *People v. Fondal,* 154 A.D.2d 476 (2nd Dep't, 1989).

This Honorable Court should reverse the Appellant's conviction and award a new trial with a directive that the People's videotape violates the Best Evidence Rule and cannot be shown to a jury, nor introduced into evidence.

B.    The People failed to properly authenticate the tape

The admissibility of audio, video, or photographic evidence is a power vested initially to the trial courts. *People v. Patterson,* 93 NY 2d 80 (1999). "Similar to a photograph, a videotape may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted. Testimony, expert or otherwise, may also establish that a videotape truly and accurately represents what was before the camera.

Evidence establishing the chain of custody of the videotape may additionally buttress its authenticity and integrity, and even allow for acceptable inferences of reasonable accuracy and freedom from tampering." *People v. Patterson,* 93 N.Y. at 84.

In *United States v. Yevakpor,* 419 F.Supp.2d 242 (N.D.N.Y., 2006), the District Court addressed the admissibility of three one-minute video clipped segments that had been redacted by the United States Customs and Border Patrol. *Yevakpor* involved utilization of images from the same Digital Video Recording System used in this case. In excluding the video clips, the District Court relied upon Federal Rules of Evidence 106, holding, "[w]hen a writing or a recorded statement or a part thereof is introduced by a party, and adverse party may required the introduction at the time of any part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. It should be noted that even where courts have instructed the Prosecution to edit tapes for one reason or another, the instruction has included that caveat that an inedited version be retained. Preserving the entire video recording would have been a relatively easy and inexpensive task considering that the video van be saved to a compact disc."

In this case, when the trial court allowed the People to enter the videotape into evidence, the court gave the People the advantage of self-

selecting the material that was more prejudicial than probative. Additionally, the People over-edited the material and the images the jury was able to see were taken out of context. The excerpts played during the trial and during deliberations compromised the Appellant's right to a fair and impartial trial.

For the aforementioned reasons, this Court should reverse the Appellant's conviction and remand this matter to the County Court with appropriate instructions regarding the admission of the videotape.

## POINT FOUR
## THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO USE A MANNEQUIN AS DEMONSTRATIVE EVIDENCE

Near the close of the People's case, the prosecutor announced to the County Court and to defense counsel that he had arranged for Police Officer Scott Kovar to craft a mannequin or "dummy" that was similar in size to the victim.    The County Court improperly permitted the mannequin into evidence, holding that there was an issue before the jury "with respect to the shots and the trajectory thereof." T. 798-800.

"Demonstrations and tests, when relevant to a contested issue, can play a positive and helpful role in the ascertainment of the truth." *People v. Acevedo,* 40 N.Y.2d 701 (1976).   "However, though tests and demonstrations in the courtroom are not lightly to be rejected when they would play a positive role is the ascertainment of truth, courts must be alert to the danger that, when ill-designed or not properly relevant to the point at issue, instead of being helpful they may serve but to mislead, confuse, divert or otherwise prejudice the purposes of the trial.   Therefore, the trial court must decide in the exercise of a sound discretion based on the nature of the proffered proof and the context in which it is offered, whether the value of the evidence outweighs its potential for prejudice." *People v. Acevedo, supra.*

Here, the trial court erred by allowing the prosecution to utilize a mannequin to "demonstrate" where bullets passed through Calabrese's sweat shirt. First, the prosecution was preparing the mannequin from the beginning of the trial, but failed to mention it until the last prosecution witness was about to take the stand. Although the County Court informed the Appellant that he would be granted an adjournment to contact an expert, if he so choose, it was unfair surprise at the close of the People's case.

Additionally, Det. Kovar conceded that the mannequin was not the same height and weight as the victim, but the jury was still able to watch the People's witness manipulate the mannequin as if it was the victim. Furthermore, the prosecution actually manipulated the mannequin, while hypothesizing that the Appellant pulled the victim's sweat shirt over his head, exposing his neck to gunfire.

