*To Be Argued by*
Sarah Spatt
*(15 minutes)*

# NEW YORK SUPREME COURT

### Appellate Division - Second Department

### THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

A.D. No. 2005-8854
Ind. No.  167N-05

*- against -*

### MARK ORLANDO,

*Defendant-Appellant.*

# RESPONDENT'S BRIEF

**KATHLEEN M. RICE**
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Robert A. Schwartz
Sarah Spatt
Assistant District Attorneys
 *Of Counsel*

TABLE OF CONTENTS

                                                                    Page

Preliminary Statement . . . . . . . . . . . . . . . . .      i

Statement of Facts
        Introduction . . . . . . . . . . . . . . . . . . .   1
        The Pre-Trial Suppression Hearing  . . . . . . . .   3
                The People's Case  . . . . . . . . . . . . .   4
                Defendant's Case   . . . . . . . . . . . . .  13
        The Hearing Court's Decision . . . . . . . . . . .  14
        The Trial  . . . . . . . . . . . . . . . . . . . .  14
                The People's Case  . . . . . . . . . . . . .  14
                Defendant's Case   . . . . . . . . . . . . .  33
        The Verdict and Sentence . . . . . . . . . . . . .  33

Point I
        Defendant's Statements to the Police Were Not
        Obtained in Violation of His Right to Counsel  . .  34

Point II
        Defendant's Claim That Testimony by Detective
        McGinn Denied Him His Right to Confront His
        Accuser Is Meritless; Error, If Any, Was
        Harmless . . . . . . . . . . . . . . . . . . . . .  42

Point III
        Despite Defendant's Unpreserved Claim to the
        Contrary, the Trial Court Properly Admitted
        the Storage Facility Videotape into Evidence;
        Error, If Any, Was Harmless  . . . . . . . . . . .  53

Point IV
        The Trial Court Providently Exercised its
        Discretion in Permitting the People to Use
        a Demonstrative Exhibit to Display the Bullet
        Trajectories, and Later Refusing to Permit
        the Jury to Tamper with the Exhibit During
        Deliberations; Error, If Any, Was Harmless . . . .  60

Point V
        Defendant's Claim Regarding $17,000 That Was
        Allegedly Recovered During the Investigation
        Is Not Reviewable on Appeal; Error, If Any,
        Was Harmless . . . . . . . . . . . . . . . . . . .  65

Point VI
      Defendant's Unpreserved Claim Regarding
      the Prosecutor's Summation Is Meritless;
      Error, If Any, Was Harmless . . . . . . . . . . .          68

Point VII
      Defendant's Challenges to the Court's Charge
      Are Unpreserved and Meritless; Error, If Any,
      Was Harmless . . . . . . . . . . . . . . . . . .          72

      A.   Defendant's Unpreserved Claim Regarding
           the Circumstantial Evidence Charge Is
           Meritless and Any Error Was Harmless    . . . .      72

      B.   Defendant's Unpreserved Claim Regarding
           the Motive Charge Is Partly Contradicted
           by the Record and Wholly Meritless    . . . . .      76

      C.   Defendant's Unpreserved Claim Regarding
           the Charge on Demonstrative Evidence and
           Models Is Meritless . . . . . . . . . . . . .        78

Point VIII
      Defense Counsel Provided Defendant with
      Meaningful and Effective Representation    . . . . .      82

Conclusion   . . . . . . . . . . . . . . . . . . . . . .        87

Certificate of Compliance

Certification Pursuant to CPLR 2105

# NEW YORK SUPREME COURT

Appellate Division - Second Department

————··•┷•··————

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

MARK ORLANDO,

*Defendant-Appellant.*

————···•———

## RESPONDENT'S BRIEF

———

Preliminary Statement

Defendant appeals from a judgment of the County Court, Nassau County, rendered on April 23, 2004, convicting him, after a jury trial, of murder in the second degree (Penal Law § 125.25[1]). Defendant was sentenced to an indeterminate term of imprisonment of twenty-five years to life (Sullivan, J., at trial and sentence; Honorof, J., at pre-trial suppression hearing). Defendant is incarcerated pursuant to the judgment of conviction.

i

Defendant was indicted with a co-defendant, Herve Jeannot, who was tried separately and convicted of murder in the first degree (Penal Law § 125.27[1][vi]), and criminal possession of a weapon in the second degree (Penal Law § 265.03[2]) (Berkowitz, J., at trial and sentence).  Jeannot has perfected his appeal (A.D. No. 2006-10691), which is pending before this Court.

ii

STATEMENT OF FACTS

## Introduction

On the night of December 3, 2004, defendant Mark Orlando drove his wife's silver Suzuki Verona to an alley located at the intersection of Broadway and Georgia Avenue in Island Park, Nassau County. Defendant had arranged to meet there with the runner for a gambling ring, twenty-four-year-old Bobby Calabrese, regarding a $17,000 gambling debt that defendant owed Calabrese. Unbeknownst to Calabrese, defendant was accompanied to the meeting by his friend, co-defendant Herve Jeannot. Defendant and Jeannot planned to kill Calabrese so that defendant could avoid paying his $17,000 debt.

Once at the meeting spot, Jeannot exited defendant's car carrying a .44 Magnum revolver and hid outside the car. Within a few minutes, Calabrese arrived in his gray Infiniti. Calabrese and defendant exited their respective cars, approached one another, and began talking. Calabrese was wearing an oversized, gray hooded sweatshirt. Defendant gave Calabrese the money and the two of them hugged, as they often did after a money exchange. When they hugged that night, however, defendant yanked Calabrese's sweatshirt up over his head so that Calabrese could not see Jeannot approaching behind him. At that time, Jeannot started moving toward

1

Calabrese's back, facing defendant, and fired one shot at Calabrese's head. As Calabrese fell to the ground, Jeannot fired two more shots into his head. Defendant and Jeannot then got back into the Suzuki and drove away. As they drove over a bridge, defendant slowed the car down and Jeannot threw the bullets out of the car window. Then as they drove over another bridge, defendant stopped the car and Jeannot got out of the car and threw the revolver into the water. Calabrese was pronounced dead at the scene.

Defendant was arrested on December 9, 2004. Initially, he denied any involvement with Calabrese's murder, but ultimately admitted that he had brought Jeannot with him to the meeting with Calabrese, had seen Jeannot shoot Calabrese, and had driven Jeannot away from the murder scene, at which point Jeannot disposed of the bullets and the revolver. Notwithstanding these admissions, defendant maintained that he played no role in the shooting and that Jeannot acted alone.

For his acts, defendant was indicted for murder in the second degree (Penal Law § 125.25[1]). Defendant was convicted, following a jury trial, during which the prosecution introduced evidence including defendant's two inconsistent written statements, testimony that demonstrated defendant's motive for the murder -- his $17,000 debt, a surveillance videotape depicting the relevant

2

vehicles arriving and leaving the scene of the crime, cell phone records placing defendant in the immediate vicinity of the crime just before and after the shooting, expert crime reconstruction evidence demonstrating that someone had yanked Calabrese's sweatshirt up over his head just before the shooting, and the murder weapon, which was found at the very spot where defendant admitted he had seen Jeannot dispose of it.

## The Pre-Trial Suppression Hearing

Prior to trial, defendant and his co-defendant Herve Jeannot claimed that the police lacked probable to arrest them and they also moved to suppress their statements made to the police, each alleging that the statements were obtained in violation of their constitutional rights. Finally, defendant claimed that the physical evidence found as a result of a consent search of his office should be suppressed.[1] A joint pre-trial Dunaway, Huntley, and Mapp hearing was conducted between April 18 and April 21, 2005, before the Honorable Alan L. Honorof.

---

[1] On appeal, the only hearing issue raised is whether defendant's statements were procured in violation of his right to counsel. Therefore, the only hearing facts summarized herein are the facts that pertain to that issue.

3

The People's Case

On December 3, 2004, at approximately 8:39 p.m., Bobby Calabrese was shot three times in the back of his head and killed on the street in Island Park. Detective JOHN McHUGH of the Homicide Squad was assigned to investigate the murder. During the course of his investigation, Detective McHugh discovered that Calabrese had met with defendant at the scene of the shooting, just prior to his murder. Further, defendant had outstanding misdemeanor bench warrants for his arrest[2] (McHugh: H40-51).[3]

On December 9, 2004, at approximately 9:10 p.m., Police Officer STEVEN LOSCHIAVO arrested defendant, who was in his car at the time of the arrest. As the police approached defendant's vehicle he muttered, "Oh, shit. Oh, shit." Defendant exited his car, at which point he was handcuffed and turned over to Detectives McHugh and JAMES McGINN (McHugh: H53; McGinn: H176).

---

[2] Defendant had two outstanding Nassau County bench warrants for aggravated unlicensed operation of a motor vehicle in the second degree. The warrants were admitted in evidence (McHugh: H50-52; People's Exhibits 2A, B).

[3] Numbers in parentheses preceded by "H" refer to the minutes of the pre-trial suppression hearing, numbers in parentheses preceded by "T" refer to the minutes of the trial, and numbers in parentheses preceded by "S" refer to the minutes of sentencing. Names preceding numerical references refer to the witnesses who testified.

4

McHugh and McGinn arrived at police headquarters with defendant at approximately 9:50 p.m. Defendant's handcuffs were removed and he was taken to an interview room. At approximately 10:10 p.m., McHugh and McGinn entered defendant's interview room and McHugh advised defendant of his <u>Miranda</u> rights. Specifically, McHugh told defendant that he had the right to remain silent, that any statements he made could be used against him in court, that he had the right to speak to an attorney before answering questions and have an attorney present at any time, and that if he could not afford an attorney, one would be provided for him. Defendant said he understood his rights and was willing to speak to the detectives. He wrote the word "yes" on the pre-printed rights card indicating that he understood his rights, and signed the card in two spots. McHugh and McGinn signed the card as well (McHugh: H53-54; McGinn: H176-79).[4]

Defendant said he was expecting the police to question him about Calabrese's death because he had been with Calabrese the night he was murdered and was possibly the last person to see Calabrese alive. McHugh asked defendant how he knew Calabrese and defendant stated that he had been introduced to Calabrese by a co-worker named Tom Flores and that he had placed gambling bets with

---

[4] The rights card was admitted in evidence (McHugh: H59; People's Exhibit 3).

5

Calabrese for approximately six weeks, up until Calabrese's death.
Defendant claimed that during his six-week period of betting with
Calabrese, he had won approximately $10,000.  He placed the bets
using an offshore account.  His account number was "Pop 1271" and
his password was "Tom" (McHugh: H60-61; McGinn: H179-80).

Defendant told the detectives that during the period he was
betting with Calabrese, they would usually "square up" on Thursdays
or Fridays.  Defendant further stated that at the end of the week
of December 3, 2004, the date of Calabrese's death, he owed
Calabrese a total of $17,000.  According to defendant, on the
afternoon of Friday, December 3, 2004, he called Calabrese and told
him that he would meet him that evening in Island Park.  Defendant
and Calabrese normally met in Farmingdale, but defendant claimed he
changed the meeting place because he had errands to run that night
near Island Park.  Defendant was familiar with Island Park because
his wife had lived there and his father had at one time owned an
auto repair business on Industrial Place in Island Park (McHugh:
H60-62; McGinn: H181-82).

Defendant said that after work that afternoon he went to the
LA Fitness gym with Herve Jeannot, who worked with him.  After
about an hour at the gym, defendant went with Jeannot to meet
Calabrese.  When they approached the Long Beach Bridge, at about
8:25 p.m., defendant called Calabrese and told Calabrese to meet

6

him near McQuade's Restaurant by Industrial Place.   Defendant was driving his wife's Suzuki Verona, which he parked by Industrial Place and waited for Calabrese.   After a couple of minutes, Calabrese pulled up.   Defendant claimed that he and Calabrese did not get out of their cars and that he handed Calabrese the $17,000 through the window.   Defendant said the last time he saw Calabrese, Calabrese was driving away toward Oceanside, and that he and Jeannot drove away in the other direction.

Defendant stated that after the meeting he wanted to pick up a check at the Wantagh Suzuki dealership, but that when he called there, he was told the man he dealt with, "Ralph," was gone for the day.   Defendant nonetheless stopped at Wantagh Suzuki on the way home, but it was closed.   Defendant then stopped at an ATM machine in Wantagh.   Finally, he and Jeannot stopped by the home of another co-worker, Vivian Barushik, in order to look at some renovations she had done on her property (McHugh: H62-64; McGinn: H181-83).

Defendant also talked with the detectives about his gambling habit and told the detectives that he was in a lot of debt due to his mortgage, a loan he had taken out in order to install a pool, his taxes, his car lease, and outstanding credit card balances that

7

totaled approximately $18,500. As defendant spoke, he took notes and drew diagrams.[5]

McHugh then reduced defendant's account to writing by asking him a question and then telling defendant how he was going to record defendant's answer. When defendant confirmed that the sentence was accurate, McHugh incorporated it into the statement. At approximately 2:00 a.m., defendant signed the written statement that McHugh had prepared, which was based on defendant's account of what had occurred on the night of Calabrese's murder. Defendant did not want anything changed and he signed each of the five pages of the statement.[6] Defendant never asked to speak with the attorney whom he had retained in connection with his open misdemeanor cases (McHugh: H64-68, 125-27; McGinn: H183-87).

At approximately 5:10 a.m., Detective McGinn resumed the interview with defendant, who was still uncuffed. McGinn told defendant that Detective McHugh was interviewing Jeannot and that it seemed as if Jeannot was going to tell McHugh the truth about what happened the night of the murder. McGinn told defendant that if he wanted to tell his side of the story, that that was the time

---

[5] The notes and diagrams defendant made during the interview with Detectives McHugh and McGinn were admitted in evidence (McHugh: H65-66; People's Exhibits 4A, B, C, and D).

