SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------------------------x

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | AFFIRMATION IN OPPOSIITON TO DEFENDANT'S MOTION FOR A WRIT OF ERROR CORAM NOBIS |
| Respondent, | |
| -against- | |
| MARK ORLANDO, | A.D. No. 2005-8854 Ind. No. 167N-05 |
| Defendant-Appellant. | |

----------------------------------------------------------X

SARAH S. RABINOWITZ, an attorney duly admitted to practice law in the State of New York, affirms the following under the penalty of perjury:

1.     I am an Assistant District Attorney, of counsel to the Honorable Kathleen M. Rice, District Attorney of Nassau County, and submit this affirmation in opposition to defendant's application, returnable May 13, 2011, for a writ of error coram nobis.

2.     The statements contained herein are made upon information and belief, based upon my examination of the records of the Office of the District Attorney.

3.     On the night of December 3, 2004, defendant Mark Orlando drove his wife's silver Suzuki Verona to an alley located at the intersection of Broadway and Georgia Avenue in Island Park, Nassau County.  Defendant had arranged to meet there with the runner for a gambling ring, twenty-four-year-old Bobby Calabrese, regarding a $17,000 gambling debt that defendant owed Calabrese.  Unbeknownst to Calabrese, defendant was accompanied to the meeting by his friend, co-defendant Herve Jeannot. Defendant and Jeannot planned to kill Calabrese so that defendant could avoid paying his $17,000 debt.  Once at the meeting spot, Jeannot exited defendant's car carrying a

.44 Magnum revolver and hid outside the car. Within a few minutes, Calabrese arrived and he and defendant exited their respective cars, approached one another, and began talking. Calabrese was wearing an oversized, gray hooded sweatshirt. Defendant gave Calabrese the money and the two of them hugged, as they often did after a money exchange. When they hugged that night, however, defendant yanked Calabrese's sweatshirt up over his head so that Calabrese could not see Jeannot approaching behind him. At that time, Jeannot started moving toward Calabrese's back, facing defendant, and fired one shot at Calabrese's head. As Calabrese fell to the ground, Jeannot fired two more shots into his head. Defendant and Jeannot then got back into the Suzuki and drove away. As they drove over a bridge, defendant slowed the car down and Jeannot threw the bullets out of the car window. Then as they drove over another bridge, defendant stopped the car and Jeannot got out of the car and threw the revolver into the water. Calabrese was pronounced dead at the scene.

4.      Defendant was arrested on December 9, 2004. Initially, he denied any involvement with Calabrese's murder, but ultimately admitted that he had brought Jeannot with him to the meeting with Calabrese, had seen Jeannot shoot Calabrese, and had driven Jeannot away from the murder scene, at which point Jeannot disposed of the bullets and the revolver. Notwithstanding these admissions, defendant maintained that he played no role in the shooting and that Jeannot acted alone.

5.      For his acts, defendant was indicted for murder in the second degree (Penal Law § 125.25[1]). Defendant was convicted, following a jury trial, during which the prosecution introduced evidence including defendant's two inconsistent written statements, testimony that demonstrated defendant's motive for the murder -- his

2

$17,000 debt, a surveillance videotape depicting the relevant vehicles arriving and leaving the scene of the crime, cell phone records placing defendant in the immediate vicinity of the crime just before and after the shooting, expert crime reconstruction evidence demonstrating that someone had yanked Calabrese's sweatshirt up over his head just before the shooting, and the murder weapon, which was found at the very spot where defendant admitted he had seen Jeannot dispose of it.

6.    Co-defendant Herve Jeannot was tried separately and convicted of murder in the first degree (Penal Law § 125.27[1][vi]) and criminal possession of a weapon in the second degree (Penal Law § 265.03[2]) (Berkowitz, J., at trial and sentence).[1]  In a decision dated February 24, 2009, however, a panel of this Court reversed Jeannot's judgment of conviction and ordered a new trial, ruling that Jeannot had been deprived of the effective assistance of counsel.  See People v. Jeannot, 59 A.D.3d 737 (2d Dept. 2009).  Jeannot was retried and convicted, once again, of murder in the first degree (Penal Law § 125.27[1][vi]) and criminal possession of a weapon in the second degree (Penal Law § 265.03[2]) (Berkowitz, J., at trial and sentence).  Jeannot committed suicide in prison before he was sentenced.

7.    Kerry Bassett, Esq., defendant's retained appellate counsel, filed a brief on defendant's behalf on or about April 23, 2008.  In the one hundred seven page brief, appellate counsel raised nine claims: (1) that defendant's statements were the product of an interrogation that occurred while he was in custody for unrelated misdemeanor

---

[1] This conviction was obtained at Jeannot's third trial upon the indictment.  At each of the two proceeding trials, which took place in September 2005 and January 2006, the jury was unable to reach a unanimous verdict, and therefore the trial court declared a mistrial.

3

charges on which he was represented by counsel, and the statements were consequently obtained in violation of his right to counsel, (2) that a detective's trial testimony regarding Jeannot's statements constituted impermissible hearsay that violated defendant's right to confront his accuser, (3) that the videotape copy of the digital footage recorded by storage facility surveillance cameras was admitted in violation of the best evidence rule, (4) that the trial court improperly permitted the People to use a demonstrative exhibit to display the bullet trajectories, and improperly refused to permit the jury to tamper with the exhibit during deliberations, (5) that the prosecutor made improper summation remarks that deprived defendant of a fair trial, (6) that the People improperly failed to notify defendant before the trial that a detective had confiscated money from defendant's house, (7) that the court's jury charges regarding circumstantial evidence, motive, and demonstrative evidence and the use of models were improper, (8) that defendant was denied effective assistance of trial counsel, and (9) that the appellate court should review all of the asserted issues on the merits, in the interest of justice. (That brief is annexed hereto as Exhibit A.)

8.      After the People filed a brief opposing defendant's appeal, defendant's appellate counsel filed a twenty page reply brief, in which she reiterated defendant's claims and responded to the People's arguments.  (That brief is annexed hereto as Exhibit B.)

9.      On April 28, 2009, a panel of this Court unanimously affirmed defendant's judgment of conviction.  See People v. Orlando, 61 A.D.3d 1001 (2d Dept. 2009). Specifically, this Court held that defendant's statements were not procured in violation of his right to counsel, and that defendant's right to confront his accuser had not been

4

violated when the trial court permitted a detective to testify that he told defendant that a co-defendant had given a statement about the murder. See id. at 1001-02. The court also ruled that the admission of the videotape and the mannequin exhibit were proper (id. at 1002-03), defense counsel provided defendant with meaningful representation (id. at 1002), and defendant's remaining claims were unpreserved (id.).

10.     On June 10, 2009, appellate counsel moved in the Court of Appeals for defendant to be granted leave to appeal from this Court's order affirming his judgment of conviction. On October 29, 2009, the Court of Appeals denied defendant's application for leave to appeal. See People v. Orlando, 13 N.Y.3d 837 (2009).

11.     Defendant, acting pro se, now seeks to have this Court's order of April 28, 2009, vacated and his appeal reopened on the ground that appellate counsel was ineffective. Defendant specifically contends that counsel improperly failed to annex certain documents (copies of his NYSID and the V.T.L. § 511 bench warrants on which he was arrested) to the appellate brief in relation to his claim that his statements had been obtained in violation of his right to counsel. Defendant asserts that these documents "would have shown that defendant did have retained counsel" (Defendant's Brief). Defendant further argues that appellate counsel should have made a claim alleging "multiple Brady violations committed by the Nassau County District Attorney's Office for the failure to turn over test results for GSR; DNA; Hair, Fiber and Serology from the evidence collected at [his] residence" (id.).

12.     As detailed in the accompanying memorandum of law, defendant's coram nobis application is unworthy of relief. Annexing defendant's criminal record and V.T.L. warrants to his brief could not have helped his right-to-counsel claim because the

5

derivative right to counsel was not applicable here, where defendant was arrested on bench warrants and then, after waiving his Miranda rights, was questioned only regarding an unrelated incident. In any event, appellate counsel was not ineffective for failing to rely on materials that had not been admitted in evidence at the hearing, and were, consequently, dehors the record.

13.     Moreover, the record is insufficient to review defendant's vague allegation regarding "multiple Brady violations" (id.), and thus, the claim would not have been meritorious on direct appeal. In any event, defendant fails to even specify why the materials, which he claims the People improperly failed to turn over, were exculpatory and constituted Brady material. Regardless, even if the Brady claim was reviewable and not frivolous, and even if defendant could establish that his NYSID and the V.T.L. warrants supported his right-to-counsel claim, appellate counsel had discretion in deciding which claims to raise on appeal and which arguments to make in support of those claims, and was not required to raise every possible claim. An examination of appellate counsel's lengthy and exhaustive brief on appeal establishes that counsel did, in fact, provide effective representation.

WHEREFORE, based upon the foregoing and the annexed memorandum of law, defendant's application for a writ of error coram nobis should be denied.

Dated:   Mineola, New York
         April 28, 2011

                                        SARAH S. RABINOWITZ

6

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                             Respondent,

              -against-

MARK ORLANDO,

                       Defendant-Appellant.
-----------------------------------------------------------------x

**MEMORANDUM OF LAW**

A.D. No. 2005-8854
Ind. No. 167N-05

## STATEMENT OF FACTS

The relevant procedural history of this case is set forth in the accompanying affirmation.  The facts of defendant's hearing and trial are set forth at pages 1-33 of the main brief Respondent filed in connection with defendant's judgment appeal.  (That brief is annexed hereto as Exhibit C.)

<u>ARGUMENT</u>

<u>DEFENDANT RECEIVED EFFECTIVE REPRESENTATION BY APPELLATE
COUNSEL (answering defendant's motion).</u>

Despite overwhelming evidence of guilt and the rejection of nine appellate

claims, defendant seeks a new appeal on the ground that his appellate counsel was

ineffective.  Specifically, defendant appears to argue that his appellate attorney was

ineffective because, in the brief filed on defendant's behalf, counsel failed to annex

certain exhibits in support of his right-to-counsel claim, and failed to argue that the

prosecutor had committed <u>Brady</u> violations by failing to turn over the results of scientific

testing done on "evidence collected from [defendant's] residence" (Defendant's Motion).

Defendant's claims are entirely without merit and defendant's application for a writ of

error coram nobis should be summarily denied.

