UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARK ORLANDO,

                      Petitioner,

– against –

NASSAU COUNTY D.A. OFFICE,

                      Respondent.

**MEMORANDUM & ORDER**

2:11-cv-3992 (ERK)

KORMAN, *J*.

      The evidence presented at trial demonstrated that, just after 8:30 PM on December 3, 2004, near a self-storage facility in Island Park, New York, Herva Jeannot shot Bobby Calabrese in the head three times, killing him. Jeannot then climbed into the passenger seat of a vehicle driven by petitioner Mark Orlando, who drove him away from the scene of the crime. Calabrese had ventured out to Island Park to collect a gambling debt from Orlando, who had racked up $17,000 in sports betting losses over the course of the two weeks prior to the killing. Shortly after the killing, Jeannot disposed of the unfired ammunition from his gun by tossing it out of Orlando's car window over the side of a bridge on the Loop Parkway, and then disposed of his firearm by tossing it over the side of a bridge on the Wantagh Parkway. Orlando then drove Jeannot home.

      After a jury trial, Orlando was convicted of Intentional Murder in the Second Degree, *see* N.Y. PENAL LAW § 125.25(1) (McKinney 2017), and sentenced to imprisonment of twenty-five years to life. The Appellate Division affirmed. *People v. Orlando*, 61 A.D.3d 1001 (N.Y. App.

Div. 2009), *leave to appeal denied*, 13 N.Y. 3d 837. Orlando's petition asserts a variety of grounds for relief, each of which is without merit.

## DISCUSSION

*I.     Orlando's Confrontation Clause Rights*

On December 9, 2004, Mark Orlando was arrested and taken to police headquarters in Mineola, New York for questioning. Orlando initially told detectives that he and Jeannot had met up with Calabrese on the night of December 3, but that Orlando had paid Calabrese $17,000 to settle a debt and then parted ways with him. Calabrese's lifeless body was found shortly after Orlando claimed to have paid him. Detective McGinn, who was interrogating Orlando, did not believe this implausible story. In order to get at what really happened to Calabrese, McGinn told Orlando that police officers were questioning Jeannot, and that Jeannot would probably tell them a "truer" version of events. Tr. Min. 621. Orlando, though, did not change his account. Detective McGinn then told Orlando that the police had a videotape that proved Orlando was lying about the location of his meeting with Calabrese, and that Jeannot had told police where the murder weapon was. Still, Orlando did not change his account. It was not until McGinn told Orlando that Jeannot had made a statement, in which he alleged that Orlando paid him to kill Calabrese, that Orlando changed his story.

In summary, Orlando told Detective McGinn that on December 3, Jeannot had agreed to accompany him to meet Calabrese. Later that day, Orlando and Jeannot arrived at the location that Orlando had selected to meet Calabrese. After they parked, Jeannot stepped out of the car, stating that he had to use the bathroom. While Jeannot was supposedly using the bathroom, Bobby Calabrese arrived. Orlando and Calabrese each got out of their cars, met, and hugged. Following a short conversation, Orlando handed Calabrese the $17,000 that he owed. Suddenly, Orlando

heard a shot and saw Calabrese fall to the ground. He saw Jeannot run over to Calabrese's car and close the door, then return to where Calabrese had fallen and shoot him twice more. Jeannot and Orlando then got back into Orlando's car. They did not drive away, however. Instead, Orlando stopped the car next to Calabrese's body, and Jeannot got out and attempted to fire the gun at Calabrese again, but it would not fire. Jeannot then grabbed the $17,000 that Orlando had given to Calabrese, got back into the car, and Orlando drove the two of them away from the scene of the crime. Before Orlando dropped Jeannot off at his house, Jeannot threatened that, if Orlando told anyone what had happened, Jeannot would kill Orlando's wife. Jeannot kept the entire $17,000 stolen from Calabrese.

The prosecutor argued that it was Detective McGinn's statement to Orlando, informing him that Jeannot had implicated him in the murder, which finally caused Orlando to change his story and admit to being present for the killing and driving the getaway car. In support of that argument, the prosecution sought to introduce testimony of Detective McGinn to that effect. Over objection, McGinn was permitted to give the following testimony:

> I left the [interrogation] room at about 6:50 [AM]. I went back into the room at about ten minutes to eight. About 7:50 in the morning. And I told [Orlando] at this point that Herva Jeannot was, in fact, talking to the other detectives. He had given a statement and he had implicated himself in the murder. He said that he was the murderer, but that Mark Orlando had paid him to do it.