The demonstrative value of the evidence was outweighed by the prejudice of its use. This is especially true in light of the trial court's refusal to allow the jury to manipulate the mannequin. The prosecution asked the jury to question *how* the victim was shot, leaving a certain number of bullet holes in his sweat shirt. To support the prosecution's theory, the Assistant District Attorney manipulated the sweat shirt on the dummy. However,

when the jury was instructed to deliberate, and judge the People's evidence, the jurors were not permitted to examine the demonstrative evidence.

The use admission of the mannequin as a demonstrative tool, and the Court's failure to allow the jury to manipulate the mannequin, was prejudicial. As a result, the Appellant is deserving of a new trial.

## POINT FIVE

## THE PROSECUTOR'S SUMMATION WAS IMPROPER AND PREJUDICIAL

When the Assistant District Attorney invited the jury to act like "Columbo" and investigate the storage facility video to determine whether the Appellant's automobile's license plate was "obstructed," arguing that the Appellant placed a piece of tape over the license plate, the prosecutor stepped outside the bounds of what is considered a proper summation. There was no evidence produced at trial that a piece of tape was placed on the Suzuki's license plate; there was no forensic testing done on the license plate to test for adhesive or finger prints.  The prosecutor statement was prejudicial and improper.

It is the right of counsel during summation to comment upon every pertinent matter of fact bearing upon the questions the jury has to decide.  In criminal trials, it is a right guaranteed to the defendant and prosecutor alike. Although counsel is to be afforded the widest latitude by way of comment, denunciation or appeal in advocating his cause, summation is not an unbridled in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. *People v. Ashwal,* 39 N.Y.2d 105 (1976).

It is fundamental that the jury must decide the issued on the evidence, and therefore fundamental that counsel, in summing up, must stay within the 'four corners of the evidence' and avoid irrelevant comments that have no bearing on any legitimate issue in the case. Thus, the District Attorney may not refer to matters not in evidence, or call upon the jury to draw conclusions that are not fairly inferable from the evidence. Above all, he should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions that have a decided tendency to prejudice the jury against the defendant. *People v. Ashwal,* 39 N.Y.2d at 109-110.

Here, the prosecutor invited the jury to speculate, with no basis in the record, that the Appellant had placed a piece of tape over his automobile's license plate, so that in the event he was recorded, his car could not be identified.   Obviously, the prosecutor needed to make such a statement, despite the lack of any evidence to support it, because the prosecutor needed to show the Appellant as a willing participant in the Calabrese killing.

The prosecutor's statements were prejudicial and outside the bounds of a proper summation.   The prosecutor's statements likely focused the jury's intention on supposition rather than the evidence, and was improper. As a result, the Appellant is entitled to a new trial.

## POINT SIX

**THE PROSECUTION'S FAILURE TO NOTIFY THE APPELLANT THAT NASSAU COUNTY POLICE RECOVERED $17,000.00 DURING THE COURSE OF THE INVESTIGATION CONSTITUTES A DISCOVERY VIOLATION**

The People's theory of the case was simple. Mark Orlando could not afford to pay Bobby Calabrese's bookmaker, so Mark Orlando paid Herve Jeannot to kill Calabrese. The theory is fundamentally flawed, because killing a runner for a bookmaker is akin to killing the postman because he delivers a utility bill a homeowner cannot afford...neither extinguish the actual debt. However, it is the theory that the People crafted a case around.

It was therefore wholly improper for the Nassau County District Attorney's Office to fail to inform the Appellant that Detective Michael Kuhn recovered $17,000.00 during the course of the investigation. A formal discovery demand was forwarded to the Nassau County District Attorney's Office, requesting notification of the property taken from the Appellant during the Calabrese investigation. Criminal Procedure Law Section 240.20 requires that the People provide the Appellant such information.

Despite the People's obligation to provide such information to the Appellant, Det. Kuhn's testimony is the first time the Appellant was made aware that $17,000.00 was recovered during the case investigation. T. 711.

89

Since the People argued that the Appellant did not have enough money to pay his debt to Calabrese, the Appellant was entitled to rebut this testimony with the fact that he was in possession of adequate funds to extinguish his debt.