[6] Defendant's statement was admitted in evidence (McHugh: H68-69; People's Exhibit 5).

to do it.  Defendant answered McGinn by repeating over and over,
"Detective, you don't understand.  You just don't understand."
After about twenty-five minutes, McGinn left the room, but
reentered at about 6:00 a.m.  At that point, he told defendant that
Jeannot was, in fact, "giving up the entire thing," including
telling the detectives that defendant had paid him to kill
Calabrese and telling them the location of the murder weapon and
what he had done with the bullets.  McGinn also told defendant that
the police had a surveillance videotape, which demonstrated where
the meeting between he and Calabrese had actually taken place, and
that it showed that defendant had lied about meeting Calabrese on
Industrial Place.  After several minutes of McGinn asking defendant
to tell the truth, he finally said, "Okay, I'll tell you the truth.
This is what happened" (McGinn: H188-91).[7]

Defendant started out by claiming that Jeannot had also been
placing bets with Calabrese and that on December 3, 2004, Jeannot
had agreed to go with defendant to meet Calabrese.  Defendant

---

[7] After completing his initial interview with defendant,
Detective McHugh began to interview Jeannot in another room.
During the interview with Jeannot, Jeannot admitted that he had, in
fact, shot Calabrese, because defendant had paid him $4,000 to kill
Calabrese.  Jeannot then gave Detective McHugh a detailed account
of the events leading up to Calabrese's murder and what occurred
immediately after the murder.  McHugh reduced Jeannot's account to
writing and Jeannot signed the written statement.  Jeannot's
written statement was admitted in evidence (McHugh: H70-78;
People's Exhibit 6).

9

stated that that day, Jeannot came to work with a brown bag and asked defendant if he could put the bag in defendant's car, which defendant permitted him to do, and that Jeannot placed the brown bag in his trunk. Defendant claimed that when he and Jeannot went to Industrial Place to meet Calabrese, he decided it was not a good meeting place because there were open stores and people in the vicinity, so he called Calabrese at approximately 8:25 p.m. and told him to go to a more secluded street, but defendant did not recall the name of the street. He and Jeannot drove down the street twice and then parked at the side of the road. About one minute later, Jeannot said he had to go to the bathroom and got out of the car (McGinn: H191-94).

According to defendant, a couple of minutes after Jeannot got out of the car, Calabrese pulled up. Defendant and Calabrese got out of their cars, they hugged, conversed for a couple of minutes, and then defendant handed Calabrese the $17,000. Defendant then heard a shot and Calabrese dropped to the ground. He saw Jeannot run up to Calabrese's car and close the car door. Jeannot then shot Calabrese two more times as he lay on the ground. Defendant and Jeannot got back into defendant's car. Defendant stopped the car next to Calabrese's body and Jeannot got out of the car and attempted to shoot Calabrese again, but the gun would not fire. Jeannot then knelt down, grabbed the $17,000, and got back into the

10

car. Defendant then drove away. He claimed that he told Jeannot they should call the police, but that Jeannot told him not to do it (McGinn: H194-95).

Defendant told the detectives that when they got to the first bridge on the Loop Parkway, Jeannot threw the bullets out the window and that when they drove over another bridge on the Wantagh Parkway, defendant stopped the car for Jeannot, at which point he threw his gun into the water. Defendant claimed that he wanted to be seen with Jeannot by as many people as possible, so he stopped at Wantagh Suzuki, a Citibank ATM, his friend Vivian's house, and his house, so that his mother-in-law would see them together. Jeannot threw away his clothes in a dumpster and defendant took Jeannot home. Defendant claimed that when they were in front of Jeannot's house, Jeannot threatened defendant by saying that he would kill defendant's wife if defendant told anyone about what had happened. Defendant stated that he did not take any of his $17,000 back from Jeannot (McGinn: H195-97).

Defendant refused to give a videotaped statement, but agreed to give Detective JAMES CEREGHINO a second written statement based on his revised account of what had occurred on the night of Calabrese's death. Cereghino reminded defendant of his Miranda rights by reading to him from a pre-printed rights card. Defendant once again stated that he understood his rights and was willing to

11

answer questions without speaking to an attorney.  Defendant wrote the word "yes" on the card, indicating that he understood his rights and was willing to speak to the police without having a lawyer present and he then signed the card (McGinn: H197-98; Cereghino: H273-74).[8]

Detective Cereghino reduced defendant's second statement to writing by asking defendant questions and then telling him how he was going to record defendant's answer.  When defendant confirmed that a sentence was accurate, Cereghino incorporated it into the statement.  When Cereghino completed the statement, defendant made several corrections and wanted one sentence added.  Cereghino told defendant that when he was satisfied with the statement he should sign the bottom of each page, which defendant did.  Cereghino signed it as well.  Defendant also drew a diagram that illustrated where his car was parked, where Calabrese's car was parked, and where he and Calabrese had stood during their meeting (Cereghino: H277, 279).[9]

During his detention, defendant drank water and was offered an egg sandwich, which he refused.  On the morning of December 10, 2004, he ate a donut, and after that, he ate lunch at around noon.

---

[8] Defendant's second rights card was admitted in evidence (Cereghino: H275; People's Exhibit 12).

[9] Defendant's second written statement and diagram were admitted into evidence (Cereghino: H279-80; People's Exhibits 13, 14).

Defendant was also permitted to use the bathroom whenever he asked and he appeared to be healthy, uninjured, and calm. Defendant made no complaints and seemed completely willing to respond to all of the questions asked of him (McHugh: H69-70; McGinn: H187-88, 199; Cereghino: H280-82).

On the afternoon of December 10, 2004, Detective Cereghino overheard defendant tell his wife on the phone that he was going to jail for life for something he was "involved in." Later that day, defendant made another phone call to his sister. At that time, Detective MANUEL NASH overheard defendant say, "I wasn't honest with you. When I went to pay Bobby, Herve killed him." He said he was cooperating, that the detectives were "cool," that they had arrested him after work while he was driving the black car, and that the car had been impounded. Defendant told his sister that there had been "no roughhousing," and that he had given them a full statement. Defendant then said, "I think I'm going to jail because of my involvement in this. Whatever they need make available. Make the house and car available." Finally, defendant said, "You understand why I've been nervous" (Cereghino: H280-82; Nash: H320-22).

### Defendant's Case

Defendant did not present any evidence.

13

## The Hearing Court's Decision

The hearing court determined that defendant had voluntarily waived his <u>Miranda</u> rights, had voluntarily agreed to discuss Bobby Calabrese's murder with the detectives, and had validly relinquished his right to have counsel present when he answered the detectives' questions.   Consequently, the court ruled all of defendant's written and oral statements admissible (H373).[10]

## The Trial

### The People's Case

In late October of 2004, TOM FLORES introduced defendant, who was his co-worker at Professional Credit Services in Farmingdale, to a young man named Bobby Calabrese, who was a runner for a gambling operation.   Flores introduced defendant to Calabrese because he knew that defendant was a gambler.   Herve Jeannot and Flores's girlfriend BARBARA DIAMANT also worked at Professional Credit Services.   It was well known at Professional Credit Services that defendant and Jeannot were very close friends.   Defendant would drive Jeannot to and from work, and they would go to the gym,

---

[10] The court also ruled Jeannot's statements admissible and ruled that both defendant's and Jeannot's arrests were based on probable cause, that the items found pursuant to a consent search of defendant's office were admissible, and that DNA samples provided by defendant and Jeannot were voluntarily relinquished and admissible (H372-73).

14

bars, and stip clubs together.  Defendant had even lent Jeannot his car at times (Flores: T352-57; Diamant: T393-95).

Shortly after Flores introduced defendant to Calabrese, defendant started placing gambling bets with Calabrese.  When defendant first started betting with Calabrese, he won several bets in a row, which totaled approximately $18,000 in winnings. Defendant boasted about his winnings with the people at work and told them that he spent all of the money by paying off debts and doing renovations on his house (Flores: T359-60; Diamant: T400, 409).

As a runner, it was part of Calabrese's job, not only to take bets from gamblers, but also to pick up and drop off all the money that was won and lost.  Calabrese's cousin, ROBERT IANFOLLA, accompanied Calabrese when he met with defendant to give him his winnings.  On those occasions, Calabrese always met defendant right in front of Professional Credit Services in Farmingdale.  There were usually a lot of people around when they would meet and sometimes they met while it was still light outside.  Calabrese and defendant shook hands when they exchanged the money, they gave each other a hug, and then Calabrese would get in his car and leave with Ianfolla (Ianfolla: T324-28).

Towards the end of November of 2004, however, defendant's winning streak came to an end.  During the week of November 29,

15

2004, Flores noticed that defendant seemed upset and when he asked defendant what was wrong, defendant told him that he was "stressed out" because he had lost some bets and owed Calabrese approximately $17,000. Flores noticed other changes in defendant's behavior that week. Normally, during the breaks from work, everyone, including Flores, Diamant, defendant, and Jeannot, would walk together to the cafeteria and talk. That week, however, defendant and Jeannot kept to themselves and would talk alone while everyone else went to the cafeteria. Toward the end of the week, on Thursday, December 2, 2004, defendant picked up Flores for work and told him that he was upset because he had "two locked bets" that would enable him to earn back some of the money he was "down," but that Calabrese refused to take any more bets from him (Flores: T360-61, 365).

On Friday, December 3, 2004, Flores and Diamant saw defendant and Jeannot together at the gym after work. Throughout their time at the gym, Jeannot pressured defendant to leave because he "had to go somewhere." Defendant told Jeannot to calm down and they left the gym sometime between 7:15 p.m. and 7:30 p.m. (Flores: T361-62; Diamant: T400-01).

That night, Calabrese was hanging out with Ianfolla at his house in Long Beach and told Ianfolla that he was going to Island Park to meet defendant and get the money defendant owed him. At some point after 8:00 p.m., Calabrese, who was wearing a gray

16

hooded sweatshirt, left his house to meet defendant. That was the last time Ianfolla saw his cousin alive (Ianfolla: T329-31).

That night, at 8:36 p.m., KATHLEEN CARDINEAU was in her Island Park bedroom when she suddenly heard three gunshots. She exited her house, got in her car, and drove down the block. She reached a poorly lit commercial area near the 7-Eleven, in the vicinity of Broadway that was normally somewhat deserted at night. Cardineau saw Bobby Calabrese's body in the middle of the road. A 7-Eleven employee and another man passed by her and she heard the 7-Eleven employee call the police on his cell phone (Cardineau: T206-09; Nystrom: T234-35).

Meanwhile, at 8:39 p.m., defendant called the Wantagh Suzuki dealership and spoke to FRANK WALKER, a salesman there. Defendant asked to speak to the owner of the dealership, a man named "Ralph," about a refund check that he was owed. Walker told defendant that Ralph was not there and that defendant could pick up the check the next day. Defendant replied, "This is bullshit," and hung up the phone (Walker: T411-14).

At approximately 8:45 p.m., Police Officer PETER VOZZO arrived at the scene where Calabrese's body had been found. He saw Calabrese lying face down in a pool of blood in the middle of the roadway. Calabrese's arms were above his head and his gray hooded sweatshirt was covered in blood with several large holes in it.

17

The neck of the sweatshirt was pulled over the top of Calabrese's head.  Vozzo did not see any signs of life.  Calabrese's gray 2003 Nissan Infiniti was parked near his body.  The engine was running and the headlights were on (Vozzo: T292-95).

At 8:47 p.m., AMT DANIEL BROOKS arrived at the scene in an ambulance.  Brooks approached Calabrese's body and, in order to determine whether Calabrese was alive, he used a pair of scissors to cut Calabrese's sweatshirt up the middle.  He avoided the holes in the sweatshirt when he cut it in order to preserve any possible evidence.  Brooks saw that Calabrese had bullet wounds in his head, he did not see any signs of life, and he could not find Calabrese's pulse.  Consequently, he pronounced Calabrese dead (Brooks: T304-07; 320).

At about 9:00 p.m., Detective DAVID NYSTROM of the Crime Scene Section of the police department arrived at the scene of Calabrese's shooting.  Detective JOHN McHUGH of the Homicide Squad also responded to the scene (Nystrom: T234-35; McHugh: T527).  Upon examining Calabrese's body and the surrounding area, a $20 bill was recovered from Calabrese's right front pants pocket, but no other money was recovered from his person.  There were also no weapons recovered in the vicinity of Calabrese's body, or from his Infiniti.  Detective Nystrom photographed and videotaped the crime scene (Nystrom: T236-37, 251; McHugh: T530).

18

Dr. Brian O'Reilly from the Medical Examiner's Office went to the scene to examine Calabrese's body. During the course of his examination, Dr. O'Reilly found a copper bullet jacket, which must have surrounded the core of one of the bullets, sticking to the front of Calabrese's sweatshirt. Detective Nystrom gave the copper bullet jacket to Detective JAMES DiBENEDETTO of the Ballistics Section. Calabrese's wallet was found inside the Infiniti, which contained his driver's license and $39 (Nystrom: T244-45; McHugh: T530-31; DiBenedetto: T724-32).

At the same time, at approximately 9:26 p.m., defendant called Tom Flores and told him the story of how he had wanted to get his refund check from the Wantagh Suzuki dealership and how he had gone there, but the place was closed. Defendant sounded frantic, which was unlike him, and he did not seem to be paying attention to what Flores was saying. Flores was surprised by defendant's call, given that he had no interest in defendant's story about the refund check (Flores: T363-64).

The next morning, on December 4, 2004, Flores learned that Calabrese had been shot and killed the night before. He called defendant because he knew that defendant had probably met with Calabrese at some point during the week. Defendant normally told Flores when he was going to meet with Calabrese, but he had not mentioned when he was meeting Calabrese that week. Flores asked

19

defendant if he had seen Calabrese the night before and defendant said that he had.   Flores told defendant that Calabrese had been killed.   Defendant seemed shocked and told Flores to give his phone number to Calabrese's family so that he could "make things right." Later, Flores spoke with defendant again and defendant told Flores that he and Calabrese had met at around 8:20 p.m. in Island Park by Puma Auto Body Shop.   He said they had only met for two minutes, that he had paid Calabrese, and that Calabrese had left the meeting, driving in the direction of Oceanside (Flores: T364-68).