The test for determining whether a defendant was denied the right to effective

assistance of counsel under the federal constitution is two pronged:  the defendant must

show that counsel's performance was deficient, <u>i.e.</u>, less than "meaningful," and that he

was prejudiced by the deficient performance. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S.

668 (1984).  To satisfy the prejudice component, the defendant must demonstrate "that

there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." <u>Id.</u> at 694.  The test under the state

constitution is similar.  The only notable difference is that under the state standard, the

two <u>Strickland</u> prongs are merged into one; "prejudice is examined more generally in the

context of whether defendant received meaningful representation." <u>People v.</u>

<u>Benevento</u>, 91 N.Y.2d 708, 713 (1998); <u>see also</u> <u>People v. Stultz</u>, 2 N.Y.3d 277 (2004).

2

The meaningful representation standard "applies as well to claims of ineffective assistance of appellate counsel." People v. Borrell, 12 N.Y.3d 365, 368 (2009). Appellate counsel is deemed effective when his "actions are consistent with those of a reasonably competent appellate attorney," and his representation "may be meaningful even where [he has] failed to brief potentially meritorious issues." Id. at 368.   A constitutional violation is established only upon a showing that counsel's failure to raise an issue was "unreasonabl[e]." People v. Costello, 190 A.D.2d 815 (2d Dept. 1993); People v. Bechlin, 172 A.D.2d 756 (2d Dept. 1991).   Defendant must show that it is "likely" that the issue would have required reversal or modification of the judgment. People v. Linden, 171 A.D.2d 694 (2d Dept. 1991) (the omission of "colorable but . . . weak arguments" is not a basis to question the effectiveness of appellate counsel); accord Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992) (claim must be shown to have had a "reasonable probability of success" on appeal for its omission to be indicative of the ineffective assistance of appellate counsel); People v. De La Hoz, 131 A.D.2d 154, 158 (1st Dept. 1987) (defendant must show that the issue, if raised, would have created "a greater likelihood . . . that the judgment would have been reversed, or at least, modified").

It is defendant's considerable burden, then, to demonstrate that, viewed in its totality as of the time of the appeal, the representation afforded him was less than meaningful. See Stultz, 2 N.Y.3d at 283; see also People v. Henry, 95 N.Y.2d 563, 565 (2000); Benevento, 91 N.Y.2d at 712; People v. Baldi, 54 N.Y.2d 137, 147 (1981). Indeed, as the Court of Appeals stated, the standard for meaningful representation is "undemanding," and the courts "have often tolerated errors by counsel where the overall

3

representation was nonetheless capable of characterization as 'meaningful.'"  Borrell,
12 N.Y.3d at 368 (citing People v. Flores, 84 N.Y.2d 184 [1994]).  Here, under either the
federal standard as set forth in Strickland, or the more demanding state constitutional
standard of "meaningful representation," defendant has not shown ineffectiveness of
appellate counsel.

To begin, defendant's appellate counsel filed a one hundred seven page brief
and a twenty page reply brief raising nine claims on direct appeal.  The briefs were
competent and well-organized, set forth the relevant facts, cited relevant cases, and
clearly presented the legal arguments.  See People v. Stultz, 2 N.Y.3d at 285.  Indeed,
in a case where the proof of defendant's guilt was overwhelming, appellate counsel filed
briefs that fully summarized the facts and presented colorable claims addressing the
admissibility of defendant's statement, a detective's allegedly improper hearsay
testimony, the admissibility of various pieces of demonstrative evidence, an alleged pre-
trial discovery error by the People, the propriety of the prosecutor's closing arguments,
the trial court's charge to the jury, and the supposed ineffective assistance of trial
counsel.  Viewed as a whole, therefore, appellate counsel's brief reveals competent,
meaningful representation.

Defendant claims that, had appellate counsel "attached . . . a copy of the NYS
Rap Sheet [and] copies of 511.1; and, 511.2 bench warrants . . . it would have shown
that defendant did have retained counsel" (id.).  Defendant, therefore, presumably
approves of the fact that appellate counsel raised a right-to-counsel claim on appeal,
but implies that counsel erred by failing to annex the above-mentioned documents in

support of that claim.  Defendant's argument is meritless because these documents would have done nothing to help the appellate claim at issue.

Defendant argued on appeal that his statements were the product of an interrogation that occurred while he was in custody for unrelated misdemeanor charges on which he was represented by counsel.  Consequently, defendant claimed that, under People v. Rogers, 48 N.Y.2d 167 (1979), his statements to the detectives about the Calabrese homicide were obtained in violation of his right to counsel and improperly admitted at trial.  See Defendant's Appellate Brief at 64-69.  In Rogers, the Court of Appeals determined that, when a defendant is in police custody for a criminal charge on which he is represented by counsel, a derivative right to counsel attaches and custodial interrogation about any subject, whether related or unrelated to that charge, must cease.  See Rogers, 48 N.Y.2d 167.

Since Rogers, however, this Court and others have consistently held that, where a defendant is arrested on a bench warrant that is unrelated to the charge under investigation, there is a "break in custody," rendering the Rogers derivative right to counsel inapplicable.  See People v. Lovell, 267 A.D.2d 476, 477 (2d Dept. 1999); see also People v. Tyler, 43 A.D.3d 633, 635 (4th Dept. 2007); People v. Garcia, 40 A.D.3d 541, 541 (1st Dept. 2007).  Recently, the Court of Appeals reiterated that principle.  See People v. Lopez, 2011 N.Y. Slip Op. 01316 at *16 2011 WL 588457 (February 22, 2011) ("If defendant . . . had been released and was arrested on a fugitive warrant for failure to appear, he could have been questioned about an unrelated matter").[2]

---

[2] In Lopez, the Court of Appeals held that the police officer who questioned the defendant was required to make a reasonable inquiry concerning the defendant's

(Continued)

5

Applying that principle here, defendant had no derivative right to counsel. Defendant was concededly arrested on two bench warrants for V.T.L. charges that were unrelated to the Calabrese homicide.   See Defendant's Appellate Brief at 65-68. Defendant's representation on those traffic matters was, therefore, of no significance. Defendant was able to, and did, effectively waive his right to counsel with regard to the unrelated homicide investigation.

The testimony educed at the pre-trial suppression hearing established that, prior to giving his statements, defendant was advised of his Miranda rights on several occasions and waived those rights both verbally, and by signing two pre-printed rights cards at different times.   Notably, defendant never asked to speak with the attorney whom he alleges he had retained on his misdemeanor cases, nor did he ever ask to speak to any attorney whatsoever (McHugh: H53-54, 58-78, 125-27; McGinn: H176-98; Cereghino: H273-75, 277-82).[3]   The derivative right to counsel was, therefore, clearly inapplicable in defendant's case.   Indeed, contrary to defendant's present assertions

representational status before commencing interrogation about an unrelated matter, where the circumstances, such as the fact that bail had been set, indicated that there was a probable likelihood that an attorney had entered the custodial matter, and the defendant was actually represented on the custodial charge.   See Lopez, 2011 WL 588457.  In this case, however, even if it was somehow reasonable for the detectives to suspect that defendant was represented by counsel as to the traffic matters -- and defendant has not established that it was -- it was of no moment because, as discussed, as a result of the "break in custody," he was not represented by counsel on the matter for which he was in custody (i.e., the bench warrants).  See Lopez, 2011 N.Y. Slip Op. 01316 at *16; Lovell, 267 A.D.2d at 477.   Moreover, Lopez was decided well after defendant's appeal.  Accordingly, appellate counsel could not have relied on Lopez in support of defendant's appeal and the decision in Lopez is of no benefit to defendant's coram nobis petition.

[3] Numbers in parentheses preceded by "H" refer to the minutes of the pre-trial suppression hearing.  Names preceding numerical references refer to the witnesses who gave the recounted testimony.

6

and regardless of whether his NYSID and the bench warrants reflected that he was represented by counsel, annexing those documents could not have salvaged his right-to-counsel claim, and counsel was not ineffective for failing to do so.

Notably too, neither defendant's NYSID or the bench warrants at issue were admitted in evidence at the pre-trial suppression hearing.  Thus, appellate counsel cannot be faulted for failing to annex those documents to the brief, given that they were not even part of the record on appeal.  Moreover, defendant cannot properly rely on dehors the record materials in support of his coram nobis petition.  See People v. Taranow, 28 A.D.2d 562 (2d Dept. 1967) ("[Q]uestions involving matters allegedly dehors the record . . . are not properly within the purview of coram nobis."); accord People v. Brown, 24 A.D.3d 792 (2d Dept. 2005) (striking all references in defendant's coram nobis application to matters outside the record).

In any event, even if defendant's NYSID and the bench warrants did somehow reflect that defendant was represented by counsel, and even if appellate counsel had annexed those documents as exhibits, it would have had no effect on the outcome of the appeal.  As discussed, defendant was not entitled to the derivative right to counsel because he was arrested on bench warrants, and then, after waiving his Miranda rights, was questioned only regarding an unrelated incident.  See Lovell, 267 A.D.2d at 477.

Next, defendant makes the overly broad argument that he was deprived of the effective assistance of appellate counsel as a result of counsel's failure to assert an appellate claim regarding "multiple Brady violations committed by the Nassau County District Attorney's Office for the failure to turn over test results for GSR; DNA; Hair, Fiber and Serology from the evidence collected at [his] residence" (Defendant's Brief).

7

First, defendant does not provide any support for his ambiguous claim that the People committed "multiple" Brady violations. Indeed, defendant does not even specify exactly how the purported "test results" were exculpatory, and consequently constituted Brady material.

Second, there is absolutely nothing in the record that references any potential Brady violations regarding the People's failure to turn over scientific test results in connection with evidence collected at defendant's home. Consequently, this claim was not reviewable from the record (see People v. Kinchen, 60 N.Y.2d 772, 773-74 [1983]), and could not have been raised on direct appeal. See People v. Panawoty, 18 A.D.3d 579 (2d Dept. 2005) ("contentions involving factual matters dehors the record are not properly before [the] court on direct appeal"). Significantly, then, it cannot be the basis of a coram nobis petition. See Taranow, 28 A.D.2d 562 (2d Dept. 1967); accord Brown, 24 A.D.3d 792.