Tr. Min. 623-24. Consistent with the purpose for which it was admitted, the trial judge gave the following limiting instruction: "You're to consider this testimony only when considering the circumstances under which the defendant himself may have made statements and for no other purposes. You are to completely disregard any statement allegedly made by Herva Jeannot when considering evidence against the defendant." *Id.* The trial judge repeated the instruction when he charged the jury. *Id.* at 930.

On appeal, relying principally on *Bruton v. United States*, 391 U.S. 123 (1968), Orlando argued that Jeannot's out-of-court statement, as recounted by Detective McGinn, constituted a violation of his Sixth Amendment right to confront and cross-examine the witnesses against him. The District Attorney argued, in response, that McGinn's testimony regarding what he told Orlando about Jeannot's confession was necessary to enable the jury to understand what had caused Orlando to abandon his blanket denial of any involvement in the murder, and admit that he had been present and helped dispose of evidence. The Appellate Division, relying on *Tennessee v. Street*, 471 U.S. 409 (1985), and its state court progeny, denied relief.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), habeas corpus relief is available only when a state court judgment is "contrary to, or *involved an unreasonable application of*, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1) (emphasis supplied). "[C]learly established Federal law, as determined by the Supreme Court," means "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. It is worth emphasizing that "a state court's 'unreasonable' application of law is not synonymous with an 'incorrect' or 'erroneous' decision." *See Jackson v. Conway*, 763 F.3d 115, 135 (2d Cir. 2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

In *Bruton*, the Supreme Court held that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135. Specifically, the Court recognized that situations where "the alleged accomplice . . . does not testify and cannot be tested by cross-examination" are precisely the type of "threats to a fair trial [against which] the Confrontation Clause was directed." *Id.*

Nevertheless, "the use of testimonial statements for purposes other than establishing the truth of the matter asserted" is not barred by the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. at 414). In *Tennessee v. Street*, the Supreme Court recognized that, in some contexts, the prosecution may introduce an alleged accomplice's confession for a "legitimate, nonhearsay purpose." 471 U.S. at 417. In *Street*, "[t]he State's most important piece of substantive evidence was [defendant's] confession." *Id.* at 415. The defendant attempted to undermine the strength of that evidence by arguing that his "confession" did not reflect his recollection of what had happened, but rather that the police had forced him to repeat the confession of his alleged accomplice. *Id.* The prosecution sought to introduce the accomplice's confession to prove that there were differences between the two confessions, thereby demonstrating that the defendant's argument was based on a lie. According to the *Street* Court, "[h]ad the prosecutor been denied the opportunity to present [the accomplice's] confession in rebuttal so as to enable the jury to make the relevant comparison, the jury would have been impeded in its task of evaluating the truth of respondent's testimony and handicapped in weighing the reliability of his confession." *Id.* The Supreme Court concluded that "there were

no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." *Id.* at 416.

Subsequently, in *United States v. Logan*, 419 F.3d 172 (2d Cir. 2005), the Second Circuit applied *Street* to allow the prosecution to introduce the out-of-court alibi statements of alleged accomplices in order to help prove an element of their case, rather than as part of a rebuttal. Specifically, the defendant in *Logan* had made a statement to police in which he predicted what alibis the members of his fraternity would use to exculpate themselves from a suspected arson. The fact that his prediction was accurate indicated that he was privy to the other fraternity brothers' plans to commit arson and obstruct justice. Thus, the prosecution introduced the alibis not to prove the facts stated therein, but to prove the existence of a conspiracy among the fraternity brothers. The Second Circuit held that this was a valid, nonhearsay purpose, and found that the situation was "no different" than that in *Street. Id.* at 178.

In this case, the Appellate Division, relying on *Street*, held that "the court did not violate [Orlando's] right to confront a witness when it permitted a detective to testify that he told the defendant that a codefendant gave details about the killing." *Orlando*, 61 A.D.3d at 1002. Specifically, the Appellate Division held that Detective McGinn's testimony about Jeannot's statement was introduced for the legitimate, nonhearsay purpose "of explaining the detective's actions and their effect on the defendant," and that the trial judge gave a proper limiting instruction. *Id.* The nonhearsay purpose proffered here is not as compelling as that in *Street*, where introduction of the accomplice's confession was actually necessary to rebut defendant's argument that his confession was a mirror image of that of his accomplice. The introduction of Jeannot's statement, however, provided context for explaining why Orlando altered his exculpatory story,

which he had been repeating even after being told that Jeannot had identified the weapon and that police had found video evidence proving that Orlando's initial statement was a lie.