The People's failure to abide by Criminal Procedure Law Section 240.20 was extremely prejudicial, because it denied the Appellant the ability to rebut the People's theory of the case...a theory that the jury apparently accepted as plausible. In conjunction with all other errors at the Appellant's trial, this discovery violation was highly prejudicial. As a result, the Appellant is entitled to a new trial.

## POINT SEVEN
## THE TRIAL COURT IMPROPERLY CHARGED THE JURY

At the close of testimony, the trial court charged the jury on the law and incorrectly instructed the jury.

A.    Circumstantial evidence

While explaining the requisite two-step process that the jury must follow in considering the circumstantial evidence that had been presented during the trial, the trial court first instructed that the "facts from which the inference is to be drawn must be proven by direct evidence...the inference to be drawn from the facts you find to have been proven by the direct evidence may not be based on conjecture or speculation, but must flow naturally and logically from those proven facts." T. 920.

The error occurred when the Court omitted the second portion of the Pattern Criminal Jury Instruction for the State of New York. The County Court only gave the jury preliminary instructions regarding circumstantial evidence, which merely provided the jury with a cursory understanding of the differences between direct evidence and circumstantial evidence. T. 918-921.

The New York State Pattern Jury Instruction provides that a cursory explanation of the difference between direct and circumstantial evidence is required, and, when the People's case is made entirely of circumstantial

evidence, another, more detailed instruction is required by the trial court. Here, the County Court failed to properly instruct the jury regarding the People's circumstantial case.

Evidence is direct and positive when the very facts in dispute are communicated by those who have actual knowledge of them by means of their senses. Circumstantial evidence is the proof of collateral facts, and differs from direct and positive proofs in that it never proves directly the fact in questions. An extrajudicial admission by a defendant, not amounting to a confession because not directly acknowledging guilt, but including inculpatory acts from which a jury may or may not infer guilt, is circumstantial, not direct evidence. *People v. Bretagna,* 298 N.Y. 323 (1949).

The Court should have charged the jury as follows:

> Because circumstantial evidence requires the drawing of inferences, I will explain the process involved in analyzing that evidence and what you must do before you may return a verdict of guilty based solely on circumstantial evidence.
>
> Initially, you must decide, on the basis of all of the evidence, what facts, if any, have been proven. Any facts upon which an inference of guilt can be drawn must be proven beyond a reasonable doubt.
>
> After you have determined what facts, if any, have been proven beyond a reasonable doubt, then you must decide what inferences, if any, can be drawn from those facts.
>
> Before you may draw an inference of guilt, however, that inference must be the only one that can fairly and reasonably be drawn from the facts, it must be consistent with the proven

92

facts, and it must flow naturally, reasonably, and logically from them.

Again, it must appeal that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence.

If there is a reasonable hypothesis from the proven facts consistent with the defendant's innocence, then you must find the defendant not guilty.

If the reasonable inference you find is that the defendant is guilty of a charged crime, and that inference is established beyond a reasonable doubt, then you must find the defendant guilty of that crime. New York State Pattern Jury Instructions: Circumstantial Evidence-Entire Case.

The necessity for such concise instruction is mandated based on the facts of this case, since the People's entire direct presentation was circumstantial. The Appellant's statements were not confessions; therefore, they are not direct evidence. Furthermore, the alleged statement made by co-defendant Herve Jeannot, introduced by Detective McGinn, was not, according to the trial court, "evidence against the defendant." T. 624.

The Appellant's statements contained facts that tended to negate the prosecution's theory that he intended to cause the death of the decedent; that he solicited, requested, commanded, co-defendant Herve Jeannot in killing the decedent; or that the Appellant intended co-defendant Jeannot to case the decedent's death. The Appellant's statements were equally consistent with innocence as with guilt, and the Appellant was entitled to the proper instruction as a matter of law.