That morning, Flores also told Diamant that Calabrese was dead and that Calabrese had met with defendant the night before because defendant owed Calabrese money.   Diamant called defendant and asked him what had happened the night before.   Defendant told her that he had met with Calabrese before Calabrese was shot three times in the head.   It struck Diamant as odd that defendant knew the details surrounding Calabrese's death, considering that Flores had not told her any details.   Defendant told Diamant that he was afraid the police would think he killed Calabrese because his phone number was listed in Calabrese's phone.   Defendant even said, "I'm praying for my life."   Defendant once again said that he wanted his phone number to be given to the Calabrese family (Diamant: T402-03).

The fact that Calabrese was shot three times in the head was not released to the public, nor was it even known by the police on

20

the morning of December 4, 2004. It was not until the afternoon of December 4, that Dr. MICHAEL DeMARTINO, the Deputy Chief Medical Examiner, performed an autopsy on the remains of Calabrese. At that time he determined that Calabrese had been shot three times in the head and informed Detective McHugh of the nature of Calabrese's wounds (McHugh: T536; DeMartino: T754-67).

During the autopsy, Dr. DeMartino determined that Calabrese's cause of death was multiple gunshot wounds to his head, which had perforated his brain and fractured his skull. He observed that Calabrese had four gunshot wounds -- a gunshot wound in his right forearm and three gunshot wounds in his head. All three of Calabrese's head wounds were in the back of his head and all three bullets had entered his brain. DeMartino found a bullet core lodged in the tissue of Calabrese's right cheek and found another bullet core and a bullet jacket lodged in Calabrese's brain. There were also other various bullet fragments recovered within Calabrese's brain. Dr. DeMartino determined that the exit wound on Calabrese's face was consistent with an injury caused when the face is against a flat, hard surface. Dr. DeMartino also determined that the shooter and Calabrese could not have been facing each other. In addition, Dr. DeMartino discovered that the gunshot that entered the back of Calabrese's head next to his right ear had initially passed through his right forearm (DeMartino: T754-71).

21

Dr. DeMartino examined the sweatshirt that Calabrese had been wearing at the time of the shooting and positioned the sweatshirt over Calabrese's wounds in order to ascertain how the holes in the sweatshirt lined up with the wounds on the body. As a result of this examination, Dr. DeMartino determined that the wounds and the holes in the sweatshirt could only line up if the sweatshirt had been pulled up over Calabrese's head at the time of the shooting. Moreover, Dr. DeMartino was of the opinion that a single bullet had caused more than one perforation in the sweatshirt due to the sweatshirt having been folded over at the time of the shooting (DeMartino: T768-71).

The same day as the autopsy, Detective BOB SHAW of the Computer Crime Section went to Calabrese's home in Long Beach and took possession of Calabrese's computer in order to examine his gambling records (Shaw: T458-62). Detective KENNETH STRIGARO of the Electronics Squad went to a storage facility called Central Self Storage, which was located on Austin Boulevard in Island Park. The facility had two outdoor cameras that faced Broadway in the vicinity of where Calabrese was killed. The surveillance system was programmed to record continuously during any period in which the recorded area contained motion or a change of light; during periods of stillness, the system was programmed to record an image of the area every thirty-six seconds. Accordingly, the video

22

contained continuous action as well as intermittent images. Detective Strigaro identified the time period of interest and downloaded the pertinent video, which was recorded by a digital video recorder, onto his own portable video recorder (Strigaro: T480-93).[11]

As Detective Strigaro made the recording, Detective McHugh was present. McHugh knew that defendant's wife owned a Suzuki Verona, so he printed out a picture of a Verona from the Suzuki website, and held the picture as he watched the images on the monitor (McHugh: T536-39).

The scenes captured between 8:10 and 8:45 p.m., on December 3, 2004,[12] by the two relevant surveillance cameras showed a vehicle driving northbound on Broadway. That vehicle appeared to make a U-turn on Broadway and, facing south, pulled to the curb. At approximately 8:35 p.m., a second vehicle came into view and parked in front of the first vehicle. At approximately 8:36 p.m., the

---

[11] The videotape downloaded by Detective Strigaro was admitted in evidence and played for the jury (Strigaro: T492-93; People's Exhibit 57). In addition, Strigaro created still images of scenes from the video, which were entered into evidence as well (Strigaro: T505-06; People's Exhibits 61A-61Q).

[12] The times displayed on the videotape were an hour fast. The camera was operating on daylight savings time, when it should have been operating on standard time (Strigaro: T483-87).

23

first vehicle drove away and the second vehicle stayed where it was (Strigaro: T499-505).

By conducting a search of defendant's cell phone records, Detective Strigaro determined that the calls made on defendant's cell phone on December 3, 2004, at 8:23 p.m., 8:39 p.m., and 8:41 p.m., were all made through the cell site tower on Oceanside Boulevard in Oceanside, which meant that calls were made from defendant's cell phone near the time and place of the shooting (Strigaro: T507-09).[13]

On December 9, 2004, at approximately 9:10 p.m., Police Officer STEVE LOSCHIAVO arrested defendant in Farmingdale near Professional Credit Services and turned defendant over to Detectives McHugh and JAMES McGINN of the Homicide Squad. Detectives McHugh and McGinn transported defendant to the Homicide Squad at police headquarters in Mineola. Jeannot was also arrested at approximately 9:15 p.m. that same night (Loschiavo: T472-74; McHugh: T539-42; McGinn: T594-95).

Defendant was held at Nassau County Police Department Headquarters from approximately 10:00 p.m. on December 9, 2004, until the next afternoon. During that time, defendant was

---

[13] CHRISTINA RASMUSSEN, who worked for Cingular Wireless, testified regarding the phone calls made from defendant's cell phone on December 3, 2004, between 8:23 p.m. and 9:26 p.m. (Rasmussen: T286-90).

24

interviewed by Detectives McHugh, McGinn, and JAMES CEREGHINO. During his detention, defendant was advised of his <u>Miranda</u> rights on at least four occasions, signed a pre-printed rights card on December 9, signed an additional rights card on December 10, (People's Exhibits 44 and 47), and repeatedly assured the police that he was willing to answer questions without having a lawyer present. On the morning of December 10, 2004, defendant signed a refusal of videotape interview form (People's Exhibit 46). Prior to signing the form, defendant gave oral and written statements regarding his relationship with Calabrese and the events surrounding his meeting with Calabrese on the night of the murder (People's Exhibit 45). After giving his initial written statement, on the morning of December 10, defendant gave additional oral statements and signed a second written statement (People's Exhibit 48) (McHugh: T542-54, 560-69; McGinn: T596-608; 615-17, 619-35, Cereghino: T667-83, 686-88).[14]

In his initial statement, which was completed and signed by defendant just before 2:00 a.m. on December 10, 2004, defendant claimed that on the night of December 3, 2004, he went with Jeannot to meet Calabrese on Industrial Place in Island Park, in order to

---

[14] The testimony regarding defendant's time in custody and the giving of his statements was substantially the same as set forth in the pre-trial suppression hearing and is only briefly recounted here (<u>see</u> Respondent's Brief at 3-14).

25

pay Calabrese the $17,000 he owed him in gambling debts. Defendant stated that he parked his car on Industrial Place and that, within a couple of minutes, Calabrese pulled up next to him. Defendant said that he and Calabrese never got out of their cars, that he handed Calabrese the $17,000 through the car window, and that they then each drove off in different directions (McHugh: T546-54; McGinn: T599-608).

At approximately 5:10 a.m. on December 10, 2004, Detective McGinn informed defendant that Detective McHugh was interviewing Jeannot, and that Jeannot was probably going to tell McHugh the truth as to what had occurred on the night of Calabrese's murder. At 6:00 a.m., McGinn told defendant that the police were in possession of a surveillance videotape, which demonstrated that defendant had lied about where the meeting with Calabrese occurred. He also told defendant that Jeannot had told the detectives the location of the murder weapon. At 7:50 a.m., Detective McGinn told defendant that Jeannot had admitted to shooting Calabrese and had said that defendant paid him to do it. At that point, defendant said, "Okay, I will tell you the truth" (McGinn: T619-26).[15]

---

[15] As discussed in Point II, _infra_, the court twice delivered limiting instructions regarding how the jury was to consider the testimony about Jeannot's statements -- during Detective McGinn's testimony and during the final jury charge at the end of the trial (McGinn: T624; T930-31).

26

At that point, defendant told Detective McGinn a different version of what had occurred on the night of Calabrese's murder. His revised account of what had occurred was reduced to writing by Detective Cereghino and it was completed and signed by defendant at approximately 12:00 p.m. on December 10, 2004 (McGinn: T623-32; Cereghino: T667-72).

In defendant's second written statement, he claimed that Jeannot had also placed bets with Calabrese and owed Calabrese money. He said that Jeannot knew defendant was meeting Calabrese on Friday, December 3, 2004. Defendant further stated that on the day of Calabrese's murder, Jeannot brought a brown backpack to work and asked defendant if he could put the backpack in defendant's trunk. Defendant told Jeannot that he could store the bag in the trunk, and defendant and Flores watched as Jeannot put it there.[16]

Defendant then stated that he and Jeannot went to Island Park to meet Calabrese, and that, although he had originally intended to meet Calabrese on Industrial Place, he decided at the last minute to move the meeting spot to a more secluded area, near the 7-Eleven on Austin Boulevard. Defendant called Calabrese at 8:25 p.m. and told him where to go. Once he arrived at the meeting spot,

---

[16] Flores testified that he did not see Jeannot put a bag in defendant's trunk on the day of Calabrese's murder or any other day that week (Flores: T368).

27

defendant drove down the block twice, made a U-turn and parked the car. He claimed that after a couple of minutes, Jeannot said he had to urinate and exited the car. Shortly after that, Calabrese pulled in front of defendant's car and they each got out of their cars. Defendant stated that he gave Calabrese a hug and handed him the $17,000. Defendant was facing Calabrese and he alleged that Calabrese looked past him and said something. Defendant then looked to his right and saw Jeannot behind him. Defendant said that he could see something in Jeannot's hand and that it was then that he heard a shot go by his right ear (McGinn: T623-27, 629; Cereghino: T673-79).

Defendant stated that Calabrese fell to the ground and that Jeannot ran past him and closed Calabrese's car door. Jeannot then shot Calabrese on the ground two more times. Defendant and Jeannot got into defendant's car and defendant pulled up alongside Calabrese's body, at which point Jeannot got out of the car and attempted to shoot Calabrese again, but the gun would not fire. Jeannot picked up the $17,000 and got back into the car. Defendant then drove away (McGinn: T629-30; Cereghino: T679-80).

Defendant claimed that he wanted to call the police, but that Jeannot told him not to. When they drove over the second bridge on the Loop Parkway, defendant slowed down and Jeannot threw the bullets out of the car window. As they drove over a bridge on the

28

Wantagh Parkway that was under construction, Jeannot told defendant to stop the car. Defendant stopped and Jeannot got out of the car and threw the gun into the water. Defendant stated that he called the Wantagh Suzuki dealership, Flores, his wife, and his friend Vivian. He wanted to be seen with Jeannot, so he went to the Wantagh Suzuki dealership, but it was closed. He then stopped at an ATM machine and withdrew $300 in the hopes that a picture would be taken of him with Jeannot. Next, defendant drove to his friend Vivian's house and stayed there for about forty minutes, while Jeannot stayed in the car. After that, defendant went to his house with Jeannot briefly so that his mother-in-law would see them together. Defendant took Jeannot to a school parking lot where Jeannot dumped his clothes in a dumpster. Finally, defendant took Jeannot home. He claimed that, at that point, Jeannot said he owned three guns and had killed someone else before Calabrese, and that if defendant told anyone what happened, he would kill defendant's wife (McGinn: T628-32; Cereghino: T680-83).

On the night of December 10, 2004, Detective MICHAEL KUHN got a warrant to search defendant's house. During the search, the police found $2,749 in a safe in defendant's bedroom closet. The money consisted of several new one-hundred-dollar bills that had the large picture of Benjamin Franklin on them. There was also a

29

shotgun and seven boxes of shotgun shells found in defendant's bedroom (Kuhn: T707-09).

Meanwhile, Detective MICHAEL NIGRO searched Jeannot's home. As a result of that search, Nigro recovered five one-hundred-dollar bills in a shoe box inside Jeannot's bedroom closet. Like the one-hundred-dollar bills found in defendant's closet, the bills were new and had the large picture of Benjamin Franklin on them. Aside from a BB gun, the police did not find any other guns or gun paraphernalia in Jeannot's house (Nigro: T713-16).

On the morning of December 13, 2004, Police Officer NORMAN McCLOY of the Marine Aviation Bureau and seven other divers reported to the location where defendant said Jeannot disposed of the murder weapon. Subsequently, McCloy found a .44 caliber Magnum revolver at the bottom of the bay, right near the Sloop Channel Bridge. Sergeant GREG MAGNIFICO transported the revolver to the Marine Base Bureau, where it was taken by Detective WILLIAM BROSNAN of the Homicide Squad (McCloy: T434-38; Magnifico: T445, 447; Brosnan: T454-57).

Ultimately, Detective DiBenedetto received the gun. He also had a bullet jacket fragment, which he had received from Detective Nystrom, and two bullet fragments that Dr. DeMartino had turned over after the autopsy. Detective DiBenedetto matched the striation patterns on each of the fragments and determined that

30

they were all fired from the same gun. He then conducted test fires with the revolver that had been found underwater, using sample bullets. Comparing the resulting patterns on the sample bullets to the fragments, Detective DiBenedetto determined that the fragments recovered at the scene and during Calabrese's autopsy came from the gun. Finally, he examined Calabrese's sweatshirt and conducted a test in which he fired bullets through cloth at different distances. He determined that the distance between the revolver and Calabrese's sweatshirt at the time of the shooting was between six inches and four feet (DiBenedetto: T724-43, 745).