None of the arguments that defendant now seems to contend appellate counsel should have raised would have prevailed on direct appeal. Regardless, even assuming that some of the claims raised by defendant were appropriate or were not completely meritless, appellate counsel was under no obligation to raise them. See Jones v. Barnes, 463 U.S. 745, 751 (1983); Stultz, 2 N.Y.3d at 285 ("Effective appellate representation by no means requires counsel to brief or argue every issue that may have merit.").

As in any other context of representation, an attorney is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 689-90. "When it comes to

8

the choice of issues, appellate lawyers have latitude in deciding which points to address." Stultz, 2 N.Y.3d at 285; accord People v. Larkins, 10 A.D.3d 694, 694 (2d Dept. 2004). Accordingly, and especially in light of defendant's failure to support his claims, this Court should not second-guess appellate counsel's decisions regarding which issues, and which specific arguments in support of those issues, to include in her brief. See People v. Waters, 123 A.D.2d 798, 799 (2d Dept. 1986) ("[R]easonable professional judgments by appellate attorneys as to what are the most promising issues on appeal should not be second-guessed.").

Here, defendant merely suggests that annexing certain exhibits would have supported his right-to-counsel claim and that there were Brady violations, without providing any support for his blanket assertions. Indeed, other than making baseless, conclusory allegations, defendant has not demonstrated that the inclusion of the proposed exhibits or the Brady claim in the brief would have resulted in reversal or modification of the judgment. Defendant's reticence is unsurprising, however, in light of the fact that, as discussed, there is absolutely no likelihood that, had appellate counsel annexed the exhibits at issue or raised the proposed Brady claim, the outcome of the appeal would have been different. Defendant fails to recognize that appellate counsel appropriately refrained from annexing pointless exhibits that were dehors the record, and raising frivolous issues that were unlikely to succeed on appeal.

In sum, therefore, appellate counsel's failure to raise defendant's current claims was not only reasonable, but legally sound. Appellate counsel filed a well-written brief that contained a professional and thoughtful analysis of the facts and legal issues. She advocated zealously and skillfully on behalf of her client before this Court, and more

9

than satisfied the standards for effective assistance of appellate counsel under both the federal and state constitutions. Moreover, given the overwhelming evidence of defendant's guilt (see annexed Exhibit C at 14-33), nothing that appellate counsel could have done would have led to a more favorable result on appeal. Accordingly, defendant's present attempt to besmirch appellate counsel's efforts must fail because it is without merit.

10

## CONCLUSION

## THE MOTION FOR A WRIT OF ERROR CORAM NOBIS SHOULD BE DENIED.

Dated:   Mineola, New York
         April 28, 2011

Respectfully submitted,

KATHLEEN M. RICE
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501

Robert A. Schwartz
Sarah S. Rabinowitz
  Assistant District Attorneys
    Of Counsel

11

# EXHIBIT A

# D.A. COPY

To be argued by:
Kerry Bassett, Esq.
Time requested: 15 minutes

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT
------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                              Respondent,

                                                        Ap. Div. Dkt. No.
        -against-                                       2005-8854
                                                        Nassau Ind.
                                                        167N-05
MARK ORLANDO,

                              Appellant.

------------------------------------------------------------------X


## APPELLANT'S BRIEF


Kerry Bassett
Bassett & Bassett, P.C.
Attorneys for Appellant
320 Carleton Avenue, Suite 4200
Central Islip, New York 11722
(631) 234-2511

# TABLE OF CONTENTS

CPLR 5531 STATEMENT.................................................................4

QUESTIONS PRESENTED.............................................................6

PRELIMINARY STATEMENT.........................................................9

STATEMENT OF FACTS.............................................................10

POINT ONE
PURSUANT TO *PEOPLE V. ROGERS*, THE APPELLANT'S RIGHT TO
COUNSEL WAS VIOLATED, AND THE HEARING COURT SHOULD
HAVE SUPPRESSED THE APPELLANT'S ALLEGED STATEMENTS
TO POLICE...............................................................................63

POINT TWO
REVERSAL IS REQUIRED BASED ON *BRUTON V. UNITED STATES*
AND *CRAWFORD V. WASHINGTON*..............................................70

POINT THREE
THE STORAGE FACILITY VIDEOTAPE SHOULD NOT HAVE BEEN
ENTERED INTO EVIDENCE BECAUSE IT VIOLATED THE BEST
EVIDENCE RULE......................................................................78

POINT FOUR
THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO
USE A MANNEQUIN AS DEMONSTRATIVE EVIDENCE..............84

POINT FIVE
THE PROSECUTOR'S SUMMATION WAS IMPROPER AND
PREJUDICIAL..........................................................................87

POINT SIX
THE PROSECUTION'S FAILURE TO NOTIFY THE APPELLANT
THAT NASSAU COUNTY POLICE RECOVERED $17,000.00 DURING
THE COURSE OF THE INVESTIGATION CONSTITUTES A
DISCOVERY VIOLATION..........................................................89

POINT SEVEN
THE TRIAL COURT IMPROPERLY CHARGED THE JURY.............91

POINT EIGHT
THE APPELLANT WAS NOT AFFORDED MEANINGFUL.............100
REPRESENTATION BR TRIAL COUNSEL

POINT NINE
THE COURT SHOULD REACH THE ISSUES ON THE MERITS......105

CONCLUSION..................................................................106

CERTIFICATE OF COMPLIANCE.........................................107

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT
-------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                        Respondent,

              -against-                                    Ap. Div. Dkt. No.
                                                           2005-8854
                                                           Nassau Ind.
                                                           167N-05
MARK ORLANDO,

                                        Appellant.

-------------------------------------------------------------------------X

              **STATEMENT PURSUANT TO CPLR 5531**

1.     The County Court Indictment Number was 167N-05.

2.     The full names of the original parties are the People of the State of
       New York against Mark Orlando.  There has been no change.

3.     This action was commenced in the Nassau County Court by the filing
       of Indictment number 167N-05.

4.     Appellant was charged with one count of Murder in the Second
       Degree, in violation of Penal Law §125.25(1).  A jury trial began on
       May 31, 2005 (Sullivan, J.).  On July 14, 2005, the jury returned a
       guilty verdict.  On August 18, 2005, the Appellant was sentenced to a
       term of imprisonment of twenty-five years to life.

                                                                      4

5.  This appeal is from a judgment of conviction of the County Court, Nassau County (Sullivan, J.), dated August 18, 2005, and from all pre-trial orders (Honoroff, J.).

6.  The Appellant's co-defendant, Herve Jeannot, was tried separately for Murder in the First Degree and was convicted. On November 1, 2006, the County Court, Nassau County (Berkowitz, J.) sentenced Mr. Jeannot to life in prison. His matter is currently being appealed.

5

## QUESTIONS PRESENTED

1.     According to the hearing court, the Appellant was arrested for outstanding misdemeanor warrants issued by a Nassau County District Court judge.   The Appellant was represented by counsel on those misdemeanor cases.  Pursuant to *People v. Rogers,* did the hearing court err in suppressing the Appellant's statements to police, taken in violation of his right to counsel?

2.     The County Court permitted the prosecution to illicit testimony from a member of the Nassau County Police Department, who testified that a nontestifying co-defendant, Herve Jeannot, had confessed to killing Bobby Calabrese because the Appellant paid him to do so.   Jeannot was tried separately and the effect of hearing his confession *did not* result in the Appellant implicating himself in the murder of Bobby Calabrese.   The testimony was fundamentally prejudicial, and a violation of *Bruton v. United States* and *Crawford v. Washington.*  Was the testimony harmless error?

3.     Did the County Court err when it permitted the prosecution to use and manipulate a mannequin as demonstrative evidence, with no advanced warning to defense counsel, and then refuse to allow the jury to manipulate the mannequin during deliberations?

6

4.    A videotape was created by the Nassau County Police Department by utilizing still photographs taken by a storage facility security camera system. Did the introduction of the video tape violate the Best Evidence Rule, and was it properly authenticated by the People?

5.    During summation, the prosecutor hypothesized that the Appellant placed a piece of tape over his automobile license plate to obscure its view. There was no evidence produced at trial to support the prosecutor's remarks. Coupled with all other trial errors, did the prosecutor's improper statements prejudice the Appellant and deny him a fair trial?

6.    While testifying, Detective Michael Kuhn stated that he recovered $17,000.00 during the Calabrese investigation. The Nassau County District Attorney's theory of the case was that the Appellant paid his co-defendant $4,000.00 to kill Calabrese because he did not have $17,000.00 to extinguish his gambling debt. Did the prosecutor's failure to disclose the $17,000.00 violate Criminal Procedure Law Section 240.20, and substantially prejudice the Appellant?

7.    The Court's instructions to the jury were incomplete, confusing, and misleading. Did the jury charge violate the Appellant's right to a fair trial?

8.    Was trial counsel's performance so far below the standard of meaningful representation to render his service ineffective?

7

9.    In the interest of justice, should this Honorable Court reach all issues
on the merits?

8

## PRELIMINARY STATEMENT

Appellant Mark Orlando appeals from a Judgment of conviction entered in the County Court, Nassau County, on August 18, 2005, sentencing him to twenty-five years to life for Murder in the Second Degree.

Appellant is presently incarcerated at the Clinton Correctional Facility in Dannemora, New York.

Appellant was represented by Dennis Lemke, Esq., at the time of trial and sentence.   Bassett & Bassett, P.C. was retained to represent the Appellant after sentencing.

The People of the State of New York are represented by Kathleen Rice, District Attorney of Nassau County.

Co-defendant Herve Jeannot was tried separately after a joint suppression hearing was held.  He was represented by William Aronwald, Esq. at trial.  On August 11, 2006, Herve Jeannot was convicted of Murder in the First Degree and Criminal Possession of a Weapon in the Second Degree and subsequently sentenced to life in prison.   He is presently incarcerated at the Great Meadow Correctional Facility in Comstock, New York.  His case is being appealed.

9

## STATEMENT OF FACTS

Nassau County Indictment 167N-05 charged Appellant with one count of Murder in the Second Degree, in violation of Penal Law §125.25(1), for the killing of twenty-four year-old Bobby Calabrese ("Calabrese" or "decedent"), a money collector for a local bookmaker.  On December 3, 2004 at 8:40 in the evening, Calabrese was shot in the head and died in an alley in North Long Beach, in Nassau County.