While the admission of Jeannot's statement incriminating Orlando may implicate the defendant's Sixth Amendment right to confront and cross-examine the witnesses against him, the record in this case suggests that this is a rare instance in which the evidence the jury asked for during its deliberations demonstrates that it actually followed the judge's limiting instructions. Indeed, in *United States v. Swiderski*, 548 F.2d 445, 451–52 (2d Cir. 1977), the Second Circuit acknowledged that such requests from the jury may be indicative of the evidence that was important to the jury's decision. Here, the jury requested "written statements to the police by the defendant," "surveillance video" of Orlando's car coming and going, "view of sweat shirt on the dummy,"[1] "picture of Bobby [Calabrese] after being shot," Tr. Min. 943, "phone records . . . from defendant to Bobby C," "what was found in defendant's home," as well as the testimony of Orlando's friend, Barbara Diamant, stating that, on the morning after the murder, Orlando recounted to her "shocking," "vivid detail[s]" of the murder, such as the number and location of the bullet wounds that killed Calabrese—details that were not public knowledge at that time. *Id.* at 956. Thus, the jury asked for virtually every piece of incriminating evidence, except that which they were told to disregard—namely, the testimony of Detective McGinn recounting Jeannot's statement that induced Orlando to change his story. This provides compelling support for the conclusion that the jury followed the judge's instruction "to completely disregard any statement allegedly made by Herva Jeannot when considering evidence against the defendant." *Id.* at 930.

Even if the jury's requests for evidence do not constitute a separate ground for rejecting petitioner's *Bruton* claim, because the jury followed the judge's limiting instruction, these

---

[1] The significance of this evidence is discussed *supra*, at 8.

requests, combined with the overwhelming evidence of Orlando's guilt, also provide compelling support for the conclusion that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)); *see also United States v. Dhinsa*, 243 F.3d 635, 656 (2d Cir. 2001) (applying harmless error analysis to a Confrontation Clause violation). The prosecution's case, even absent the testimony about Jeannot's alleged statement, was very strong. Orlando admitted (1) that he was present when the victim was murdered (corroborated by cell phone evidence that placed him in the vicinity of the murder at the time it was committed), (2) that he drove Herva Jeannot—the man who shot the victim—away from the scene (corroborated by video evidence showing Orlando's wife's car at the scene of the murder), and (3) that he assisted Jeannot in disposing of evidence. Significantly, as discussed above, the prosecution elicited testimony from a friend of Orlando, Barbara Diamant, stating that, on the morning after the murder, Orlando recounted to her details of the murder that were not public knowledge at that time.

Moreover, Calabrese was found dead in the street with his sweatshirt pulled over his head, and three bullet wounds to the back of his head. The prosecution's theory was that while Orlando was hugging Calabrese—a fact to which Orlando admitted—he pulled Calabrese's sweatshirt over his head so that Jeannot could get a clean shot while Calabrese was blinded. To illustrate this theory to the jury, the prosecution brought in a dummy that had holes in its head, which matched the location of the holes in the sweatshirt and on Calabrese's body. The inescapable inference is that Orlando was the person who pulled the sweatshirt over Calabrese's head. Thus, there is overwhelming evidence that Orlando was "acting in concert" with Jeannot, a theory on which the jury was charged, Tr. Min. 936, which supports a conviction of Second Degree Murder independent of whether Orlando paid Jeannot to commit the murder. *See* N.Y. PENAL LAW § 20.00

("Criminal Liability for Conduct of Another") (McKinney 2017); *see also People v. Whatley*, 69 N.Y.2d 784 (1987); *Maldonado v. Scully*, 86 F.3d 32 (2d Cir. 1996).

## II. *Alleged Brady Violation*

Orlando contends that the prosecution failed to notify him that the Nassau County police recovered $17,000 during the course of the investigation. If $17,000 were, in fact, recovered, it would corroborate one of Orlando's arguments—namely, that he had enough money to pay Calabrese, did in fact pay him, and therefore had no reason to kill him. Orlando characterizes the alleged failure to disclose as a "discovery violation." Pet. 11. Nevertheless, read liberally, it could be viewed as a failure to disclosure exculpatory evidence in violation of the due process. *See Brady v. Maryland*, 373 U.S. 83 (1963). The problem, however, is that Orlando concedes that Detective Kuhn testified, in response to a leading question from Orlando's attorney, that "the other $17,000" was recovered and housed in the evidence locker. Tr. Min. 711. The fact that Orlando's attorney knew to ask the question at all, combined with Kuhn's response, suggests that Orlando had sufficient opportunity to exploit Kuhn's admission in closing. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.").