93

The omissions made by the trial court in the jury charge diminished the People's burden of proof of beyond a reasonable doubt and resulted in prejudice to the Appellant. The circumstantial evidence charge is a "material legal principle" required by CPL 300.10 (2) when the People's evidence is entirely circumstantial. The proof presented with respect to all of the elements related to the homicide was based on circumstantial evidence. Accordingly, the trial court erred in failing to give the jury a complete circumstantial evidence charge. *People v. Rivera,* 304 A.D.2d 841 (2nd Dept, 2003). Coupled with all of the egregious errors committed during the Appellant's suppression hearing and trial, the County Court's charge cannot be deemed harmless error. *People v. Brian,* 84 N.Y.2d 887 (1994).

B.     Motive

The Appellant was prejudiced by the County Court's misleading charge to the members of the jury when the Court gave an inappropriate instruction on motive.

The Court instructed that, "motive is that which *proves* a person engaged in conduct to do an act". T. 932.

Although the Court went onto explain, "the existence of motive or lack of motive is a consideration for the jury," the harm was created when

the Court gave two examples of the "circumstances" where the jury could consider motive or discount it.  T.932-933.

Motive is not a necessary element that the People were required to prove in order to obtain a conviction, and the County Court's use of the word "circumstance" only sought to confuse the jury, who had just been instructed about circumstantial evidence.

The New York Pattern Jury Instructions provide a definition of motive as: motive is that which *"moves"* a person to engage in conduct or to do an act."  Here the Court's use of the word *"proves"* misled the jury into believing that the People proved that the Appellant had a motive to kill the decedent, and alone satisfied the requisite intent necessary to be found guilty of Murder in the Second Degree.

C.    Demonstrative Evidence and Use of Models

The County Court committed reversible error when it failed to charge the members of the jury with the appropriate instructions on Demonstrative Evidence and the Use of Models, in accordance with the New York State Pattern Jury Instructions.

The need for the instruction was required when the People called Detective Scott Kovar, a member of the Forensics Evidence Bureau of the Nassau County Police Department, to testify to the results of his

95

examinations of the forensic evidence that had been submitted in this case. T. 801.

Specifically, Scott Kovar recounted for the jurors the results of an examination he had performed on a Lee Sweatshirt that the deceased had been wearing on the evening he was killed. T. 805.

Det. Kovar testified that he examined the garment to identify bullet holes. Det. Kovar also examined the sweatshirt for burned or unburned gunshot particle residue, to distinguish initial points of entry which were then compared to the Medical Examiners Report, which had documented the decedent's wound tracks, in an effort to determine wound track trajectories. T. 806.

Detective Kovar explained the complexities in determining initial points of entry made by bullets in detailing for the jurors what is known as "bullet wipe," the residues of oils or lubricants or gunshot residues that are left around the ring or entrance hole of a given surface area. T. 809.

Detective Kovar then proceeded to describe the results of his examination that was evidenced by documenting the rest of the holes in the sweatshirt and reported to the jurors his findings in identifying three initial points of entry, distinguishable from what he described as other secondary

holes caused by folding or overlapping of the garment during the course of the murder. T. 810-812.

Detective Kovar testified to having purchased an exemplar sweatshirt in similar size and style to the one the victim was wearing on the night he was killed, and by using the original holes, duplicating them onto the exemplar sweatshirt. The exemplar sweatshirt was moved into evidence as People's Exhibit 35. T. 813.

The sweatshirt accompanied a mannequin (People's Exhibit 70), which the People claimed depicted the entrance wounds in the Medical Examiner's Autopsy Report. T. 813-814.

During the course of Detective Kovar's direct testimony, he claimed that Calabrese had been initially grabbed by the Appellant while still standing, and held until Jeannot could approach and shoot Calabrese. T. 813-814, 819-828.

The People offered this testimony to disprove the Appellant's account of Calabrese's death, as related to the jurors through the introduction of the Appellant's statements to the homicide detectives.