Detective SCOTT KOVAR of the Forensic Evidence Bureau, who specialized in crime scene reconstruction and the preparation of demonstrative courtroom exhibits, took part in the investigation of Calabrese's death. He performed a microscopic examination of the gray sweatshirt and reviewed the autopsy report regarding Calabrese's wound tracks, in order to determine the bullet trajectories. Based on his microscopic examination of the amounts of gunshot residue, and burnt and unburnt particle grains around the holes in the sweatshirt, Detective Kovar determined which holes had probably been the first to be created by the bullets, and which holes had been created due to folds in the garment. According to Kovar's findings, it did not appear that each bullet had only created a single hole in the sweatshirt (Kovar: T802-06, 809-12).

31

Based on his examination of the sweatshirt and the autopsy report, Kovar determined the probable trajectory of the bullets and prepared an exhibit to demonstrate the only way that the bullet holes on the sweatshirt could have aligned with Calabrese's wounds. First, Kovar obtained a sweatshirt that was the exact brand, style, and size of Calabrese's sweatshirt. He then made holes in the new sweatshirt in the same places where they existed in Calabrese's sweatshirt. Next, he put the sweatshirt on a mannequin, and following the wound tracks in the autopsy report, he put rods through the holes in the sweatshirt, in order to demonstrate the probable trajectories of the bullets.

The exhibit demonstrated that in order for the holes in the sweatshirt to line up with the wounds, one of the bullets made three holes. Further, the exhibit demonstrated that there were three shots fired, and that in order for the holes to line up with the wounds, Calabrese's sweatshirt must have been pulled up over his head. Moreover, it appeared that someone had forcefully yanked Calabrese's sweatshirt up over his head, given that there was a tear in the hood. Finally, according to Detective Kovar's reconstruction of the bullet trajectories, when the sweatshirt was up over Calabrese's head, the first shot went through the back of the sweatshirt before hitting the back of his head, then as Calabrese fell to the ground, the sweatshirt also fell, and the

32

final two shots were fired directly into Calabrese's head (Kovar:
T812-22).

### Defendant's Case

Defendant did not call any witnesses or present any evidence.

### The Verdict and Sentence

The jury found defendant guilty of murder in the second degree
(Penal Law § 125.25[1]) (T962-64).  On August 18, 2005, defendant
was sentenced to an indeterminate term of imprisonment of twenty-
five years to life (S38).

33

## POINT I

DEFENDANT'S STATEMENTS TO THE POLICE WERE NOT OBTAINED IN
VIOLATION OF HIS RIGHT TO COUNSEL (answering defendant's brief,
Point One).

Defendant claims that his statements to the detectives about
the Calabrese homicide were obtained in violation of his right to
counsel and improperly admitted at trial.   He claims that his
statements were the product of an interrogation that occurred while
he was in custody for unrelated misdemeanor charges on which he was
represented by counsel.[17]   See Defendant's Brief at 64-69.
Defendant's claim must fail, however, because the derivative right
to counsel was not applicable here, where defendant was arrested on
bench warrants and then, after waiving his Miranda rights, was
questioned only regarding an unrelated incident.   Moreover,
defendant has not even established that he was, in fact,
represented by counsel on the prior charges, or that the detectives
had any knowledge of the alleged representation.   In any event, the
record is wholly insufficient to permit appellate review of
defendant's claim.

---

[17] Defendant did not assert his present right to counsel claim
in a suppression motion, at the pre-trial suppression hearing, or
at trial.   See Defendant's Brief at 68, 103-04.   However, the
People recognize that the Rogers claim that defendant now advances
need not be preserved for this Court's review.   See People v.
Samuels, 49 N.Y.2d 218, 221 (1980).

34

Defendant contends that, under <u>People v. Rogers</u>, 48 N.Y.2d 167 (1979), his statements were procured in violation of his right to counsel. In <u>Rogers</u>, the Court of Appeals determined that, when a defendant is in police custody for a criminal charge on which he is represented by counsel, a derivative right to counsel attaches and custodial interrogation about any subject, whether related or unrelated to that charge, must cease. <u>See</u> <u>People v. Rogers</u>, 48 N.Y.2d 167 (1979). While the principle advanced in <u>Rogers</u> remains viable, despite a myriad of decisions expounding on its holding (<u>see, e.g.</u>, <u>People v. Burdo</u>, 91 N.Y.2d 146 [1997]; <u>People v. Steward</u>, 88 N.Y.2d 496, 501 [1996]), it is still not applicable in the manner defendant advocates here.

Since <u>Rogers</u>, this Court and others have consistently held that, where a defendant is arrested on a bench warrant that is unrelated to the charge under investigation, there is a "break in custody," rendering the <u>Rogers</u> derivative right to counsel inapplicable. <u>See</u> <u>People v. Tyler</u>, 43 A.D.3d 633, 635 (4th Dept. 2007); <u>People v. Garcia</u>, 40 A.D.3d 541, 541 (1st Dept. 2007); <u>People v. Clarke</u>, 298 A.D.2d 259, 259 (1st Dept. 2002); <u>People v. Acosta</u>, 259 A.D.2d 422, 422-23 (1st Dept. 1999); <u>People v. Lovell</u>, 267 A.D.2d 476, 477 (2d Dept. 1999); <u>People v. Windbush</u>, 202 A.D.2d 527, 527 (2d Dept. 1994).

Such is the case here.  Defendant acknowledges that he was arrested on two misdemeanor bench warrants for Vehicle and Traffic Law charges that were unrelated to the Calabrese homicide.  <u>See</u> Defendant's Brief at 65-68.  Consequently, defendant was able to, and did, effectively waive his right to counsel with regard to the unrelated homicide investigation.

In fact, the testimony adduced at the pre-trial suppression hearing established that, prior to giving his statements,[18] defendant was advised of his <u>Miranda</u> rights on several occasions and waived those rights both verbally, and by signing two pre-printed rights cards at different times.  Notably, defendant never asked to speak with the attorney whom he now alleges he had retained on his misdemeanor cases, nor did he ever ask to speak to any attorney whatsoever (McHugh: H53-54, 58-78, 125-27; McGinn: H176-98; Cereghino: H273-75, 277-82).  Consequently, there is no merit to defendant's right to counsel claim.

In any event, defendant has failed to establish that he was, in fact, represented by counsel on his misdemeanor cases, and that the detectives had any knowledge of the alleged representation.  In

---

[18] There was no testimony during the trial regarding the statements defendant made over the phone to his wife and sister, which were overheard by detectives.

36

People v. Bing, 76 N.Y.2d 331 (1990) and its companion cases,[19] the Court of Appeals held that even if a defendant is in custody on a pending charge, and is represented by counsel on that charge, the police may question him about unrelated matters if they have no knowledge of defendant's representation on the pending matter. Put another way, the principle advanced in Bing, eliminated the derivative right to counsel arising from an attorney-client relationship on prior pending charges, unless there is a pure Rogers scenario, i.e., where the defendant has established that the police had knowledge of the representation by counsel on the prior charges. See People v. Jackson, 292 A.D.2d 466 (2d Dept. 2002).

The burden of establishing that defendant had representation on the prior charges, and that the police had knowledge of the prior representation, rests upon defendant. See generally, People v. Rosa, 65 N.Y.2d 380, 386-88 (1985); see also People v. Jackson, 292 A.D.2d at 466 ("Although the defendant was represented on the charges related to the outstanding warrants, he presented no evidence that the police knew that he was represented on such charges"); People v. Acosta, 259 A.D.2d 422, 422 (1st Dept. 1999); People v. Brown, 174 A.D.2d 842 (3d Dept. 1991) ("[I]t was up to defendant to make the claim that he was represented by counsel on

--------

[19] People v. Cawley and People v. Medina, were decided with Bing.

another pending charge of which the police had knowledge and to show that at the time of the interrogation he was represented by counsel on the earlier charge."); People v. Keefer, 197 A.D.2d 915, 915-16 (4th Dept. 1993).

Here, defendant does not even allege that the detectives who questioned him were aware of the alleged representation by counsel on his misdemeanor cases. This is unsurprising, given that there was no evidence adduced at the pre-trial suppression hearing or the trial that demonstrated that any of the detectives had any such knowledge, or for that matter, that defendant had, in fact, retained counsel in connection with his misdemeanor cases.

In an attempt to defuse the impact of this flaw in his argument, citing People v. Bertolo, 65 N.Y.2d 111 (1985), defendant incorrectly asserts that, having knowledge of his misdemeanor cases, the detectives were obligated to inquire whether he had retained counsel prior to questioning him about the homicide. See Defendant's Brief at 65, 67-68. This argument, however, is wrong. The law is clear from the pronouncements in Bing/Cawley, and the post-Bing, Appellate Division decisions, that there is no longer a duty for the police to inquire as to whether the defendant is represented by counsel on pending charges, and any such representation of which the police are unaware, is not a bar to the waiver of the defendant's right to counsel regarding the new,

38

unrelated charges.  See People v. Terry, 179 A.D.2d 833 (2d Dept. 1992); cf. People v. Burdo, 91 N.Y.2d at 146 (police aware of representations on pending matter).[20]

Finally, contrary to defendant's claim, the factual record in the instant case is not "clear enough for this Court to decide this issue on the merits."  Defendant's Brief at 68-69.  A defendant's failure to preserve a right to counsel claim at a suppression hearing may not in itself prevent an appellate court from reviewing the issue on appeal, but it does not relieve a defendant of the burden of developing a sufficient factual record for this issue to be reviewed.  See People v. Kinchen, 60 N.Y.2d 772, 773-74 (1983); People v. Ramos, 99 N.Y.2d 27, 30 (2002); People v. Peak, 214 A.D.2d 1012, 1013 (4th Dept. 1995); People v. Ross, 158 A.D.2d 560 (2d Dept. 1990).

---

[20] Initially, under People v. Bartolomeo, 53 N.Y.2d 225 (1981), an interrogating detective who had actual knowledge of the outstanding criminal case against the defendant was under an obligation to inquire whether the defendant was represented by an attorney on that charge, and, failing to make such an inquiry, was chargeable with what such inquiry would have disclosed.  People v. Bartolomeo, 53 N.Y.2d at 231-32.  However, in Bing/Cawley, the Court of Appeals abandoned the Bartolomeo rule and held that the police, who were aware of the pending charges against defendant but who "made no inquiry . . . about representation" were not chargeable with the knowledge that inquiry would have disclosed. See People v. Bing, 76 N.Y.2d at 344-50.  Moreover, that the right to counsel on the misdemeanor cases may have indelibly attached by virtue of the issuance of bench warrants is of no significance. That did not put the police on notice that defendant was actually represented by counsel on those charges.  See Bing, 76 N.Y.2d at 341.

Here, defendant has failed to fulfill his obligation to provide an adequate record, given that there is nothing in the record that demonstrates that he was, in fact, represented by counsel on his misdemeanor cases. Moreover, defendant has not alleged, let alone established in the record, that, at the time the detectives questioned him about the Calabrese homicide, they had any knowledge that he was represented by counsel on the unrelated charges for which the bench warrants had been issued and on which he was in custody. Indeed, Detective McHugh testified that defendant did not ask to speak to any attorney, and specifically did not mention any attorney he had retained in connection with his misdemeanor cases (McHugh: H53-54, 58-60, 125).

As defendant notes, there was a brief reference during the pre-trial suppression hearing to an attorney named Barry Philips, Esq. See Defendant's Brief at 66. However, to the extent defendant argues that this vague testimony regarding Mr. Philips provides a sufficient factual record upon which to decide the merits of his claim, his argument falls flat.

In fact, the testimony regarding Mr. Philips shed no light on the issue of whether defendant had been deprived of his right to counsel, given that the testimony did not establish either that Mr. Philips was, in fact, representing defendant on his misdemeanor cases, or that the police were aware that that was so (H125-27).

40

Consequently, the brief and ambiguous reference to Mr. Philips during the hearing does not provide this Court with a sufficient factual record to determine the merits of defendant's claim. Thus, since crucial facts necessary to decide the merits of defendant's claim do not appear in the record, it cannot be reviewed on appeal. See People v. Kinchen, 60 N.Y.2d at 774; People v. Ramos, 99 N.Y.2d at 30.

In sum, defendant's right to counsel claim is factually and legally without support. Defendant's legal analysis is fundamentally flawed owing to his failure to recognize that the derivative right to counsel did not apply here, where he was arrested on bench warrants. Moreover, the derivative right to counsel applies only where the police have knowledge of the prior representation. Because defendant has failed to establish that he was in fact represented by counsel or that the police had knowledge of the alleged representation, his claim must fail.

41

POINT II

DEFENDANT'S CLAIM THAT TESTIMONY BY DETECTIVE McGINN DENIED HIM HIS RIGHT TO CONFRONT HIS ACCUSER IS MERITLESS; ERROR, IF ANY, WAS HARMLESS (answering defendant's brief, Point Two).

Defendant claims that Detective McGinn's testimony regarding Jeannot's statements constituted impermissible and prejudicial hearsay that violated his constitutional right to confront his accuser. See Defendant's Brief at 70-77. Contrary to defendant's contention, however, the testimony was properly offered for the nonhearsay purpose of demonstrating what prompted defendant to give his second statement. In any event, even if this Court were to find that the evidence was improperly presented, any error was harmless.

Detective McHugh and Detective McGinn testified that, when questioning defendant, he initially denied any involvement in the shooting of Calabrese. However, Detective McGinn further testified that defendant drastically changed his story after being told that he had been implicated in the murder by Jeannot. Specifically, McGinn told defendant that McHugh was interviewing Jeannot, and that Jeannot was probably going to tell McHugh the truth as to what had occurred on the night of Calabrese's murder. Subsequently, McGinn informed defendant that Jeannot had told the detectives the location of the murder weapon. Finally, McGinn told defendant that Jeannot had admitted to shooting Calabrese and had said that defendant paid him to do it. At that point, defendant said, "Okay, I will tell you

42

the truth" (McHugh: T550-52; McGinn: T603-04, 619-26).  Clearly,

Detective McGinn's testimony regarding Jeannot's statements, was not

only permissible, but necessary, in order to enable the jury to

understand what had caused defendant to change his original blanket

denial of any involvement in the murder.