Pre-trial hearings

Hearings for the Appellant and his co-defendant Herve Jeannot (hereinafter "Jeannot") were conducted before the County Court, Nassau County (Honoroff, J.) on April 18-21, 2005.[1]  The hearing was to address probable cause, admissibility of statements attributed to the co-defendants, and physical evidence recovered as to the Appellant.  The Court would also review the sufficiency of the search warrants, previously under Judge Donnino's purview. H.2-3.

Nassau County Police Officer Steven Loschiavo testified that he was working on December 9, 2004 with Officer Kevin McCarthy.  Officer Loschiavo was informed that the Appellant was involved in a homicide.  H. 23.  Officer Loschiavo testified that the police had arrest warrants for the

---

[1]Numbers preceded by the letter 'H' refer to pages of the hearing transcript.

Appellant and Jeannot, though later admitted that he did not have an arrest warrant for the Appellant and was unsure if anyone had an arrest warrant for the Appellant. H. 23, 28-29. Officer Loschiavo was informed that the Appellant had two existing warrants for Aggravated Unlicensed Operation of a Motor Vehicle, and was wanted for his involvement in a homicide. Officer Loschiavo did not know where the Aggravated Unlicensed Operation of a Motor Vehicle warrants originated from, and he arrested the Appellant under orders to do so by his Lieutenant. H. 30-31.

Special Operations officers stopped the Appellant as he was driving. H. 24. The Appellant got out of the car, was placed on his stomach, and handcuffed. Detectives McHugh and McGinn took control of the Appellant and put him in their car. H. 26.

On December 3, 2004, Homicide Detective John McHugh testified that he arrived at the crime scene in North Long Beach at approximately 9:30 p.m. H. 38-40.

The decedent was laying face-down in the road, adjacent to a running car. He was fully clothed, wearing a grey hooded sweatshirt pulled over his head. H. 41.

An autopsy performed on December 4, 2004 revealed that the decedent died of three gunshot wounds to the head. H. 42.

11

On December 4, 2004, Det. McHugh watched a video from Central Self-Storage, a facility near the crime scene. The surveillance tape showed a Suzuki Verona driving on Broadway three times within ten to fifteen minutes before the decedent's death. The Suzuki was parked, and then the decedent's car was visible parked in front of the Suzuki. Figures could not be seen on the video, and then the Suzuki left the crime scene. H. 48. On December 5, 2005, Det. McHugh learned that the Appellant's wife owned a Suzuki. H. 49.

On December 6, 2004, Det. McHugh learned that the co-defendants both had outstanding Nassau County warrants. H. 50.

On December 9, 2004, Det. McHugh attended the pre-arrest briefing. H. 92. Det. McHugh told the Special Operations officers that they had warrants for the co-defendants and wanted the men arrested. H. 95.

Later that evening, the Appellant was arrested. Once the Appellant was given to Dets. McHugh and McGinn, Det. McGinn drove the Appellant to Nassau County Police Headquarters. While Det. McGinn drove, Det. McHugh introduced them and told the Appellant that they were arresting him for Calabrese's death and would question him at Headquarters. H. 54.

They arrived at 9:50 p.m. The Appellant was put in one of two interrogation rooms in the squad. H. 54.

12

Det. McHugh spoke with the Appellant with Det. McGinn present. Det. McHugh advised the Appellant of his *Miranda* rights. The Appellant stated he understood his rights and agreed to speak with the detectives. H. 60.

The Appellant said that he knew the decedent through a friend. For the past six weeks, the Appellant had been placing bets with the decedent. H. 61. The Appellant won approximately ten thousand dollars over a six week period. H. 132-133. The Appellant would place bets through an offshore number. His account number was "Pop1271" with a password of "Tom." H. 61.

The Appellant lost $8,700.00 in the week of December 3, and it was due to be paid to the decedent either Thursday or Friday. The Appellant also owed the decedent $9,100.00 for losing bets placed earlier that same week, but that was not due until the following week. The decedent owed the Appellant $800.00 from a prior pay-off. In total, the Appellant owed $17,000.00. H. 61. The Appellant said that he kept his gambling winnings in a safe. H. 133.

The Appellant could not meet the decedent on Thursday, December 2 and suggested they meet in Island Park on Friday, December 3, because he already had plans to be at Wantagh Suzuki that evening. H. 61-62.

13

On Friday evening, the Appellant and Jeannot went to LA Fitness. After an hour and a half, they left to meet the decedent. When the Appellant was at the Long Beach Bridge, he called Calabrese and told him he was in Island Park, suggesting they meet by the old "McQuade's." H. 62.

The Appellant parked and saw the decedent pull up. The Appellant handed the decedent the money owed. The last time the Appellant saw the decedent, he was heading north. The Appellant drove to his home in Suffolk County. H. 63.

The Appellant called Wantagh Suzuki as he left Island Park to see if a refund check was waiting for him. The check was not prepared. The Appellant stopped at Wantagh Suzuki on the way home and found the dealership closed. H. 63.

The Appellant then stopped at an ATM because he just paid the decedent $17,000.00 and needed cash. H. 63.

The Appellant, with Jeannot still in the car, stopped at Vivian Barushik's home to see the brickwork she recently had installed in her home. H. 64.

Det. McGinn asked the Appellant about his gambling activity with the decedent. H. 64. The Appellant took a writing pad from the Detectives and penned four pages of notes. H. 65.

14

At approximately 12:10 a.m., Det. McHugh began writing a statement for the Appellant. Det. McHugh asked the Appellant questions, waited for the answer, and then incorporated it into a statement. H. 67. Just before 2:00 a.m., Det. McHugh finished writing the statement. He read it aloud to the Appellant and the Appellant read it to himself. Corrections were initialed. H. 68.

The Appellant asked that an addendum be added, and then he signed all pages, as did the detectives. H. 68.

At approximately 4:30 a.m. on December 10, 2004, Det. McHugh bean interrogating Jeannot, who was in the other interview room. H. 70. Det. Partee accompanied Det. McHugh. Prior to this, Dets. Partee and Trillo interrogated Jeannot. Jeannot had admitted to shooting and killing the decedent. Det. McHugh entered the interrogation room because he wanted to know if anyone else was involved in the homicide. H. 71, 98, 100.

After being advised of his rights again, Jeannot was still willing to speak to the officers. Jeannot said he killed Calabrese because the Appellant paid him $4,000.00 to do so. H. 72.

Jeannot claimed that on December 1, 2004, while at work, the Appellant said he was in debt to "Bobby" for $17,000.00, did not have the money to pay him, and had to kill him. The Appellant said he'd meet with

the decedent Friday or Saturday evening in Island Park. Later that week the Appellant said he had plans to meet with the decedent that evening and would try to kill him. H. 72.

Jeannot claimed that after work, they drove to Amityville to purchase a coat. As they were driving to LA Fitness, the Appellant asked Jeannot to kill Calabrese, because it would be easier and he could get paid $4,000.00. Jeannot agreed to kill Calabrese. H. 73.

In the evening of December 3, 2004, the Appellant and Jeannot arrived in Island Park, and Appellant took out a gun from a black bag in the rear seat. Jeannot saw that the .44 caliber gun was loaded with six copper jacketed bullets.

The Appellant asked Jeannot to get a gun in case the decedent arrived with someone else. Jeannot tried to get a gun from someone in Uniondale, but could not do so. H. 74.

The Appellant noticed that a nearby collision shop was open. He was concerned about video cameras in the junkyards, so they moved. The two men drove by convenience store that appeared dark. They drove around the block a few times and then parked. The Appellant called the decedent, who said he would be there in five minutes. Jeannot got out of the car and hid behind the rear passenger fender. H. 74-75.

16

A few minutes later, a car pulled up in front of the Appellant's car. The Appellant got out and talked with Calabrese. Jeannot circled around the Appellant's car and approached the decedent from behind. Calabrese saw Jeannot, fell to the ground, and held onto the Appellant's leg. H. 75. Jeannot fired one shot in Calabrese's head and fired two more bullets. Jeannot and the Appellant got back into the Appellant's car, made a sharp left-hand turn, cut through a car repair shop, and headed through Long Beach. H. 75.

On Loop Parkway, Jeannot threw bullets and shell casings off a bridge. At another bridge, Jeannot threw the gun in the water. The Appellant informed Jeannot that they should be seen by as many people as possible. They stopped by Wantagh Suzuki to pick up a check, but the dealership was closed. They stopped at an ATM, and went north on the Seaford-Oyster Bay Expressway. They decided to visit co-worker Vivian Barushik. Before arriving at her home, Jeannot threw his clothing in a dumpster in a schoolyard. H. 75.

The two men visited with Vivian, and then drove to the Appellant's home, where the Appellant paid Jeannot four thousand dollars in cash. The Appellant then dropped Jeannot off at home. H. 76.

17

Jeannot told Det. McHugh that he paid off a student loan, purchased clothing, and had five hundred dollars left in a shoebox in his room. H. 76.

From five to six a.m., Det. McHugh wrote the statement. Det. McHugh read it aloud, and then Jeannot read it to himself. Jeannot signed every page. H. 77. Jeannot refused to give a videotape statement. H. 78-79.

Det. McHugh admitted that no witness ever came forward to say that a Suzuki was seen leaving the crime scene at approximately 8:30 on December 3, 2004. H. 113. Det. McHugh also admitted that no eyewitness has come forth identifying the Appellant at the crime scene. H. 114.

Det. McHugh claimed that when he viewed the storage facility video, he could see neither a passenger, nor a license plate. H. 117.

Det. McHugh admitted that the Nassau County Police Department *did not have arrest warrants for the co-defendants; he intended to have them "picked up" for outstanding warrants.* H. 118.

Det. McHugh admitted that he did not witness the Appellant leaving his place of employment on the night he was arrested, and he did not see the Appellant commit any traffic infractions before his automobile was stopped by Special Operations officers. H. 122.

When the Appellant was taken into custody, Det. McHugh did not ask him if he wanted an attorney. H. 125. Det. McHugh did not "recall" the

18

Appellant asking to speak to his attorney, Barry Philips, Esq., but did recall
an attorney calling later that day. H. 125.

The Homicide Bureau blotter reflects that Barry Philips, Esq. called,
representing the Appellant, at 3:15 p.m. the afternoon after the Appellant's
arrest. H. 126-127.

Det. McHugh testified that he was not involved in the Appellant's
second written statement, which was taken by Detective Cereghino. H. 140.