Nevertheless, I decline to resolve the merits of Orlando's *Brady* claim for two reasons. The first is that the record is ambiguous regarding whether $17,000 was in fact recovered, and from whom. As the District Attorney explained in her brief, "[Detective] Kuhn repeatedly testified that he found only $2,749 during his search of petitioner's home [Tr. Min. 707–09, 711]. Consequently . . . the random and unexplained reference to $17,000 during Kuhn's cross-examination might well have been the result of a misstatement on the part of defense counsel or an error in the

transcription of the record." *See* Resp't's Mem. of Law at 20–21. The possibility that it was an inadvertent misstatement is supported by the fact that Orlando's attorney did not exploit it, or even refer to it, in his summation.

More significantly, the *Brady* claim is unexhausted. Orlando may still collaterally attack the judgment, based on the alleged discovery violation, pursuant to N.Y. C.P.L. § 440.10, as the District Attorney concedes. Nevertheless, in order to do so, he would have to withdraw the petition and could not later refile it because it would be untimely. Under other circumstances, a stay and abeyance order could avoid this problem. Such an order, however, is only appropriate "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that he engaged in intentionally dilatory litigation tactics." *Rhines v. Weber*, 544 U.S. 269, 278 (2005). Here, as early as 2012, the District Attorney alerted Orlando to the fact that his *Brady* claim was not exhausted. Nevertheless, Orlando failed to exhaust the claim even though he was granted a stay to allow him to pursue his state remedies on July 3, 2012. Thus, he does not have "good cause" for his failure to exhaust, which renders a stay inappropriate. *Id.* at 277. Unless Orlando deletes this claim, I would therefore dismiss the petition as a mixed petition, and any subsequent petition would be time-barred. *See Rose v. Lundy*, 455 U.S. 509 (1982).

### III.    *Orlando's Right to Counsel*

Orlando contends that his Sixth Amendment right to counsel was violated when, despite having retained legal counsel for unrelated traffic charges, he was questioned regarding the murder of Calabrese without his counsel present. But the Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Moreover, the right "does not attach until a prosecution is commenced." *Id.* Thus, Orlando did not have a right to have counsel present

for questioning about a murder for which he had not yet been charged. Nor is there any merit to his related ineffective assistance of counsel claim. Because there were no grounds to suppress, there is no reasonable probability that an objection would have been successful.

## IV.    *Evidentiary Issues*

Orlando argues that his due process rights were violated by the introduction of an altered surveillance video tape and a demonstrative mannequin that did not match the victim's height and weight. The Appellate Division held that neither of these claims had merit. Specifically, Orlando did not explain how the differences between the mannequin and the victim misled the jury. Moreover, there were only minor glitches in the video tape, and the problems with the tape went to its weight, not its admissibility. Nothing in the record or the briefs suggests that the Appellate Division was wrong. Nor is there is any merit to his related ineffective assistance of counsel claim. There is no reasonable probability that an objection, had one been made by Orlando's counsel, would have been successful.

## V.    *Improper Summation*

Orlando contends that the prosecutor exceeded the bounds of proper summation when he invited the jury to speculate that an apparent obstruction blocking the view of Orlando's wife's license plate was in fact a piece of tape that Orlando had used to prevent identification of the car. "Both prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments." *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978). While the inference that the "obstruction" or "shadow" making Orlando's license plate illegible was in fact a "strip of tape" is not an obvious one, it is nevertheless a fair inference that the prosecution was entitled to ask the jury to draw.

## VI. *Improper Charge*

Finally, Orlando argues that the trial judge improperly charged the jury. The Appellate Division held that this claim was not preserved for appellate review because it was not raised during the trial. That is an independent and adequate state ground upon which to deny this claim. Moreover, the argument is without merit for the reasons stated in Nassau County's Memorandum of Law. *See* Resp't's Mem. of Law at 47–48.

## CONCLUSION

I reserve ruling on the petition, because of the exhaustion problem that I have identified above. I appoint Jane Simkin Smith to represent the petitioner for the purpose of advising him on whether to withdraw the unexhausted claim, and to represent him on appeal. If petitioner decides to delete his *Brady* claim, I would grant him a certificate of appealability with respect to the issue of whether his Sixth Amendment right to confront and cross-examine witnesses was violated.

The Clerk is directed to close the case for administrative purposes until I receive a response from petitioner's counsel. I would expect such a response within sixty days from the date of this order.

**SO ORDERED.**

Brooklyn, New York
March 29, 2017

*Edward R. Korman*
Edward R. Korman
United States District Judge