The People asked Det. Kovar to demonstrate to the jury how Calabrese's sweatshirt was pulled over Calabrese's head during the alleged struggle between the decedent and the Appellant. Afterwards, defense

counsel stridently cross-examined Detective Kovar as to the feasibility of his proffered theory. T. 822-825.

The People argued vehemently during closing statement that the Appellant had participated in the preparation and planning of the homicide based upon the testimony of Detective Kovar and the demonstrative exhibits he prepared.    The exhibits were permitted in the jury room during deliberations.

The County Court gave the jury a preliminary instruction as to expert testimony.  T. 922-923.  During deliberations, the jurors requested the first of several read-backs concerning Detective Kovar's testimony and the disputed theory of the sweatshirt.  The Court noted that the jury was not to tamper with or remove the sweatshirt from the mannequin.  T. 943.

Trial Counsel objected to the Court's intended instruction, arguing that since the Court allowed the dummy into the jury room over his objection, then the jury should be permitted to maneuver the mannequin. The Court then stated that if the jury moved the exhibit, it would become the "jury's" exhibit. T. 944.

The Court then instructed the jury, in response to their request to view the sweatshirt and mannequin, that: "this is demonstrative evidence that the

Court admitted, I put that in there with you. You are not to manipulate it in any way. You apply the testimony to that exhibit". T. 947.

The next day, the jurors requested that they be allowed to utilize their own sweatshirt that had been furnished by a member of the jury to reproduce the enactment that had been presented by the People in having Detective Kovar demonstrate his theory on the murder. The jurors also requested a re-read back of Detective Kovar's testimony. T. 957. The Court denied the jury's request to use a sweatshirt from one of the members. T. 957. Shortly thereafter, the Appellant was found guilty.

The instructions by the Court on the use of demonstrative evidence and models was so deficient and inadequate as a matter of law that the jurors were left completely adrift in terms of the legal reasoning with respect to applying this exhibit to the testimony that had been elicited.

Moreover, the Court truncated their fact-finding process when it restricted the members of the jury from applying the testimony to the evidence by admonishing them from reenacting the demonstration that had been presented by Detective Kovar during his testimony. T. 947.

Clearly, the trial court's jury instructions were so deficient, the Appellant was deprived of a fair trial.

## POINT EIGHT

## THE APPELLANT WAS NOT AFFORDED MEANINGFUL REPRESENTATION BY TRIAL COUNSEL

In evaluating assistance of counsel claims, the New York State Court of Appeals has consistently applied a "flexible" approach. *People v. Benevento,* 91 N.Y.2d 708 (1998). "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of representation, reveal that the attorney provided meaningful representation," a defendant's constitutional right to the effective assistance of counsel will have been met. *People v. Henry,* 95 N.Y.2d 563 (2000); *quoting People v. Baldi,* 54 N.Y.2d 137 (1981). Thus, the standard in New York has long been whether the defendant was afforded "meaningful representation." *People v. Henry,* 95 N.Y.2d at 565; quoting *People v. Benevento,* 91 N.Y.2d at 712.

The New York State standard of meaningful representation includes a prejudice component that focuses on the "fairness of the process as a whole rather than [any] particular impact on the outcome of the case." *People v. Benevento,* 91 N.Y.2d at 714. There is no precise definition for what constitutes ineffective assistance of legal representation, nor is there a particular standard in every case. Rather, all of the evidence must be weighed in context and as of the time of representation to assess the alleged

deficient representation. Where a single, substantial error by counsel so seriously compromises a defendant's right to a fair trial, it will qualify as ineffective representation. *People v. Hobot,* 84 N.Y.2d 1021 (1995).

Here, it is clear that trial counsel made *several* errors, and those errors substantially prejudiced the Appellant.

A.    Trial counsel failed to object to the admission of the police-created surveillance tape.

Relevant videotapes and technologically generated documentation are ordinarily admissible under standard evidentiary rubrics. Some reliable authentication and foundation are still required. The decision to admit or exclude videotape evidence generally rests within a trial court's founded discretion. *People v. Patterson,* 93 N.Y.2d 80 (1999).