In <u>Tennessee v. Street</u>, 471 U.S. 409 (1985), the Supreme Court

held that a defendant's rights under the Confrontation Clause are

not violated by introduction of statements of nontestifying

individuals for the nonhearsay purpose of demonstrating what

prompted a defendant to give a statement.  See <u>Street</u>, 471 U.S. at

409; <u>see also</u> <u>Crawford v. Washington</u>, 541 U.S. 36, 59 n.9 (2004).

Where evidence of a nontestifying witness's statements is offered

to prove what happened when the defendant gave a statement, and not

to prove what happened at the murder scene, it is not hearsay under

traditional rules of evidence.  <u>Street</u>, 471 U.S. at 413.  Further,

such nonhearsay evidence does not raise Confrontation Clause

concerns.  <u>Id.</u> at 414.

In <u>Street</u>, the defendant, who was accused of murder, testified

that he was coerced by the Sheriff into confessing to the murder,

and that his forced confession was derived from the written

confession of his accomplice, which the Sheriff read to him.  In

rebuttal, the Sheriff testified that the defendant was not coerced

into confessing, and that he never read the accomplice's confession

43

to the defendant. The Sheriff then read the accomplice's confession to the jury to highlight the differences between the two written statements. Prior to the reading of the accomplice's statement, the court also instructed the jury that the statement was not admitted for its truthfulness. Subsequently, the defendant claimed on appeal that the introduction of the nontestifying accomplice's statement had denied him his right to confrontation. See Street, 471 U.S. at 409.

Ultimately, the Supreme Court found that the accomplice's confession had been introduced to disprove the defendant's claim of coercive interrogation by the Sheriff, and not for its truthfulness. Accordingly, defendant's constitutionally protected right to confront his accuser had been satisfied when the Sheriff took the stand and was cross-examined. See Id. at 409, 416.

Similarly, here, Detective McGinn testified regarding what he had said to defendant just before defendant gave his second statement, which was vastly different from his first statement. This testimony was offered for the nonhearsay purpose of demonstrating the circumstances that fostered defendant's second statement. Defendant initially denied any involvement in the shooting; he told the detectives he was not even present when the shooting occurred (McHugh: T550-52; McGinn: T603-04).

44

Then, hours later, he admitted that he was not only present when the shooting occurred, but had driven the shooter (Jeannot) away from the scene and helped him dispose of the bullets, the gun, and his clothing (McGinn: T623-32; Cereghino: T673-83). Clearly, the statements of Jeannot, offered for the nonhearsay purpose of demonstrating what prompted defendant's second statement, are admissible and do not violate the Confrontation Clause. See Street, 471 U.S. at 409-16; Crawford, 541 U.S. at 59 n.9.

Defendant contends that, unlike the defendant in Street, he never testified or called into question the voluntariness of his statements; therefore, the principle set forth in Street is inapplicable here because no "rebuttal" evidence was necessary. What defendant overlooks, however, is that during the court's final jury charge, the court stated: "The law provides that statements made by a defendant may be used in evidence against him if they were made voluntarily by the defendant. The burden of proving this beyond a reasonable doubt is upon the People" (T926-27). The court informed defendant before delivering the final jury charges that it would deliver a voluntariness charge, and defendant did not object to the charge (T835-36). More importantly, at no time prior to or during the trial did defendant, by stipulation or otherwise, relieve the People of their burden of proving the voluntariness of his statements.

45

Therefore, regardless of whether defendant testified or argued during the trial that his statements were involuntary, the People nonetheless had the burden of establishing the voluntariness of the statements in order for them to be considered as evidence against defendant (T926-30). Consequently, to establish the voluntariness of defendant's statements beyond a reasonable doubt (see People v. Huntley, 15 N.Y.2d 72, 78 [1965]; C.P.L. § 710.70[3]), it was necessary for Detective McGinn to explain to the jury what had transpired to prompt defendant to change his account of the murder.

In any event, evidence of a nontestifying witness's statement is not only admissible as "rebuttal" evidence to prove voluntariness of a defendant's statements, but is also admissible for any appropriate nonhearsay purpose, including demonstrating a detective's state of mind during an interview and how an investigation evolved. See People v. Reyes, 49 A.D.3d 565, 566 (2d Dept. 2008); see also People v. Reynoso, 2 N.Y.3d 820, 821 (2004) (defendant's right to confront witnesses not violated when court allowed prosecutor to elicit statement that nontestifying co-defendant made to detective for purposes other than establishing truth of the matter asserted); People v. Rodriguez, 28 A.D.3d 496, 496 (2d Dept. 2006) (prosecutor properly permitted to question detective about knowledge he had derived from other people for nonhearsay purpose of rebutting defense argument that detective had

46

fabricated defendant's statement); People v. Ewell, 12 A.D.3d 616, 617 (2d Dept. 2004) (defendant's right to confrontation not violated when court permitted detective to testify that he told defendant that nontestifying co-defendant had incriminated defendant in order to explain why defendant confessed).

Here, Detective McGinn's testimony regarding his interview of defendant would not have made sense if he had been precluded from explaining the sequence of events that triggered defendant's second statement.  It surely would not have been clear to the jury why, during the early morning hours of December 10, 2004, several hours after defendant gave his initial statement, McGinn suddenly, and for no apparent reason, reentered defendant's interview room and took another statement from him, which conflicted with his first statement.  Such a limitation on McGinn's testimony would have hindered the jury's ability to evaluate the truth of the testimony and the validity of defendant's statements, and would have consequently "been at odds with the Confrontation Clause's very mission -- to advance 'the accuracy of the truth-determining process in criminal trials.'"  Street, 471 U.S. at 415 (quoting Dutton v. Evans, 400 U.S. 74, 89 [1970]).

Defendant also asserts that Street is inapplicable because, unlike in that case, his statement was not a "confession." Defendant's Brief at 73.  Defendant is splitting hairs.  Even though

47

defendant did not admit in his second statement that he had paid Jeannot to kill Calabrese, he nonetheless admitted that he had been present for the murder and helped Jeannot dispose of evidence, facts which he had previously denied. Therefore, aside from being direct evidence of his guilt, the statement also demonstrated defendant's consciousness of guilt in that defendant had initially lied to the police (McGinn: T623-32; Cereghino: T673-83).

Defendant primarily relies on Bruton v. United States, 391 U.S. 123 (1968), in his argument that the prosecution impermissibly introduced statements containing accusations against defendant at trial, without the accuser taking the stand. See Defendant's Brief at 20-21. However, defendant's reliance on Bruton v. United States is misplaced. In Bruton, the issue was whether a co-defendant's confession, which was inadmissible hearsay as to Bruton, could be admitted at a joint trial, accompanied by a limiting instruction that the confession could only be considered for its truth against the co-defendant. See Bruton v. United States, 391 U.S. at 135-36. Here, however, any statements by the co-defendant were not offered for the truth of the facts asserted in any manner; therefore, the evidence was not hearsay under traditional rules of evidence. See Prince, Richardson On Evidence, § 200 at 176-77 (10th Ed. 1973). Consequently, unlike the hearsay evidence improperly admitted in

48

Bruton, the nonhearsay evidence at issue did not invoke Confrontation Clause restrictions. See Street, 471 U.S. at 413-14.

Notably, the court delivered two extensive limiting instructions pertaining to the evidence of Jeannot's statements, one during the testimony of Detective McGinn, and another during the final jury charge (McGinn: T624; T930-31). In both limiting instructions, the court directed the jury that they were to consider the statements allegedly made by Jeannot, only when considering the circumstances under which defendant made his statements, and that they were to completely disregard Jeannot's alleged statements when considering the evidence against defendant. The court further instructed that the jury was not to consider whether Jeannot actually made the statements at issue, and if he did, whether or not Jeannot's statements were true (McGinn: T624; T930-31).

Clearly, therefore, any possible prejudice arising from the testimony at issue was avoided by the court's thorough limiting instructions, which amply informed the jury that Jeannot's alleged statements were not to be considered for their truth. See Street, 471 U.S. at 411-12; People v. Jackson, 298 A.D.2d 144, 145 (1st Dept. 2002); People v. Tosca, 287 A.D.2d 330, 330-31 (1st Dept. 2001).

Finally, defendant suggests that the trial court should have "craft[ed] a remedy that would [have] allow[ed] Det. McGinn to

49

testify as to the Appellant's changed version of the facts of the Calabrese killing without the mention of Jeannot's confession . . . ." Defendant's Brief at 70-71. However, this proposition by defendant is flawed. First, defendant does not specify what "remedy" should have been crafted. Second, defendant's suggestion essentially proposes that the prosecutor should have had McGinn tailor his testimony in a manner that would have rendered it completely inaccurate. Third, even if the prosecutor could have potentially presented a redacted version of the events leading to defendant's second statement, as defendant suggests, that does not mean that it was the only presentation of this particular evidence that was constitutionally permissible. As stated above, statements of nontestifying individuals, offered for appropriate nonhearsay purposes, are admissible and do not violate the Confrontation Clause.

In any event, even if the introduction of the disputed testimony by Detective McGinn could somehow be viewed as error, any such error was harmless. Defendant argues that the testimony was not harmless because "Other than Jeannot's confession implicating the Appellant, the People offered no other proof that the Appellant was actively involved in the death of Calabrese." Defendant's Brief at 76. However, the record demonstrates that defendant vastly

50

exaggerates the impact that the testimony had on the verdict in this case.

In reviewing for harmless error, appellate courts look to the significance of the improperly admitted evidence and the weight of the overall evidence of defendant's guilt, to determine if the improper evidence diverted the jury's attention from the actual charges to be proven, and, thus, denied the defendant his right to a fair trial. See People v. Crimmins, 36 N.Y.2d 230, 237-38 (1975); People v. Bynoe, 149 A.D.2d 523, 523 (2d Dept. 1989).

Here, there was overwhelming proof of defendant's guilt, having nothing to do with the testimony at issue. The evidence against defendant consisted of his two inconsistent statements, which included his statement that he was standing in front of Calabrese when Jeannot shot Calabrese and subsequently aided Jeannot in fleeing from the murder scene and disposing of evidence. The evidence also consisted of the videotape footage and cell phone records placing defendant in the vicinity of the murder at the time of the crime, and testimony regarding the $17,000 debt defendant owed to Calabrese. Moreover, perhaps the most important evidence establishing that defendant was actively involved in the planning and carrying out of Calabrese's murder, was the testimony of Dr. DeMartino and Detectives DiBenedetto and Kovar.

51

Dr. DeMartino testified that, contrary to what defendant said in his second statement, it was impossible that Calabrese had been facing Jeannot at the time of the shooting (DeMartino: T754-71). Further, Detective DiBenedetto testified that after examining Calabrese's sweatshirt, he determined that the "muzzle to garment distance" between the revolver and Calabrese's sweatshirt at the time of the shooting was between six inches and four feet (DiBenedetto: T724-43, 745). Finally, Detective Kovar testified that in order for the holes in the sweatshirt to line up with Calabrese's wounds, the sweatshirt must have been pulled up over his head. Moreover, it appeared that someone had forcefully yanked Calabrese's sweatshirt up over his head, given that there was a tear in the hood (Kovar: T812-22).

Detective McHugh's testimony regarding what he said to defendant prior to defendant giving his second statement, was not compelling evidence of defendant's guilt in comparison with the other ample evidence against defendant. Hence, if the admission of this testimony were error, and it was not, that error would be harmless.

POINT III

DESPITE DEFENDANT'S UNPRESERVED CLAIM TO THE CONTRARY, THE TRIAL COURT PROPERLY ADMITTED THE STORAGE FACILITY VIDEOTAPE INTO EVIDENCE; ERROR, IF ANY, WAS HARMLESS (answering defendant's brief, Point Three).

Defendant claims that the videotape copy of the digital footage recorded by the storage facility surveillance cameras, was admitted in evidence in violation of the best evidence rule, because the videotape, which had been generated by the police, exhibited "distorted images." Defendant's Brief at 78-81. Defendant further argues that the videotape was not properly authenticated. See id. at 81-82. Defendant's contentions are uniformly unpreserved and patently meritless.

At the outset, defendant failed to object to the admission of the videotape on any ground, let alone on the ground that it violated the best evidence rule (Strigaro: T493). Consequently, defendant's claim is unpreserved for appellate review. See C.P.L. § 470.05(2); People v. Gray, 86 N.Y.2d 10, 19 (1995); People v. Weissman, 28 A.D.3d 338, 338 (1st Dept. 2006).

Nor is review of defendant's unpreserved claim warranted in the interests of justice, as the evidence of defendant's guilt was overwhelming (see Point II, supra), and the harm that may have resulted from any error in admitting the videotape had no effect on the actual verdict. See People v. Washington, 68 A.D.2d 90, 100 (2d

Dept. 1979), aff'd 51 N.Y.2d 214 (1980). In any event, defendant's claim regarding the best evidence rule is meritless.

Under the best evidence rule, whenever a party seeks to prove the contents of a "writing,"[21] the party must produce the original writing or satisfactorily account for its absence. See Prince, Richardson On Evidence, § 568 at 578 (10th Ed. 1973); see also People v. Vickio, 50 A.D.3d 1479, 1480 (4th Dept. 2008); People v. Grasso, 237 A.D.2d 741, 742 (3d Dept. 1997); People v. Miller, 199 A.D.2d 692, 694 (3d Dept. 1993).