Homicide Detective James McGinn testified that he drove the
Appellant and Det. McHugh to Headquarters when the Appellant was
arrested. H. 176. After they arrived, the Appellant was placed in an
interrogation room. H. 177.

The Appellant described his betting history with the decedent. H.
180. Calabrese drove to Professional Credit Services on Thursdays to pay
the Appellant his winnings. The Appellant voluntarily closed his gambling
line. H. 180.

The Appellant was supposed to meet the decedent on December 2,
2004, to pay him the money he was owed. The Appellant's losses for bets
made until November 28 were due on December 2. The Appellant lost
$9,100.00 on November 29 and 30, which would not be due and owing until

19

December 9. The Appellant, however, had the cash to pay the decedent the entire $17,000.00 he was owed. H. 181.

The decedent wanted to meet on December 3, and the Appellant agreed. H. 181.

On Friday, December 3, the Appellant went to LA Fitness with Jeannot and other co-workers. The Appellant and Jeannot left at approximately 7:30 to meet the decedent. H. 181-182.

The Appellant drove to an industrial area in Island Park, and the decedent arrived five minutes later, pulling up next to the Appellant's automobile. H. 182. The Appellant handed the decedent $17,000.00 through the windows. The Appellant left through Long Beach heading for Wantagh Suzuki. H. 182.

The Appellant attempted to contact Wantagh Suzuki and others between 8:40 and 9:00 p.m. H. 182. When the two men arrived at Wantagh Suzuki, the dealership was closed. H. 182. The Appellant then stopped at an ATM. He later left the ATM receipt on his work desk. H. 183. The two men then drove to a friend's home and visited with her for thirty minutes. The Appellant drove Jeannot home and called his wife while in front of Jeannot's house. H. 183.

The Appellant signed a written statement once Det. McHugh completed it. H. 187. At 5:10 a.m., Homicide detectives spoke with the Appellant again. Det. McGinn told the Appellant that Det. McHugh was speaking to Jeannot, who admitted to killing Calabrese. Det. McGinn warned that if the Appellant wished to give his side of the story, now was the time to do so. H. 188. The Appellant continued to repeat, "you don't understand." After twenty-five minutes, Det. McGinn left the room. H. 189.

At six a.m., Det. McGinn returned. The Appellant said he was afraid for his family and slept with a shotgun. Det. McGinn offered protection for the Appellant's family if organized crime was involved. H. 190.

Det. McGinn left the interrogation room at 6:50 and returned at 7:50 a.m. H. 190. He said that Jeannot confessed to killing Calabrese, to the location of the gun and the bullets, how the decedent was killed, and that the Appellant paid him $4,000.00 to commit murder. H. 190-191.

The Appellant informed Det. McGinn that he was afraid that Jeannot will hurt the Appellant's wife Diana, and their unborn child, because he saw that Jeannot was capable of shooting someone in cold blood. H. 208, 214.

The Appellant agreed to talk. Jeannot knew that the Appellant was going to pay the decedent $17,000.00 the night he died. H. 191. Some time

21

on Friday, December 3, 2004, Jeannot came into Professional Credit Services with a brown paper bag and asked the Appellant if he could put it in his trunk. H. 192. The Appellant watched Jeannot put the bag in the Appellant's trunk. H. 192.

The Appellant told Det. McGinn that Jeannot threw bullets out the window while they were on Loop Parkway, and threw the gun out the window while they were on Wantagh Parkway. The Appellant said he was afraid of Jeannot and his family. H. 193.

The Appellant told Det. McGinn that he and Jeannot drove down a street near Austin Blvd. in Island Park twice; they made a U-turn, pulled over, and parked. Jeannot told the Appellant he needed to relieve himself and got out of the car. A few minutes later, the decedent arrived. H. 194. The Appellant got out of the car to speak to Calabrese, and the two men met in the middle of the street. The Appellant hugged Calabrese, and they spoke. The Appellant took $17,000.00 out of his breast pocket and handed it to Calabrese. H. 194.

The Appellant heard a gunshot pass by his ear. The decedent dropped to the ground, and the Appellant saw Jeannot running toward Calabrese's car. The car door was still open. Jeannot closed the door, and shot Calabrese two more times. The Appellant and Jeannot then got back in the

22

Appellant's Suzuki and started to drive away. H. 195. The Appellant told Jeannot that Calabrese's feet were still moving. Jeannot got out of the car and attempted to shoot Calabrese again, but the gun wouldn't fire. Jeannot reached down and grabbed the $17,000.00 that the Appellant just gave Calabrese. H. 195. Jeannot got back in the car. The Appellant drove away. H. 195.

The Appellant told Det. McGinn that he wanted to be seen with Jeannot, and that he stopped at every light because lights have cameras. H. 196.

Jeannot threw bullets out the window as they drove over a bridge. Jeannot then told the Appellant to stop and he threw the gun into the water. H. 196.

Jeannot threw his clothes in a school dumpster near their co-worker Vivian's home. After they finished their visit with Vivian, the Appellant drove Jeannot home. Jeannot told the Appellant to keep his mouth shut or he would kill the Appellant's wife. H. 196.

The Appellant told Det. McGinn that he did not get any portion of the $17,000.00 back; that money was Calabrese's, and he paid it. H. 197.

The Appellant *never* admitted to taking part in Calabrese's killing. H. 217.

23

Homicide Detective Cereghino testified that he interrogated the Appellant at 10:00 a.m. on December 10, 2004. No one else was present. H. 273. The Appellant agreed to give a statement and his *Miranda* rights were read. H. 273.

Det. Cereghino went to Professional Credit Services to recover the Citibank ATM receipt dated December 3, 2004. H. 283.

At the close of the hearing, the People argued that the officers had probable cause to arrest the co-defendants because they had valid Nassau County warrants. The People also alleged that the police observed the Appellant driving without a valid license. H. 345-346.

On April 21, 2005, the parties returned for the Court's ruling. H. 362. The Court determined that Police Officer Loschiavo apprehended the Appellant based on an outstanding warrant. H. 373. The Court determined that all of the statements and physical evidence attributed to the co-defendants were admissible. H. 373.

Trial

The People alleged that Mark Orlando was a habitual gambler who had won thousands of dollars placing bets with Calabrese, but recently lost and owed $17,000.00 to Calabrese's bookmaker. The People alleged that

24

the Appellant paid Jeannot $4,000.00 to kill Calabrese, because the Appellant did not have $17,000.00 to settle his debt. T. 183.[2]

The People claimed that Mark Orlando arranged to meet Calabrese to settle his debt, but had no intention of paying him the money he was owed. The People alleged that Jeannot accompanied the Appellant to the meeting with Calabrese, and hid behind the Appellant's car, waiting for Calabrese to arrive. When Calabrese's car pulled up, he got out and Mark Orlando gave Calabrese a hug, signaling to Jeannot to fire the revolver he held. Mark Orlando allegedly pulled Calabrese's hooded sweatshirt over his head so he couldn't see Jeannot approaching with the gun. Jeannot then allegedly fired, killing Calabrese. T. 183-184. The People claimed that Mark Orlando's plan was simple: kill Calabrese, tell everyone he already paid Calabrese that night, and that someone must have killed him and taken the $17,000.00 payment. T. 186.

The People convinced a jury that its theory of the case was true; that Mark Orlando paid Jeannot a mere $4,000.00 to kill Mr. Calabrese because he did not have $17,000.00. However, the testimonial and demonstrative evidence adduced at trial does not support the People's theory. Detective Michael Kuhn would testify that the police recovered $17,000.00 during the

---

[2] Numbers preceded by the letter 'T' refer to pages of the trial transcript.

25

course of the homicide investigation (though the Appellant was never given any notice that such evidence was in police custody.) T. 711. The Nassau County Crime Laboratory could not detect any blood evidence on Mark Orlando's clothing.

The People's theory that Mark Orlando arranged to have Calabrese killed because he couldn't pay his debt is implausible, because the death of the bookmaker's runner does not extinguish Mark Orlando's debt.

Detective David Nystrom testified that at nine p.m. on December 3, 2004, he was called to a crime scene in North Long Beach, to document the scene through photography, video, and sketching. Many other police officers had arrived before Det. Nystrom. T. 238-239, 265.

The crime scene was in a commercial area. The area was poorly lit and is lightly traveled at night. A convenience store is located at the corner of Austin Blvd., Georgia Avenue, and Broadway. T. 235.

When Det. Nystrom arrived, he saw a gray Infiniti sedan, engine running, parked on the east side of Broadway, facing north, about sixty feet south of the convenience store. T. 235. Calabrese was lying face down in the roadway, just south of the gray Infiniti, wearing gray sweats. Calabrese's arms were up around his head and there appeared to be multiple gunshots to the back of his head. The deceased's sweat shirt was cut up the

26

center, and there were bullet holes in the back of the sweat shirt, which was pulled up around his head and neck. T. 236. Det. Nystrom was not present when the decedent's sweat shirt was cut. T. 272. Det. Nystrom did not speak to the person who cut the decedent's sweat shirt. T. 272.

Other than a twenty dollar bill that was recovered from Calabrese's right front pocket of his sweat pants, no money or weapon was recovered from Mr. Calabrese's vicinity, or the Infiniti. T. 236-237.

Det. Nystrom photographed the scene. After he was finished "processing" the scene, a Medical Examiner's physician examined Calabrese. He turned the decedent over and felt through the blood on the roadway and the front of Calabrese's body, recovering a copper jacketing portion of a bullet from the front of Calabrese's sweat shirt. T. 244.

Det. Nystrom packaged the bullet fragment in a plastic bag and handed it to Detective DiBeneditto, from ballistics. No other bullets or fragments were recovered from the scene. T. 245.

No other forensic evidence such as DNA or fingerprints was recovered from the crime scene. T. 246.

Some time after December 3, 2004, Det. Nystrom examined the decedent's car. T. 278. Reddish material was removed from the outside of

27

the rear window of the automobile and determined to be the decedent's human tissue. T. 247.

The Infiniti's exterior door handles, windows and body passages were examined for fingerprints, but none were located. T. 247.

Calabrese's wallet was recovered from the Infiniti, and it contained personal papers, thirty-nine dollars, and the decedent's driver's license. T. 248.