Similar to a photograph, a videotape may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted. Testimony, expert or otherwise, may also establish that a videotape truly and accurately represents what was before the camera. Evidence establishing the chain of custody of the videotape may additionally buttress its authenticity and integrity, and even allow for acceptable inferences of reasonable accuracy and freedom from tampering. *People v. Patterson,* 93 N.Y. at 668; *People v. Ely,* 68 N.Y.2d 520 (1986).

Here, Detective Strigaro did not observe the recorded events; therefore, based on the "silent witness" theory of authentication, the Prosecution was required to elicit testimony establishing the integrity, authenticity, and competency of the evidence and the security system that produced the evidence.

Here, the Prosecution failed to call "an operator or installer or maintainer of the equipment" to testify as to the videotape's accuracy *and* as to the functionality of the system. While Det. Strigaro testified as to the type of security system he *presumed* the storage facility used, Det. Strigaro was not competent to offer such testimony.

Trial counsel never objected to the introduction of the videotape, and while this Honorable Court may determine that issue unpreserved for appellate review, this issue of trial counsel's competence is *not* waived.

Clearly, the videotape of the Appellant's wife's automobile is damning evidence. First, it placed the Appellant in or around the crime scene. The jury watched the looped videotape of the Appellant's wife's car circling the storage facility and crime scene.

If trial counsel had objected to the admission of the videotape based on the Prosecution's failure to lay a proper authentication foundation, the

trial court would have committed error by admitting the evidence over counsel's objection.

A reasonable attorney confronted with a question of the propriety of a police witness attesting to the authenticity, accuracy and integrity of a evidentiary item, while a complete, original copy of the disputed evidence was never submitted to the Court or to Counsel for inspection, would have challenged the admission of the evidence.

B.     Counsel failed to pursue the *Rogers* issue at the suppression hearing.

At the suppression hearing, defense counsel knew that the Appellant was arrested for outstanding misdemeanor traffic warrants, and that Barry Philips, Esq. represented the Appellant on those District Court cases. Counsel did not pursue the *Rogers* issue (addressed in Point One of this brief), even though the County Court would have been *required* to suppress the Appellant's statements to police.

Clearly, defense counsel's failure to fully pursue the *Rogers* issue with the hearing court constitutes ineffective assistance of counsel under the Federal standard *and* a violation of the New York State meaningful representation standard.    Counsel's failure to fully address this issue demonstrates a performance below that of a reasonable attorney, and such

performance prejudiced the Appellant, since the jury heard two inconsistent statements from the Appellant.

## POINT NINE
## THE COURT SHOULD REACH THE ISSUES ON THE MERITS

If this Honorable Court finds that the arguments set forth by the Appellant are unpreserved for appellate review, the Appellant requests that the Court decide the issues on the merits in the interest of justice. In light of all of the trial errors illuminated for this Court's review, it would be a miscarriage of justice should this Court find that it will not examine the Appellant's case in its totality.

Furthermore, this Honorable Court should review this matter based on New York State and Federal Constitutional grounds. *Rudenko v. Costello,* 322 F.3d 168 (2nd Cir., 2003); *Jimenez v. Walker,* 458 F.3d 130 (2nd Cir., 2006).

## CONCLUSION

The Appellant respectfully requests that the Appellant's conviction be

reversed.

Dated:     Central Islip, New York
             March 31, 2008

Respectfully submitted,

Kerry Bassett

## CERTIFICATE OF COMPLIANCE
### Pursuant to Rule § 670.10.3 (f) of the
### Appellate Division, Second Department

It is hereby certified that the information below sets forth the specifications by which this computer-generated brief complies with Rule § 670.10.3 (f) of this Court.

The 'Microsoft Word' program indicates that this brief contains 20,174 words, not including the table of contents or certificate of compliance.

The typeface (font) is Times New Roman.

The point size is 14pt, including foot notes.

The line spacing is 2.0, including footnotes.

Dated:     Central Islip, New York
           March 31, 2008


                                        Kerry Bassett
                                        Kerry Bassett