In Vickio, the court determined that there had been no violation of the best evidence rule where the trial court had admitted a still photograph taken from a surveillance videotape, in lieu of the actual videotape, because the "'unavailability of the original [was] satisfactorily explained. . . .'" Vickio, 50 A.D.3d at 1480; compare with People v. Cyrus, 48 A.D.3d 150, 159 (1st Dept. 2007) (police testimony concerning their observations from a videotape that had been erased, depicting a crime they did not witness, would violate the best evidence rule).

Similarly, here, Detective Strigaro explained during his testimony that the only way for him to import the digital images that were recorded by the surveillance cameras, was for him to

---

[21] For purposes of the best evidence rule, "writings" include videotapes. See People v. Vickio, 50 A.D.3d 1479, 1480 (4th Dept. 2008).

54

download the relevant images onto his own portable video recorder (Strigaro: T487-93). The videotape contained some pauses and disjointed images at certain times, but Strigaro explained each of these interruptions in the tape (Strigaro: T487-98).

For example, as Detective Strigaro testified, some of the pauses were the result of him intentionally freeze-framing on an image for the benefit of the investigating detectives who were present when the recording was made. He also rewinded certain images so that the detectives could carefully examine them, after which he would move the images forward once again.[22] Some of the images were also disrupted by the fact that the security system only recorded an image every couple of seconds -- there were always intervals of no recording between images. Consequently, in parts of the videotape, the viewer could only see the back of a car or the front of a car as it passed the camera (Strigaro: T487-98).

Detective Strigaro testified, however, that he had not added anything to the videotape that was not originally recorded by the storage facility recording system, that everything recorded between 8:10 p.m. and 8:45 p.m. on the night of the murder from the two

---

[22] The videotape was made the day after the murder, at which point no arrests had been made and the investigation was still ongoing. Consequently, investigating detectives watched the images recorded by the surveillance cameras at the same time that Detective Strigaro recorded the images onto a videotape (Strigaro: T480-98).

55

Broadway-facing cameras was included on the videotape, that there was no difference between the images on the videotape and the images recorded by the storage facility cameras, and that the images on the videotape provided a fair and accurate representation of the images recorded by the relevant surveillance cameras (Strigaro: T491-93, 496-506).

Clearly, Detective Strigaro accounted for the manner in which he made the videotape at issue, attested to its accuracy and completeness, and provided a reasonable explanation for the few minor disruptions in the visual images on the tape.   Accordingly, defendant's best evidence rule argument misses the mark.   Indeed, the fact that the videotape had gaps and did not depict the events of December 3, 2004, in a single, fluid stream of images, goes to the weight of the evidence and not its admissibility.   See People v. Gibbons, 18 A.D.3d 773, 773 (2d Dept. 2005); People v. Wilson, 207 A.D.2d 463, 464 (2d Dept. 1994).

Next, defendant did not object to the authentication of the videotape.   Hence, his claim that the People failed to properly authenticate the videotape is unpreserved.   See People v. Pierre, 41 A.D.3d 289, 291 (1st Dept. 2007); People v. Brown, 214 A.D.2d 679, 679 (2d Dept. 1995).   And, as with defendant's best evidence claim, review of defendant's unpreserved claim is not warranted in

56

the interests of justice. See People v. Washington, 68 A.D.2d at 100.

The claim is likewise meritless. As defendant correctly notes, "a videotape may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted." People v. Patterson, 93 N.Y.2d 80, 84 (1999).

Here, Detective Strigaro, who specialized in electronics and created the videotape at issue, testified in detail regarding the mechanics of the storage facility's surveillance system and how he went about making the videotape (Strigaro: T480-93). He also testified that the images on the videotape provided a fair and accurate representation of the images recorded by the relevant surveillance cameras and that he had not added anything to the videotape that was not originally recorded by the storage facility recording system (Strigaro: T491-93, 496-506). Clearly, therefore, the videotape was properly authenticated. See id.

In any event, even if the admission of the videotape could somehow be viewed as error, any such error was surely harmless. See People v. Crimmins, 36 N.Y.2d 230, 237-38 (1975); People v. Craven, 48 A.D.3d 1183, 1184 (4th Dept. 2008) ("Any violation of the best evidence rule that may have occurred as the result of the admission in evidence of the edited surveillance videotapes 'was not at all

57

prejudicial to the defendant and did not affect the fairness of his trial.'"); People v. Fondal, 154 A.D.2d 476, 477 (2d Dept. 1989); see also People v. Daniels, 36 A.D.3d 502, 503 (1st Dept. 2007) (failure to exclude surveillance videotape for lack of sufficient foundation was harmless).

Here, as shown, there was overwhelming proof of defendant's guilt (see Point II, supra), having nothing to do with the content of the videotape. All that admission of the videotape accomplished for the prosecution was to possibly place defendant at the scene of the murder. Indeed, the videotape merely depicted a vehicle, which could not even be conclusively identified as defendant's vehicle, driving northbound on Broadway. That vehicle appeared to make a U-turn on Broadway and pulled to the curb. At approximately 8:35 p.m., a second vehicle (presumably Calabrese's Infiniti) came into view and parked in front of the first vehicle. At approximately 8:36 p.m., the first vehicle drove away and the second vehicle stayed where it was (Strigaro: T499-505).

It is evident that the brief images of a car driving and parking in the vicinity of Calabrese's murder, around the time of the murder, was not compelling evidence of defendant's guilt in comparison with the overall body of evidence against defendant. The videotape was clearly just one minor piece in a very large puzzle. Moreover, any error was harmless because defendant himself admitted

in his statements to the detectives that he was present in the alley, standing right in front of Calabrese when Calabrese was shot (McGinn: T627-630). Thus, to the extent admission of the videotape was improper, defendant's statements brought out the same evidence and worse.

POINT IV

THE TRIAL COURT PROVIDENTLY EXERCISED ITS DISCRETION IN PERMITTING THE PEOPLE TO USE A DEMONSTRATIVE EXHIBIT TO DISPLAY THE BULLET TRAJECTORIES, AND LATER REFUSING TO PERMIT THE JURY TO TAMPER WITH THE EXHIBIT DURING DELIBERATIONS; ERROR, IF ANY, WAS HARMLESS (answering defendant's brief, Point Four).

During the trial, the People informed the court and defendant that they intended to present a demonstrative exhibit, prepared by Detective Kovar, who specialized in crime reconstruction and the preparation of demonstrative courtroom exhibits. The exhibit displayed the probable trajectories of the bullets that hit Calabrese and was based on the findings of Detective Kovar and Dr. DeMartino. The exhibit consisted of a mannequin dressed in a sweatshirt that was the exact brand, style, and size of the sweatshirt Calabrese had been wearing when he was shot. Holes were put in the new sweatshirt, in the same places where the bullet holes were found in Calabrese's sweatshirt. Finally, rods were placed through the holes in the sweatshirt in order to demonstrate the bullet trajectories (T798-99; Kovar: T812-22).

Defense counsel objected to the use of the exhibit, claiming he had not been given sufficient notice of the evidence in time for him to retain his own expert to give an opinion as to the exhibit's accuracy. The court offered defendant the opportunity for an adjournment to have the exhibit examined by an expert, but defendant declined the offer. The court then denied defendant's objection.

60

Moreover, defendant never sought a mistrial or any other relief. During jury deliberations, defendant requested that the jury have the opportunity to manipulate the sweatshirt and the mannequin in the jury room. The court refused to permit that, reasoning that the jury could then "start basically creating their own exhibit which becomes something that is not in evidence," and instructed the jury that they were not to manipulate the exhibit (T799-800, 944-45, 947).[23]

Defendant now claims that the court improperly permitted the People to use the demonstrative exhibit, that the People did not give defendant sufficient notice of their intention to use it, and that the court erred in refusing defendant's request for the jury to have the opportunity to manipulate the exhibit in the jury room. See Defendant's Brief at 84-86. Defendant's arguments are meritless.

It is well settled that "tests and demonstrations in the courtroom are not lightly to be rejected when they would play a positive and helpful role in the ascertainment of truth . . . . [T]he trial court itself must decide in the exercise of a sound discretion based on the nature of the proffered proof and the

---

[23] Subsequently, the jury requested permission to conduct an experiment in the jury room using a sweatshirt belonging to one of the jurors. The court refused the request with defendant's acquiescence (T953-57).

61

context in which it is offered, whether the value of the evidence outweighs its potential for prejudice." People v. Acevedo, 40 N.Y.2d 701, 704 (1976).

In the present case, perhaps the most vital factual discrepancy that the jury had to resolve was the question of where Jeannot, Calabrese, and defendant were positioned at the time of the shooting. While defendant claimed in his written statement that Jeannot was behind him and in front of Calabrese when he shot Calabrese, it was the People's contention that Jeannot was in front of defendant and behind Calabrese, and that defendant forcibly yanked Calabrese's sweatshirt up over his head so that he would not be able to stop Jeannot from shooting him from behind. Accordingly, it was critical for the People to present every possible piece of evidence concerning the bullet trajectories, in support of their theory that Jeannot was behind Calabrese at the time of the shooting and that the sweatshirt had been pulled up over Calabrese's head.

The accuracy of the exhibit was established, given that it was designed based on Dr. DeMartino's medical findings regarding Calabrese's wounds, and Detective Kovar's microscopic analysis of the holes in Calabrese's sweatshirt (Kovar: T809-22). It is apparent, therefore, that the value of the evidence at issue far outweighed its potential for prejudice, and that the exhibit did not "mislead, confuse, [or] divert" the jury. People v. Acevedo, 40

62

N.Y.2d at 704; <u>People v. Barnes</u>, 80 N.Y.2d 867, 868 (1992); <u>People v. Brower</u>, 285 A.D.2d 609, 610 (2d Dept. 2001); <u>People v. Del Duco</u>, 247 A.D.2d 487, 488-89 (2d Dept. 1998).

Defendant further argues that the introduction of the exhibit was an "unfair surprise at the close of the People's case." Defendant's Brief at 85. However, the trial court alleviated any possible prejudice resulting from defendant's initial lack of awareness of the exhibit, by offering defendant the opportunity for an adjournment in order to consult with his own expert (T798-800). Defendant declined the adjournment (T800). Consequently, because defendant declined the relief that would remedy his concern, he should not now be heard to argue that he was prejudiced by the amount of notice he was given of the People's intention to present the exhibit.

Finally, the trial court properly acted within its discretion when it refused defendant's request that the jury be permitted to tamper with the exhibit, if it so desired, during deliberations. As the court noted in its ruling, if the jury had been given permission to tamper with the exhibit in question, it would have been tantamount to giving the jury a license to create a totally different exhibit, which had not been admitted in evidence, and the accuracy of which had not been established. Moreover, it would have permitted the jury to improperly conduct its own experiments during

63

deliberations.  See People v. Arnold, 96 N.Y.2d 358 (2001); People v. Isaac, 214 A.D.2d 749 (2d Dept. 1995).  Hence, the court's refusal of defendant's request was a reasonable and provident exercise of its discretion.[24]

In any event, any error on the court's part for admitting the exhibit and refusing to permit the jury to manipulate it was harmless.  See People v. Crimmins, 36 N.Y.2d 230, 237-38 (1975); People v. Franceschi, 215 A.D.2d 330, 330 (1st Dept. 1995).  There was overwhelming proof of defendant's guilt, having nothing to do with the demonstrative evidence at issue (see Point II, supra). Moreover, there was additional proof, outside of the exhibit, regarding the bullet trajectory (DeMartino: T754-71; Kovar: T802-22).  Hence, if the admission of the exhibit and the court's subsequent ruling that the jury could not manipulate it, was error, and it was not, that error would be harmless.

---

[24] Additionally, any prejudice to defendant from the court's ruling is entirely speculative because the jury never even requested permission to manipulate the exhibit in a permissible manner.  See e.g., People v. Gomez, 273 A.D.2d 160 (1st Dept. 2000).

64

## POINT V

DEFENDANT'S CLAIM REGARDING $17,000 THAT WAS ALLEGEDLY RECOVERED DURING THE INVESTIGATION IS NOT REVIEWABLE ON APPEAL; ERROR, IF ANY, WAS HARMLESS (answering defendant's brief, Point Six).

Defendant contends that the People improperly failed to notify him before the trial that "Detective Michael Kuhn recovered $17,000 during the course of the investigation." Defendant's Brief at 89. He bases his entire claim on a single unclear reference to $17,000 during Kuhn's cross-examination (Kuhn: T711). Defendant's claim is unpreserved, unreviewable from the record, and if anything, contradicted by the record. Moreover, any error was harmless.

During the direct testimony of Detective Kuhn, who searched defendant's home, Kuhn consistently testified that during his search, he found $2,749 (Kuhn: T707-09). However, during Kuhn's cross-examination, defense counsel asked him if "the other $17,000" was "still in evidence" and "locked up" (Kuhn: T711). After that rather ambiguous reference was made, there was no further mention of the $17,000.

Although defendant claims that he was not made aware of the $17,000 in question until Detective Kuhn testified in the middle of the trial, defendant failed to voice an objection regarding the People's alleged discovery violation at any point during or after the trial (Kuhn: T711-12). Defendant's current complaint is thus

unpreserved for this Court's review. See C.P.L. § 470.05(2); People v. Gray, 86 N.Y.2d 10, 19 (1995); People v. Redmond, 41 A.D.3d 514, 516 (2d Dept. 2007). Nor is review of defendant's unpreserved claim warranted in the interests of justice. See People v. Washington, 68 A.D.2d 90, 100 (2d Dept. 1979).

Defendant's claim is also unreviewable because he has not satisfied his obligation to provide a proper record on which this Court could evaluate it. See People v. Kinchen, 60 N.Y.2d 772, 773-74 (1983). It is well-settled that it is the appellant's responsibility to insure that the Court has a factual record sufficient to permit appellate review. See People v. Kinchen, 60 N.Y.2d at 773-74. This principle has been applied to discovery violation claims. See, e.g., People v. Lorenzo, 272 A.D.2d 184, 184-85 (1st Dept. 2000).