Christina Rasmussen, a Cingular Wireless representative, testified that she serves as the custodian of records for Cingular and is familiar with subscriber records.   T. 286.   The Appellant was the AT&T Wireless subscriber using cell phone number (631) 882-3428 in December 2004.  T. 288.  On Friday, December 3, 2004, he made seven phone calls to various telephone numbers. T. 288-290.

Police Officer Peter Vozzo testified that at 8:45 p.m. on December 3, 2004, he responded to North Long Beach after receiving a radio transmission. T. 292.

Officer Vozzo was the first police officer to respond to the crime scene and he saw the decedent lying in the street. T. 293. Calabrese showed no signs of life.  Officer Vozzo noticed a substantial amount of blood

surrounding Calabrese, who was lying face down with his arms over his
head. T. 293-294.

The decedent was wearing a gray hooded sweat shirt. Officer Vozzo
noticed several large holes in the midsection of the back of the sweat shirt
with a substantial amount of blood also on the rear of the sweat shirt. T.
294. The neck of the sweat shirt was pulled over the top of the decedent's
head. T. 294. The decedent's t-shirt was not pulled up. T. 299.

Officer Vozzo made sure the area was protected so officers could
respond and gather evidence. He called for assistance and an ambulance. T.
299-300.

When Ambulance Medical Technician Daniel Brooks responded to
Officer Vozzo's call, several officers were present at the scene. T. 300.
Officer Vozzo did not touch the decedent, but AMT Brooks did. Even
though Officer Vozzo determined that Calabrese was dead, AMT Brooks
began to cut the decedent's sweat shirt. T. 301. Officer Vozzo explained
that even though he was sure Calabrese was dead, it was up to AMT Brooks
to determine what, if anything could be done for the decedent. T. 301.

AMT Brooks testified that he had been employed as an AMT with
Nassau County Police for eleven years, and was an emergency medical

technician for almost twenty years. He is charged with treating the sick and injured when 911 is called for emergencies. T. 303.

AMT Brooks was working on December 3, 2004, driving in a police ambulance. AMT Brooks responded to a radio call at 8:43 p.m. for an intoxicated person, with subsequent calls for a person possibly shot. T. 304. When AMT Brooks arrived at the crime scene, Officer Vozzo was present and another squad car was down the street, blocking the road. AMT Brooks was the first medical technician to arrive. T. 305.

When AMT Brooks first noticed the decedent, he was lying in the middle of the street with no signs of life. As AMT Brooks approached the decedent, he noticed a large pool of blood, a running car in the vicinity, and the decedent's sweat shirt that seemed to be pulled up over the top of his head. T. 305-306.

In order to determine whether there was any life in the decedent, AMT Brooks reached up to the top of the hood to see of there was anything in it. There wasn't, so he cut the hood of the sweat shirt around the top, avoiding the bullet holes, and pulled the two pieces apart and peered at the decedent's head. T. 306. AMT Brooks testified that he cut the sweat shirt hood on the side, to check for a pulse. T. 314. AMT Brooks testified that he

30

cut the back side of the sweat shirt from the bottom to the top of the hood. T. 319.

Four bullet holes in the sweat shirt were consistent with four bullet holes in the decedent's head. AMT Brooks never saw the decedent when he was placed on his back, and is not responsible for the significant tear in the front of the sweat shirt. T. 321.

AMT Brooks observed what appeared to be several bullet holes and no signs of life. T. 306. After checking the decedent's pulse, Calabrese was pronounced dead. T. 306-307.

AMT Brooks was not present when the decedent was turned on his back, or when he was moved to search for anything under his body. AMT Brooks was also not present when the decedent's body was turned over again for crime scene to take photographs. T. 310.

Robert Ianfolla, the decedent's cousin, testified that on December 3, 2004, Calabrese worked for a bookmaker. Mr. Calabrese was employed to locate prospective gamblers, and pick up money from and drop off winnings to betters. T. 325, 333.

Ianfolla was present when Mark Orlando and Calabrese met for the first time, when a mutual friend, Tommy Flores, arranged an introduction.

31

The Appellant and the decedent met at Professional Credit Services, where the Appellant and Flores were employed. T. 325.

Ianfolla accompanied Calabrese to Professional Credit Services four to five times to pay the Appellant the proceeds of his wagers. T. 326. Whenever Ianfolla was present, Calabrese paid the Appellant his winnings in front of Professional Credit Services, with people milling around. On one occasion, Calabrese commented to Mark Orlando that he never traveled alone; Ianfolla was always with him. T. 328-239.

Incredulously, even though Ianfolla saw Calabrese four to five times a week and loved him like a brother, Ianfolla claimed he did not know the identity of the bookmaker Calabrese illegally took bets for. T. 343.

On December 3, 2004, Ianfolla was visiting Calabrese at his family home. After eight p.m., Calabrese announced that he was going to Island Park to collect money Mark Orlando owed the bookmaker. T. 330. Calabrese was wearing a new, untorn gray hooded sweat shirt. T. 330. Ianfolla claims he did not know how much money Mark Orlando owed Calabrese; he just knew for once, Calabrese did not have to pay the Appellant, and that the Appellant was not going to gamble any more. T. 350.

32

Tommy Flores testified that he worked with the Appellant and had known him for about thirteen months. T. 369. Flores had a criminal record of Driving While Ability Impaired and Driving While Intoxicated. T. 352-353.

Flores and Orlando were friends and would socialize during breaks and after work. Flores also knew co-worker Jeannot, though they were never close. Mark Orlando took Jeannot to work every day. T. 354.

Flores knew Calabrese was employed as a runner for a bookmaker and he introduced him to Orlando because Flores knew the Appellant gambled. T. 357-358.

The Appellant often spoke about the bets he placed with Calabrese. T. 359. Flores recalled one instance when Calabrese paid the Appellant approximately $18,000.00. T. 359.

Right before Thanksgiving, Flores, his girlfriend, the Appellant and Jeannot were sitting in the Appellant's car, each holding the money Orlando won from Calabrese. T. 369. Flores knew that the Appellant had won $38,000.00 in the past four to five weeks placing bets with Calabrese. T. 370.

Flores claimed that during the week of November 29, 2004, the Appellant was not "himself" and owed nine thousand dollars for one week

33

of wagering, and eight thousand dollars for another week of poor betting.  T. 360.

On Thursday, December 2, 2004, the Appellant picked up Flores to drive him to work and was talking about gambling with Calabrese.  Flores claimed that the Appellant's wife found his gambling books, and that the Appellant told Calabrese he wasn't going to gamble any more.  T. 360.

On December 3, 2004, Flores, the Appellant and Jeannot left work and went to the local gym.  T. 362.  During the Appellant's work-out, Jeannot "rushed" the Appellant along, telling the Appellant he had to go somewhere.  The Appellant and Jeannot left the gym between 7:15 and 7:30 in the evening.  T. 362.

Later that evening, at 9:26 p.m., Flores received a telephone call from the Appellant on his cell phone.  The Appellant stated he was returning home from a car dealership, and was supposed to pick up money but the appropriate dealership representative was not working.  The Appellant sounded frantic; frazzled.  T. 363.

On December 4, 2004, Flores was working when his brother called and informed him that Calabrese was dead.  T. 365.  Flores telephoned the Appellant after he left work and asked if he saw Calabrese the night before.

34

The Appellant answered that he did see Calabrese, and was shocked to learn that he was killed.  T. 366.

Later that evening, Flores again contacted the Appellant to find out details of his meeting with the decedent.   The Appellant stated he met Calabrese around 8:20 or 8:30 and paid him the money he was owed from cash the Appellant held in his home safe.  T. 367.  The Appellant told Flores that Calabrese left and headed towards Oceanside, and the Appellant left in the Long Beach direction.  T. 368.

Barbara Diamont testified that she worked with the Appellant, Jeannot, and her boyfriend, Tommy Flores, at Professional Credit Services. T. 394-395.  Barbara was aware that in October or November of 2004 Flores introduced Calabrese to Orlando and that the Appellant placed bets with the decedent.  T. 396.  The Appellant would often tell Diamont about his gambling winnings.  T. 398.

On December 3, 2004, at roughly 7:15 p.m., Diamont saw the Appellant and Jeannot at L.A. Fitness.   T. 400.   The Appellant was exercising and Jeannot was rushing the Appellant to leave.  T. 401.

Diamont learned of Calabrese's death on December 4, 2004.  Flores called her on her cellular phone and stated that Calabrese had been shot. Flores told Diamont that the Appellant owed Calabrese money and had met

35

with him the night before.  T. 402.  Diamont called the Appellant, who stated he saw Calabrese the night before.  The Appellant knew that Calabrese had been shot in the head three times. T. 402-403.  Diamont was surprised that the Appellant knew details about the homicide that Flores did not.  T. 403.  The Appellant was worried that law enforcement would think he had a role in Calabrese's death.  T. 403.

Diamont recalled the Appellant winning roughly $29,000.00 about a week before Calabrese died. T. 409.

Frank Walker testified that he is a car salesman at Wantagh Suzuki and became acquainted with the Appellant when he purchased two or three cars from the dealership over a two year period. T. 411.

On December 3, 2004, the Appellant spoke to Walker, and asked whether a refund check was available to be picked up.  Walker advised the Appellant to come in the next day to pick up the check.  T. 412.  The Appellant replied, "this is bull shit," and hung up.  The Appellant picked up the refund check the following Monday evening. T. 415.

Detective Charles Costello, Jr. was deemed an expert witness in latent fingerprint identification by the County Court and affirmed that after testing five (5) one hundred dollar bills recovered from Herve Jeannot's bedroom,

36

he could *not* detect the Appellant's fingerprints or the decedent's fingerprints. T. 426, 430-431.

Nassau County Police Officer Norman McCloy, assigned to the Marine Aviation Bureau, was involved in the investigation of the Calabrese death. T. 434-435. On Monday, December 13, 2004, Officer McCloy and other divers responded to the Sloop Channel Bridge in Wantagh, Nassau County. Officer McCloy testified that he recovered a .44 caliber handgun in the water near the bridge. Officer McCloy confirmed that the weapon shown to him by the prosecutor was the same weapon he recovered on December 13, 2004. T. 438-439.

Nassau County Police Sergeant Greg Magnifico, assigned to the Marine Aviation Bureau, testified that on Friday, December 10, 2004, he was asked by the Homicide Bureau to locate a gun off the Sloop Channel Bridge. T. 441-442. Due to weather conditions, Marine Aviation Bureau divers were unable to search for the weapon until Monday, December 13, 2004.