Here, notwithstanding the vague reference to $17,000 during the cross-examination of Detective Kuhn (Kuhn: T711), there is nothing in the record that establishes that Kuhn found $17,000 during his search of defendant's home, or at any other time. Indeed, Kuhn repeatedly testified that he found only $2,749 during his search of defendant's home (Kuhn: T707-09, 711). Consequently, examination of the record reveals that the random and unexplained reference to $17,000 during Kuhn's cross-examination might well have been the result of a misstatement on the part of defense counsel or an error

66

in the transcription of the record.[25] Either way, because crucial facts necessary to decide the merits of defendant's claim do not appear in the record, it cannot be reviewed on appeal.

Even if it were established that Detective Kuhn found $17,000 in defendant's home, there is still no indication in the record that such information was improperly withheld from defendant (Kuhn: T711). Indeed, on its face the record suggests that if $17,000 was recovered, defendant was, in fact, aware of it. It was defense counsel who first brought up the $17,000, by asking, "And, the other $17,000 is still in evidence?" Id. Thus, it is evident that there are too many ambiguities in the record pertaining to this point to permit appellate review. See People v. Kinchen, 60 N.Y.2d at 773-74.

In any event, even if defendant had established that the prosecutor failed to inform him about $17,000 found during the investigation -- which he clearly has not -- any possible error in the prosecutor's conduct was harmless. Given the overwhelming evidence of defendant's guilt (see supra), there is no reasonable probability that the alleged nondisclosure by the People contributed to the verdict. See People v. Crimmins, 36 N.Y.2d 230, 241 (1975); People v. Evans, 16 A.D.3d 517 (2d Dept. 2005).

---

[25] $17,000 was exactly the amount of money that defendant owed Calabrese.

67

POINT VI

DEFENDANT'S UNPRESERVED CLAIM REGARDING THE PROSECUTOR'S
SUMMATION IS MERITLESS; ERROR, IF ANY, WAS HARMLESS (answering
defendant's brief, Point Five).

Defendant claims that the prosecutor's summation was improper
because the prosecutor "invited the jury to act like 'Columbo' and
investigate the storage facility video to determine whether the
Appellant's automobile's license plate was 'obstructed,' arguing
that the Appellant placed a piece of tape over the license plate."
Defendant's Brief at 87. Defendant contends that by suggesting
there was a piece of tape over his license plate in the surveillance
video, the prosecutor improperly referred to matters not in
evidence, given that there was no mention of the tape during the
trial. See Defendant's Brief at 87-88. Not only is defendant's
claim unpreserved, but it is meritless, and any possible error was
harmless.

During his closing remarks, the prosecutor stated in pertinent
part, "[l]et's get back to that license plate. Interesting piece
of evidence for Columbo fans . . . . It's not on there . . . .
What is the obstruction . . . . I submit to you it's a strip of
tape" (T880).

At the outset, defendant failed to object to the prosecutor's
summation comments (T880-81). Consequently, defendant's claim with
regard to the prosecutor's comments is not preserved for appellate

68

review.   See C.P.L. § 470.05(2); People v. Gray, 86 N.Y.2d 10, 19

(1995); People v. Salnave, 41 A.D.3d 872, 874 (2d Dept. 2007);

People v. Lara, 265 A.D.2d 428, 428 (2d Dept. 1999).  Nor is review

of defendant's unpreserved claim warranted in the interests of

justice, as the evidence of defendant's guilt was overwhelming (see

Point II, supra), and the harm that may have resulted from any error

in the prosecutor's summation, had no effect on the actual verdict.

See People v. Washington, 68 A.D.2d 90, 100 (2d Dept. 1979).

In any event, defendant's claim with regard to the summation is

meritless.   Although the prosecutor did make a brief reference to

"Columbo fans" during his closing remarks, not once during his

summation did the prosecutor "invite the jury to act like 'Columbo'"

(defendant's brief at 87), or to engage in any improper

investigation of its own.

Moreover, any objection to the prosecutor's comments does not

warrant reversal of defendant's conviction.   That remedy is

"properly shunned" where the prosecutor's behavior "has not

substantially prejudiced a defendant's trial." People v. Galloway,

54 N.Y.2d 396, 401 (1981).  Unless defendant has been substantially

prejudiced, the order of a new trial serves only "to punish the

victim[s] and the witnesses through additional inconvenience and

expense." People v. Roopchand, 107 A.D.2d 35, 37 (2d Dept. 1985).

Thus, "the appropriate question is whether the [prosecutor's conduct] deprived the defendant of a fair trial." Id. at 36.

Defendant cannot complain that the prosecutor's summation deprived him of a fair trial. It is well settled that a prosecutor may call upon the jury to draw conclusions that can be fairly inferred from the evidence and, within this boundary, should be afforded the widest possible latitude in advocating the People's cause. See People v. Galloway, 54 N.Y.2d at 399; People v. Ashwal, 39 N.Y.2d 105, 109 (1976). Applying this principle to the instant case, the prosecutor's summation comments should not be a basis for reversal.

Here, the prosecutor's remarks constituted fair comment on the surveillance tape, which was in evidence and did, in fact, demonstrate that the license plate on the vehicle believed to be defendant's was not visible (Strigaro: T492-506).[26] Therefore, the prosecutor's suggestion that the obstruction might have been a piece of tape over the license plate, merely called upon the jury to draw a reasonable inference from the evidence. See Galloway, 54 N.Y.2d at 399; see People v. Strathum, 280 A.D.2d 316, 316 (1st Dept. 2001).

---

[26] A copy of the surveillance videotape will be sent to this Court upon request.

70

Finally, given the overwhelming evidence of defendant's guilt (see Point II, supra), the prosecutor's brief comments about "Columbo" and the possibility of a piece of tape covering the license plate, even if improper, must be deemed harmless. See People v. Crimmins, 36 N.Y.2d 230, 241 (1975); People v. Cardillo, 167 A.D.2d 347 (2d Dept. 1990).

71

POINT VII

DEFENDANT'S CHALLENGES TO THE COURT'S CHARGE ARE UNPRESERVED
AND MERITLESS; ERROR, IF ANY, WAS HARMLESS (answering defendant's
brief, Point Seven).

Defendant contends that the court's jury charges regarding
circumstantial evidence and motive were improper and denied him a
fair trial. Defendant further alleges that the court improperly
failed to provide a detailed charge regarding demonstrative evidence
and the use of models. Defendant's claims are uniformly unpreserved
and meritless. Moreover, his claim regarding the motive charge is
partly contradicted by the record and based on a typographical
error. In any event, the charge, as a whole, properly instructed
the jury as to the standards it should apply in this case (see
People v. Ladd, 89 N.Y.2d 893, 895 [1996]; People v. Fields, 87 N.Y.
2d 821, 823 [1995]), and any possible error was harmless beyond a
reasonable doubt.

    A.    Defendant's Unpreserved Claim
          Regarding The Circumstantial
          Evidence Charge Is Meritless
          And Any Error Was Harmless.

In charging the jury regarding circumstantial evidence, the
court thoroughly defined direct and circumstantial evidence and gave
the jury a hypothetical example that demonstrated the difference
between the two types of evidence (T918-20). The court also
instructed the jury regarding the methods to be used in evaluating

72

circumstantial evidence: 1) any facts upon which an inference may be drawn had to be proven by direct evidence and the inferences could not be based on conjecture or speculation; and 2) the inference drawn had to flow naturally and logically from the proven facts (T920). Shortly after instructing the jury regarding how to evaluate circumstantial evidence, the court gave a detailed instruction regarding reasonable doubt. The court told the jury that it was the People's burden to prove defendant's guilt beyond a reasonable doubt, and that the reasonable doubt standard applied to all the evidence presented (T934-39).

Defendant now contends that "the People's entire direct presentation was circumstantial." Defendant's Brief at 93. Consequently, defendant avers that the court erred in failing to give a full circumstantial evidence charge that conformed with the New York State Pattern Jury Instruction for a case that consists entirely of circumstantial evidence. See Defendant's Brief at 91-94.

At the outset, defendant did not request a full circumstantial evidence charge at any point, nor did he object to the circumstantial evidence charge as it was delivered (T834-36, 918-20, 942). Defendant's present claim is, therefore, unpreserved for review. See People v. Soberanis, 52 A.D.3d 416 (1st Dept. 2008); People v. Montefusco, 44 A.D.3d 879, 881 (2d Dept. 2007). Moreover,

73

review of defendant's unpreserved claim is not warranted in the
interests of justice. See People v. Washington, 68 A.D.2d 90, 100
(2d Dept. 1979).

When the prosecution's entire case is circumstantial, "the jury
should be instructed in substance that it must appear that the
inference of guilt is the only one that can fairly and reasonably be
drawn from the facts, and that the evidence excludes beyond a
reasonable doubt every reasonable hypothesis of innocence." People
v. Sanchez, 61 N.Y.2d 1022, 1024 (1984). However, it also well
established that "this legal standard does not apply to a situation
where . . . both direct and circumstantial evidence are employed to
demonstrate a defendant's culpability." People v. Barnes, 50 N.Y.2d
375, 379-80 (1980).

That is the case here. In this case, the People presented
direct evidence of defendant's involvement in the murder in the form
of defendant's statements to the homicide detectives. Indeed,
defendant's admissions constituted direct evidence that defendant
owed Calabrese a large sum of money, summoned Calabrese to the
location, watched Jeannot shoot Calabrese, started to drive Jeannot
away from the murder scene and stopped the car, at which point
Jeannot got out of the car and attempted to shoot Calabrese again,
drove Jeannot away from the murder scene, took part in the disposal
of the bullets, the gun, and Jeannot's clothing, and failed to

74

report what had occurred to the police (McGinn: T627-32; Cereghino: T673-83).

Hence, the People's case, though partly circumstantial, was also comprised of direct evidence sufficient for a jury to conclude that defendant aided and abetted in the murder, and defendant was consequently not entitled to a full circumstantial evidence charge. See People v. Roldan, 88 N.Y.2d 826, 827 (1996); see also People v. Schachter, 6 A.D.3d 111, 114-15 (1st Dept. 2004) ("[T]he evidence of defendant's guilt of the substantive charges was entirely circumstantial only in the most technical sense . . . . [T]he inferences of guilt that were required to be drawn were 'direct and compelling.'"). People v. McDonald, 287 A.D.2d 655, 656 (2d Dept. 2001); People v. Chillino, 186 A.D.2d 260, 261-62 (2d Dept. 1992); People v. Timmons, 138 A.D.2d 428, 428-29 (2d Dept. 1988).

In any event, even if this Court were to determine that the People's case was entirely circumstantial, any error in the court's circumstantial evidence charge was harmless, given that the jury was instructed on how to evaluate circumstantial evidence and there was overwhelming evidence of defendant's guilt. Therefore, there is no significant probability that the jury would have acquitted if a full circumstantial evidence charge had been given. See People v. Brian, 84 N.Y.2d 887, 889 (1994); People v. Williams, 48 A.D.3d 1108, 1110

75

(4th Dept. 2008); <u>People v. Fuentes</u>, 290 A.D.2d 563, 564 (2d Dept. 2002).

B.   Defendant's Unpreserved Claim
     Regarding The Motive Charge Is
     Partly Contradicted By The Record
     <u>And Wholly Meritless.</u>

Defendant claims that the court's charge regarding motive was improper for two reasons. First, defendant contends that the court improperly stated, "Motive is that which <u>proves</u> a person engaged in conduct to do an act" (T932) (emphasis added), whereas, according to the New York State Pattern Jury Instructions, the court actually should have stated, "Motive is that which <u>moves</u> a person . . . to do an act." Defendant's Brief at 94-95. Second, defendant asserts that the court's use of the word "circumstance" in its motive charge, shortly after the jury was charged regarding "circumstantial evidence," inevitably confused the jury. <u>Id.</u> at 95.

Defendant's challenges to the court's motive charge are clearly unpreserved, as he failed to object to that portion of the charge (T932-33, 942). <u>See People v. Ramos</u>, 201 A.D.2d 679, 682 (2d Dept. 1994); <u>People v. Vargas</u>, 134 A.D.2d 302 (2d Dept. 1987). And review of the unpreserved claims is not warranted in the interests of justice. <u>See People v. Washington</u>, 68 A.D.2d at 100.

Moreover, defendant's claim that the court improperly used the word "proves" when it should have used the word "moves" during the

76

motive charge, is based entirely on an error in the transcript. The court did, in fact, state, "Motive is that which <u>moves</u> a person to engage in conduct to do an act" (T932) (emphasis added).[27] Accordingly, there is no factual basis for defendant's claim. Notably, the fact that defendant failed to object to the motive charge is further evidence that the court did not misstate the charge.

Defendant's contention that the court improperly used the word "circumstance" in its motive charge is likewise baseless. During the court's motive charge it stated, "if you find from the proof that the defendant had a motive to commit the crime charged, that is a circumstance you may wish to consider as tending to establish guilt" (T933). Defendant offers no support in the record for his claim that the jury was confused by the court's use of the word "circumstance," nor does he explain how he could possibly have been prejudiced by the court's use of the word "circumstance." Consequently, this claim cannot stand.

In any event, even if there was error in the court's motive charge, which there was not, any such error was harmless beyond a

---

[27] A copy of the amended charge minutes and a certification from the court reporter are annexed hereto as "Exhibit One." Respondent has advised defendant's appellate counsel, Kerry Bassett, Esq., of the error in the original minutes and Ms. Bassett has consented to the Respondent submitting the corrected minutes to the court.

77

reasonable doubt because there is no significant probability that the verdict would have been different if the court had not used the word "circumstance" in its motive charge. See People v. Monroe, 49 A.D.3d 900 (2d Dept. 2008).