When Officer McCloy recovered a .44 caliber weapon gun, Ser. Magnifico placed the weapon in a bucket of sea water, to limit corroding, and took the weapon to the Marine Bureau Base. Det. William Brosnan

arrived and took the gun to Nassau County Headquarters for processing.  T. 447, 455.

Nassau County Police Officer Bob Shaw, assigned to the Computer Crime Section, testified that he examined the contents of Bobby Calabrese's computer, recovered from the home he shared with his parents. T. 460.

Officer Shaw recovered what appeared to be gambling records with the following: "Player Pop 1271."  Oddly, Officer Shaw was *not* asked to recover *every* gambling record on Calabrese's computer.  Additionally, Shaw was *not* asked to examine the contents of Calabrese's computer to attempt to discover who Calabrese worked for.  T. 462-465.

Officer Shaw did not know if gambling records labeled "Player Pop 1271" pertained to Mark Orlando, and could not determine whether the gambler identified as "Player Pop 1271" was in debt to Calabrese or was winning. T. 464, 467.

Police Officer Steve Loschiavo he arrested the Appellant on December 9, 2004. T. 471-474.  Officer Loschiavo stopped the Appellant's vehicle.  The Appellant stepped out of his car and fell to the ground on his stomach. T. 475.  Officer Loschiavo handcuffed the Appellant, assisted him to his feet, and was placed in the custody Homicide detectives.  T. 476. Officer Loschiavo testified that the Appellant was cooperative and when

38

searched, was not found in possession of a weapon or illicit substances.  T. 476.

Detective Ken Strigaro, assigned to the electronics command of the Nassau County Police Department, testified that on December 4, 2004, he responded to the Central Self Storage facility on the block where the decedent was found.  T. 477-481.  Central Self Storage had video cameras outside the facility facing east and northeast from the rear of the facility.  T. 481.  The security system was a thirteen-camera system, with some of the cameras located outside the building.  The cameras would take images that were stores on a digital video recorder, or DVR.  T. 482.    Det. Strigaro stated that the security system was sophisticated; it had three modes of operation.  The third operational mode was a combination of the time-lapse and the event or 'alarm" mode in which when there is no activity on any cameras, the system sits in time lapse mode, but can automatically drop out of that mode if there's any activity.  T. 482-483.

In December 2004, the storage facility was set in the third operational mode.  The system was set to take time-lapsed images approximately every thirty-six seconds and every two and one half to three seconds in the event or alarm mode.  If there was a lot of activity, the system would record images about once a second.  T. 483.  According to Det. Strigaro, the event

mode of the third operational system is triggered when a certain portion of the screen changes from dark to light.   Only a fair amount of light would trigger the system. T. 483.

Det. Striago admitted that the security system never produced a videotape, or a tape of actual time passing.  Instead, Det. Strigaro *created* a tape of the images stored on the DVR.   The cameras *never* produced an actual "real-time" videotape of the scenes outside the facility. T. 485-486.

Det. Strigaro admitted that the storage facility's date and time displayed on the recorded DVR images was inaccurate in December 2004. Det. Strigaro noted that the time was "off" by approximately one hour. T. 486.  Det. Strigaro came to this conclusion by checking the programmed time with his wrist watch. T. 487.  Det. Strigaro simply assumed that the incorrect time was due to the system not reflecting that it was Standard Time, and not Daylight Savings Time.  T. 487.

Det. Strigaro determined that the system recorded images on the DVR between eight o'clock and nine o'clock on the night of Friday, December 3, 2004, by examining the "search" mode of the system.  The Detective entered the time and date of interest (December 3, 2004) for two of the thirteen cameras that the system recorded on.   T. 487-488.   According to Det. Strigaro, once you ask the system to locate images from the database, the

40

system finds any matches for the inputted parameters, automatically brings them on the screen, and allows you to display them. T. 487-488. Det. Strigaro requested this from the database one camera at a time. T. 488.

Det. Strigaro testified that the system captured images between 8:35 and 8:36 p.m. on the night of December 3, 2004. T. 489. Det. Strigaro retrieved images between eight and nine p.m. T. 489. That night, there was no recording device capturing the images, such as a VCR or DVD or CD burner. Therefore, Det. Strigaro had to *create* a videotape. T. 490. The times covered by the created videotape are 9:10 p.m. to 9:45 p.m., although Det. Strigaro stated it was "actually" 8:10 to 8:45. T. 490.

When Det. Strigaro responded to the storage facility to create the videotape, he was able to manipulate the recording by freeze-framing an image, going backwards and forwards. Det. Strigaro taped all of the distortions he created in the timeline of the images. T. 491.

The created videotape was entered into evidence and played for the jury. T. 496. Det. Strigaro testified that the pauses in the video were created by him, often in response to one of the investigating Detectives' request to re-examine an image. T. 497.

Det. Strigaro testified that he captured the decedent's car driving northbound on Broadway. T. 499. Det. Strigaro also took note of a car

41

traveling southbound on Broadway that made a U-turn to head northbound on Broadway. The Detective claimed that it was the same car that could be seen earlier on the tape. T. 500-501. Det. Strigaro pointed out that the car that made the U-turn has a distinct black line that bisected the license plate, and this is how the Nassau County Police Department differentiated this vehicle from others captured on the DVR. T. 501. Assistant District Attorney Hayden then played the created videotape for the jury in its entirety. T. 501.

Det. Strigaro admitted that the videotape displays approximately eight other cars traveling northbound or southbound on the tape. T. 513.

A car parked near the storage facility and it was captured on the DVR. T. 515. The lights on the car were off and then turned back on before the decedent's car arrived on the scene and was recorded by the cameras. T. 515. After the decedent's car arrives, approximately forty-two second lapse until the other car pulls out. T. 515. The car the stopped as it was pulling away, which caused the DVR to store another "event" image. T. 516.

Det. Strigaro admitted that rather than simply record all of the images from the DVR onto one videotape, unaltered, he choose to manipulate the images to record exactly what he wanted to see. T. 517.

42

Homicide Detective John McHugh testified that on December 3, 2004, at 9:30 p.m., Det. McHugh responded to North Long Beach. T. 527-528. The area was commercial and dimly lit. On the west side of the street is a large public storage facility, a limousine business, and an auto repair shop. Further north on the street, on the corner of Georgia Avenue, was a convenience store. T. 528. Det. McHugh testified that the limousine business and storage facility were not opened when Calabrese died, at approximately 8:36 p.m. T. 528.

When Det. McHugh arrived at the crime scene, an Infiniti, with engine running and head lights on, was parked at the curb, facing north. T. 529. The decedent was lying in the roadway, face down, with his arms on the ground, up near his head. Calabrese was several feet away from the Infiniti, fully clothed, wearing a gray sweat shirt that had been cut up the back. T. 530.

Det. McHugh was present when Dr. O'Reilly arrived at the crime scene and flipped the decedent's body over. T. 530. A cell phone and twenty dollars was recovered from Calabrese's body. T. 530. Thirty-nine dollars was recovered from the Infiniti. T. 531. Det. McHugh denied that any other money was recovered from the vicinity of Bobby Calabrese's body or the Infiniti. T. 530.

43

On December 4, 2004, Homicide Detective Partee attended the autopsy performed on Bobby Calabrese, and told Det. McHugh that the decedent had been shot in the head three times. T. 536.

On December 4, 2004, Det. McHugh watched a videotape created by Detective Strigaro, which consisted of recorded images captured by the public storage facility's two surveillance cameras. T. 537. From the videotape, Det. McHugh became interested in a Suzuki Verona, which police later learned was owned by the Appellant's wife. T. 538.

Between December 3 and December 4, 2004, the Nassau County Police Department could not locate an eye-witness to the death of Calabrese. T. 571.

After the Defendant was arrested on December 9, 2004, Det. McHugh took custody of the Appellant, and placed him in a police vehicle. T. 541. As Detective McGinn drove the car back to Police Headquarters, Det. McHugh explained that the Nassau County Police wanted to speak to the Appellant about Bobby Calabrese's death. T. 541. At Headquarters, the Defendant was placed in a ten foot by ten foot interrogation room. T. 542.

Co-defendant Jeannot was also arrested on December 9, 2004 as he left work. Jeannot was transported by other officers to Headquarters and put in a second interview room. T. 542-543.

44

A few minutes after ten p.m., Det. McHugh, in Det. McGinn's presence, read the Appellant his *Miranda* warnings and told him to pay attention. T. 543. The Appellant understood his rights and agreed to speak to the Detectives. T. 546.

The Appellant told the Detectives that he knew Calabrese, having been introduced six weeks earlier by mutual friend Flores. T. 547-548. Calabrese had provided the Appellant with an offshore telephone number, through which he could place bets under an account named POP 1271 with a password, "Tom." T. 542.

The Appellant explained that for the next six weeks, he gambled through the number and was up about $10,000.00, but recently had started loosing money. As a result of the loss, the Appellant had shut down the line on the Tuesday prior to Calabrese's death. T. 548. The Appellant denied that his wife found out about his gambling; he simply thought he should stop. T. 548.

The Appellant told the Detectives that Calabrese paid the Appellant's winnings where the Appellant worked. T. 549. However, when the Defendant was due to pay Calabrese, the Appellant drove to Calabrese's vicinity. T. 549.

45

On Friday, December 3, 2004, the Appellant called Calabrese and told him he could meet in Island Park later that evening. T. 550.

The Appellant had paid bills, put money in the bank, and put money in his wife's bank account, with his gambling winnings. T. 550.

The Appellant said that on Friday, December 3, 2004, he worked during the day, and went to L.A. Fitness afterwards with Jeannot. T. 550. The two met co-workers there. The Appellant and Jeannot left between 7:15 and 7:30 p.m. to meet Calabrese. T. 550.

The Appellant drove his wife's Suzuki Verona because his 1991 Cougar was old, and in poor condition. T. 550. The Appellant and Jeannot drove through Long Beach. When the Appellant got to the Long Beach Bridge at about 8:25 p.m., he called Calabrese on his cell phone and told him they would meet him on Industrial Place by "Puma's". Calabrese stated he would meet them in a few minutes. T. 561.

The Appellant drove straight to Industrial Place to meet Calabrese. T. 561. The Appellant waited and saw Calabrese's car pull up. They spoke, and then the Appellant handed Calabrese $17,000.00 in two "bricks." They did not get out of their cars. T. 552.