C.   Defendant's Unpreserved Claim
     Regarding The Charge On Demonstrative
     Evidence And Models Is Meritless.

Defendant argues that, as a result of the admission into evidence of the mannequin exhibit, the court erred in failing to deliver a full and formal jury instruction on demonstrative evidence and the use of models "in accordance with the New York State Pattern Jury Instructions." Defendant's Brief at 95. Defendant further contends that this alleged error was compounded by the court's failure to permit the jury to manipulate the exhibit and perform its own re-enactment of the murder with a juror's sweatshirt during deliberations. See Defendant's Brief at 98-99. Defendant's claims are unpreserved and meritless.

Here, defendant never requested that the court deliver a charge regarding demonstrative evidence and the use of models, even though he had several opportunities to do so -- i.e., when the court initially denied his objection to the admission of the mannequin exhibit (T799-800), during the charge conference (T834-36), at the end of the charge when the court asked if there were any objections (T942), when the court refused his request that the jury be

78

permitted to manipulate the mannequin exhibit during deliberations (T944-46), and when the court denied the jury's request to re-enact the murder using a sweatshirt (T953-54, 957). Nor did defendant object to the court's brief instruction to the jury, that the mannequin was "demonstrative evidence" and that the jury was to "apply the testimony to [the] exhibit" and was not to manipulate it (T947). Therefore, defendant's present claim is clearly unpreserved and does not warrant review in the interests of justice. See People v. Dougal, 266 A.D.2d 574 (3d Dept. 1999); cf. People v. Monroe, 90 N.Y.2d 982 (1997) (claim that judge was not present when exhibits in evidence were viewed by jury not preserved).

Even now, on appeal, defendant fails to specify what charge should have been given to the jury regarding demonstrative evidence and models, and how he was prejudiced by the court's failure to give the charge. On appeal, as at trial, defendant complains about the court's instruction that the jury not tamper with the mannequin, but he does not articulate what instruction the jury should have received regarding demonstrative evidence and models.[28] He claims

---

[28] Defendant merely states that the court should have charged the jury "with the appropriate instructions on Demonstrative Evidence and the Use of Models, in accordance with the New York State Pattern Jury Instructions." Defendant's Brief at 95. Defendant, however, gives no cite to the charge he believes should have been given or the language that the desired charge contains. There is a pattern jury charge for demonstrative evidence in civil cases (NY PJI 1:90.3), but that brief charge -- that the exhibit is not evidence of the actual event, and is admitted to illustrate the opinion of the expert witness -- would have merely told the jury what it already knew.

that the jury was "left completely adift in terms of the legal reasoning with respect to applying this exhibit to the testimony that had been elicited" (defendant's brief at 99), but he points to nothing to support this conclusion.  Indeed, had the jury been confused or if it had questions regarding the exhibit it is not evident from the record.  Other than asking to bring the exhibit into the jury room, the jury never asked any questions about the exhibit's purpose or use.

Finally, as is discussed above (see Point IV, supra), the trial court properly acted within its discretion when it refused defendant's request that the jury be permitted to tamper with the exhibit during deliberations.  Further, to the extent defendant is claiming that the court improperly refused to permit the jury to conduct its own experiment using a juror's sweatshirt, that claim is unpreserved because defense counsel agreed with the court that the request should be denied (T953).  See People v. Vasquez, 216 A.D.2d 21 (1st Dept. 1995); People v. Metts, 184 A.D.2d 592 (2d Dept. 1992); People v. Moore, 149 A.D.2d 629 (2d Dept. 1989).

In any event, any error in the court's conduct in failing to give an additional charge on demonstrative evidence and models, and refusing to permit the jury to manipulate the exhibit and conduct its own experiment, was surely harmless, given the explanation for the model when it was introduced into evidence and the overwhelming

evidence of defendant's guilt.  See People v. Crimmins, 36 N.Y.2d at 241.

81

POINT VIII

DEFENSE COUNSEL PROVIDED DEFENDANT WITH MEANINGFUL AND
EFFECTIVE REPRESENTATION (answering defendant's brief, Point Eight).

Defendant claims that he was denied effective assistance of
counsel for two reasons. First, defendant contends his counsel
improperly failed to object to the admission of the surveillance
videotape on the ground that the People had not laid a proper
foundation for the tape to be entered in evidence. See Defendant's
Brief at 101-03. Second, defendant argues that his counsel was
ineffective for failing to assert a Rogers suppression claim. See
Defendant's Brief at 103-04. Defendant's ineffective assistance
claims are meritless. Furthermore, the record establishes that
defendant's attorney provided him with meaningful representation.

The federal standard for effective assistance of counsel has
been defined as that of reasonably effective assistance. See
Strickland v. Washington, 466 U.S. 668, 687 (1984). New York's
standard for effective assistance of counsel requires "meaningful
representation." People v. Berroa, 99 N.Y.2d 134, 138 (2002); see
also People v. Henry, 95 N.Y.2d 563, 565 (2000) (quoting People v.
Benevento, 91 N.Y.2d 708, 712 [1998]). What constitutes effective
assistance of counsel is not, and cannot be, fixed with yardstick
precision; rather, it varies according to the unique circumstances
of each representation. See People v. Baldi, 54 N.Y.2d 137, 146

82

(1981).   Moreover, even if defense counsel commits errors, to
constitute ineffective assistance, these errors must "prejudice the
defense or defendant's right to a fair trial." People v. Hobot, 84
N.Y.2d 1021, 1024 (1995).

To succeed on a claim of ineffective assistance, "it is
incumbent on defendant to demonstrate the absence of strategic or
other legitimate explanations for counsel's failure" to undertake an
action that defendant, with perfect hindsight and nothing to lose,
now feels should have been undertaken. People v. Rivera, 71 N.Y.2d
705, 709 (1988); accord, People v. Taylor, 1 N.Y.3d 174, 176 (2003);
People v. Benevento, 91 N.Y.2d at 712.   If defendant fails to make
"such a showing, it will be presumed that counsel acted in a
competent manner and exercised professional judgment." People v.
Rivera, 71 N.Y.2d at 709; People v. Alicea, 229 A.D.2d 80, 86 (1st
Dept. 1997).   Accordingly, New York courts "have been careful to
distinguish between true ineffectiveness and losing tactics . . . ."
People v. Stultz, 2 N.Y.3d 277, 283 (2004).

It is well-established that "a showing that counsel failed to
make a particular pretrial motion generally does not, by itself,
establish ineffective assistance of counsel." People v. Rivera, 71
N.Y.2d at 709 (citing People v. De Mauro, 48 N.Y.2d 892 [1979]).
Moreover, it is "rare" that it is possible from the trial record
alone to reject all legitimate explanations for counsel's failure to

83

pursue a suppression issue. <u>See</u> <u>People v. Rivera</u>, 71 N.Y.2d at 709.
Indeed, many factors can account for a lawyer's failure to make a
pretrial motion, including de hors the record knowledge that filing
a motion would be futile and/or meritless because there is no
colorable basis for a hearing. <u>See</u> <u>id.</u> Counsel are not ineffective
for failing to make meritless motions. <u>See</u> <u>People v. Flores</u>, 84
N.Y.2d 184, 189 (1994); <u>People v. Lightfoot</u>, 306 A.D.2d 107 (1st
Dept. 2003).

Consequently, absent a showing that there were no legitimate
explanations for counsel's failure to pursue a suppression issue,
"it will be presumed that counsel acted in a competent manner and
exercised professional judgment in not pursuing a hearing." <u>Rivera</u>,
71 N.Y.2d at 709. A complaint of ineffectiveness, therefore,
although "frequently made, is rarely found to have merit." <u>People
v. Droz</u>, 39 N.Y.2d 457, 459 (1976); <u>see also</u> <u>People v. Benevento</u>, 91
N.Y.2d at 712. With these principles in mind, it is evident that
defendant's claim is meritless.

Defendant claims his counsel was ineffective for failing to
object to the admission of the surveillance videotape for lack of
proper authentication. As shown in Point III, <u>supra</u>, the videotape
was properly authenticated and admitted in evidence. Therefore,
defense counsel correctly refrained from making a frivolous
objection to its admission. However, even if the evidence at issue

84

was objectionable, defendant has not shown a lack of strategic explanation for defense counsel's failure to object, and cannot do so.

Moreover, at most, the surveillance tape showed only what defendant admitted to in his written statement -- that he was present during the murder. Given the overwhelming proof of defendant's guilt, separate and apart from the videotape, admission of the videotape into evidence did not deny defendant a fair trial. Consequently, even if counsel's failure to object constituted error, it does not entitle defendant to any relief. See People v. Arroyo, 38 A.D.3d 792 (2d Dept. 2007); People v. Drummond, 34 A.D.3d 492 (2d Dept. 2006).

Next, defendant claims counsel was ineffective for failing to raise a Rogers suppression claim. At the outset, this particular ineffective assistance claim is not reviewable on direct appeal. In order for this Court to determine that there was no legitimate explanation for counsel's failure to pursue the Rogers issue in a suppression motion or at the hearing, analysis of off-the-record information regarding defendant's representation on pending matters is necessary. This Court is, therefore, precluded from entertaining defendant's present ineffective assistance of counsel claim. See People v. Rivera, 71 N.Y.2d at 709.

85

In any event, defendant's claim is not only unreviewable from the record but also patently unpersuasive.  Contrary to defendant's present argument, he had no viable Rogers suppression claim (see Point I, supra).  Therefore, counsel undoubtedly recognized that there was no colorable basis for suppression based on a Rogers claim, and he was not ineffective for failing to make a meritless suppression argument that had little or no chance of success.  See People v. Carter, 44 A.D.3d 677, 679 (2d Dept. 2007).

Defendant's complaints aside, the totality of the circumstances demonstrates that counsel furnished meaningful representation, and defendant has not established otherwise.  Counsel moved for the suppression of incriminating evidence, conducted pre-trial hearings, conducted voir dire as to the prospective jurors, objected to the introduction of evidence (including the mannequin exhibit, see Point IV, supra), and gave persuasive opening and closing statements.

At any rate, there was no prejudice resulting from counsel's alleged errors because, as shown, the surveillance videotape was admissible, it was not compelling evidence of defendant's guilt, and defendant's Rogers suppression claim had no chance of success. Accordingly, this Court should reject defendant's claim and deny his appeal in all respects.

86

CONCLUSION


THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.


Dated:      Mineola, New York
            August 7, 2008




                              Respectfully submitted,

                              Kathleen M. Rice
                              District Attorney, Nassau County
                              Attorney for Respondent
                              262 Old Country Road
                              Mineola, New York 11501
                              (516) 571-3800




Robert A. Schwartz
Sarah Spatt
Assistant District Attorneys
   Of Counsel




                              87

CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)

SARAH SPATT does hereby certify as follows:   This brief was prepared by computer; the body of the brief is double-spaced and utilizes a monospaced typeface (Dark Courier) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (WordPerfect 12.0), the brief contains 18,697 words, exclusive of any pages containing the cover, table of contents, proof of service, and certificate of compliance.

Dated:   Mineola, New York
         August 7, 2008

                              _Sarah Spatt_____
                              SARAH SPATT
                              Assistant District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND  DEPARTMENT
----------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,            CERTIFICATION PURSUANT
                                                TO CPLR 2105
                          Respondent,
                                                Appellate Division
                 -against-                      Docket No. 2005-8854

MARK ORLANDO,                                   Ind. No. 167N-05

                  Defendant-Appellant.

----------------------------------------x

        I, SARAH SPATT, an attorney at law admitted to practice

before the courts of the State of New York, hereby certify

pursuant to CPLR 2105 that the papers contained in the annexed

Respondent's Brief/Exhibit One has been personally compared by me

with the original certified copy prepared by the official court

reporter, and that I have found it to be a true and complete copy

of that original.

Dated:  Mineola, New York
        August 7, 2008

                                    _Sarah Spatt_____
                                    SARAH SPATT
                                    Assistant District Attorney
                                    Office of the Nassau County
                                      District Attorney
                                    Attorney for Respondent
                                    262 Old Country Road
                                    Mineola, New York 11501

E X H I B I T    O N E

Proceedings

1   photographs objectively without emotion and without

2   prejudice.

3       Also, among the exhibits received in evidence, were

4   diagrams and maps.  These diagrams and maps were

5   received in evidence to assist you in making your

6   evaluation of the testimony relating to the locations,

7   scenes or objects depicted therein.  You are the sole

8   judges of the accuracy of the diagrams and maps.  And

9   you are the sole judges of the weight to be given to

10  such diagrams and maps.

11      Motive is that which moves a person to engage in

12  conduct to do an act.  It is the reasons which motivate

13  conduct.  Motive may be good or bad.  Criminal intent on

14  the other hand is the state of mind which accompanies

15  the criminal conduct or act.  A person acts with

16  criminal intent when his conscious objective is to

17  engage in conduct which the law forbids.  Criminal

18  intent is an essential element of the crime charged and

19  must be proved by the People beyond a reasonable doubt.

20  On the other hand, motive is not an element of the crime

21  charged.  Therefore, the People have no obligation to

22  prove that the defendant had a reason or reasons to

23  commit the crime.  Nevertheless, the existence of

24  motive, or the lack of motive, when established by

25  evidence, is a consideration for the jury.

```
 1                  *      *      *      *

 2

 3

 4

 5

 6         This is to certify that upon review of the stenographic
           notes in the case of the People of the State of New York
 7         against Mark Orlando and a copy transcript, I determined
           an error was made on page 932 line 11.  The sentence
 8         containing the words, "Motive is that which proves"
           should actually read "Motive is that which moves."
 9
                                   Mary Ocskai
10         Mary Ocskai
           Senior Court Reporter
11

12

13    State of New York, County of Nassau, on
      the 29th day of July in the year 2008,
14    before me the undersigned, personally
      appeared, Mary Ocskai, and acknowledged
15    to me that she executed the same, and that
      by her signature on the instrument, the
16    individual executed the instrument.

17

18                                   Notary Public

19                                   JERRI KREVOFF
                                NOTARY PUBLIC-STATE OF NEW YORK
20                                   No. 01KR2202455
                                  Qualified In Nassau County
21                              My Commission Expires 9-13-09

22

23

24

25
```

MO