The Appellant denied carrying a weapon, and stated that Jeannot did not have one, either. T. 552. After Calabrese departed, the Appellant left

46

the area, traveling east through Long Bean back to Loop Parkway. The Appellant called Wantagh Suzuki in an attempt to get a refund check he was owed. As he was driving, the Appellant called the dealership, asked for Ralph, and was told Ralph was not available, and that the Appellant could not pick up the refund check that evening. When the Appellant arrived at the dealership, it was closed. T. 552-553.

The Appellant stopped at a Citibank branch on Sunrise Highway in Wantagh to take money from his account via the ATM machine. T. 553. The Appellant then drove to Plainview to the home of co-worker Vivian Barushik. Ms. Borushik had just installed a pool and deck, and the Appellant was interested in having that work done as well. They left and the Appellant drove Jeannot home. The Appellant arrived at his residence at 10:30 p.m. T. 553.

The Appellant told the Detectives that Flores called him the next morning and told him that Calabrese was dead. The Appellant offered to speak to the Calabrese family, and instructed Flores to offer the Appellant's cell phone number should they wish to speak to him. T. 554.

The sum and substance of the Appellant's interrogation was reduced to writing and admitted into evidence at trial as People's Exhibit 45. T. 561.

47

Det. McHugh stated that not everything the Appellant said was included—only portions the *Detectives* believed pertinent. T. 576.

The Appellant's oral and written statements *do not* allege that he or Jeannot were involved in Calabrese's death. T. 577. After speaking with the Appellant for roughly four hours, and after reducing the Appellant's interrogation to writing, Det. McHugh left the interview room at two a.m. T. 578.

Det. McHugh reasonably believed that the Appellant did not know that Jeannot was present at Headquarters as he was being interrogated and as his statement was being drafted. T. 581.

An ATM receipt was recovered from the Appellant's work desk, showing that at 9:12 p.m. on December 3, 2004, an ATM withdrawal was made. T. 569.

The People expected to call Detective James McGinn to testify after Det. McHugh. Appellant's counsel, Dennis Lemke, Esq., objected to portions of Det. McGinn's anticipated testimony. Mr. Lemke objected to Det. McGinn being permitted to testify about Jeannot's confession to detectives, in which Jeannot stated he killed Calabrese because the Appellant paid him to do so. Counsel asked that his objection be noted for the record,

48

stating that he would not object at the time of Det. McGinn's testimony. T. 591.

Homicide Detective James McGinn testified that as he and Det. McHugh were speaking to the Appellant before his statement was written about his gambling winnings. Over six weeks, the Appellant was "up" roughly ten thousand dollars, even after his losses. T. 601.

The Appellant was left alone for three hours. At 5:10 a.m., Det. McGinn entered the room. T. 619-620. Det. McGinn told the Appellant that Jeannot was next door, speaking to Det. McHugh. T. 620. Det. McGinn told the Appellant he should truthfully explain his side of the story. T. 620.

The Appellant repeated, "You don't understand" to Det. McGinn. Det. McGinn asked the Appellant to explain. The Appellant repeated that Det. McGinn "didn't understand" for nearly thirty minutes. T. 630-621. Det. McGinn then left the room. T. 621.

Det. McGinn entered the Appellant's interrogation room at six a.m. He informed the Appellant that Jeannot was confessing to the facts of the killing. Jeannot told Police where the murder weapon was located. Det. McGinn informed the Appellant that the Police were aware that the meeting with Calabrese did not take place at Industrial Park; that the Police had a

49

videotape of the spot the meeting occurred. T. 621. The Appellant repeated, "You don't understand." T. 621.

The Appellant explained to Det. McGinn that he was afraid for his family. T. 620-622. The Defendant told Det. McGinn that he did not sleep in bed with his wife, but slept at the other end of the house with a shot gun. T. 623.

Det. McGinn left the interrogation room at 6:50. At 7:50, Det. McGinn re-entered the Appellant's room and informed him that Jeannot was talking to the other Detectives. Jeannot gave a statement, implicating himself in the murder. Jeannot confessed that he was the murderer, but that Mark Orlando had paid him to do it. 623-624.

The Court interrupted Det. McGinn and gave the jurors the following instruction:

> The Court: Ladies and Gentlemen, you have been permitted to hear testimony about remarks made to the defendant by Det. McGinn about statements allegedly made by Herve Jeannot. You're to consider this testimony only when considering the circumstances under which the defendant may have made statements and for no other purpose. You are to completely disregard any statement allegedly made by Herve Jeannot when considering evidence against the defendant.
>
> Any statement allegedly made by Herve Jeannot is not evidence against the defendant. You are not to concern yourself with whether Herve Jeannot did or did not make any statements to the police, if he did, what those statements may have been or whether or not they were true. T. 624.

50

After hearing of Jeannot's confession, the Appellant changed his statement to Det. McGinn, *but did not implicate himself in the Calabrese shooting.* The Appellant explained that on Thursday, December 2, 2004, during the work day, Jeannot asked the Appellant if he could put a brown paper bag in the Appellant's car. The Appellant agreed. While the Appellant *and* Flores stood on the steps of Professional Credit Services watching, Jeannot placed the brown paper bag in the Appellant's trunk. T. 627.

The Appellant told Det. McGinn that on the night of Calabrese's death, the Appellant was wearing white sneakers, a white T-shirt, black sweat pants, and the black suede jacket he was wearing the night he was arrested. T. 628.

At 8:25 p.m., the Appellant was across the street from the North Long Beach 7-Eleven. He called Calabrese to arrange the meeting and waited five minutes until Calabrese arrived. T. 629. Jeannot got out of the Appellant's car. A few minutes later, Calabrese arrived. The Appellant and Calabrese got out of their cars. The Appellant gave Calabrese a hug and handed him $17,000.00. The Appellant then heard a shot ring next his right ear. T. 629.

Calabrese fell to the ground and Jeannot ran past the Appellant towards Calabrese's car. Jeannot closed the Infiniti's open door, walked

51

back to Calabrese, who was lying in the middle of the street, and shot him two times.

The Appellant and Jeannot got back into the Suzuki, and Jeannot ordered the Appellant to leave.   Jeannot got out of the car again and attempted to shoot Calabrese, but the gun would not fire.  T. 630.  Jeannot reached down, picked up the $17,000.00, and got back in the Suzuki.  T. 630.

As the Appellant drove away, he screamed at Jeannot that he would call the police.  Jeannot told the Appellant that they would not call anyone, and would go home.  T. 630.  The Appellant, in fear, decided that he wanted as many people as possible to see him with Jeannot.  T. 630.

As they drove over Loop parkway, Jeannot told the Appellant to slow down.  Jeannot threw the bullets out of the window of the car.  T. 631.  As they drove over a bridge on the Wantagh Parkway, Jeannot ordered the Appellant to stop.  Jeannot threw the gun over the bridge into the water.  T. 631.

The Appellant attempted to call as many people as possible, and tried to stop at Wantagh Suzuki, but the dealership was closed.  T. 631.  The Appellant then withdrew money from a Citibank ATM, knowing that a camera will record him being seen with Jeannot.  T. 631.

52

As they drove to a co-worker's home, Jeannot ordered the Appellant to pull into a school parking lot.  Jeannot placed his clothes in a dumpster. They then arrive at Ms. Barushik's home.  Jeannot stayed in the car as the Defendant looked around her home. T. 632.

When the Appellant dropped Jeannot off at home, Jeannot threatened the Appellant to keep his mouth shut, or he would kill the Appellant's pregnant wife. T. 632.

The Appellant told Det. McGinn that Jeannot kept all of the $17,000.00 he paid Calabrese.  T. 632.

Det. McGinn's never reduced the aforementioned interrogation to writing.  T. 654.  Even though the Appellant was cooperative and gave a truthful account of Calabrese's death, Det. McGinn made the Appellant wait at least an hour before a written statement was taken by Det. James Cereghino. T. 664.

Det. McGinn admitted that he never examined the gambling records found on Calabrese's computer in an attempt to learn who Calabrese worked for, even though he was the lead detective on the case. T. 632.

Det. McGinn never asked the Appellant if he was afraid to explain what happened the night of Calabrese's death because of organized crime,

53

even though Det. McGinn is well aware that gambling might have played a part in Calabrese's death. T. 643.

Det. McGinn admitted that on the night of Calabrese's death, the Appellant did not owe the bookmaker $17,000.00, he owed $8,700.00. The following week, the Appellant's remaining losses would be due and owing. Calabrese never threatened the Appellant with physical violence if he did not pay his debt. T. 657.

Det. Cereghino testified that he was assigned to the Calabrese investigation on December 10, 2004 and spoke to the Appellant at ten in the morning. T. 667. The Appellant and Det. Cereghino were alone in a small interrogation room. T. 667. Det. McHugh asked Det. Cereghino to take a statement from the Appellant on his "final" version of the Calabrese death. T. 668.

Det. Cereghino entered the interrogation room, took off the Appellant's handcuffs, and told the Appellant he would take his final statement. First, Det. Cereghino read the Appellant his *Miranda* rights. T. 668.

Even though the Appellant was not handcuffed and was capable of writing his own statement, Det. Cereghino penned the statement.

54

Corrections were made as the statement was being drafted and after completion. T. 671-672.

The statement was admitted into evidence as People's 48 and read for the jury to hear by Assistant District Attorney Hayden. T. 673-684.

After writing the Appellant's statement, Det. Cereghino located an ATM receipt on the Appellant's work desk, the Appellant's wallet and notebooks. T. 687.

Nassau County Detective Michael Kuhn testified that on December 10, 2004, he went to the Appellant's home in Suffolk County with other members of the Nassau Police Department and two uniform Suffolk County Police Officers, to execute a search warrant. T. 707.

In accordance with the search warrant, Det. Kuhn recovered $2,749.00 in cash from the Appellant's bedroom. The cash was located in a safe in the Appellant's bedroom closet. T. 708. A shotgun and ammunition was also recovered. T. 709. The ammunition was suitable for the shotgun only; it would not fit into a magnum handgun. T. 710.

*Det. Kuhn also testified that he located $17,000.00, but did not bring that evidence to court.* Det. Kuhn testified that the $17,000.00 was still "locked up," presumably in the Nassau County Police Department's